IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIMON BRONNER, et al., <br><br> Plaintiffs, <br><br> and SIMON BRONNER, DERIVATIVELY ON BEHALF OF NOMINAL DEFENDANT, THE AMERICAN STUDIES ASSOCIATION, <br><br> Derivative Plaintiff, <br><br> v. <br><br> LISA DUGGAN, et al., <br><br> Defendants. | Case No: 1:16-cv-00740-RC |

## DECLARATION OF JOHN STEPHENS

I, John Stephens, hereby declare:

1. I am over eighteen years of age and have personal knowledge of the facts set forth herein.

2. I am the Executive Director of the American Studies Association ("ASA"), a Defendant in the above-referenced matter. I have been the Executive Director of ASA since 1983. Part of my responsibilities involve overseeing the financial books and records of ASA. The financial information set forth in this Declaration is taken from ASA's tax returns form 990, which is available to the public.

3. I have reviewed the Complaint, and in particular the allegations regarding any alleged financial loss to ASA as a result of the Resolution at issue. There has been no financial loss to ASA as alleged in the Complaint.

4.   Our fiscal year ends on June 30th. The Resolution at issue was passed by the Council in November 2013 and approved by a vote of the members which concluded on December 15, 2013.

5.   One of the allegations in the Complaint involves alleged loss of membership dues. The annual membership dues of ASA members has averaged $260,000 over the past 15 years. Dues revenue is the best index of gain or loss of members. There are a several factors that can influence the amount of the membership dues collected each year. Dues receipts regularly fluctuate quite aside from stances ASA takes, including cuts in university travel budgets, appeal of the conference sites, schedule overlap with other conferences, and the rise of new conferences to which our constituents go some years. A number of individuals pay dues only during the years they are on the conference program.

6.   The single most important factor for membership dues is the location of the meeting. For example, our 2015 annual meeting was held in Toronto, Canada. There were a number of active members who did not have valid passports, thus they didn't apply for the program, so they did not pay membership dues for that year.

7.   Our membership dues for fiscal year ending in June 2013, before the Resolution, amounted to $263,294.55. In the fiscal year following the Resolution, membership dues actually increased by $23,817.51 to $287,116.06. In our most recently concluded fiscal year ending June 30, 2015, membership dues were $261,876.00. In FY 2015 our annual meeting was held in Canada, and, as noted in paragraph 6, a decrease

in dues was expected. Nevertheless, these dues were nearly equal to those dues in the fiscal year before the Resolution and slightly above the average of $260,000.

8. Another of the allegations in the Complaint involves alleged extra monies spent on employee resources in support of the Resolution. There have been no extra monies spent on employee resources in support of the Resolution, either leading up to or following the Resolution.

9. Another allegation in the Complaint involves alleged loss of contributions and grants. In terms of contributions and grants, in the fiscal year preceding the Resolution, the total contributions and grants were $31,458. In the year following the Resolution, contributions and grants increased to $70,544.00, and there have been additional contributions since that time. Following the Resolution, a number of organizations and individuals instituted various public relations – oriented attacks on ASA because of the Resolution. A large amount of the contributions since the Resolution have been in support of ASA's Resolution. $49,000.00 is the total amount of the contributions that have been specifically designated by donors for ASA's support for the Resolution.

10. In response to the above-referenced attacks on ASA, ASA retained a media strategist and a Public Relations consultant for the total amount of $20,000.00. That $20,000.00 was paid out of the contributions that had been received by ASA as specifically designated for support of the Resolution.

11. The only other areas of expenses that were arguably related to the Resolution were in regards to ASA's 2014 annual meeting. First, there were certain

conference travel grants in the amount of $9,900.00 which brought scholars from both Israel and Palestine to discuss the Resolution at our 2014 annual meeting.

12. At the 2014 meeting, the ASA featured two panels (Scholars Under Attack/Students Under Attack) and a video exhibit. These highlighted attacks on students and scholars for their speech, actions, or support of various academic boycott resolutions under consideration at the time on their campuses and in a number of other associations. The panelists described assaults on their freedom of speech and association, academic freedom, faculty profiling, dismantling of academic programs in American Studies (as well as Women's, Gender, and Sexuality Studies, Ethnic Studies, and other allied programs), denial of access to education, and hostile environments on many campuses for faculty and student labor organizing and protest. Scholars Under Attack focused on the range of actions against academics in U.S. colleges and universities, from openly political broadsides to supposed budget cuts that target controversial or inconvenient programs, centers and departments. Students Under Attack focused on actions against students, including limits to free speech on campus, disciplinary action for political protest (such as boycott organizing), administrative union busting, defunding of controversial or inconvenient programs, departments and centers, and inequalities of race, class, gender and sexuality on campus.

13. There were $7,330.00 in expenses in support of the Scholars Under Attack initiative, which as described above, related to a multitude of issues, including but not limited to attacks on ASA because of the Resolution. The $7,330.00 was also paid out of

4

the contributions that had been received by ASA as specifically designated for support of the Resolution.

14. All of the expenses referenced in paragraphs 11 through 13 above were paid out of the contributions that had been received by ASA as specifically designated for support of the Resolution.

15. The only monies/expenses paid out by ASA related to the Resolution were less than the total amount of contributions made to ASA specifically designated for ASA in support of the Resolution. These contributions would not have been given to ASA had the Resolution and the resulting attacks on ASA not occurred.

16. When one compares the amount of funds received by ASA in direct support of the Resolution/Attacks on ASA for the Resolution with the amount of monies that arguably could have been expended by ASA in support of the Resolution/Attacks on ASA because of the Resolution, it is clear that there has been no financial loss on ASA's part as a result of the Resolution. If anything, there has been a net gain of at least $11,770.00.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this <u>8th</u> day of June, 2016.

*John F Stephens*
John F. Stephens

*2086546*