**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON, <br><br> Plaintiffs, <br><br> and SIMON BRONNER, Derivatively on Behalf of Nominal Defendant, THE AMERICAN STUDIES ASSOCIATION, <br><br> Derivative Plaintiff, <br><br>          v. <br><br> LISA DUGGAN, CURTIS MAREZ, AVERY GORDON, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, and THE AMERICAN STUDIES ASSOCIATION <br><br> Defendants, <br><br> and THE AMERICAN STUDIES ASSOCIATION, <br><br> Nominal Defendant. | Case No. 16-cv-00740-RC |

**AMENDED AND VERIFIED COMPLAINT**
**FOR DERIVATIVE AND DIRECT CLAIMS**

Plaintiff Simon Bronner, derivatively on behalf of the American Studies Association (the "ASA"), hereby brings claims for breach of fiduciary duty, ultra vires acts, and waste against Defendants Lisa Duggan, Curtis Marez, Avery Gordon, Neferti Tadiar, Sunaina Maira, and Chandan Reddy ("the Individual Defendants").  Plaintiff Bronner, along with Plaintiffs Michael

Rockland, Michael L. Barton, and Charles D. Kupfer (collectively, "the Direct Plaintiffs"), concurrently brings direct claims against the ASA for breach of contract, breach of the District of Columbia Non-Profit Corporations Act ("the Non-Profit Act"), ultra vires acts, and waste against all defendants.  The Plaintiffs claim, on information and belief, as follows:

## INTRODUCTION

1.      This case arises from the ASA's adoption of an academic boycott of Israel.  The ASA is a non-profit corporation with a stated mission – to advance the field of American Studies.  This mission is clearly stated in the ASA's corporate charter and in its annual filings with the IRS.  (*See* ASA Const., art. 1 § 2, as set forth up to and including at least January 5, 2016, and ASA Form 990 (2014), at 2.)  An academic boycott of a foreign country is simply outside of the ASA's authority to act.  Plaintiffs bring this lawsuit under D.C. Non-Profit Code § 29-403.04 to enjoin the ultra vires boycott and to bring related claims detailed below.

2.      The ASA's academic boycott of Israel was an overtly political act that was spearheaded by the Individual Defendants.  The larger political issues, however highly charged, are not germane to the resolution of this lawsuit.  The Complaint turns on straightforward legal questions:  whether or not an academic boycott of Israel is an act that falls under the ASA's "exempt purpose – advancing the study of American culture" (as the ASA describes it in IRS filings), ASA Form 990 (2014), at 2, whether the procedures governing the conduct of a vote by the ASA's members were complied with, and whether the Individual Defendants have complied with their other legal duties as officials of the ASA.

3.      Those legal questions arise in the context of an effort by the Individual Defendants to essentially convert an academic society, taking it from the hands of the scholars by and for whom it was created, and making that organization the tool of political activists.

4.      For over sixty years, the American Studies Association ("ASA") - an organization
devoted to the "promotion of the study of American culture" - has served as the home for leading
scholars of American studies.  *See* former ASA Constitution art. I, § 2, as it read at the time of
the Boycott Resolution and up to and including at least January 5, 2016.  Accordingly, the ASA
had undertaken a leading role in educating the American public on American culture.
Unfortunately, in the past few years, a small group of ASA officers and councilmembers have
engaged in a concerted effort to subvert and change the ASA's purpose, converting it into a
political advocacy organization with a particular focus on what they characterize as "social
change" that is to be sought both within and outside of America.

5.      The Individual Defendants' goals have nothing to do with the promotion of
scholarship and everything to do with the advancement of their own political views, and their
goal in hijacking the ASA is to use it to advance those views, not to advance the study of
American culture.

6.      The Individual Defendants seek to appropriate the entire apparatus of the ASA –
its name, its reputation, its office, its budget, and its membership, among other resources – and to
put these assets in the service of the Individual Defendants' political and non-scholarly goals.

7.      The insurgents' primary accomplishment thus far is an academic boycott of Israel,
imposed pursuant to a Resolution (the "Boycott Resolution") purportedly adopted by the ASA in
December of 2013.

8.      Defendants' effort to reorient the ASA from an academic association to a political
one (and particularly one that advocates for policy change in a foreign country) is contrary to
will of a substantial number of ASA members and has torn the group asunder. Plaintiff Simon
Bronner, an officer of the ASA and member of its governing council, as well as a member in
good standing of the ASA, and Plaintiff Michael Rockland, a member in good standing, have
repeatedly attempted to have the Defendant ASA usurpers abide by the rules and procedures set

forth in ASA's Constitution.  Defendants having made clear that they will not voluntarily redress Plaintiffs' concerns, Plaintiffs brings this action to recover damages, and to restore the ASA to its stated mission - the promotion of the study of American culture - so that the members of the ASA can once again faithfully exercise their membership.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction under 28 U.S.C. § 1332, inasmuch as there exists complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

10.     Venue is properly in the District of Columbia by operation of 28 U.S.C. § 1391, inasmuch as Defendant ASA is a non-profit organization incorporated under the laws of the District of Columbia.

## THE PARTIES

11.     Plaintiff Simon Bronner is Distinguished Professor of American Studies and folklore at the Pennsylvania State University.  Pursuant to the ASA Constitution, Article II, Section 1I, Mr. Bronner is an honorary lifetime member of ASA, and has full rights and privileges of ASA membership.  He is also an officer and member of the ASA's Governing Council.  He is a citizen of the Commonwealth of Pennsylvania.

12.     Plaintiff Michael Rockland is Professor of American Studies at Rutgers University, where he founded the Department of American Studies.  Pursuant to the ASA Constitution, Article II, Section 1I, Mr. Rockland is an honorary lifetime member of ASA, and has full rights and privileges of ASA membership.  He is a citizen of the State of New Jersey.

13.     Plaintiff Michael L. Barton is Professor Emeritus of American Studies at Pennsylvania State University.  He first joined the ASA as a graduate student in 1968, and was a

member for approximately 44 years.  Plaintiff Barton's membership to the ASA lapsed for approximately one year beginning in 2012.  When he attempted to pay his dues to reactivate his membership to vote on the boycott, the ASA was willing to accept him again as a member, but refused to let him vote.  He is a citizen of the Commonwealth of Pennsylvania.

14.     Plaintiff Charles D. Kupfer is Associate Professor of American Studies at Pennsylvania State University.  He first joined the ASA as a graduate student.  Plaintiff Kupfer allowed his ASA membership to lapse in 2014, after the adoption of the boycott of Israel.  He is a citizen of the Commonwealth of Pennsylvania.

15.     Nominal Defendant ASA is the nation's largest and oldest organization dedicated to the promotion of the study of American culture.  It is the central convening point for academics who study and educate on American culture.  The ASA was incorporated on May 4, 1951 as a private, nonprofit corporation organized under the laws of the District of Columbia. It has been designated by the Internal Revenue Service as a tax exempt organization under I.R.C. § 501(c)(3).  The ASA maintains its corporate office at 1120 19th Street, N.W., Suite 301, Washington, D.C. 20036.  Defendant ASA adopted a Constitution and Bylaws in effect as of December 2013, pertinent parts of which are attached as Exhibit A.

16.     Defendant Curtis Marez is Associate Professor at the University of California, San Diego, and past-president and Councilmember of the ASA.  He is a citizen of the State of California.

17.     Defendant Avery Gordon was a 2013 National Council Member.  She co-hosted, with Marez, the open panel "Town Hall" described below. Ms. Gordon is a citizen of the State of California.

18.     Defendant Neferti Tadiar served on the programming committee for the ASA's 2013 national convention, and participated in planning the activities that took place at the convention.  Ms. Tadiar is a citizen of the State of New York.

19.     Defendant Sunaina Maira was a member of the ASA's 2013 National Council and Executive Committee.  Ms. Mair is a citizen of the State of California.

20.     Defendant Lisa Duggan served on the 2013 Executive Committee and National Council, and was the incoming president for 2014-2015.  Ms. Duggan is a citizen of the State of New York.

21.     Defendant Chandan Reddy served on the 2013 Executive Committee and National Council.  Mr. Reddy is a citizen of the State of Washington.

## STATEMENT OF FACTS

22.     The ASA was founded in 1951. Under its Constitution:

> The object of the association shall be the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity.

ASA Const. art. I, § 2, as it read at the time of the boycott and at least until January 5, 2016.

23.     The ASA served this mission for over sixty years by maintaining its purpose, becoming the foremost organization for the study of American culture.  The ASA was primarily an academically-focused institution, reflecting the academic composition of its members, officers and directors.  The ASA's academic and educational focus was reflected on the ASA's website under a "What We Do" Section, dated October 31, 2013:

> The American Studies Association is the nation's oldest and largest association devoted to the interdisciplinary study of American culture and history.
>
> Chartered in 1951, the American Studies Association now has 5,000 individual members along with 2,200 library and other institutional subscribers.
>
> * Together these members represent many fields of inquiry, such as history,  literature, religion, art and architecture, philosophy, music, science, folklore, ethnic studies, anthropology, material culture,

museum studies, sociology, government, communications, education, library science, gender studies, popular culture, and others.

\* They include persons concerned with American culture, such as teachers, researchers, and other professionals whose interests extend beyond their specialty; faculty and students associated with American Studies programs in universities, colleges and secondary schools; museum directors and librarians interested in all segments of American life; public officials and administrators concerned with the broadest aspects of education.

\* They approach American culture from many directions but have in common the desire to view America as a whole rather than from the perspective of a single discipline.

*What the ASA Does*, American Studies Association, https://web.archive.org/web/

20131023031554/http://www.theasa.net/about/page/what_the_asa_does/ (archived as of Oct. 31,

2013).

24.     The ASA's organic documents also provide that "The corporation is organized

exclusively for education and academic purposes."  STATEMENT OF ELECTION TO

ACCEPT OF THE AMERICAN STUDIES ASSOCIATION, PARAGRAPH THIRD.

25.     Decades of ASA's unbroken practice comply with this mandate and, and both that

mandate and this long record of uniform practice prevent the ASA from taking action to advance

a particular position on questions of U.S. government policy.  Indeed, the ASA's bylaws

specifically mandate that "No substantial part of the activities of the corporation shall be the

carrying on of propaganda, or otherwise attempting, to influence legislation, and the corporation

shall not participate in, or intervene in (including the publishing or distribution of statements)

any political campaign on behalf of any candidate for public office."  STATEMENT OF

ELECTION TO ACCEPT OF THE AMERICAN STUDIES ASSOCIATION, PARAGRAPH

THIRD (4).

26.     Many members of the ASA, including but not limited to the Plaintiffs, have

contributed funds and effort to the ASA solely on the condition and understanding that this

practice would be followed and this mandate obeyed.

27.     From the date of its creation until the events at issue in this case, the ASA served as a hub for the exchange of ideas about American culture and for the "broadening of knowledge" about American culture.  Past Presidents of the ASA have included preeminent scholars of American studies, such as Carl Bode, the author of over 30 books, many of them on H. L. Mencken, Henry David Thoreau and Ralph Waldo Emerson; Daniel J. Boorstin, Librarian of the U.S. Congress; Daniel Aaron, a founder of the Library of America; and William H. Goetzmann, a historian of the West and winner of the Pulitzer Prize.

28.     In 2013, Curtis Marez was elected President of the ASA.  Professor Marez is Associate Professor at the University of California, San Diego and specializes in the study of race and political economy in popular culture and media.  In his candidate statement for the organization's presidency, Marez did not mention Israel or any academic boycotts, but instead premised his candidacy on suggesting that the ASA partly take the "Open University" instituted by the "Occupy Cal" movement at Berkeley as an inspiring model and dedicated ourselves to making knowledge less privatized and more equally distributed."

29.     Notwithstanding Marez's failure to mention the issue of an Israel boycott, and despite the fact that the ASA is an organization whose purpose is to study American culture, Israel became the central focus of the ASA's leadership under Marez's tenure as ASA President. At the ASA's annual meeting in 2013, the ASA's National Committee adopted a boycott of "Israeli academic institutions"   (the "Boycott Resolution).

30.     The ASA meeting at which the Boycott Resolution was presented and discussed, and to a certain extent, voted on, took place in the District of Columbia.  Each of the actions and omissions, described below, by the individual defendants was taken, and their impact felt, in the District of Columbia.  In addition, each of these actions did in fact, and was intended to, alter the nature and purpose of the ASA, a District of Columbia chartered and domiciled organization.

31.     The Boycott Resolution stated in full:

Whereas the American Studies Association is committed to the pursuit of social justice, to the struggle against all forms of racism, including anti-Semitism, discrimination, and xenophobia, and to solidarity with aggrieved peoples in the United States and in the world;

Whereas the United States plays a significant role in enabling the Israeli occupation of Palestine and the expansion of illegal settlements and the Wall in violation of international law, as well as in supporting the systematic discrimination against Palestinians, which has had documented devastating impact on the overall well-being, the exercise of political and human rights, the freedom of movement, and the educational opportunities of Palestinians;

Whereas there is no effective or substantive academic freedom for Palestinian students and scholars under conditions of Israeli occupation, and Israeli institutions of higher learning are a party to Israeli state policies that violate human rights and negatively impact the working conditions of Palestinian scholars and students;

Whereas the American Studies Association is cognizant of Israeli scholars and students who are critical of Israeli state policies and who support the international boycott, divestment, and sanctions (BDS) movement under conditions of isolation and threat of sanction;

Whereas the American Studies Association is dedicated to the right of students and scholars to pursue education and research without undue state interference, repression, and military violence, and in keeping with the spirit of its previous statements supports the right of students and scholars to intellectual freedom and to political dissent as citizens and scholars;

It is resolved that the American Studies Association (ASA) endorses and will honor the call of Palestinian civil society for a boycott of Israeli academic institutions. It is also resolved that the ASA supports the protected rights of students and scholars everywhere to engage in research and public speaking about Israel-Palestine and in support of the boycott, divestment, and sanctions (BDS) movement.

32.     Art. XI, § 3 of the ASA By-Laws in effect at the time of the vote on the Boycott

Resolution states:

Should an issue arise which, in the opinion of the Executive Committee or Council, seems to require public action, speech or demonstration by the association at a particular annual meeting, the Council shall meet to formulate a response. The Council shall convene an emergency meeting of the membership on the first full day of the annual meeting, to recommend a course of action, and conduct a public discussion of

the issue(s); and the vote of two-thirds of those in attendance may
approve the recommended action.

Pursuant to this provision, the Boycott Resolution could pass only if it were approved by two-thirds of the members voting convened on the first full day of the Annual Meeting.

33.   The vote did not conform to § 3.  The ASA National Committee put the Boycott Resolution to a vote of the ASA membership during a ten-day period in December 2013, not on the first day of the November meeting.  The ASA, upon information and belief, had approximately 5,000 members at the time.  However, according to the ASA, only 828 members voted for the resolution.  The ASA asserts that the resolution passed because only 1,252 members voted on the proposal.  In any event, if art. XI, § 3 governs, then the Resolution did not pass because it was not supported by two-thirds of those voting.  Two-thirds of 1252 is 835.

34.   Plaintiff Barton's membership to the ASA expired at the end of 2013.  Plaintiff Barton was unclear on his membership status, but when he attempted to vote online, he was unable to do so.  He immediately renewed his membership, paying a year's worth of dues.  Defendants were willing to accept his payment and renew his membership.

35.   Although Plaintiff Barton had paid his dues, his attempts to vote still failed.  ASA Executive Director John Stephens then told Plaintiff Barton he would not be permitted to vote on the Boycott Resolution, ostensibly because he renewed too late to vote.

36.   No provision of the ASA regulations governing membership restrict the right to vote on questions to be addressed by the membership to persons who became a member any specified period prior to the date on which such a vote was to be held.

37.   In fact, the ASA routinely sends emails to those whose memberships have expired just before annual elections, to remind them to pay dues so that they may vote in the upcoming election.

38.   On information and belief, at least one person that Plaintiffs know was able to vote after paying dues in December 2013, after the November 2013 meeting, just as Plaintiff

Barton attempted to do.

39.     Plaintiff Barton's position on the Boycott Resolution was publicly known and in particular was known to John Stephens.  On information and belief, Plaintiff Barton was not allowed to vote because of his views.

40.     On information and belief, in the period immediately prior to the vote, certain members of the ASA encouraged their students to join precisely so they could vote.  Such new members, hand-picked by current members who supported the Boycott Resolution and who knew how their students would vote, were selected because their teachers believed they knew how they would vote.  On information and belief, many such new members became members at approximately the same time that Barton sought to renew his membership.  These new members were all permitted to vote on the Boycott Resolution.

41.     The Boycott Resolution was advanced and defended on the ground that it responded to Israel's alleged restriction of academic activity in the formerly Jordanian-occupied territory that came under Israeli control after the Six Day War in 1967 (the "Territories").  There was no discussion of how the Boycott Resolution would affect "the promotion of the study of American culture" or "the broadening of knowledge among the general public about American culture."

42.     The Boycott Resolution's allegations concerning Israel's restriction of academic activity are, to put it mildly, subject to significant dispute.  It would have been appropriate for a scholarly, academic organization to present and review actual evidence before taking action on such allegations, and to foster a true and open debate as to such matters, on the basis of facts that proponents should seek to prove or at least illuminate, rather than merely allege.  The essentially political, rather than scholarly, nature of the Boycott Resolution is evident not only from its text, but also from the heavy-handed and decidedly nonacademic manner in which the Defendants rammed the resolution through.  The failure to present evidence and foster debate reflects the

proponents' departure from the mission of the ASA.

43.     Although the ASA is an organization run by and for scholars, and devoted to scholarship, no data or research performed with scholarly rigor, was presented at any time by the proponents of the Boycott Resolution regarding academic freedom in the Territories.

44.     None of the presentations made by the proponents of the Boycott Resolution mentioned any facts regarding the establishment of any academic communities in those territories, and, in particular, none addressed whether any of these communities were founded during Israel's administration of the area or during the reign of some other political entity.

45.     Thus, none of the ASA-conducted discussion about the Boycott Resolution addressed the question of who, in the period immediately before and after the date of Israel's founding, was or is responsible for the creation or growth of colleges and universities in the Territories, or any other aspect of the actual state of academic freedom in the Territories at any time.

46.     The steps leading to the vote on the Boycott Resolution, and its passage, constitute a series of abuses of power by the ASA leadership, including each of the Individual Defendants, which, among other things, actively prevented an informed and methodical discussion of the Boycott Resolution; prevented those opposing the Boycott Resolution from knowing the steps being taken by the leadership to have the Boycott Resolution pass; and actively prevented opponents of the Resolution from being heard equally by those voting on the Boycott Resolution.

47.     Among the abuses of power by the ASA leadership, including each of the Individual Defendants, was the conduct of a "Town Hall" discussion, which was held out to ASA members as a full discussion of the Boycott Resolution's merits.  In fact, however, as a result of the Individual Defendants' efforts, only speakers supporting the Boycott Resolution were invited to the podium at the "Town Hall."

48.     Notwithstanding the ostensible justification for the Boycott Resolution, the state of academic freedom in the Territories was not even a principal focus of the Town Hall.  Instead, each of the six speakers argued in support of the Boycott Resolution by saying simply that it should be adopted to help end the so-called settler-colonialist Zionist project, and America's complicity in maintaining an alleged apartheid state.

49.     The day after the Town Hall, another event was held at which the opportunity to speak was allocated randomly.  At this event some opponents of the Boycott Resolution were permitted to speak.  However, each speaker at this event was given the floor for a maximum of two minutes.

50.     In addition, the Individual Defendants, abusing their authority as members of the ASA's National Council, refused to circulate or post to the ASA's website several letters opposing the Resolution, signed by approximately 70 ASA members as well as other scholars who were not members of the ASA.  The Individual Defendants also refused to circulate a letter opposing the Boycott Resolution signed by eight former ASA presidents.

51.     All of the ASA's official correspondence, directed by the Individual Defendants, endorsed the boycott and included links to works that supported it.  On its homepage, in a section designated, "What's new in the community?" the ASA posted only pro-boycott news and links.

52.     As might be expected considering that only a minority of the ASA supported this resolution, the ASA's boycott has met with furious resistance and protest.  Many of the objections were ideological, disagreeing with the ASA's new position supporting an academic boycott of Israel.

53.     A second, significant ground for complaint was also raised by ASA members, namely, that the boycott is not part of the ASA's object to promote the "study of American culture" and is instead ultra vires.  Twelve ASA members who were winners of the ASA's Mary C. Turpie Award – an award founded in 1993, to recognize American Studies professors for

outstanding teaching and program development – wrote a letter to the ASA raising this objection. In their letter, the professors protested the Israel boycott resolution on numerous grounds, including that:

> [I]t is at odds with the purpose of the American Studies Association, which the ASA Constitution defines as "the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity." The boycott resolution divides the membership of the association by taking a political position that is extraneous to its statement of purpose, and impedes the "strengthening of relations among persons and institutions in this country and abroad devoted to such studies."

54.     The twelve Turpie winners also highlighted a third objection to the boycott, namely, that it restricts the spread of knowledge, contrary to the stated purpose of the ASA which is to "foster" the spread of knowledge about American culture.  The Turpie winners wrote:

> The ASA National Council's call for a boycott is wrong in principle. We are strongly opposed to the Israeli occupation and the Israeli government's policies in the Occupied Territory, including the continued expansion of settlements. But the principle at stake here has nothing to do with the merits of arguments about Israeli policy. A professional organization is supposed to foster and protect academic freedom – the right of scholars and teachers to pursue inquiry without political interference or censorship.

55.     The knowledge-limiting effect of this boycott was also the subject of a protest statement by the American Association of University Professors, which stated that:

> Since its founding in 1915, the AAUP has been committed to preserving and advancing the free exchange of ideas among academics irrespective of governmental policies and however unpalatable those policies may be viewed. We reject proposals that curtail the freedom of teachers and researchers to engage in work with academic colleagues, and we reaffirm the paramount importance of the freest possible international movement of scholars and ideas.

56.     This sentiment was echoed by Michael S. Roth, the President of Wesleyan University who referred to the ASA Israel boycott when he wrote in the *Los Angeles Times* on December 19, 2013:

> Boycotts don't serve these debates; they seek to cut them off by
> declaring certain academic institutions and their faculty off-limits. This
> tactic, in the words of Richard Slotkin, an emeritus professor here at
> Wesleyan University, "is wrong in principle, politically impotent,
> intellectually dishonest and morally obtuse."

Michael S. Roth, *Boycott of Israeli Universities: A Repugnant Attack on Academic Freedom*,

L.A. Times (Dec. 19, 2013), http://www.latimes.com/opinion/op-ed/la-oe-roth-academic-

boycott-israel-20131219-story.html.

57.     In contemporaneous letters and statements, ASA's leadership, including the

Individual Defendants, confirmed that their support for the boycott was motivated by reasons

outside the purpose of the ASA as set forth in the ASA's Constitution.  *See* ASA Const., as set

forth up to and including at least January 5, 2016.  For example, in a statement issued at the time

of the boycott adoption, the ASA justified this resolution as follows:

> The ASA's endorsement of the academic boycott emerges from the
> context of US military and other support for Israel; Israel's violation of
> international law and UN resolutions; the documented impact of the
> Israeli occupation on Palestinian scholars and students; the extent to
> which Israeli institutions of higher education are a party to state
> policies that violate human rights; and finally, the support of such a
> resolution by a majority of ASA members.

58.     Another example of public pronouncements demonstrating that the purpose of the

Boycott Resolution had nothing to with scholarship and everything to do with politics was issued

on December 31, 2013 by then-ASA President Defendant Marez, when he published an editorial

in the *Chronicle of Higher Education* attempting to justify the ASA's boycott.  In so doing, he

made clear that the Boycott Resolution has nothing to do with the mission of the ASA. In the

editorial Defendant Marez stated that "[t]he boycott is one prong of a global justice movement

that is anchored in international law and universal principles of human rights."  Curtis Marez, *In

Defense of an Academic Boycott of Israel*, Chronicle of Higher Education (Dec. 31, 2013),

http://chronicle.com/blogs/conversation/2013/12/31/in-defense-of-an-academic-boycott-of-

israel/.

59.     As the ASA Turpie award winners noted, and as the ASA's own words reveal, the ASA's Israel boycott is not reconcilable with the ASA's purpose, which is limited to the "promotion of the study of American culture" and "the broadening of knowledge" about American culture. Moreover, the ASA's Constitution provides that the ASA's goal is "the strengthening of relations among persons and institutions in this country and abroad devoted to such studies." *See* ASA Const., art. 1 § 2, as set forth up to and including at least January 5, 2016.  Boycotting a country does not strengthen relations "among persons and institutions in this country and abroad," and in fact contravenes that goal, as a boycott forcibly separates an entire country, including its academic institutions, students and professors, from the United States and from the community of U.S. and other scholars studying American culture.  Additionally, the ASA's Articles of Incorporation at the time of the vote provided that "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation…"  The ASA and the ASA National Council's actions are therefore ultra vires and in breach of the ASA's Constitution and other organic documents.

60.     Since the boycott's adoption, many members of the ASA have resigned in protest over enactment of the Boycott Resolution and the consequent belief that the ASA is no longer a scholarly society but instead an organization of political activists.  The exact number of people who have resigned is unknown because the ASA has not released this figure.  Each of these losses of membership injures the ASA financially by depriving it of the dues of its members.  This injury will continue for years because, Plaintiffs allege on information and belief, the vast majority of persons who become members of the ASA remain members, and continue to pay dues, throughout their academic careers and often even after they are retired.

61.     The boycott has met significant public opposition and led to a deterioration in the ASA's reputation as a scholarly organization.  The American Association of University Professors condemned the boycott as did Presidents of over 200 universities. At least two

chapters of the ASA have refused to honor the boycott.  In January 2014, 134 members of Congress sent a letter to ASA president Curtis Marez and president-elect Lisa Duggan condemning the boycott, stating that "Academic cooperation can be an important tool to help foster peace between Israelis and Palestinians, but you have chosen the unproductive path of isolation."

62.     Since the Boycott Resolution's adoption, the Defendants who are current and former Councilmembers have become even further dedicated to causing the ASA to pursue a new mission to promote their political views, including the boycott and criticism of Israel. Professor Marez began a fund-raising campaign in which the ASA requested that "everyone who has supported the boycott as well as those who are in solidarity with the ASA" donate to the ASA.  During the Gaza War in the summer of 2014, the ASA alleged that Israel maintains a "long-standing practice of denying an entire people the basic necessitates of life and freedom," and "call[ed] upon the United States to withdraw political, financial, and military support from the state of Israel."

63.     In November 2013, ASA president from 2014-2015, Defendant Lisa Duggan, defended the ASA's boycott "as a nonviolent means to secure Palestinian rights and freedom." Regardless of whether the boycott actually advances or hinders this goal, and at what cost, the ASA's charter calls for the advancement of American studies, not "securing Palestinian rights and freedoms" - and certainly not at the expense of advancing American studies.

64.     As part of the turn to promote an Israel boycott and otherwise criticize Israel, the Individual Defendants have purported to cause the ASA to adopt a new mission as a "social justice" organization.  The ASA's reorientation to prosecuting a "social justice" agenda has not been adopted in a manner consistent with the procedure mandated by the ASA's organic documents. Instead, the ASA's current and recent leadership have simply rewritten the ASA's website and caused the organization to issue statements inconsistent with its decades-long

commitment to scholarship about American studies.

65. Thus, on November 7, 2014, the ASA issued a press release announcing a "Nationwide Initiative to Document Assaults on Academic Freedom and Higher Education" in response to the failure of the University of Illinois to hire a professor due to his statements on Twitter concerning the Gaza war. In its press release, the ASA noted that it was "one of the leading scholarly communities supporting social change." This statement explicitly admitted that, in the view of the Defendants, the ASA's mission is no longer limited to the scholarly one specified by its organic documents – the promotion of the study of American culture – but has instead changed. The ASA further stated that it was acting in response to what it perceived to be "hostile environments on many campuses for faculty and student labor organizing and protest." Upon information and belief, this campaign is also a result of the ASA's response to protests over its Israel boycott and is conducted at the behest of the Individual Defendants who are current Councilmembers.

66. The ASA's purported new purpose and reorientation is also now reflected in a new website blurb for what the ASA "does." Paragraph 23 of this Complaint detailed the ASA's statement on "What the ASA Does" as of October, 31 2013. This statement has now been deleted on the website, and the ASA now states that:

> The ASA promotes meaningful dialogue about the U.S., throughout the U.S. and across the globe. Our purpose is to support scholars and scholarship committed to original research, innovative and effective teaching, critical thinking, and public discussion and debate. We are a network of scholars, teachers, writers, administrators and activists from around the world who hold in common the desire to view US history and culture from multiple perspectives. In addition to being the oldest and largest scholarly association devoted to the interdisciplinary study of US culture and history in a global context, we are also one of the leading scholarly communities supporting social change.

*What the ASA Does*, American Studies Association, http://www.theasa.net/about/ page/what_the_asa_does/ (accessed Nov. 30, 2014). Upon information and belief, this new statement and purpose was made at the behest of the Individual Defendants who were

Councilmembers at the time.

67.     The effort to transform the ASA from a society of scholars and into an
organization devoted to "social change," including an Israel boycott, has led to significant
reputational damage to the ASA as well as numerous member resignations.  The *New York Times*
reported that:

> With its recent vote to boycott Israel's higher-education institutions to
> protest the country's treatment of Palestinians, the American Studies
> Association has itself become the target of widespread criticism and
> ostracism. It has gone from relative obscurity to prominence as a pariah
> of the United States higher-education establishment, its experience
> serving as a cautionary tale for other scholarly groups that might
> consider taking a similar stand on the Middle East.

Peter Schmidt, *Backlash Against Israel Boycott Throws Academic Association on Defensive*,
N.Y. Times, Jan. 5, 2014, *available at* http://www.nytimes.com/2014/01/06/us/backlash-against-
israel-boycott-throws-academic-association-on-defensive.html?_r=0.

68.     Upon information and belief, the ASA, at the behest and direction of the
Individual Defendants, has also expended significant monetary and employee resources in
support of this boycott and the ASA's putative new purpose, at odds with its constitutional one.

69.     While the ASA, at the behest and direction of the Individual Defendants, is
conducting and has conducted itself as a new organization, it has not held a membership vote to
amend its constitutionally limited purpose.  Nor have the Individual Defendants attempted to
start a new "social justice" organization devoted to promoting the boycott and isolation of Israel
or advancing their other political opinions, among other pursuits.  Instead, the Individual
Defendants have, over the protests of members, attempted to hijack the current ASA from an
academic organization devoted solely to the study of American culture to a political organization
that pursues what Defendants call "social justice."  This trampling of member rights is ultra vires
and harmful to – indeed, it destroys – the ASA's original academic mission.

**DERIVATIVE ALLEGATIONS**

70.     Plaintiff Simon Bronner bring Counts I-III of this action derivatively to redress injuries suffered by the ASA as a direct result of the breaches of duty and related misconduct on the part of the Individual Directors.

71.     Plaintiff Simon Bronner was a member, officer and member of the ASA's Governing Council at the time of the acts above and continuously during the time of the wrongful course of conduct by the Individual Directors alleged herein, and continues in such positions.

72.     Plaintiff Simon Bronner will adequately and fairly represent the interests of the ASA and its members in enforcing and prosecuting their rights, and he has retained counsel competent and experienced in derivative litigation.

73.     Under the D.C. Non-Profit Act, a derivative claim can be brought by "[a]ny director or member of a designated body." D.C. Non-Profit Act § 29–411.02(a)(2). Pursuant to the By-laws of the ASA, the Governing Council of the ASA shall include as a member the editor of the Encyclopedia of American Studies. ASA By-laws art. 5, § 1. Simon Bronner is the current editor of this volume and thus is a member of the governing body of the ASA and he is acknowledged as such on the website of the ASA. http://www.theasa.net/about/page/officers_and_committees/. He is therefore qualified to bring this derivative action under the laws of the District of Columbia.

74.     The Council of the ASA serves as its Board of Directors. Demand upon the Council that it initiate prosecution of the claims stated in this Complaint is futile because it is apparent that a majority of the board is unwilling to impartially address the allegations raised in this complaint. *Rales v. Blasband*, 626 A.2d 1364 (Del. 1993). A majority of the current governing council has openly acknowledged and endorsed the boycott of Israel. Of the 23-member council at least 12 have expressed open hostility to Israel and endorsement of the ASA's

boycott of Israel.  For a majority of the members, a number of documented instances of this support is noted below:

i.      J. Kehaulani Kauanui was a councilmember of the ASA at the time of the adoption of the Boycott Resolution and whole-hearted supporter of that resolution.  She is an advisory board member of the U.S. Campaign for the Academic and Cultural Boycott of Israel (USACBI), "a U.S. campaign focused on a boycott of Israeli academic and cultural institutions, responding to the call of Palestinian civil society to join the Boycott, Divestment, and Sanctions movement against Israel." (http://www.usacbi.org.)  She has been quoted as stating that the decision by the American Anthropological Association to put an Israel boycott resolution to a full membership vote was "a huge win for keeping both Palestine and academic boycott on the table within the association."  Alex Kane, *The Year Ahead in Academic Boycotts of Israel*, Mondoweiss (Jan. 6, 2015), http://mondoweiss.net/2015/01/academic-boycotts-israel/#sthash.1nnpNWkc.dpuf.

ii.     Steven Salaita is a vociferous advocate of a boycott of Israel, and a member of the organizing collective of USACBI.  He has among other writings, penned an article on how to boycott Israel in academia.  Steven Salaita, *How to Practice BDS in Academe*, The Electronic Intifada (May 27, 2014), https://electronicintifada.net/blogs/steven-salaita/how-practice-bds-academe.

iii.    Lisa Duggan is a vociferous advocate of a boycott of Israel, and as President of the ASA defended the boycott in print.  Lisa Duggan, *Blowback: Academic Boycott of Israel Gives Voice to Peaceful Protest*, Los Angeles Times (Nov. 13, 2014), http://www.latimes.com/opinion/opinion-la/la-ol-israel-boycott-american-studies-blowback-20141113-story.html.

iv.    Robert Warrior is future President of the ASA and has repeatedly attacked Israel in print stating publicly he advocates a boycott.  Robert Warrior, *Palestine Without Smears: Why*

*Israel and Natives Aren't Natural Allies*, Indian Country Today (Jan. 29, 2014), http://indiancountrytodaymedianetwork.com/2014/01/29/palestine-without-smears-why-israel-and-natives-arent-natural-allies.

    v.      David Roediger is an advocate of the boycott and has repeatedly defended the boycott as President of the ASA.  Megan Hanna, *Students and Academics Challenge the "Palestine Exception" to Free Speech in US*, Mondoweiss (Dec. 21, 2015), http://mondoweiss.net/2015/12/challenge-palestine-exception/.

    vi.     Jodi Melamed is an advocate of the boycott, and co-authored a statement in support of the vote.  Roderick A. Ferguson and Jodi Melamed, *Academic Freedom with Violence*, Mondoweiss (Feb. 16, 2014), http://mondoweiss.net/2014/02/academic-freedom-violence/.

    vii.    Nadine Naber is a vociferous advocate of boycotting Israel and a member of the Organizing Collective of the USACBI.  In addition to the ASA boycott, she is also one of the anthropologists who submitted the resolution of the American Anthropological Association to boycotts Israeli academic institutions.  *The Resolution*, Anthropologists for the Boycott of Israeli Academic Institutions, https://anthroboycott.wordpress.com/the-resolution/ (last visited Apr. 15, 2016).  Additionally, she co-authored an article on the importance of boycotting Israeli academic institutions.  Junaid Rana and Nadine Naber, *Why Voting Matters: The American Anthropological Association's Upcoming Vote to Boycott Israeli Academic Institutions*, Anthropologists for the Boycott of Israeli Academic Institutions (Apr. 11, 2016), https://anthroboycott.wordpress.com/2016/04/11/why-voting-matters-the-american-anthropological-associations-upcoming-vote-to-boycott-israeli-academic-institutions/#more-1159. Further, she signed on to statement from Palestinian and other Arab-American scholars and writers in the wake of the ASA vote, "to endorse the academic boycott of Israeli institutions, and the backlash against it by anti-Palestinian groups." Ali Abunimah, *Palestinian, Arab*

*American Scholars Back ASA's Israel Boycott, Condemn "Intimidation"*, Electronic Intifada (Jan. 8, 2014), https://electronicintifada.net/blogs/ali-abunimah/palestinian-arab-american-scholars-back-asas-israel-boycott-condemn-intimidation.

  viii. Mari Yoshihara, an ex officio editor of the American Quarterly, was also an advocate of boycott. Following the University of Hawaii's condemnation of the ASA vote, Yoshihara signed onto a response condemning the University administration, and in support of the ASA resolution in support of the academic boycott of Israel.  Adam Horowitz, *University of Hawai'i Faculty Responds to Administration's Condemnation of ASA Boycott Resolution*, Mondoweiss (Feb. 27, 2014), http://mondoweiss.net/2014/02/administrations-condemnation-resolution/#sthash.gJzrxnhc.dpuf.  Further, in 2009, she signed onto a letter addressed to President Obama on the Lebanese Campaign for the Boycott of Zionism.  *Lebanese Campaign for the Boycott of Zionism: In Solidarity with the Palestinian Call for BDS*, BDS News (Jan. 12, 2009), https://boycottzionism.wordpress.com/bds-news/page/262/.

  ix. Martin Manalansan was a member of the ASA Council who recommended the boycott.  William A. Jacobson, *American Studies Association Leadership Recommends Academic Boycott of Israel*, Legal Insurrection (Dec. 4, 2013, 9:50 PM), http://legalinsurrection.com/2013/12/american-studies-association-leadership-recommends-academic-boycott-of-israel/.  He co-authored an article which stated, "we have considered our struggle to be part of the overall BDS movement.  We strongly believe in responding to the call to action in the fight against the violent and inhumane treatment of the Palestinian people by the Israeli state. . . ." Martin Manalansan and Ellen Moodie, *"Waiting" in the Neoliberal University: The Salaita Case and the Wages of an Academic Boycott*, Savage Minds (July 28, 2015), http://savageminds.org/2015/07/28/waiting-in-the-neoliberal-university-the-salaita-case-and-the-wages-of-an-academic-boycott/.

x.      Marisol LeBrón, an ASA student councilor, was a member of the ASA Council that recommended the boycott.  William A. Jacobson, *American Studies Association Leadership Recommends Academic Boycott of Israel*, Legal Insurrection (Dec. 4, 2013, 9:50 PM), http://legalinsurrection.com/2013/12/american-studies-association-leadership-recommends-academic-boycott-of-israel/.

xi.      Christina Hanhardt, an ASA Council Member, was an advocate of the boycott. In 2011 she signed a letter asking organizers of an international tourism conference in Berlin to boycott Israeli participation at the conference, accusing Israel of "pinkwashing."  The letter said, "We would like to bring your attention that you are in danger of supporting apartheid policies of the Israeli government which are infringing upon the human and civil rights of the Palestinian population. We urgently appeal to you not to blindly side with the official Israeli public relations policies, which looks to distract the international public from the colonial, occupation and settlers policies through a polished image of Israel."  *Open Letter to Those Responsible for the ITB*, BDS Kampagne (Mar. 10, 2011), http://bds-kampagne.de/wp-content/uploads/2011/03/110310_OpenLetter_ITB_EN.pdf.

x.      Sunaina Maira is a member of the Organizing Committee of the USACBI, and featured speaker for the USACBI, and one of the Individual Defendants here.

75.      Notwithstanding and without waiving his claim that Demand would be futile and without admitting that the Council maintains the independence or objectivity to investigate such a demand effectively and impartially, Plaintiff Bronner has issued a written Demand to the Council that it investigate these claims and that it cause the ASA to prosecute such claims.

76.      Waiting ninety days to receive the Council's response to this Demand will irrevocably harm the ASA and its members.  Each day without redress is a day when the scholarly goals for the ASA established at its creation, and desired by its scholar members, are not pursued, and when the ASA instead continues to be used to advance the political goals and

- 24 -

agenda of the Individual Defendants – all the expense of the ASA itself and its scholar members.

77.     For the foregoing reasons, Plaintiff satisfies Federal Rule of Civil Procedure Rule 23.1 and may properly proceed with the prosecution of the derivative claims set forth in the present action.

## COUNT ONE

### Derivative Claim for Breach of Fiduciary Duty
### Against the Individual Defendants by Plaintiff Bronner

78.     Plaintiff Bronner repeats and realleges each of the allegations set forth in ¶¶ 1–72 above as if fully set forth herein.

79.     As members of the Governing Council of the ASA, the Individual Defendants owe the ASA and its members the highest duties of care, loyalty, good faith, and candor. Moreover, these duties include the obligation to fairly represent the interests of the ASA and its members and to abide by the dictates of its organizational documents and the D.C. Non-Profit Act.  The Individual Defendants' duties also include the duty not to engage in conduct that is in their own self-interest and to instead faithfully represent the mission of the ASA.

80.     However, as explained above, the Individual Defendants have breached their fiduciary duties and failed to act in good faith by consciously attempting to appropriate the assets and reputation of the ASA to achieve purposes different from and at odds with, those purposes and mission to which the ASA is committed, and which the ASA was created to pursue.  The Individual Defendants also breached their fiduciary duty by pushing through the Boycott resolution and manipulating the process to obtain the alleged approval.  As a result of breaching their fiduciary duties, the Individual Defendants have harmed the ASA and its members and are liable to the ASA for the damages incurred.  Since their conduct was not in good faith, it is not exculpated by § 29–306.31 of the D.C. Non-Profit Act.  Plaintiff is entitled to recover damages from the Individual Defendants incurred by the ASA related to this breach of fiduciary duty.

## COUNT TWO

### Derivative and Direct Claim for Ultra Vires Action
### Against All Defendants by All Plaintiffs

81.     Plaintiffs repeat and reallege the allegations set forth in ¶¶ 1–75 as if fully set forth herein.

82.     Article II of the ASA's Constitution, as in effect on the date of the alleged passage of the Boycott Resolution, limited its purpose and activities to the "promotion of the study of American culture.".  In addition, the ASA's Articles of Incorporation at the time of the vote provided that "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation…"

83.     The Defendants' operation of the ASA as "a social justice" organization, including through the promotion of a boycott against Israel, is outside and inconsistent with the purpose of the ASA's Constitution.

84.     Defendants' ultra vires conduct is harmful to the Plaintiffs, other members of the ASA, and the ASA itself.  This ultra vires conduct has frustrated the legitimate aims and purposes of the ASA, resulting in significant harm to the Plaintiffs and other ASA members, and to reputational damage, including public criticism of the ASA, which the ASA has attempted to fend off at the expense of tens of thousands of dollars, and loss of charitable donations, to the ASA. This ultra vires conduct has also resulted in the improper expenditure of ASA funds related to membership dealings, public relations, legal matters, and other items including employee time and effort.  These actions have also resulted in a significant number of membership resignations and failure of individuals to join the ASA, resulting in a significant and ongoing loss of revenue for the ASA. As a proximate result of Defendants' abuses of power and disregard for ASA's foundational documents, Plaintiffs have suffered significant economic and reputational damage. Defendants' actions have caused and continue to cause irreparable injury to ASA's reputation.

85.     Section 29–403.04 of the D.C. Non-Profit Act authorizes a member to challenge an ultra vires act in a legal proceeding, and it authorizes the award of injunctive relief and damages by a court.  Plaintiffs are entitled to recover damages from the Individual Defendants incurred by the ASA, and to declaratory and to injunctive relief restoring the ASA to its constitutional purpose.

## COUNT THREE

### Derivative and Direct Claim for Waste
### Against All Defendants by All Plaintiffs

86.     Plaintiffs repeat and reallege the allegations set forth ¶¶ 1–80 as if fully set forth herein.

87.     The doctrine of waste defines "waste" as the "exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."  See 3A *Fletcher Cyc. Corp.* § 1102 at 150–51 (2010).  The essence of a waste claim is "the diversion of corporate assets for improper or unnecessary purposes." *Id.*

88.     The Individual Defendants' decision to expend ASA resources to advocate, conduct a vote on, and declare enacted, the Boycott Resolution was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests. That decision went far so beyond the bounds of reasonable business judgment that the only possible determinant of these actions by the Individual Defendant is their bad faith, which consists of their conscious determination to have the ASA act beyond the purposes established by its organic documents and solely to advance their own personal political goals.

89.     These actions resulted in the damages alleged herein and outlined in prior Counts and previous paragraphs.  Plaintiffs are entitled to recover damages from the Individual Defendants on behalf of the ASA.

- 27 -

**COUNT FOUR**
**(IN THE ALTERNATIVE)**

**Direct Claim for Breach of Contract**
**Against the ASA by All Plaintiffs**

90.     Plaintiffs repeat and reallege the allegations set forth in ¶¶ 1–84 as if fully set forth herein.  Plaintiffs plead this Count Four in the alternative to Count Five.

91.     "It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members since the continuing relationship between the organization and its members manifests an implicit agreement by all parties concerned to abide by the bylaws."  *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).

92.     Boycotting Israel was an issue "which, in the opinion of the Executive Committee or Council, seem[ed] to require public action, speech or demonstration by the association at a particular annual meeting" per art. XI, § 3 of the ASA By-Laws.  Accordingly, pursuant to art. XI, § 3 of the ASA By-Laws, the Boycott Resolution could pass only if it were approved by two thirds of the members voting on the first full day of the Annual Meeting.

93.     The ultimate vote tally, and the only tally publicly available, is not of the votes cast at the Annual Meeting, but of the votes cast at the Annual Meeting and by hundreds of other members who were not present at the Annual Meeting.  In addition, a two-thirds majority of the 1,252 members who allegedly voted on the resolution would have been 834 or 835.  The alleged number of those supporting the Boycott Resolution fell short of that number. In addition, the vote was not held on the first full day of the annual meeting that occurred that year, November 20, 2013.  For these reasons, the National Council's announcement that the Boycott Resolution had passed was incorrect and a breach of the ASA's By-Laws.

94.     The breach of the ASA's contractual obligations to Plaintiffs harmed Plaintiffs, resulting in the damages set forth in Count Two of the complaint.  Plaintiffs are entitled to

declaratory and injunctive relief against the implementation of the Boycott Resolution produced as a consequence of Defendants' breach.

## COUNT FIVE
## (IN THE ALTERNATIVE)

### Direct Claim for Breach of the D.C. Non-Profit Corporations Act
### Against the ASA by All Plaintiffs

95.     Plaintiffs repeat and reallege the allegations set forth in ¶¶ 1–89 as if fully set forth herein.  Plaintiffs plead this Count Five in the alternative to Count Four.

96.     Section 29-405.24 of the D.C. Non-Profit Corporations Act sets forth the requirements for a quorum for a vote of the members of groups like the ASA.  It states that:

> "Members entitled to vote as a separate voting group may take action on a matter at a meeting only if a quorum of those members exists with respect to that matter. Except as otherwise provided in the articles of incorporation or bylaws, a majority of the votes entitled to be cast on the matter by the voting group constitutes a quorum of that voting group for action on that matter."

97.     Accordingly, in the event that art. XI, § 3 of the ASA By-Laws did not govern the Israel Boycott, a quorum on the measure would have been "a majority of the votes entitled to be cast on the matter by the voting group."

98.     Upon information and belief, a "majority of the votes entitled to be cast on the matter" of the Boycott Resolution would have had to exceed 2,500 members—a majority of the ASA's voting membership. The Boycott Resolution was thus adopted in breach of § 29-405.24 of the D.C. Non-Profit Corporations Act and is null and void.

99.     The wrongful adoption of the Boycott Resolution in breach of the D.C. Non-Profit Corporations Act was harmful to the Plaintiffs, resulting in the damages set forth in Count One of the complaint. Plaintiffs are entitled to declaratory and injunctive relief against the

implementation of the Boycott Resolution purportedly adopted without a lawful quorum.

## COUNT SIX

### Direct Claim for Breach of Contract
### Against the ASA by Plaintiff Barton

100.    Plaintiff Barton repeats and realleges the allegations set forth in ¶¶ 1–95 as if fully set forth therein.

101.    By offering membership on the terms set forth in its website, ASA makes an offer capable of being accepted and forms a contract entitling those persons who accept that offer to the benefits of membership.

102.    One of the contractual benefits of membership is the right to vote on matters put before the ASA's members for approval.  Plaintiff Barton accepted the ASA's offer for membership in 2013, prior to the vote on the Israeli boycott.

103.    Notwithstanding Barton's acceptance of the ASA's offer, the ASA – acting through John Stephens - breached its contractual obligation to Barton by refusing to accept his vote on the Boycott Resolution.  There was no valid basis for refusing him the right to vote on the Boycott Resolution.

104.    The ASA official who refused to accept Barton's vote was familiar with Barton's position on the issue, and refused to accept his vote because the ASA official knew that Barton was voting against the Boycott Resolution.  Had Barton been known as a person who supported the Boycott Resolution, his vote would have been accepted.

105.    On information and belief, many members of the ASA who approved of the Boycott Resolution urged their students to join the ASA in the period immediately before the vote precisely so that they could cast a vote in support of the Resolution.  These people were no more or less entitled to vote than Plaintiff Barton, and their votes were accepted simply and only because they were voting in favor of, rather than against, the Resolution.

106.    Such discrimination against Barton regarding his right to vote, on the basis of the way he chose to vote, is a violation of Barton's contractual rights to membership privileges as those rights are created by the ASA and its regulations.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court enter judgment against the Defendants and in favor of the Plaintiffs, and award:

1)      A declaration that the vote of the ASA membership with respect to the Israel boycott was ultra vires, in breach of Defendants' contractual obligations or of the D.C. Non-Profit Corporations Act, and wasteful;

2)      A declaration that the Individual Defendants breached fiduciary duties owed to the ASA;

3)      A permanent injunction enjoining and restraining the ASA from taking any action that does not strictly follow the statement of purpose in Defendant ASA's Constitution;

4)      A permanent injunction enjoining and restraining the ASA from taking any action to enforce the Israel Boycott purportedly adopted by the ASA's National Council and the ASA;

5)      A permanent injunction enjoining and restraining the ASA from making any payments or expenditures in violation of the Defendant ASA's Constitution, including in support of the Israel boycott;

6)      Actual damages on behalf of the ASA from the Individual Defendants, jointly and severally, in an amount to be determined at trial but in excess of $75,000;

7)      The costs and disbursements of this action, including attorneys' and experts' fees; and

8)      Such other and further relief as is just and equitable.

Dated:  June 23, 2016               Signed:   */s/ Jerome M. Marcus*
                                              Jerome M. Marcus

**MARCUS & AUERBACH LLC**

Jerome M. Marcus, Esq.  (admitted pro hac vice)
Jonathan Auerbach, Esq.  (admitted pro hac vice)
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250


**BARNES & THORNBURG LLP**

Scott Godes, Esq.  (D.C. Bar No. 463674)
Devin Stone, Esq.  (D.C. Bar No. 1022055)
1717 Pennsylvania Avenue NW, Suite 500
Washington, DC 20006-4623
(202) 408-6928

L. Rachel Lerman, Esq.  (admitted pro hac vice)
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3871


**THE LOUIS D. BRANDEIS CENTER
   FOR HUMAN RIGHTS UNDER LAW**

Kenneth L. Marcus, Esq.  (D.C. Bar No. 437391,
D.D.C. member)
Jennifer Gross, Esq.  (D.C. Bar No. 1003811,
D.D.C. bar application pending)
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006-4623
(202) 559-9296

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 23, 2016, I caused to be filed Plaintiffs' *Amended and Verified Complaint* with the Clerk of Court using the CM/ECF system, which will send notice of this filing to all parties registered to receive such notice.

<u>/s/ *Jerome M. Marcus*_____</u>
Jerome M. Marcus