**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SIMON BRONNER, MICHAEL
ROCKLAND, CHARLES D. KUPFER, and
MICHAEL L. BARTON,

Plaintiffs,

and SIMON BRONNER, Derivatively on
Behalf of Nominal Defendant, THE
AMERICAN STUDIES ASSOCIATION,

Derivative Plaintiff,                                    Case No. 16-cv-00740-RC

v.

LISA DUGGAN, CURTIS MAREZ, AVERY
GORDON, NEFERTI TADIAR, SUNAINA
MAIRA, CHANDAN REDDY, and THE
AMERICAN STUDIES ASSOCIATION

Defendants,

and THE AMERICAN STUDIES
ASSOCIATION,

Nominal Defendant.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
RENEWED PARTIAL MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT .................................................................................................2

FACTS ACTUALLY AT ISSUE IN THIS CASE .......................................................................3

ARGUMENT ......................................................................................................................10

I.   THE AMENDED COMPLAINT ALLEGES FACTS ESTABLISHING THAT EACH
     INDIVIDUAL DEFENDANT HAS SUBMITTED HIM OR HERSELF TO THE
     JURISDICTION OF THIS COURT ...............................................................................10

II.  THIS COURT CANNOT DISMISS FOR LACK OF SUBJECT MATTER
     JURISDICTION BECAUSE DEFENDANTS HAVE NOT SHOWN AND CANNOT
     SHOW TO A "LEGAL CERTAINTY" THAT THE AMOUNT IN CONTROVERSY
     IS LESS THAN $75,000 ............................................................................................13

III. DEFENDANTS' ATTACK ON PLAINTIFF BRONNER'S RIGHT TO BRING
     DERIVATIVE CLAIMS FAILS BECAUSE IT IGNORES BOTH THE FACTS PLED
     AND THE GOVERNING LAW
     ...........................................................................................................................19

IV.  PLAINTIFFS PROPERLY STATE A CLAIM FOR *ULTRA VIRES* MISCONDUCT   25

V.   THE COMPLAINT DOES NOT VIOLATE THE FIRST AMENDMENT ...................29

     A.   Plaintiffs' Claims Arise Under Generally Applicable Laws and Do Not Violate
          the First Amendment ........................................................................... 30

     B.   Plaintiffs' Claims Seek To Enforce Self-Imposed Restrictions that Do Not
          Violate the First Amendment................................................................ 31

     C.   The ASA Voluntarily Waived the First Amendment Argument Defendants Raise
          Here...................................................................................................... 34

VI.  PLAINTIFFS' DIRECT CLAIMS AGAINST THE INDIVIDUAL ARE ENTIRELY
     APPROPRIATE...........................................................................................................35

VII. DEFENDANTS BREACHED THEIR OBLIGATIONS TO PLAINTIFFS UNDER
     CONTRACT LAW AND THE NON-PROFIT CORPORATIONS ACT ...................... 36

CONCLUSION...................................................................................................... 40

ii

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 366 (3d Cir. 2014) ................................ 28

*Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13 (D.D.C. 2003) .......................................................... 17

*Anderson v. Enterprise Lodge No. 2, Independent Order of Odd Fellows*, 80 Wn. App. 41,
    906 P.2d 962, 966 (Wash. Ct. App. 1995) ................................................................................. 29

*Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) ...................................................................... 21

*Beam*, *supra*, 845 A.2d at 1049 ................................................................................................... 21

*Behradrezaee v. Dashtara*, 910 A.2d 349, 358 (D.C. Ct. App. 2006) ........................................ 21

*Blum v. Yaretsky*, 457 U.S. 991, 1004-05, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) ................ 33

*Brown v. Hart, Schaffner & Marx*, 96 FRD 64 (N.D. IL. 1982) .................................................. 23

*Cable Invest., Inc. v. Woolley*, 680 F. Supp. 174, 177 (M.D.Pa.1987) ........................................ 33

*Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984) .......................... 12
*Cf. Dugan v. Rank,* 372 U.S. 609 (1963) ..................................................................................... 36

*Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S. Ct. 2513,
    115 L. Ed. 2d 586 (1991) ................................................................................... 30,31,32,34

*Columbia Broadcasting System v. Democratic National Committee*,
    412 U.S. 94, 93 S. Ct. 2080, 36 L. Ed. 2d 772 (1973) ............................................................. 32

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd*, 15 F. Supp. 2d 1
    (D.D.C. 1997) .......................................................................................................................... 26

*Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1 (D.D.C. 2014),
    aff'd, No. 15-7026, 2016 WL 1657956 (D.C. Cir. Apr. 26, 2016) ................................. 14,18,26

*Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723 (D.C. Ct. App. 2011) ..... 11,12,19,26,35

*Davis v. Cox*, No. 11-2-01925-7 (Wash. Super. Ct. Feb. 25, 2016) ............................................ 28

*Dumosch*, 13 F. Supp. 3d at 141 ................................................................................................. 13

*Edwards v. Habi*b, 397 F.2d 687, 691 (D.C. Cir. 1968) .............................................................. 33

*Erie Telecommunications, Inc. v. Erie*, 853 F.2d 1084, 1099 (3d Cir. 1988) .............................. 34

*Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008) ..................................................... 19

*Family Fed'n for World Peace v. Hyun Jin Moon,* 129 A.3d 234 (D.C. Ct. App. 2015) ... 11,24,32

*Flocco v. State Farm Mut. Auto. Ins. Co*., 752 A.2d 147, 163 n.20 (D.C. 2000) ........................ 12

*Franchise Tax Board of Cal. v. Alcan Aluminum, Ltd*., 493 U.S. 331, 336,
     110 S. Ct. 661, 107 L. Ed. 2d 696 (1990) ................................................................. 20

*Gaubert v. Federal Home Loan Bank Bd*., 863 F.2d 59 (D.C. Cir. 1988) ................................... 21

*Gresham Park Community Organization v. Howell*, 652 F.2d 1227, 1239 (5th Cir.1981) ......... 33

*Grimes*, *supra*, 673 A.2d at 1216 ................................................................................................. 21

*Haase v. Sessions*, 835 F.2d 902, 907-08 (D.C. Cir. 1987) ......................................................... 17

*Heller v. Nicholas Apple Gate Capitol Management, LLC,* 498 F.Supp.2d 100 (D.D.C. 2007).. 12

*Herbert v. Nat'l Acad. of Scis*., 974 F.2d 192, 197-98 (D.C. Cir. 1992) ....................................... 17

*Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005) . 24

*Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*,
     720 F.3d 939, 950 (D.C. Cir. 2013) ......................................................................... 28

*In re Kauffman Mutual Fund Actions*, 479 F.2d at 265; *Greenspun*, 634 F.2d at 1210 .............. 21

*In re OCA Secs. & Derivative Litig.*, 2005 U.S. Dist. LEXIS 49978 (E.D. La. 2005) ................ 23

*Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 140-41 (D.D.C. 2014) ........................... 13

*Jews for Jesus, Inc. v. Jewish Community Relations Council,* 968 F.2d 286 (2nd Cir. 1992) ....... 33

*Johnson v. Long Beach Mortg. Loan Trust 2001-4*, 451 F. Supp. 2d 16, 46–47 (D.D.C. 2006).. 28

*Martin v. Gibson*, 723 F.2d 989, 991, 993 (D.C. Cir.1983) ......................................................... 13

*Matter of Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 186 Misc. 2d 126,
     715 N.Y.S. 2d 575, 595 (N.Y. Sup. Ct. 1999) ......................................................... 24

*Mills v. Alabama*, 384 U.S. 214 (1966) ..................................................................................... 33

*Mills v. Electric Auto-Lite Co*., 396 U.S. 375, 392-94 (1970) ..................................................... 16

*Moran v. Vincent, Worthy Grand Matron of the Grand Chapter of the Order of the Eastern Star*, 588 S.W.2d 867, 870 (Tenn. Ct. App. 1979) ....................... 29

*NAACP v. Alabama ex re. Patterson*, 357 U.S. 449 (1958) ............................... 33

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ............................... 33

*New York Times Co. v. Sullivan*, 376 U.S. 254, 277-78 (1964)......................... 30

*Norton v. K–Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del.2013)....................... 28

*Paragould Television v. City of Paragould*, 930 F.2d 1310, 1315 (1991) ................... 34

*Parks v. "Mr. Ford*, 556 F.2d 132, 136, n. 6a (3d Cir.1977) ....................... 33

*Perricone v. Perricone*, 292 Conn. 187, 200-05 (2009) ............................... 34

*Putka v. First Catholic Slovak Union of the United States and Canada*, 75 *Ohio App.* 3d 741, 600 N.E.2d 797, 802 (Ohio Ct. App. 1991) ........................... 29

*Queen of Angels Hosp. v. Younger*, 66 Cal. App. 3d 359, 136 Cal. Rptr. 36, 41 (Cal. Ct. App. 1977)................................................................... 24

*Reed v. Quatkemeyer*, 647 So. 2d 172, 173 (Fla. Ct. App. 1994)........................ 29

*Rutledge v. Gulian*, 93 N.J. 113, 459 A.2d 680, 683, 686 (N.J. 1983)....................... 29

*Saunders v. Hankerson*, 312 F. Supp. 2d 46 (D.D.C. 2004)........................... 22

*Schreiner v. McKenzie Tank Lines & Risk Management Services, Inc.*, 408 So. 2d 711, 719 (Fla. Dist. Ct. App. 1982) ....................... 33

*Settles v US Parole Com'n*, 429 F.3d 1098 (D.C. Cir. 2005) ....................... 17

*Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 935 (Del.Ch.2012)............... 28

*SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 42–44 (Del.1998) ........................... 28

*Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978).................................. 13,22

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) ................... 13

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966) ............................... 23

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)....................... 20

*United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 264, 61 L. Ed. 1119, 37 S. Ct. 509 (1917) ........................................................................................... 21

*United Egg Producers v. Standard Brands, Inc*., 44 F.3d 940, 943 (11th Cir. 1995) ................. 32

*USA Techs., Inc. v. Tirpak*, 2012 U.S. Dist. LEXIS 72318 (E.D. Pa. 2012) ............................... 33

*Usery v. Local Union No. 639 Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 543 F.2d 369, 381 (D.C. Cir. 1976) ................................................... 16


**Rules**
Fed.R.Civ.P. 12(b)(1) .......................................................................................... 17
Fed.R.Civ.P. 12(b)(6) ................................................................................... passim
Fed.R.Civ.P. 23.1 ............................................................................................... 23
Fed.R.Civ.P. 23(b) ............................................................................................. 23


**Regulations**
D.C. Code §29-403.04 ................................................................................. 26, 27
D.C. Code §29-403.04(b) ..................................................................................... 27
D.C. Code Ann. §29-506 ...................................................................................... 26


**Other Authorities**
Federal Practice & Procedure § 3702 (4th ed. 2011) .......................................... 13

Defendants' attack on the Amended Complaint in this case is striking for its failure to acknowledge or confront either the facts actually alleged or the law that governs those facts.  In argument after argument, Defendants ask this Court to dismiss a case whose factual predicate is left unmentioned in their brief; where the true nature of the dispute is unacknowledged; and where directly applicable authority, from the District of Columbia Court of Appeals and even the Supreme Court of the United States, is left either without citation at all, or whose holdings are unmentioned, unexplained and unapplied.  Indeed, several legal arguments are advanced without citation to even a single case – a serious flaw where, as here, directly applicable, recent, binding, cases hold clearly that Defendants' arguments are simply and clearly wrong.  Strikingly, although Defendants ask this Court to throw this case out in its entirety, they advance no argument relating to Count V at all, and they say nothing to attack Count I (breach of fiduciary duty, brought derivatively against all defendants), or to attack Count III, insofar as Count III presents a derivative but not *ultra vires* claim.  In addition, Defendants say nothing regarding Count VI, which states a claim for breach of contract by Professor and Plaintiff Rockland arising out Defendants' refusal to allow him to vote on the Boycott Resolution. That claim necessarily goes forward as well.

There is accordingly no possible reason for dismissing those claims, and so no reason for disposing of the entire case. For that reason, Plaintiffs have captioned this Memorandum as filed in opposition to Defendants' Partial Motion to Dismiss.

Even with respect to the parts of the Complaint they do discuss, the detachment of Defendants' arguments from both the law and the facts leaves the Court with an attack on Plaintiffs' Amended Complaint that has no legal merit and no factual grounding.  Defendants' Motion to Dismiss must be denied.

## SUMMARY OF ARGUMENT

Defendants attack this Court's subject matter jurisdiction through the amount in controversy requirement, without acknowledging what the Amended Complaint alleges the controversy is actually about; without citation of directly applicable, recent D.C. appellate authority clearly establishing the applicable legal standard; and without even trying to argue that that standard is satisfied here.  The applicable standard permits dismissal only when the Court can determine "to a legal certainty" that the amount in controversy threshold cannot possibly be reached.   No such finding could possibly be made here – and Defendants do not even try to satisfy that requirement.

Defendants claim this Court lacks personal jurisdiction over the individual Defendants without at all confronting paragraph after paragraph in the Amended Complaint that attributes specific actions, in or having an impact in this jurisdiction and, again, without acknowledging recent DC authority holding that these allegations establish this Court's ability to reach these Defendants.

They attack the *ultra vires* claims without so much as mentioning recent DC appellate authority defining the applicable law, and without acknowledging or even attempting to explain the holdings of other recent, relevant DC appellate authorities on the subject.

They attack the verification of the derivative claim without citing even a single case on the subject, when the applicable cases – including a U.S. Supreme Court case – make absolutely clear that the verification here is proper.

They ask the Court to reject Plaintiffs' claim that a demand prior to filing the derivative claim would have been futile, without so much as mentioning well over a dozen paragraphs of

2

the Complaint showing the deep-seated bias of the individual Defendants and the other persons

by whom such a demand must be assessed.  That showing of bias makes clear that such a

demand would have been futile. Defendants proffer their argument on this subject without

citation to even a single case establishing the standard for assessing futility.

The section of their brief attacking the direct claims against individual Defendants does

not cite even a single case, on any subject – even though recent, appellate, District of Columbia

authority holds squarely that such claims are appropriate.

Their effort to hide behind the First Amendment, when the Amended Complaint invokes

only privately imposed restrictions, and no government restriction on speech at all, is

substantively vacuous.  There is no state action at issue in this case, and so no violation of the

First Amendment.  The only thing this case enforces are restrictions upon the ASA that the ASA

took upon itself.  The First Amendment of course allows enforcement of such voluntarily

assumed obligations.

## FACTS ACTUALLY AT ISSUE IN THIS CASE

Because Defendants' brief so completely fails to acknowledge the facts actually pled in

the pleading they attack, it is necessary to begin this brief by detailing Plaintiffs' allegations and

by explaining what this case is about and how it arose.

The Amended Complaint places two things at issue: first, it details Defendants' breach of

ASA requirements, which the individual Defendants committed to force adoption of the Boycott

Resolution.  More broadly, the Amended Complaint details Defendants' attempt "hijack" and

"appropriate" the ASA itself.  It thus describes Defendants' effort to capture and remake the

ASA itself – turning the ASA from the scholarly focus mandated by the ASA's organic

documents and many decades of respected practice, into a "social justice" organization that serves not scholars and scholarship but a particular political goal.

The Amended Complaint details the ASA organic documents and practices which define and commit the Association to one thing and one thing only:  advancement of the scholarship in American Studies.  Amended And Verified Complaint (hereinafter A.C.) ¶¶1, 4, 22, 23, and 24 detail commitments set forth in the ASA's organic documents to the Association's purpose:  they provide that "*The* object of the association shall be the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity."  (Emphasis added.)

Lest there be any uncertainty about whether other, non-academic, purposes might be allowed as well, the organic documents are clear:  as A.C. ¶24 alleges, STATEMENT OF ELECTION TO ACCEPT OF THE AMERICAN STUDIES ASSOCIATION, PARAGRAPH THIRD states (emphasis added) that "The corporation is organized *exclusively for education and academic* purposes."  Equally clear, and directly relevant here, A.C. ¶25 quotes another provision of the same document:  PARAGRAPH ELEVEN, which states that "No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation."

The Amended Complaint further alleges – and Defendants do not seriously dispute – that Defendants' actions at issue in this case are a flat and categorical violation of these repeated, clear and binding restrictions on ASA activity.  As A.C. ¶ 57 makes clear, the goal of the Boycott Resolution challenged here – as Defendants themselves espouse that goal -- is to counter what

Defendants perceive to be American support of Israel.  See A.C.  ¶57, quoting an ASA statement proclaiming that "[t]he ASA's endorsement of the academic boycott emerges from the context of US military and other support for Israel."  And as explained in A.C. ¶45, ASA speakers justified "the Boycott Resolution by saying simply that it should be adopted to help end the so-called settler-colonialist Zionist project, and America's complicity in maintaining an alleged apartheid state."  There is no way to square these goals with the ASA's commitment "exclusively" to to education and academic purposes, or with the ASA's absolute ban on "propaganda" and efforts "to influence legislation."

More generally, A.C. ¶63 alleges that "Defendant Lisa Duggan, defended the ASA's boycott "as a nonviolent means to secure Palestinian rights and freedom."  And ¶65 identifies the Defendants' admission that, rather than being devoted "exclusively" to "education and academic purposes," they wish to make ASA into a "scholarly communit[y] supporting social change."

Having laid out the ASA's unequivocal and commitment to scholarship, its absolute ban on engaging in politics and propaganda, and Defendants' explicit commitment to violation of these principles, the Amended Complaint goes on to detail exactly how, where, and when Defendants' actions gave rise to the claims at issue in this case.

The details begin with the fact that the ASA is not only chartered in this jurisdiction; it also maintains its headquarters here.  A.C. ¶15.  Thus, contributions made to the ASA are paid to and received in this jurisdiction.  The ASA's commitments about how it will spend donations are issued here.  And the Amended Complaint specifically alleges, in ¶26, that "[m]any members of the ASA, including but not limited to the Plaintiffs, have contributed funds and effort to the ASA solely on the condition and understanding that [the above-defined] practice would be followed and [the above-defined] mandate obeyed."

All of the individual Defendants are officers of the ASA (A.C. ¶¶16-21).  Because the actions of the individual Defendants were, as detailed above, focused on obtaining control over the ASA and causing it to deviate from the purposes defined for it in its organic documents and long practice, the impact of the Defendants' actions is necessarily felt – and was directed toward – this jurisdiction.

Contacts in this jurisdiction are especially prevalent not only because the ASA is based here but also because the multi-day ASA meeting at which the individual Defendants acted to secure adoption of the Boycott Resolution – including the conduct of meetings, described in the Amended Complaint, at which completely one-sided "discussion" of the proposed resolution was conducted – were all carried out here. Thus, for example, individual Defendants Marez and Gordon conducted the "town hall" meeting in the District, A.C. ¶47.  This gathering "was held out to ASA members as a full discussion of the Boycott Resolution's merits.  In fact, however, as a result of the Individual Defendants' efforts, only speakers supporting the Boycott Resolution were invited to the podium at the 'Town Hall.'"   In flat violation of the limitations on ASA activity defined above, "each of the six speakers [at the Town Hall] argued in support of the Boycott Resolution by saying simply that it should be adopted to help end the so-called settler-colonialist Zionist project, and America's complicity in maintaining an alleged apartheid state." A.C. ¶48.  Similarly, the Amended Complaint alleges, at ¶50, that when opponents of the proposed Resolution attempted to communicate with ASA members on the subject, "the Individual Defendants, abusing their authority as members of the ASA's National Council, refused to circulate or post to the ASA's website several letters opposing the Resolution, signed by approximately 70 ASA members as well as other scholars who were not members of the ASA.  The Individual Defendants also refused to circulate a letter opposing the Boycott

Resolution signed by eight former ASA presidents."  In addition, Plaintiffs' Complaint alleges

further, at ¶51, that "All of the ASA's official correspondence, directed by the Individual

Defendants, endorsed the boycott and included links to works that supported it.  On its

homepage, in a section designated, 'What's new in the community?' the ASA posted only pro-

boycott news and links."

The Amended Complaint also alleges, in ¶60, that "[s]ince the boycott's adoption, many

members of the ASA have resigned in protest over enactment of the Boycott Resolution and the

consequent belief that the ASA is no longer a scholarly society but instead an organization of

political activists. "  This is a direct impact of the individual Defendants' actions.  It eliminates

the ASA's dues income from these many members, and indeed eliminates the voices of these

people from the organization altogether, even though many of them were senior, well-respected

members of the American Studies academic community.   The impact of this injury is felt

directly in the District of Columbia, where the ASA is based and maintains its headquarters.

Indeed, as alleged in ¶67 of the Amended Complaint, the reputational damage to the ASA itself

has been enormous:  The *New York Times* reported that: 'With its recent vote to boycott Israel's

higher-education institutions to protest the country's treatment of Palestinians, the American

Studies Association has itself become the target of widespread criticism and ostracism. It has

gone from relative obscurity to prominence as a pariah of the United States higher-education

establishment.'"

Each of the individual Defendants served in a leadership role at the ASA and, by virtue of

their official position on various ASA leadership committees, each was directly involved in

planning the ASA meeting at which the Boycott Resolution was adopted.  See A.C. ¶18 (role of

Defendant Neferti Tadiar served on the programming committee for the ASA's 2013 national

convention, and participated in planning the activities that took place at the convention); ¶19 role

of Defendant Sunaina Maira); ¶20 (role Defendant Lisa Duggan); see also *id.* at ¶63 (in the wake

of the Resolution's adoption, Duggan continues to defend it as a "means to secure Palestinian

rights and freedom"); ¶21 (Defendant Chandan Reddy served on the 2013 Executive Committee

and National Council).

The Amended Complaint also details the individual Defendants' absolute commitment to

this path, and their adamant, sustained and continuing refusal to consider any alternative.  The

Amended Complaint explains that, in the wake of the adoption of the Boycott Resolution, the

individual Defendants have not merely admitted that they no longer have an open mind on the

Resolution or any of the other issues raised by this case:  as the Amended Complaint details, the

individual Defendants have proclaimed this fact to the world, repeatedly and out loud.  The

Amended Complaint details the avalanche of criticism that fell upon the ASA, from the United

States Congress, which issued the ASA's original charter; and from the most highly respected

quarters of the American academic community and its intellectual life:  from the American

Association of University Professors (¶55); from the Presidents of numerous among the most

prestigious colleges and universities in the country; from former presidents of the ASA itself;

and even from the New York Times.

The individual Defendants were, and remain, completely undeterred:  they turned back –

or ignored – every statement, argument and criticism.  Instead, they have repeatedly doubled

down:  their response to these criticisms was, as Mr. Stephens' Declaration makes clear, to spend

tens of thousands of dollars hiring public relations consultants to defend the actions they caused

the ASA to take (and, one assumes, to defend the individual Defendants and their own

reputations as well).

Further demonstrating their complete lack of an open mind on the issues in this case, the individual Defendants have also have purported (with no authorization from anyone) to rewrite the ASA's mission statement (A.C. ¶66); they have repeatedly announced to the world the ASA's purported new status as a "social justice" organization, (A.C. ¶64); and they have caused the ASA to take positions on issues – such as the 2014 war in Gaza – that have absolutely nothing to do with American studies. (Amended Complaint ¶62) ("During the Gaza War in the summer of 2014, the ASA alleged that Israel maintains a 'long-standing practice of denying an entire people the basic necessitates of life and freedom,' and 'call[ed] upon the United States to withdraw political, financial, and military support from the state of Israel'").

Finally, the Amended Complaint also sets out in detail the commitment of a majority of the ASA's current governing Council are publicly and emphatically committed to the Boycott Resolution and opposed to support by the United States government of the State of Israel. See A.C. ¶74, which proceeds with such allegations, member by member, for a majority of the persons holding seats on the ASA's Governing Council.  This is the body responsible for determining how to proceed with Plaintiff  Bronner's demand that the ASA itself correct its violations of its own organic documents and that it pursue the claims, set forth in this case derivatively, against the ASA officials who have taken the ASA down this path of disobedience to its own defining principles.  This section of the Amended Complaint states, and supports the statement, that "a majority of the board is unwilling to impartially address the allegations raised in this complaint."

**ARGUMENT**

## I.  THE AMENDED COMPLAINT ALLEGES FACTS ESTABLISHING THAT EACH INDIVIDUAL DEFENDANT HAS SUBMITTED HIM OR HERSELF TO THE JURISDICTION OF THIS COURT

Defendants' attack on this Court's personal jurisdiction over the individual Defendants fails because it makes no serious effort to come to terms with the factual allegations Plaintiff set forth to support such jurisdiction.  Defendants completely ignore numerous specific and detailed allegations, set out above in the FACTS section of this brief, describing specific actions by individual, identified Defendants, taken in and/or having an impact in this jurisdiction.  Simply pretending that these allegations do not exist, Defendants would have this Court believe that "the *only* allegations of any connection to the District of Columbia as to any [individual] defendant is [sic] they attended the ASA annual meeting in the District of Columbia at which the Resolution came up for a vote."  Def. Mem. 13 (emphasis added).

The argument falls as soon as one actually looks at the pleading Defendants purport to attack. That pleading alleges far more than Defendants' wildly incomplete characterization that the individual defendants happened to find themselves at a meeting in this jurisdiction when a resolution "came up" – apparently of its own volition -- "for a vote."  As shown above, the Amended Complaint details the precise actions taken by each of the individual Defendants – not only to cause the Boycott Resolution to "come up" for a vote, but to gerrymander and distort the debate on the Resolution; to silence numerous, well-respected voices, opposing the Resolution; to manipulate the membership of the ASA to ensure as high a vote in favor as they could; and the failure even to follow the ASA's own rules for conducting a vote.  In the end, the individual Defendants *lost* the vote they themselves structured.  And then, as Counts IV and V allege in detail, the individual Defendants declared themselves the winners anyway.

Defendants' discussion of the law on this topic is even more incomplete than their discussion of the facts.  Their brief musters only a sprinkling of inapposite cases stating generalities, which Defendants then attempt to muster in their favor.  Defendants ignore direct DC authority which holds clearly that the facts pled here are sufficient to establish personal jurisdiction.   Thus for example in *Family Fed'n for World Peace v. Hyun Jin Moon,* 129 A.3d 234 (D.C. Ct. App. 2015), the DC Court of Appeals faced a battle for control of a non-profit entity which was, in many essential respects, like this case.

There, as here, Defendants took actions designed to completely recharacterize the purpose of the entity, and to cement their control by manipulating the substance of organic documents and the identity of the entity's leaders.  Although ***no*** individual defendants appeared physically ***at all*** in DC in that case, the Court held such physical absence from the jurisdiction no obstacle to its assertion of personal jurisdiction over these absent individuals.

The D.C. Court of Appeals found personal jurisdiction in *Family Fed'n* for two reasons: first, "all the alleged wrongdoing affected a District of Columbia corporation."  And second, "at least one of those acts and a significant one, the allegedly wrongful amendment of the Articles of Incorporation, indubitably occurred within the District by filing here."  That was enough for the court to find that the director defendants "clearly could anticipate being hauled into [a District of Columbia] court to account for their activities and that doing so does not violate notions of fair play and substantial justice."  129 A.3d at 243.

Similarly, in *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723 – a case Defendants cite, but whose holding they completely ignore -- the same Court invoked the same two factors to find personal jurisdiction: conduct in the District of the meetings at which the

11

challenged decisions were made, and the fact that those decisions "dealt with the management of a District of Columbia corporation."[1]

Defendants also attempt to escape this Court's reach by hiding behind the fiduciary shield rule, but the *Daley* case explicitly and definitively rejects exactly the rule Defendants ask this Court to follow, in the process limiting and distinguishing the case Defendants mistakenly invoke as governing law:

> The so-called corporate or fiduciary shield doctrine protecting employees who act for a corporation is inapplicable here. In the very case relied upon by appellees, we said that "we explicitly decline to adopt such an absolute 'fiduciary shield' doctrine, which would be difficult to reconcile with Supreme Court precedent and with persuasive case authority from other courts." *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 163 n.20 (D.C. 2000). *See, e.g.*, *Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984) (defendants' "status as employees does not somehow insulate them from jurisdiction"). Here, among other things, while the individual appellees as officers and directors were members of the Boule, it appears they were also in part acting in their individual capacities as such members. The trial court properly recognized that the doctrine did not protect the individual appellees in this case and that the jurisdictional question depended on the minimum contacts analysis.

*Daley v. Alpha Kappa*, 26 A.3d at 728 n.3.

Finally, the Amended Complaint makes clear that his case is an effort to prevent the individual Defendants from "hijack[ing] the current ASA from an academic organization devoted solely to the study of American culture to a political organization that pursues what Defendants call 'social justice.'" A.C. ¶69.  The organization at issue is a District of Columbia

---

[1] *Heller v. Nicholas Apple Gate Capitol Management, LLC,* 498 F.Supp.2d 100 (D.D.C. 2007) is not to the contrary.  Its passing phrase in dictum that personal jurisdiction is not created by "random" or "fortuitous" contact certainly does not – indeed, it could not – overrule the repeated holdings of DC law cited above, from the highest District of Columbia court, that personal jurisdiction will be found where a meeting is held in the District, at which action was taken that the case challenges and that affects the governance of a District of Columbia corporation.  Those repeated holdings are dispositive here.  And in any event, the holding in *Heller* was that the entity sued – a German company with absolutely no presence in the District of Columbia – could not be haled into court here because of the actions of some other, entirely separate party, of which the German company had no contemporaneous knowledge.  That holding is entirely unsurprising.  It is also completely unhelpful to the Defendants.

chartered entity with its principal place of business in this District. The *Family Fed'n* case and *Daley* find personal jurisdiction in significant part because the conduct or control of a District of Columbia entity is at issue.  So it is here, and the holdings of those cases make clear that a dispute over actions taken in the District, with respect to control over a District of Columbia entity, will subject the actors to the personal jurisdiction of a District of Columbia court.

## II. THIS COURT CANNOT DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE DEFENDANTS HAVE NOT SHOWN AND CANNOT SHOW TO A "LEGAL CERTAINTY" THAT THE AMOUNT IN CONTROVERSY IS LESS THAN $75,000

Although Defendants fail even to cite it, this Court has clearly established the governing legal standard for assessing satisfaction of the amount-in-controversy requirement: "For a court to reject the amount claimed by the plaintiff, '[i]t must appear ***to a legal certainty*** that the claim is really for less than the jurisdictional amount.'"  *Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 140-41 (D.D.C. 2014) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938)).  "The default rule governing the amount-in-controversy requirement is that 'the sum claimed by the plaintiff controls if the claim is apparently made in good faith.'"  *Id.* (quoting *St. Paul*, 303 U.S. at 289) (emphasis added); *see also Martin v. Gibson*, 723 F.2d 989, 991, 993 (D.C. Cir.1983) (characterizing the *St. Paul* test as "exacting" and "stringent").  "Even a 'cursory' allegation of the amount in controversy, if it exceeds the jurisdictional requirement, is sufficient to evade dismissal."  *Dumosch*, 13 F. Supp. 3d at 141 (citing 14AA Charles Alan Wright et al., Federal Practice & Procedure § 3702 (4th ed. 2011).

The rule "applies to complaints for declaratory or injunctive relief in the same way that it does for damages."  *Id.* at 141 (citing *Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978)).  Defendants simply and completely ignore this binding rule.

Defendants also fail to acknowledge the teaching of *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1 (D.D.C. 2014), aff'd, No. 15-7026, 2016 WL 1657956 (D.C. Cir. Apr. 26, 2016), on this issue, even though they cite the decision. The court there considered a similar jurisdictional challenge in a case involving a suit against a sorority by two alumni members and their daughters, who alleged that the local chapter wrongfully denied the daughters admission to the sorority as legacy candidates, based on claims for, *inter alia*, ultra vires acts and breach of contract.  While the court found that the Plaintiff's generalized allegations left "much to be desired," it declined to dismiss this matter because it could not determine to a "legal certainty" that plaintiffs could not prove up damages exceeding $75,000.  *Id.* at 13-14.

Here, the Plaintiffs have pleaded more than just "generalized" allegations.  Specifically, Plaintiffs allege that, "[s]ince the boycott's adoption, many members of the ASA have resigned in protest over enactment of the Boycott Resolution and the consequent belief that the ASA is no longer a scholarly society but instead an organization of political activists."  (A.C. ¶ 55.)  While "[t]he exact number of people who have resigned is unknown because the ASA has not released this figure, these losses of membership injures the ASA financially by depriving it of dues" for years to come.  The evidence Defendants offer to the contrary is hardly dispositive – even if one accepts everything they say as true, which is hardly the appropriate course when adjudicating Motion to Dismiss.  Indeed, Defendants' proffered evidence is consistent with the Amended Complaint's allegation that numerous students joined – at the lowest dues level – at the urging of their mentors and so they could vote on the Boycott Resolution as their mentors wished.  But that is hardly a long-term strategy for boosting dues revenue.  And Defendants' sworn admission that they have spent tens of thousands of dollars on public relations, to defend the ASA and the actions (and so the reputations) of the individual Defendants is a clear acknowledgement that

much of the distance toward $75,000 can be covered just by properly understanding the purportedly exculpatory evidence Defendants offer at this threshold stage of the case.

Indeed, Defendants' evidence provides no reason for the Court to conclude, dispositively, now, and without any discovery on the subject, that the net impact of Defendants' actions on revenue is positive or negative. Only discovery can enable the Court to truly know the facts on this subject.

The boycott has further "resulted in the improper expenditure of ASA funds related to membership dealings, public relations, legal matters, and other items including employee time and effort" and losses due to "failure of individuals to join the ASA, resulting in a significant and ongoing loss of revenue for the ASA." (A.C. ¶ 79.)

More broadly, the Amended Complaint alleges, at ¶80, that Defendants are "consciously attempting to appropriate the assets and reputation of the ASA to achieve purposes different from and at odds with, those purposes and mission to which the ASA is committed, and which the ASA was created to pursue." As Defendants' own sworn Declaration states, the annual budget of the ASA includes revenues in the hundreds of thousands of dollars; to this sum must be added all of the remaining assets of the ASA that Defendants are attempting to appropriate for themselves, including ASA offices, its reputation (or what is left of it); its academic journals, and its membership lists, among other things. No serious argument can be made that these assets are not worth at least $75,000.

The Amended Complaint makes absolutely clear that Defendants are attempting to appropriate all of these assets, so that the value of all of these assets is at issue in this case. Thus, in addition to ¶80, Plaintiffs' Amended Complaint states clearly that the wrong at issue in this case is that, rather than "start a new 'social justice' organization devoted to promoting the

15

boycott and isolation of Israel or advancing their other political opinions, among other pursuits, *
* * the Individual Defendants have, over the protests of members, attempted to hijack the current
ASA."  (A.C. ¶69.)

In addition to these money damages, Plaintiffs allege that the boycott has "led to a
deterioration in the ASA's reputation as a scholarly organization," and to loss of reputation to
individual plaintiffs.  (A.C. ¶¶ 56, 62 [quoting the New York Times' statement that "the
American Studies Association has … [become] a pariah of the United States higher-education
establishment"].)  This reputational damage is difficult to quantify but critical to a scholarly
organization and its members.

Finally, Plaintiffs seek attorney fees under the "common benefit" doctrine, which permits
plaintiffs to recover such fees when they succeed in "preserving or recovering a fund for the
benefit of others in addition to himself."  *Usery v. Local Union No. 639 Int'l Bhd. of Teamsters,
Chauffeurs, Warehousemen & Helpers of Am*., 543 F.2d 369, 381 (D.C. Cir. 1976); *see id*. at 382
("There is no prerequisite of pecuniary benefit, as was made clear by *Mills v. Electric Auto-Lite
Co*., 396 U.S. 375, 392-94 (1970)).

Instead of trying to meet the "legal certainty" standard, which they fail even to
acknowledge, Defendants argue that this Court lacks subject matter jurisdiction based on their
version of the facts, conveyed – at this Motion to Dismiss stage of the case – in a sworn
statement of a Mr. John Stephens, who asserts that dues and donations have increased by
approximately $11,700 since the boycott was adopted.  This stratagem fails for a number of
reasons.

First, Defendants' effort to defeat Plaintiff's complaint by submitting a statement of
disputed facts before the parties have even engaged in discovery is inappropriate as a matter of

law.  Defendants cite a number of cases involving Article III **standing** for the proposition that outside evidence may be considered in motions to dismiss under FRCP 12(b)(1).  *E.g., Settles v US Parole Com'n*, 429 F.3d 1098 (D.C. Cir. 2005); *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13 (D.D.C. 2003) (cited in Motion, p. 8.).   But Defendants are not challenging standing; they are challenging the amount in controversy, which is determined using the "legal certainty" standard set forth above.  If Defendants' partial view of the facts is to be accorded any weight at all, it should only be as the basis for Plaintiffs to take discovery regarding satisfaction of the jurisdictional amount.

In any event, evidentiary attacks on the pleadings are precluded *even in standing cases*. *Settles*, 429 F.3d at 1107 (quoting *Haase v. Sessions*, 835 F.2d 902, 907-08 (D.C. Cir. 1987); *see id*. at 1108 (concluding that district court "exceeded the bounds of factual inquiry" when it rejected the plaintiff's theory of the case based on evidence submitted by the defendant).  It is well-settled that courts should not dismiss a complaint on standing grounds "before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction." *Herbert v. Nat'l Acad. of Scis*., 974 F.2d 192, 197-98 (D.C. Cir. 1992) (citation omitted).

Second, Mr. Stephens' statement simply begs the question whether the ASA has experienced a net loss or gain, because the numbers he cites cannot be assessed until Plaintiffs have had an opportunity to conduct discovery.  For one thing, Stephens says nothing about the reputational damage to the ASA from its action – even though the Amended Complaint details the virtually universal criticism that poured down upon the Association, from all quarters of the U.S. academic community, Congress, and respected public organs, in the wake of the adoption of the Boycott Resolution.  (Stevens's statement does delicately allude to this injury by noting that the ASA had to spend tens of thousands of dollars to hire a PR firm to combat these widespread

17

attacks.  Of course, such PR expenditures were directed by the individual Defendants and also afforded a mechanism by which these people could use ASA funds to defend their own reputations – another inappropriate action that Plaintiffs only learned about through Mr. Stevens's statement, but which Plaintiffs will be able to explore in discovery. As noted above, the PR expenditures are a large step all on their own toward the $75,000 requirement.)

In addition, the gains Stevens cite, even if accurate, may well be temporary, *e.g.*, due to new members signing on for the purpose of voting in favor of the Resolution.  (The Amended Complaint alleges, at ¶40, that pro-Boycott academics urged their students to join the ASA so they could vote for the Resolution.  But there is no reason to believe such graduate students will continue to pay for such membership when their mentors no longer need their votes.)

In another vulnerability, the affidavit says nothing about how many members *canceled* their membership during the period after the boycott – nor does it acknowledge that the members lost were far more likely to be senior, well-respected members of the academic community than the students who signed up at their mentors' direction.  The impact of such a change upon the ASA itself is also a matter that can hardly be determined on a Motion to Dismiss.

These examples demonstrate that the long term costs to the ASA cannot be determined based on the shallow analysis provided by Mr. Stephens.  Nor can the Court assess to a legal certainty the value of the ASA's lost reputation—a loss the Defendants do not even attempt to address, or the amount of potential attorneys' fees, which Defendants also ignore. Compare *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp.3d 1, 13-14 (D.D.C. 2014) (finding that emotional harm from ultra vires and other wrongful actions relating to sorority membership could satisfy the federal amount-in-controversy threshold).

In sum, this Court should deny Defendants' motion to dismiss for lack of subject matter jurisdiction because Defendants have not and cannot show "to a legal certainty" that no Plaintiff may recover more than $75,000.

### III. DEFENDANTS' ATTACK ON PLAINTIFF BRONNER'S RIGHT TO BRING DERIVATIVE CLAIMS FAILS BECAUSE IT IGNORES BOTH THE FACTS PLED AND THE GOVERNING LAW

In an effort to ward off the derivative claims, Defendants acknowledge that a pre-suit demand was made, and they do not dispute the fact that that they have not responded to this demand even though more than 90 days have elapsed since it was made.

Indeed, a substantial part of Defendants' argument on this topic comes from authorities they marshal that discuss the deference due to a refusal of a demand. Br. at 16. But there has been no refusal here. There has been no response at all. Given that more than 90 days have passed since the demand was made, that fact alone should be dispositive of Defendants' arguments on this issue.

Defendants also acknowledge that several different doctrines entirely suspend the need to make a demand in the first place. Defendants' discussion of these exceptions, however, ignores both the facts here at issue and the governing law.[2]

---

[2] With respect to the derivative claims, it should be noted that the District of Columbia Court of Appeals has in any event held that a derivative action is unnecessary to challenge actions by a non-profit. In *Daley,* the Court of Appeals explained:

On its face, it would seem almost self-evident that members of a nonprofit organization whose revenue depends in large part upon the regular recurring annual payment of dues by its members have standing to complain when allegedly the organization and its management do not expend those funds in accordance with the requirements of the constitution and by-laws of that organization. The trial court rejected this argument on the ground that the suit was brought in the members' own names rather than as a derivative suit. *See, e.g., Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008). We think this is too expansive a view of the requirement of derivative suits. To begin with, the total equation of a stockholder in a for-

Case 1:16-cv-00740-RC   Document 23   Filed 07/21/16   Page 26 of 48

Arguing that Plaintiffs waited too long to bring the case, and so cannot claim the ASA is being irreparably harmed, Defendants ignore Plaintiffs' allegation that Plaintiffs and many others spent the time trying to address the problem by means other than litigation.  But this argument cannot be ignored. Amended Complaint ¶8 states clearly (emphasis added):

> Plaintiff Simon Bronner, an officer of the ASA and member of its governing council, as well as a member in good standing of the ASA, and Plaintiff Michael Rockland, a member in good standing, *have repeatedly attempted to have the Defendant ASA usurpers abide by the rules and procedures set forth in ASA's Constitution*.  Defendants having made clear that they will not voluntarily redress Plaintiffs' concerns, Plaintiffs bring this action to recover damages, and to restore the ASA to its stated mission - the promotion of the study of American culture - so that the members of the ASA can once again faithfully exercise their membership.

Similarly, numerous other allegations set forth in the FACTS section of this brief identify the steps taken by a wide variety of ASA members, former individual members, institutions, Congress, and others in an effort to get Defendants to reconsider.  Defendants' argument on this point simply ignores these allegations and asks the Court to pretend that the allegations do not exist, and that these facts never occurred.

Defendants fare no better with their effort to demonstrate that a pre-suit demand would not have been futile.  Here again, Defendants completely ignore numerous allegations of the Amended Complaint – in this case, allegations showing the fixed bias of both the individual Defendants and a majority of the ASA's current governing body.  See *supra* at 8-9, and, *inter*

---

profit corporation complaining of financial losses with a member of a nonprofit corporation in an on-going dues-paying basis aimed at social and charitable purposes and the accompanying emotional connotations is an uneasy fit. Furthermore, in the case at bar, the individual rights of the plaintiffs were affected by the alleged failure to follow the dictates of the constitution and by-laws and they thus had a "direct, personal interest" in the cause of action, even if "the corporation's rights are also implicated." *Franchise Tax Board of Cal. v. Alcan Aluminum, Ltd*., 493 U.S. 331, 336, 110 S. Ct. 661, 107 L. Ed. 2d 696 (1990). *See Tooley v. Donaldson, Lufkin & Jenrette, Inc*., 845 A.2d 1031, 1033 (Del. 2004).

*alia,* A.C. ¶74.  At the same time, also not for the first time, Defendants ignore the governing

law.

That law is clear.  Under *Gaubert v. Federal Home Loan Bank Bd*., 863 F.2d 59 (D.C.

Cir. 1988),

> when directors' actions demonstrate self-interest or some other form of bias [] most courts
> [will] find that it is presumptively unlikely that they would respond fairly to a shareholder
> demand for corporate action. *See, e.g., In re Kauffman Mutual Fund Actions*, 479 F.2d at
> 265; *Greenspun*, 634 F.2d at 1210.

The *Gaubert Court* further explained that the law governing derivative actions does not expect

those to whom a derivative demand is sent to step outside themselves and objectively consider

the merits of suing themselves for actions to which they have committed themselves:

> as a general matter courts should allow a shareholder derivative action to go forward even
> against the wishes of the board when the directors "stand in a dual relation which
> prevents an unprejudiced exercise of judgment," *United Copper Securities Co. v.
> Amalgamated Copper Co.*, 244 U.S. 261, 264, 61 L. Ed. 1119, 37 S. Ct. 509 (1917),

> Significantly, å derivative Plaintiff need not *prove* bias:  the Plaintiff need only raise a

serious question as to the fair-mindedness of the corporate decision-makers to whom a demand

would have been submitted:

> In determining presuit demand futility, the focus is upon "whether, under the
> particularized facts alleged, a reasonable doubt is created that: (1) the directors are
> disinterested and independent and (2) the challenged transaction was otherwise the
> product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814
> (Del. 1984). "If the Court determines that the pleaded facts create a reasonable doubt that
> a majority of the board could have acted independently in responding to the demand, the
> presumption is rebutted for pleading purposes and demand will be excused as futile."
> *Beam*, *supra*, 845 A.2d at 1049; *Grimes*, *supra*, 673 A.2d at 1216 (noting that one ground
> for alleging demand futility is a reasonable doubt as to the board's ability to make an
> independent decision).

*Behradrezaee v. Dashtara*, 910 A.2d 349, 358 (D.C. Ct. App. 2006).

Thus in *Saunders v. Hankerson*, 312 F. Supp. 2d 46 (D.D.C. 2004), for example, the

Court found futility because

> Plaintiff has made sufficient and particularized allegations of wrongdoing by a number of WTU Directors and has alleged acquiescence of the remaining Directors as well as the WTU Board of Trustees, thus giving rise to a permissible inference that these individuals would be biased with respect to any request that they take action against themselves. *See Smith*, 668 F. Supp. at 523.

> Similarly, plaintiff has made specific allegations of bias against the AFT and its Secretary Treasurer James McElroy, suggesting that a demand against these parties would also be futile; for instance, plaintiff has alleged that McElroy served on the same AFT Executive Council as Barbara Bullock and that the AFT has repeatedly denied responsibility for oversight of the WTU. It can easily be inferred from AFT's dismissive response to plaintiff's contentions that Secretary-Treasurer McElroy bore any responsibility for [**58] ensuring that AFT received biennial audits and annual financial statements from the WTU, as well as from its failure to answer Mr. Saunders' November 2002 demand that the AFT account for how the events underlying this action could have taken place under its watch, that any demand on the AFT that it bring legal action against Secretary-Treasurer McElroy would have been futile.

Under this standard, it is plain that any demand by Plaintiffs would necessarily have been

rejected at best, or ignored at worst (which is in fact what has happened). Defendants' extensive

actions since enactment of the Boycott Resolution – to defend it in writing and publications; to

spend tens of thousands of dollars on public relations defending enactment of the Resolution and

the reputation of the individual Defendants who backed it; and to continue to try to turn the ASA

into a "social justice" organization rather than the organization devoted to scholarship that is

mandated by its organic documents – all of these continuing steps make it clear beyond any

doubt that Defendants have no open mind at all on this question. Any request, demand,

suggestion or even question on the topic would be met with exactly the same response as

Defendants have already proffered to numerous other such requests, all of which are detailed in

the Amended Complaint and set forth at length in the FACTS section of this brief.

22

Lastly, without even bothering to cite a case or a rule, Defendants attack the Verification Plaintiff Bronner has attached to the Amended Complaint, on the theory that it speaks of both knowledge and information and belief.  Their argument ignores binding Supreme Court authority governing what is now Federal Rule of Civil Procedure 23.1.  In *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966), a seamstress with very limited English, and no personal knowledge of the facts at issue, signed a verification for a derivative action (then required under Federal Rule of Civil Procedure 23(b)) in reliance on information provided to her by someone else.  The plaintiff's deposition revealed that she lacked personal knowledge of the facts.  The Seventh Circuit affirmed the District Court's dismissal of the complaint on this ground, holding that the verification had been proven false.

The Supreme Court, in a unanimous opinion by Justice Black, reversed, holding that the verification was sufficient if the plaintiff's knowledge was on information and belief, acquired from her investment advisor.  Justice Harlan joined the Court's opinion on the strength of the verification submitted by counsel for the plaintiff, which Justice Harlan found adequate on its own.  See, in addition, *In re OCA Secs. & Derivative Litig.*, 2005 U.S. Dist. LEXIS 49978 (E.D. La. 2005) (finding verification in reliance on counsel acceptable, though not as good as another plaintiff's verification on the basis of knowledge, information and belief).  See also *Brown v. Hart, Schaffner & Marx*, 96 FRD 64 (N.D. IL. 1982), where the court held:

> As required by Fed.R.Civ.P. 23.1, plaintiff verified her complaint, stating:
> Deponent is the plaintiff in the within action; deponent has read the foregoing complaint and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters deponent believes them to be true.

Plaintiff Bronner's verification is entirely satisfactory.

Defendants do not attempt to persuade this Court that the substance of Plaintiffs' direct claims are legally insufficient, but it is nonetheless worth emphasizing what those claims are about on the merits.  Count I of the Amended Complaint is a derivative claim, brought by Mr. Bronner against the individual Defendants, for breach of their fiduciary duty.  The claim is an effort to enforce the clear law in the District of Columbia that "[i]t can be a breach of duty to 'change substantially the objects and purposes of the corporation.'"  *Family Fed'n,* 129 A.3d at 253 citing the following authorities:  7A Fletcher Cyclopedia of the Law of Corps. § 3718 (2006); *Queen of Angels Hosp. v. Younger*, 66 Cal. App. 3d 359, 136 Cal. Rptr. 36, 41 (Cal. Ct. App. 1977) ("The question is whether [the corporation] can cease to perform the primary purposes for which it was organized. That, we believe, it cannot do."); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005) (distinguishing legal powers of directors from equitable duty); and *Matter of Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 186 Misc. 2d 126, 715 N.Y.S. 2d 575, 595 (N.Y. Sup. Ct. 1999) (breach of fiduciary duty to depart "from the charity's central and well-understood mission").

The *Family Fed'n* Court noted that "a profound alteration in the corporation" is evidenced in part by the defendant directors' "amending the article of incorporation."  Here the individual Defendants have been frank and open in proclaiming their desire to turn the ASA into a "social justice" organization and one that pursues "social change."  Like the changes to the organic documents in *Family Fed'n,* the individual Defendants here have, on their own motion, rewritten the ASA's description of "What we do" precisely in an attempt to carve in stone the change in mission at issue in this case.

Whatever may be the virtue of the political activities favored by the individual Defendants, their alteration of the ASA statement regarding "what we do" provides exactly the

24

same kind of recognition as was present in *Family Fed'n* that a "profound change" had been made in the "objects and purposes of the corporation."  Such a change, the DC courts have held, can constitute a breach of fiduciary duty. The claim for that breach is, plainly, not going to be brought by, and against, the very people who have carried it out and who are continuing to try to transform the ASA.

### IV. PLAINTIFFS PROPERLY STATE A CLAIM FOR *ULTRA VIRES* MISCONDUCT

In seeking dismissal of Plaintiffs' *ultra vires* claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants allege that the "ASA was well within its rights and powers to issue the resolution" because the "ASA's actions were not expressly prohibited by statute or bylaw."  Motion at pp. 21-22.  Defendants are wrong.

First, Defendants would have this Court believe that any actions not expressly proscribed by the ASA's organic documents are permitted.  This is flatly incorrect, and ignores the very meaning of the words "ultra vires" – "beyond the powers" authorized for a corporation or its agents.  An act is thus *ultra vires"* if it is not authorized.  Defendants' reading of the law – that everything that is not proscribed by by-law is permitted – ignores the very words of the doctrine being applied.  Moreover, Defendants also ignore the argument set forth in the Amended Complaint, which is that both the organic documents – which, for example, define "The" ASA's purpose and object, and which proscribe engagement in propaganda – as well as the ASA's unbroken, decades'-long practice, do indeed explicitly impose limitations on what the ASA and its corporate officials may do.

In addition, Plaintiffs allege that Defendants' resolution that the ASA, as an organization, boycott a foreign country is directly contradictory to the mandates of the ASA's organizational documents, which specifically prohibit "the carrying on of propaganda, or otherwise attempting, to influence legislation." (A.C. ¶25.)  Furthermore, the Defendants' conduct was *ultra vires* under District of Columbia law, which allows an *ultra vires* claim against an organization

"where the organization has ***exceeded the powers conferred upon it by its certificate of***

***incorporation, bylaws, or statute***." *Compton v. Alpha Kappa Alpha Sorority, Inc.* 64 F. Supp.3d

1, 18 (2014) (emphasis added) (internal quotations and citations omitted); *see also Daley v.*

*Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 730-31 (D.C. 2011).[3]  Thus, a claim that an

organization has acted beyond the scope of the authority conferred by its foundational documents

is sufficient to state a claim for *ultra vires* misconduct.

      Indeed, the *Family Fed'n* decision recognizes that an action can be *ultra vires* simply

because it contravenes well-established corporate ***practice***, even when that practice is not stated

anywhere in a corporation's organic documents:  Thus the Court there held that "[i]n certain

circumstances, a long-standing pattern or practice of corporate behavior may give rise to a by-

law" the defines the limits of a corporation's powers and so of the reach of the corporation's

officers.  Thus the "practices [plaintiffs claimed served as limits on the power of the defendant

corporate officers] were not necessarily inconsistent with the corporate documents and might be

viewed as supplemental thereto. It is in this context, if fully fleshed out and proven, that the

precise fiduciary duties can be adjudged."  129 A.3d. at 251.

      Given this law, Plaintiffs properly allege that an academic boycott of a foreign country is

outside of the ASA's authority to act under its Constitution, which describes the ASA as an

organization devoted to the "promotion of the study of American culture."[4]  (A.C. ¶¶ 1, 4, and

---

[3] In yet another failure to provide the Court with an accurate statement of current law,
Defendants invoke *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd*, 15
F. Supp. 2d 1 (D.D.C. 1997) for the proposition that *ultra vires* is "only" appropriate where the
actions taken are expressly prohibited by statute or by-law.  Motion at p. 24.  Defendants fail to
inform the Court that *Columbia Hospital* was decided in 1997; the version of the D.C. Nonprofit
Corporation statute cited there (D.C. Code Ann.§ 29-506) was repealed in 2011.  Therefore,
*Columbia Hospital* is inapposite under the current statute (D.C. Code Ann.§ 29-403.04) and case
law interpreting that statute.  *See, e.g. Compton v. Alpha Kappa Alpha Sorority, Inc*., 64 F. Supp.
3d 1 (D.D.C. 2014).  In any event, *Columbia Hospital* is inapposite because its mention of the
*ultra vires* doctrine was dictum:  the decision was based not on that body of law at all, but on
agency law.  *Columbia Hosp. for Women Found., Inc.*, 15 F. Supp. 2d at 7 ("Not ultra vires, but
the law of *agency* governs Plaintiff's claim.") (emphasis in original).

[4] In relevant part, the ASA's Constitution provides:

22.)  The Complaint also cites the ASA's foundational documents, which provide that "[t]he corporation is organized exclusively for education and academic purposes" and mandate that "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation…"  (A.C. ¶¶ 24-25.)  The Complaint further alleges that ASA's leadership, including the Individual Defendants, have indicated that their support for the boycott was motivated by political goals beyond the scope of the ASA's purpose as set forth in the ASA's Constitution.  (A.C. ¶¶ 57-58.)  Indeed, while the ASA's goal, as expressed in its Constitution, is "the strengthening of relations among persons and institutions in this country and abroad devoted to such studies," Plaintiffs allege that the Defendants proceeded to boycott a country and its scholars—an action that does not strengthen relations "among persons and institutions in this country and abroad," and in fact contravenes that goal.  (A.C. ¶ 59.)

In sum, the Complaint properly alleges that the Defendants' operation of the ASA as "a social justice" organization, including through the promotion of a boycott against Israel, is outside of and inconsistent with the purpose of the ASA's Constitution and other foundational documents.  (A.C. ¶¶ 81-85.)

Defendants' passing reference to D.C. Code §29-403.04 does nothing to salvage their argument that the *ultra vires* claims should be dismissed.  Motion at p. 24.  As Defendants concede, this statute does not bar *ultra vires* actions; it expressly allows such an action to be brought by a member or derivatively through a legal representative.  *Id*. (citing D.C. Code §29-403.04(b).)  Here, Plaintiff Simon Bronner, who is a member of the governing body of the ASA,

---

*The* object of the association shall be the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity.

ASA Const. art. I, § 2 (emphasis added).

27

is a legal representative through whom Plaintiffs can derivatively assert their *ultra vires* claims. (A.C. ¶¶ 70-73; 85.)  Therefore, Defendants' citation to D.C. Code §29-403.04 is inapposite.

Finally, Defendants' challenge of the merits of the *ultra vires* claims is inappropriate at the motion to dismiss stage.  In asking this Court to dismiss the *ultra vires* claims, Defendants urge this Court to adopt Defendants' interpretation of the ASA's bylaws and other governing documents and even go so far as to argue that any ambiguities in these documents should be construed in favor of the Defendants.[5]  Motion at pp. 22-24 and n. 9.  However, on a motion to dismiss, a court is not to weigh the evidence but must determine whether any evidence may be put forth to support the claims of the plaintiffs. *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 950 (D.C. Cir. 2013) (stating that on motion to dismiss for failure to state a claim, a court must assess the legal feasibility of the complaint, but may not weigh the evidence that might be offered to support it.); *Johnson v. Long Beach Mortg. Loan Trust 2001-4*, 451 F. Supp. 2d 16, 46–47 (D.D.C. 2006) (a contract attached to a motion to dismiss is a "matter outside the pleading" and cannot be considered at this stage.)[6]

---

[5] Defendants misstate the applicable law by citing a 1915 case from West Virginia and a 1934 case from Illinois to argue that any ambiguity in the ASA's governing documents should be construed in favor of the ASA.  Motion, p. 24 at n. 9. However, under the well-established doctrine of contra proferentem, ambiguities in governing documents are construed against the corporate drafter.  *Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 366 (3d Cir. 2014) (explaining that  the concept of *contra proferentem* could apply to resolving ambiguities in an organization's bylaws); *Norton v. K–Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del.2013) (discussing contra proferentem in the context of a dispute involving a limited partnership agreement between limited partners, a general partner, and the board of directors); *see also SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 42–44 (Del.1998) (applying contra proferentem when interpreting a partnership agreement); *Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 935 (Del.Ch.2012) (applying contra proferentem when interpreting a certificate of incorporation).

[6] *See also Davis v. Cox*, No. 11-2-01925-7 (Wash. Super. Ct. Feb. 25, 2016) (denying a motion to dismiss *ultra vires* claims based on defendants' decision to boycott Israeli goods.  The court held under similar procedural law, "that any ruling [regarding the argument that defendants acted beyond the scope of their authority] is not appropriate in a motion under CR 12(b)(6) as it requires review of and potential interpretation of the bylaws and other documents beyond the complaint in this case. The Court cannot and will not decide this argument in a 12(b)(6) motion.")

For the foregoing reasons, this Court should deny Defendants' motion to dismiss the *ultra vires* claims.

For other cases, see *Anderson v. Enterprise Lodge No. 2, Independent Order of Odd Fellows*, 80 Wn. App. 41, 906 P.2d 962, 966 (Wash. Ct. App. 1995) ("Disputes [which] are judicially cognizable" include those "(1) involving property rights of members . . . , and (2) involving whether the organization's 'proceedings were regular, in good faith, and not in violation of the laws of the order or the laws of the state'"); *Reed v. Quatkemeyer*, 647 So. 2d 172, 173 (Fla. Ct. App. 1994) ("Absent a property interest, the governing body of a social organization is the final arbiter of the sufficiency of cause for expulsion," and "the courts will not interfere with the decisions of fraternal organizations with regard to its grievances absent fraud or bad faith"); *Putka v. First Catholic Slovak Union of the United States and Canada*, 75 *Ohio App.* 3d 741, 600 N.E.2d 797, 802 (Ohio Ct. App. 1991) ("In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision by [a voluntary] association in accord with its own charter and rules made by the governing body must be accepted by courts of law"); *Rutledge v. Gulian*, 93 N.J. 113, 459 A.2d 680, 683, 686 (N.J. 1983) ("member's valuable personal relationship to the organization [is] the true basis for judicial relief against wrongful expulsion," but "judicial intrusion should be confined to procedures that are fundamentally unfair"); *Moran v. Vincent, Worthy Grand Matron of the Grand Chapter of the Order of the Eastern Star*, 588 S.W.2d 867, 870 (Tenn. Ct. App. 1979) ("courts may intervene where the procedures of the [organization] were not followed or where its officers acted in an arbitrary, oppressive, or unlawful manner").

## V.  THE COMPLAINT DOES NOT VIOLATE THE FIRST AMENDMENT

Defendants' First Amendment arguments are flatly wrong.  The claims brought by Plaintiffs are based on general principles of corporate and contract law that require that an incorporated non-profit entity abide by its promises.  These generally applicable rules apply even

where there is an incidental effect on speech, and particularly where, as here, the entity made those promises entirely voluntarily.

### A. Plaintiffs' Claims Arise Under Generally Applicable Laws and Do Not Violate the First Amendment.

Defendants quote from *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), but they fail to acknowledge the key holding of the case.[7]  *Cohen* holds that enforcement of generally applicable laws does not violate the First Amendment, even where application of those laws may have an incidental effect on speech.  *Cohen* is directly on point, and consistent with its holding, Defendants' First Amendment argument clearly fails.

*Cohen* involved a claim of promissory estoppel brought against a newspaper for publishing the identity of a confidential informant.  Defendants argued that the identity of the individual was a matter of public significance, and that its publication was protected by the First Amendment.  They further argued that a judicial finding against the paper for disclosing the informants identity would be subject to strict scrutiny.  *Id*. at 668-69.  The Minnesota Supreme Court adopted Defendants' view.

The United States Supreme Court reversed.  Rejecting Defendants' theory that strict scrutiny should apply, the court held that the case turned on the "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement . . . has incidental effects" on speech.  *Id*. at 669.

---

[7] Defendants quote *Cohen* and *New York Times Co. v. Sullivan*, 376 U.S. 254, 277-78 (1964) for the general principle that action by the court constitutes state action for purposes of the First Amendment.  MTD at 19.  Plaintiffs do not dispute that general principle, but it is irrelevant to the present case, because the action plaintiffs ask of the court – enforcement of the generally applicable rules underlying Plaintiffs' claims – does not violate the First Amendment.

The court listed numerous laws of general application that apply to the press, including copyright laws, the National Labor Relations Act, the Fair Labor Standards Act, antitrust laws, and tax laws.  Although they may incidentally burden speech when applied to the press, the court held that "enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Id*. at 670.  The Court concluded, "There can be little doubt that the Minnesota doctrine of promissory estoppel is a law of general applicability.  It does not target or single out the press.  Rather, insofar as we are advised, the doctrine is generally applicable to the daily transactions of all the citizens of Minnesota.  The First Amendment does not forbid its application[.]" *Id*.

Plaintiffs' claims here arise under rules that are generally applicable to the daily transactions of all of those in the District who form contracts (of any kind), incorporate entities, purchase shares of stock, donate to incorporated non-profit entities, and serve on boards of directors.  They are not directed not at speech; indeed, any effect on speech would be purely incidental.  As in *Cohen*, the First Amendment does not bar the usual and lawful enforcement of these rules by the court.

## B.  Plaintiffs' Claims Seek To Enforce Self-Imposed Restrictions that Do Not Violate the First Amendment

Defendants' effort to hide behind famous civil rights cases, protecting from *government restriction* the right to engage on boycotts, is a very red herring.  The issue here is not at all the question in those cases – whether *the Government* may, for reasons of *the Government's choosing,* prevent people or organizations from engaging in boycotts.  Plaintiffs do not ask this Court to enforce any government-imposed duty not to boycott.  Plaintiffs in this case simply ask the Court to enforce the restriction on its activities that the ASA itself assumed, by creating itself

31

as an exclusively scholarly organization that would never engage in propaganda or seek to influence government policy.

As the District of Columbia Court of Appeals explained in *Family Fed'n*, "[a]n organization plainly established to promote the preservation of African wildlife and acquiring vast funds on that basis might well be barred from switching its purpose to expenditures on domestic cats and dogs regardless of how technically such a switch might be read into the text of its articles of incorporation." 129 A.3d at 252. Absent the self-imposed restriction, nothing at all would have prevented an organization from protecting dogs and cats, and one can well imagine that the First Amendment's speech and association clauses would protect the right of people and organizations to join together to pursue that worthy cause. But if *the organization* itself collects dues, and secures donations, on the strength of its commitment to do something entirely different, nothing in the First Amendment would preclude enforcement of that voluntarily assumed restriction.

The cases recognize this clear distinction, without which every confidentiality agreement, every trade secret case, and many agreements settling litigation would become suspect under the First Amendment because they involve voluntarily assumed restrictions on what a party will say to someone else. Thus, in *United Egg Producers v. Standard Brands, Inc*., 44 F.3d 940, 943 (11th Cir. 1995), the Eleventh Circuit held enforcement of a non-disparagement provision in a settlement stipulation does not constitute state action, and thus does not trigger First Amendment protections. The *United Egg Producers* court explained:

> Without governmental action there can be no First Amendment violation. *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 93 S. Ct. 2080, 36 L. Ed. 2d 772 (1973); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S. Ct. 2513, 115 L. Ed. 2d 586 (1991). . . . In holding that court enforcement of the Stipulation [restricting speech] is not governmental action, we follow other courts which have indicated that where a court acts to enforce the right of a private party which is permitted but not

compelled by law, there is no state action for constitutional purposes in the absence of a finding that constitutionally impermissible discrimination is involved. *See Cable Invest., Inc. v. Woolley*, 680 F. Supp. 174, 177 (M.D.Pa.1987) (*citing Parks v. "Mr. Ford*, 556 F.2d 132, 136, n. 6a (3d Cir.1977)). *See also Gresham Park Community Organization v. Howell*, 652 F.2d 1227, 1239 (5th Cir.1981); *Schreiner v. McKenzie Tank Lines & Risk Management Services, Inc.*, 408 So. 2d 711, 719 (Fla. Dist. Ct. App. 1982).

Thus as the DC Circuit has held, "if, for constitutional purposes, every private right were transformed into governmental action by the mere fact of court enforcement of it, the distinction between private and governmental action would be obliterated." *Edwards v. Habi*b, 397 F.2d 687, 691 (D.C. Cir. 1968). More generally, "there is no state action when a court "approv[es] or acquiesce[s] in the initiatives of a private party." *Blum v. Yaretsky*, 457 U.S. 991, 1004-05, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982). Thus, in the context of a contractual limitation of speech, there is no state action unless the court enjoins speech that is beyond the scope of the parties' agreement. *USA Techs., Inc. v. Tirpak*, 2012 U.S. Dist. LEXIS 72318 (E.D. Pa. 2012).

In this case the only duty to avoid boycotts that Plaintiff asks this Court to enforce is the duty the ASA voluntarily assumed. That source of the duty means there is simply no state action here. The First Amendment is therefore completely irrelevant. And so, therefore, are the great principles enunciated in *Mills v. Alabama*, 384 U.S. 214 (1966), *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and *NAACP v. Alabama ex re. Patterson*, 357 U.S. 449 (1958), *inter alia*.[8]

---

[8] Because only voluntarily assumed, and completely private, restrictions on activity are at issue here, no broader question about the constitutionality of regulating boycotts is implicated. But in the interest of completeness it should be noted that in any event, a boycott need not only be speech: it can also be conduct. And insofar as it is conduct it is regulatable, and subject to restriction, even ***by*** state action. *Jews for Jesus, Inc. v. Jewish Community Relations Council,* 968 F.2d 286 (2nd Cir. 1992). That case upheld the enforcement of laws barring discrimination on the basis of religion in the use of public accommodations, even when restrictions on such use were sought by religious organizations for religious reasons.

**C. The ASA Voluntarily Waived the First Amendment Argument Defendants Raise Here**

The ASA voluntarily drafted the organization's corporate mission, and was not restricted in any way when it did so.  The ASA also relied on that mission statement when it voluntarily formed a non-profit entity under the laws of the district, when it applied for and received non-profit status from the IRS, and when it formed a contract with each of its members.  It is well-established that a party that "effectively bargained away some of its free speech rights. . . . cannot [then] invoke the first amendment to recapture surrendered rights." *Paragould Television v. City of Paragould*, 930 F.2d 1310, 1315 (1991) ("Cablevision voluntarily entered into the franchise agreement[.] . . . The forum for protecting its free speech rights was the bargaining table, not the courtroom seven years later").  As the Supreme Court held in *Cohen*, the "law simply requires those making promises to keep them.  The parties themselves, as in this case, determine the scope of their legal obligations[.]" *Cohen* at 770-71.  *See Perricone v. Perricone*, 292 Conn. 187, 200-05 (2009) ("as numerous courts have recognized, when private parties – and not the government – voluntarily have defined the scope of the disclosures that would trigger sanction, the parties cannot complain if the court merely holds them to their promises"); see also *Erie Telecommunications, Inc. v. Erie*, 853 F.2d 1084, 1099 (3d Cir. 1988).  Relying on *Cohen*, the Connecticut Supreme Court held that an agreement that restricts speech "constitutionally may be enforced by the courts even if the contract is not narrowly tailored to advance a compelling state interest." 292 *Conn*. at 205.

The ASA Constitution, corporate mission, and contractual agreements with each of its members were adopted, voluntarily, by the ASA itself.  Defendants' attempt to invoke the First Amendment to absolve them from their promises must fail.

## VI.   PLAINTIFFS' DIRECT CLAIMS AGAINST THE INDIVIDUAL ARE ENTIRELY APPROPRIATE

Without bothering to cite even a single case, or even to acknowledge the holdings of cases Defendants themselves cited elsewhere in their brief, Defendants suggest that the District of Columbia's statute authorizing suit for *ultra vires* actions somehow immunizes the corporate agents who actually commit the improper actions.  The statute in fact says nothing of the kind, and District of Columbia case law makes clear that Defendants' claim of immunity is wrong.

The statute Defendants invoke does nothing more than *authorize* ultra vires actions – thereby codifying an equitable cause of action that has existed for centuries.  Contrary to Defendants' claim, however, the statute contains absolutely no language precluding any claim, against any entity.  Defendants would have this Court read the statutes *grant* of authority – authorizing an ultra vires claim "against the corporation" to say as well that "no such action may proceed against anyone else."  But the statute says nothing of the kind, and indeed it contains no restriction on an aggrieved party's right to sue anyone.

In any event, the opinion of District of Columbia Court of Appeals in *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723 (D.C. Ct. App. 2011) explicitly rejects Defendants' theory that some categorical immunity precludes a claim against corporate agents, arising out of *ultra vires* actions they caused the corporate entity to take.  That holding, which Plaintiffs cited above at 12, is clear:  the District "explicitly declines to adopt the so-called fiduciary shield doctrine" which immunizes corporate agents from claims arising out of their assertedly *ultra vires* actions.

Moreover, there is no inconsistency between the mandate of the DC statute Defendants invoke and the direct claims Plaintiffs press in this case.  The fact that the illegality of the corporation's action can only be adjudicated in a case in which the corporate entity is named as a

defendant does not in any way preclude a Plaintiff from recovering damages, from a corporate

officer, if those damages were caused by the officer's actions.  And Defendants cite nothing to

suggest the existence of any such shield – which is not surprising, because the rejection of the

fiduciary shield doctrine precisely precludes any such argument.  Indeed, any conceivable

immunity from such a claim would depend entirely on the actions being *valid* corporate actions –

i.e., that they were *not* actions taken *ultra vires.  Cf. Dugan v. Rank,* 372 U.S. 609 (1963) (no

immunity for government official who commits *ultra vires* actions).

## VII.    DEFENDANTS BREACHED THEIR OBLIGATIONS TO PLAINTIFFS UNDER CONTRACT LAW AND THE NON-PROFIT CORPORATIONS ACT

Plaintiffs claim that the ASA's voting procedures breached the association's obligations

to its members.  This claim is set forth in alternative counts.   Count IV presents a claim for

breach of contract, based on ASA's failure to meet the voting requirements set forth in Art. XI, §

3 of the ASA bylaws.  In the alternative, Count V alleges that the vote violated the quorum

requirement set forth in NCPA § 29-405.24.

It must be noted at the outset of this discussion that Defendants have not challenged this

bifurcation into two alternative theories.  In addition, Defendants have not challenged the second

of these two alternatives: nothing in their brief urges the Court to reject the second alternative

claim for relief, or offers any explanation of why that claim is unfounded. Necessarily, therefore,

that claim survives and must proceed.  Defendants' arguments only address Count IV.

Defendants do not argue anywhere in their brief that Count V fails to state a claim upon which

relief can be granted; in fact, Defendants do not mention Count V or § 29-405.24 at all.

Defendants have therefore now waived their opportunity to challenge Count V under Rule

12(b)(6), and Count V must survive this motion to dismiss.

The one attack Defendants do attempt to make necessarily fails, because Plaintiffs adequately alleged Count IV's claim for breach of contract.  The Amended Complaint alleges that the vote on the resolution did not meet the requirements set forth in Art. XI, § 3 of the ASA bylaws, which sets forth the procedure for the membership to vote on "Public Issues." Defendants argue that Art. XI, § 3 does not apply to the resolution vote.  As discussed below, these arguments are both unconvincing and inappropriate for at this stage, because they require the court to consider and resolve factual issues on a motion to dismiss.

As a preliminary matter, Defendants concede, as they must, that the ASA constitution and bylaws form a contract between the ASA and its members.  (Def. Br. 27.)  Defendants thus do not dispute Plaintiff's claim that failure to abide by applicable voting requirements explicit in an organization's bylaws constitutes breach of contract, nor do they argue that damages and declaratory and injunctive relief are inappropriate remedies for such breach.  Defendants also do not argue here that the resolution vote complied with Art. XI, § 3.  Defendants' sole argument is that Art. XI, § 3 is not applicable to the vote on the boycott resolution.  This is clearly a question of fact.

Art. XI of the ASA bylaws sets forth the procedures for the ASA to follow when it considers whether to speak or act on a "public issue."  Art. XI is the only section of the bylaws that addresses statements or actions to address issues of "social justice," public policy, or any expression of opinion on political matters, domestic or international.  Article XI, § 3 sets forth the requirements for voting on "public issues," and is the only provision in the bylaws that addresses voting by the membership at all, with the sole exception of Article VI, § 4, which addresses the election of officers, and clearly does not apply to the resolution vote.

Defendants advance their claim that Art. XI, §3 is inapplicable to the vote on the Boycott Resolution even though there is no other provision anywhere in the bylaws that addresses public issues, or indeed voting by the membership on any issue (except officer elections).

Strikingly, therefore, Defendants do not even argue that there is some other bylaw provision that might apply to this vote on a public issue.  Instead, Defendants argue that Art. XI, § 3 does not apply because the council did not deem the boycott resolution to be a matter that required action at a particular annual meeting.  Yet it is clear that the council did deem the matter to be one that required action (because they recommended action), and it is clear that the council also formulated a response (indeed, they issued their own statement on the resolution), and, finally, it is clear that the council called for a vote of the membership.  Plaintiffs allege all of these facts, which are supported by the council's own public statements – and which Defendants do not dispute in any way in their motion papers.

According to Defendants' argument, whether or not Art. XI, § 3 applies depends on two issues:  1) whether, when the council deemed that the issue required action (which it clearly did do), it also deemed that the action must be "at a particular annual meeting," and 2) whether the portion of the 2013 meeting that was dedicated to the vote on the boycott resolution was deemed to be "an emergency meeting."  Defendants' arguments that these questions must be resolved in the affirmative in order for the voting requirements to apply make no practical sense, because it asks the Court to adopt an interpretation of the by-laws as a whole that is plainly irrational.  Why would the drafters require a 2/3 vote if the council deems that an issue requires action, but only if the action is required at an annual meeting?  At the same time, why would the by-laws entirely leave open the question of how to conduct a vote on the exact same issue if the council deemed that the issue requires action the week after the annual meeting?

38

The correct interpretation of Art. XI, § 3 leaves the Court with no such obligation to postulate that these rules impose irrational distinctions.  When the council deems an issue of public interest to require action by the membership, it must bring the issue to a vote at the annual meeting, and that two-thirds of those in attendance at the meeting must vote in favor of the action for it to pass.

However, under any interpretation of the bylaws, the question of whether Art. XI, § 3 applies here requires the Court to delve into factual issues outside of the pleadings.  Past practice of the Association will bear on this issue.  Statements made by the individual Defendants themselves will bear on what they were doing, and on their own admissions regarding whether the 2/3 threshold was binding.  These issues simply are not amenable for resolution under Rule 12(b)(6).

Finally, Plaintiffs note that if Art. XI does not apply to the boycott resolution, Defendants must concede that the ASA bylaws provide absolutely no procedure for considering and adopting this resolution – a fact that is certainly persuasive with respect to Plaintiffs' *ultra vires* claims. The bylaws provide procedures for the types of decisions the ASA is expected to make under its corporate mission.  If Art. XI does not apply to the boycott resolution, we can only assume that those who drafted the ASA constitution and bylaws did not anticipate needing any procedure for voting on such matters.  And that tells us a lot about what the drafters considered to be within the corporate mission of the ASA.

This is one reason why Plaintiffs brought Count V in the alternative to Count IV.  The ASA was created as an academic association, and the ASA bylaws were written for an academic organization, not an organization whose purpose is to issue political statements on controversial matters of international politics.  And that is exactly why Plaintiffs have brought this lawsuit.

In conclusion, Count IV and Count V are brought in the alternative, and both adequately allege that the conduct of the boycott vote violated ASA's obligations to its members for purposes of this motion to dismiss.  Defendants do not even argue for dismissal of Count V, and now have waived their opportunity to do so under Rule 12(b)(6).

## CONCLUSION

The Amended and Verified Complaint alleges a wealth of detail regarding both the effort of the individual Defendants to hijack the American Studies Association, in breach of the ASA's commitments in its organic documents and decades of the Association's practice; as well as individual Defendants' specific breach of law and the ASA's rules to generate what they claim, incorrectly, is adoption of a Boycott Resolution that (a) was not in fact adopted in compliance with applicable governing provisions and (b) is itself a breach of binding restrictions on the ASA's nature and activities.

For the foregoing reasons, the Court should deny Defendants' Renewed Partial Motion to Dismiss the Amended Complaint in this action.

Dated:  July 21, 2016

Signed:  */s/ Jerome M. Marcus*
Jerome M. Marcus

**MARCUS & AUERBACH LLC**

Jerome M. Marcus, Esq.  (admitted pro hac vice)
Jonathan Auerbach, Esq.  (admitted pro hac vice)
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250

**BARNES & THORNBURG LLP**

Scott Godes, Esq.  (D.C. Bar No. 463674)
Devin Stone, Esq.  (D.C. Bar No. 1022055)
1717 Pennsylvania Avenue NW, Suite 500
Washington, DC 20006-4623
(202) 408-6928

L. Rachel Lerman, Esq.  (admitted pro hac vice)
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3871

**THE LOUIS D. BRANDEIS CENTER
  FOR HUMAN RIGHTS UNDER LAW**

Kenneth L. Marcus, Esq.  (D.C. Bar No. 437391,
D.D.C. member)
Jennifer Gross, Esq.  (D.C. Bar No. 1003811,
D.D.C. bar application pending)
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006-4623
(202) 559-9296

41

**CERTIFICATE OF SERVICE**

I certify that on July 21, 2016, I caused to be filed *Plaintiffs' Memorandum in Opposition to Defendants' Renewed Partial Motion to Dismiss* with the Clerk of Court using the CM/ECF system, which will send notice of this filing to all parties registered to receive such notice.


/s/ *Jerome M. Marcus*_____
Jerome M. Marcus