# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SIMON BRONNER, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 16-0740 (RC) |
| | : | | |
| v. | : | Re Document No.: | 21 |
| | : | | |
| LISA DUGGAN, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' RENEWED MOTION TO DISMISS

## I. INTRODUCTION

Plaintiffs bring this suit in their individual capacities and derivatively on behalf of the American Studies Association, alleging that a group of academic leaders improperly introduced and implemented an academic boycott of Israel. Plaintiffs seek injunctive relief and damages from the American Studies Association for alleged breach of fiduciary duty, *ultra vires* acts, breach of contract, and violation of the D.C. Nonprofit Corporation Act. They seek recovery for alleged *ultra vires* acts and waste against the pro-boycott leaders directly. Defendants move to dismiss on several grounds, including lack of subject-matter jurisdiction, lack of personal jurisdiction, the First Amendment, and failure to state a claim. With respect to their contention that Plaintiffs do not state cognizable claims, Defendants' argument does not extend to Plaintiffs' claims for waste or violation of the D.C. Nonprofit Corporation Act.

Although the Court finds that it possesses jurisdiction and it would not violate the First Amendment to rule against Defendants in this case, it also finds that Plaintiffs, in part, failed to state cognizable claims. Although Plaintiffs allege plausible direct claims for breach of contract and waste, their failure to adequately demand that the nonprofit corporation remedy the situation

internally makes them ineligible to proceed derivatively under District of Columbia law.

Additionally, because Plaintiffs do not allege facts suggesting that Defendants acted in violation

of an express prohibition in the bylaws, they fail to state cognizable *ultra vires* claims.

Accordingly, the Court will dismiss Plaintiffs' derivative claims and *ultra vires* claim.  The case

will proceed, however, with Plaintiffs' direct claims for waste, breach of contract, and violation

of the D.C. Nonprofit Corporation Act, which survive dismissal.

## II.  FACTUAL BACKGROUND

Plaintiff Simon Bronner brings this action derivatively on behalf of the American Studies

Association ("ASA") against Defendants Lisa Duggan, Curtis Marez, Avery Gordon, Neferti

Tadiar, Sunaina Maira, and Chandan Reddy (collectively "Individual Defendants") for breach of

fiduciary duty, *ultra vires* acts, and waste.  *See* Am. & Verified Compl. for Derivative and Direct

Claims ("Compl.") at 1, ECF No. 19.  Plaintiffs Bronner, Michael Rockland, Michael Barton,

and Charles Kupfer (collectively "Individual Plaintiffs") bring this action directly against the

ASA for breach of contract and violation of the D.C. Nonprofit Corporation Act, and against all

Defendants for *ultra vires* acts and waste.  Compl. at 1–2.  Individual Plaintiffs are or were

members of the ASA during the time period at issue.  *See* Compl. ¶¶ 11–14.  Individual

Defendants were involved with the ASA in different capacities during the relevant time period.

*See* Compl. ¶¶ 16–21.  Individual Plaintiffs are citizens of Pennsylvania and New Jersey.

Compl. ¶¶ 11–14.  Individual Defendants are citizens of California, New York, and Washington.

Compl. ¶¶ 16–21.  The ASA is organized under the District of Columbia's nonprofit laws and

maintains its corporate headquarters there.  Compl. ¶ 15.

### A.  The American Studies Association

The ASA is a nonprofit organization whose object is "the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity." *See* Const. & Bylaws of the Am. Studies Ass'n ("ASA Const. & Bylaws"), Const., Art. I § 2, Defs.' Ex. 1, ECF No. 21-3.[1]  Founding documents of the ASA provide that the society was "organized exclusively for education and academic purposes." Compl. ¶ 24.  The president of the ASA presides over the National Council and has a duty to "fulfill the chartered obligations and purposes of the [ASA]."  ASA Const. & Bylaws, Const., Art. IV § 2.  The National Council is charged with "conduct[ing] the business, set[ting] fiscal policy, . . . and oversee[ing] the general interests of the [ASA]."  ASA Const. & Bylaws Const. Art. V § 2.  There are 23 voting members of the National Council.  Compl. ¶ 74; ASA Const. & Bylaws, Const., Art. V § 1.  Under the ASA's bylaws, "[n]o substantial part of the activities of the [ASA] shall be the carrying on of propaganda, or otherwise attempting, to influence legislation, and the corporation shall nor participate in, or intervene in . . . any political campaign on behalf of any candidate for public office."  Compl. ¶ 25.  According to the complaint, the ASA has conformed to these rules for decades and has established a "uniform practice" that prevents the ASA from advocating for particular positions on U.S. government policy.  Compl.

---

[1] Because Plaintiffs specifically reference the ASA Constitution and Bylaws in their complaint, *see, e.g.*, Compl. ¶¶ 22, 32, the Court considers them in the context of this motion to dismiss without converting the motion to one for summary judgment. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (4th ed. 2014)).

¶ 25.  Based "solely on the condition and understanding that this practice would be followed," Individual Plaintiffs donated time and money to the ASA.  Compl. ¶ 26.

The ASA bylaws provide that "[t]he Executive Committee [may] speak for the [ASA] on public issues [that] directly affect" the scholarly work of the ASA's members.  *See* ASA Const. & Bylaws, Bylaws, Art. XI § 1.  These bylaws also provide that if "an issue arise[s] which, in the opinion of the Executive Committee or Council, seems to require public action, speech[,] or demonstration by the association at a particular annual meeting, . . . [t]he Council shall convene an emergency meeting of the membership on the first full day of the annual meeting[] to recommend a course of action [and] conduct a public discussion of the issue."  *See* ASA Const. & Bylaws, Bylaws, Art. XI § 3.  The votes of two-thirds of the members in attendance at the emergency meeting are required for such a proposition to pass.  *See* ASA Const. & Bylaws, Bylaws, Art. XI § 3.

In 2013, the ASA elected Defendant Marez to be its president.  Compl. ¶ 28.  Mr. Marez ran on a platform of campus openness and "making knowledge less privatized and more equally distributed."  Compl. ¶ 28.  He did not mention Israel or the concept of an academic boycott during his campaign.  *See* Compl. ¶ 28.  According to the complaint, after he was elected, Mr. Marez made Israel the "central focus" of the ASA under his leadership, and generally began turning the ASA into a "social justice" organization.  Compl. ¶ 29.

## B.  ASA's Boycott Resolution

At the ASA's annual meeting in November 2013, ASA leadership introduced a resolution advocating for the boycott of Israeli academic institutions on the grounds that Israel restricted academic activity in formerly Jordanian-occupied territory that came under Israeli control after the Six Day War in 1967.  *See* Compl. ¶ 41.  The boycott resolution's preambulatory clauses

stated that the ASA is devoted to "the struggle against all forms of racism," that the United States

helps enable Israel to illegally occupy Palestine, that there is "no effective or substantive

academic freedom for Palestinian students and scholars under conditions of Israeli occupation,"

and that the ASA is dedicated to the rights of students and scholars in Israeli institutions.  Compl.

¶ 31.  The operative clause of the resolution read as follows:

> It is resolved that the American Studies Association (ASA) endorses and will
> honor the call of the Palestinian civil society for a boycott of Israeli academic
> institutions.  It is also resolved that the ASA supports the protected rights of
> students and scholars everywhere to engage in research and public speaking about
> Israel–Palestine and in support of the boycott, divestment, and sanctions (BDS)
> movement.

Compl. ¶ 31.  During the presentations in support of the resolution, the proponents allegedly did

not present any data or research, did not address how the affected institutions were founded, and

did not specifically address "any . . . aspect of the actual state of academic freedom in the

[t]erritories at any time."  Compl. ¶ 45.  Instead, the speakers' "principal focus" was on an

alleged apartheid state in the territories at issue, and the need for the ASA to support the ending

of "the so-called settler-colonialist Zionist project" and America's support for these policies.

Compl. ¶ 48.  Plaintiffs allege that no speakers in opposition to the resolution were invited to

speak during the course of the discussion, Compl. ¶ 47, and that Defendants "actively prevented

an informed and methodical discussion of the Boycott resolution" in part by actively preventing

opponents of the measure from being heard.  Compl. ¶ 46.

    Individual Defendants were involved with the boycott resolution in varying degrees.

Defendants Marez and Gordon co-hosted the discussion of the resolution.  Compl. ¶ 16–17.

Defendant Tadiar is alleged to have helped plan the 2013 convention.  Compl. ¶ 18.  Defendants

Maira, Duggan, and Reddy are alleged to have been members of the 2013 National Council and

Executive Committee.  Compl. ¶¶ 19–21.  Plaintiffs allege that Individual Defendants each

engaged in actions that were intended to, and did in fact, alter the nature and purpose of the ASA. Compl. ¶ 30. Individual Defendants are alleged to have jointly led the campaign for the ASA to adopt the boycott resolution. Compl. ¶ 2. Plaintiffs further allege that a majority of the current National Council members are supporters of the boycott resolution, but do not specifically plead facts showing that a majority actually participated in the adoption of the resolution. Compl. ¶ 74.

According to the Amended Complaint, the ASA National Committee allowed ASA members to vote at any time during a ten-day period in December, the month following the 2013 convention. Compl. ¶ 33. Plaintiffs allege that, although around 5,000 people were members of the ASA at the time of the conference, Compl. ¶ 33, only 1,252 voted on the proposal, with 828 voting in favor of the resolution. Compl. ¶ 33. So, according to Plaintiffs, of the members who voted on the resolution, just under two-thirds voted in favor. Compl. ¶ 33.

Plaintiffs also suggest that Defendants manipulated the vote. According to the complaint, members of the ASA who supported the resolution encouraged their students to join the ASA because they knew the students would vote in favor of the resolution. Compl. ¶ 40. Around the same time, at least one Individual Plaintiff attempted to vote but was told by ASA leadership that he could not vote on the resolution "ostensibly because he renewed [his ASA membership] too late to vote." Compl. ¶ 35. Plaintiffs allege that at least one other person who renewed his membership just before the vote was allowed to vote despite the individual plaintiff being barred from doing so under similar circumstances. Compl. ¶ 38. At the end of voting, the ASA asserted that the resolution passed. Compl. ¶ 33.

Plaintiffs allege that since the boycott, several members of the ASA have resigned in protest of the boycott, financially depriving the ASA of membership dues for years to come.

Compl. ¶ 60.  Moreover, Plaintiffs allege that the ASA has experienced a significant decline in reputation because of the boycott.  The ASA is alleged to have suffered financial harm as a result of the boycott because of an alleged decrease in donations and an increase in public-relations spending required by the need to deal with the public backlash resulting from the boycott. Compl. ¶ 61.  Although Plaintiffs do not allege any specific amounts of damages in their complaint, they do, in their "Jurisdiction and Venue" section, assert that "the amount in controversy exceeds $75,000."  Compl. ¶ 9.

The ASA, through its Executive Director, has countered that the ASA's membership dues actually increased in the year following the boycott and have not significantly changed since then.  *See* Decl. of John Stephens ("Stephens Decl.") ¶¶ 5–8, ECF No. 21-2.  The ASA also claims that it received an increase in grants and contributions following the boycott.  This increase is alleged to have amounted to almost $40,000 in the first year, with a total of $49,000 specifically designated by donors for support of the boycott resolution.  Stephens Decl. ¶ 9. However, the ASA acknowledges that it spent $20,000 of the funds received in support of the boycott resolution on a media strategist, and spent over $15,000 on boycott-related expenses during annual meetings.  Stephens Decl. ¶¶ 10–14.  All said, according to the Executive Director of the ASA, "there has been no financial loss on ASA's part as a result of the Resolution[, and] [i]f anything, there has been a net gain of at least $11,770[]."  Stephens Decl. ¶ 16.

Prior to filing this suit, some Individual Plaintiffs allege that they attempted to get the ASA to rescind the resolution and reorient its focus away from Israel.  Compl. ¶ 8.  According to the complaint, two Individual Plaintiffs, one of whom was an officer and member of the ASA governing council, "repeatedly attempted to have the Defendant ASA usurpers abide by the rules and procedures set forth in [the] ASA's [c]onstitution."  Compl. ¶ 8.

But the complaint does not further specify what actions Plaintiffs took to resolve these issues short of filing this suit.  According to the Complaint, "Plaintiff Bronner has issued a written Demand to the Council that it investigate these claims and that it cause the ASA to prosecute such claims."  Compl. ¶ 75.  Although the complaint does not indicate when this demand was made, Defendants attach the demand letter as an exhibit to their motion to dismiss. Defs.' Mot. Dismiss Ex. 2, ECF No. 21-4.  It is dated April 18, 2016, two days before Plaintiffs filed their complaint in this case, and apparently attached a copy of the original complaint. Defs.' Mot. Dismiss Ex. 2, ECF No. 21-4.  Plaintiffs do not contest the authenticity of the demand document.  Pls.' Mem. Opp'n Defs.' Renewed Partial Mot. Dismiss ("Pls.' Opp'n") at 19–25, ECF No. 23.

Plaintiffs allege that, despite their pre-suit efforts to resolve these issues and their written demand, Defendants have allegedly "made clear that they will not voluntarily redress Plaintiffs' concerns."  Compl. ¶ 8.  Plaintiffs support this contention by citing the ASA's expenditures on public relations, continued efforts to turn the ASA into a "social justice" organization, and their publicly-stated positions in favor of the boycott and efforts to defend the boycott in publications. Pls.' Opp'n at 22.

## III.  LEGAL STANDARDS

### A.  12(b)(1)

Plaintiffs have the burden of showing subject-matter jurisdiction, and their allegations are not presumed to be truthful.  *Carmona v. Snow*, 2007 WL 915220, at *2 (D.D.C. Mar. 26, 2007) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 n.16 (3d Cir. 1977)). Indeed, the Court must give the plaintiff's allegations "closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim."

*Ludvigson v. United States*, 525 F. Supp. 2d 55, 56–57 (D.D.C. 2007).  In doing so, the Court

may consider evidence outside of the pleadings.  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192,

197 (D.C. Cir. 1992); *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

### B.  12(b)(2)

The plaintiff bears the burden of establishing personal jurisdiction over each defendant.

*Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  And, although the court

must resolve any factual discrepancies in favor of the plaintiff, *Crane*, 894 F.2d at 456, "[b]are

allegations and conclusory statements are insufficient," *Johns v. Newsmax Media, Inc.*, 887 F.

Supp. 2d 90, 95 (D.D.C. 2012).  *See also Second Amendment Found. v. U.S. Conference of*

*Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).  A court may consider evidence outside of the

pleadings to resolve questions of personal jurisdiction.  *See Mwani v. bin Laden*, 417 F.3d 1, 7

(D.C. Cir. 2005).

### C.  12(b)(6)

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as

true, would state a plausible claim to relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Id.*  Instead, plaintiffs must "nudge[] their claims across the line

from conceivable to plausible."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "In

evaluating a Rule 12(b)(6) motion to dismiss, a court may consider the facts alleged in the

complaint, documents attached as exhibits or incorporated by reference in the complaint, or

documents upon which the plaintiff's complaint necessarily relies even if the document is

produced not by [the parties]." *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133–34

(D.D.C. 2013) (alteration in original) (internal citations and quotation marks omitted).

## IV.  ANALYSIS

Defendants move to dismiss on several grounds.  First, they contend that the Court lacks

subject-matter jurisdiction because Plaintiffs do not meet the amount-in-controversy requirement

to maintain this diversity suit.  Second, they argue that the Court lacks personal jurisdiction over

Individual Defendants because their only alleged connection with the District of Columbia was

the fortuitous location of the ASA's annual meeting.  Third, Defendants argue that a ruling in

favor of Plaintiffs—and thus against the boycott resolution—would constitute state action

infringing on their First Amendment rights.  As their fourth grounds for dismissal, Defendants

argue that Plaintiffs failed to make an adequate pre-suit demand on the ASA because the demand

was made only two days prior to the commencement of this lawsuit, and that the demand would

not have been futile.  Fifth, Defendants contend that, because the ASA had the authority to pass

the boycott resolution, it did not act *ultra vires*.  Sixth, Defendants argue that they did not breach

any contractual obligations owed to the ASA membership—in other words, that they did not

violate the bylaws.  Finally, Defendants argue that the D.C. Nonprofit Corporation Act does not

allow Plaintiffs' claims to proceed against Individual Defendants.

For the reasons set forth below, the Court grants Defendants' Motion to Dismiss in part

and denies it in part.  The Court concludes that it has both subject-matter and personal

jurisdiction.  It has subject-matter jurisdiction because Plaintiffs have shown, beyond the low

standard of legal possibility, that they could recover more than $75,000 if they prevailed.  The

Court has personal jurisdiction over the Individual Defendants because they voluntarily served as

directors of a nonprofit registered in D.C. and attended an annual meeting in D.C. and, thus, have

purposefully availed themselves of the laws and protections of the District of Columbia.

Moreover, because a judgment against Defendants would be based on generally-applicable laws

with only incidental effects on expression, it would not violate the First Amendment. But

Plaintiffs' claims begin to falter when the Court moves to their substantive claims. Because

Plaintiffs bring a derivative claim, they were required to make a demand of the ASA before

bringing suit. But Plaintiffs failed to wait the required time after making their demand—which

would not necessarily have been futile—to maintain their derivative claims. Plaintiffs also fail to

show that Defendants acted contrary to any express prohibitions in the bylaws, and thus do not

state an *ultra vires* claim. Plaintiffs do, however, state a cognizable claim for breach of contract

and Defendants do not move to dismiss their claim for waste. Accordingly, the Court will

dismiss Counts I and II in their entirety, and Count III insofar as it seeks derivative relief on

behalf of the ASA.

### A. The Court Has Subject-Matter Jurisdiction, Because It is Not Legally Impossible for Plaintiffs to Recover More than $75,000

The court first addresses Defendants' argument that Plaintiffs do not exceed the $75,000

amount-in-controversy requirement to maintain this diversity suit. *See* Defs.' Mem. Supp.

Renewed Mot. Dismiss ("Defs.' Mot. Dismiss") at 8–11, ECF No. 21. Defendants contend that

Plaintiffs do not allege any specific losses to the ASA as a result of the boycott, and thus have

not adequately shown that the Court possesses subject-matter jurisdiction. The Court concludes

that Plaintiffs have shown, beyond the low standard of legal possibility, that they could recover

more than $75,000 if they were to prevail.

"Federal courts are courts of limited jurisdiction. They possess only that power

authorized by Constitution and statute . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511

U.S. 375, 377 (1994). Congress has the "prerogative to restrict the subject-matter jurisdiction of

federal district courts" based on the types of claims brought by particular plaintiffs. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 n.11 (2006).  Congress has limited the Court's Article III jurisdiction over diversity cases to matters where the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a).  The parties here do not dispute diversity of citizenship.

In general, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted).  For a court to reject the amount claimed by the plaintiff, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* at 289.  This means that a court should find jurisdiction at this motion-to-dismiss stage of the proceedings even if it has serious doubts as to the bases for establishing the amount in controversy.  *See Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 14 (D.D.C. 2014), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016).  Even a "cursory" allegation of the amount in controversy, if it exceeds the jurisdictional requirement, is sufficient to survive a motion to dismiss. 14AA C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3702, p. 314 (4th ed. 2011); *see also Rosenboro v. Kim,* 994 F.2d 13, 17 (D.C. Cir.1993) ("[T]he Supreme Court's yardstick demands that courts be very confident that a party cannot recover the jurisdictional amount before dismissing the case for want of jurisdiction."); *Martin v. Gibson,* 723 F.2d 989, 991, 993 (D.C. Cir. 1983) (characterizing the *St. Paul Mercury* test as "exacting" and "stringent" in favor of the plaintiff).

Plaintiffs' claims plainly meet the low standard for establishing a sufficient amount in controversy.  The complaint asserts that over $75,000 is in controversy in the case, albeit in a cursory fashion.  *See* Compl. ¶ 9.  It is far from legally certain that Plaintiffs could not recover over $75,000.  The complaint seeks monetary, injunctive, and declarative relief for waste, breach

of contract, breach of fiduciary duties, *ultra vires* acts, and violation of the D.C. Nonprofit

Corporation Act.  *See* Compl. at 25–31.  It specifically alleges that the ASA will lose

membership dues from many former members for years to come.  Compl. ¶ 60.  The complaint

also specifically states that the boycott resolution has "resulted in the improper expenditure of

ASA funds related to membership dealings, public relations, legal matters, and . . . employee

time and effort," and that Individual Defendants are "consciously attempting to appropriate the

assets and reputation of the ASA to achieve purposes . . . at odds with[] [the] purposes and

mission . . . [of] the ASA."  Compl. ¶¶ 80, 84.

Defendants' evidence allegedly showing that the ASA has profited because of the boycott

resolution is irrelevant at this stage.  Even if the ASA has experienced a short-term increase in

revenues, it is possible that the long-term losses could surpass the short-term financial benefits of

the boycott resolution.  At this stage of the litigation, before any discovery has been taken and

Defendants' rosy financial assertions have been tested, Plaintiffs' allegations are sufficient to

overcome the low bar of "legal impossibility."  The Court accordingly finds that the amount-in-

controversy requirement is satisfied.

### B. The Court Has Personal Jurisdiction Over Individual Defendants Because They Voluntarily Assented to the Laws and Protections of the District of Columbia

Defendants also move to dismiss the claims against Individual Defendants for lack of

personal jurisdiction.  *See* Defs.' Mot. Dismiss at 11–14.  Defendants argue that the only alleged

connection between Individual Defendants and the District of Columbia is that they attended the

ASA annual meeting in the District of Columbia, where the ASA debated and voted on the

boycott resolution.  The Court concludes that Individual Defendants have sufficient contacts with

this jurisdiction related to the claims for this Court to assert personal jurisdiction against them.

"A personal jurisdiction analysis requires that a court determine whether jurisdiction over a party is proper under the applicable local long-arm statute and whether it accords with the demands of due process." *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995); *accord GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). There are two distinct types of personal jurisdiction: general jurisdiction, whereby a court can entertain claims against the defendant regardless of the claim's relationship to the forum, and specific jurisdiction, where jurisdiction is based on acts by the defendant that touch and concern the forum. *See D'Onofrio v. SFX Sports Grp., Inc.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008). General jurisdiction "sets a high bar," requiring that the defendant have "continuous and systematic" contacts with the forum state. *Id.* Specific jurisdiction, in comparison, requires only sufficient "'minimum contacts' with [the forum]," but requires that the plaintiffs' claims arise from those contacts. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). For claims brought pursuant to a court's specific jurisdiction, the relationship between the defendant, the forum, and the litigation "is the essential foundation of [personal] jurisdiction." *Id.* In a diversity-jurisdiction case, "the federal district court's personal jurisdiction over the defendant is coextensive with that of a District of Columbia court." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004). Accordingly, an assertion of personal jurisdiction here must comply with due process and District of Columbia law. Courts give District of Columbia law concerning specific jurisdiction an expansive reading, making D.C.'s long-arm statute coextensive with the Due Process Clause with respect to defendants transacting business in the District of Columbia. *See id.*; *see also* D.C. Code § 13-423.

In determining whether specific jurisdiction over an individual defendant exists, the court looks to whether "there [is] some act by which the defendant purposefully avails itself to the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *accord Heller v. Nicholas Applegate Capital Mgmt., LLC*, 498 F. Supp. 2d 100, 109 (D.D.C. 2007).   The "purposeful availment" requirement exists to ensure that a court does not exercise personal jurisdiction over parties who have only "random, fortuitous, or attenuated contacts" with the forum state.   *Heller*, 498 F. Supp. 2d at 109 (quoting *Burger King Corp.*, 471 U.S. at 475).   A single act by the defendant that creates a "substantial connection" to the forum is sufficient for a court to assert specific jurisdiction.   *Id.* (quoting *Burger King Corp.*, 471 U.S. at 475 n.18).

Because the District of Columbia has not adopted an "absolute fiduciary doctrine"—that is, a rule that an employee's actions taken on behalf of a corporation cannot give rise to specific jurisdiction over that employee—under certain circumstances, individual defendants can fairly be haled into court based on actions they took on behalf of their business organization.   *See Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 243 (D.C. 2015).   There is no "mechanical test" for determining whether a court has personal jurisdiction over an individual defendant who acted on behalf of an organization; courts "weigh the facts of each case."   *Id.* (citing *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270–71 (D.C. 2001)).

In *Family Federation for World Peace*, the individual defendants, who were directors of a nonprofit corporation, allegedly enriched themselves without proper authority.   *Id.* at 243.   The nonprofit was organized under District of Columbia law.   *Id.* at 238.   However, none of the individual defendants were D.C. residents.   *Id.* at 242.   Nonetheless, because the directors

voluntarily served as the governing body that was "in total control of the [D.C.] corporation," and participated in at least one wrong that went "to the very essence of th[e] corporation's existence" in the District of Columbia, the D.C. Court of Appeals "ha[d] little difficulty in concluding [that the] directors clearly could anticipate being hauled into [a District of Columbia] court to account for their activities." *Id.* at 243–44 (third alteration in original).

Similarly, in *Daley v. Alpha Kappa Alpha Sorority, Inc.*, members of a sorority brought claims of breach of fiduciary duty, breach of contract, fraud, unjust enrichment, corporate waste, and *ultra vires* acts against several sorority officials alleging that they mismanaged the sorority's finances. 26 A.3d 723, 726 (D.C. 2011). The plaintiffs contended that the directors made several expenditures without authorization from the sorority's legislative body, which the sorority's constitution and bylaws vested with the power to run the sorority. *See id.* at 726–27. The plaintiffs specifically alleged that the directors failed to put the expenditures on the legislative agenda at a biannual meeting in the District of Columbia, and "suppress[ed] any discussion of the[] expenditures." *See id.* at 728 (also reasoning that the case "focus[es] in large part on wrongdoing with respect to the [biannual meeting]"). None of the individual defendants were D.C. citizens and the sorority itself was a foreign corporation. *Id.* at 727. The only apparent connection between the individual defendants and this jurisdiction was that they participated in the legislative sessions—which allegedly involved the suppression of dissenting opinions and resulted in unauthorized spending—in the District of Columbia. The D.C. Court of Appeals found that "in th[o]se circumstances, the participants could reasonably anticipate being required to defend their actions in the District without offending traditional notions of fair play and substantial justice," rejecting the notion that such contacts were "random [or] fortuitous." *Id.* at 727–28. That court added that once the court had personal jurisdiction over the parties, the

plaintiffs' claims need not be limited to the scope of the activity that occurred in the District of Columbia.  *Id.* (citing D.C. Code § 13-423).

This case falls squarely within the holdings in *Family Federation for World Peace* and *Daley* and leads the Court to the conclusion that, taken together, the facts weigh in favor of finding personal jurisdiction.  Individual Defendants all voluntarily served as officers of the ASA which is a District of Columbia nonprofit corporation located in the District of Columbia and organized under District of Columbia law.  Compl. ¶¶ 15–21.  Their respective positions charged them with leading the ASA.  *See* ASA Const. & Bylaws, Const., Art. IV (outlining the governing structure of the ASA); Compl. ¶ 28 (noting that Defendant Marez was the president of the ASA).  Individual Defendants also voluntarily participated in the 2013 annual meeting in the District of Columbia.  Compl. ¶ 30.  Each Individual Defendant allegedly took part in the purportedly injurious activities of the ASA in the District of Columbia: Defendants Marez and Gordon co-hosted the discussion of the resolution where dissenting ideas were allegedly suppressed, as in *Daley*; Defendant Tadiar helped organize the programming of the 2013 convention, which included the allegedly *ultra vires* act of introducing, debating, and voting on the boycott resolution; Defendants Maira, Duggan, and Reddy were members of the National Council and Executive Committee at the time.  *See* Compl. ¶¶ 16–21.  Moreover, Individual Defendants together led the effort to adopt the allegedly inappropriate boycott resolution, and allegedly did so with the intent to alter the nature and purpose of the ASA, a District of Columbia entity, as in *Family Federation for World Peace*.  Compl. ¶¶ 2, 30.

As the D.C. Court of Appeals concluded in *Daley*, Individual Defendants' attendance at the meeting in D.C. where they allegedly suppressed ideas and mismanaged the ASA was not "fortuitous."  *See* 26 A.3d at 728.  Nor was it fortuitous that Individual Defendants assumed

leadership positions in the D.C. nonprofit organization.  *See Family Federation for World Peace*, 129 A.3d at 243.  Taken together, given that the allegedly injurious acts occurred at a meeting in the District of Columbia and Individual Defendants voluntarily assumed leadership roles in the District of Columbia organization they allegedly injured, the Court finds that each Individual Defendant could reasonably anticipate being haled into a District of Columbia court to answer for alleged wrongdoing in connection with their roles in the boycott resolution.  And, because the Court finds specific jurisdiction over each defendant, the Court need not limit its analysis of Plaintiffs' claims to activity that took place within the District of Columbia.  *See Daley*, 26 A.3d at 728 (citing D.C. Code § 13-423).

## C.  Ruling Against Defendants would not Violate the First Amendment, Because the Laws at Issue are Generally Applicable and Defendants Voluntarily Agreed to Them

With the jurisdictional issues resolved, the Court moves to Defendants' claim that judicial enforcement of the laws under which Plaintiffs seek redress would violate Defendants' First Amendment rights.[2]  *See* Defs.' Mot. Dismiss at 19–21.  In essence, Defendants argue that they have a First Amendment right to engage in a boycott, and that enforcing District of Columbia law to suppress that right would constitute unconstitutional action by the Court.  *See* Defs.' Mot Dismiss 19–20.  Defendants cite to *New York Times Co. v. Sullivan*, a case in which the Supreme Court held that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel."  376 U.S. 254, 277 (1964).

---

[2] For the first time in their reply, Defendants argue that this case falls within the purview of the District of Columbia's Anti-SLAPP statute, yet puzzlingly concede that "the statute does not apply in diversity cases."  *See* Defs.' Reply Br. at 3 & n.1, ECF No. 25.  Defendants are correct that the D.C. Circuit has held that the D.C. Anti-SLAPP Act does not apply under *Erie* principles, *see Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1337 (D.C. Cir. 2015), so it is unclear how the argument applies here.  At any rate, because Defendants first raise this argument in their reply, the Court will not consider it.  *See Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006).

Although it is true that the courts cannot serve as conduits for certain private actions that deprive others of constitutionally-protected rights, *see, e.g.*, *Shelley v. Kraemer*, 334 U.S. 1, 13–14, 18–20 (1948), there is a "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement . . . has incidental effects on" expression, *see Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).  To trigger First Amendment protection, the infringement upon speech must have arisen from state action of some kind.  *See Blum v. Yaretsky*, 457 U.S. 991, 1002–03 (1982).  "Mere approval of or acquiescence in the initiatives of a private party" does not constitute state action in the First Amendment context.  *See id.* at 1004–05; *see also Edwards v. Habib*, 397 F.2d 687, 691 (D.C. Cir. 1968) ("[I]f, for constitutional purposes, every private right were transformed into governmental action by the mere fact of court enforcement of it, the distinction between private and governmental action would be obliterated.").  Thus, when a court merely enforces obligations explicitly assumed by the parties, there is no state action.  *See Cohen*, 501 U.S. at 669–70.  To hold otherwise would mean that courts could never enforce non-disclosure agreements.  *See United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 943 (11th Cir. 1995) (holding that court enforcement of a settlement agreement is not state action for constitutional purposes).  Formal constitutions and bylaws of organizations are construed by courts as contracts between the organization and its members.  *See Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).

This case does not present a First Amendment issue because the Court's passive enforcement of the obligations expressly assumed by the parties does not constitute state action. Plaintiffs take issue with actions by Defendants that were allegedly inconsistent with the ASA's organizational purpose, constitution, and bylaws.  *See* Compl. ¶ 1 ("An academic boycott of a

foreign country is simply outside of the ASA's authority to act."). Thus, Plaintiffs ask the Court to enforce the contract that the Plaintiffs and Defendants freely entered into when they voluntarily subjected themselves to the constitution and bylaws of the ASA. *See Meshel*, 869 A.2d at 361. Defendants, Plaintiffs argue, voluntarily assumed certain obligations toward the ASA when they took on leadership positions within the organization, and that they violated those obligations through their roles in passage of the boycott resolution. *See* Compl. ¶¶ 79–80, 83–84, 88–89, 92–93.

Plaintiffs' claims all arise under generally-applicable laws. *See Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 190–91 (D.D.C. 2009) (setting forth the elements of breach of fiduciary duty); *Adamski v. McHugh*, No. 14-cv-0094 (KBJ), 2015 WL 4624007, at *6 (D.D.C. July 31, 2015) (describing the law governing *ultra vires* claims); *Daley*, 26 A.3d at 730 (describing the doctrine of waste); *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 16 (D.D.C. 2014) (setting forth the elements of breach of contract), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016); D.C. Code § 29-405.24 (outlining the procedures all nonprofit organizations must follow). They also only seek to enforce rights created at the initiation of private parties; Individual Defendants voluntarily assumed roles where their right to expression would be limited by bylaws, the common law, and statute. Because Defendants voluntarily assented to these laws and the ASA's constitution and bylaws, the Court's interference with speech is passive and incidental to enforcement of a contract. Thus, enforcement of Plaintiffs' rights derived from that contract would not constitute state action as contemplated under *Sullivan* and *Shelley*, meaning there would be no First Amendment issue with a judgment for Plaintiffs in this case.

**D.  Failure to State a Claim**

Defendants move to dismiss several of Plaintiffs' claims under Federal Rule of Procedure 12(b)(6).  Specifically, Defendants argue that all of Plaintiffs' derivative claims fail because they did not make an adequate pre-lawsuit demand, that Plaintiffs did not act *ultra vires*, that they did not breach any contract, and that Individual Defendants cannot be sued for acting outside the scope of their corporate positions. *See* Defs.' Mot. Dismiss at 14–19, 21–29.  Defendants do not specifically move to dismiss Plaintiffs' waste or D.C. Nonprofit Act claims under Rule 12(b)(6). *See generally* Defs.' Mot. Dismiss.  For the reasons set forth below, the Court will dismiss all of Plaintiffs' derivative claims and Plaintiffs' *ultra vires* claim, but allow the case to proceed to discovery on their other claims.

1.  Plaintiffs Failed to Make an Adequate Pre-Suit Demand

The Court first addresses Defendants' contention that Plaintiffs' derivative claims must be dismissed because Plaintiffs  failed to make a proper pre-lawsuit demand, as required by the D.C. Nonprofit Corporation Act.  *See* Defs.' Mot. Dismiss at 14–19.  Defendants' contention has merit.

A derivative action is a lawsuit brought by members of a corporation, on behalf of the corporation to remedy injuries done to the corporation.  18 C.J.S. Corporations § 482.  Derivative suits are often brought against members of the corporation's board of directors, and allege that a member or members either disregarded their duties or put their personal interests ahead of the corporation's.  *Id.*  The corporation itself is included as a nominal defendant for reasons of issue preclusion.  *Knop v. Mackall*, 640 F. Supp. 2d 58, 61 (D.D.C. 2009), *rev'd in part on other grounds*, 645 F.3d 381 (D.C. Cir. 2011).  In many cases, before filing a derivative suit against a corporation to remedy injuries to the corporation, a member must attempt to have the

corporation's board of directors remedy the problem itself.  *See* 7C Wright, A. Miller & E.

Cooper, *Federal Practice and Procedure* § 1831 (3d ed.).  D.C. law requires a member of a

nonprofit organization to make a demand on its directors ninety days before initiating a lawsuit.

*See* D.C. Code § 29-411.03(2).  Demand requirements arise from the concept of corporate self-

governance.  *See* Wright & Miller § 1831.  Demand statutes are rooted in "the basic principle of

corporate governance that the decisions of a corporation—including the decision to initiate

litigation—should be made by the board of directors or the majority of shareholders."  *Kamen v.*

*Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (quoting *Daily Income Fund, Inc. v. Fox*, 464

U.S. 523, 530 (1984)).  In comparison, demand requirements do not exist in direct claims by

shareholders against a corporation, because in that situation the plaintiff alleges harm to himself

as an individual, not the corporation.

Defendants claim that Plaintiffs failed to make a proper demand because they did so only

two days before filing the instant lawsuit, not having waited the ninety days required by statute.

*See* Defs.' Mot. Dismiss at 14–19; Defs.' Mot. Dismiss Ex. 2, ECF No. 21-4.  Plaintiffs respond

that their demand was sufficient because over ninety days have now passed since the demand

was made, even if only two days passed before they filed this lawsuit.  Pls.' Opp'n at 19.  In the

alternative, Plaintiffs argue that even if their demand was deficient, the lack of demand should be

excused because a demand would have been futile.  *See* Pls.' Opp'n at 19–25.  The Court will

first address the sufficiency of the demand made before analyzing the futility argument.

### a.  *Plaintiffs Failed to Wait Ninety Days after Making a Pre-Suit Demand*

At issue under the D.C. Code is whether a plaintiff may file a derivative lawsuit

less than ninety days after formally demanding a nonprofit corporation to take the

plaintiff's desired action, so long as ninety days have passed between the demand and the

court's order on the motion to dismiss.  Plaintiffs do not dispute that they filed the instant

suit a mere two days after serving their formal demand.  *See* Pls.' Opp'n at 19.

Despite Defendants' argument that Federal Rule of Civil Procedure 23.1

"require[s] that a demand be made before suit," *see* Defs.' Mot. Dismiss at 14, the federal

rule concerns only the form pleadings must take, *see* Fed. R. Civ. P. 23.1; *see also*

*Kamen*, 500 U.S. at 96.  It does not impose legally substantive requirements any more

than Rule 8 does with respect to ordinary complaints.  *See id.*  Because this is a diversity

case applying D.C. law, Rule 23.1 is animated by the District of Columbia's substantive

law requiring a pre-suit demand, D.C. Code § 29-411.03.  The text of the D.C. law leads

the Court to an easy answer to the Court's inquiry—with certain exceptions, after

submitting a demand, a party must wait ninety days before filing suit.

Under District of Columbia Code § 29-411.03,

A person shall not commence a derivative proceeding until:
(1) A demand in the form of a record has been delivered to the nonprofit
corporation to take suitable action; and
(2) Ninety days have expired from the date the demand was effective unless:
(A) The person has earlier been notified that the demand has been rejected by the
corporation; or
(B) Irreparable injury to the corporation would result by waiting for the expiration
of the 90-day period.[3]

The Court's interpretation of this provision "begins with the statutory text, and ends there as well

if the text is unambiguous."  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).

Abridged, the statute provides that "[a] person shall not *commence* a derivative proceeding until .

. . [a] demand . . . *has been delivered* to the nonprofit corporation. . . *and* . . . [n]inety days have

---

[3] The D.C. nonprofit corporation demand statute is identical to the demand statute for for-
profit corporations.  *Compare* D.C. Code § 29-411.03 *with* D.C. Code § 29-305.52.

expired from the date the demand was effective" unless the exceptions apply.[4]  D.C. Code § 29-411.03 (emphasis added).  The statute defines "derivative proceeding" as "a civil action in the right of a domestic nonprofit corporation."  *Id.* § 29-411.01.  Under both the D.C. and federal rules of civil procedure, "[a] civil action is commenced by filing a complaint with the court."  *See* D.C. Super. Ct. R. Civ. P. 3; Fed. R. Civ. P. 3.  Thus, D.C. nonprofit corporation law provides that a person is precluded from *filing* a civil derivative action until the demand has been delivered to the nonprofit corporation and ninety days have actually expired (unless a rejection is received earlier or irreparable harm will occur in the interim).  Thus, the act of filing the lawsuit before waiting ninety days is improper under D.C. law, unless some exception to the demand requirement applies.

In *Arkansas Teacher Retirement System ex rel. Progress Software Corp. v. Alsop*, the District of Massachusetts reached the same result with a nearly identical statute.  There, the plaintiff filed its original complaint before making a formal demand, but filed an amended

---

[4] In a cursory fashion, Plaintiffs assert in their complaint that waiting the ninety-day period would have brought about irreparable harm to the ASA, because "[e]ach day without redress is a day when the scholarly goals for the ASA . . . are not pursued . . . a[t] the expense of the ASA itself and its scholar members."  Compl. ¶ 76.  This argument can be rejected out of hand for three reasons.  First, this claim is conclusory and fails to meet the heightened pleading standards of Rule 23.1, as explained below.  Plaintiff in no way articulates what harms flow from scholarly goals not being pursued on a daily basis, other than the ambiguous "expense[s]" that it is costing the ASA and its members.  Compl. ¶ 76.  Second, assuming the plaintiffs had literal financial expenses in mind, "economic loss does not, in and of itself, constitute irreparable harm."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Third, with full knowledge of the resolution that was allegedly causing irreparable injury each and every day, Plaintiffs waited over two years to file a lawsuit.  This significantly undermines Plaintiffs' claims that waiting an additional 88 days would have caused irreparable harm.  *See Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 68 (D.D.C. 2015) (noting that the "[t]he D.C. Circuit has found that a delay of even forty-four days before bringing action" was "inexcusable," and "bolstered the conclusion that" irreparable harm did not exist in the context of a motion for a preliminary injunction (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975))).

complaint ninety after the demand, and thus argued that the motion to dismiss for failure to make a demand was moot.  2007 WL 7069609, at *5 (D. Mass. 2007).  The relevant statute provided that "[n]o shareholder may commence a derivative proceeding until . . . a written demand has been made upon the corporation to take suitable action[] and . . . 90 days have elapsed from the date the demand was made."  *Id.* at *7 (emphasis removed).  That court concluded that "[t]he plain language requires a demand prior to commencing suit."  *Id.* at *8.

As noted above, Federal Rule of Civil Procedure 23.1 outlines the pleading requirements for derivative actions brought in federal court.  *See Weiner v. Winters*, 50 F.R.D. 306, 309 (S.D.N.Y. 1970).  As a rule of procedure, it instructs parties how to demonstrate that they have complied with a substantive demand requirement.  *See* Fed. R. Civ. P. 23.1.  Rule 23.1 requires plaintiffs to submit a verified complaint stating, with specificity, any effort by the plaintiff to comply with the substantive demand statute—in this case, D.C. nonprofit law—or the reasons for not making any such efforts, assuming that the substantive law allows plaintiffs to avoid making such a demand.  Rule 23.1 requires plaintiffs to be substantially more thorough than does Rule 8.  *See Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 68 (D.C. Cir. 1988).

Plaintiffs plainly did not make an adequate pre-suit demand.  They delivered a formal demand letter, with their original complaint attached, to the ASA National Council on April 18, 2016.[5]  Then, two days later, Plaintiffs filed a civil derivative action in federal court.  *See* Original Compl., at 31, ECF No. 1.  Under the plain text of the D.C. demand statute, this was too

---

[5] The Court considers this letter because Plaintiffs explicitly relied upon it in their complaint.  *See* Compl. ¶ 75; *Busby*, 932 F. Supp. 2d at 133–34.

early.  Because Plaintiffs did not make an adequate pre-suit demand, the Court next addresses whether plaintiff's lack of demand can be excused as futile.[6]

### b.  Demand was not Futile as a Matter of Law

Plaintiffs argue that the demand requirement should be excused as futile because Defendants could not reasonably have been expected to fairly judge whether to bring this action themselves.  Pls.' Opp'n at 20–22.  Defendants respond that Plaintiffs have not adequately pled futility.  Reply Br. Supp. Mot. Dismiss at 8–15, ECF No. 25.  Because Plaintiffs have not shown that a majority of the members on the National Council at the time of filing had bias against the corporation to the point of being unable to independently evaluate the merits of the suit, the Court concludes that demand would not have been futile.

In determining whether pre-suit demand would have been futile, the court focuses on whether the complaint alleges enough particularized facts to create a reasonable doubt as to whether a majority of the officers responsible for bringing such an action could have made an independent and disinterested response to the demand.  *See Behradrezaee v. Dashtara*, 910 A.2d 349, 358 (D.C. 2006).  Under Federal Rule of Civil Procedure 23.1, "mere allegations or conclusory statements regarding directors' dual allegiances, self-interest, or control by others is insufficient."  *Gaubert*, 863 F.2d at 68.  Indeed, "[m]ere allegations of improper motives" are inadequate, and showing "mere participation or acquiescence by the directors" is not enough.  *Id.* (quotation marks omitted).

---

[6] The complaint also vaguely suggests that some Individual Plaintiffs made efforts to stop the Israel boycott and force plaintiffs to adhere to the ASA rules.  Compl. ¶ 8.  However, those allegations are far from sufficient to show that Plaintiffs "delivered" the demand to take "suitable action," let alone that it did so more than ninety days before filing this suit.

Instead, the plaintiff must allege specific facts demonstrating an "unmistakable link" between the alleged wrongdoing and directors' self-interest or other form of personal bias that could get in the way of correction. *See In re Kauffman Mut. Fund Actions*, 479 F.2d 257, 264 (1st Cir. 1973); *Gaubert*, 863 F.2d at 68. "The predominant federal view is that the board of directors must have been actively involved in the alleged wrongdoing for demand to be excused." *Gaubert*, 863 F.2d at 65. Because "rare is the significant corporate act that has not in one way or another been 'approved of,'" it is not enough for a party to simply show that a director supported a particular action that allegedly harmed the corporation. *See id.* (quoting *In re Kauffman Mut. Fund Actions*, 479 F.2d at 265). Plaintiffs have not adequately pleaded facts showing that pre-suit demand would have been futile for four independently-sufficient reasons.

First, the conclusory allegation that Individual Defendants[7] "have made clear that they will not voluntarily redress Plaintiffs' concerns," Compl. ¶ 8, is not only conclusory, *see Gaubert*, 863 F.2d at 68, but it is inapposite. It is not *Defendants* who must have been open to voluntary redress, but the members of the ASA's National Council at the time the suit was filed. *See Behradrezaee*, 910 A.2d at 358. This is because it was the Council at the time of demand that was charged with determining whether the corporation would remedy the situation internally. *See* ASA Const. & Bylaws Const. Art. V § 2. Plaintiffs acknowledge in their complaint that only two Individual Defendants were members of the National Council when Defendants filed this suit. *See* Compl. ¶ 74.

---

[7] The most natural reading of paragraph 8 of Plaintiffs' complaint suggests that only Individual Defendants have "made clear that they will not voluntarily redress Plaintiffs' concerns. *See* Compl. ¶ 8. In the preceding sentence, Plaintiffs refer to their attempts to get "the Defendant ASA usurpers" to abide by the ASA's rules. *See* Compl. ¶ 8. Moreover, as noted above, the organizational defendant in a derivative action is nominal only. *Knop*, 640 F. Supp. 2d at 61.

Second, Plaintiffs' argument would not be salient even if Defendants were a majority of the National Council.  Their argument confuses bias with support for the actions underlying the suit.  Plaintiffs, in essence, argue that Defendants have shown that they could not independently evaluate a demand because of their passion for the boycott resolution.  *See* Pls.' Opp'n at 22.  This is insufficient under *Gaubert*, which notes that one could rarely find a major corporate action that has not been approved by a majority of directors.  863 F.2d at 65.  If shareholders could skirt the demand requirement by showing that directors believed in their own actions, shareholders would almost never have to make a demand at all.  As Plaintiffs themselves assert in their complaint, this lawsuit is not about the substance of the boycott resolution, but rather "turns on straightforward legal questions: whether . . . an academic boycott of Israel is an act that falls under the ASA's 'exempt purpose.'"  Compl. ¶ 2.  Plaintiffs do not show that any single Individual Defendant would be unable to independently analyze whether the actions of the ASA were in line with that exempt purpose.  Nor do they show that all of the Individual Defendants were more than "mere participants" in the boycott resolution.

Third, and perhaps most obviously, Plaintiffs have not shown that a majority of the 23-member National Council—which is expressly charged with the governance of the ASA and changes every year, *see* ASA Const. & Bylaws, Const., Art. V §§ 1, 2—as composed at the time of filing, even contributed to the actions at issue.  Without that showing, Plaintiffs have not pleaded facts demonstrating that a majority of the ASA board members participated in or acquiesced to the boycott resolution, a standard *below* the requirement articulated in *Gaubert*, which requires active involvement in the alleged wrongdoing.  *See* 863 F.2d at 68.

Finally, even assuming that being in favor of a past Council's actions could demonstrate bias, Plaintiffs have not shown anything more than "mere allegations of improper motives" by

citing to piecemeal statements of support by current councilmembers.  *See id.*; Compl. ¶ 74.

Thus, Plaintiffs have not adequately pleaded facts supporting its claim of futility.  Accordingly,

the Court will dismiss Plaintiffs' derivative claims pursuant to Federal Rule of Civil Procedure

23.1.

### 2.  Defendants Did Not Act *Ultra Vires*

Plaintiffs' *ultra vires* claim hinges on the idea that the boycott resolution falls outside the

scope of the purpose of the ASA, and that Defendants are operating the ASA as a "social justice

organization" instead of as an academic organization.[8]  *See* Compl. ¶¶ 82–83.  Plaintiffs

primarily cite the purpose of the ASA—which is the "promotion of the study of American

culture through the encouragement of research, teaching, publication, and the strengthening of

relations among persons and institutions in this country and abroad devoted to such studies"—

and the bylaw prohibiting the carrying on of propaganda.  *See* Compl. ¶¶ 22, 82.  Defendants

contend that the boycott resolution was within the ASA's authority to "engage in any and all

lawful activities incidental to" the purpose of the organization.  Defs.' Mot. Dismiss at 22; *see*

*also* ASA Const. & Bylaws, Const., Art. I § 2.  Defendants further argue that the ASA

constitution requires the organization to promote the study of American culture both

domestically and abroad, and that no particular provision precluded the adoption of the boycott

resolution.  Defs.' Mot. Dismiss at 22–23.  Because Plaintiffs have not pleaded facts showing

that the boycott resolution was expressly prohibited by any statute or ASA bylaw, their *ultra*

*vires* claim must be dismissed.

---

[8] Plaintiffs devote much of their complaint and opposition to the idea that Individual
Defendants hijacked the ASA for the improper purpose of turning it into a social justice
organization.  *See* Compl. ¶¶ 26, 59, 64.  This alleged hijacking is not a discrete cause of action,
but does tangentially relate to Plaintiffs' *ultra vires* claim.  *See* Compl. at 25–31.

A member of an organization may directly sue that organization to enjoin actions that the organization did not have power to execute. *See* D.C. Code § 29-403.04(b)(1); *see also Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011). Actions taken by the organization that are "expressly prohibited by statute or by-law" or outside the powers conferred upon it by its articles of incorporation are *ultra vires*. *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 18 (D.D.C. 2014), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016); *see also Daley*, 26 A.3d at 730 (emphasis omitted) (quoting *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 7 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998)). "In certain circumstances, a long-standing pattern or practice of corporate behavior may give rise to a by-law." *Family Fed'n for World Peace*, 129 A.3d at 251. Interpretation of an organization's constitution and bylaws, including whether they are ambiguous, presents legal questions to be resolved by the text of the documents, unless that text is fairly susceptible to different interpretations. *See Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 20 (D.D.C. 2016) (using such a rule in the context of D.C. contract law). Where there is ambiguity in the text of the articles of incorporation, the Court determines whether the action is reasonably in furtherance of the objects of the organization. *See Hollar v. Gov't of the Virgin Islands*, 857 F.2d 163, 169 (3d Cir. 1988) (cting 6 Am. Jur. 2d, *Associations and Clubs* § 11 (1963)).

Plaintiffs advance three theories to support their claim that ASA's adoption of the boycott resolution was an *ultra vires* act. First, Plaintiffs contend that the adoption of the boycott resolution violated the express purpose of the ASA. Second, Plaintiffs argue that it violated the Article of Incorporation banning the carrying on of propaganda. And third, Plaintiffs assert that

it violated a bylaw created by a longstanding practice of not becoming involved with American political issues.  *See* Compl. ¶¶ 81–85.  None of these theories are sufficient to state a claim.

In support of their first theory—that the adoption of the boycott resolution was an *ultra vires* act because it violated the express purpose of the ASA—Plaintiffs cite to the ASA's "organic documents" that allegedly provide that "[t]he corporation is organized exclusively for education and academic purposes," and Article I § 2[9] of the ASA Constitution, which provides that "[t]he object of the association shall be the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity."  Compl. ¶¶ 22, 24.  Neither of these provisions "expressly prohibited" the boycott resolution, and the ASA was within its powers to do so.  *See Daley*, 26 A.3d at 730.  The boycott resolution "endorse[d] and . . . honor[ed] the call of Palestinian civil society [to] boycott . . . Israeli academic institutions."[10]  Compl. ¶ 31.  As shown by the preamble of the resolution, the ASA passed the boycott resolution because, in its view, Israel suppresses the academic freedom of Palestinian scholars and students, and the United States "plays a significant role in enabling" that suppression.  Compl. ¶ 31.  The ASA also did so as a show of solidarity with

---

[9] Later in their complaint, Plaintiffs cite to "Article II" to establish the ASA's purpose. *See* Compl. ¶ 82.  Based on earlier citations in the complaint and the ASA Constitution & Bylaws attached to Defendants' motion to dismiss, it seems apparent that Plaintiffs intended to cite to Article I § 2.  *See* Compl. ¶ 22.

[10] To the extent Plaintiffs argue that Defendants' true purpose was different from the stated purpose in the resolution—and it is far from clear that they do—those ulterior motives do not matter.  "The power of a corporation to do an act is not affected by the motives or intent with which the act is done."  6 Fletcher Cyc. Corp. § 2477; *see also* 18B Am. Jur. 2d *Corporations* § 1716 (noting that an act is "not rendered *ultra vires* by the mere fact that the corporation intends to use the proceeds [of the act] for an *ultra vires* purpose").

those scholars.  Compl. ¶ 31.  The boycott resolution was, therefore, enacted for "academic purposes," at least to a point where it was not in violation of the ASA's founding documents. *See Daley*, 26 A.3d at 730.  It also was reasonably in furtherance of the ASA's purpose of advancing education and the promotion of the study of American culture through encouraging research, teaching, and *strengthening relations among persons and institutions in the United States and abroad.  See Hollar*, 857 F.2d at 169.  The boycott resolution was aimed both at encouraging academic freedom for Palestinians and strengthening relations between American institutions and Palestinians.  At the very least, it was "reasonably in furtherance of the objects" of the ASA.  *See id.*  Thus, it was not contrary to the ASA's express purposes.

Plaintiffs' second theory—that the adoption of the boycott resolution was an *ultra vires* act because it violated the Articles of Incorporation banning the carrying on of propaganda—also comes up short.  According to the ASA's bylaws, "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation, and the corporation shall not participate in . . . any political campaign on behalf of any candidate for public office."  Compl. ¶ 25.  Without the phrase offset by commas ("or otherwise attempting"), the bylaw plainly reads as a restriction only on using propaganda to influence legislation: "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda . . . to influence legislation."[11]  Compl. ¶ 25. The boycott resolution

---

[11] Plaintiffs disregard this caveat in their opposition, suggesting that there is both "an absolute ban on 'propaganda' and [on] efforts 'to influence legislation.'"  *See* Pls.' Opp'n at 5. This is plainly not the case.  At least one other court has reached the same conclusion interpreting similar text.  *See Williamson v. S. Reg'l Council, Inc.*, 154 S.E.2d 21, 25 (Ga. 1967). The statute at issue in *Williamson* restricted the "carrying on propaganda, or otherwise attempting to influence legislation.'"  154 S.E.2d at 24.  Despite the absence of a comma after "attempting," the Georgia Supreme Court concluded that "[t]he use of the word 'otherwise' indicates that 'carrying on propaganda' relates to 'attempting to influence legislation."  *Id.* at 25.

was not an attempt to influence legislation in any meaningful sense of the term. *See Haswell v.
United States*, 500 F.2d 1133, 1140 (Ct. Cl. 1974) (citing *Cammarano v. United States*, 358 U.S.
498, 512 (1959)) (tracing "the development of the congressional policy against an exemption for
organizations that attempt to *promote or defeat* legislation" (emphasis added)). Plaintiffs have
not pointed to any existing, proposed, or pending legislation that the ASA may have been
targeting with the resolution. Although one may be able to draw an indirect link between any
resolution and some potential piece of legislation in that it calls attention to a public issue, that
connection is far too attenuated to make the boycott resolution "expressly prohibited" by the
bylaw. *See id.*; *Daley*, 26 A.3d at 730.

Plaintiffs' final theory—that the boycott resolution was a violation of longstanding
practice—also falls short of stating a plausible claim of *ultra vires* acts. As noted above, in
certain circumstances, longstanding practice can give rise to a bylaw. *Family Fed'n for World
Peace*, 129 A.3d at 251. The complaint alleges that a "long record of uniform practice prevent[s]
the ASA from taking action to advance a particular position on questions of U.S. government
policy." Compl. ¶ 25. The boycott resolution was passed, at least in part, because the ASA
believed that the United States' policies toward Israel "play[] a significant role in enabling"
Israeli suppression of academic freedom for Palestinians. *See* Compl. ¶ 31. However, *ultra vires*
acts are those that are "*expressly* prohibited by statute or by-law." *Daley*, 26 A.3d at 730
(emphasis added and omitted) (quoting *Columbia Hosp. for Women Found., Inc.*, 15 F. Supp. at
7). For a bylaw to "expressly" prohibit an action, the prohibition must be "[c]learly and
unmistakably communicated," or, in other words, "stated with directness and clarity." *Express*,
Black's Law Dictionary (10th ed. 2014); *accord Threshold Techs., Inc. v. United States*, 117
Fed. Cl. 681, 697 (Ct. Fed. Cl. 2014). An "express" bylaw is one "whose terms [are] explicitly

set out." *See Threshold Techs., Inc.*, 117 Fed. Cl. at 697 (quoting *Express Contract*, Black's Law Dictionary (10th ed. 2014)).

Plaintiffs do not in any way allege that the "long record of uniform practice" actually functioned as a prospective, affirmative prohibition on taking a position on U.S. government policy. *See* Compl. ¶ 25. Even if the Court were to read such a rule into the complaint, Plaintiff does not suggest that the rule was in any way "set out" by the ASA itself, its membership, its past National Council members, or any other relevant party. *See* Compl. ¶ 25; *Threshold Techs., Inc.*, 117 Fed. Cl. at 697. Still further, there is no indication that the rule was clearly and directly set out in explicit terms. *See* Compl. ¶ 25. Without pointing to some express form of a rule that Defendants could have violated as a result of the "longstanding practice" of not involving the ASA in U.S. government policy, Plaintiffs have not stated a cognizable *ultra vires* claim. Thus, the Court dismisses Plaintiffs' *ultra vires* claim.

\*      \*      \*

Plaintiffs have not pled facts plausibly showing that Defendants acted *ultra vires*. The boycott resolution was, at the very least, reasonably in furtherance of the ASA's organic documents and Articles of Incorporation, which provide that the ASA was organized exclusively for educational and academic purposes, and that the object of the ASA is the promotion of American culture through, *inter alia*, "the encouragement of research, teaching, publication, [and the] strengthening [of] relations among persons and institutions in this country and abroad devoted to such studies." *See* Compl. ¶¶ 22, 24. The boycott resolution was aimed at promoting academic freedom abroad, solidarity with foreign institutions and scholars, and encouraging an array of studies at foreign institutions. The boycott resolution did not violate the ASA bylaws' restriction on "the carrying on of propaganda . . . to influence legislation," *see* Compl. ¶ 25,

because Plaintiffs have not drawn the connection between the boycott resolution and any piece of legislation.  Finally, Plaintiffs have not shown that an implied bylaw exists that precludes commentary of U.S. governmental policy.  Even if they had, however, because that bylaw would not be "express," violation of it would not constitute *ultra vires* action.

### 3.   Plaintiffs have Stated a Plausible Claim for Breach of Contract

Plaintiffs' breach of contract claim assumes that even if the ASA had the authority to adopt the boycott resolution, its authority was contractually bound by Article XI § 3 of the ASA Bylaws, which requires the affirmative votes of two-thirds of voting members on the first full day of the meeting, and the ASA failed to enact the resolution in accordance with those procedures.  *See* Compl. ¶¶ 90–94.  Defendants argue that Article XI § 3 did not apply to the boycott resolution, because the Committee itself had the power to speak on behalf of the ASA, and that the vote on the resolution was simply a legitimizing act on the controversial measure.  Defs.' Mot. Dismiss at 26–28.  Because Plaintiffs have plausibly alleged that the boycott resolution was enacted in violation of the ASA's bylaws, the Court denies Defendants' motion to dismiss with respect to their breach of contract claim.

A nonprofit organization's "Constitution and Bylaws form a contract between that [organization] and its members."  *See Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 16 (D.D.C. 2014), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016).  "Plaintiffs' breach of contract claims require (1) the existence of a valid contract, (2) an obligation or duty arising out of that contract, (3) a breach of the contract . . . , and (4) damages suffered by Plaintiffs due to the breach."  *Id.*  Defendants only argue that they did not breach the contract by violating the ASA bylaws, because no obligation or duty arose from the inapplicable provision of the bylaws.  *See* Defs.' Mot. Dismiss at 26–28.

Article XI of the ASA Bylaws empowers the Executive Committee to speak for the ASA on public issues that "directly affect [members'] work as scholars and teachers."  ASA Const. & Bylaws, Bylaws, Art. XI § 1.  That provision sets forth examples of the types of issues on which the Executive Committee may speak for the ASA, including matters of academic freedom, freedom of access to information, and policies concerning academic grants.  ASA Const. & Bylaws, Bylaws, Art. XI § 1.  This provision extends only to issues directly affecting ASA members.  It seems based on the complaint—which contains the text of the boycott resolution itself, including the preamble—that the purportedly oppressive practices by Israel do not "directly" affect the scholarly work or teaching of current ASA members.  As a result, it is plausible that the Executive Committee was not entitled to speak for the ASA on this issue.

Article XI also provides the following:

> Sec. 3. Should an issue arise which, in the opinion of the Executive Committee or Council, seems to require public action, speech or demonstration by the association at a particular annual meeting, the Council shall meet to formulate a response. The Council shall convene an emergency meeting of the membership on the first full day of the annual meeting, to recommend a course of action, and conduct a public discussion of the issue(s); and the vote of two-thirds of those in attendance may approve the recommended action.

ASA Const. & Bylaws, Bylaws, Art. XI § 3.  Breaking this provision down, anytime an issue arises that the Executive Committee or Counsel feels requires (1) public action, speech, or demonstration (2) by the association at a particular annual meeting, the Council shall comply with the procedural requirements of Article XI § 3.

Because it is plausible that the Executive Committee saw the U.S.–Israeli policy issue as the type "requir[ing] public action, speech, or demonstration by the association at [the 2013] annual meeting," Plaintiffs state a plausible claim for breach of contract.  Plaintiffs have pleaded multiple facts suggesting that the Executive Committee and Council felt that the ASA needed to speak and demonstrate on the public issue of Israeli suppression of academic freedom as a matter

of social justice.  *See* Compl. ¶¶ 26, 59, 64, 78.  They also plead facts plausibly showing that the Executive Committee felt the demonstration must take place by the ASA at the 2013 annual meeting.  At the annual meeting, the Executive Committee organized a variety of boycott-related programming, including a town-hall meeting, to discuss the issue as an organization.  *See* Compl. ¶¶ 30, 47.  Moreover, the ASA Executive Committee appears to have attempted to follow some procedural requirements of Article XI § 3—they "formulate[d] a response" in the form of the boycott resolution, they "recommend[ed] a course of action," they "conduct[ed] a public discussion of the issue[]," and they held a vote.  But the Executive Committee did not secure "the vote of two-thirds of those in attendance" at the annual meeting before implementing the resolution.  *See* Compl. ¶ 33.  Instead, the Executive Committee opened the vote to all ASA members and conducted the vote during the course of ten days in December.  *See* Compl. ¶ 33.  It is plausible that the Executive Committee attempted to follow some, but not all, of the Article XI § 3 procedures because it saw the issue as the type described therein.

As noted above, if the Executive Committee or Council did indeed believe that Israeli policies "require[d] public action, speech[,] or demonstration by the [ASA] at [the] annual meeting," the National Council was required to "meet to formulate a response," "convene an emergency meeting of the membership on the first full day of the annual meeting[] to recommend a course of action," "conduct a public discussion of the issue[]," and obtain votes from two-thirds of those in attendance.  At this stage, Defendants do not dispute that the National Council did not follow all of these steps.  *See* Defs.' Mot. Dismiss at 26–28.  Thus, if it is established that this provision of the bylaws applies to the scenario at issue, Plaintiffs have plausibly alleged that the ASA breached its contractual obligations to its members.

4.  Defendants' Substantive *Ultra Vires* Arguments are Moot

Defendants' final argument is that, under the D.C. Nonprofit Corporation Act, Plaintiffs

cannot bring *ultra vires* claims directly against Individual Defendants.  *See* Defs.' Mot. Dismiss

at 28–29.  Because the Court dismisses Plaintiffs' *ultra vires* claims brought against both the

ASA and Individual Defendants, that argument appears to be moot.  But Defendants assert, in

conclusory terms, that, in addition to applying to the now-dismissed *ultra vires* counts, this

statutory argument also pertains to Plaintiffs' claim for waste.  *See* Defs.' Mot. Dismiss at 28–29.

Defendants are wrong.

The D.C. Nonprofit Corporation Act provides that individual members of the nonprofit

may only directly challenge an action as *ultra vires* by suing the corporation to enjoin the act.

D.C. Code § 29-403.04(b)(1).  By virtue of this provision, Defendants claim that Plaintiffs

cannot bring waste claims against Individual Defendants.  In contrast to *ultra vires* claims,

however, claims of corporate waste need only "articulate an 'exchange of corporate assets for

consideration so disproportionately small as to lie beyond the range at which a reasonable person

might be willing to trade,' and must be 'egregious or irrational.'"  *Daley*, 26 A.3d at 730

(quoting  *In re Greater Southeast Comty. Hosp. Corp., I*, 333 B.R. 506, 524 (Bankr. D.D.C.

2005)).  Plaintiffs cite to this rule in their Count for waste.  *See* Compl. ¶ 87 (quoting 3A

Fletcher Cyc. Corp. § 1102 at 150–51) (2010)).  Although Plaintiffs also assert that the

motivation for the allegedly wasteful use of corporate assets was a cause "beyond the purposes

established by its organic documents," Compl. ¶ 88, that language is not essential to Plaintiffs'

claim for waste; improper motive is not an element, *see Daley*, 26 A.3d at 730.  Thus, because

the D.C. Nonprofit Corporation Act does not prohibit Plaintiffs' waste claim against Individual

Defendants, that claim survives dismissal.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 31, 2017                                     RUDOLPH CONTRERAS
                                                          United States District Judge