# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON, <br><br> Plaintiffs, <br><br> v. <br><br> LISA DUGGAN, CURTIS MAREZ, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, and THE AMERICAN STUDIES ASSOCIATION, <br><br> Defendants. | Case No. 16-cv-00740-RC |

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPAINT

Basing itself on a distortion of the proposed pleading, imagined "facts" about the intent of Plaintiffs' counsel, and a misreading of applicable law, Defendants' Opposition ("Opposition") to Plaintiffs' Motion for Leave to File a Second Amended Complaint ("Motion for Leave") makes numerous, short, and unsubstantiated arguments alleging, *inter alia*, that amendment would be futile, that the Proposed Second Amended Complaint ("SAC") presents previously dismissed claims, that the motion for leave to amend is made in bad faith, that Plaintiffs and their counsel engage in dilatory litigation practices, and that Defendants would incur undue prejudice if the Motion for Leave is granted.  Although numerous, the arguments are unsupported by the law and fact.

Plaintiffs' response to Defendants' arguments follow.

I.     **THE PROPOSED AMENDED COMPLAINT IS NOT FUTILE**

A.     **The New Claims Are Properly Brought as Direct Claims Pursuant to Long-Standing and Clearly-Established Law, and Not Subject to Dismissal as Derivative Claims.**

Ignoring the many important allegations based on newly produced evidence, Defendants' primary argument is that the SAC merely resurrects derivative claims that were previously dismissed.  That this argument is factually incorrect is apparent from a review of the 83-page SAC.  Although the pending claims remain, the SAC presents entirely new claims that arise from facts uncovered in documents produced by Defendants just three weeks before the Motion for Leave was filed. These new claims allege breach of contract, *ultra vires* acts, and breach of fiduciary duty – all direct causes of action under long-established District of Columbia precedent.  All of these new claims plead valid causes of action, and Defendants' suggestion to the contrary – in an argument almost entirely bereft of authority or substantive legal argument – is meritless.  Indeed, even the First Amended Complaint ("FAC") included both a direct breach of contract claim and a direct *ultra vires* claim, and neither of these was dismissed.[1]  The FAC also brought a derivative breach of fiduciary duty claim, which was dismissed, but did not bring a direct breach of fiduciary claim; as discussed below, plaintiffs' new claims are direct, and valid, claims because officers and directors owe fiduciary duties to both the organization and to the individual members.

On the false but completely undefended premise that the new claims are derivative, Defendants' primary argument in opposition to the Motion to Amend is that the SAC is "an improper attempt . . . to resurrect previously dismissed causes of action[.]" (Opposition at 6.)

---

[1] The *ultra vires* claim was dismissed for failure to state a claim, but not because the claim was derivative. The breach of contract claim is still pending.

***But defendants do not cite a single case in support of their extended (but legally and factually incorrect) argument that the SAC's new claims are derivative.*** (*See* Opposition at 3-6.)  There is only one possible explanation for Defendants' failure to cite a single case:  There is simply no case law that supports their primary argument.  The breach of fiduciary duty, breach of contract, and *ultra vires* claims newly introduced by the SAC are entirely unlike the derivative claims that were dismissed, and they are appropriately brought as direct claims.  That is what the SAC does.

### 1.     The Breach of Fiduciary Duty Claims Are Direct.

Claims for breach of fiduciary duty are direct claims, because officers and directors owe a fiduciary duty directly to both the entity and its members (or shareholders). *Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n*, 441 A.2d 956, 962-63 (D.C. 1982) (hereinafter, *Wisconsin Avenue*).  *Wisconsin Avenue* involves claims for breach of fiduciary duty and breach of contract brought by individual shareholders against fiduciaries of their housing cooperative.  Citing numerous cases describing the duties owed by fiduciaries, the *Wisconsin Avenue* court held:

> Officers and directors of a corporation owe a fiduciary duty to the corporation ***and to its shareholders***, which requires them to act in good faith in managing the affairs of the corporation.  *See, e.g., United States v. Byrum*, [408 U.S. 125, 142 (1972)]; *SEC v. Chenery Corp.*, [318 U.S. 80, 85 (1943)]; *McKay v. Wahlenmaier*, [226 F.2d 35, 44 (1955)]; *Johnson v. American General Insurance Co.*, 296 F. Supp. 802, 809 (D.D.C. 1969).   . . .
>
> Similarly, promoters of a corporation stand in a fiduciary relation to ***both the corporation and its stockholders***, which requires them to act with the utmost good faith and to ***disclose fully all material facts to both the corporation and its stockholders***. *McCandless, Receiver v. Furlaud*, [296 U.S. 140, 156-57 (1935)]; *Dickerman v. Northern Trust Co.*, [176 U.S. 181, 203-04 (1900)]; *Post v. United States*, [407 F.2d 319, 328 (1968), *cert. denied*, 393 U.S. 1092 (1969)]; *Bailes v. Colonial Press, Inc.*, 444 F.2d 1241, 1244 (5th Cir. 1971); *Earle R. Hanson & Associates v. Farmers Cooperative Creamery Co.*, 403 F.2d 65, 70 (8th Cir. 1968). The fiduciary concept is not limited to stock

> corporations but applies to membership organizations as well. *Post v. United States, supra*, [407 F.2d at 329].
> Like promoters or directors of a corporation, developers of a housing cooperative *occupy a fiduciary position with respect to the individual members* of the cooperative.

441 A.2d at 962-63, emphasis added. *Wisconsin Avenue* follows the United States Supreme Court's decision in a federal tax case, *United States v. Byrum*, which turned on the permissible scope of discretion exercisable by a majority shareholder. After holding that a fiduciary owes duties to both the corporation and to its stockholders, the Supreme Court held that minority shareholders could bring direct claims for breach of fiduciary duties against the majority shareholder:

> Byrum was similarly inhibited by a fiduciary duty from abusing his position as majority shareholder for personal or family advantage to the detriment of the corporation *or other stockholders*. There were a substantial number of minority stockholders in these corporations who were unrelated to Byrum. Had Byrum and the directors violated their duties, the minority shareholders would have had a cause of action under Ohio law.

*United States v. Byrum*, 408 U.S. 125, 142 (1972), emphasis added. The result is the same under District of Columbia law. *See Wisconsin Avenue, supra*; *see also Willens v. 2720 Wis. Ave. Coop. Ass'n*, 844 A.2d 1126, 1136 (D.C. 2004) ("directors of the Cooperative owed the duties of a fiduciary to the corporation *and to its members*," emphasis added) and *Daley*, 26 A.3d at 729 ("the right of faithful representation" is "a direct claim").

## 2.   The Breach of Contract Claims and *Ultra Vires* Claims Are Properly Brought as Direct Claims.

The breach of contract and *ultra vires* claims alleged in Counts 3, 4 and 5 of the SAC are also correctly brought as direct claims.

It is a long-standing and clearly established matter of law that the bylaws of an organization "are akin to a contract enforceable by all individual members." *Welsh v. McNeil*,

4

162 A.3d 135, 157 (D.C. 2017); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C.

2005) ("It is well established that the formal bylaws of an organization are to be construed as a

contractual agreement between the organization and its members"); *Daley*, 26 A.3d 723, 731

(D.C. 2011) (*quoting Meshel*); *Willens*, 844 A.2d at 1135.  Although Defendants assert that the

SAC presents derivative claims "dressed up differently," they do not specifically mention the

new breach of contract claims in Counts 3, 4, and 5, and they do not attempt to make any real

argument that these claims are derivative in nature.  Nor could they.  A contract between an

organization and its members is individual to each member.  Indeed, this Court has recognized as

much, in this very case -- a direct claim for breach of contract is already pending in this case.

The SAC also alleges *ultra vires* claims arising from violations of the ASA bylaws, and

these are also appropriately brought as direct claims.  As this Court held in this very case:

> ***A member of an organization may directly sue that organization*** to
> enjoin actions that the organization did not have power to execute.  *See*
> D.C. Code § 29-403.04(b)(1); *see also Daley v. Alpha Kappa Alpha
> Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011). Actions taken by the
> organization that are 'expressly prohibited by state or by-law' or
> outside the powers conferred upon it by articles of incorporation are
> *ultra vires*.

(Memorandum Opinion dated 3/31/2017, Dkt. 28 at 30, emphasis added.)  Defendants simply

ignore this directly applicable holding.

The D.C. Nonprofit Corporations Act § 29-403.04(b) also explicitly provides for

members to bring direct claims to challenge *ultra vires* actions: "The power of a nonprofit

corporation to act may be challenged in a proceeding by: (1) A member, director, or member of a

designated body against the corporation to enjoin the act; [or] (2) The corporation, directly,

derivatively, or through a receiver trustee, or other legal representative."  As with the breach of

contract claims, Defendants do not actually argue that the *ultra vires* claims in Counts 3, 4, and 5 are derivative in nature, or that ultra vires claims cannot be brought as direct claims.

### 3. Defendants' Arguments Regarding the Waste Claim Are Not Applicable or Relevant to the New Claims – And They Are Also Wrong on The Merits.

Ignoring allegata in the new claims that do not fit with their attacks, Defendants rehash their old arguments from the Waste Motion in support of the idea that Plaintiffs new claims are, or should be, derivative. Defendants focus on the new claims' alleged failure to allege direct injury to a Plaintiff. These recycled arguments fail for three independently dispositive reasons:

- First, the SAC **does** present allegations of personal harm, including reputational and economic harm;

- Second, the *ultra vires*, breach of contract, and breach of fiduciary duties claims alleged in the SAC are not the same as the corporate waste claim, and Defendants' theories on waste claims are irrelevant to the requirements of direct *ultra vires*, breach of contract, and breach of fiduciary duties claims; and

- Third, defendants' old Waste brief misreads the law regarding the distinction between direct and derivative claims.

Though Defendants pretend it isn't so, see Opposition at 4, the SAC explicitly alleges that "Plaintiffs have suffered significant economic and reputational damage," (SAC ¶¶ 206, 214, 224). Moreover, none of the new claims require a particular showing of financial damages to establish a direct claim. For both the breach of contract and the breach of fiduciary duty claims, the breach of the duty owed by the defendant to the plaintiff constitutes the direct injury required to bring a direct claim. This is made clear by the D.C. statute creating the claim, which grants standing to make this claim without requiring any financial injury. D.C. Code § 29-403.04(b)(1).

For the same reason, Plaintiffs' *ultra vires* claims also do not require a claim for monetary damages.  A direct claim can therefore be brought by any member to enjoin the *ultra vires* action.

The following argument reveals how poorly Defendants' rehashed arguments apply to the new claims in the SAC:

> Plaintiffs again seek to invoke *ultra vires* theories in some of the purportedly new claims and reference the *ultra vires* subsection of the statute, D.C. Code § 29-403.04.  However, that section *only* allows damages in a derivative proceeding.  *See* D.C. Code § 29-403.04(c).  But again the derivative claims have been dismissed, this is an improper attempt to circumvent this Court's prior ruling and to resurrect previously dismissed causes, just dressed up differently.

Opposition at 6.

First, § 29-403.04 does not only allow damages in a derivative proceeding.  Subsection b explicitly allows for direct claims to enjoin the *ultra vires* act.  In words Defendants completely ignore, the provision says clearly: "(b) The power of a nonprofit corporation to act may be challenged in a proceeding by: (1) A member, director, or member of a designated body against the corporation to enjoin the act."  Subsection (c) is not required for Plaintiffs to bring this claim; and there is therefore nothing improper about the *ultra vires* claims, which are intended to be, and will remain, direct.

Defendants cite not a single case in support of their argument on this topic – they do not even cite the cases they themselves invoked the last time they made this argument.  In their Waste Motion, they relied on *Corwin v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984) and *Tooley v. Donaldson, Lufkin & Jenrette, Inc*. 845 A.2d 1031, 1033 (Del. 2004).  As Plaintiffs showed in their brief opposing that Motion, both apply Delaware, not District of Columbia, law, and both involve for-profit corporations.  Moreover, Defendants have cherry-picked snippets from both

cases, even though the later of the two cases clearly rejected the specific language that

Defendants rely on from the former.  (*See* Plaintiffs' Surreply, Dkt. 40-1, at 3-6; s*ee also Corwin*

*v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984) (applying Delaware law) (applying "special

injury" standard for distinguishing between direct and derivative claims), and *Tooley v.*

*Donaldson, Lufkin & Jenrette, Inc*. 845 A.2d 1031, 1033 (Del. 2004) ("In our view, the concept

of 'special injury' . . . is not helpful to a proper analytical distinction between direct and

derivative actions.  We now disapprove the use of the concept of 'special injury' as a tool in that

analysis").

Plaintiffs' Opposition to the Waste Motion (Dkt. 36) and Proposed Surreply (Dkt. 40-1),

incorporated here by reference, explain in detail the clear, binding precedent from the District of

Columbia Court of Appeals that explicitly reject the direct/derivative distinction discussed in

*Corwin* and *Tooley* in the context of non-profit cases.  *See* Dkt. 36, discussing *Daley* v. *Alpha*

*Kappa Alpha Sorority*, 26 A.3d 723, 729-30 (D.C. 2011) and *Jackson v. George*, 146 A.3d 405,

415 (D.C. 2016); *see also* Dkt. 40-1 (same).

But not even *Corwin* and *Tooley* can offer any support to Defendants' claims that the

SAC's breach of contract, breach of fiduciary duty, and *ultra vires* claims are actually

"derivative claims dressed up as something different."   Defendants' primary argument, four

pages long, does not cite a single case.

### B.     The *Ultra Vires* Claims Are Not Futile

The *ultra vires* claims are well-pleaded and actionable, despite Defendants' inexplicable

statement that the *ultra vires* claims are "the precise type of tactic that requires the denial of the

Motion for Leave, D.C. Nonprofit Corporations Act, § 29-403.04, and [are] indicative of

Plaintiffs' continued campaign to harass those who hold opinions different from their own."

8

(Opposition at 5.)  We discuss Defendants' frequent and indiscriminate accusations of harassment at Section II, *infra*.  We show here that the *ultra vires* claims are appropriately brought as direct claims under § 29-403.04.

Indeed, Defendants offer no explanation or argument to the contrary, nor do they explain how the *ultra vires* claims constitute harassment of "those who hold opinions different from [the Plaintiffs]."  (Opposition at 5.)

As explained in above, Counts 3, 4, and 5 of the SAC allege both *ultra vires* and breach of contract claims arising from violations of bylaws of the American Studies Association.  The specific sections of the bylaws violated are cited and quoted, and the factual support showing the violations is presented with far more detail than required by notice pleading, including citation and quotations from documents produced in discovery and the deposition of John Stephens.

Again ignoring essential allegations in the new proposed pleading, Defendants argue that the SAC "doesn't even attempt to satisfy the requirements . . . to hold the Individual Defendants liable."  *Id.*  This argument fails for multiple reasons, first among which is that, even if this were true, the *ultra vires* claims would not be futile, because they are also brought against the American Studies Association itself.

Second, the SAC does satisfy D.C. Code § 29-406.31, "Standards of Liability for Directors," with respect to the Individual Defendants who served on the National Council, the American Studies Association's equivalent of a Board of Directors.  The SAC at ¶ 197 states, "Because their conduct was not in good faith, it is not exculpated by § 29-406.31[.]" Defendants quote this allegation in the Opposition, but nonetheless continue to argue that the SAC is futile: "However, in order to hold the individual defendants liable here, Plaintiffs must allege and establish not only that the Defendants' actions were in bad faith, but they must also allege and

establish that subsection (d) of 29-406.31 does NOT apply."  (Opposition at 5.) This assertion is just wrong.  Subsection (d) only applies to liability for money damages, not other forms of relief. Plaintiffs seek both declaratory and injunctive relief.

Moreover, § 29-406.31 only applies to claims against directors, not officers.  Claims brought against Individual Defendants for acts taken while they served as President are unaffected by § 29-406.31. Nor does § 29-406.31 apply to John Stephens, a paid employee and Executive Director of the American Studies Association, who owed and owes fiduciary duties to the members of the association, and is not and was not a member of the National Council.

### C.     Claims Related to the Trust and Development Fund Are Not Futile.

On the basis of information Plaintiffs learned in discovery, the SAC pleads the most basic wrong imaginable for a fiduciary: invading Trust assets for personal reasons.  In a footnote, Defendants nonetheless argue that the claims and allegations related to the American Studies Association's Trust and Development Fund ("the Trust Fund") are futile.  Yet again ignoring explicit allegations that say exactly what they deny Plaintiffs have pled, the footnote states that Plaintiffs "admit . . . that they do not have sufficient information to support the allegations they nonetheless make regarding the 'alleged' of the trust fund."  (Opposition at n.5.)

There is, absolutely, no such "admission" in the SAC.  Instead, Plaintiffs' proposed pleading includes ten paragraphs describing in detail, with specific quotations and citations to Defendants' own documents, withdrawals from the Trust Fund for the purpose of paying expenses arising from the resolution.  These allegations also describe changes to the bylaws made specifically to allow for these large withdrawals from the trust fund.  (SAC ¶¶ 162-71.)

Thus, the SAC alleges, *inter alia*:

- That there had been no withdrawals from the Trust Fund until fiscal year 2015, going back as least as far as 2008 (¶ 162);

- That in fiscal year 2015, the ASA withdrew $112,034 from the Trust Fund to cover unpaid expenses (¶ 167);

- That the unpaid expenses included, in large part, expenses related to the Resolution, according to internal documents produced in discovery and quoted in the SAC (¶¶ 170-71);

- That in fiscal year 2016 and 2017, the ASA withdrew a total of $294,000 from the Trust Fund to cover extraordinary expenses arising from the Resolution and a new website (¶ 171);

- That despite those withdrawals, the ASA was still carrying debt of $40,000 on an American Express card in unpaid legal expenses related to the Resolution at the 2016, which planned to be paid in fiscal year 2018, when revised bylaws allowed the ASA to withdraw another 4% from the Trust Fund (*Id.*);

- Other extraordinary expenses requiring withdrawal from the Trust Fund include the purchase of liability insurance for directors and officers of the ASA, and the creation of a "substantial contingency fund" to cover "extraordinary legal expenses" (¶ 185).

Defendants' brief makes absolutely no effort to come to terms with these allegations.

The SAC also alleges facts in support of breach of fiduciary claims arising from a change in the ASA bylaws to allow for the withdrawal of 4% of the trust per year.  These allegations are supported with citations to and quotations Defendants' own documents, produced in discovery. (SAC ¶¶ 163-69.)  The paragraphs cited here are an incomplete listing of the allegations related

to the Trust Fund, yet more than sufficient to satisfy the notice pleading standard.  Defendants

have nothing to say about any of these allegations; yet their argument cannot fly if these

allegations are acknowledged.

The so-called admission that Plaintiffs "don't have sufficient information to support the

allegations they nonetheless make" (Opposition at n. 5) is simply a statement about detail that

Defendants have taken out context.  Paragraph 188 refers to the months immediately after the

passage of the Boycott.  This is apparent when one reads the paragraphs before and after ¶ 188.

Paragraph 188 states, in full: "Many of these emails discuss payment out of the American

Studies Association Trust Fund, including the email [quoted] in the previous paragraph.  At this

time, we have insufficient documents to determine whether funds were withdrawn from the

[Trust Fund] specifically to cover expenses related to the Resolution.  However, the emails

produced thus far indicate that Defendants were planning to pay Resolution-related expenses

with money withdrawn from the [Trust Fund] well into 2014."  (¶ 188.)   Shortly after, the SAC

makes a clear "Without documentation that has yet to be produced, it is impossible to establish

when the "separate budgets" were established, and to what extent support for the Resolution was

in fact financed by the Trust Fund – *it is clear, however, that the withdrawals from the Trust

Fund in 2016 and 2017 did cover Resolution-related expenses to some extent*.  (SAC ¶ 191)

(emphasis added).

Given the emphasized language, Defendants' cherry-picked quotations cannot refute the

fact that the SAC clearly alleges that Defendants invaded the Trust Fund to cover resolution-

related expenses, and supports the allegations with detailed factual information taken directly

from Defendants' own documents.  The claims related to the Trust Fund, including claims

arising from invasion of the Trust Fund, are not futile.[2]

> **D.**     **The New Claims Are Not Barred by the Statute of Limitations.**

The Defendants further argue that amending the complaint would be futile, because the

claims would be barred by the statute of limitations.  Defendants' entire statute of limitations

argument is all of three of sentences long:

> For example, the proposed second amended complaint seeks to add
> four new Defendants and hold them liable for events leading up to and
> including the passage of the resolution.  However, those claims would
> clearly be barred by the statute of limitations, at the very least, as the
> Resolution was passed more than three years ago.  The same would be
> true for the alleged "misrepresentation" claims leading up to the
> election prior to the Resolution and the Resolution itself.

(Opposition at 7.)  Defendants' three sentences are insufficient to meet the standard for dismissal

under Rule 12(b)(1).

First, the statute of limitations argument fails because the SAC presents claims based on

decisions and actions that took place in 2015, 2016, and potentially 2017, *e.g.*, the claims arising

from the invasion of the trust, the change in the bylaws to allow for invasion of the trust, and

disclosures related to both.  These claims clearly fall within the statute of limitations.

---

[2] With respect to the reference in the SAC to documents not yet produced, Defendants sarcastically argue, "This despite the fact that [Defendants] have produced nearly 17,000 documents, including ASA's IRS forms 990 for the years 2010 through 2015.  That their lawsuit is primarily a publicity-focused fishing expedition has never been clearer."  (Opposition at n. 5.)  Notwithstanding their purported outrage, Defendants objected to producing – and, until ordered to produce them, Defendants withhold from discovery -- any documentation of expenses, financial (or any) documents dated after 2015 (and sometimes 2013), their own Form 990s, and refused to produce any of these until the Court ordered them to do so on October 3.  To the extent Defendants have now produced the relevant documents, they did so on October 17, in a one-day production of more than 11,200 documents, and without any providing any information as to where in this production these particular documents were located (as Defendants also refuse to comply with that long-standing rule).  Plaintiffs had only three weeks to identify the many documents cited in the SAC.

Second, the statute for claims based on events that occurred in 2013 is tolled by Defendants' fraudulent concealment.  These claims are based in significant part on the fact that Defendants have (or had) a fiduciary responsibility to the members of the ASA.  But the D.C. Circuit has held clearly that "where there is a fiduciary duty to disclose information on a particular matter, failure to do so will constitute fraud or fraudulent concealment that tolls the statute of limitations on any claim as to notice of which that information is material."  *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1495-96 (D.C. Cir. 1989); see also *Firestone v. Firestone*, 76 F.3d 1205, 1209-10 (D.C. Cir. 1996) ("failure to disclose by one who has a duty to do so – such as someone standing in a fiduciary relationship – also can establish fraudulent concealment").

"Once a plaintiff shows fraudulent concealment, a defendant wishing to assert 'a defense based on the plaintiff's lack of due diligence must show something close to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment.'"  *Firestone* at 12090-10, quoting *Riddell* at 1491. Defendants have not even attempted, or claimed, to meet this standard.

Defendants' three sentences do not meet the standard for dismissal of a complaint on statute of limitations grounds.  As the Court held in *Firestone*:

> As we have repeatedly held, courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.  [Citations.]  In *Richards* [*v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981),] we made clear that, because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred.

*Firestone*, 76 F.3d at 1209. *See also Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 86 (D.D.C. 2013) ("It is not clear from the face of Smith's complaint that his claims are time-barred. . . . he

also alleges that defendant's conduct . . . continued through the present. . . . To the extent some of his claims may be untimely, this presents fact-sensitive questions not appropriate for resolution at this stage").

**E.      Plaintiffs' Proposed Amendment to Plead Breach of Fiduciary Duties Claims Arising from Material Misrepresentations and Omission in Connection with Elections is Not Futile.**

Defendants' attack on the breach of fiduciary duty claims presented in Count 1 (Material Misrepresentations and Omissions in Connection with Elections) fail because the principle of law they invoke does not exist.  Reliance is not an element of this claim.  *Malone v. Brincat*, 722 A.2d 5 (Del. 1997).  *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C. 1992), which Defendants cite, Opposition at 7, is not to the contrary – in fact, *Hercules* explicitly rejects the very rule for which Defendants invoke it.

*Hercules* involves a claim for common law fraud in the inducement.  Although actual reliance is an element of fraud, it is not an element of breach of fiduciary claims arising from misrepresentations or omissions by a fiduciary.  *Malone v. Brincat*, 722 A.2d 5 (Del. 1997).  The *Hercules* case makes exactly this point on the very page Defendants cite: "'the plaintiff did not reasonably rely upon the defendant's prior oral assurances. Absent this element, fraud, in the legal sense, cannot exist. . . . One cannot close his eyes and blindly rely upon the assurances of another ***absent some fiduciary relationship*** or emergency[.]" Hercules at 923, quoting *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F. Supp. 666, 672 (N.D. Ga. 1982), emphasis added.  *See also Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) ("action for a breach of fiduciary duty arising out of disclosure violations in connection with a respect for stockholder action do not include the elements of reliance, causation and actual quantifiable money damages" (*Id.* at 12); shareholder action not required, when "directors are not seeking

shareholder action, but are deliberately misinforming shareholders about the business of the

corporation, there is a violation of fiduciary duty" (*Id.* at 14)).

Consequently, Count 1 of the SAC is not futile for failure to allege actual reliance.

## II.   <u>DEFENDANTS CANNOT AND DO NOT ESTABLISH BAD FAITH</u>

Under Rule 15(a)(2), leave to amend should be freely given, in the absence of "undue

delay, bad faith or dilatory motive on the part of the movant[.]"  *Foman v. Davis*, 371 U.S. 178,

182 (1962).  No factor is present here that would justify denial of Plaintiffs' motion.

Bad faith is not easily established:

> Courts are more likely to hold that motions to amend are brought in bad
> faith when the proposed amendments are similar to already-rejected
> claims or otherwise unlikely to succeed on their face. *See Hoffman*, 266
> F. Supp. 2d at 34. Preventing a party from amending her complaint on
> the basis of bad faith generally requires an affirmative showing by the
> nonmoving party. *Roller Bearing Co. of Am. v. Am. Software, Inc.*, 570
> F. Supp. 2d 376, 386 (D. Conn. 2008) (citing *Monahan v. New York
> City Dep't of Corr.*, 214 F.3d 275, 283-84 (2d Cir. 2000)). Such a
> showing often requires extrinsic evidence. *See Adams v. Gould Inc.*,
> 739 F.2d 858, 868 (3d Cir. 1984).

*Sherrod v. McHugh*, 249 F. Supp. 3d 85, 86-87 (D.D.C. 2017) (Defendant "has not factually

supported her argument with more than conclusory assertions, let alone extrinsic evidence"); *see*

*Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984) ("Defendants assert that the plaintiffs'

delay in moving to amend the complaint was in 'bad faith,' but they offer no facts other than the

delay in support of the contention. . . . Defendants point to no extrinsic evidence of bad faith,

and, as noted below, plaintiffs had a colorable excuse for not amending earlier since the district

court accepted the facial validity of their original legal theory").

Defendants here have no basis to argue that the Motion to Amend was brought in bad

faith.  The standard is very high, and requires Defendants to make an affirmative showing,

including extrinsic evidence.  *Id.*   Defendants cite no case that denied a Rule 15(b) motion for

bad faith under anything like the circumstances here.  The plain fact is that Plaintiffs did not

delay filing the SAC, which was filed within three weeks of receiving two-thirds of Defendants'

production.  (*See* Plaintiffs' Reply on the Motion to Extend Time to Add Parties, Dkt. 60,

refuting Defendants' claims that Plaintiffs could have drafted the SAC in September, before the

October 17 production, and citing to use of documents produced on October 17 in the SAC.)

Moreover, even if Plaintiffs had been entirely able to file the complaint in September, as

Defendants argue, and had simply chosen to wait until the beginning of November, that two-

month delay is just a fraction of the time that required to constitute "bad faith."

 Yet throughout the Opposition, Defendants falsely accuse Plaintiffs and Plaintiffs'

Counsel of serious abuses.  These accusations, themselves, are improper.  The very first

argument Defendants make – just the second line of the brief – states, "The Motion for Leave is

another in the long line of Plaintiffs' improper litigation tactics which should not be

countenanced by this Court."  The brief then goes on to make entirely unfounded and

inflammatory claims of harassment and dilatory tactics.   Many of these claims stem from the

fact that the Brandeis Center issued three press releases over the 18 months of this litigation:  (1)

when the original complaint was filed on April 20, 2016, (2) nearly a year later, when the court

ruled on the Motion to Dismiss on March 31, 2017, and (3) over seven months later, when

Plaintiffs filed the Motion for Leave on November 9, 2017.

 Press releases announcing new litigation and major milestones in litigation are extremely

common among non-profit, public interest legal advocacy organizations.  Press releases

announcing litigation-related events are also commonly made by law firms and lawyers in

private practice.  U.S. Attorneys and the FBI issue press releases announcing arrests and

indictments.  There is nothing uncommon about the press releases issue here.  Indeed, Palestine

Legal – which provided legal advice to some of the Individual Defendants at the time of the

Boycott Resolution – also issued press releases about this case, as they often do in cases

involving the Boycott, Divestment and Sanctions movement against Israel ("BDS"), regardless

of whether they actually represent any of the litigants.  (*See* https://palestinelegal.org/news/ for a

list of Palestine Legal's recent press releases.) One of the Defendants in this case, Sunaina Maira,

recently published a book about the ASA's enactment of the resolution at issue in this case

entitled *Boycott! The Academy and Justice for Palestine*

(https://www.ucpress.edu/book.php?isbn=9780520294899).

There is nothing wrong with any of this.  The issues that about which public interest

organizations litigate are – by design – important matters of public policy, and the cases

themselves are matters of important public interest.  The matters at issue in cases brought by

such organizations are the issues which the public interest organizations were created to deal

with.  Speech about these cases is core political speech, protected by the First Amendment

because it is focused on public issues.

Not only is there nothing wrong with such speech:  there is everything right about it.  The

suggestion that there is anything improper about such speech, or that it evidences an improper

motive of some kind, is entirely groundless.  All parties to this case are, and must remain,

entirely free to speak about the issues in the case, and about the case itself.  The fact that

Plaintiffs or their counsel engage in such speech is not grounds for punishment, nor does it

provide any basis for the Defendants' suggestion that the initiation or prosecution of this case is

improper in any way.

What is wrong, however, is Defendants' argument, repeated throughout the Opposition, that press releases were issued 1) with the sole and specific intent to harass the Defendants and others who disagree with Plaintiffs' viewpoint, and 2) that Plaintiffs intentionally, and in bad faith, timed the filing of these litigation milestones, including this Motion for Leave, so that the corresponding press releases go out at a specific time, in order to intimidate other academic associations.  When defense counsel make false claims of this type in this court filing, it is intriguing to note that no one on the team signed their name to it.

Both of these claims are absolutely false.  And Defendants do not have an iota of factual information to support these bad faith attacks on Plaintiffs and Plaintiffs' Counsel – which is why Defendants' brief cites no evidence in support of either of these assertions, and why Defendants have produced nothing in response to any of the formal discovery requests Plaintiffs have issued seeking evidence of such "harassment."

While Defendants have alleged and complained about "threats" and "harassment" since this case began, they have never provided any evidence to support their complaints:  and they have also never actually sought any relief from this Court relating to their complaints.  As a result, Defendants continue to make these accusations over and over, without ever having to choose between proving their allegations or ceasing to make them.

Thus, as this Court noted in a Minute Order granting Plaintiffs' recent motion for continuance of a status conference, Defendants "raise the issue of the press release, which the court duly notes, [but] Defendants do not indicate that the hearing is necessary ***nor do they explicitly seek relief concerning the press release*** that needs to be addressed at the status hearing."  (Minute Order of Nov. 15, 2017.)

Defendants next make the argument that the timing of the Motion to Amend suggest "both dilatory tactics and ulterior motive." (Opposition at 8.) For the next four pages, the Opposition makes one false and misleading claim after another about Plaintiffs' counsel. For example, Defendants allege, Opposition 10-11, that Plaintiffs' counsel timed the Motion to Amend so that a press release about the SAC would be released on November 9, which apparently is, according to Defendants, precisely the right time to intimidate and harass the Middle Eastern Studies Association ("MESA"). Defendants announced in the Opposition that MESA held its national conference November 18-21, and were considering an academic boycott of Israel.

Plaintiffs' counsel learned about the MESA conference from Defendants' Opposition, long after November 9. And it appears that there was no boycott resolution on the agenda at the MESA conference after all; at least, none was indicated on the program (the same program that Defendants' exhibits were excerpted from, a point worth noting), and an internet search did not identify any record or discussion of a MESA boycott resolution.

And in any event, the MESA conference had nothing to do with the timing of the SAC, the Motion for Leave, or the concomitant press release. These "facts" do not establish any bad motive and do not provide any reason why the Court should deny Plaintiffs' Motion for Leave to Amend the Complaint.[3]

---

[3] We are troubled by the groundless nature of Defendants' allegations that Plaintiffs' counsel knew the weekend of MESA's national meeting and knew that MESA was considering an academic boycott of Israel. Defendants cite and attach three exhibits to their Opposition, all intended to support the false claim that Plaintiffs' counsel knew about the MESA conference, that MESA was considering an academic boycott, and that the SAC and the Motion to Amend were timed to harass and intimidate MESA members. (See Dkt. 66-2, 66-3, & 66-4.) In fact, these exhibits show nothing of the kind. The exhibits are "excerpts" from the MESA Annual Meeting Program – pages 1, 25, and 39 of the 51-page program. The two excerpted pages of the conference program list sessions at the conference tangentially related to academic boycotts of Israel: *Special Session, BDS: A Critical Evaluation* (Dkt. 66-3) and *Special*

III.    **DEFENDANTS WOULD SUFFER NO PREJUDICE FROM THE AMENDMENT**

Defendants' final argument is that the Motion for Leave should be denied because the SAC would "greatly expand the preparation and expenses necessary for Defendants to litigate the new claims."  First, this isn't true – the new claims arise primarily from the same circumstances as the current claims, and the current defendants are unlikely to incur significantly more expense than they would otherwise.  Second, Defendants misunderstand the concept of prejudice.  "Undue prejudice is not mere harm to the non-movant, but a denial of the opportunity to present facts of evidence which would have been offered had the amendment been timely." *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 6 (D.D.C. 2008); *Council on American-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311 (D.D.C. 2011), quoting *City of Moundridge*.

Rule 15 in neither designed nor intended to protect Defendants from expending the resources reasonably incurred defending against legitimate claims.  Rule 15 states, "[t]he court should freely give leave when justice so requires[.]" Fed. R. Civ. P. 15(a)(2).  This provision "'severely restrict[s]' the court's discretion to deny leave to amend and dismiss, *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, [148 F.3d 1080, 1084] (D.C. Cir. 1998) (quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991)).  Courts have also recognized a 'policy in favor of hearing cases on their merits' that weighs in favor of permitting amendments. *Id.*" *Geter v. United States Gov't Publ. Office*, 2017 U.S. Dist. LEXIS 119868, *10, 2017 WL 3267698.

---

*Session, Academic Freedom Trends and the Work of MESA's Committee on Academic Freedom* (Dkt. 66-4), but there is no mention of MESA considering an Academic Boycott of Israel, and presumably the other 48 pages that were not excerpted for exhibits to the Opposition list about 300 other entirely unrelated sessions at the conference.  Meanwhile, our internet research failed to find any article, post, or other record of any academic boycott under consideration at the MESA meeting.

Consistent with the policy, the court in *Hisler v. Gallaudet Univ.*, 206 F.R.D. 11 (D.D.C. 2002), rejected arguments that leave to amend "would unjustly prejudice the defendants because of the delay in the proceedings and unanticipated expense in defending the plaintiff's newly asserted claims." 206 F.R.D. at 13. The *Hisler* court held:

> [T]he defendant asserts that by allowing the plaintiff to amend her complaint, the defendant will be forced to "incur further unanticipated expense" resulting from "additional written discovery," a "lengthy investigation," and the need to prepare responsive pleadings. See Def.'s Opp'n at 4. These purported results, however, would likely stem from an amendment asserting additional causes of action in almost any case. As such, if this court were to employ a policy of denying plaintiffs leave to amend in every situation where an amended complaint may result in additional discovery or expense, then this court would fail to abide by the legal standard of granting leave "freely . . . when justice so requires." See Fed. R. Civ. P. 15(a); *Liberty Lobby Inc.*, 638 F. Supp. at 1150-1151 (dismissing complaint after a plaintiff had been allowed to assert four additional causes of action). Indeed, for this court to find otherwise would run afoul of the federal rules and the policy undergirding the authority in this area of law.
>
> In the instant case, the two counts which the plaintiff seeks to add to her complaint contain a total of five additional factual allegations. . . . The discovery resulting from these allegations does not place an unjust burden on the defendant, . . . the court notes that an "adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *See United States v. Continental Ill. Nat'l Bank & Trust Co.*, 889 F.2d 1248, 1255 (2d Cir. 1989). . . .
> The court is also guided by the underlying purpose of Rule 15, which is to facilitate a decision on the merits of the case rather than on technicalities. *See Filmtec Corp. v. Hydranautics*, 67 F.3d 931, 935 [\*15] (Fed. Cir. 1995) (citing *DCD Programs Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)). Also taking into consideration the fact that a pretrial order has not been issued and a trial date has yet to be scheduled in the case, it is evident that the litigation is still in its infancy and the plaintiff's proposed amendment would not stand in the way of allowing both parties a significant amount of time to prepare the case.

*Hisler v. Gallaudet Univ.*, 206 F.R.D. 11, 14-15 (D.D.C. 2002).

The court in *Council on American-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 326 (D.D.C. 2011), rejected arguments similar to those raised by defendants here. In that case, the defendants claimed that granting leave to amend would "require them to expend additional 'time and expense[.]'" The *Gaubatz* court held:

> [T]hese contentions are either entirely conclusory or relate to the ordinary costs and inconveniences incidental to defending against any lawsuit.  They fall short of the 'good reason' required to deny leave to amend."

793 F. Supp. 2d at 325.  In response to the defendants' claims that leave to amend would have "a 'chilling effect' on the exercise of their First Amendment rights," the court held:

> Viewed from a slightly different perspective, the alleged prejudice . . . has nothing to do with the effect of any proposed amendment, but is attributable to the action itself.  The argument begs the question at the heart of this litigation – namely, whether Plaintiffs can prevail on the merits of their claims and that question cannot be answered at this stage of the proceedings.

*Id.* at 326.

\* \* \* \*

For all the reasons discussed above, as well as in Plaintiffs' Motion to Extend Time to Add Parties (Dkt. 56), Plaintiffs' Motion for Leave to File an Amended Complaint (Dkt. 59), and Plaintiffs' Reply Regarding Motion to Extend Time to Add Parties (Dkt. 60), which address arguments raised by Defendants in earlier briefs and repeated in the Opposition, and incorporated herein by reference, Plaintiffs respectfully request that the Court grant the Motion for Leave to File an Amended Complaint.

Dated:  December 4, 2017

Signed:          /s/*Jennifer Gross*
                  Jennifer Gross

Jerome M. Marcus (admitted *pro hac vice*)
Jonathan Auerbach (admitted *pro hac vice*)
**MARCUS & AUERBACH LLC**
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250
jmarcus@marcusauerbach.com
auerbach@marcusauerbach.com

*Lead Counsel for Plaintiffs*

Jennifer Gross, DC Bar No. 1003811
Aviva Vogelstein (admission to DDC pending,
   DC Bar No. 1024231)
**THE LOUIS D. BRANDEIS CENTER
   FOR HUMAN RIGHTS UNDER LAW**
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006-4623
(202) 559-9296
jenniegross@brandeiscenter.com
avogelst@brandeiscenter.com

L. Rachel Lerman (admitted *pro hac vice*)
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3871
rlerman@btlaw.com

Joel Friedlander (*pro hac vice* pending)
**FRIEDLANDER & GORRIS, P.A**.
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3502
jfriedlander@friedlandergorris.com

Scott Godes, DC Bar No. 463674
Devin Stone, DC Bar No. 1022055
**BARNES & THORNBURG LLP**
1717 Pennsylvania Avenue NW, Suite 500
Washington, DC 20006-4623
(202) 408-6928
sgodes@btlaw.com
dstone@btlaw.com

Eric D. Roiter (*pro hac vice* pending)
Lecturer in Law
**BOSTON UNIVERSITY SCHOOL OF LAW**
765 Commonwealth Avenue
Boston, MA  02215
(617) 734-8266
eroiter@bu.edu

*Counsel for Plaintiffs*