# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON,<br><br>Plaintiffs,<br><br>v.<br><br>LISA DUGGAN, CURTIS MAREZ, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, and THE AMERICAN STUDIES ASSOCIATION,<br><br>Defendants. | Case No. 16-cv-00740-RC |

### PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiffs Simon Bronner, Michael Rockland, Michael L. Barton, and Charles D. Kupfer (collectively, "Plaintiffs"), by and through their attorneys, move this Court for an order compelling Defendants Sunaina Maira and Curtis Marez to produce documents that are responsive to Plaintiffs' First Request for Production of Documents ("the Requests"), and that were identified using specific search terms (unilaterally selected by Defendants), but have been improperly withheld.

The present issue is the use of technology-assisted review ("TAR") to limit Defendants Maira and Marez's productions to only about 60% of the relevant and discoverable materials responsive to Plaintiffs' Requests. As we explain below, the documents at issue are already identified as relevant. This is not a question of expending resources to review and analyze

millions of documents to identify a subset of documents that are relevant and responsive. Frankly, the only benefit of using TAR in this particular case is to avoid appropriate discovery.

Though invoking the claimed right to minimize expense, Defendants have in fact magnified their own expenses, utilizing unnecessary technology and spending lavishly on consultants, solely to restrict the number of documents they turn over. And, although they plead burden and expense, Defendants Maira and Marez and their attorneys are spending far more to avoid discovery than they would have to spend to simply make the correct and complete production that Rule 26(g) requires. Fed. R. Civ. Proc. 26(g).

## I.   **BACKGROUND**

Defendant Maira was the driving force behind the resolution for an academic boycott of Israel ("the Resolution") that lies at the heart of this case. She is also a member of the Organizing Collective and one of the very most active leaders of USACBI, which her husband founded.[1] She was elected to the ASA National Council ("the Council") just a few months before the Resolution was proposed. This lawsuit alleges, with substantial supporting evidence, that Defendant Maira was nominated for election to the Council for one purpose only: to usher through the proposed Resolution, and without consideration for her fiduciary duties to association.

Defendant Marez, meanwhile, was the ASA President Elect and then President from July 1, 2012 through June 30, 2014. He was dedicated to the passage of the Resolution during his term as President, although he knew that it would result in a public backlash against the ASA,

---

[1] USACBI, or the US Campaign for the Academic and Cultural Boycott of Israel, is an organization solely dedicated to advancing boycotts of Israel. The cultural side of the group primarily uses social media and forms of vocal public protest to stop artists, musicians, bands and other performing groups, and theater from performing in Israel. The academic side seeks to organizes within academic groups to promote boycotts of academic institutions in Israel.

destructive internal division and strife, loss of valuable institutional memberships, diminished reputation, the resignation of distinguished lifetime American Studies scholars, and financial loss.  Marez sought to cover the financial loss with targeted fundraising campaigns specifically designated to cover expenses related to the Resolution and Palestine-related advocacy, to the detriment of the ASA's general fund and membership.

Both Defendants Maira and Marez possess key documents critical to this litigation.  We know this because a number of them have already been produced, albeit months late, and only after similar discovery disputes, which ended only after Plaintiffs threatened to file a motion to compel and Defendants capitulated.

The discovery requests at issue here were served in May of 2017, over eight months ago, and most of the individual defendants completed their responses on September 1, 2017 – but not Defendants Maira and Marez.  Instead, both made extremely small partial productions before September 1 comprising a small fraction of the responsive documents they possessed.

The other individual defendants generally produced a few hundred documents apiece, with the exception of Lisa Duggan, President Elect and then President of the ASA from July 2013 through June 2015, who produced about 3,000 documents.  These productions were clearly not overly burdensome on the Defendants – even the ASA itself only produced 1,350 documents.

Review of the productions indicated that Defendant Maira's production, which was expected to be the largest, was woefully incomplete.  Defendant Maira had only produced 88 documents, almost all of which fell in a single 10-day period.  She produced fewer documents than any other defendant in the case.

Although Plaintiffs reached out to Defendants numerous times regarding the apparent missing documents, Defendants simply said that they were working on Defendant Maira's

production ("the Maira Production") and that there would be a supplemental production.  No mention was made of electronic searches, search terms, or TAR.

At a status conference on October 3, Plaintiffs asked the Court to set a firm deadline for the Maira Production.  For the first time, Defendants stated that they were reviewing documents using "technology-assisted review" – which Plaintiffs' counsel understood at that moment to be electronic searches only, not TAR.   (10/3/17 Tr. 7:14-17, attached hereto as Exh. G.)  Plaintiffs' counsel were shocked just to hear that Defendants were conducting electronic searches, as defense counsel had never discussed searches or proposed search terms.  Plaintiffs' counsel argued:

> [C]ounsel just mentioned technology-assisted review,
> by which I assume he means using search terms and having
> electronic searches. And that's jolly except that we never
> heard about it before.
> The right way to do that is to prepare a list of
> search terms and discuss them with co-counsel, and that has
> not happened here. It comes back to the first thing that I
> said, Your Honor, which is we are just on an endless hunt.
> This never ends. So now they'll give us a list of search
> terms, which they should have done at least when they started
> producing in their own minds the list of search terms. They
> have never raised the issue before. Now we'll have to
> discuss it[.]

(Exh. G at 9:6-18.)  The Court asked defense counsel, "Have you developed search terms?  Have you done searches?  Have you talked to the other side about those at all?" (*Id.* at 10:8-10.) Defendants stated that they had done the searches, but they had not talked to Plaintiffs about the search terms.  (*Id.* at 10:8-11.)  Defense counsel sought to explain, "I want to go back to earlier in the history of the case. It appears that there was not really a true – there wasn't a request for search terms, there wasn't a discussion about search terms. There were requests for documents." (*Id.* at 10:13-16.)  As the Court may recall, defense counsel ignored Plaintiffs' numerous attempts to confer on a discovery plan, as well as an ESI protocol.  (*Id.* at 11:20-12:7.)  *See also*

Joint Case Management Report (Dkt. 31) at 6-7, setting forth Plaintiffs' proposed protocol for production of electronically-stored information ("ESI") ("The parties will conduct further discussion regarding the production of ESI, including search terms").  Defendants would not agree to Plaintiffs' proposed ESI protocol (*id*. at 7), did not provide specific reasons, and never responded to Plaintiffs' subsequent requests to discuss the specifics of a discovery plan or ESI protocol.

Defense counsel then stated that they were "using technology-assisted review," "a slightly different process" than the electronic searches Plaintiffs' counsel were referring to. (Exh. G at 10:23-11:9.)  Defense counsel vaguely described the tool as "artificial intelligence." (*Id*.)  What defense counsel did not say, however, was that this vaguely-described tool would be used in addition to electronic searches with search terms, not instead of them, and that it would be allow Defendants Maira and Marez to avoid production of nearly 40% of the documents that were identified using search terms.

The Court instructed defense counsel as follows:

> ***I do want you to share the search terms with the other side because better to get those fights over with sooner rather than later.***
>
> &ast;   &ast;   &ast;   &ast;
>
> [Produce Sunaina Maira's] documents based on what you have done already by October 16th, and then ***within the next two weeks, I want both sides to sit down and discuss the search terms as well as the artificial intelligence tools that are being used.***
>
> &ast;   &ast;   &ast;   &ast;
>
> Discuss it in the context of both defendants or any defendants that this is being used for. ***I have never actually seen defense counsel use this type of tool. I have always seen plaintiffs in much larger cases uses this type of tool, where the document volume is much greater. But the two sides should talk about that.*** Everything else in this case has resulted in a fight, so I assume that that will result in a fight, as well, and I will decide it when it comes down the pike.

(*Id*. at 11:1-17, 13:2-6, 13:14-22.)

On October 6, Defendants sent Plaintiffs an email with a list of search terms attached. (Exh. E.)  Plaintiffs understood that these were the search terms that had already been used to gather documents, and Defendants confirmed that assumption: "Jennie, these are terms that were used to gather documents for review."  (Exh. F.)

Plaintiffs did not object to the list.  At the time, Plaintiffs did not know and could not have known that Defendants intended to produce only about 60% of the documents identified with the search terms.

Worse, Plaintiffs did not know and could not have known that Defendants would also toss aside this list of search terms and rerun the searches with a much more restrictive set of terms, but that is exactly what they did.  Defendants must have substituted the agreed-upon terms with the revised, restrictive set before October 12, because the TAR process completed on or before that day.  It was less than a week after they sent Plaintiffs the agreed-upon list.

To create the set of search terms that Defendants actually used, they eliminated two of the agreed-upon search terms and substantially altered many of the others, adding restrictive modifiers and deleting alternative words.  The new set of search terms also eliminated wildcards (the indicator to include all variations of a root word, e.g., boycott* identifies documents with the term boycott, boycotted, boycotts, or boycotting), so that, in the above example, only documents with the term boycott, would be identified; documents with the terms boycotted, boycotts, or boycotting were now excluded and thus would not be produced.

Defendants would never voluntarily share this information with Plaintiffs, despite the Court's instruction.  A full three months after the production, Plaintiffs would independently notice discrepancies on a report and inquire.  Defendants ultimately confirmed that they had not

used the agreed search terms.  (Exh. H.)  Numerous responsive, relevant documents were
eliminated from the productions in this manner; the elimination of the wildcards, for example,
would have substantiality impacted the size of the population.[2]

After unilaterally and secretly designing keyword searches, without consulting with
Plaintiffs on the choice of search terms, Defendants' searches yielded approximately 27,000
documents.  Thus, the entire field of documents with key word hits is at most six or seven boxes
of documents.  The simplest and most economical thing for Defendants to have done would have
been to turn over these documents, perhaps temporarily excluding those that TAR identified as
potentially privileged for further review.

But Defendants did not do so.  Instead, they insisted on spending additional funds and
attorney time to sift these materials further using TAR.  The TAR process would assign scores to
each document, intended to indicate how "responsive" the document is.  Once the scores were
assigned, Defendants' then decided unilaterally to limit the production to those documents with a
score above .4 – approximately 17,000 of the 27,000 documents already known to include at
least one search term. On October 17, Defendants produced approximately 11,000 of these
documents.

Eventually, Plaintiffs realized that the production appeared to be smaller than expected.
(At the time of the production, Plaintiffs did not know how large the production was supposed to
be; later Plaintiffs learned that TAR had identified 17,000 responsive documents.)  In late
November, Plaintiffs inquired; no response.  For over a month, Plaintiffs continued to send
emails inquiring about the difference between the 17,000 documents expected and the 11,000

---

[2] Defendants have now agreed to produce those documents that include search terms from the agreed-
upon list but were not produced because they do not include search terms from the revised list, although
they will not commit to a date for that production.  These documents are thus not at issue in this Motion.

received.  Finally, on January 5, 2018, Defendants finally responded.  Defendants had withheld 6,000 documents that TAR had identified as "potentially privileged."  Purportedly, Defendants were planning to review them to determine whether any were actually privileged.  Once again, Defendants did not voluntarily disclose that they had withheld a substantial number of documents; this time, they even ignored Plaintiffs' questions for weeks on end.[3]

Finally, with respect to the Court's instruction that Defendants collaborate with Plaintiffs on the TAR process within two weeks – this would not happen, although Plaintiffs would send numerous emails asking Defendants to do so.  Only long after the TAR process was complete would Defendants agree to talk with Plaintiffs on the phone and explain the process, in a call that lasted less than 20 minutes.  Defendants would never seek or allow input from Plaintiffs or discuss the methods before they completed the TAR, when the discussions might impact the process.  Nor would they explain or justify the selection of .4 as a cut-off, and there would be no TAR Protocol.

Ultimately, Plaintiffs educated themselves on the TAR process – a time-consuming and expensive endeavor that included engaging an outside consultant.  It is now clear to Plaintiffs that TAR played no role in minimizing costs or efforts in this small case, which involves only two custodians and 27,000 documents.  The only effect of TAR was to prevent Defendants Maira and Marez from making complete and correct productions.

As we show below, all documents containing keywords are responsive to Plaintiffs' requests, and production of all of these materials is proportionate to the needs of the case.  Indeed, complete production of this small collection of keyword-containing documents would

---

[3] Defendants finally produced the 6,000 documents withheld as "potentially privileged" (except for a very small number that Defendants deemed are indeed privileged) on February 2, 2018, after Plaintiffs threatened to move to compel.  Thus, these documents are not at issue in this Motion.

have been far cheaper for Defendants than extreme extra measures they have taken. Defendants have not offered any evidence otherwise or specific argument otherwise.

## II.   **LEGAL STANDARD**

The Federal Rules of Civil Procedure encourage the exchange of information through broad discovery. *In re England* 375 F.3d 1169, 1177 (D.C. Cir. 2004).  A party may generally obtain discovery regarding any nonprivileged matter that is relevant and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).  Relevance for discovery purposes is broadly construed. *Food Lion, Inc. v. United Food & Comm'l Workers Int'l Union,* 103 F.3d 1007, 1012 (D.C. Cir. 1997).

 If a party objects or refuses to disclose discoverable materials, the requesting party may move to compel disclosure of discovery.  Fed. R. Civ. P. 37(a).  For the purposes of a motion to compel discovery under Rule 37(a), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." *Oxbow Carbon & Minerals LLC v. Union Pac. R.R.,* 322 F.R.D. 1, 6 (D.D.C. 2017).

The moving party bears the initial burden of explaining how the requested information is relevant, once it does so, the burden shifts to the non-moving party to specifically object, explaining why the court should not permit discovery. *See Jewish War Veterans of the United States of Am. V. Gates,* 506 F.Supp. 2d 30, 42 (D.D.C. 2007); *Doe v. District of Columbia*, 231 F.R.D. 27, 30 (D.D.C. 2005); *Alexander v. FBI*, 192 F.R.D. 50, 53 (D.D.C. 2000).   This allocation of the burdens on the parties pursuing and resisting a motion to compel is unaffected by the amendment of Rule 26(b) effective in 2015. *Union Pac. R.R.*, 322 F.R.D. at 6, citing *Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 319 F.R.D. 220, 226 (N.D. Tex. 2016).

III. **DISCOVERY OF THE WITHHELD DOCUMENTS IS PROPORTIONAL TO THE NEEDS OF THE CASE.**

Improperly pleading expense and burden as a justification for their failure to make a complete production, Defendants have turned the Rule 26 mandate of proportionality upside down: rather than their actions saving money, Defendants' conduct has in fact increased their own burden. Its only effect is to reduce the scope of documents that Plaintiffs get to see. This is wholly improper.

Pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure,

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. Proc. 26(b)(1). Although the above language is newly added to subsection (b)(1), proportionality of discovery is not new to the Rule 26. Prior to the 2015 Amendments to the Federal Rules of Civil Procedure, the same considerations were codified at Rule 26(b)(2)(C)(iii). *See* Notes of Advisory Committee on 2015 Amendments ("The considerations that bear on proportionality are moved from present Rule 26(b)(2)(C)(iii), slightly rearranged, and with one addition"). The Notes of the Advisory Committee further state:

> Restoring the proportionality calculation to Rule 26(b)(1) does not change the existing responsibilities of the court and the parties to consider proportionality, and the change does no place on the party seeking discovery the burden of addressing all proportionality considerations. Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional. The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.

*Id.*   Thus, today as before the 2015 Amendments, the "burden or expense of discovery should be determined in a realistic way." *Id.*

The six factors set forth in Rule 26(b)(1) provide guidance: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. Proc. 26(b)(1). The sixth factor, "whether the burden or expense of the proposed discovery outweighs its likely benefit," *id.*, "may combine all the previous factors into a final analysis of burdens versus benefits." *Arrow Enter. Computing Sols., Inc. v. BlueAlly, LLC*, 2017 U.S. Dist. LEXIS 30558, at *13-14 (E.D.N.C. Mar. 3, 2017).

Here, however, Defendants have turned that rationale on its head: they are spending *more* money, and *more* attorney time*,* to avoid producing clearly discoverable material than they would have had to expend to simply produce the material Plaintiffs now seek to compel – all of which contain one, and almost all of which contain at least two of the keywords Defendants themselves unilaterally chose as indicators of relevance.

Although they have not specified their objections to producing the withheld documents (as the Rules require), Defendants' statements to the Court and in communications with Plaintiffs suggest that they intend to rely on Rule 26(b)(1)'s proportionality requirement in support of their decision to use TAR – which is clearly not an appropriate tool in a case this size – and to refuse to produce documents that they have already identified.

This Motion does not ask the Court to require Defendants to search for more material, or to incur any additional costs of any kind. On the contrary: Plaintiffs are asking that Defendants

spend less, while Defendants, hiding behind the concept of proportionality, prefer to spend more – so they can produce less.

Based on Defendants' arguments in Court and in correspondence between the parties, it appears that Defendants' claimed basis for withholding these documents is that the Requests are not "proportional to the needs of the case." Fed. R. Civ. Proc. 34(b)(1). The basis, apparently, is that the production of all the documents sought is simply too large a number, imposing an undue burden on Defendants.

Even assuming that Defendants make a specific objection on these grounds, and further assuming that Defendants have not long since waived that objection, the argument that Defendants may limit discovery solely because they possess a large number of responsive documents simply fails on the merits.

First, despite Defendants' complaints, the number of responsive documents is simply not excessive, and production of the withheld documents would not create an undue burden. The population contains fewer than 30,000 documents, most of which are brief emails.

Plaintiffs have been unable to find, and Defendants have not provided to us, a single case where TAR was used on so few documents. Instead, the cases discussing TAR involve millions of documents to be reviewed for potential production. For example, *DaSilva Moore v. Publicis Group*, Judge Peck's decision approving TAR "for use in ***large data volume cases***," involved "one of the world's 'big four' advertising conglomerates" and a massive amount of ESI – 3 million potentially responsive documents. *DaSilva Moore v. Publicis Group*, 287 F.R.D. 182, 183-84, 193 (S.D.N.Y. 2012).

In such "large data volume cases" involving millions of documents, the use of TAR to identify responsive documents may satisfy Rule 26(g)'s "reasonable inquiry" requirement, as

long as the parties comply with the other Rules, including Rule 1 and Rule 26(f).  Generally, this requires that the parties work cooperatively together to develop and follow a discovery plan and a specific protocol for the use of TAR, which Defendants here were entirely unwilling to do. Under those conditions, manual review of millions of documents can present an undue burden, and TAR presents a reasonable alternative.

Defendants Maira and Marez's productions in this case do not come remotely close to the size or complexity of the productions in "large data volume cases," where defendants, generally very large corporations or government entities, must search the custodial files of many employees and officers, where the number of search terms may extend into triple digits, and the manual review of millions of documents is simply unrealistic.  This motion involves only 10,583 documents, from only two custodians.  The materials have already been searched to create a population of less than 28,000 documents, every one of which includes at least one (and in most cases two) of only eleven search terms.  Of such small size and utter lack of complexity, this production simply does not present an undue burden.  Those documents are already sitting on a hard drive, and they likely can be produced with the push of a button, and without the need for any additional expense.

Second, the use of TAR in this case has not reduced the burden on Defendants.  On the contrary – it has increased it.  It has, in addition, needlessly imposed an excessive burden on Plaintiffs.

Production of these documents would not require Defendants to manually review an additional 10,583 documents.  Defendants need only review these documents for privilege, and Plaintiffs strongly suspect (although Defendants have not confirmed) that Defendants have not had attorneys personally review each document in the population for privilege before producing

them.[4]   Instead, for the 17,060 documents that TAR identified as "responsive," Defendants again used TAR to identify those that were potentially privileged – approximately 6,129 (36%).

As for the approximately 10,931 documents which were not identified as "potentially privileged," all of these documents were produced on October 17 in one large production. Plaintiffs believe that Defendants produced these without having an attorney personally review them.

In addition, the Parties have agreed to a clawback order in this case, so there is no risk incurred by not reviewing every document produced for privilege.   Thus, Defendants would not incur excessive costs from the manual review of 10,583 documents for privilege.  They would only need to review those that are identified as "potentially privileged" by TAR.  If we assume that approximately 36% are identified as potentially privileged, Defendants would only need to review approximately 3,810 documents for privilege, which is clearly not an undue burden.

Nor would have Defendants have to review the 10,583 documents to ensure they are responsive and relevant.  Plaintiffs have made it clear to Defendants that Plaintiffs would accept the entire set of documents and would not complain about production of non-responsive documents.

---

[4] Plaintiffs asked defense counsel what steps were taken to review these materials, and whether the documents were actually reviewed by hand. Defense counsel did not respond.

**IV.   THE MOTION TO COMPEL SHOULD BE GRANTED BECAUSE THE DOCUMENTS ARE ALL RELEVANT AND DEFENDANTS CANNOT MEET THEIR BURDEN.**

**A.      All Documents Requested Are Relevant.**

To succeed on a motion to compel, Plaintiffs must show that the documents sought are relevant.  *Smith v. Ergo Sols., LLC*, 2017 U.S. Dist. LEXIS 94337, *4, 2017 WL 2656096 (D.D.C. June 20, 2017).  The relevance of the documents at issue here is easily shown.

Plaintiffs served the exact same set of Requests for Production of Documents ("Requests") to each of the (then) seven Defendants over eight months ago.  Only Defendants Maira and Marez have taken the larger part of a year to produce the responsive documents; the other Defendants largely completed their productions in early September.  The documents responsive to the Requests are no less relevant when sought from Defendants Maira and Marez – the two defendants that are most involved in the underlying events.  These two simply have many more responsive documents than the other Defendants.

Per Defendants, the documents in the population were all identified because they include one or more of the search terms, or are in the same family as a document with one or more search terms.[5]  The TAR process, after training by Defendants (with no discussion or collaboration with Plaintiffs), assigned a score between 0 and 1 to each document, reflecting how "responsive" the document is.  In what appears to be an entirely arbitrary selection, Defendants deemed all documents with a score above .4 to be "responsive," and documents with a score of .4 of lower were deemed "non-responsive" and withheld.

---

[5] Email messages and attachments are considered to be in the same family.  Defendants have informed Plaintiffs' counsel that if an email that was identified using search terms had one or more attachments, the attachments were included in the population, even if the attachment did not include a search term; similarly, if an attachment was identified using search terms, the email it was attached to was included in the population, even if the email did not include a search term.

Of the 27,643 documents in the population, 17,060 – 62% – were deemed responsive using this method.  The remaining 10,583 documents (38%) were withheld and are the subject of this Motion.

Two keyword reports include summary data for the set of documents that was fed into the TAR program ("the population") and summary data for the set of documents that were identified for production.  The two keyword reports are attached hereto as Exhibits A and B, respectively.  Analysis of the differences between the two keyword reports allows for a rough calculation of summary data for the set of documents at issue in this Motion – "the withheld documents."  That analysis provides ample evidence that the withheld documents are, in fact, relevant and responsive.

Ninety-seven percent of the 10,583 withheld documents include at least one of the following search terms; the remainder are a small number (435) that are family.  And, importantly, 7,505 of these, *71% of the withheld documents, include two or more of the following search terms*:

- (Jasbir or Puar) w/20 committee
- (Nominate or nomination) and (NC or council or committee)
- Boycott and (Marez or Duggan or Reddy or Gordon or Maira or Tadiar)
- Bronner or Rockland or Kupfer or Barton
- Harass
- Israeli w/20 (conference or meeting or academic or freedom)
- Resign
- Resolution
- Territories
- USACBI w/20 (nomin* or recruit or encourage or join)
- Vote w/50 (Boycott or Resolution)

There is virtually no way that documents in the possession of Sunaina Maira, perhaps the defendant most involved in the Resolution at the heart of this case, or Curtis Marez, who was president of the ASA at the time the Resolution was adopted, could include two or more of these search terms and still not be relevant to the case.  It is even clearer that there is no way that 7,505 of these documents can contain *at least two such terms* and still be irrelevant to this case.  Many of these search terms are so specific to this case, and to Plaintiffs' Requests, that the presence of even a single search term renders the document relevant and responsive.

 For example, every document that includes one or more of the Plaintiffs' last names should have been produced; Plaintiffs specifically sought all documents in possession of the individual defendants that mention or discuss any of the four Plaintiffs.  Neither Maira nor Marez has any relationship with any of the Plaintiffs outside of the events underlying this lawsuit, so there is no reason why either of these Defendants would mention any of the four Plaintiffs other than in connection with the facts here at issue.  Yet of the 1,523 documents in the population that include one or more of the Plaintiffs' last names, only 790 (52%) were produced.  Moreover, of the 733 documents that include one or more of the Plaintiffs' last names but were not produced, 659 – 90% – also included another search term.  We cannot imagine how a document in the possession of Defendants Maira or Marez that includes both the name of one of the plaintiffs and another of the search terms would not be relevant to this case, we certainly cannot imagine over 650 of them.

As another example, consider the term *resolution*.  Exhibit A shows that 15,894 of the documents in the population include the term *resolution*.  Of these, 13,151 (83%) included both *resolution* and one or more of the other search terms.  Yet only 9,065 (57%) of the 15,894 documents with the term *resolution* were produced.  And, of the 6,829 documents that included

the search term *resolution* but were not produced, 5,902 (86%) included two or more search terms.  In other words, ***more than half – 58 percent – of the withheld documents at issue in this Motion include both the search term "resolution" and at least one other search term.***

The search term *resolution* is unlikely to produce many false positives, particularly when appearing in a document with another search term specific to the ASA:  The Resolution at issue in this case is the only resolution adopted by the ASA since the association's adopted a Resolution on the Iraq War in 2006. *See* https://www.theasa.net/about/advocacy/resolutions-actions/resolutions.

An additional 16% of the withheld documents also contain two search terms, but do not include the term *resolution*.  Together, nearly three-quarters of the documents at issue include two or more search terms.  This is clear evidence that the great majority of the withheld documents are relevant.

### B.      Defendants Have Made No Specific Objection to the Request for Documents at Issue.

Once the moving party shows that the discovery sought is relevant, the burden shifts to the non-moving party to specifically object to the request.  *Jewish War Veterans of the United States of Am. V. Gates,* 506 F.Supp. 2d 30, 42 (D.D.C. 2007); *Doe v. District of Columbia*, 231 F.R.D. 27, 30 (D.D.C. 2005); *Alexander v. FBI*, 192 F.R.D. 50, 53 (D.D.C. 2000).

Pursuant to Rule 34, a response to a document request "must either state that [discovery] will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B).  "An objection must state whether responsive materials are being withheld on the basis of that objection.  An objection to part of a request must specific the part and permit inspection of the rest."  Fed. R. Civ. P. 34(b)(2)(C).

"Rule 34(b) 'is structured in this way so that, in combination with [Rule 26(g)(1)], both the requesting party and the court may be assured that *all* responsive, non-privileged materials are being produced, except to the extent a valid objection has been made.' *Evans v. United Fire & Cas. Ins. Co.*, 2007 U.S. Dist. LEXIS 58578, 2007 WL 2323363, at *2 (E.D. La. Aug. 9, 2007) (emphasis in original)." *Heller v. City of Dall.*, 303 F.R.D. 466, 487 (N.D. Tex. 2014).

Defendants Maira and Marez's amended responses to these document requests, served on September 13 – presumably after they had collected documents for production – did not include any objections specific to the production of the withheld documents.  For example, with respect to Request No. 17, which sought production of "[a]ll documents pertaining to discussion of, consideration of, and voting on the Resolution by the National Council," Defendants Maira and Marez both responded, "Such documents have been or will be produced," without objection. Similarly, with respect to Request No. 18, for "[a]ll documents referring or relating to the Resolution, at any time prior to, during, or subsequent to the vote on the Resolution . . . ," Defendants Maira and Marez both responded that the request was overbroad, but, "without waiving that objection, such relevant documents relating to the claims or defenses have been or will be produced," and, with respect to Request No. 19, requesting "[a]ll documents pertaining to the ASA vote on the Resolution, . . . ," Defendants Maira and Marez both responded, "Such documents have been or will be produced."  (*See* Defendant Sunaina Maira's Amended Responses to Plaintiffs' Requests for Production of Documents, attached hereto as Exh. C, and Defendant Curtis Marez's Amended Responses to Plaintiffs' Requests for Production of Documents, attached hereto as Exh. D.)

Having failed to make a specific objection to the production of documents responsive to these requests – all of which are identified by the term *resolution*, and many of which would also

include the search term *vote w/50 (Boycott or Resolution)*, among others, Defendants have

waived their ability to do so now.

### C.      Absent a Specific Objection, Defendants Must Make a Correct and Complete Production Based on Reasonable Inquiry.

Pursuant to Rule 27(g), a response to discovery request, including a request for

production of documents, must be "complete and correct" based on "a reasonable inquiry."  Fed.

R. Civ. Proc. 37(g).  The producing party is required to certify that the production meets this

standard.  *See, e.g., Lewton v. Divingnzzo*, 2010 U.S. Dist. LEXIS 148238, 2010 WL 1630719, at

*5 (D. Neb. Apr. 21, 2010) (requiring amended responses indicating "whether all responsive

documents have been produced after a diligent and good faith effort to locate and identify

responsive materials").

In this case, Rule 27(g) clearly requires production of the withheld documents, which

have already been identified, via keyword searches, as highly likely to be responsive.  The

reasonable inquiry has been done, and the documents identified.  If Defendants refuse to produce

them, they cannot certify that the production is "complete and correct" based on "reasonable

inquiry" – as reasonable inquiry has already identified the documents.  Defendants need only

review them for privilege.  *See Hansen v. Savage Arms Co.*, 2017 U.S. Dist. LEXIS 204937, at

*22-24 (N.D. Iowa Dec. 13, 2017), requiring "defendants to supplement their discovery

responses to explicitly state that they have diligently and in good faith searched for responsive

documents and have produced all responsive documents they located," even where "Defendants'

production of voluminous materials . . . suggests defendants have conducted a diligent and good

faith attempt to produce all non-privileged materials requested."  *Id. See also Heller v. City of

Dall.*, 303 F.R.D. 466, 491 (N.D. Tex. 2014) ("Defendant's counsel's certification of Defendant's

undue burden and overbreadth objections to the document requests . . . violated Rule 26(g)(1) in

a manner that reflected a lack of reasonable inquiry and that was not substantially justified. This

requires the Court to impose an appropriate sanction under Rule 26(g)(3).")

## V.   PLAINTIFFS HAVE INCURRED SIGNIFICANT COSTS DUE TO DEFENDANTS' WRONGFUL WITHHOLDING OF DOCUMENTS AND REFUSAL TO COOPERATE ON A DISCOVERY PLAN OR TO DISCLOSE MATERIAL INFORMATION RELATED TO DISCOVERY.

Plaintiffs have incurred significant costs, and discovery in this case has been significantly

delayed, as a consequence of Defendants' use of TAR, lack of transparency, refusal to

collaborate on a discovery plan, failure to comply with the Court's orders, and wrongful

withholding of responsive documents.  Some examples of Defendants' conduct that are

particularly relevant to the production of the withheld documents and Defendants' misuse of

TAR – to inhibit discovery, rather than increase efficiency – are summarized below.  These

examples are not intended to be exclusive.

- *Abuse of the Confidentiality Order*

Immediately after Plaintiffs filed the Motion for Leave to Amend the Complaint on

November 9, 2017, Defendants retroactively deemed approximately 90% of all the documents

thus far produced as CONFIDENTIAL.  Moreover, in every new production since November 9,

nearly every document (and in some cases, every single document) has been deemed

confidential.  For example, in the February 2 production, only 5 out of 7,338 documents are *not*

marked confidential.

The confidentiality order allow for provides that a document may be deemed and marked

CONFIDENTIAL (only) where:

> the producing party reasonably deems in good faith to incorporate
> Confidential information:

(a) information that is reasonably likely to result in harassment, threats, or harm to individuals if publicly disclosed; or

(b) personally identifiable information ("PII") (including social security numbers, email addresses, home addresses, and telephone numbers, but no including names); or

(c) the salaries, benefits, or bonuses of American Studies Association ("ASA") employees; or

(d) the names of individual persons (but not associations or other entities other than individual persons) who have made financial contributions to the ASA,

whether oral or written, including the terms thereof, may be designated by the producing party as CONFIDENTIAL.

(Dkt. 52 at 1-2.)  The Protective Order further requires, that any document filed with court that includes CONFIDENTIAL information, must be filed under seal, and thus must be filed in person at the Courthouse, *inter alia*.

When we sought to confer with Defendants on this matter, they informed us that, in their view, every document that mentions or connects one of the defendants to the Resolution places their clients at risk of harassment.  Yet, as discussed in previous briefing, and despite Defendants' repeated claims of harassment, they have only produced one, single email that was angry or insulting since the filing of this lawsuit, and that email was addressed to a person who is not a defendant in this case, was sent from Israel, and does not constitute a threat or harassment. Moreover, that email was sent in November 2017.  Prior to that, the only support for Defendants' numerous claims of harassment – in Court, in their briefs, and repeated through media put out by USACBI, Electronic Intifada, and Palestine Legal – predated this lawsuit by approximately two years.  Further, Defendants continually comment on the Resolution and publicize this lawsuit, apparently unconcerned about threats and harassment that may result.

Marking very close to every single document CONFIDENTIAL without a good faith review "constitutes a willful violation of a court order." *Youngevity Int'l Corp. v. Smith*, 2017 U.S. Dist. LEXIS 210386, at *36-37 (S.D. Cal. Dec. 21, 2017).  In *Youngevity*, the Court held:

> Youngevity admits that it did not conduct a document-by-document review . . . , but instead "[t]o be able to timely produce all of these documents," designated every document in its 4.2 million page productions as [Attorneys Eyes Only, or AEO].  Youngevity cannot have a good faith belief that every document in its 4.2 million page productions should be designated as AEO if it has not reviewed any of the documents. Furthermore, Youngevity has apparently not used the intervening five months to mitigate this violation by conducting the necessary review and revising its improper designation.  Youngevity's mass designation of 4.2 million pages of documents as AEO without review constitutes a willful violation of a court order. Accordingly, the Court may issue just orders pursuant to Rule 37(b)(2)(A) and its inherent authority. [Citation.]  As outlined below, Youngevity is ordered to designate all documents . . . with the appropriate designation under the Stipulated Protective Order.

*Id., citing O'Connor v. Uber Techs., Inc.*, 2017 U.S. Dist. LEXIS 141095, at *14-15 (N.D. Cal. Aug. 31, 2017) *and Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1019 (9th Cir. 2012).

- ***Failure to meet and confer regarding search terms and misrepresentation of the search terms used to identify documents***

As discussed in section I, *supra*, the Court ordered that "within the next two weeks, I want both sides to sit down and discuss the search terms as well as the artificial intelligence tools that are being used."  (Exh. I at 13:2-6.)  Your honor also stated, "I do want you to share the search terms with the other side because better to get those fights over with sooner rather than later."  (*Id.* at 11:15-17.)   Although Defendants did share search terms with Plaintiffs, they did not share the search terms that they actually used.  Plaintiffs were misled as to the conduct of the search and the content of the production.  This is conduct violates not only the Court's order, but also Rules 1 and 26 of the Federal Rules of Civil Procedure.

- ***Failure to produce documents identified as "potentially privileged" by TAR***

Also as discussed in section I, *supra*, Defendants employed the TAR process to identify "potentially privileged" documents in the set of 17,060 that were identified as responsive for the production due on October 16.   Over 6,000 documents – approximately 38% – were then excluded as "potentially privileged."   Again, Plaintiffs were not informed.   Defendants went to great lengths to avoid answering Plaintiffs' questions about this issue.   Although the documents were eventually produced, the incident caused further delay, and again exemplifies Defendants' failure to conduct discovery in the collaborative manner proscribed by Rules 1 and 26.

- ***Privilege logs***

Defendants have not produced a single privilege log in this litigation; not even for the initial set of ASA documents that were produced six months ago.   Defendants had once agreed to produce the privilege logs by August 31, 2017 – the deadline to produce documents responsive that Defendants themselves had selected and agreed to.   (Transcript of Sept. 14, 2017 Status Conference ("9/14/17 Tr.") 14:2-17.)   Then, Defendants informed the Court they would produce the logs when the productions were complete.   *Id*.   Plaintiffs are still waiting for even the first privilege log to arrive.

- ***Misspellings***

The February 2, 2018, production, which was primarily comprised of documents of the "potentially privileged" documents, also included documents that Defendants inform us were excluded from the original search term because Defendant Maira's last name was misspelled in the keyword search.   Plaintiffs do not know how many documents were originally excluded as a result of this misspelling, because this set of documents was produced in the same set as the

"potentially privileged" documents, and although we asked Defendants to inform us how many of the documents produced that day were to correct the misspelling of Maira, and how many had been withheld as "potentially privileged," they have not yet responded to this simple question.

## VI.    CONCLUSION

Defendants Maira and Marez are both primary defendants in Plaintiffs' lawsuit arising from the ASA's adoption of an academic boycott of Israel; consequently, they possess more relevant and responsive documents than the other Defendants.  This fact does not render Plaintiffs' Requests for those documents overly burdensome.

The withheld documents sought through this Motion are proportional to the needs of the case.  Simply producing the full set of documents that were identified by keyword – excluding those that are privileged – is less burdensome on both Plaintiffs and Defendants, independently, than Defendants' use of TAR in this case.  TAR can effectively reduce the burden of identifying responsive documents in very large, complex cases involving multiple custodians and millions of documents to review for production, but that is not the case here, and the benefits of TAR simply do not scale down to a production of two Individual Defendants of less than 30,000 documents.

Plaintiffs have shown that the withheld documents are relevant; the burden on this Motion now shifts to Defendants, who must have not made a specific objection and have long since waived their opportunity to do so.  Moreover, there is no applicable objection that applies.

Finally, Defendants' failure to engage in discovery in a cooperative and transparent manner as required under Rule 1 and Rule 26(f) has caused Plaintiffs' to expend unnecessary resources and resulted in unnecessary and extensive delay.  The use of TAR has only served magnified these burdens and continued use of TAR will serve no purpose but to limit the discovery of relevant material.

For these and all of the reasons presented above, Plaintiffs respectfully request that the Court grant this Motion to Compel Production of Documents.

Dated:  February 8, 2017

Signed:  _____*/s/Jennifer Gross*_____
                                      Jennifer Gross

Jerome M. Marcus (admitted *pro hac vice*)
Jonathan Auerbach (admitted *pro hac vice*)
**MARCUS & AUERBACH LLC**
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250
jmarcus@marcusauerbach.com
auerbach@marcusauerbach.com
*Lead Counsel for Plaintiffs*

Jennifer Gross, DC Bar No. 1003811
Aviva Vogelstein, DC Bar No. 1024231
**THE LOUIS D. BRANDEIS CENTER**
    **FOR HUMAN RIGHTS UNDER LAW**
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006-4623
(202) 559-9296
jenniegross@brandeiscenter.com
avogelst@brandeiscenter.com

L. Rachel Lerman (admitted *pro hac vice*)
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3871
rlerman@btlaw.com

Joel Friedlander (admitted *pro hac vice*)
**FRIEDLANDER & GORRIS, P.A**.
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3502
jfriedlander@friedlandergorris.com

Scott Godes, DC Bar No. 463674
Devin Stone, DC Bar No. 1022055
**BARNES & THORNBURG LLP**
1717 Pennsylvania Avenue NW, Suite 500
Washington, DC 20006-4623
(202) 408-6928
sgodes@btlaw.com
dstone@btlaw.com

Eric D. Roiter (admitted *pro hac vice*)
Lecturer in Law
**BOSTON UNIVERSITY SCHOOL OF LAW**
765 Commonwealth Avenue
Boston, MA  02215
(617) 734-8266
eroiter@bu.edu

*Counsel for Plaintiffs*