**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| SIMON BRONNER, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 16-0740 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 57, 59 |
| | : | | |
| LISA DUGGAN, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

GRANTING PLAINTIFFS' AMENDED MOTION TO EXTEND TIME TO ADD PARTIES [57];
GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT [59]

## I.  INTRODUCTION

Plaintiffs bring this suit against the American Studies Association ("ASA") and several of its current and former leaders, including Defendants Lisa Duggan, Curtis Marez, Avery Gordon, Neferti Tadiar, Sunaina Maira, and Chandan Reddy ("Individual Defendants"), alleging that they improperly introduced and implemented a resolution calling for the academic boycott of Israel. This matter now comes before the Court on Plaintiffs' Motion for Leave to File a Second Amended Complaint, in which Plaintiffs seek to assert several new theories of liability for breaches of fiduciary duties, breaches of contract, and *ultra vires* activity and to add four new defendants to the suit: Jasbir Puar, J. Kehaulani, Kauanui, Steven Salaita, and John Stephens. Pls.' Mot. Leave File Second Amended Compl. ("Pls.' Mot."), ECF No. 59.  For the reasons stated below, the Court will grant the motion.  However, the Court has also identified a potential impediment to this Court's subject matter jurisdiction and, therefore, it will require the parties to submit additional briefing on that issue.

## II.  BACKGROUND

### A.  The American Studies Association

The ASA is a nonprofit organization whose object is "the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity." *See* Const. & Bylaws of the Am. Studies Ass'n ("ASA Const. & Bylaws"), Const., Art. I, § 2, ECF No. 21-3.  The ASA's founding documents provide that the society was "organized exclusively for education and academic purposes."  Am. Verified Compl. Derivative and Direct Claims ("FAC") ¶ 24, ECF No. 19.

The ASA is overseen by a President and a "National Council."  The National Council is charged with "conduct[ing] the business, set[ting] fiscal policy, . . . and oversee[ing] the general interests of the [ASA]."  ASA Const. & Bylaws, Const., Art. V, § 2.  There are 23 voting members of the National Council.  FAC ¶ 74; ASA Const. & Bylaws, Const., Art. V, § 1.  In addition, there is a President who presides over the National Council and has a duty to "fulfill the chartered obligations and purposes of the [ASA]."  ASA Const. & Bylaws, Const., Art. IV, § 2.

Under the ASA's bylaws, "[n]o substantial part of the activities of the [ASA] shall be the carrying on of propaganda, or otherwise attempting, to influence legislation, and the corporation shall not participate in, or intervene in . . . any political campaign on behalf of any candidate for public office."  FAC ¶ 25.  According to Plaintiffs, the ASA has conformed to these rules for decades and has established a "uniform practice" that prevents the ASA from advocating for particular positions on U.S. government policy.  FAC ¶ 25.  Based "solely on the condition and

understanding that this practice would be followed," Individual Plaintiffs donated time and

money to the ASA.  FAC ¶ 26.

### B.  ASA's Boycott Resolution

In November 2013, at the ASA's annual meeting, ASA leadership introduced a resolution

advocating for the boycott of Israeli academic institutions (the "Boycott Resolution" or

"Resolution") on the basis that Israel restricted academic activity in formerly Jordanian-occupied

territory that came under Israeli control after the Six Day War in 1967.  *See* FAC ¶¶ 29, 41.  The

Boycott Resolution states that the ASA is devoted to "the struggle against all forms of racism,"

that the United States helps enable Israel to illegally occupy Palestine, that there is "no effective

or substantive academic freedom for Palestinian students and scholars under conditions of Israeli

occupation," and that the ASA is dedicated to the rights of students and scholars in Israeli

institutions.  FAC ¶ 31.  The Resolution's operative clause states:

> [i]t is resolved that the American Studies Association (ASA) endorses and will
> honor the call of the Palestinian civil society for a boycott of Israeli academic
> institutions.  It is also resolved that the ASA supports the protected rights of
> students and scholars everywhere to engage in research and public speaking about
> Israel–Palestine and in support of the boycott, divestment, and sanctions (BDS)
> movement.

FAC ¶ 31.  During the presentations in support of the resolution, the proponents allegedly did not

present any data or research, did not address how the affected institutions were founded, and did

not specifically address "any . . . aspect of the actual state of academic freedom in the

[t]erritories at any time."  FAC ¶¶ 43–45.  Instead, the speakers' "principal focus" was on an

alleged apartheid state in the territories at issue and the need for the ASA to support the ending

of "the so-called settler-colonialist Zionist project" and America's support for these policies.

FAC ¶ 48.  Plaintiffs allege that no speakers in opposition to the resolution were invited to speak

during the course of the discussion, FAC ¶ 47, and that Defendants "actively prevented an

informed and methodical discussion of the Boycott resolution" in part by actively preventing opponents of the measure from being heard.  FAC ¶ 46.

Ultimately, the resolution passed, but Plaintiffs suggest that Defendants manipulated the vote.  According to the complaint, members of the ASA who supported the resolution encouraged their students to join the ASA because they knew the students would vote in favor of the resolution.  FAC ¶ 40.  Around the same time, at least one Individual Plaintiff attempted to vote but was told by ASA leadership that he could not "ostensibly because he renewed [his ASA membership] too late to vote."  FAC ¶ 35.  Plaintiffs allege that at least one other person who renewed his membership just before the vote was allowed to vote despite the individual plaintiff being barred from doing so under similar circumstances.  FAC ¶ 38.  At the end of voting, the ASA asserted that the resolution passed.  FAC ¶ 33.

Plaintiffs claim that, since the boycott, several members of the ASA have resigned in protest of the boycott, financially depriving the ASA of membership dues for years to come. FAC ¶ 60.  Moreover, Plaintiffs allege that the ASA has experienced a significant decline in reputation because of the boycott.  FAC ¶ 61.  The ASA is alleged to have suffered financial harm as a result of the boycott because of an alleged decrease in donations and an increase in public-relations spending required by the need to deal with the public backlash resulting from the boycott.  FAC ¶ 84.  Although Plaintiffs do not allege any specific amounts of damages in their complaint, they do, in their "Jurisdiction and Venue" section, assert that "the amount in controversy exceeds $75,000."  FAC ¶ 9.

## C.  The Present Suit

Plaintiffs initially filed suit in this Court on April 20, 2016 and later amended their complaint on June 23, 2016.  Plaintiffs initially sought to challenge various acts leading up to the

passage of the Boycott Resolution both in their individual capacities and derivatively on behalf

of the ASA, seeking damages, declaratory relief, and injunctive relief for alleged breaches of

fiduciary duties, *ultra vires* acts, breaches of contract, violations of the D.C. Nonprofit

Corporation Act, and corporate waste.

In response, Defendants moved to dismiss the suit on various grounds.  Among other

arguments, Defendants claimed that the suit should be dismissed because this Court lacked

subject matter jurisdiction and that, alternatively, the derivative claims should be dismissed for

failure to make a pre-suit demand on ASA's National Council.  *See* Defs.' Mot. Dismiss, ECF

No. 14.  On the issue of subject matter jurisdiction, Defendants argued that jurisdiction was

lacking because Plaintiffs failed to satisfy the amount-in-controversy requirement necessary to

maintain a diversity suit under 28 U.S.C. § 1332.  *See* Defs.' Mot. Dismiss at 7–11.  The Court

disagreed, holding that, because it was not a legal impossibility for Plaintiffs to receive a

judgment of at least $75,000, that the amount-in-controversy requirement was satisfied.  Mem.

Op. at 11–13, ECF No. 28.  However, the Court did agree with Defendants' argument that

Plaintiffs had failed to make a pre-suit demand under circumstances in which it was required.

*See* Mem. Op. at 21–26.  Accordingly, the Court dismissed all of the derivative claims.  *See*

Mem. Op. at 29.  In addition, the Court found that Plaintiffs had failed to state cognizable *ultra*

*vires* claims.  *See* Mem. Op. at 29–34.  The Court did, however, allow Plaintiffs to proceed on

their direct claims for waste,[1] breach of contract, and violation of the D.C. Nonprofit Corporation

Act.  *See* Mem. Op. at 2.

---

[1] Defendants have since moved for judgment on the pleadings with respect to this claim, arguing that a claim for waste may only be asserted by ASA itself and cannot be asserted by Plaintiffs directly.  Because the Court has identified a potential impediment to subject matter jurisdiction, the Court will not resolve the Defendants' motion unless and until the Court can assure itself that it has subject matter jurisdiction.

On November 9, 2017, Plaintiffs moved for leave to amend their complaint.  *See* Pls.'
Mot.  In their amended complaint, Plaintiffs have significantly expanded on their factual
allegations and now seek to add four new defendants who held senior leadership roles at ASA:
Jasbir Puar, J. Kehaulani Kauanui, Steven Salaita, and John Stephens (the "New Defendants").
*See* Pls.' Mot. at 1–2.  In addition, Plaintiffs assert several new claims that they contend were
revealed in the course of discovery.  Specifically, they assert several new claims sounding in
breach of fiduciary duties and claims for breach of contract and *ultra vires* acts.  *See* Pls.' Mot. at
1.  Defendants have opposed Plaintiffs' motion to amend.  *See* Defs.' Opp'n Mot. Leave File
Seond Am. Compl. ("Defs.' Opp'n"), ECF No. 66

## III.  ANALYSIS

### A.  Motion for Leave to File Second Amended Complaint

Under the Federal Rules of Civil Procedure, once a defendant has responded to a
complaint and more than 21 days have elapsed, the plaintiff may amend his or her complaint
"only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).
Because Defendants refuse to consent to an amendment, Plaintiffs have requested this Court's
leave.  "The grant or denial of leave to amend is committed to the sound discretion of the district
court."  *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 113 (D.D.C. 2012) (citation omitted).
However, "[t]he court should freely give leave when justice so requires," Fed. R. Civ. P.
15(a)(2), which "severely restrict[s]" the court's discretion to deny leave to amend and dismiss,
*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1084 (D.C. Cir. 1998)
(quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991)).  Courts have also recognized a
"policy in favor of hearing cases on their merits," which weighs in favor of permitting
amendments.  *Id.*  Nevertheless, leave is properly denied in cases involving "undue delay, bad

faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here, Defendants argue that leave to amend should be denied because (1) the amendment would cause undue prejudice to Defendants, (2) the Plaintiffs are acting out of bad faith or dilatory motive, and (3) the amendment would be futile. *See* Defs.' Opp'n at 1. The Court addresses each of Defendants' arguments below.

### 1. Prejudice

The Court begins its inquiry into Plaintiffs' motion by considering what prejudice, if any, Defendants might sustain if leave to amend were granted. Indeed, "[t]he most important factor the Court must consider when deciding whether to grant a motion for leave to amend is the possibility of prejudice to the opposing party." *Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006) (citing Wright, Miller, & Kane, *Federal Practice and Procedure*, § 1487 (2d ed.1990)). An amendment may be unduly prejudicial if it "substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation." *Id.* (quoting Wright, Miller, & Kane § 1487). Likewise, leave may also be denied where the non-moving party would be put to the additional expense and burden of a more lengthy and complicated trial or where the issues raised by the amendment are remote to the issues in the case. *Id.* "Where the proponent of the amendment establishes that the additional claim would not 'unduly increase discovery or delay the trial, and when the opponent could not claim surprise,' however, the amendment should be allowed." *Id.* (quoting Wright, Miller, & Kane, *Federal Practice and Procedure*, § 1487 (2d ed.1990)).

Defendants generally complain that allowing the amendment would expand the preparation and expenses necessary for them to litigate the new claims. *See* Defs.' Opp'n at 12. Specifically, they claim that the amendment would require additional discovery and, in particular, document review of emails for the newly added defendants. *See* Defs.' Opp'n at 15. But, "[i]nconvenience or additional cost to a defendant is not necessarily *undue* prejudice," *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 6–7 (D.D.C.2008) (emphasis added), and "an amendment is not automatically deemed prejudicial if it causes the non-movant to expend additional resources," *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 301 F.R.D. 5, 9 (D.D.C. 2013); *see also Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 458 (D.D.C. 1984) ("While it is true that permitting the plaintiffs to amend their complaint may require a postponement of the trial date to permit further discovery, this is not an adequate reason to deny plaintiffs' motion . . . [n]or does the need for additional discovery necessarily constitute sufficient prejudice to deny an otherwise meritorious motion."). Indeed, "[a]ny amendment will [necessarily] require some expenditure of resources on the part of the non-moving party." *United States ex rel. Westrick*, 301 F.R.D. at 9. If the court "were to employ a policy of denying plaintiffs leave to amend in every situation where an amended complaint may result in additional discovery or expense, then this court would fail to abide by the legal standard of granting leave 'freely . . . when justice so requires.'" *Hisler v. Gallaudet Univ.*, 206 F.R.D. 11, 14 (D.D.C.2002) (quoting Fed. R. Civ. P. 15(a)).

The Court is not convinced that the additional discovery and expense that this amendment might create for Defendants is so substantial as to warrant denial of the motion. To start, Defendants do not offer evidence that the amended complaint would unduly prejudice their legal strategy or their ability to present evidence. Plaintiffs do not depart drastically from the

theories advanced in the first two complaints.  Indeed, Defendants do not dispute that Plaintiffs'

new claims advance theories for relief that stem from and are otherwise related to the passage of

the Boycott Resolution.  Instead, Defendants claim simply that, if new defendants are added,

Plaintiffs will likely seek "the same broad categories of documents" from them that Plaintiffs

have sought from the other Defendants.  Defs.' Opp'n at 15.  But this fact does not speak of

undue prejudice—it suggests a simple reality in litigation that the addition of defendants will in

many cases entail additional discovery involving those defendants.  Whatever prejudice

Defendants might endure is not undue and the Court will not deny a motion to amend on this

type of prejudice that typically inheres in all motions to amend.  *See Hisler*, 206 F.R.D. at 14.

## 2.  Bad Faith or Dilatory Motive

Defendants also argue that Plaintiffs have been dilatory in moving to amend their

complaint and that Plaintiffs' motion is being made in bad faith.  In this regard, Defendants make

two points.  First, they contend that Plaintiffs have always known about the four proposed New

Defendants and their roles relative to the resolution.  Defs.' Opp'n at 8–10.  Second, they suggest

that Plaintiffs are merely using the motion in a sort of public relations campaign intended to

dissuade third parties from adopting resolutions similar to the one at issue in this case.  Defs.'

Opp'n at 10–12.  The Court finds that neither of these arguments meets the bar necessary to

show bad faith or dilatory motive.

It is certainly true that a court may deny a motion to amend under circumstances when it

is apparent that the moving party has been dilatory and failed to amend their pleadings promptly.

But, "[c]ourts that have found an undue delay in filing have generally confronted cases in which

the movants failed to promptly allege a claim for which they already possessed evidence."

*United States ex rel. Westrick*, 301 F.R.D. at 9; *see also LaPrade v. Abramson*, No. 97–10, 2006

WL 3469532, at *5 (D.D.C. Nov. 29, 2006) (finding the motion for leave to amend dilatory and unduly delayed "because [the plaintiff] knew sufficient facts before the amendment deadline to make the claims she now seeks to add"); *see also McGee v. District of Columbia*, 646 F.Supp.2d 115, 121–22 (D.D.C.2009) (holding that "[t]he fact that claims [added] in an amended complaint are based on the same legal duties or facts asserted in the original complaint is grounds for denying leave to amend").  In this case, Defendants argue that plaintiffs were both aware of the New Defendants and that they had a role in the Boycott Resolution.  *See* Defs.' Opp'n at 9. Defendants point out that these New Defendants were identified in the Plaintiffs' original complaint and claims that they were discussed in certain early discovery requests and responses (though Defendants have not included those discovery materials in its submission to the Court). *See* Defs.' Opp'n at 9–10.  Nevertheless, it is one thing to be aware of someone's existence and general role in an enterprise or transaction, but it is quite something else to have a sufficient factual predicate upon which to assert a claim.  Plaintiffs argue in their motion that the proposed complaint "rests on newly discovered evidence that the Plaintiffs could not have presented to the Court earlier," including "factual matters that . . . identify additional parties *who are culpable*." Pls.' Mot. at 8 (emphasis added).  Defendants give the Court no reason to doubt that this is the case, and the fact that Plaintiffs might have been aware of these persons' mere existence at an earlier stage is neither surprising nor does it, in and of itself, suggest that Plaintiffs were dilatory in asserting their claims.

Defendants also argue that, during a meet and confer in September 2017, Plaintiffs indicated an intention to add two of the New Defendants by filing an amended complaint.  *See* Defs.' Opp'n at 8.  They contend that the two-month period between these statements and the ultimate filing of this motion necessarily proves Plaintiffs' dilatory intentions.  *See* Defs.' Opp'n

at 8–12.  The Court is not convinced.  First, the length of delay here, in the context of the size

and complexity of this case, is relatively minor.  Second, and more importantly, during this two-

month period, there was still a substantial amount of discovery that was apparently taking place.

Indeed, approximately two thirds of all of the documents produced by Defendants were produced

in mid-October alone.  One can hardly fault Plaintiffs for waiting until they could review a

substantial portion of these documents before amending their complaint, for they might have

been forced to amend it once more after they were done.  Finally, whatever delay there might

have been—which appears to have been minimal, if there was any at all—was hardly prejudicial

to Defendants.  Indeed, this is not a case where a plaintiff seeks to amend his complaint on the

eve of trial or in an attempt to save an action from an already-pending motion for summary

judgment.  Rather, Plaintiffs sought to amend their complaint before the close of discovery and

before any trial or pretrial dates have been scheduled.  "Generally, [] a plaintiff is not dilatory in

seeking to amend a complaint when no trial or pretrial dates have been scheduled."  27A T.

Bateman, *et. al., Federal Procedure, Lawyers Edition* § 62:273 (2018).  And Defendants have

made no attempt to show that they have been prejudiced by any purported delay.  *Djourabchi*,

240 F.R.D. at 13 ("delay alone is an insufficient ground to deny [a] motion [to amend] unless it

prejudices the opposing party").

      Apart from allegations of dilatory behavior, Defendants also claim that Plaintiffs have

other nefarious purposes in moving to amend their Complaint at this time.  Specifically, they

speculate that Plaintiffs have timed their motion to coincide with an annual meeting of another

academic association that was considering an academic boycott of Israel.  *See* Defs.' Opp'n at

10–11.  According to Defendants, the motion is, in reality, part of an elaborate public relations

campaign designed "to 'ratchet up' the pressure on third parties who might consider a boycott

against Israeli academic institutions." Defs.' Opp'n at 10. But the Court cannot countenance

denial of a motion to amend based purely on this type of conjectural guess-work. "Preventing a

party from amending her complaint on the basis of bad faith generally requires an affirmative

showing by the nonmoving party." *Sherrod v. McHugh*, 249 F. Supp. 3d 85, 87 (D.D.C. 2017)

(internal citations omitted). Typically, this entails a showing that "the proposed amendments are

similar to already-rejected claims or otherwise unlikely to succeed on their face." *Id.* (citing

*Hoffmann v. United States*, 266 F. Supp. 2d 27, 34 (D.D.C. 2003)). Defendants have made no

such showing here. First, even if the motion does coincide with a meeting of another academic

institution, Plaintiffs have made a plausible showing that the timing of the motion was actually

the result of Defendants' late production of large amounts of materials, rather than other

questionable purposes. Moreover, the new claims that Plaintiffs assert do not appear to be the

same as those that this Court has already rejected[2] nor do they appear outlandish on their face.

Accordingly, the Court cannot find that the motion should be denied on the basis of bad faith.

### 3. Futility

Finally, the Court may deny leave to amend if the proposed amendment would be futile,

meaning the amended complaint could not withstand a motion to dismiss. *BEG Investments,*

---

[2] Defendants do claim that Plaintiffs are attempting to repackage former derivative claims as direct claims. But the Court does not view this alone as an indication of bad faith. The Court dismissed the derivative claims because Plaintiffs had failed to make a demand on the National Council, not because the claims themselves, if ASA had asserted them on its own, lacked merit. The claims that Plaintiffs seek to assert sound in breaches of fiduciary duty, breaches of contract, and *ultra vires* action, which the D.C. Court of Appeals has suggested may be asserted directly by shareholders and members of non-profit organizations under certain circumstances. *See Jackson v. George*, 146 A.3d 405, 415 (D.C. 2016); *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729–30 (D.C. 2011). Moreover, to the extent that Plaintiffs are asserting *ultra vires* claims, it is apparent from the Complaint that Plaintiffs have made efforts to cure defects that the Court identified in its prior opinion. In short, while the Court takes no position on whether the claims would survive a motion to dismiss, the changes made to the Complaint are not so egregious and lacking as to suggest to the Court that Plaintiffs are acting in bad faith.

*LLC v. Alberti*, 85 F. Supp. 3d 13, 23 (D.D.C. 2015) (citing *Foman*, 371 U.S. at 182; *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)).  The Court, however, will not deny leave on this basis.  There are two principle reasons for this decision.  First and foremost, as explained below, the briefing on the motion to amend has raised a serious question concerning this Court's subject-matter jurisdiction.  Consequently, the Court declines to assess and evaluate the legal issues implicated in Defendants' various arguments until the Court can adequately resolve the threshold jurisdictional issue.  *See Wesberry v. United States*, 205 F. Supp. 3d 120, 134 n.12 (D.D.C. 2016) ("The Court cannot reach the merits of the case without assuring itself that it has subject matter jurisdiction.").  Second, Defendants appear to have taken a rather scattershot approach to arguing futility and have presented only bare-bones arguments with almost no legal authority for their various positions.  Given the rather complex nature of this matter, the Court is not inclined to dismiss the proposed claims based purely on cursory arguments that lack clear rationale and legal authority.  *See Fox v. District of Columbia*, 851 F. Supp. 2d 20, 39 (D.D.C. 2012) ("The Court declines to dismiss these [amended] counts prospectively on the basis of futility when it has not been presented with a clear legal basis for why they are futile."); *Doe v. Siddig*, 810 F. Supp. 2d 127, 137–38 (D.D.C. 2011) ("courts need not resolve arguments raised in a cursory manner and with only the most bare-bones arguments in support." (citing *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997))).  Consequently, the Court will not address the Defendants' futility arguments at this time; however, Defendants may re-raise these objections in a well-supported motion to dismiss or motion for summary judgment.  As a result of the foregoing, the Court finds that Plaintiffs should be granted leave to amend their Complaint.

## B.  Question of Subject Matter Jurisdiction

The Court now returns to a question concerning its own subject-matter jurisdiction.  In this Court's prior opinion, it addressed arguments by the parties concerning subject-matter jurisdiction under 28 U.S.C. § 1332.  That statute provides that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between," among others, "citizens of different states."  28 U. S. C. § 1332(a).  In the earlier round of briefing, the principal dispute between the parties concerned whether Plaintiffs had satisfied the amount in controversy requirement.  The Court concluded that, because it was not legally impossible for Plaintiffs to recover at least $75,000 in damages, they had satisfied their burden to demonstrate the existence of subject matter jurisdiction.  *See* Mem. Op. at 11–13, ECF No. 28.  Despite having previously addressed the issue, this Court has a continuing duty to examine its subject matter jurisdiction and must raise the issue *sua sponte* when it comes into doubt.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").  Although the parties have not explicitly readdressed subject matter jurisdiction in their latest round of motions, they have raised certain issues that have given this Court reason to revisit the amount in controversy issue once more.

In the Complaint, the only damages that Plaintiffs seek are "damages from the individual Defendants incurred by [ASA]."  *See* Pls.' Proposed Second Am. Compl. ("SAC") ¶¶ 194, 197, 207, 215, 225; SAC at 82.  All of those individuals either currently serve or have previously served on ASA's National Council, which is equivalent to a Board of Directors for purposes of

the D.C. Nonprofit Corporations Act.  *See* D.C. Code § 29-401.02 ("'Board' or 'board of

directors' means the group of individuals responsible for the management of the activities and

affairs of the nonprofit corporation, regardless of the name used to refer to the group.").  The

D.C. Nonprofit Corporations Act, however, provides that directors of nonprofit organizations are

not liable for money damages except in very specific situations.  *See* D.C. Code § 29-406.31.  Of

particular import here is D.C. Code § 29-406.31(d).  That provision states:

> [n]otwithstanding any other provision of this section, a director of a charitable
> corporation shall not be liable to the corporation or its members for money damages for
> any action taken, or any failure to take any action, as a director, except liability for: (1)
> The amount of a financial benefit received by the director to which the director is not
> entitled; (2) An intentional infliction of harm;  (3) A violation of § 29-406.33; or (4) An
> intentional violation of criminal law.

D.C. Code § 29-406.31(d).

In their opposition to the Plaintiffs' motion for leave to amend, Defendants argued that

Plaintiffs did not "attempt to satisfy the requirements under the D.C. Nonprofit Corporations Act

to hold the individual defendants liable."  Def.'s Opp'n. at 5.  Specifically, they pointed to D.C.

Code § 29-406.31(d), and noted that "Plaintiffs' proposed second amended complaint alleges

none of [the] exceptions [under the statute], nor could [they]."  Defs.' Opp'n at 5.  Plaintiffs have

not disputed this.

Instead, Plaintiffs responded in two ways.  First, they argue that the suit may proceed

because "[s]ubsection (d) only applies to liability for money damages, not other forms of relief"

and, in this case, "Plaintiffs seek both declaratory and injunctive relief."  Pls.' Reply at 10, ECF

No. 67.  While it is true that subsection (d) applies to suits for money damages and that Plaintiffs

are pursuing both legal and equitable remedies, the implicit argument that § 29-406.31(d) is

somehow unimportant is plainly wrong.  Indeed, not only does it affect the remedies that

Plaintiffs might ultimately obtain, it necessarily has important implications for this Court's

analysis of subject matter jurisdiction.  Because Plaintiffs are only seeking money damages from the Individual Defendants, if the D.C. Nonprofit Corporations Act precludes them from doing so, then it would in fact be legally impossible for them to recover $75,000 in this action.  Such a finding would necessarily mean that this Court's subject matter jurisdiction could not be founded on 28 U.S.C. § 1332.

Plaintiffs also argue, however, that subsection (d) does not preclude damages because it applies only to directors, not to officers.  Thus, according to Plaintiffs, "[c]laims brought against Individual Defendants for acts taken while they served as President are unaffected" by the statute.  Pls.' Reply at 10.  Likewise, they argue it does not "apply to John Stephens, a paid employee and Executive Director of [ASA]."  Pls.' Reply at 10.  Both of these arguments, however, seem potentially problematic.  First, the Court is rather skeptical of the assertion that the statute does not apply to acts taken by ASA's President.  It is true that the "President" of ASA is described in ASA's Constitution as an "Officer."  *See* ASA Const. & Bylaws, Const., Art. IV, §1.  But this label alone is not dispositive.  Indeed, under the D.C. Nonprofit Corporations Act, the term "director" is quite broad and means any "individual designated, elected, or appointed, by that *or any other name or title*, to act as a member of the board of directors, while the individual is holding that position."  D.C. Code § 29-401.02(9) (emphasis added).  Thus, even though the President is termed an "officer" under the ASA's Constitution, the position of President certainly seems to fit within the definition of "director" given that the President, by the terms of ASA's Constitution, is a member of the National Council.  *See* ASA Const. & Bylaws, Const. Art. IV, § 2; Art. V, § 1(a).  And, in fact, based on the Constitution's description of duties for the President, the position would seem to be analogous to that of a Chairman of a Board of Directors, given that the President presides over meetings of the Council

and formulates policies and projects for presentation to the Council.  *See* ASA Const. & Bylaws, Const., Art. IV, § 2.  Moreover, the President does not appear to have a clear role in day-to-day management of the organization.  Rather, the President and the National Council are to supervise the Executive Director, who is described as the "chief administrative officer of the association" and "oversee[s] the affairs of the association" with "responsibility for the continuing operations of the association."  *See* ASA Const. & Bylaws, Const. Art. IV, Sec. 4.  Consequently, it is difficult to understand the position of President as being anything other than that of director for purposes of the D.C. Nonprofit Corporations Act.

        To the extent that Plaintiffs hang their hat on Defendant Stephens being a non-director, the question seems closer.  Mr. Stephens is ASA's Executive Director and, as described above, that position does involve oversight and responsibility for the everyday administration of ASA's activities.  Nevertheless, like the President, ASA's Constitution specifies that ASA's Executive Director is a member of the National Council, albeit a non-voting member.  *See* ASA Const. & Bylaws, Const. Art. V, § 1(g).  Thus, it would seem that Defendant Stephens may also come within the ambit of D.C. Code § 29-406.31(d).

    Given that the parties have not addressed the impact that D.C. Code § 29-406.31(d) may have on this Court's subject matter jurisdiction, the Court will order the parties to provide supplemental briefing addressing this threshold issue within thirty days of this opinion.  In the meantime, the case is stayed pending the Court's consideration of its jurisdiction.

## IV.  CONCLUSION

    For the foregoing reasons, Plaintiffs' Amended Motion To Extend Time To Add Parties (ECF No. 57) is **GRANTED** and Plaintiffs' Motion For Leave To File Second Amended Complaint (ECF No. 59) is **GRANTED**.  In addition, the parties are directed to provide

supplemental briefing on the issue of subject matter jurisdiction within 30 days of this opinion.

The case will remain stayed pending the resolution of that issue.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 6, 2018                                          RUDOLPH CONTRERAS
                                                                          United States District Judge