**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON, <br><br> Plaintiffs, <br><br> v. <br><br> LISA DUGGAN, CURTIS MAREZ, AVERY GORDON, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, J. KEHAULANI KAUANUI, JASBIR PUAR, STEVEN SALAITA, JOHN STEPHENS, and THE AMERICAN STUDIES ASSOCIATION, <br><br> Defendants. | Case No. 16-cv-00740-RC <br><br> JURY TRIAL DEMANDED |

**PLAINTIFFS' [PROPOSED] SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

THE PARTIES ................................................................................................................... 6

STATEMENT OF FACTS ................................................................................................. 9

I. BACKGROUND ........................................................................................................... 9

   A.   The American Studies Association ................................................................... 9

   B.   USACBI and PACBI's Academic Boycott of Israel ...................................... 12

   C.   USACBI Targets the American Studies Association ...................................... 15

II.  DEFENDANTS INFILTRATE AND EXPLOIT THE AMERICAN STUDIES
ASSOCIATION ............................................................................................................. 17

   A.   Defendants Covertly Pack the American Studies Association National Council with
USACBI Leaders and Supporters. ............................................................................ 17

   B.   Defendants Exploit American Studies Association Resources to Advance the USACBI
Platform. .................................................................................................................... 27

       1.   The Academic and Community Activism Caucus and the 2012 Annual Meeting ....... 27

       2.   The 2013 Annual Meeting, "Roundtable," and "Open Meeting" ................................ 31

   C.   Silencing Dissent and Withholding Information Pertinent to the Vote
from Membership ...................................................................................................... 37

       1.   Removal of Plaintiff Bronner from the 2013 National Council Meeting ................... 38

       2.   Defendants hide dissenting viewpoints that would inform the membership's decision
on the vote. ............................................................................................................... 40

       3.   Defendants form a subcommittee of USACBI Leaders and firmly pro-resolution
advocates to draft the disclosure materials for the National Council, and withhold their
knowledge of the expected backlash. ....................................................................... 42

   D.   Defendants Freeze the Membership Rolls to Prevent Those Opposed to the Resolution
from Voting, Banning Plaintiff Barton From Voting. .............................................. 45

E.   The Announced Results of the Vote Violate American Studies Association Bylaws and the District of Columbia Nonprofit Corporations Act. .......................................................... 50

F.   The Passage and Adoption of the Resolution Constitutes a Substantial Part of the American Studies Association's Activities, Violating the Association's Bylaws. ................... 52

  1.   Efforts to Influence Israeli Legislation Constitute a Substantial Part of American Studies Association Activities ............................................................................. 53

  2.   Efforts to Influence United States Legislation Constitute a Substantial Part of American Studies Association's Resolution-Related Activities ........................................... 55

G.   Defendants Invade the American Studies Association Trust Fund to Cover the Expenses Arising from the Boycott Resolution ........................................................................ 57

H.   Financial Injury to American Studies Association and Plaintiffs' Interests Resulting from Defendants' Actions ........................................................................................ 61

  1.   Decrease in revenue ....................................................................................... 61

  2.   Resolution-related expenses ............................................................................. 63

COUNT ONE  Breach Of Fiduciary Duties Against The Individual Defendants By All Plaintiffs (Material Misrepresentations and Omissions in Connection with Elections to Office and Seeking Member Approval of Boycott Resolution and Amendment of the Bylaws) ............................... 69

COUNT TWO  Breach Of Fiduciary Duties Against The Individual Defendants By All Plaintiffs (Duty of Loyalty and Good Faith, Misappropriation and Misuse of Assets of American Studies Association) ................................................................................................................ 70

COUNT THREE  Ultra Vires and Breach of Contract Action Against All Defendants By All Plaintiffs (Failure To Nominate Officers and National Council Reflecting Diversity of Membership) .............................................................................................................. 71

COUNT FOUR  Ultra Vires Action and Breach of Contract Against All Defendants By All Plaintiffs (Freezing Membership Rolls to Prohibit Voting) ......................................... 74

COUNT FIVE  Ultra Vires Action and Breach of Contract Against All Defendants By All Plaintiffs (Substantial Part of Activities Attempting to Influence Legislation) .......................... 76

COUNT SIX (IN THE ALTERNATIVE)  Breach Of Contract Against Defendant American Studies Association By All Plaintiffs (Voting Process Contrary To Bylaws) ............................. 78

COUNT SEVEN (IN THE ALTERNATIVE)  Breach of D.C. Nonprofit Corporation Act Against Defendant American Studies Association By All Plaintiffs ........................................... 79

COUNT EIGHT  Breach Of Contract Against Defendant American Studies Association By Plaintiff Barton (Denial of Right To Vote) ................................................................... 80

COUNT NINE  Corporate Waste Against All Defendants By All Plaintiffs .............................. 81

PRAYER FOR RELIEF ......................................................................................................... 82

Plaintiffs Simon Bronner, Michael Rockland, Michael L. Barton, and Charles D. Kupfer (collectively, "Plaintiffs"), hereby bring claims for breach of fiduciary duty against Defendants Lisa Duggan, Curtis Marez, Avery Gordon, Neferti Tadiar, Sunaina Maira, Chandan Reddy, J. Kehaulani Kauanui, Jasbir Puar, Steven Salaita, and John Stevens ("the Individual Defendants"). Plaintiffs also bring claims for breach of contract and breach of the District of Columbia Nonprofit Corporation Act against the American Studies Association, and claims for *ultra vires* acts and waste against all Defendants.

## INTRODUCTION

1.      This case, at its core, seeks redress for breaches of contractual and fiduciary duties by individuals who gained and abused positions of trust within the American Studies Association through deception and misrepresentation, purposefully aided and assisted by their fellow collaborators within the USACBI, a pro-Palestinian political activist group that seeks to delegitimize the State of Israel in the world community.[1] In furtherance of their scheme, the defendants orchestrated the misappropriation of the assets, both monetary and reputational, of the American Studies Association to further their agenda to promote an academic boycott of Israel – a political agenda that subverts the apolitical mission and scholarly purpose of the American Studies Association.

2.      For over 65 years, the American Studies Association has had a single, express, legal purpose – the promotion of the academic study of American culture.  That purpose is enshrined in association's Constitution and Bylaws and mandated by its status under the D.C. Nonprofit Corporation Act of 2010, and required as a condition for income tax exemption under the Internal Revenue Code.

---

[1] USACBI is an acronym for the United States Association for the Academic and Cultural Boycott of Israel.  USACBI is the U.S. arm of PACBI (the Palestinian Campaign for the Academic and Cultural Boycott of Israel).

3.      Despite this, USACBI leaders targeted the American Studies Association as a vehicle to advance an academic boycott of Israel (the "USACBI Boycott").  They did this by taking the steps described in greater detail below to induce the American Studies Association to adopt a Resolution boycotting Israel, Israeli institutions and Israeli academics ("the Boycott" or "the Boycott Resolution").  Recognizing that (1) previous attempts to convince the American Studies Association to adopt the USACBI Boycott had failed, (2) the overwhelming majority of academics opposed any form of academic boycott as a restriction on academic freedom and the free exchange of ideas, and (3) many considered the USACBI Boycott to be anti-Semitic, in part because it focused solely on Israel, the USACBI leaders schemed to secretly infiltrate and pack the American Studies Association National Council with USACBI leaders and supporters, ensuring that the American Studies Association would adopt the USACBI Boycott in disregard of the mission of the American Studies Association and the views of the majority of its members.

4.      Acting in violation of the American Studies Association's governing documents and their own fiduciary duties, the Individual Defendants, acting on behalf of the USACBI, misappropriated the American Studies Association's funding, name, prestige, membership lists, and respected institutional voice to suborn the American Studies Association to advance USACBI's political interests. But while they promoted the American Studies Association's adoption of the boycott as the culmination of a grassroots movement of American Studies scholars, and celebrated the "normalization" of the pro-Palestinian movement by a large, respected academic association, the reality was quite different. The Boycott was the work of a handful of members of the USACBI Organizing Collective and Advisory Committee ("USACBI Leadership"), who were only able to achieve their goal by violating the American Studies Association's Constitution and Bylaws and the fiduciary duties they assumed when they succeeded in obtaining positions as officers of the American Studies Association, and so owed to members of the corporation they exploited.

5.      First, defendants obtained control of the nominations process by which the American Studies Association chose its leaders. With that power in hand, defendants schemed to

subvert the American Studies Association's National Council by limiting nominations to individuals affiliated with USACBI and who would promote and support the American Studies Association's adoption of the Boycott Resolution.  This constituted a violation of the American Studies Association bylaws, which require that nominations for the American Studies Association National Council and President reflect the diversity of the membership. The scheme was advanced by Defendant Jasbir Puar, a USACBI Leader who sat on the American Studies Association's Nominating Committee. Puar also acted, ultimately successfully, to ensure that only signed supporters of USACBI were nominated for American Studies Association President. She imposed this restriction, however, only after concluding that, while a pledge of allegiance to the goals of USACBI was a prerequisite for her nomination to positions of American Studies Association leadership, this requirement should not be disclosed to the general American Studies Association membership who would be asked to vote on Puar's chosen candidates.  By her actions, Puar violated her fiduciary duties of loyalty and candor to the American Studies Association and its members. Those USACBI leaders whose nominations were secured by Puar as part of this scheme also violated their duties of loyalty and candor to the American Studies Association membership by failing to disclose their illicit political intentions to the voting members of the association.

6.      Second, beyond their conscious decision to conceal their boycott plot from the general membership, the Individual Defendants withheld additional material information from the American Studies Association membership prior to the association's vote on whether to adopt a resolution imposing the Boycott.  This too violated the Individual Defendants' fiduciary duty of candor. Among other things, the Individual Defendants refused to post or circulate letters and other information opposing the boycott. They also withheld material information about the USACBI boycott itself, including critical aspects of the USACBI platform that the Boycott Resolution was modeled upon – and which the Boycott would help advance once the American Studies Association membership adopted it.  For example, USACBI and PACBI both reject any two-state solution to the conflict, and demand the full "right of return" for people who claim to

be the descendants of Arabs who left Israel during and prior to the onset of the Arab-Israeli War in 1947. This is a critical fact, as all sides generally agree that such a "right of return" would mean the end of Israel as a Jewish state – a position that many who might otherwise support an academic boycott of Israel would be unwilling to accept – including many members of the American Studies Association. The Individual Defendants consciously chose to avoid explaining that the USACBI Boycott that the American Studies Association members were voting on essentially called for more than the end of the occupation of the Palestinian territories, but the end of Israel itself as that country is currently constituted.

7.      Third, as the date approached upon which the American Studies Association's general membership would vote on whether to adopt the Boycott Resolution, Defendants picked a specific day upon which to freeze the membership rolls on the basis of their explicit assessment that freezing the rolls on that day would maximize the likelihood that the Boycott Resolution would be adopted.  Defendants chose the day before the announcement that the membership would vote on whether to endorse the Boycott. A freeze of the membership rolls on any date was unprecedented at the American Studies Association, and in clear violation of the American Studies Association bylaws, which provide that a lapsed member is reinstated with all the benefits of membership immediately upon paying dues. It was also contrary to all prior practice, under which members were able to pay their dues as late as the day of an election and still vote in that election. Defendants' emails amongst themselves explicitly state the reason for the freeze on membership: to maximize the number of votes in favor of the Boycott and minimize the number of votes against it.

8.      Fourth, the determination of the vote itself also violated the American Studies Association bylaws or, alternatively, the D.C. Nonprofit Corporation Act. The former requires a two-thirds vote, in person, at the Annual Meeting; the latter requires a quorum. The vote on the Boycott satisfied neither.

9.      Fifth, the Individual Defendants breached their fiduciary duty of loyalty by manipulating the American Studies Association's corporate machinery to deprive the members

4

of the American Studies Association of a full and fair vote.  The Individual Defendants did so for exactly one, improper, personal purpose that is contrary to the American Studies Association's ordained purpose and mission.  By so acting, the Individual Defendants caused irreparable damage to the American Studies Association, causing it to lose its good reputation and the good will that it had earned over more than six decades. As a direct result of these actions by the Individual Defendants, well-respected leaders in the field of American Studies resigned from the American Studies Association in protest. Also as a direct result of these actions, the American Studies Association's reputation suffered as university presidents, the American Association of University Professors, government officials, legislatures, previous American Studies Association Presidents and award-winners, and numerous others publicly condemned the boycott. Along with the decline in reputation came an increase in expenses incurred and a decrease in the general fund of the American Studies Association.

10.     Sixth, the Individual Defendants, by foisting an anti-Israel boycott on the American Studies Association and its members, caused the American Studies Association to divert a substantial portion of its resources and activities to promote legislative change, contrary to the American Studies Association's own foundational documents. The purpose of the USACBI Boycott is to force Israel to adopt changes that can only be made through legislation; moreover, as a result of its adoption of the Boycott Resolution and its commitment to the boycott of Israel, the American Studies Association has challenged numerous legislative acts that were proposed in United States state legislatures and the U.S. Congress in response to the American Studies Association boycott. These actions by the American Studies Association are clear and specific violations of a prohibition on the promotion of legislation – a prohibition which is stated explicitly in the American Studies Association's Statement of Election.  These actions therefore constitute ultra vires actions. Moreover, spending a substantial portion of activities to promote legislative change also places the American Studies Association's tax-exempt status in jeopardy. The Individual Defendants' actions in favor of USACBI and its boycott of Israel, despite the risk

to the American Studies Association's tax-exempt status, constitutes an additional breach of fiduciary duty.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1332, inasmuch as there exists complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

12.     Venue is properly in the District of Columbia by operation of 28 U.S.C. § 1391, inasmuch as Defendant American Studies Association is a non-profit organization incorporated under the laws of the District of Columbia and domiciled in the District of Columbia. Moreover, the 2013 American Studies Association meeting was held in the District of Columbia, including the "Round Table" and the "Open Meeting" discussed below.

## THE PARTIES

13.     Plaintiff Simon Bronner was employed as Distinguished Professor of American Studies and Folklore at Pennsylvania State University until his retirement in 2017. Plaintiff Bronner is an honorary lifetime member of American Studies Association, and has full rights and privileges of American Studies Association membership. (American Studies Association Constitution (ASA Const.) art. II, §1.) Until recently, he served as the editor of the association's *Encyclopedia of American Studies*, and as such, he was an *ex officio* member of the National Council. He is a citizen of the Commonwealth of Pennsylvania.

14.     Plaintiff Michael Rockland is Professor of American Studies at Rutgers University, where he founded the Department of American Studies. Plaintiff Rockland is an honorary lifetime member of American Studies Association, and has full rights and privileges of

American Studies Association membership. (ASA Const. art. II, § 1.) He is a citizen of the State of New Jersey.

15.     Plaintiff Michael L. Barton is Professor Emeritus of American Studies at Pennsylvania State University. He first joined the American Studies Association as a graduate student in 1968, and was a member for approximately 44 years. Plaintiff Barton's membership to the American Studies Association lapsed for approximately one year beginning in 2012. When he attempted to pay his dues to reactivate his membership to vote on the boycott, the American Studies Association was willing to accept him again as a member, but refused to let him vote. He is a citizen of the Commonwealth of Pennsylvania.

16.     Plaintiff Charles D. Kupfer is Associate Professor of American Studies at Pennsylvania State University. He first joined the American Studies Association as a graduate student. Plaintiff Kupfer allowed his American Studies Association membership to lapse in 2014, after the adoption of the Boycott Resolution. He is a citizen of the Commonwealth of Pennsylvania.

17.     Defendant American Studies Association is the nation's largest and oldest organization dedicated to the promotion of the study of American culture. Until recently, it was the central convening point for academics who study and teach about American culture. The American Studies Association was incorporated on May 4, 1951 as a private, nonprofit corporation organized under the laws of the District of Columbia, and chartered at the Library of Congress in 1951. (*See* https://www.theasa.net/about/history.)  It has been designated by the Internal Revenue Service ("IRS") as a tax-exempt organization under §501(c)(3) of the Internal Revenue Code. The American Studies Association maintains its corporate office at 1120 19th Street, N.W., Suite 301, Washington, D.C. 20036. Defendant American Studies Association adopted a Constitution and Bylaws in effect as of December 2013, pertinent parts of which are attached as Exhibit A.

18.     Defendant Curtis Marez is Professor at the University of California, San Diego, and served as American Studies Association President from July of 2013 through June of 2014

7

and the Executive Committee and National Council from July of 2012 through June of 2015. Defendant Marez is a citizen of the State of California.

19.     Defendant Avery Gordon was a member of the American Studies Association's National Council from July of 2011 through June of 2014. Among other things, she co-hosted, with Defendant Marez, the "open meeting" to discuss the adoption of the USACBI Boycott at the 2013 American Studies Association Annual Meeting, discussed below. Defendant Gordon is a citizen of the State of California.

20.     Defendant Neferti Tadiar is a member of both the Organizing Collective and the Advisory Committee of USACBI. Using her roles on the programming committee for the American Studies Association 2013 Annual Meeting, and the American Studies Association Activism and Community Caucus ("Activism Caucus"), Defendant Tadiar was a leader of the movement for American Studies Association to adopt the USACBI Platform through the Boycott Resolution. Defendant Tadiar is a citizen of the State of New York.

21.     Defendant Sunaina Maira is a member of the Organizing Collective of USACBI, was a member of the American Studies Association's National Council from July of 2013 through June of 2016, and co-chairman of the Activism Caucus, where she led the movement for the American Studies Association to adopt the USACBI Platform and Boycott. Defendant Maira is a citizen of the State of California.

22.     Defendant Lisa Duggan served on the Executive Committee and National Council of the American Studies Association from July of 2013 through June of 2016, and served as American Studies Association President in from July of 2014 through June of 2015. Defendant Duggan is a citizen of the State of New York.

23.     Defendant Chandan Reddy served on the National Council of the American Studies Association from July of 2012 through June of 2015, and the Executive Committee from July 2013 through June of 2015. Defendant Reddy is a citizen of the State of Washington.

24.     Defendant J. Kehaulani Kauanui is a member of the USACBI Advisory Committee, and was a member of the National Council from July of 2013 through June of 2016. Defendant Kauanui is a citizen of the state of Connecticut.

25.     Defendant Jasbir Puar is a member of the USACBI Advisory Committee, and was a member of the American Studies Association Nominating Committee from July of 2010 through June of 2013. Defendant Puar is a citizen of the state of New York.

26.     Defendant Steven Salaita is a member of the USACBI Organizing Collective and a current member of the American Studies Association National Council.  His term began on July 1, 2015, and will end on June 30, 2018.  He was a member of the National Council when the American Studies Association's bylaws were changed to allow large withdrawals from the American Studies Association's Trust and Development Fund, and when large withdrawals were taken to cover expenses related to the Boycott Resolution.  Defendant Salaita's residency has changed more than once in recent years.  On information and belief, he is currently a resident of the District of Columbia.

27.     Defendant John Stephens is the Executive Director of the American Studies Association.  He has held this position since 1983.  Defendant John Stephens is a resident of the state of North Carolina.

## STATEMENT OF FACTS

### I.     BACKGROUND

#### A.     The American Studies Association

28.     The American Studies Association was founded in 1951 for the sole purpose of advancing the academic field of American Studies. This singular objective is set forth in the American Studies Association Constitution, as follows:

> The object of the association shall be the promotion of the study of
> American culture through the encouragement of research, teaching,
> publication, the strengthening of relations among persons and
> institutions in this country and abroad devoted to such studies, and the
> broadening of knowledge among the general public about American
> culture in all its diversity and complexity.

American Studies Association Const. art. I, § 2 (as it read at the time of the events described herein, and at least until January 5, 2016). The American Studies Association served this mission for over sixty years, without straying from its sole purpose. Over that sixty-year period, and owing to the commitment and dedication of its members to their chosen field, the American Studies Association became the foremost academic organization for the study of American culture.

29.     From the date of its creation until the events at issue in this case, the American Studies Association served as a hub for the exchange of ideas in the academic field of American Studies. Past Presidents of the American Studies Association have included preeminent scholars in American culture, including Carl Bode, author of over 30 books on American literature and poetry; Daniel J. Boorstin, a Librarian of the United States Congress; Daniel Aaron, a founder of the Library of America; and William H. Goetzmann, an historian of the American West and winner of the Pulitzer Prize.

30.     In October of 1971, twenty years after its founding, the American Studies Association reaffirmed its commitment to this singular objective when it elected to be bound by the District of Columbia Nonprofit Corporation Act. The Statement of Election to Accept of the American Studies Association ("Statement of Election") provides, "[t]he corporation is organized *exclusively for education and academic purposes*." Statement of Election ¶ 3, § 4, emphasis added. The Statement of Election further prescribes that the "property, assets, profits and net income of this corporation are irrevocably dedicated to education purposes and no part of the net earnings of the corporation shall inure to the benefit of . . . its directors, officers, or other private persons, except . . . to pay reasonable compensation for services rendered . . . in furtherance of the purposes set forth in this paragraph THIRD." Statement of Election ¶ 3, § 3.

31.     Further, the Statement of Election specifically mandates that "No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office." Statement of Election, ¶ 3, § 4.

32.     Statement of Election, ¶ 3, § 4, mirrors § 501(c)(3) of the Internal Revenue Code. The Internal Revenue Code limits tax-free status under § 501(c)(3) to entities "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes . . . no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." Failure to abide by this requirement places a non-profit's tax-free status at great risk.

33.     Decades of American Studies Association's unbroken practice complied with this mandate, and both the restrictions themselves and the Association's practice pursuant to those restrictions prevent the American Studies Association from dedicating its resources to other goals.

34.     Many members of the American Studies Association, including but not limited to Plaintiffs, contributed funds – including annual dues, paid for decades by long-standing members – and effort to the American Studies Association solely on the condition and understanding that the American Studies Association would continue to abide by this mandate. These members were invested not only in the ongoing existence of their association, but also in the maintenance of the American Studies Association's reputation as an academic organization. As discussed in detail below, when the American Studies Association's reputation collapsed following the adoption of the Resolution, the individual members also bore the brunt of the backlash. The reputation of the primary academic organization in a field of study reflects on all of its members, and the even the field itself.

B.    **USACBI and PACBI's Academic Boycott of Israel**

35.    The US Campaign for the Academic and Cultural Boycott of Israel, or USACBI, is a United States-based campaign focused on a boycott of Israeli academic and cultural institutions. USACBI was formed in 2009 by pro-Palestinian activists in the boycott, divestment and sanctions movement (BDS), including Individual Defendants J. Kehaulani Kauanui and Sunaina Maira, and Defendant Maira's husband, Magid Shihade, a Palestinian and at the time, a professor at Birzeit University, to facilitate in the United States a widespread boycott of Israeli academic institutions.[2]  The academic boycott proscribes any academic engagement with Israeli universities, including intellectual discourse, collaboration on research, and even study abroad programs. USACBI also promotes a cultural boycott, including an aggressive public campaign to drive American musicians and artists to cancel concerts and other performances in Israel.

36.    USACBI describes its mission as follows:

> Responding to the call of Palestinian civil society to join the Boycott, Divestment and Sanction movement against Israel, we are a U.S. campaign focused specifically on a boycott of Israeli academic and cultural institutions, as delineated by PACBI (Palestinian Campaign for the Academic and Cultural Boycott of Israel).

http://www.usacbi.org/mission-statement/.

37.    PACBI was founded by Omar Barghouti, a founder of the BDS movement against Israel. Barghouti was born in Qatar, raised in Egypt, and has lived in Israel since 1993. He was working and studying at Tel Aviv University in 2009, while at the same advocating for a boycott Israeli universities.

38.    Barghouti does not believe in a two-state solution for the Middle East. Instead, he and the BDS movement call for a complete "right of return" to the land we now know as Israel

---

[2] Birzeit University is located near Ramallah in the West Bank.  It was established in the 1970s, years after Israel took control of the territory where the University operates. *See* http://www.birzeit.edu/en/about/history.

for people who claim to be descendants of Arabs who left Israel at the beginning of the 1948

war. He believes that the end of the state of Israel as a Jewish state is the proper outcome.

> In his book on BDS, the movement's leader Omar Barghouti slams left-
> wing Israelis for rejecting only the occupation, rather than Israel's very
> existence. He accuses prominent peace activists, such as Amos Oz,
> A.B. Yehoshua and Uri Avnery, of being 'racists' because they refused
> to support an unlimited Palestinian Right of Return, and derides
> Avnery for wanting to preserve Israel's 'Jewish character.'

Philip Mendes and Nick Dyrenfurth, "What BDS Really Wants: A One-state Solution, Minus the

Jewish State," *Haaretz*, Apr 30, 2015 (https://www.haaretz.com/opinion/.premium-1.654282). In

his own words, Barghouti argues that:

> you cannot reconcile the right of return for refugees with a two-state
> solution. That is the big white elephant in the room and people are
> ignoring it — a return for refugees would end Israel's existence as a
> Jewish state. The right of return is a basic right that cannot be given
> away; it's inalienable.

Ali Mustafa, "Boycotts Work: An Interview with Omar Barghouti," *The Electronic Intifada*,

May 31, 2009 (https://electronicintifada.net/content/boycotts-work-interview-omar-

barghouti/8263).

39.     PACBI and USACBI adopted their founder's position on the right of return,

calling for a boycott of Israeli academic institutions until the demand is satisfied. Thus, the

USACBI platform states that the academic boycott it promotes should be continued until Israel

complies with their demands by, *inter alia*, "[r]especting, protecting and promoting the rights of

Palestinian refugees to return to their homes and properties . . ." (http://www.usacbi.org/about/,

restating the PACBI platform and declaring that the "principles guiding the PACBI campaign

and the three goals outlined above are also points of unity for the US Campaign for the

Academic and Cultural Boycott of Israel.")

40.     Of the many different views on the conflict in the Middle East, the view of Omar

Barghouti, which rejects any two-state solution, and calls for the end of the State of Israel as a

Jewish state, is perhaps the most extreme view, and is extremely controversial, even among

13

Palestinian activists, and certainly within the United States. Thus, in seeking support for their boycott campaigns, USACBI does not emphasize that its platform demands boycott of Israeli universities and other institutions until Israel "promote[s] the rights of Palestinian refugees to return to their homes and properties." As discussed in detail below, those named here as Individual Defendants carefully avoided explaining USACBI's demand for the "right of return" in their campaign for the American Studies Association to adopt the USACBI Boycott, and have therefore failed to disclose the actual meaning and effect of the Boycott Resolution which the American Studies Association's membership voted on.

41.    The very concept of an academic boycott, for any purpose, is also extremely controversial, and widely rejected by U.S. academics, including the American Association of University Professors, as explained by *Inside Higher Education*:

> In the United States, opposition to academic boycotts is strong. A 2007 statement signed by nearly 300 university presidents sums up why: "In seeking to quarantine Israeli universities and scholars, this vote threatens every university committed to fostering scholarly and cultural exchanges that lead to enlightenment, empathy, and a much-needed international marketplace of ideas." . . . .
>
> The American Association of University Professors in 2006 issued a statement opposing academic boycotts, "in view of the Association's long-standing commitment to the free exchange of ideas." The AAUP particularly opposes boycotts such as the one being proposed here, in which institutions would be boycotted unless they "vocally oppose" Israeli policies. "We especially oppose selective academic boycotts that entail an ideological litmus test," the AAUP statement says. "We understand that such selective boycotts may be intended to preserve academic exchange with those more open to the views of boycott proponents, but we cannot endorse the use of political or religious views as a test of eligibility for participation in the academic community."
>
> Cary Nelson, president of the AAUP and a professor of English at the University of Illinois at Urbana-Champaign, added that, practically speaking, "I think it's inappropriate to expect institutions to take positions on a nation state's policy…. How would an institution in the United States take a stand on national policy? Would the Faculty

>       Senate vote, would the administration impose a policy, would the entire
>       campus vote, would the students have an equal vote?"

Elizabeth Redden, "Israel Boycott Movement Comes to U.S.," *Inside Higher Ed*, Jan. 26, 2009,

https://www.insidehighered.com/news/2009/01/26/boycott.

### C.     USACBI Targets the American Studies Association

42.     Individual defendants Sunaina Maira, Neferti Tadiar, J. Kehaulani Kauanui, and

Jasbir Puar are all members of USACBI and serve on either the USACBI Advisory Board

(Kauanui, Puar) or the Organizing Collective (Maira), or both (Tadiar).

43.     USACBI planning and decision-making is directed by the Organizing Committee

and the Advisory Board (collectively, "USACBI Leadership"). The USACBI Leadership

primarily strategizes for the adoption of the academic boycotts of Israel by academic associations

and institutions that have the resources and the name recognition to bring publicity and respect to

USACBI's sole cause – widespread boycotts of Israel and its institutions. In this way, USACBI

seeks to advance its cause by exploiting the goodwill and other resources of other institutions –

such as publicity, name-recognition, and respect that USACBI itself lacks, as well as the fiscal

resources of such institutions.

44.     USACBI does not fund its activities out of its own budget.  Instead, USACBI

seeks to capture other, ostensibly neutral organizations such as American Studies Association

and to use their budgets, reputations and resources to advance the goals of USACBI. USACBI is

not incorporated, and does not have § 501(c)(3) status with the IRS. A click on the "donate"

button on USACBI's webpage redirects to a page on the PayPal website with the heading,

"Palestine Right to Return Coalition" and the error message, "This recipient is currently unable

to receive any money."[3]

---

[3] https://www.paypal.com/cgibin/webscr?cmd=_flow&SESSION=6nzLVWQqXNqfVtrm97 yea95_oaU-
uhpedCKonzyeFPV5ye50BzylEBcaFO&dispatch=5885d80a13c0db1f8e263663d3
faee8d795bb2096d7a7643a72ab88842aa1f54&rapidsState=Donation__DonationFlow___StateDonationF

45.     In 2012, USACBI Leadership – including many of the defendants in this case – decided to focus on the adoption of the USACBI Boycott by the American Studies Association. Among other things, it was agreed that the group should pack the American Studies Association National Council with as many USACBI Leaders and Endorsers as possible. Defendant Puar, who was on the American Studies Association's Nominating Committee, would nominate them, solely for the purpose of assuring that the American Studies Association would adopt the USACBI Resolution. (SM3736 at 2, email from Maira, "Jasbir is nominating me and Alex Lubin for the Council and she suggests populating it with as many supporters as possible"); (SM3730, email from Puar, "I think we should prepare for the longer-term struggle by populating elected positions with as [many] supporters as possible.") Once on the National Council, the people so chosen would exploit the entities' resources for the ultimate purpose of causing the American Studies Association to adopt a boycott of Israel in conformity with the USACBI guidelines ("a USACBI Boycott").

46.     An opinion piece written by Stephen Salaita – a current member of both the American Studies Association National Council and USACBI Leadership – confirms that USACBI was behind the American Studies Association Resolution (and that USACBI lacks its own resources):

> I've worked with USACBI for around five years—closely during the process to pass the American Studies Association resolution . . .. USACBI doesn't accept funding from governments, corporations, or political parties. When we need money, we get it the old-fashioned way: everybody chips. What we lack in material resources is exceeded by the efficiency of unfettered praxis.
> . . . USACBI does not need the endorsement of university presidents or lawmaking bodies. Nor does it want their endorsement, which would constitute an abdication of what BDS works to accomplish,

---

atalError&rapidsStateSignature=c4fc0e2160d309fbaecacf3de1b7d3136e36891f (last accessed August 20, 2017.)

decolonization of the institutions those bodies exist to enrich and represent.[4]


## II.   DEFENDANTS INFILTRATE AND EXPLOIT THE AMERICAN STUDIES ASSOCIATION.

### A.   Defendants Covertly Pack the American Studies Association National Council with USACBI Leaders and Supporters.

47.   The American Studies Association Leadership is elected by American Studies Association members, who are afforded the opportunity to vote for one of two candidates for each position. All of the candidates put before the members as possible choices are selected by the American Studies Association Nominating Committee. Each year, the Nominating Committee selects two persons to run for President of the American Studies Association and two persons to run for each open seat on the National Council.[5] The Nominating Committee also selects two persons for each of two open seats on Nominating Committee.

48.   Pursuant to the American Studies Association Constitution, "Nominees shall be *representative of the diversity of the association's membership*." (American Studies Association Const., Article VI, sec. 2, *emphasis added*.)

---

[4] Salaita, S., Anti-BDS activism and the appeal to authority, published March 1, 2014 (three months after the adoption of the American Studies Association Resolution), available at http://auphr.org/.  The next year, the University of Illinois withdrew a job offer to Salaita, after Salaita tweeted a large number of comments that many considered anti-Semitic, including, "if Netanyahu appeared on TV with a necklace made from the teeth of Palestinian children, would anybody be surprised?" and "Zionists: transforming "antisemitism" from something horrible into something honorable since 1948."  Robert Mackey, "Professor's Angry Tweets Lose Him a Job," *The New York Times* (Sept. 12, 2014), https://www.nytimes.com/2014/09/13/world/middleeast/professors-angry-tweets-on-gaza-cost-him-a-job.html.

[5] There is a provision for American Studies Association members to nominate a candidate who was not nominated by the Nominating Committee.  However, this path requires a petition with 25 signatures, advanced at least four weeks before the nominating committee makes its own nominations.  There is no option to nominate alternative candidates after learning who the two nominees selected by the Nominating Committee are.  (American Studies Association Const., art. VI, § 4.)

49.     Each seat on the American Studies Association National Council and Nominating Committee is allocated for a three-year term. The American Studies Association President also serves a three-year term on the National Council – one year as President-Elect, one year as President, and then one additional year.

50.     The American Studies Association Executive Committee is composed of the President, the President-Elect, and the most recent former president. Three members of the National Council are also selected to serve on the Executive Committee each year, such that the Executive Committee has six members.

51.     The President is responsible for ensuring that the "chartered obligations and purposes of the Association" are fulfilled. (Article IV, sec. 2.) The National Council is responsible for "conduct[ing] the business, set[ting] fiscal policy, and oversee[ing] the general interests of the association." (Article V, sec. 2.)

52.     Before June 2012, no members of USACBI Leadership were on the American Studies Association Executive Committee or National Council (collectively, "American Studies Association Leadership"), and no members of USACBI Leadership had ever been nominated for American Studies Association President. In fact, none of the 800 USACBI Endorsers had been nominated for American Studies Association President, and only a small handful had ever served on the National Council.[6]

53.     Starting with the 2012 election, and continuing for four consecutive years, every candidate the Nominating Committee selected to run for American Studies Association President was a USACBI Endorser and a vocal and active member of the boycott movement. This was in sharp contrast to prior years, because not a single USACBI Endorser had been nominated for American Studies Association President before 2012, at least going back to June 2007.

54.     Beginning in 2012, voting members of the American Studies Association had no option but to vote for a USACBI Endorser for American Studies Association President, although

---

[6] These allegations are based on data beginning with the 2007-08 fiscal year.

the voting members could not know that their votes were facilitating a USACBI Boycott, because the candidates consciously chose not to reveal their intentions to promote the boycott. For example, when he was nominated and ran for American Studies Association President in 2012, Defendant Marez, the American Studies Association President who ushered in the Boycott Resolution in 2013, failed to disclose his intention to sponsor the proposed boycott and to collaborate with USACBI. His candidate statement did not mention Israel, or any academic boycotts; instead, he premised his candidacy on addressing issues related to the cost of education, student debt, and a "crisis" in academic publishing, proposing that under his leadership, American Studies Association would focus on "making knowledge less privatized and more equally distributed."

55.     Similarly, Defendant Duggan, who ran for President in the spring of 2013, and as President-Elect ushered in the Boycott Resolution with Defendant Marez, also did not mention Israel or any academic boycott in her candidate statement. Instead, her statement focused (ironically) on *increasing* collaboration among scholars, promoting new forms of "knowledge production and circulation," the increasing cost of higher education, and changes in higher education employment, such as the replacement of tenure-track positions with contract teaching positions.

56.     Notwithstanding the failure of both Marez and Duggan to even mention Israel or a boycott (and despite the fact that the American Studies Association is an organization whose purpose is to study American culture), both dedicated the great majority of their efforts as American Studies Association President (and President-Elect) to the adoption of the USACBI Boycott, and to responding to the backlash against the American Studies Association. In their work as ASA Presidents, they would never emphasize the issues of "privatization of knowledge," the cost of higher education, student debt, or changes in academic employment.

57.     In addition to nominating only BDS activists for American Studies Association President, the Nominating Committee packed the Executive Committee and National Council with candidates who were "a sure thing" with respect to adopting a USACBI Boycott.

58.     The takeover of American Studies Association Leadership by USACBI activists was manipulated by Defendant Jasbir Puar, a member of the USACBI Advisory Board who also served on the American Studies Association Nominating Committee from June of 2010 through June of 2013. Puar is an assistant professor of Women's Studies at Rutgers University, where she specializes in queer theory. She has no background in Middle Eastern studies, has conducted no original research in international relations or the Middle East conflict, and does not speak Arabic or Hebrew. She is nevertheless infamous for anti-Semitic lectures condemning Israel, which she charges with maiming Palestinians, "pinkwashing," murdering innocent Palestinian children, and using the bodies of the dead and maimed Palestinians for scientific research, in the vein of Dr. Mengele and blood libels directed against Jews since at least the Middle Ages.

59.     Mark Yudof, the former President of the University of California, wrote about one of Puar's talks at Vassar College in the Wall Street Journal:

> Ms. Puar began by exhorting the students to support a boycott of Israel as part of "armed" resistance. As reported by several in attendance at the speech—the professor introducing her requested that it not be recorded—Ms. Puar passed on vicious lies that Israel had "mined for organs for scientific research" from dead Palestinians—updating the medieval blood libel against Jews—and accused Israelis of attempting to give Palestinians the "bare minimum for survival" as part of a medical "experiment."
> When asked, she agreed with a questioner that Israeli treatment of Palestinians amounted to genocide but objected to the term itself, which she said was too "tethered to the Holocaust." . . .
> Wild charges against Israel have often been aired on U.S. campuses over the past several years, and their moral perversity pointed out. But Ms. Puar's calumnies reached a new low. She spoke of Jews deliberately starving Palestinians, "stunting" and "maiming" a population. The false accusation that a people, some of whose members were experimented on at Auschwitz, are today experimenting on others is a disgrace.

Yudof, G. & Waltzer, K. "Majoring in Anti-Semitism at Vassar." *The Wall Street Journal* 17 Feb. 2016 (https://www.wsj.com/articles/majoring-in-anti-semitism-at-vassar-1455751940).

60.     During her term on the American Studies Association Nominating Committee, Puar was dedicated to promoting the USACBI agenda by packing the American Studies Association Leadership with USACBI Leadership, endorsers, and other BDS advocates. Her plan to pack the American Studies Association National Council with USACBI Leadership is explicit in emails between her and other USACBI Leaders. (*See, e.g.*, mail from Maira, "Jasbir is nominating me and Alex Lubin for the Council and she suggests populating it with as many supporters as possible" (SM3736 at 2); email from Puar, "I think we should prepare for the longer term struggle by populating elected positions with as [many] supporters as possible" (SM3730); email from Alex Lubin, "In my conversations with Jasbir it's clear that the intent of her nominations was to bring more people who do work in, and are politically committed to . . . the question of Palestine . . . we were nominated in order to build momentum for BDS even though the question of BDS in American Studies Association may or may not emerge while we're on the council." (SM4308.)

61.     When Puar ran for her position on the Nominating Committee in 2010, she chose not to disclose her true agenda: to place as many members of the USACBI Leadership in the American Studies Association National Council as possible. Nor did Puar disclose that she would only nominate USACBI Endorsers for American Studies Association President. Like Marez and Duggan, Puar's candidate statement did not mention Israel or any academic boycott. It did not mention that her primary consideration in nominating candidates would be their position on the USACBI Boycott, rather than their qualifications to lead the American Studies Association. Members of the American Studies Association who voted for her could not have known that the outcome of that election would be to stack the American Studies Association Leadership with USACBI Leaders and Endorsers, and ultimately, the American Studies Association's adoption of the USACBI Boycott.

62.     Prior to the election in March of 2013, and after Puar had completed two years of her three-year term on the Nominating Committee, six of the ten continuing voting members of

the National Council were USACBI Endorsers. In her last year on the Nominating Committee, Puar plans to nominate as many USACBI Leaders as possible.

63.     When the slate of candidates for the five open positions on the 2013 National Council is released by the Nominating Committee, it includes two members of USACBI Leadership, Defendants Kauanui and Maira, along with Alex Lubin, of the American University in Beirut, a very active participant of USACBI, and two other USACBI Endorsers. Both candidates for American Studies Association President were also USACBI Endorsers, such that seven of the twelve nominees (58%) were USACBI Leaders or Endorsers.

64.     The candidates nominated for the 2013 election clearly did not reflect the diversity of the American Studies Association membership, which was not majority USACBI Endorsers. (Indeed, there were only approximately 800 USACI Endorsers at the time, and approximately 4,000 American Studies Association members, and the great majority of USACBI Endorsers are not American Studies Association members.)

65.     The selection of the 2013 candidates violated the American Studies Association Constitution, which mandates that "Nominees shall be ***representative of the diversity of the association's membership***." (American Studies Association Const., Article VI, sec. 2, *emphasis added*.) The failure to nominate candidates that reflect the diversity of the association's membership was thus an *ultra vires* act, in direction violation of the American Studies Association bylaws.

66.     Defendants Maira and Kauanui failed to disclose their true reasons for running for the National Council in their candidate statements. Maira's statement does not mention USACBI at all, nor does it mention an Israel or any academic boycott.[7] In the section describing her plans

---

[7] Maira's statement does note, briefly, that she is the co-chair of the Academic and Community Activism Caucus, which "***organized*** a resolution on the war in Iraq and ***discussions of boycott and divestment*** opposing the U.S.-backed occupation and violations of human rights and academic freedom in Palestine." Emphasis added. On information and belief, Maira was not involved in the resolution on the war in Iraq, which was adopted before she became involved with the Caucus in late 2012.

if she is elected, Maira states, "I would like to participate in national conversations about how to actively support the mission of the public university and the work of student and faculty activists challenging privatization and debt, as well as about the role and responsibilities of the U.S. university in relation to questions of incarceration, surveillance, war, occupation, and neoliberalism. I am also interested in mentorship of graduate students and junior faculty[.]"

67.    Similarly, Defendant Kauanui's campaign statement also does not mention Israel or any academic boycott, except to acknowledge that she is on the Advisory Committee of USACBI. She states that if elected, she would "work to build connections between the American Studies Association and NAISA [the Native American and Indigenous Studies Association]" and "would also place a high priority on being responsive to new intellectual currents and emerging fields of social and cultural inquiry, all while being attuned to the present contradictory moment of intellectual vitality and institutional crisis."

68.    No voting member of the American Studies Association could know, from reading their candidate statements, that the Maira and Kauanui only decided to run for National Council after the communication from Puar recommending that they pack the National Council with USACBI Leaders. Nor could they have known that Maira and Kauanui were part of a small group of USACBI Leaders who had already identified American Studies Association as a target for USACBI.

69.    The vague references in Maira and Kauanui's candidate statements were not only intentional, but carefully planned by the cabal of USACBI Leaders, who discussed, over email, exactly what they should and should not mention about their plans to adopt the USACBI Boycott if elected to the National Council. In one email exchange between Alex Lubin, Defendants Maira and Kauanui, and other USACBI Organizing Committee members, Lubin wrote:

> I would welcome an expanded discussion of whether those of us nominated for the council should mention in our nomination statement our support for BDS. . . . I wonder if it is strategic to be self-identified as a BDS candidate, or whether we should merely mention our support for human rights, academic freedom for everyone, and international law.

Defendant Maira responded:

> I've been thinking this over and like Alex, I'm a bit unsure –
> personally, I feel it might be more strategic not to present ourselves as a
> pro-boycott slate. We need to get on the Council and I think our larger
> goal is support for the resolution, not to test support at this early stage
> from "outside" the NC.

David Lloyd then replied:

> I would definitely suggest not specifying BDS, but emphasizing
> support for academic freedom, etc. . . .

Nikhil Singh, who was already on the National Council, disagreed:

> [W]e all know that 'academic freedom' is not good enough.

> My real question: what do we hope to gain from election of pro-BDS
> members to the American Studies Association national council if we
> have not made any of the stakes of their election clear to the
> membership? . . .

> I think that not revealing something this important and intentional and
> then hoping later to use the American Studies Association national
> council as a vehicle to advance our cause will not work and may well
> backfire, because it will lack legitimacy.

(SM4308.) Ultimately, of the three nominees in the discussion, only Alex Lubin actually

mentioned BDS in his candidate statement. He wrote: "As a council member I will support the

American Studies Association's domestic and international political commitments, including its

support of unionized hotels, its resolution on the Iraq war, its statement on the occupy

movement, ***and a pending resolution on the academic and cultural boycott of Israel***." He lost

the election. Neither Maira nor Kauanui mentioned the possibility of an American Studies

Association resolution boycotting Israel. They both won. A nominee's commitment to the

boycott of Israel and its academic and cultural institutions was a fact that was, and was believed

by ASA members to be, material.

      70.    The three National Council members selected to sit on the Executive Committee

in 2013 were Karen Leong, Nikhil Pal Singh, and Defendant Chandan Reddy. Their nominations

to the National Council (in 2011 for Singh, and in 2012 for Leong and Reddy) and then to the

Executive Committee (in 2013) were indeed "a sure thing," as they were already working with

USACBI Leaders Puar, Kauanui, Maira, Schueller and Tadiar to pass a USACBI Boycott

resolution at the Association for Asian American Studies. Leong and Singh had presented the

proposed resolution to the Association for Asian American Studies membership, and were listed

by name on the document circulated at the conference asking Association for Asian American

Studies members to vote. Reddy was listed on the same document, as one of the "Asian

American and Pacific Islander Studies scholars who have endorsed/and or are involved in the US

Campaign for the Academic and Cultural Boycott of Israel (USACBI)," along with Puar,

Kauanui, Maira, and Tadiar. (Association for Asian American Studies, Annual Conference April

2013, "Resolution Proposed: Support Boycott of Israeli Academic Institutions.")

71.     Also on the National Council were Defendants Marez, Duggan, and Gordon. By

the end of her three-year term on the Nominating Committee, Puar (along with two other

USACBI Endorsers on the Nominating Committee) had turned the American Studies

Association National Council from a body primarily comprised of American Studies professors

and scholars, and otherwise diverse members (in terms of gender, ethnicity, national origin,

religion, LGBTQ identification, and region, as well as personal interests and viewpoint), to one

overwhelmingly comprised of individuals with a singular focus on adopting the USACBI

Boycott.

72.     By concealing their political agenda when standing for election, Defendants Puar,

Kauanui, Maira, Marez, and Duggan failed to disclose a fact that they knew to be material to

ASA members.  Defendants Puar, Kauanui, Maira, Marez, and Duggan thereby breached their

fiduciary duty of candor owed to American Studies Association members. Furthermore, by

manipulating the nominating process, and by covertly packing the American Studies Association

Leadership with USACBI Leaders and Endorsers, the Individual Defendants breached their duty

of loyalty and caused American Studies Association to engage in an *ultra vires* action by

violating the American Studies Association Constitution, which requires that the nominees

presented by the nominating committee "shall be representative of the diversity of the association's membership" (Article VI, sec. 2).

73.     It is the responsibility of the American Studies Association President to ensure that the "chartered obligations and purposes of the Association" are fulfilled (Article IV, sec. 2), and it is the responsibility of the National Council to conduct the business and "oversee the general interests of the association." The President, Executive Council, and National Council breached their fiduciary duties of candor and loyalty by obscuring their illicit political agenda when seeking elective office at the American Studies Association, and thereafter by subordinating the Association's obligations and purposes to their own personal political interests.

74.     The stacking of the American Studies Association Leadership was intentional, and the National Council was aware of it. A confidential memo to the National Council from Karen Leong describes a meeting in 2012 where participants discussed the fact that they were "working to elect council members who support BDS."  (ASA 328.)

75.     By failing to ensure that the National Council fairly represented the diversity of the membership – in interests and point of view, as well as other characteristics – and by failing to fully disclose their political agenda when seeking elective office, the Individual Defendants placed their personal interest in the success of USACBI through the adoption of the USACBI Boycott at the American Studies Association over the interests of the American Studies Association and its members. In doing so, they breached their fiduciary duties to the voting membership.

76.     Packing the American Studies Association Leadership by failing to disclose to American Studies Association members material facts about its anti-Israel boycott agenda provided USACBI a vehicle to reach thousands of academics who would otherwise not be exposed to or interested in USACBI's cause. And, once in power at American Studies Association, the USACBI leaders were able to divert American Studies Association assets and to exploit the American Studies Association infrastructure (including access to the membership rolls, fundraising tools, the American Studies Association website and blogs, communications

26

from the Executive Officers and National Council to the membership, an annual meeting to spread their message), to support a movement for a boycott resolution in a large ostensibly neutral professional academic association.

77.     Moreover, prior to the annual meeting at November 2013, when the National Council would consider the proposed resolution to adopt the Boycott ("the Resolution"), it was assumed that the National Council itself – a council heavily packed with USACBI leadership and supporters achieved illicitly by withholding material facts regarding the USACBI's anti-Israel agenda – could and would adopt the Resolution without a membership vote. The American Studies Association had never held a vote on a resolution before, and the USACBI Leadership that packed the National Council expected that the Resolution would be adopted regardless of the views of the majority of the American Studies Association membership. Thus, in the minds of the Individual Defendants at the time, packing the National Council was all that was needed to ensure that the American Studies Association would adopt the USACBI Boycott.

## B.     **Defendants Exploit American Studies Association Resources to Advance the USACBI Platform.**

### 1.     The Academic and Community Activism Caucus and the 2012 Annual Meeting

78.     The Academic and Community Activism Caucus ("Activism Caucus") is an American Studies Association-sponsored caucus of American Studies Association members intended "to provide a network and resource exchange for scholars within American Studies Association interested in issues of academic activism and social justice specific to American Studies." (www.theasa.net/caucus_activism/.) "Issues to be taken up by the caucus include forms of academic activism within and without the University' work conditions and means of supporting full-time and part-time instructors in American Studies."

79.     At some point in late 2012, Defendants Sunaina Maira and Malini Johar Schueller, both members of the USACBI Organizing Collective, became co-leaders of the

Activism Caucus. The two co-leaders dedicated the Activism Caucus entirely to the adoption of the USACBI Boycott by the American Studies Association.

80.     At the same time, Maira and Schueller were both involved in a similar coordinated attempt to adopt the USACBI Boycott at the Association for Asian American Studies. In fact, Schueller is one of a small group of BDS activists who proposed the Association for Asian American Studies resolution, along with Karen Leong and Nikhil Pal Singh. The Association for Asian American Studies resolution proposal names Defendant Maira, along with Defendants Kauanui, Puar, Reddy, and Tadiar as Asian American and/or Pacific Islander Studies scholars involved in USACBI.

81.     The movements for an academic boycott of Israel at the Association for Asian American Studies and American Studies Association were conceived, planned, and executed by USACBI Leadership. (After the American Studies Association's adoption of the Boycott Resolution at issue in this case, similar attempts to bring the USACBI Boycott to the American Anthropology Association and the Modern Language Association were also conducted by USACBI, but they would fail.)

82.     Despite an urgent need for American Studies Association involvement in employment-related issues, including the closing of American Studies departments, the overuse of adjunct, part-time, and temporary instructors at the sacrifice of tenure-track positions with benefits, decreasing financial support for American Studies at universities across the country, as well as other issues related to the profession, including diversity in employment, curriculum, new research areas, and published works, the Activism Caucus run by USACBI Leaders Maira and Schueller, did not address these issues at all.  Instead, for the relevant time period, defendants subverted the mission of American Studies Association to advance their political objective of adopting the USACBI Boycott.

83.     The Activism Caucus has its own webpage on the American Studies Association website – a platform to reach the American Studies Association's 3,500 members. From the beginning of the webpage's use in late 2012, this valuable vehicle for communication with

American Studies Association members was used for only one purpose: to promote the adoption of the Boycott Resolution. The webpage failed to reflect or discuss numerous topics related to American Studies that were of particular concern to American Studies scholars, regardless of the interests and concerns of dues-paying American Studies Association members.

84.     The Activism Caucus's efforts to adopt the USACBI Boycott began at the 2012 Annual Meeting in Puerto Rico. At that meeting, Bill Mullen – a member of both the Advisory Board and the Organizing Collective of USACBI – manned a table directly next to the registration table, at the entrance to the venue. Mullen asked American Studies Association members and guests entering the Annual Meeting to sign a petition endorsing the Resolution. His table, like the registration table next to it, bore the imprimatur of the American Studies Association, making it appear as if the document on offer for signature at this table were endorsed by the American Studies Association. No other petitions, sign-up sheets, or literature were displayed at the entrance, where entrants had to stop to register.

85.     In spite of the prime and suggestive location, fewer than 150 attendees signed the petition, even though the great majority of attendees at the Puerto Rico conference stopped right next to Mullen's table, at the registration table. The reason for the failure of the petition is clear: there was no grassroots support within the membership of the American Studies Association for the USACBI Boycott. There never had been.

86.     At this time, the Individual Defendants were not concerned, and did not believe they actually needed to be concerned, with the views of real, grassroots membership of the American Studies Association. They believed they only needed to control the National Council to achieve their goal. Once such control was achieved, USACBI and the BDS movement would benefit from all of the free publicity disseminated by the American Studies Association National Council in the course of the next year.

87.     At the 2012 National Council meeting, held during the Annual Meeting, the National Council addressed the topic of a resolution and the circulating petition. Defendant Marez, who was President-Elect at the time, announced that he planned to organize "a major

plenary session, entitled 'Town Hall: The United States and Israel/Palestine' at the 2013 Annual

Meeting. The current President of the American Studies Association, Matthew Frye Jacobson,

noted that "various caucuses have also drafted statements or resolutions . . . on Palestine and

Puerto Rico to be at vetted at caucus meetings" during the 2012 Annual Meeting. President

Jacobson advised that the Activism Caucus is not authorized to speak on behalf of the American

Studies Association, but may issue a statement as an American Studies Association caucus.

However, the President stated,

> In terms of a statement, anything that the executive committee or
> council issues on behalf of the organization and the membership needs
> to conform to the by-laws that we have circulated a few times to
> councilors – that is the statement should be focused strongly around
> issues of our educational mission and questions of academic freedom.

(American Studies Association, Minutes for National Council Meeting, San Juan, Puerto Rico,

November 15, 2012.)

88.     The Activism Caucus would never present a statement that was "focused strongly

around issues of our educational mission and questions of academic freedom." *Id.*  They knew

that on July 1, 2013, Defendant Marez would take over as President, and the Executive

Committee would consist of Defendants Marez, Duggan, and Reddy, along with Nikhil Pal

Singh and Karen Leong. President Matthew Frye Jacobson would no longer be president, and

would be serving his last year on the Executive Committee. He would also be the only member

of the Executive Committee who was not a BDS activist, and the only member who was not a

USACBI Endorser.

89.     The Executive Committee again refused to adopt a resolution in support of the

USACBI Boycott at its next meeting, in May of 2013.  Defendants were informed that the

National Council would discuss the matter at the 2013 Annual Meeting. By that time, the

composition of the National Council would be packed with USACBI Leaders and Endorsers.

90.     Defendants Kauanui and Maira were elected to the National Council (after

nomination by the Nominating Council) in the spring of 2013. When they began their terms in

June, the National Council would include 9 USACBI Endorsers, including two members of the

USACBI Organizing Committee and four members who had just led the effort to adopt the

USACBI Boycott at the Association for Asian American Studies. The National Council would be

led by President Marez and President-Elect Duggan, both of whom were advocating for and

actively promoting the adoption of the USACBI Boycott.

###### 2.      The 2013 Annual Meeting, "Roundtable," and "Open Meeting"

91.     The 2013 American Studies Association Annual Meeting provided a forum for

Defendants to misdirect expenditure of American Studies Association assets to publicize and

promote USACBI's political mission to thousands of academics, without USACBI incurring any

expenses of its own. The National Council's statement on the resolution described the effort, at

least in part:

> In March of 2013, the Program Committee for the 2013 American
> Studies Association convention met and discussed ways to create
> opportunities at the meeting to discuss issues related to calls for
> boycott. The resulting program included 8 sessions on Middle East
> American Studies, with four focused specifically on United
> States/Israel/Palestine. At the same time the Ethnic Studies Committee
> organized two panels about settler colonialism that discussed the
> asserted Israeli occupation of Palestine, while the Activism Caucus
> organized a panel called 'Boycott as a Non-Violent Strategy of
> Collective Dissent.'"

(ASA 308.)  The line-up included two featured, prime-time sessions on both Friday and

Saturday: "Palestine in Crisis" and "Academic Freedom and the Right to Education: The

Question of Palestine." Well-known speakers in support of the Boycott were invited to speak at

the sessions; meanwhile, no speakers were invited to present the alternative view. On

information and belief, significant resources were expended to promote BDS and USACBI at the

2013 Conference; meanwhile, no resources were invested in presenting the opposing viewpoint.

92.     To ensure adoption of the USACBI Boycott, Defendants sought to bring

Palestinian advocates from the Middle East – and to cover their expenses from the American

Studies Association till. Defendant Marez, who would be American Studies Association President during the 2013 Annual Meeting, had no concerns about spending American Studies Association funds to fly speakers in from the Middle East to promote the USACBI Boycott. "We should provide them with a waiver of registration and travel stipend. Is it possible to use some of the complimentary rooms the American Studies Association gets to provide them with rooms as well? *I know we will probably get criticized for not offering an equal invitation to other scholars to provide a balanced viewpoint . . ."* (LD303.)  The Individual Defendants purposely selected as speakers Palestinians who lived in areas where Israel employs security procedures for travel, choosing such people instead of Arab Palestinian advocates who lived and worked in Israel or had moved to the United States, based only on this criterion – as opposed to their credentials to speak on the topics of the panels, or the question of academic freedom. Karen Leong wrote back to Marez and the others:

> one point of doing this was to make sure we invited scholars living and working in Palestine who would need permission from Israel to travel . . . . I think only Lisa Taraki fits that bill. Ahmad Sa'di lives and works in Israel and has given a number of talks in the US it appears. And Munir Akash seems to now be a U.S. based scholar. Do we need to invite someone else who's currently working and living in Palestine, in addition to Lisa? Do we have the funds to invite more than one scholar based in Palestine? But if the goal now is primarily to have a panel with Palestinian perspectives on the occupation and BDS then I think this line up is great. Also, maybe Sa'di and Akash have spoken of their difficulties and denial from entering and exiting Palestine. Then we could cite that as a clear curtailment of Palestinian and U.S.-based scholars' academic freedom: a clear reason for the American Studies Association to propose a resolution (of some sort).

Lisa Taraki is an associate professor of sociology at Birzeit University in the West Bank, and a founder of both PACBI and USACBI. She is not a scholar in American Studies and is not a member of the American Studies Association. Defendant Reddy wrote:

> I'm not sure about putting this all on email, . . . We did have a strategic purpose in inviting these scholars. . . . The strategy as discussed at EC was that any interference with the scholar's travel would give American Studies Association a reason to address academic freedom issues. So I

> guess whatever does occur may be a point of discussion at the special
> meeting. It is true that the invitation for these scholars to speak could
> be seen as "stacking the deck" by the EC.

(LD 310.) In other words, the American Studies Association Executive Committee for FY 2013

– or at least these members of it – were planning to dip into American Studies Association funds

to pay for Palestinians to come to the 2013 Annual Meeting, not for their research or scholarly

contributions, not to speak about their work, but because they might be detained in travel and this

"fact" could be used as an "example" to present to the National Council.

93.     On information and belief, speakers and guests at the American Studies

Association Annual Meetings do not have their travel expenses paid and do not receive a travel

stipend. If American Studies Association did pay Lisa Taraki or any Palestinian to come to the

2013 Annual Meeting, with the goal that the person or person(s) would have some difficulty in

travel and thus serve as a "case in point" for the Individual Defendants to exploit in debate, it

would be the only time the American Studies Association ever did so.

94.     Defendant Marez could not have been any more blunt about his intention to

"stack the deck" at the 2013 Annual Meeting:

> ***Ultimately, I don't think any scruples about appearing to stack the
> deck should stop us from inviting Palestinian scholars.*** The best way
> to address people feeling that there is too much attention to this matter
> is to recall this year's program was partly organized to provide
> information on the Israel-Palestine conflict, and to create places for the
> necessary discussion of the issue. . . .
> Which is to say it would be hard to devote too much attention to the
> nexus of issues condensed by the topic of the US/Israel/Palestine.
> I think it makes sense to invite Taraki to join the town hall. It might
> also make sense for her to join the "boycott" panel if there is room. But
> before contacting her I wanted to know about resources we can devote
> to bringing her to the convention. It's easy enough to waive
> membership and registration. John, in general I know the American
> Studies Association does not have funds it devotes to travel expenses
> for invited guests but in this case I'm hoping we can do something.
> Would it be possible to devote funds from the conference budget or
> other pots of [money] to this?

(LD313.)

95.     Regardless of these efforts, the broad, general membership of the American

Studies Association still did not support the USACBI Boycott. Although the Activism Caucus

had been pushing the petition for a full year, ever since Bill Mullen manned his table at the 2012

Annual Meeting, only 400 to 450 members had signed – about 10% of the membership of

approximately 4000.  (CM585, email dated December 3, 2013, "between 400 and 450 American

Studies Association members signed either a hardcopy of the resolution, or the change.org

petition.")

96.     At the 2013 Annual Meeting, Defendants claimed that 800 of the American

Studies Association's 4000 members had signed the petition.  Even if this were true, it would

only constitute about 20% of the membership, which would not be a very impressive share after

a full year attempting to gather signatures.  But, in fact, the number was only half that.

97.     As far as we have seen in the documents produced in this litigation, Defendants

never informed the membership that they had given them inaccurate information, and that

support for the Resolution was only half what they had claimed.

98.     For example, at the open meeting on November 23, 2013, David Lloyd, a member

of the USACBI Organizing Collective, stood up to endorse the boycott and attempted to explain

away the fact that only 800 members of the American Studies Association had signed. Meeting

notes produced by American Studies Association summarize his statement to the room as

follows:

> [The proposed resolution] has circulated within the association since
> last year, and publicly. The petition for the resolution has 800
> signatures. We are very aware of a large number of those afraid to sign
> in favor of the boycott because of the pattern of violence against those
> who speak out against Israel.

(ASA 0005.)  In fact, however, there was neither violence nor threats of violence directed in

response to any person's decision to sign the petition. Interested members had a whole year to

sign the petition, and could do so online, in the privacy of their homes. David Lloyd did not (and

could not) justify his reference to "the pattern of violence against those who speak out against

Israel," but his comment reveals his awareness of the small number of signatures obtained after a full year circulating the petition, and the lengths that USACBI Leadership was willing to go to justify imposing the Boycott on an academic association that simply did not support it. And, again, his claim that 800 ASA members had signed the petition was false, potentially inflated by 200%.

99.     During the planning for, and throughout the 2013 Annual Meeting, certain Individual Defendants continued to collaborate with USACBI Leadership and continued to keep secret their collaboration with USACBI. A subset of the Organizing Collective was involved in "organizing" the movement to adopt the USACBI Platform and Boycott at the American Studies Association, even though these people were not members of the American Studies Association, through communications with Defendants Kauanui, Maira, Mullen, and Tadiar, *inter alia*. The involvement of USACBI Leadership is revealed in numerous emails produced in this litigation between Defendants Maira, Kauanui, Mullen, and Schueller with a listserv for unidentified leaders of USACBI (uscom4acbi@lists.riseup.net) and these additional USACBI Leaders: Magid Shihade (Founding Member), Cynthia Franklin (Organizing Collective), Jordana Rosenberg (Advisory Committee), Stephen Salaita (Organizing Collective), and Sasha Gelzin (Organizing Collective), Lisa Taraki (Advisory Committee), David Lloyd (Organizing Collective), Lena Ibrahim (Organizing Collective). Other correspondence included Omar Barghouti – the "founder" of BDS and PACBI.   (*See*, *e.g.*, SM 7955, Email from S. Maira to Omar Barghouti, "I just wanted to send a quick update and request, if you have time, related to the ASA academic boycott campaign. . . . If you have a few minutes, would you mind reviewing the attached FAQ's sheet quickly? Just in case you catch anything that is inaccurate that we may have missed," and O. Barghouti's response, "Great! We shall discuss this among PACBI colleagues and get back to you ASAP. A quick reading of the first part showed at least one factual sentence that needs editing to be as accurate as possible"; *see also* SM 8306, email exchange between S. Maira, S. Gelzin, D. Lloyd, J. Rosenberg, "We are making an FAQ sheet for the upcoming ASA conference, at which we will be trying to pass a boycott resolution. I'm still waiting on final edits

35

from Lisa Taraki and  Omar Barghouti," and  "The text is still being edited by Omar Barghouti and PACBI but I could send you the draft.")

100.    In one of these emails, USACBI Organizing Committee member Jordana Rosenberg explicitly acknowledged that the American Studies Association "open meeting," and indeed the entire movement within the American Studies Association for the boycott of Israel, were a USACBI Organizing Collective production:

> [Defendant] Jasbir [Puar] has let me know she received a complainy email from Rachel Buff (prof at U-Wisc-Milwaukee) about a) Jasbir's comments at the town hall and b) the way the procedure of the resolution has come about. . . . she has complained to Jasbir among other things about the non-transparency of procedure . . . and also Jasbir's remarks about Jews. As Jasbir is not actually a member of the organizing collective (and perhaps not a member of the activism caucus) I do not believe she should have to field this rant, so I'm happy to do so.

(NT 673.) Rosenberg then continued: "by the way – by remarks about Jews, I'm of course joking but this person is upset about Jasbir having joked in an off the cuff manner during the Town Hall and she seems to be worked up about it." (NT673.)  As this exchange makes clear, the USACBI played the central role in advancing the American Studies Association Boycott: these emails reveal USACBI's Organizing Collective directing how American Studies Association officials should handle concerns raised by American Studies Association members in an American Studies Association meeting.

101.    These emails, *inter alia*, also show that Individual Defendants sacrificed their loyalty to the American Studies Association – of which they were officers, and to which these Individual Defendants bore fiduciary duties – to the interests of the USACBI. The fiduciary duties of the Individual Defendants to the membership of the American Studies Association required that the Individual Defendants put the interests of the American Studies Association and its members first when engaged in American Studies Association activities. Instead, the Individual Defendants breached their duty of loyalty by covertly using their official positions within American Studies Association to advance the agenda of the USACBI: forcing a

36

Resolution that was detrimental to the American Studies Association.  In addition, as discussed below, the Individual Defendants refused to present opposing viewpoints of American Studies Association members and factors that would weigh against the Resolution in the minds of many. They therefore also breached their fiduciary duty of candor.

### C.    Silencing Dissent and Withholding Information Pertinent to the Vote from Membership

102.    The American Studies Association National Council was to consider the Resolution on November 25, 2013. Although nine out of fifteen members of the National Council were USACBI Endorsers, and despite the experience of National Council members Leong, Reddy, Maira, and Kauanui at the Association for Asian American Studies, and the efforts and support of American Studies Association President Marez and President-Elect Duggan, apparently not everyone on National Council was in agreement.

103.    Although the plan had been for the National Council to adopt the Resolution at the November 25, 2013 meeting, the National Council was unable to agree to adopt the Boycott Resolution without putting the issue to a vote of the membership.  Apparently a compromise was reached, where the National Council announced that the council members endorsed the Resolution, but that the membership would vote to endorse it as well.

104.    Defendants Maira and Kauanui were not at all pleased that the members of the American Studies Association would be able vote on the Boycott Resolution, as Defendant Kauanui wrote to Omar Barghouti as she updated him on the outcome:

> Unanimous vote by the council to endorse the resolution (revised) but to also put a members vote asking them to endorse.  That last part was very difficult for me and Sunaina to stomach- but it was the only way.

(SM 9606, *see also* SM 9649, "Suffice it to say that it was not easy".)

105.    From this point on, the Individual Defendants used their positions of power and authority as ASA officers to ensure that the voices of dissent were silenced and that information pertinent to the members' decision on the vote (including information regarding the effect of a

boycott on the American Studies Association) was withheld unless it favored the resolution. Meanwhile, USACBI Leaders formed a google group with name "ASA-boycott-coordination." The group of USACBI Leaders would focus on winning the Boycott Resolution vote.  The group was not based out of the American Studies Association or formed for the association's members. It was a USACBI team, entirely compromised of members of the USACBI Organizing Committee (or Founding Members, the case of Omar Barghouti), where Defendants Maira and Kauanui – members of the American Studies Association National Council, with the associated fiduciary responsibilities, worked with USACBI Leaders, outside of the American Studies Association, to influence the American Studies Association vote.  (*See* SM 12446, listing the members of the ASA-boycott-coordination google group, and emails between the members.)

106.     The group would plan, together, the most effective ways to influence American Studies Association members.  (*See, e.g.*, SM9960, "I think all those articles USACBI is keeping track of should be posted on the ASA FB page, no?"; "morgan cooper swung into action . . . and has contacted the various groups, lists, individuals she contacted working w/Sunaina for the AAAS [Association of Asian American Scholars] resolution, asking them to write individually and collectively to support the [American Studies Association] resolution.")

### 1.     Removal of Plaintiff Bronner from the 2013 National Council Meeting

107.     As editor of the Encyclopedia of American Studies, Plaintiff Bronner was an *ex officio* member of the National Council. (American Studies Association Const. Art. IV, sec. 1(g).) Plaintiff Bronner attended the November 25, 2013 National Council meeting, just as he had attended the Executive Committee meeting in April 2013, the National Council meeting in November 2012, and each of the annual Executive Committee and National Council meetings during his tenure as he held the position of Editor of the Encyclopedia of American Studies.

108.     President Marez and the other Defendants knew Plaintiff Bronner's position on the Resolution on November 25, because, *inter alia*, Plaintiff Bronner had spoken against the resolution at the Saturday night meeting, just two nights before. The Individual Defendants also

frequently discussed over email the fact that Bronner opposed the Resolution, and that he was communicating his views to other members.  Marez and the other Defendants at the National Council meeting knew that Plaintiff Bronner, a former winner of the American Studies Association's Turpie award, a lifetime member of the American Studies Association, and an active and involved participant in the American Studies academy, was well-respected, and also that his views were representative of the views of a large segment and perhaps a majority of professors in American Studies departments in colleges and universities across the country.

109.    Unwilling to allow any dissent at the National Council meeting from the pro-Boycott position, Defendant Marez, acting as President, Defendants arranged for Plaintiff Bronner – an officer of the American Studies Association and member of the National Council, per the American Studies Association bylaws – to be unceremoniously kicked out of the National Council meeting. As American Studies Association Executive Director John Stephens testified in deposition, this move was unprecedented. The editor of the Encyclopedia of American Studies had never been removed from a meeting, except in the rare instance where the next editor of Encyclopedia was to be selected. (J. Stephens Dep. 101:18-104:22.)

110.    Notably, Plaintiff Bronner was not asked to leave an earlier National Council meeting also involving a resolution, on an unrelated topic. But at that meeting, as Executive Director Stephens testified, "[Bronner] did not object to the resolution." (J. Stephens Dep. 107:18.)

111.    The removal of Plaintiff Bronner from the National Council meeting was an *ultra vires* act, contrary to the bylaws and the long-standing practice of the American Studies Association. It was also an act by the Individual Defendants against the interests of Plaintiff Bronner and other members of the American Studies Association, for the purpose of furthering their personal political interests and those of USACBI, and was thus a breach of their fiduciary duties to Plaintiffs.

2. <u>Defendants hide dissenting viewpoints that would inform the
membership's decision on the vote.</u>

112. Among the fiduciary duties owed by Defendants to the Plaintiffs is the duty of
candor, also known as the duty of disclosure. The duty of candor requires fiduciaries to
"'disclose fully and fairly all material facts within its control that would have a significant effect
upon a stockholder vote.'" *Caruso v. Metex Corp.*, CV 89-0571, 1992 U.S. Dist. LEXIS 14556,
at *48 (E.D.N.Y. July 30, 1992) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)).

113. The Individual Defendants purposefully and intentionally withheld material
information from American Studies Association members, including the fact that the Individual
Defendants expected that if the Boycott Resolution was adopted, the American Studies
Association would be widely attacked throughout the academic world and the press, and that this
would harm the American Studies Association's reputation, its members' relationships with their
universities, and the American Studies Association's size, strength, and finances. The Individual
Defendants also withheld information refuting factual claims about the USACBI/PACBI
platform and academic freedom in the territories.

114. Among other things, Defendants refused to post any information questioning or
condemning the Resolution on the American Studies Association's general website, including
two letters opposing the boycott from academic leaders including former presidents of the ASA.
As John Stephens explained in deposition:

> A. [T]here was a debate about how this should be done, and at the end of
> debate there was a decision made by the council that the president
> would have the final authority as to what would go on or not go on the
> website.
> Q. Okay. So were there any guidelines for the president to follow with
> respect to making those decisions?
> A. From the board? No.

(Stephens Dep. 91:15-23.)

> Q. Do you recall an incident where somebody wanted to have something
> posted on the website and the president said no?
> A. Yes.
> Q. What do you recall?

> A. I recall that Hank Reichman at the American Association of University of professors wanted to post a letter of opposition to the resolution, and the president's response basically was that if the AAUP would allow him to post a letter of opposition on their site to his opposition, then he would consider it, but he denied the request to post.

(*Id.* at 92:2-14.)

> A. There was statements from former presidents of the American Studies Association asking that their opposition to the resolution be prominently displayed as information for the membership at large.
> Q. Who made the decision to refuse that request?
> A. The president.
> Q. Was there a vote with the council?
> A. There was discussion on the council. Either the Council or between the president and the executive committee. I believe that the request came to the president and to me. I forwarded it to the council.
> Q. And[?]
> A. I don't know how the decision was finally arrived at except that the decision was made and the letter describing the rationale was offered by the president[.]

(*Id.* at 94:3-18.)

> Q. Does that mean that you are unable to recall any example of documents that were in favor of the resolution that the president refused to have posted on the website?
> A. The president's argument was that the documents posted on the website were those adopted by the council, and it was the president's vehicle for communicating with his membership.
> Q. [T]he time period that we're discussing here, then, is it after the council had decided to put it to vote . . . but the membership had not yet voted?
> A. Yes.
> Q. And so this is the period when people are getting prepared to vote?
> A. Right.
> . . .
> Q. And at that time, the president refused to put up certain documents that set forth the opinion of people opposed to the resolution?
> A. Yes.

(*Id.* at 95:10-96:8.)

115.    These letters in opposition are just two of the many letters opposing the Boycott Resolution that the American Studies Association received from leaders in academia and American Studies.  The Individual Defendants refused to share any of these letters with the

members, simply and only because the letters expressed a view with which the Individual

Defendants disagreed. Many other such letters were received by the American Studies

Association, expressing a wide range of reasons why the American Studies Association should

not adopt the Resolution, including from some who agreed with the goals of the Resolution, but

felt that the procedure of adoption was flawed, opaque, and unfair; that the Resolution reflected

an anti-Semitic intent in that it punished the academics of Israel while other countries were not

targeted for boycotts, and that the Resolution severely infringed on academic freedom, and

eliminated the potential for productive discourse among academics.

116.    The Defendants received correspondence from still others who warned that the

passage of the Resolution would be destructive to the American Studies Association.  Amongst

themselves, the Individual Defendants acknowledged that the association would be powerfully

and widely attacked, and also that Resolution would be divisive, and cause conflict amongst the

membership. This information was clearly material to American Studies Association members

who were contemplating how to vote on the Resolution. In order to maximize votes for the

Resolution and minimize those against, however, the Defendants withheld it.

> 3.    <u>Defendants form a subcommittee of USACBI Leaders and firmly pro-
> resolution advocates to draft the disclosure materials for the National
> Council, and withhold their knowledge of the expected backlash.</u>

117.    Once the National Council had decided that the full membership would vote on

whether to "endorse" the Resolution, the Individual Defendants endeavored to ensure that the

American Studies Association shared only pro-boycott propaganda with its members, to

minimize members' exposure to opposing viewpoints, and to withhold from the membership the

risks the Resolution posed to the American Studies Association – risks that the Individual

Defendants were well aware of, discussed among themselves, and were preparing to spend

American Studies Association funds to counter.

118.    A subcommittee of the National Council was formed to revise the text of the Resolution and the accompanying documents. The members of the subcommittee were Defendants Kauanui, Maira, and Reddy, later joined by Defendant Avery.

119.    Of course, there were other members of the National Council who were not USACBI Leadership and/or had not just led the same movement for boycott at the Association for Asian American Studies who might have served on the subcommittee. On information and belief, there were members of the National Council who were ambivalent about, or even opposed to, the American Studies Association's adoption of the USACBI Boycott, and others concerned about the process by which the Resolution was to be decided upon, because the process appeared to them one-sided.  Certainly, there were members of the National Council who were less interested in the outcome of the vote than Defendants Avery, Kauanui, Maira, and Reddy. They were not represented on the subcommittee that drafted the materials that would go to the membership, the academic community (including university presidents), and the press.

120.    The subcommittee drafted a statement from the National Council to accompany the Resolution and documents for distribution to the members, including Frequently Asked Questions or FAQ's and Guidance. It also drafted talking points for discussions with the media, and separate talking points for discussions with the members who were preparing to vote. All of these documents were entirely one-sided in support of the Resolution. Large portions of them were adopted from USACBI documents, and included links to USACBI materials.  (See, e.g., CM 495.)

121.    Defendant Maira continued to share these documents with other USACBI Leaders, as well as Omar Barghouti, to ensure that the final documents complied with the USACBI/PACBI Platform. She and others on the subcommittee would reject potential changes that the National Council proposed unless they were in conformance with the USACBI Platform. Maira even distributed at least one document to PACBI and Barghouti to ask for their comments and edits.  (See, e.g., SM 9426, Email from S. Maira (Dec. 2, 2013), with the subject line, "*IMPORTANT ! suggestions from PACBI on specific guidelines,*" "Dear Lisa, Curtis, and all: I'm

43

sharing feedback I also just received from Omar Barghouti himself. In fact, he made the effort to even suggest a way we can add a few words to make sure that the line for boycott is more clear for both these Q's in the guidelines and the FAQs.*")* With respect to another issue, she reprimanded the National Council regarding whether a university could be "unboycotted," saying that this should be up to USACBI, not American Studies Association. In an email to the entire National Council, with the subject line "*CONFIDENTIAL: What does it mean to 'unboycott,'*" Defendant Maira wrote:

> I'd already raised the concern that it is not simply up to us in ASA to adjudicate when an Israeli university would or would not be boycottable. I'd explained that would be determined by PACBI, along the lines of the guidelines based on the 3 principles of BDS, which an Israeli university would need to publicly uphold and affirm (highly unlikely as I note[.)]

(CM 451.)

122.    In anticipation of an attack on the ASA as a result of their wrongdoing, the Individual Defendants planned a "Rapid Response Team" to address it. The Individual Defendants planned to pay for related expenses, including the costs of public relations professionals, out of American Studies Association funds.[8] (*See, e.g.,* CR 66; LD 5754, "We may have to use some of our trust fund principal this year to put out these fires. The sooner we explore the logistics the better.") The documents prepared for distribution to the membership did not reflect the concerns over the need to repel an attack on the ASA, or what such an attack, and

---

[8] According to Defendants, expenses related to the Resolution were paid from a budget dedicated to such matters, funded by contributions earmarked for this purpose. According to our review of the documents, however, that budget would not exist until spring 2014. Plaintiffs do not have information as to the specific expenses incurred, but are aware that Resolution-related legal expenses (dating perhaps back to 2013) had been paid by credit card, and that significant funds were withdrawn from the American Studies Association Trust Fund to pay for Resolution-related expenses, including the credit card bill, in 2016. See section II.G., pp. 57-60, *infra*. Requests for Production of documents reflecting expenses related to the resolution were served in May; however, as of now, Defendants have objected to this request and have not produced the full set of responsive documents.

ASA-funded efforts to repel it, might mean for both the reputation and the finances of the American Studies Association.

> ### D.   Defendants Freeze the Membership Rolls to Prevent Those Opposed to the Resolution from Voting – Thereby Banning Plaintiff Barton From Voting.

123.   Knowing that the general membership of the American Studies Association did not support the Resolution, and that the National Council did not accurately reflect the membership's interests, priorities, and viewpoints, and the diversity of the membership generally, the Defendants decided to freeze the membership rolls at a strategic moment so that some members who were thought unlikely to support the Resolution could be prevented from voting. This decision was made on November 25, 2013, and the membership rolls were immediately frozen, over a week before the American Studies Association announced that a vote would take place.

124.   Pursuant to the American Studies Association Constitution, a "member whose dues are six months in arrears shall be dropped from the rolls. Members who are so dropped *may be reinstated at any time* by the payment in advance of one year's dues." (American Studies Association Const. Art. II, sec. 2, *emphasis added*.)

125.   Consistent with Article II, section 2, in all previous elections, members could pay dues as late as the last day of an election and still vote in the election. Executive Director John Stephens testified that the election on the Resolution was the first and only time that members whose dues were six months behind were not allowed to vote even after they paid the late dues:

> Q. [I]s there any record of a deadline for eligibility to vote prior to November 24, 25, 2013?
> THE WITNESS: I didn't know, and no one knew, actually, there would be a vote until November 25. That is, the council had not decided to put it out for a vote until November 25. There had been no discussion at the previous meetings about putting it out for a vote. That discussion took place at the Sunday meeting.

Q. Is there any place in the bylaws that accounts for suspending the provision in the bylaws that says that membership is reactivated upon payment of dues in arrears?
THE WITNESS: Not that I'm aware of.
Q. Okay. Has this ever happened at any time that you recall?
A. No.

. . .

Q. And so the experience of members in the American Studies Association who, if they're procrastinators like me, who always do things at the very last minute, the experience of those people is that they can wait until a day before an election, pay their dues, and vote?
A. Yes.

. . .

Q. So up to the day that they were already banned from voting, they had no previous awareness that if they didn't pay their dues on time, this vote would happen and they would already be banned from taking part?
A. Well, no one would have known that because no one knew there was going to be a support vote until November 25.
Q. But on November 25 when that group got together and said, "We're going to do a support vote," they could have said, "So let's give folks five days to get their money in arrears to pay up their debt so that they can take part"?
A. Yes.
Q. But they didn't do that?
A. No.

. . .

Q. That heads up that you weren't going to be able to vote came after it was too late for people to pay their arrears and be able to vote?
A. They froze the membership roster on November 25.
Q. With no warning?
A. That was the board decided to freeze that --
Q. I hear you.
A. -- and they told me to instruct Johns Hopkins to hold all orders for membership until the vote was over.

(J. Stephens Dep. 150:3-23, 151:18-23, 154:14-155:4, 155:16-156:1.)

    126.    Defendants' decision to freeze the membership before announcing the vote meant

that Plaintiff Barton and other American Studies professors and scholars, long invested in the

reputation of American Studies as a field of study and the American Studies Association as an institution, and who had paid dues for many years, were blocked from voting on the resolution. That was exactly the intention of the Individual Defendants.

127.    At the time of the vote, Plaintiff Barton was unclear on his membership status, but when he attempted to vote online, was unable to do so. He immediately renewed his membership, paying a year's worth of dues. Defendants accepted Barton's payment and renewed his membership.

128.    Although Plaintiff Barton had paid his dues, Defendants' scheme to freeze the membership rolls prevented him from voting. American Studies Association Executive Director John Stephens told Plaintiff Barton that Barton would not be permitted to vote on the Boycott Resolution because he did not renew his membership early enough. Stephens did not admit or otherwise disclose that Defendants had intentionally manipulated the American Studies Association's rules in order to prevent Barton and other long-time American Studies Association members from voting against their Resolution.

129.    No provision of the American Studies Association regulations governing membership restricts the right to vote on questions to be addressed by the membership to persons who became a member any specified period prior to the date on which such a vote is to be held.

130.    In fact, the American Studies Association routinely sends emails just before elections to those whose memberships have expired, reminding them to pay dues so that they may vote in the upcoming election.

131.    On information and belief, at least one person known by Plaintiffs was permitted to vote after paying dues in December 2013, just as Plaintiff Barton attempted to do.

132.    Plaintiff Barton's position on the Boycott Resolution was publicly known and was known in particular to John Stephens. On information and belief, Plaintiff Barton was prevented from voting solely because of his views – as were others in the same situation.

133.    Although Barton and others would not be allowed to vote, the American Studies Association National Council still accepted their payments of dues, and did so without warning them that the payments would not reinstate their voting rights.

134.    Emails produced in discovery reveal that Defendants intentionally froze membership before the announcement of the vote in order to minimize votes in opposing the Resolution. An email from John Stephens makes the point clearly: those who would pay their dues after the announcement of the vote would likely vote against the Resolution. (CM00000268.) The email reflects the fact that many former and potential members, some who even paid to attend the 2013 Annual Meeting, conference, were not paying to join or renew their memberships to the American Studies Association, because of the Resolution. These people had no way of knowing at the time that there would be the opportunity for the membership to vote, and thus were withholding their potential dues payments because they simply chose not to be "members" of an organization that would adopt a USACBI Boycott, even if their research and academic work required them to attend the 2013 Annual Meeting. The first email from Stephens to Defendant J.K. Kauanui, states, in pertinent part:

> On October 31, 2013, there were 3730 paid individual American Studies Association members. So 230 people joined/renewed in conjunction with their pre-registration to attend the annual meeting. There were additional people who joined at the 2013 American Studies Association. . . . The 3,500 figure was for individuals on September 30, 2013 . . . Our drop from 4600 in 2012 was partly related [to] non-renewals from San Juan program participants [and people] for whom the 2013 theme did not resonate.
>
> The vast majority of these folks [who attended the 2013 Annual Meeting but did not renew or become members] attended in support [of] the projects of the 2013 annual meeting. They are simply not joining the American Studies Association to oppose BDS . . .
>
> And JHU Press told me today that they've heard from some members who are holding off on their 2014 renewals until the issue is resolved.
>
> ***I bet that 90% of the 400 or so who joined or renewed since October 1 are either for the resolution or neutral.***

48

I noted that several people, like Sonya Michel, did register for the
conference as non-members attended the open forum[, s]o I think the
day we announce any vote is the cutoff date for voter registration (or
December 31st)

***For now the risk is to cut off supporters, not opponents.***
***Once a vote is announced, the risk shifts dramatically the other way***
(I.e. people joining/renewing to oppose), IMHO

(CM 268, *emphasis added*.)

135.    In a second email just minutes later, Stephens recommended cutting off

membership on December 1 – the day before the planned announcement of the vote. As he

explained, this would greatly limit the ability of even long-term members to pay their dues so as

to be able to vote on a matter important to them and of great importance to the future of the

American Studies Association. Stephens wrote:

So I think the cut off for "voter registration," i.e., joining the American
Studies Association and being included in the referendum, ought to be
December 1, the day before Curtis this all goes to the media. I also
think we should state that ONLY members registered before December
1, 2013 are eligible to vote. ***It's once a referendum is announced that***
***the opponents may move to renew in order to vote instead of***
***withholding their renewals as a protest.*** And there's no opening for
people to join simply to vote against our council.

(CM 268, *emphasis added*.)

136.    Not even the day before the announcement of the vote was soon enough to lock

out the opposition, however. Defendant J.K. Kauanui immediately forwarded the email to the

National Council, and the response from USACBI Leaders and Endorsers was swift and harsh.

(CM 329, Email, "Re: CONFIDENTIAL: Proposed cutoff date for member endorsement ballot,"

Nov. 26, 2013.)  Maria Saldana wrote:

We agreed at the meeting that the cut off of registration would be the
weekend of the conference. I said it three times and Curtis agreed that
the membership as of the conference would be those allowed to vote. ***I***
***assure you that even though we haven't announced the vote people***
***are registering in anticipation.*** Please let us not walk back on this!

*Id.*, *emphasis added*. Defendant Sunaina Maira wrote, "YES" (*Id.*), and Marisol Lebron wrote:

49

> I think it is very important to stick to this deadline and we
> have a clear rationale for doing so, namely people will be registering
> AFTER the conference when these debates took place.

*Id.* Never before had attendance at the last Annual Meeting or any debate been a requirement to renew membership to the American Studies Association, or to vote on any matter. There was no legitimate, "clear rationale," only an illegitimate plan to lock potential opponents out of the vote, in clear contravention of the American Studies Association bylaws.

137.    The decision to freeze the membership rolls on November 25 and ban members like Plaintiff Barton from voting was an *ultra vires* act, in violation of the American Studies Association Constitution, Article II, sec. 2, and the long-standing practice of the American Studies Association, and a breach of the contract between Plaintiff Barton and the association. It was also an act by the Defendants against the interest of Plaintiff Barton and other members of the American Studies Association, for the purpose of furthering their personal interests and the interests of the USACBI, and thus was a breach of Defendants' fiduciary duties to the Plaintiffs. Moreover, accepting the dues payment from Professor Barton, knowing that the reason for the payment would not be fulfilled, constitutes an additional breach of Defendants' fiduciary duties to Plaintiff Barton and those current and former members of the American Studies Association who did not benefit from the Resolution.

### E.    The Announced Results of the Vote Violate American Studies Association Bylaws and the District of Columbia Nonprofit Corporations Act.

138.    Art, XI, § 3 of the American Studies Association By-Laws in effect at the time of the vote on the Boycott Resolution states:

> Should an issue arise which, in the opinion of the Executive Committee
> or Council, seems to require public action, speech or demonstration by
> the association at a particular annual meeting, the Council shall meet to
> formulate a response. The Council shall convene an emergency
> meeting of the membership on the first full day of the annual meeting,
> to recommend a course of action, and conduct a public discussion of
> the issue(s); and the vote of two-thirds of those in attendance may
> approve the recommended action.

Pursuant to this provision, the Resolution could pass only if it were approved by a vote of two-thirds of the members convened on the first full day of the Annual Meeting.

139.    The vote that took place did not conform to § 3. The American Studies Association National Committee put the Resolution to a vote of the American Studies Association membership during a ten-day period in December 2013, not on the first day of the November meeting.  Less than a third of the membership voted – 1,252 members out of 3,853 that were eligible to vote.  Only 827 members voted for the resolution – approximately 21% of the total membership. The American Studies Association asserts that the resolution passed with 827 votes in favor, out of 1,252 members who voted on the proposal.  However, ***even if the Resolution could pass with less than a third of the members voting, and only 21% of the members voting in favor, it did not pass under art. XI, § 3, because it was not supported by two-thirds of those voting***. Two-thirds of 1,252 is 835.

140.    If art. XI, §3 of the bylaws was not applicable to the vote on the boycott, the default rule is found in Section 29-405.24 of the D.C. Nonprofit Corporation Act, which sets forth the requirements for a quorum for a vote of the members of groups like the American Studies Association. Section 29-405.24 provides:

> Members entitled to vote as a separate voting group may take action on a matter at a meeting only if a quorum of those members exists with respect to that matter. Except as otherwise provided in the articles of incorporation or bylaws, a majority of the votes entitled to be cast on the matter by the voting group constitutes a quorum of that voting group for action on that matter.

141.    Accordingly, in the event that art. XI, § 3 of the American Studies Association By-Laws did not govern the Boycott Resolution, a quorum on the measure would have been "a majority of the votes entitled to be cast on the matter by the voting group."  Thus, in order for the Resolution to pass, more than 50% of the active members would have to vote in favor of the Resolution.  Fifty percent of 3,853 is 1,927.

### F. **The Passage and Adoption of the Resolution Constitutes a Substantial Part of the American Studies Association's Activities, Violating the Association's Bylaws.**

142.     The American Studies Association's Statement of Election specifically mandates that "No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office." Statement of Election, ¶ 3, § 4.

143.     The American Studies Association claims tax-free status under 26 U.S.C. § 501(a), which exempts from taxation organizations described under 26 U.S.C. § 501(c)(3). Section 501(c)(3) states:

> **(3)** Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, . . . *no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation* . . . .

26 U.S.C. § 501. Under IRS regulations, a "nonprofit organization that attempts to influence and advocate changes in the laws of a foreign country is an 'action' organization . . . and therefore does not qualify for exemption from tax." Rev. Rul. 73-440, 1973-2 C.B. 177.

144.     "An organization will not be regarded as operated exclusively for one or more purposes specified in § 501(c)(3) if more than an insubstantial part of its activities is not in furtherance of one or more of those purposes." *Mysteryboy, Inc. v. Commissioner*, 2010 Tax Ct. Memo LEXIS 14, 40-45. "An organization is also not operated exclusively for one or more purposes specified in § 501(c)(3) if it is an action organization . . . Under § 1.501(c)(3)-1(c)(3)(ii), Income Tax Regs., an organization is an action organization if a substantial part of its activities is attempting to influence legislation by propaganda or otherwise." *Id.*

1.   <u>Efforts to Influence Israeli Legislation Constitute a Substantial Part of American Studies Association Activities</u>

145.   USACBI calls for a boycott of Israeli academic institutions until Israel complies with the USACBI demands. Those demands require dramatic change in Israeli law, and specifically, the adoption of numerous statutes and large-scale legislation by the Knesset. As stated in the USACBI *FAQ's* and *Mission Statement*, available on the USACBI website, USACBI calls for boycott of Israeli academic organizations until Israel implements the following:

- Ending its occupation and colonization of all Arab lands and dismantling the Wall;

- Recognizing the fundamental rights of the Arab-Palestinian citizens of Israel to full equality; and

- Respecting, protecting and promoting the rights of Palestinian refugees to return to their homes and properties as stipulated in UN resolution 194.

http://www.usacbi.org/wp-content/uploads/2015/10/FAQ-on-the-Academic-Boycott-of-Israeli-Institutions.pdf; see also http://www.usacbi.org/mission-statement/ (same, and showing that the demands come directly from PACBI). The individual defendants specifically referenced these requirements as they sought to draft a resolution that would be consistent with the USABI and PACBI boycott goals.

146.   It would not be feasible to describe the thousands of laws the State of Israel would have to adopt, strike, or amend in order to meet the three requirements of PACBI. To begin with, Israeli law requires that any international treaties or agreements are issued through legislation by the Knesset.[9] Thus, the act of withdrawing from the West Bank or East Jerusalem could only be accomplished by a legislative act of the Knesset.

_____

[9] Specifically, Israeli constitutional law denies the force of law to international agreements of the Israeli government, even if ratified as treaties by the Knesset, unless the provisions thereof are enacted into statutory law by the Knesset. Moreover, Israel's Basic Law: Human Dignity and Liberty requires that infringements upon property rights to be authorized by primary legislation.

147.    Indeed, all major transfers or cessions of Israeli authority in the West Bank and Gaza Strip since 1967 have required legislative acts of the Knesset. For example, Israel's unilateral withdrawal from the Gaza Strip required a massive piece of legislation (the Disengagement Plan Implementation Law of 2005) to address questions of property ownership, compensation, taxation, and local government authority, *inter alia*. *See* HCJ 1661/05 **Gaza Coast Regional Council v. The Knesset**, PD 59(2) 481 (2006) (Israel Supreme Court) (holding that the state of Israel was constitutionally required to grant compensation to aggrieved property owners, a legislative act). Further legislation was required to enact various aspects of the Israel-PLO agreements (the "Oslo Accords") into Israeli statutory law, such as the Implementation of the Interim Agreement Concerning the West Bank and Gaza Strip Law (Judicial Powers and Other Provisions) (Legislative Amendments), 1996.

148.    The American Studies Association Boycott adopts the platform of USACBI and PACBI, a fact that was explicitly stated, without reservation, in certain emails between the individual defendants.  Defendants who serve or served in both USACBI and American Studies Association Leadership relied on USACBI materials in drafting the Resolution and associated documents. Individual defendants even consulted with Omar Barghouti, the leader of BDS and a founding member of USACBI, while drafting the Resolution and explanatory documents. Indeed, when there was discussion about when an Israeli academic institution could or should be "unboycotted," individual defendant Sunaina Maira, demonstrating her conflicting loyalties, instructed others working on the Resolution that such decisions should only be left up to USACBI/PACBI, and not American Studies Association.  (CM 451, "*it is not simply up to us in ASA to adjudicate* when an Israeli university would or would not be boycottable. I'd explained *that would be determined by PACBI, along the lines of the guidelines based on the 3 principles of BDS*."),

149.    The Resolution therefore calls for constitutes an attempt to influence Israeli legislation, in violation of the American Studies Association Bylaws that prohibit "the carrying

on of propaganda, or otherwise attempting, to influence legislation," and therefore is *ultra vires*. Statement of Election, ¶ 3, § 4.

150.    Aside from the passage of the Resolution itself, the efforts of the Defendants directed at forcing Israel to change legislation were resource-intensive. They include campaigning for adoption of the Resolution, the 2013 Annual Meeting, which was dominated by the Resolution issue, and responding to organizational risks and widespread backlash in the larger academic community and the general public resulting from the Resolution.

151.    These activities overwhelmingly occupied the time, energy, and resources of American Studies Association officers, Executive Committee, and National Council. Defendants even sought to hire an additional employee to assist. For many years, the American Studies Association had only one paid employee: Executive Director John Stephens. After the Resolution, the National Council set out to hire a second employee specifically because of the very large amount of extra work required to address the backlash from the Resolution.

152.    In conclusion, for a multi-year period and very likely still today, change in Israeli legislation was a substantial purpose of the American Studies Association, in violation of the American Studies Association bylaws and placing the American Studies Association's status as a § 501(c)(3) non-profit entity at risk.

2.      Efforts to Influence United States Legislation Constitute a Substantial Part of American Studies Association's Resolution-Related Activities

153.    The American Studies Association's adoption of and support for the Resolution also required Defendants to commit a substantial part of the organization's efforts to influencing U.S. legislation.

154.    Immediately after the American Studies Association announced the Resolution, U.S. federal and state legislators introduced bills in response. In January of 2014, the New York State Senate passed a bill prohibiting state universities from expending tax dollars on groups that boycott Israel. Also in January, legislation was introduced in Pennsylvania condemning "the

American Studies Association's academic boycott against Israel as an intolerable, anti-Semitic, base form of bigotry and hatred." (CR59, quoting the bill.) Similar bills specifically targeting the American Studies Association Resolution were introduced in Illinois and Maryland state legislatures (LD6463).

155.    At the federal level, H.R. 4009, a similar bill also intended to prohibit government funding from supporting the American Studies Association, was introduced specifically in response to the American Studies Association Resolution. (LD6089.)

156.    The American Studies Association, acting through the Individual Defendants in their official capacities as officers or other leaders of the American Studies Association, engaged in a variety of efforts to block legislation directed at the association from multiple legislatures became all-consuming, easily constituting a substantial portion of the association's efforts and resources. (*See, e.g.*, LD00006114, "the American Studies Association is logistically overwhelmed right now" as a result of its efforts to combat these proposed state laws)

157.    As the cost of defending the American Studies Association against, *inter alia*, the legislative initiatives directed at the Resolution, became prohibitive, President Marez began a fundraising campaign by the name of "Stand with the American Studies Association." The campaign began on March 28, 2014, and was scheduled to end six months later, with the goal of raising $100,000 to fund the American Studies Association's efforts to respond to the bills proposed in Congress and the state legislatures, *inter alia*.

158.    The "Stand with the American Studies Association" campaign began with a mass email to the membership. The response was not positive – many members responded angrily. The campaign would only raise approximately $50,000 – just half the goal – and would take up the majority of President Marez's time as American Studies Association President. Responding to the legislation proposed in multiple states and at the federal level consumed a substantial portion of the American Studies Association's resources.

159.    The overwhelming expenditures of effort, time, and financial resources for the purpose of influencing legislation violated the Statement of Election, ¶ 3, § 4:

> No substantial part of the activities of the corporation shall be the
> carrying on of propaganda, or otherwise attempting, to influence
> legislation, and the corporation shall not participate in, or intervene in
> (including the publishing or distribution of statements) any political
> campaign on behalf of any candidate for public office.

Violation of this provision constitutes an *ultra vires* act.

160.    "The presence of a single substantial purpose that is not described in § 501(c)(3)

precludes exemption from tax . . . regardless of the number of the importance of the purposes

that are present and that are described in § 501(c)(3). *Mysteryboy v. Commissioner*, 2101 Tax Ct.

Memo Lexis at 47-49.  The actions of the Individual Defendants described here clearly

contravene this rule and so put the American Studies Association's tax-exempt status at material

risk.

161.    Because they placed at substantial risk the American Studies Association's non-

profit tax status, Defendants breached fiduciary duties of loyalty and care to Plaintiffs, whose

individual rights as members of the non-profit entity "were affected by the alleged failure to

follow the dictates of the constitution and by-laws and they thus had a 'direct, personal interest'

in the cause of action, even if 'the corporation's rights are also implicated.'" *Daley v. Alpha

Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011), *quoting Franchise Tax Board of Cal.

v. Alcan Aluminum, Ltd.*, 493 U.S. 331, 336 (1990); *see also Jackson v. George*, 146 A. 3d 405,

415 (D.C. App. 2016).

### G.    Defendants Invade the American Studies Association Trust Fund to Cover the Expenses Arising from the Boycott Resolution

162.    The American Studies Association maintains a Trust and Development Fund ("the

Trust Fund").  According to documents provided by the Defendants, there have been no

withdrawals from the Trust Fund at least as far back as June 30, 2008 – the earliest date that

Defendants have provided documents that report transfers from the Trust Fund to the operating

account. (ASA 930.)

163.    Article XII of the American Studies Association bylaws sets forth the association's bylaws regarding the Trust Fund.  As of the adoption of the Boycott Resolution, Article XII, in pertinent part, read as follows:

**Bylaws, Article XII: Association Trust and Development Fund**

Sec. 1. The Trust and Development Fund shall have as its main purpose to insure the longterm, financial stability of the association in accordance with Article VIII, Section VI, of the Constitution of the American Studies Association. The Fund may also from time to time ***make small grants*** in support of the projects, activities, or prizes of the association.

. . .

Sec. 3. The interest and dividend income of the Trust and Development Fund may be used during the fiscal year for the purposes of the association's incorporation to the extent authorized by the Internal Revenue Service and the District of Columbia. ***No expenditure shall be made from the Fund's principal balance or capital gains.*** All surpluses at the end of the fiscal year shall be assigned to the Fund's principal balance.  . . .

(ASA Bylaws, art. XII, as of November 2013 ("2013 Bylaws"), emphasis added.)

164.    Today, the American Studies Association's bylaws have been amended to allow the association to withdraw large amounts from the Trust Fund, and the Individual Defendants have withdrawn such large amounts specifically to pay for expenses incurred as a result of the Boycott Resolution.  Article XII of the bylaws, effective March 2016, is restated below, with emphasis on the elimination of the word "small" from the term "make small grants" in §1, and the addition of the clause in § 4 providing for the withdrawal of 4% of assets of the trust fund each year, including the fund's principal balance and capital gains:

**ARTICLE XIII: Association Trust and Development Fund**

Sec. 1. The Trust and Development Fund shall have as its main purpose to insure the long-term, financial stability of the association. The Fund may also from time to time ***make grants*** in support of the projects, activities, or prizes of the association.

. . .

> Sec. 4. The interest and dividend income of the Trust and Development Fund may be used during the fiscal year for the purposes of the association's incorporation to the extent authorized by the Internal Revenue Service and the District of Columbia. ***The Trustees may spend each year a maximum of 4% of the monthly average of Fund's assets from the preceding year.*** All surpluses at the end of the fiscal year shall be assigned to the Fund's principal balance.  . . .

ASA Bylaws, art. XIII, adopted Mar. 2, 2016 ("2016 Bylaws"), available at

https://www.theasa.net/about/governance/articles-bylaws#ARTICLE%20XIII, emphasis added.

165.     The 2016 Bylaws also state that, "[a]t least once annually, the Board shall

publicly issue an official accounting of the Fund's receipts, investments, and expenditures[.]"

(2016 Bylaws, art. XIII, § 2.)

166.     The full membership of the American Studies Association voted on changes to the

association's bylaws and constitution in March 2016, as part of the annual election for President

of the American Studies Association and members of the National Council.  A letter to the

membership explaining the proposed changes to the bylaws does not mention the changes to art.

XIII.  But this letter explains only the changes to other bylaws, that are unrelated to the Trust

Fund  (JS 2003) – it says nothing about bylaw changes related to the Trust and specifically about

the ease with which ASA officers could withdraw money from the Trust or the purposes for

which they would or could do so.  On information and belief, Defendants did not inform the full

membership about proposed changes to the bylaws governing withdrawals from the Trust Fund

in advance of the vote in March of 2016.  If true, Defendants violated their fiduciary duty to

Plaintiffs, and the other members of the American Studies Association, by failing to inform them

that the vote on the bylaws in March 2016 allowed for large withdrawals from the Trust Fund.

167.     Withdrawals totaling $112,034 were made from the Trust Fund in fiscal year

2015, which began on July 1, 2015 and ended on June 30, 2016.  (JS 1332_37.)  Assuming that

the average monthly balance of the Trust Fund in the previous fiscal year was between

$1,377,000 (the balance on June 30, 2014) and $1,385,000 (the balance on June 30, 2015), the

allowed withdrawal under the 2013 Bylaws would have been approximately $55,240.  However, more than twice that amount was withdrawn.

168.    The documents produced by Defendants thus far do not provide a justification or explanation for the remainder of $112,034, approximately $56,794, withdrawn in fiscal year 2015.

169.    This withdrawal – the first of at least three planned annual withdrawals – depletes the assets of the Trust Fund at a materially greater rate than the return on the fund's investments. On June 30, 2016, the balance of the Trust Fund was $1,247,000, falling 10% from the balance of $1,385,000 a year before, although the return on investments was strong that year.

170.    Although Defendants have continuously claimed that the American Studies Association did not incur costs related to the Boycott Resolution in excess of contributions earmarked for the Boycott Resolution, internal documents produced in discovery reveal that Defendants charged legal fees related to "numerous lawsuits" on an American Express card, and carried the balance on the card, potentially for years, until they began withdrawing from the Trust Fund in fiscal year 2015.  (*See*, *e.g.*, Stephens Decl., ¶ 15, "The only monies/expenses paid out by ASA related to the Resolution were less than the total amount of contributions made to ASA specifically designated for ASA in support of the Resolution"; as discussed below, these contributions totaled $49,000 and were exhausted by the end of 2014, well before the Trust Fund withdrawals described here.)

171.    According to internal emails, expenses arising from the Boycott Resolution were charged, or avoided, and so such expenses increased until money was withdrawn from the Trust Fund – including the withdrawal of approximately $150,000 noted above, and additional, subsequent withdrawals:

> Extraordinary expenses over the past several years, notably, legal fees
> and the new website, have been covered by grants from the Fund (in
> the total amount of $294k for fy 2016 and 2017 combined), as well as
> by the monies raised through the Stand with the ASA campaign.  . . .
> This convergence of extraordinary expenses has, however, meant that
> cash flow has been restricted with the result that at the end of 2016, the

> association was carrying a substantial debt [including] *$40k in unpaid legal expenses), which had been covered by charging against the ASA's American Express account*. . . . *The $40k charge remains outstanding; it will be serviced in/near the start of FY2018*.

(JS 1940.)  On information and belief, Defendants never informed the full membership that the amendments to the bylaws that they voted on would be utilized to pay legal bills arising from the Boycott Resolution – bills perhaps years old, that had been charged to an American Express card.  Nor did Defendants inform the membership of any other expenses related to the Resolution that would be paid by depleting the Trust Fund, or that the Trust Fund would be used to cover decreases in revenue resulting to the resignation of scores of individual and institutional members.

### H.   Financial Injury to American Studies Association and Plaintiffs' Interests Resulting from Defendants' Actions

#### 1.   Decrease in revenue

172.    The American Studies Association reports aggregate annual gifts, grants and contributions ("contributions") each year, as required, on its IRS Form 990. American Studies Association's average reported contributions for the ten-year period from and including FY 2003 through FY 2012 is $50,394 with a median of $41,576. This average is brought down by low giving in FY 2008 ($30,556) and 2009 ($33,959), due to the Great Recession.  Excluding the two years of the Great Recession, contributions averaged $54,928, with a median of $48,418 and a range of $31,458 (FY 2012) to $108,629 in (FY 2004).

173.    FY 2012 began July 1, 2012, and includes the 2012 Annual Meeting, where David Lloyd (and other USACBI Leadership) set up the petition calling for the Resolution, includes the presentation of the Resolution to the Executive Committee, and includes public and internal criticism of the proposed Resolution.

174.    Contributions in FY 2012 ($31,458), FY 2014 ($33,080), and FY 2015 ($31,456) – the last year we have records for – were all lower than every other year since FY 2003, with

the sole exception of FY 2008. Indeed, contributions for FY 2012, FY 2014, and FY 2015 were even less than contributions for FY 2009. Quite simply, the Resolution offended a substantial number of long-term and potential new contributors. Others did not want to contribute an organization that would engage in an academic boycott of Israel; additional others would not to contribute to an organization that would engage in *any* academic boycott, and still others simply did not want their contributions to an academic organization to go to any purpose other than education and research. Donations to the American Studies Association general fund collapsed.

175.    The American Studies Association reports contributions for FY 2013 of $70,544, but does not note on the Form 990 that $49,000 was specifically contributed by supporters of USACBI and PACBI, and that these funds were earmarked solely for responding to legal costs and other "support for the Resolution." (Decl. of J. Stephens at ¶ 9.) These funds could not be used for any other purpose.  Administrative costs, research, or grants of the type American Studies Association had generally covered through the general fund.

176.    Subtracting these $49,000 in restricted gifts from total FY 2013 contributions of $70,544 leaves contributions of only $21,544 for the American Studies Association general fund, far less than the usual amount contributed to the American Studies Association. Thus, although administrative costs increased after voting on the Resolution was completed, the unrestricted resources available to cover those costs declined significantly, due to the sharp decline in donations to the American Studies Association's general fund.

177.    According to the American Studies Association's IRS Form 990s, membership fees also fell in response to the Boycott Resolution. This is true despite the fact that USACBI Leadership and Endorsers and other supporters of the Resolution encouraged their students to join the American Studies Association so that they could attend the 2013 Annual Meeting and ultimately vote.

178.    The American Studies Association reports membership fees each year, as required, on its IRS Form 990. American Studies Association's average reported membership fees for the ten-year period from and including FY 2003 through FY 2012 is $266,948 with a

median of $ 276,411. These simple statistics include dips in membership fees during the Great Recession, when membership fees fell to $271,397 in FY 2008 and $246,024 in FY 2009.

179.    In FY 2012, membership fees fell by $41,431 (14%). As stated above, FY 2012 began July 1, 2012, and includes the 2012 Annual Meeting, where David Lloyd (and other USACBI Leadership) set up the petition calling for the Resolution, includes the presentation of the Resolution to the Executive Committee, and includes public and internal criticism of the proposed Resolution.

180.    Membership dues for FY 2014 were also less than FY 2012, although more than FY 2013. As John Stephens explained in deposition, some portion of membership fees in FY 2013 were paid by advocates for USACBI and the Resolution, as a means of "supporting" the American Studies Association Resolution. These "members" would not continue their membership in following years.

181.    As the numbers show, American Studies Association membership fees dropped after the resolution, and, per the 990 forms for FY 2014 and FY 2015, have not recovered. John Stephens confirmed this in deposition testimony:

> [Q. I]s it consistent with the trends that you have noticed that the past two years of revenue, the year ending [June 30] 2015 and the year ending [June 30] 2016, are less than the 10 years prior?
> A. Yes.
> Q. [E]xcept for the fiscal year ending in June of 2014, is that trend also consistent with respect to contributions?
> A. Yes.

(Stephens Dep., 178:16-24.)

2.    Resolution-related expenses

182.    Defendant American Studies Association claims that expenses incurred in support of the Resolution were paid out of a segregated fund, solely funded by contributions that were earmarked by the donors for this purpose. *See* Decl. of J. Stephens, ¶ 9 ("Following the Resolution, a number of organizations and individuals instituted various public relations-oriented

63

attacks on the American Studies Association because of the Resolution. A large amount of contributions since the Resolution have been in support of American Studies Association's Resolution. $49,000 is the total amount of the contributions that have been specifically designated by donors for American Studies Association's support for the Resolution.") The Stephens Declaration further states that the American Studies Association retained a media strategist and a Public Relations consultant for $20,000 (total), and that the only other areas of expenses "that were arguably related to the resolution were in regard to American Studies Association's 2014 meeting," specifically, $9,900 in conference travel grants, and $7,300 spent in support of the American Studies Association program, "Scholars Under Attack." (Stephens Decl. ¶¶ 11-13.) Thus, Stephens' statement that, "it is clear that there has been no financial loss on American Studies Association's part as a result of the Resolution. If anything, there has been a net gain of at least $11,770" is unsupported by the documents produced by Defendants.

183.    The American Studies Association has incurred substantial legal costs defending the Resolution that are not reflected in the Stephens Declaration. John Stephens testified in deposition that he hired lawyers on behalf of the American Studies Association even before the Resolution passed, because he was concerned about potential legal risk, and was aware that the Activism Caucus was engaging with Palestine Legal, an anti-Israel advocacy legal group. (Stephens Dep., 51:13-17.)

184.    If Stephens was unsure that the advice the Activism Caucus was receiving from Palestine Legal was legally sound, he was wise to hire an independent law firm. Among other things, Palestine Legal misinformed the Activism Caucus that the American Studies Association could not be successfully sued for the Resolution, on the theory that the First Amendment protects boycotts. (CM 1116.)  As this Court has held in this very case, an act that violates a law that only incidentally affects speech is not immune from legal challenge. The American Studies Association's actions in this case are not protected by the First Amendment with respect to challenges based on corporate, fiduciary or contract law. Indeed, the *ultra vires* claim presented in the First Amended Complaint survived the First Amendment challenge.

185.    Although not reported in the Stephens' Declaration, the American Studies

Association has incurred significant legal, insurance, and other costs arising from the Resolution.

Significantly, according to documents produced by Defendants, these expenditures appear to

have been covered by the American Studies Association Trust and Development Fund, the

American Studies Association's American Express card, and delaying payment. An email as

from FY 2016 American Studies Association President Candice Chuh to the American Studies

Association Board of Trustees of the Trust and Development Fund and American Studies

Association Finance Committee, dated May 10, 2017, states:

> Extraordinary expenses over the past several years, notably, legal fees
> and the new website, have been covered by grants from the Fund (in
> the total amount of $294K for FY 2016 and 2017 combined), as well as
> by the monies raised through the Stand with the American Studies
> Association campaign. . . .
>
> This convergence of extraordinary expenses has, however, meant that
> case flow has been restricted with the result that at the end of 2016, the
> association was carrying a substantial debt (of about $120K for
> payment of Denver annual meeting related expenses, as well as $40K
> in unpaid legal expense), which had been covered by charging against
> the American Studies Association's American Express Account. . . .
> The $40K charge against remains outstanding; it will be serviced
> in/near the start of FY 2018. The National Council has approved
> increase to both membership and annual meeting registration fees . . .
>
> The Executive Committee approved the purchase of liability coverage
> for Directors and Officers at the rate of $12K per year, which will be
> folded into our regular operating budget. . . .
>
> The American Studies Association has incurred extraordinary legal
> expenses related to suits filed against us [and] a substantial contingency
> fund seems warranted. Toward that end, we recommend that two years
> of the authorized draw from the Trust and development Fund be put
> aside for such purposes
> . . . roughly $95K . . .

(JS1940 at 2.) Under the new fee schedule approved by the American Studies Association,

annual membership dues for a tenured professor with an income over $125,000 per year more

than doubles, increasing from $120 to $275; dues for a professor who earns between $100,000 per year will increase 67%, from $120 to $200 per year, and dues for an associate professor who earns $75,000 per year will increase 50%, from $99 to $150 per year. *Id.*

186.    On information and belief – and based on the information in immediately previous paragraphs – a substantial portion of the costs of defending the Resolution were not have not been paid out of the $49,000 described in John Stephens' Declaration.

187.    Documents produced by Defendants thus far in discovery reveal numerous emails that refer to hiring an assistant for John Stephens specifically to address the increase in workload brought about by the backlash to the Resolution. *See, e.g.*, Email from Lisa Duggan to trustees re "American Studies Association Finance Trustees Meeting," Dec. 14, 2013:

> Dear American Studies Association Finance Trustees:
> The result of the American Studies Association vote on the boycott resolution will be announced on Monday. If, as we expect, the resolution is endorsed by the membership, we will need to act quickly and effectively to assist departments, programs, centers and individuals throughout the US and abroad that may come under attack. The National Council in its meeting on Nov. 24 supported the idea of hiring an assistant director, perhaps part time, to coordinate these efforts from the office in DC, taking some of the enormous pressure off of John. In order to release the funds to make this hire, the Finance Trustees must meet, in person or digitally, and agree to the expenditure from our trust account.

(CM 900.) Other documents address expenditures for a "rapid response" media team, *e.g.*, CM 1089 ("tell the firm the American Studies Association is in the midst of a difficult situation, describe the situation a bit, and ask them to pitch us various services they could imagine providing at a variety of different costs").

188.    Many of these emails discuss payment out of the American Studies Association Trust Fund, including the email from Lisa Duggan detailed in the previous paragraph. At this time, we have insufficient documents to determine whether funds were withdrawn from the American Studies Association Trust Fund specifically to cover expenses related to the

Resolution. However, the emails produced thus far indicate that Defendants were planning to pay Resolution-related expenses with money withdrawn from the American Studies Association Trust Fund well into 2014.

189.    For example, Defendant Marez, who was American Studies Association President in April 2013 and who dedicated much of his efforts to fundraising specifically for Resolution-related expenses (and to the detriment of the American Studies Association general fund and the American Studies Association activities and purposes that rely on that fund), sent the following email regarding accessing the American Studies Association Trust Fund to Stephens and the trustees of the fund:

> Subject: Trust fund allocation for PR?
>
> Hi John, Lisa and I are talking with the PR folks tomorrow and I wanted to return to the below exchange, which suggests that 40K for PR, contingent on the firm and plan, have been allocated from the trust fund. I don't recall discussing that particular allocation but if the money has been earmarked, what do we need to do, John, to access it?
>
> Our fundraising is going well but at present we do not yet have enough money in hand to pay for PR . . . and we can't wait any longer to raise more before we get help.

(LD 6679.) *See also* email exchange between Chandan Reddy and John Stephens, CR 66, "[Reddy asking,] 'is the $40,000 and the six month time frame a reference to this year's approved budget? Could next year's budget continue to fund a PR firm?' [and Stephens responding] 'This is correct, Chandan (funded from the trust fund with the approval of the trustees).'"

190.    According to John Stephens' testimony, he eventually required two separate budgets, presumably due to legal concerns regarding the use of funds from the Trust to pay for Resolution-related expenses:

> A. There was a point where I drew -- where I explained to the elected officers that they could not use the trust fund of the organization to support the resolution, and said at that point, "The only way I think that you could do this is if you have contributions or do fundraising."

. . . . And that's where that – that's the origin of that particular budget.

Q. And which budget was that?

A. That's the $47- or $48,000 budget for the resolution. I basically protected the association's budget and the trust fund from any obligation to the resolution or its defense.

Q. Okay. Can you give me – I don't mean to interrupt you – but a date of when you had this correspondence with them?

A. We got – this would be some time in the period between December of '13 and the May business meeting of the executive committee of 2014.

Q. Okay. Was that written correspondence? . . . .

A. Yes. It was an opinion from counsel declaring the trust fund[.]
. . .
Q. Other than communications with your attorney, is there any record of your communications with the board or the executive officers with respect to the trust fund?

A. Only to declare that in accordance with the bylaws, it was to be used for investment in the association. It was to be spent on infrastructure[.]

(Stephens Dep., 181:4 – 183:10.)

191.    Without documentation that has yet to be produced, it is impossible to establish when the "separate budgets" were established, and to what extent support for the Resolution was in fact financed by the Trust Fund – it is clear, however, that the withdrawals from the Trust Fund in 2016 and 2017 did cover Resolution-related expenses to some extent.  (*See* ¶¶ 162-171, *supra*.)

## COUNT ONE

### Breach of Fiduciary Duties Against the Individual Defendants by All Plaintiffs

### (Material Misrepresentations and Omissions in Connection with Elections to Office and Seeking Member Approval of Boycott Resolution and Amendment of the Bylaws)

192.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

193.     As members of the National Council and the Nominating Committee of the American Studies Association, the Individual Defendants owe all the duties of a fiduciary to the American Studies Association and all of its members.

194.     However, as explained above, the Individual Defendants have breached their fiduciary duties of loyalty, care, candor and good faith by making or causing to be made material misrepresentations and omissions  to members, when seeking election to the National Council and approval of the Boycott Resolution, including  misrepresentation and omission of material facts regarding (1) their personal political agenda and plan to suborn the Association to advance the purposes of the USACBI by causing the American Studies Association to adopt and implement the Boycott Resolution, and (2 the expected costs of the Boycott Resolution, including, *inter alia*, reputational and financial costs and the loss of good will. As a result of breaching their fiduciary duties, the Individual Defendants have harmed the American Studies Association and its members and are liable to the American Studies Association for the damages incurred. Because their conduct was not in good faith, it is not exculpated by § 29–406.31 of the D.C. Nonprofit Corporation Act. Plaintiffs are entitled to recover damages from the Individual Defendants that the American Studies Association incurred as a result of this breach of fiduciary duty.

## COUNT TWO

**Breach of Fiduciary Duties Against the Individual Defendants by All Plaintiffs
(Duty of Loyalty and Good Faith, Misappropriation and Misuse of Assets of American
Studies Association)**

195.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set
forth herein.

196.    As members of the National Council of the American Studies Association, the
Individual Defendants owe the American Studies Association and all of its members the highest
duties of care, loyalty, good faith, and candor. Among other things, these duties include the
obligation not to engage in conduct that directly or indirectly is in their own self-interest, and to
instead faithfully represent the mission of the American Studies Association and its members,
and to abide by the dictates of its organizational documents and the D.C. Nonprofit Corporation
Act. The Individual Defendants also have a fiduciary duty to treat all members equally and to
avoid conferring benefits or advantages on themselves that are not enjoyed by all other members.
*See Willens v 2720 Wisconsin Ave Co-op Assn Inc*., 844 A.2d 1126,1136 (D.C. 2004) (board
members "'owe a fiduciary duty to act solely in the interest of *all* shareholders.' . . . the 'unequal
treatment of shareholders' may violate the fiduciary duty of loyalty—especially if the directors
responsible for such treatment are personally interested in the transaction in question," *quoting
Ackerman v 305 East 40th Owners Corp*. 592 N.Y.S. 365, 367 (App. Div. 1993).)

197.    However, as explained above, the Individual Defendants have breached their
fiduciary duties and wasted Association assets by (1) misappropriating, misusing and diverting
the funds, membership list, reputation, good will, institutional structure, processes and other
assets of the American Studies Association and its members to further their personal political
interests over the interests and mission of the American Studies Association and its members, (2)
conferring an unequal and unfair advantage to supporters of the Boycott Resolution over
opponents by manipulating the nomination and voting process, miscounting votes, causing the
violation of American Studies Association Constitution and bylaws, withholding voting rights

70

from certain members and denying opponents access to the American Studies Association's online and other resources to communicate to fellow American Studies Association members their opposition to the resolution and (3) subverting the interests and resources of the American Studies Association and its members to advance the political goals of an outside party, namely the USACBI. As a result of breaching their fiduciary duties, the Individual Defendants have harmed the American Studies Association and its members and are liable to the American Studies Association for the damages incurred. Because their conduct was not in good faith, it is not exculpated by § 29–406.31 of the D.C. Nonprofit Corporation Act. Plaintiffs are entitled to recover damages from the Individual Defendants that the American Studies Association incurred as a result of these breach of fiduciary duties.

## COUNT THREE

### Ultra Vires and Breach of Contract Action Against All Defendants by All Plaintiffs (Failure to Nominate Officers and National Council Reflecting Diversity of Membership)

198.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

199.    Pursuant to the American Studies Association Constitution, "The Nominating Committee shall nominate candidates for the office of [President Elect], member of the Council, and members of the Nominating Committee. It shall present two nominees for each elected position. ***Nominees shall be representative of the diversity of the association's membership***." (American Studies Association Const., art. VI, § 2.)

200.    The American Studies Association Constitution further provides that it "shall be [the President's] duty formulate policies . . . and to fulfill the chartered obligations and purposes of the Association" (Art. IV, § 2). The National Council provides oversight, including "the discussion of policies and of instructions that should be given to the elected or appointed

officers, and "shall conduct the business, set fiscal policy, and oversee the general interests of the association." (Art. V, § 2.)

201.    Defendants were in violation of the American Studies Association Constitution, because the candidates for American Studies Association President, the Executive Committee, and the National Council were not "representative of the diversity of the association's membership." This violation of the American Studies Association Constitution continued for years.

202.    The American Studies Association Presidents, including Defendants Marez and Duggan, did nothing to ensure that the slate of candidates was "representative of the diversity of the association's membership," in violation of their "duty . . . to fulfill the chartered obligations" of the American Studies Association, and . the National Council, including all of the Individual Defendants with the exception of Puar, also failed to properly oversee the officers and the nominating committee, and to "oversee the general interests of the association."

203.    Defendants' failure to abide by the American Studies Association Constitution, Article VI § 2, Article V, § 2, and Article VI, § 2, constitutes *ultra vires* conduct that has harmed Plaintiffs, other members of the American Studies Association, and the American Studies Association itself. First, Defendants' conduct deprives the individual members of leadership that appropriately reflected the actual interests of the membership. The great majority of members of the American Studies Association did not join to advocate for USACBI, but instead to be part of an academic association that would focus on the interests of American Studies scholars. The American Studies Association Leadership, however placed the interests of USACBI and the PACBI platform ahead of the interests of American Studies scholars, spending almost all of the time they dedicated to their American Studies Association positions promoting and supporting the Resolution and related issues.

204.    These *ultra vires* acts also damaged the American Studies Association as an institution. The Resolution was extremely divisive, and the many of the most respected scholars in American Studies, with years of knowledge and experience to share, simply abandoned the

group, as a result of which the American Studies Association became an organization that was no longer dedicated, primarily, to *studies*. These and other acts of the Defendants in the context of the Resolution, destroyed the faith and trust of the members in the American Studies Association Leadership and the procedures the Leadership adopted, causing permanent division, all to the detriment of those members and the American Studies Association itself.

205.    Finally, these *ultra vires* acts allowed the Defendants to force the Resolution on the American Studies Association, against the best interests of the entity itself. The American Studies Association has suffered financial detriment, from decreased revenues resulting from both a decline in membership fees and fewer and/or smaller contributions, and from an increase in expenses directly related to the Resolution. It has also suffered reputational damage, including public criticism of the American Studies Association, which the American Studies Association has attempted to fend off at the expense of tens of thousands of dollars spent on public relations and media consultants. This *ultra vires* conduct has also resulted in the improper expenditure of American Studies Association funds related to membership dealings, public relations, legal matters, and other items including employee time and effort.

206.    As a proximate result of Defendants' abuses of power and disregard for American Studies Association's foundational documents, Plaintiffs have suffered significant economic and reputational damage. Defendants' actions have caused and continue to cause irreparable injury to American Studies Association's reputation.

207.    Section 29–403.04 of the D.C. Nonprofit Corporation Act authorizes a member to challenge an *ultra vires* act in a legal proceeding, and it authorizes the award of injunctive relief and damages by a court. Plaintiffs are entitled to recover damages from the Individual Defendants incurred by the American Studies Association, and to declaratory and to injunctive relief.

## COUNT FOUR

## Ultra Vires Action and Breach of Contract Against All Defendants by All Plaintiffs
## (Freezing Membership Rolls to Prohibit Voting)

208.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

209.    "A member of an organization may directly sue that organization to enjoin actions that the organization did not have power to execute." *See* D.C. Code § 29-403.04(b)(1); *see also Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011). Actions taken by the organization that are "expressly prohibited by statute or by-law" or outside the powers conferred upon it by its articles of incorporation are ultra vires. *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 18 (D.D.C. 2014), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016); *see also Daley*, 26 A.3d at 730 (emphasis omitted) (quoting *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 7 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998)). 'In certain circumstances, a long-standing pattern or practice of corporate behavior may give rise to a by-law.' *Family Fed'n for World Peace* [*v. Hyun Jin Moon*, 129 A.3d 234, 251 (D.C. 2015)]." Memorandum Opinion (Mar. 31, 2017) at 30 (Dkt. 28).

210.    Defendants' decision to freeze the American Studies Association membership rolls as of November 25, 2013, such that members (including Plaintiff Barton) who paid their dues after November 25 were unable to vote on the Resolution, is "expressly prohibited" by the American Studies Association Constitution, Art. 2, sec. 2, and constitutes an *ultra vires* act. Defendants' decision to freeze the American Studies Association membership rolls also violates the American Studies Association's long-standing practice of allowing members whose dues were in arrears to vote immediately upon paying their dues – even if they paid their dues as late as the last day of an election.

211.    Defendants' *ultra vires* acts were harmful to the Plaintiffs and other members of the American Studies Association. First, they stripped certain members of their right to vote, an

integral benefit of membership in the organization. Moreover, they stripped these members of their rights solely on the basis of their beliefs, and the likelihood that those beliefs would stand in the way of Defendants' Resolution.

212.    Defendants' *ultra vires* conduct also damaged the American Studies Association as an institution. The Resolution itself and Defendants' *ultra vires* interference with members' voting rights has been extremely divisive. These and other acts of the Defendants have destroyed the faith and trust of the members in the American Studies Association Leadership and procedures adopted by the Leadership, causing permanent division and mass resignations by long-term, active members, to the detriment of those members and the American Studies Association itself.

213.    Finally, *ultra vires* acts allowed the Defendants to force the Resolution on the American Studies Association, against the best interests of the entity itself. The American Studies Association has suffered financial detriment, from decreased revenues resulting from both a decline in membership fees and fewer and/or smaller contributions, and from an increase in expenses directly related to the Resolution. It has also suffered reputational damage, including public criticism of the American Studies Association, which the American Studies Association has attempted to fend off at the expense of tens of thousands of dollars on public relations and media consultants. This *ultra vires* conduct has also resulted in the improper expenditure of American Studies Association funds related to membership dealings, public relations, legal matters, and other items including employee time and effort.

214.    As a proximate result of Defendants' abuses of power and disregard for American Studies Association's foundational documents, Plaintiffs have suffered significant economic and reputational damage. Defendants' actions have caused and continue to cause irreparable injury to American Studies Association's reputation.

215.    Section 29–403.04 of the D.C. Nonprofit Corporation Act authorizes a member to challenge an ultra vires act in a legal proceeding, and it authorizes the award of injunctive relief and damages by a court. Plaintiffs are entitled to recover damages from the Individual

Defendants incurred by the American Studies Association, and to declaratory and to injunctive relief, including withdrawal of the Resolution.

## COUNT FIVE

### Ultra Vires Action and Breach of Contract Against All Defendants by All Plaintiffs (Substantial Part of Activities Attempting to Influence Legislation)

216.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

217.    The American Studies Association's bylaws specifically mandate that "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation[.]" Statement of Election, ¶ 3, § 4.

218.    As discussed above, efforts to influence Israeli legislation constitute a substantial part of the American Studies Association's activities, as do efforts to influence U.S. legislation at both the state and federal level. Indeed, efforts to influence legislation appear to constitute nearly all of the American Studies Association's activities, at least with respect to Defendant Marez's term as American Studies Association President (FY 2012) and Defendant Duggan's term as American Studies Association President (FY 2013).

219.    Consequently, American Studies Association was in violation of the Statement of Election from approximately July 2013 until at least June of 2015.

220.    The Defendants' failure to abide by the Statement of Election constitutes an *ultra vires* act that was harmful to Plaintiffs, other members of the American Studies Association, and the American Studies Association itself.

221.    First, the individual members did not receive the value they expected from membership in the American Studies Association. The great majority of members of the American Studies Association did not join to advocate for USACBI or to influence legislation, but instead to be part of an academic association that would focus on the interests of American

Studies scholars. The Defendants, however, as a consequence of the American Studies Association Leadership's *ultra vires* acts, placed the interests of USACBI and the PACBI platform ahead of the interests of American Studies scholars.

222.     These *ultra vires* acts also damaged the American Studies Association as an institution. The effort to change Israeli law by adopting the Boycott Resolution was extremely divisive, and the subsequent backlash, including the bills introduced in U.S. state and federal legislatures and the Defendants' all-consuming efforts to defeat those bills only intensified the divide, until many of the most respected scholars in American Studies, with years of knowledge and experience to share, simply abandoned the group, and the American Studies Association became an organization that was no longer dedicated, primarily, to *studies*. These and other acts of the Defendants in the context of the Resolution, destroyed the faith and trust of the members in the American Studies Association Leadership and the procedures the Leadership adopted, causing permanent division, all to the detriment of those members and the American Studies Association itself.

223.     Finally, these *ultra vires* acts allowed Defendants to force the Resolution on the American Studies Association, against the best interests of the entity itself. The American Studies Association has suffered financial detriment, from decreased revenues resulting from both a decline in membership fees and fewer and/or smaller contributions, and from an increase in expenses directly related to the Resolution. It has also suffered reputational damage, including public criticism of the American Studies Association, which the American Studies Association has attempted to fend off at the expense of tens of thousands of dollars on public relations and media consultants. This *ultra vires* conduct has also resulted in the improper expenditure of American Studies Association funds related to membership dealings, public relations, legal matters, and other items including employee time and effort.

224.     As a proximate result of Defendants' abuses of power and disregard for American Studies Association's foundational documents, Plaintiffs have suffered significant economic and

reputational damage. Defendants' actions have caused and continue to cause irreparable injury to American Studies Association's reputation.

225.   Section 29–403.04 of the D.C. Nonprofit Corporation Act authorizes a member to challenge an *ultra vires* act in a legal proceeding, and it authorizes the award of injunctive relief and damages by a court. Plaintiffs are entitled to recover damages from the Individual Defendants incurred by the American Studies Association, and to declaratory and to injunctive relief.

**COUNT SIX**
**(IN THE ALTERNATIVE)**

**Breach of Contract Against Defendant American Studies Association by All Plaintiffs**
**(Voting Process Contrary to Bylaws)**

226.   Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein. Plaintiffs plead this Count Six in the alternative to Count Seven.

227.   "It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members since the continuing relationship between the organization and its members manifests an implicit agreement by all parties concerned to abide by the bylaws." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).

228.   Boycotting Israel was an issue "which, in the opinion of the Executive Committee or Council, seem[ed] to require public action, speech or demonstration by the association at a particular annual meeting" per Article XI, § 3 of the American Studies Association By-Laws. Accordingly, the Boycott Resolution could pass only if it were approved by two-thirds of the members voting on the first full day of the Annual Meeting.

229.   The Boycott Resolution was not lawfully passed because: (a) the ultimate vote tally, and the only tally publicly available, is not limited to votes cast at the Annual Meeting, but

78

includes votes by hundreds of other members who were not present at the Annual Meeting; (b) a two-thirds majority of the 1,252 members who allegedly voted on the resolution would have been 834 or 835, while the alleged number of those supporting the Boycott Resolution falls short; (c) the vote was not held on the first full day of the annual meeting that occurred that year, November 20, 2013.

230.    The breach of the American Studies Association's contractual obligations to Plaintiffs harmed Plaintiffs, resulting in the damages set forth in Count Two of the complaint. As a consequence of Defendants' breach, Plaintiffs are also entitled to declaratory relief invalidating and vacating the Boycott Resolution and injunctive relief to prohibit its implementation.

### COUNT SEVEN
### (IN THE ALTERNATIVE)

### Breach of D.C. Nonprofit Corporation Act
### Against Defendant American Studies Association by All Plaintiffs

231.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein. Plaintiffs plead this Count Seven in the alternative to Count Six.

232.    Section 29-405.24 of the D.C. Nonprofit Corporation Act sets forth the requirements for a quorum for a vote of the members of groups like the American Studies Association. It states that:

> Members entitled to vote as a separate voting group may take action on a matter at a meeting only if a quorum of those members exists with respect to that matter. Except as otherwise provided in the articles of incorporation or bylaws, a majority of the votes entitled to be cast on the matter by the voting group constitutes a quorum of that voting group for action on that matter.

233.    Accordingly, in the event that art. XI, § 3 of the American Studies Association By-Laws did not govern the Boycott Resolution, a quorum on the measure would have been "a majority of the votes entitled to be cast on the matter by the voting group."

234.    Upon information and belief, a "majority of the votes entitled to be cast on the matter" of the Boycott Resolution would have had to exceed 1,8000 members—a majority of the American Studies Association's voting membership. The Boycott Resolution was thus adopted in breach of § 29-405.24 of the D.C. Nonprofit Corporation Act and is null and void.

235.    The wrongful adoption of the Boycott Resolution in breach of the D.C. Nonprofit Corporation Act was harmful to the Plaintiffs, resulting in the damages set forth in Count One of the complaint. Plaintiffs are also entitled to declaratory and injunctive relief against the implementation of the Boycott Resolution purportedly adopted without a lawful quorum.

## COUNT EIGHT

### Breach of Contract Against Defendant American Studies Association by Plaintiff Barton (Denial of Right to Vote)

236.    Plaintiff Barton repeats and realleges the allegations set forth above as if fully set forth therein.

237.    By offering membership on the terms set forth in its website, American Studies Association makes an offer capable of being accepted and forms a contract entitling those persons who accept that offer to the benefits of membership.

238.    "It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members since the continuing relationship between the organization and its members manifests an implicit agreement by all parties concerned to abide by the bylaws." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).

239.    One of the contractual benefits of membership is the right to vote on matters put before the American Studies Association's members for approval. American Studies Association Const. art. II, § 3 ("Only individual members in good standing shall have the right to vote or hold

office in the association"). Plaintiff Barton accepted the American Studies Association's offer for membership in 2013, during the vote on the Israeli boycott.

240.    Such discrimination against Barton regarding his right to vote, on the basis of the way he chose to vote, is a violation of Barton's contractual rights to membership privileges as those rights are created by the American Studies Association and its regulations.

## COUNT NINE

## Corporate Waste Against All Defendants by All Plaintiffs

241.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

242.    The doctrine of waste defines "waste" as the "exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *See* 3A *Fletcher Cyc. Corp.* § 1102 at 150–51 (2010). The essence of a waste claim is "the diversion of corporate assets for improper or unnecessary purposes." *Daley v. Kappa Alpha Sorority, Inc.,* 26 A.3d 723, 730 (D.C. 2010).

243.    The Individual Defendants' decision to use American Studies Association resources to advocate, conduct a vote on, declare enacted, and then support the Boycott Resolution was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests. This decision went far so beyond the bounds of reasonable business judgment that the only possible determinant of these actions by the Individual Defendant is their bad faith and conflict of interest, which consists of their conscious decision to appropriate American Studies Association resources for purposes outside of those established by its organic documents and to advance their own personal political goals.

244.    These actions resulted in the damages alleged herein and outlined in prior Counts and previous paragraphs. Plaintiffs are entitled to recover damages from the Individual Defendants on behalf of the American Studies Association.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court enter judgment against the Defendants and in favor of the Plaintiffs, and award:

1)      A declaration that the vote of the American Studies Association membership with respect to the Israel boycott was *ultra vires*, in breach of Defendants' contractual obligations or of the D.C. Nonprofit Corporation Act, and wasteful;

2)      A declaration that the Individual Defendants breached fiduciary duties owed to the American Studies Association and its members;

3)      A permanent injunction enjoining and restraining the American Studies Association and each of the Individual Defendants who remains in a position of American Studies Association leadership from taking any action that does not strictly follow the statement of purpose as set forth in the American Studies Association's Constitution;

4)      A permanent injunction enjoining and restraining the American Studies Association from taking any action to enforce the Israel Boycott purportedly adopted by the American Studies Association's National Council and the American Studies Association;

5)      A permanent injunction enjoining and restraining the American Studies Association from making any payments or expenditures in violation of the Defendant American Studies Association's Constitution, including in support of the Israel boycott;

6)      Actual damages on behalf of the American Studies Association from the Individual Defendants, jointly and severally, in an amount to be determined at trial but in excess of $75,000, representing the amounts of all money expended, and the value of all American Studies Association assets appropriated, in the service of getting the Boycott Resolution enacted; defending it and/or the American Studies Association after such enactment; or enforcing the Boycott Resolution after it was enacted;

7)      The costs and disbursements of this action, including attorneys' and experts' fees; and

8)      Such other and further relief as is just and equitable.

Dated: _____, 2017                      Signed: _____
                                                                    Jennifer Gross

Jerome M. Marcus (admitted *pro hac vice*)      Jennifer Gross, DC Bar No. 1003811
Jonathan Auerbach (admitted *pro hac vice*)     Aviva Vogelstein (admission to DDC
**MARCUS & AUERBACH LLC**                        pending, DC Bar No. 1024231)
1121 N. Bethlehem Pike, Suite 60-242             **THE LOUIS D. BRANDEIS CENTER**
Spring House, PA 19477                                **FOR HUMAN RIGHTS UNDER LAW**
(215) 885-2250                                   1717 Pennsylvania Avenue NW, Suite 1025
jmarcus@marcusauerbach.com                       Washington, DC 20006-4623
auerbach@marcusauerbach.com                      (202) 559-9296
                                                 jenniegross@brandeiscenter.com
                                                 avogelst@brandeiscenter.com
*Lead Counsel for Plaintiffs*



L. Rachel Lerman (admitted *pro hac vice*)      Joel Friedlander (*pro hac vice* pending)
**BARNES & THORNBURG LLP**                       **FRIEDLANDER & GORRIS, P.A**.
2029 Century Park East, Suite 300                1201 N. Market Street, Suite 2200
Los Angeles, CA 90067-2904                       Wilmington, DE 19801
(310) 284-3871                                   (302) 573-3502
rlerman@btlaw.com                                jfriedlander@friedlandergorris.com


Scott Godes, DC Bar No. 463674                   Eric D. Roiter (*pro hac vice* pending)
Devin Stone, DC Bar No. 1022055                  Lecturer in Law
**BARNES & THORNBURG LLP**                       **BOSTON UNIVERSITY SCHOOL OF**
1717 Pennsylvania Avenue NW, Suite 500           **LAW**
Washington, DC 20006-4623                        765 Commonwealth Avenue
(202) 408-6928                                   Boston, MA  02215
sgodes@btlaw.com                                 (617) 734-8266
dstone@btlaw.com                                 eroiter@bu.edu



*Counsel for Plaintiffs*