**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON,<br><br>Plaintiffs,<br>v.<br><br>LISA DUGGAN, CURTIS MAREZ, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, J. KEHAULANI KAUANUI, JASBIR PUAR, STEVEN SALAITA, JOHN STEPHENS, and THE AMERICAN STUDIES ASSOCIATION,<br><br>Defendants. | Case No. 16-cv-00740-RC |

**SUPPLEMENTAL BRIEF ON THE ISSUE OF SUBJECT MATTER JURISDICTION**

Plaintiffs Simon Bronner, Michael Rockland, Michael L. Barton, and Charles D. Kupfer (collectively, "Plaintiffs") respectfully submit this Supplemental Brief on the Issue of Subject Matter Jurisdiction, as directed in this Court's Memorandum Opinion Granting Plaintiffs' Amended Motion to Extend Time to Add Parties and Plaintiffs' Motion for Leave to File Second Amended Complaint ("Opinion," at 17-18, Dkt. 80).

This Supplemental Brief is filed under seal, pursuant to the Protective Order that governs this case, which requires the parties to file under seal any document that is marked "Confidential." (Protective Order at ¶ 10, Dkt. 52.)[1]

---

[1] Defendants have marked well over 90% of their productions "Confidential," most retroactively. Plaintiffs do not agree that these documents are correctly identified as "Confidential," as the term is defined in the Protective Order. However, as this Supplemental Brief references multiple documents

The jurisdictional amount requirement is satisfied here because the Individual Defendants spent hundreds of thousands of dollars of the ASA's money pursuing a goal when, defendants' emails make clear, defendants knew their actions exposed the ASA to harm: they didn't care. As one email produced in discovery by Defendant Maira explained, **"The point of the campaign is to pass the resolution to embolden other organizations and to contribute to emboldening the movement at large. So, essentially, between us *I don't care if it 'splits' the organization*."** (SM00027941.)

To advance this "campaign" the Individual Defendants looted the ASA's modest endowment of slightly over $1 million, withdrawing hundreds of thousands of dollars to pay for Boycott Resolution-generated expenses. They directed the ASA's only employee, Individual Defendant John Stephens – who is paid over a quarter of a million dollars a year – to spend a very substantial amount of his time engaging in activities to advance the Resolution itself and the "campaign" of which it is a part, including lobbying for and against laws relating to the boycott of Israel – when lobbying for laws is explicitly forbidden by the ASA's Constitution. (SAC ¶¶ 142-61.)

In addition, the injunctive relief that will be needed and appropriate to remedy the injuries inflicted on the ASA by the Individual Defendants is itself sufficient to satisfy the amount in controversy requirement.

The facts as set forth in the SAC and as further detailed in the discovery produced to date thus reveal the Individual Defendants acting not on behalf of the ASA, but to its detriment, and using the ASA, its money, and its reputation to advance the Individual Defendants' own personal goals.

---

produced by Defendants and attaches the documents as exhibits, the terms of the Confidentiality Order require that we file this Supplemental Brief under seal.

Because that is what is at issue in this case, no Individual Defendant is immune from liability.  The corporate law provisions about which the Court has inquired exist to protect members of an entity's board of directors so long as (a) they are acting *as* directors, *and* (b) only so long as they are not alleged to have acted for their own benefit.  In essence, these rules implement a capacious understanding of the business judgment rule.

But that rule, and the provisions that enforce it, do not ever protect people from liability if they are alleged to have acted at the explicit expense of the organization on whose board they sit.  Moreover, the District of Columbia's corporation laws, like those of other jurisdictions, only protect board members ***when they are acting as board members***.  As Plaintiffs show below, that means that the statute immunizes these people, if at all, only when they deliberate with and as board members, and act through the board.  ***None*** of the Individual Defendants' actions here at issue were committed in that capacity – all are charged with acting individually, to advance their own "campaign."

As we show below, no other provision of law shields any of the individual Defendants from the actions with which they are charged by the SAC.

## I.  <u>STATEMENT OF FACTS</u>

The Plaintiffs in this case are renowned professors of American Studies, current and former members of the American Studies Association ("ASA"), and include two winners of the ASA's Turpie Award and lifetime ASA members.  At the time this case was filed, one was editor of the ASA publication, *Encyclopedia of American Studies*, an ASA officer, and a member of the ASA National Council.  The Plaintiffs filed this case against after the ASA adopted a resolution boycotting academic institutions in Israel ("the Boycott Resolution") against the best interests of the organization and its members.

The First Amended Complaint ("FAC") brought six claims:  two for breach of contract, and one each for breach of fiduciary duty, *ultra vires* acts, and violation of the D.C. Nonprofit Corporation Act, and sought injunctive and declaratory relief as well as monetary damages from the ASA and six individual defendants. (FAC at 25-31, Dkt. 19; Mem. Op. on Mo. to Dismiss at 12-13 ("MTD Opinion"), Dkt 28.)  Although Defendants argued that the amount in controversy did not satisfy the $75,000 minimum required by 28 U.S.C. § 1332(a), this Court held that "Plaintiffs' claims plainly meet the low standard for establishing a sufficient amount in controversy."  (MTD Opinion at 12.)  The Court cited the FAC's allegations of damages, including loss of membership dues, improper expenditure of ASA funds, the time and effort of ASA employees, and appropriation of ASA assets and reputation for non-ASA purposes.  (MTD Opinion at 13.)

Discovery has been slow, contentious, and remains incomplete.  Although Plaintiffs served Defendants with Requests for Production on May 30, 2017, Defendants did not produce the bulk of their production until October 17, 2017.  Upon review of the October production, Plaintiffs identified additional claims and culpable parties and drafted the Second Amended Complaint ("SAC").  (Motion for Leave to File the SAC, Dkt. 59.)  The Court granted the Motion for Leave, and the SAC was filed on March 7, 2018.  (Dkt. 81.)

The SAC brings new claims, adds new defendants, and includes new factual allegations unknown to Plaintiffs when the FAC was filed.  The SAC does not, however, exclude any of the surviving claims brought in the FAC, or omit any of the factual allegations supporting those claims for damages or injunctive and declaratory relief.

### A.     Invasion of the ASA Trust Fund

The SAC includes new allegations related to the invasion of the ASA Trust and Development Fund ("the Trust Fund") to pay expenses arising from the Boycott Resolution.

(SAC ¶¶ 162-71.)  Prior to fiscal year 2015, there had been no withdrawals from the Trust Fund, at least as far back as June 30, 2008 – the date of the earliest financial statement produced by Defendants that reports such withdrawals.  (ASA 930; SAC ¶ 162.)  Then, in fiscal year 2015, Defendants **withdrew over $112,000 from the Trust Fund, and at a loss of $16,240.**  (JS 1332_37; SAC ¶ 167; ASA 2014 Form 990.)  This withdrawal is consistent with documents produced in discovery that reveal plans to invade the Trust Fund to pay expenses related to the Boycott Resolution.  (SAC ¶¶ 162-73.)

Defendants have not produced financial statements for fiscal year 2016, so the SAC does not include information on withdrawals from the Trust Fund after fiscal year 2015.  Subsequent to the SAC, however, the ASA's Form 990 for fiscal year 2016 became publicly available.  The form reports **sale of securities for $268,085 in fiscal year 2016 – approximately 21% of the value of the fund at the beginning of the year – at a loss of $19,319**.  Although the Form 990 does not specify if the entire amount of securities sold were withdrawn from the Trust Fund, it certainly seems likely, as the value of securities was increasing, and yet the ASA sold securities at a substantial loss.

We do know that the withdrawals in fiscal year 2015 were made to cover expenses related to the Boycott Resolution (along with the cost of a new website), because documents produced in discovery explicitly say so.  (*See*, *e.g.*, JS 1940; SAC ¶¶171.)  The same documents reflect plans to withdraw similar amounts in subsequent years to cover legal expenses and D&O insurance coverage.  (SAC ¶¶ 175.)

Setting aside the planned withdrawals in future years, and attempts to estimate exactly how much withdrawn from the Trust Fund in fiscal year 2016, **we know that at least $294,000 was withdrawn from Trust Fund in fiscal years 2015 and 2016, combined**, because another ASA document produced in discovery says exactly that. (SAC ¶ 171.)  **Although it seems likely**

*that the amount withdrawn from the trust was closer to $380,000, the difference is not*

*material for purposes of meeting the $75,000 requirement – approximately one-fourth of the*

*lower estimate*.

As the SAC explains, the Defendants had to change the bylaws of the ASA to withdraw

these large sums.  (SAC ¶¶ 162-69.)  Yet the documents produced by defendants to date do not

include documentation of the change in the bylaws to allow for these withdrawals.  This is still

true even after the Court ordered Defendants to produce documents related to changes in the

ASA's bylaws, overruling their objections.  However, documents produced to reveal intentions

to invade the trust in fiscal year 2013.  (LD 6679, SAC ¶ 189.)

**B.      Documents Produced by Defendants Reflect the Defendants' Knowing and
Intentional Disregard for the Best Interests of the ASA.**

The SAC brings new claims for, *inter alia*, breach of fiduciary duty of loyalty and

candor.  These claims are supported by documents produced in discovery, including

communications to and from the Individual Defendants, reflecting their full awareness of the

negative impact the Boycott Resolution would have on the ASA.  They include statements that

reflect utter lack of concern about the best interests of the ASA and its members, such as the

following:

> The point of the campaign is to pass the resolution to embolden other
> organizations and to contribute to emboldening the movement at large.
> So, essentially, between us *I don't care if it 'splits' the organization*.

(SM00027941.)  They also include statements of concern to Defendants, including this

statement to Defendant Maira from Nikhil Singh, in an email where he announced that he was

resigning from the USACBI Organizing Collective during the campaign for the ASA to adopt the

Boycott Resolution, because of the conflict of interest with his position on the ASA's National

Council and Executive Committee, and apparent regrets for his involvement:

> I find myself increasingly less persuaded that this is an effective political strategy . . . many of us are already consumed with rearguard defensive action at our own institutions.
>
> More to the point, as an officer of the ASA, ***I should have probably stepped down [from the USACBI Organizing Collective] some time ago to avoid any appearance of a conflict of interest***. . . . I think [the Boycott Resolution is] going to win this in the membership, but ***I think there will be fall-out and months, perhaps years of recrimination within the ASA.***

(SM00009875.)

### C.   The Stephens Declaration

In support of their Motion to Dismiss the FAC, Defendants filed a declaration from Defendant John Stephens, Executive Director of the ASA ("the Stephens Declaration").[2]  The Stephens Declaration states that there "has been no financial loss to ASA as alleged in the Complaint."  (Stephens Decl. ¶ 3, Dkt. 21-2.)  The Declaration goes on to make a number of statements with respect to revenue and expenses in support of that sweeping statement. Discovery reveals that many of these statements are untrue, and were untrue when Defendant Stephens signed the Declaration.

### 1.   Membership and convention revenue has decreased.

The Stephens Declaration states membership dues for the past 15 fiscal years averaged $260,000, and that the dues for the fiscal year ending in June 2015 were $261,876 – suggesting that with respect to dues revenue, the ASA is in line with past years.  (Stephens Decl. ¶¶ 5-7.) What the Declaration does not say is that in the year prior to the introduction of the proposed resolution – fiscal year 2011 – membership dues were over $300,000.  The Declaration also does not say that membership dues for the two fiscal years following the Boycott Resolution – fiscal

---

[2] John Stephens was not a defendant at the time of the affidavit.  He was added as a defendant with the filing of the SAC.

years 2014 and 2015 – were both lower than for any year prior as far back as fiscal year 2007

(dues revenue of $296,795), with the sole exception of the fiscal year ending in June 2010, which

largely reports dues from the fall of 2009 – the heart of the Great Recession.

In the Declaration, Defendant Stephens attempts to explain the decline in membership

dues as a reflection of the location of the 2015 Annual Meeting.  The Declaration states:

> The single most important factor for membership dues is the location of
> the meeting. For example, our 2015 annual meeting was held in
> Toronto, Canada. There were a number of active members who did not
> have valid passports, thus they didn't apply for the program, so they did
> not pay membership dues for that year.

(Stephens Decl. ¶ 6.)  Although it may or may not be true that a number of ASA members do not

have passports, it does not appear to be true that the 2015 Annual Meeting in Toronto was less

well-attended than the Annual Meetings held in the United States.  Convention revenue for fiscal

year 2015 actually exceeded average convention revenue for the prior fifteen fiscal years.  It also

exceeded convention revenue for fiscal years 2014 and 2016.  Thus, the reason for the decline in

membership dues since the Boycott Resolution is clearly not attributable to the Toronto location

of the 2015 Annual Meeting.

Although the Stephens Declaration states that "[d]ues revenue is the best index of gain or

loss of members" (Stephens Decl. ¶ 5), it is apparent from the ASA's Form 990s that

membership dues and convention revenue do not rise and fall together.

***It is also clear is that the ASA's total annual revenue has declined substantially since
the Boycott Resolution***.  In fact, ***total revenue for fiscal year 2016 is the lowest since fiscal year
2009.***  And the differential is not small.  The total revenue in FY 2016 was $877,726.  In fiscal

year 2013, the year of the Boycott Resolution, the ASA reported total revenue of $1,033,261; in

the five years prior to FY 2016, revenue never fell below $940,000.  This decline in revenue is

15% from the peak, and over $140,000 (9%) from the average of the previous five years.  *The decline in revenue alone is nearly double the $75,000 requirement.*

This is clearly inconsistent with the Stephens Declaration, ¶¶ 5-7, and there is no other explanation offered or apparent for the ASA's dramatic decline in revenue except for the decline in membership, lack of ability to attract new members, and resulting lack of interest in the Annual Meeting resulting from the Boycott Resolution (and the attendant decline in the ASA's academic and professional reputation – the primary selling point for an academic association).

2.       <u>**ASA delayed paying and reporting expenditures, which increased dramatically because of the Boycott Resolution.**</u>

The Stephens Declaration purports to describe expenses incurred by the ASA arising from the Boycott Resolution, and states that they total less than $50,000, all covered by special donations earmarked for support of the Boycott Resolution.  (Stephens Decl. ¶ 14.)  Thus, Defendant Stephens wants us to believe, the ASA general fund was unaffected by the Boycott Resolution.

What Defendant Stephens does not say in his declaration is that *the ASA does not record expenses until they are paid – and significant expenses incurred as a consequence of the Boycott Resolution were not paid for at least two years*.  Defendant Stephens acknowledged this in deposition.  For example, legal expenses incurred in 2013-15 did not appear on the ASA's 990 for those years, because they were paid with the ASA's credit card, and the credit card bill was not still unpaid as of May 2017.[3]  (JS 1940.)  We cannot possibly know from the documents produced thus far the extent of expenses incurred because of the Boycott Resolution that remain off the books because they are still unpaid.

_____

[3] This lawsuit was originally filed in 2016, thus these legal expenses could not be for the defense of this action.

3.     **Employee time and effort increased dramatically in response to the public outcry against the ASA and the Boycott Resolution.**

The Stephens Declaration states:

> Another of the allegations in the Complaint involves alleged extra monies spent on employee resources in support of the Resolution. There have been no extra monies spent on employee resources in support of the Resolution, either leading up to or following the Resolution.

(Stephens Decl. ¶ 8.)  The partial discovery produced so far in this case easily refutes this statement.

Numerous documents at the preceding and following the adoption of the Boycott Resolution discuss the overwhelming amount of time and effort required of Defendant Stephens to handle tasks arising from and related to the Boycott Resolution.  At the adoption of the Boycott Resolution, Defendant Stephens was the only paid employee of the ASA, other than on and off, part-time clerical assistance from graduate students.  Documents produced in discovery clearly reflect that his workload was overwhelmed by Boycott Resolution tasks.

It is apparent that the assistant sought to handle the extra work related to the Boycott Resolution was in fact hired.  The ASA's financial reports show that an assistant was hired to relieve Defendant Stephens of the pressure of the extra work related to the Boycott Resolution. Although we sought documents related to expenses, including salaries and wages of people hired to because the workload could no longer be handled by one employee, Defendants largely did not produce any documents after 2015.  But the ASA's 990s reflect payments of $116,050 in fiscal year 2014 and $183,197 in fiscal year 2015 on the line for "other salaries and wages" – that is, salaries and wages beyond those reported as compensation for "current officers, directors trustees, and key employees," where Defendant Stephens' salary is reported.  These reports are consistent with an email from the ASA president at the time, reporting on the financial condition

of the ASA, and the need to withdraw funds from the Trust Fund and raise the annual dues to increase revenue.

Prior to fiscal year 2014, "other salaries and wages" reported on the form never exceeded $67,000, the average over the prior five years was only $53,021 – approximately the cost of a pair of part-time graduate students.  In fiscal year 2016 – when the finances of the ASA had declined to the point that the revenues were at a seven-year low, expenses were at a fifteen-year high, and the ASA reported a loss of $242,570 – the second year in the red in a row, and by far the worst of the years that the ASA operated at a loss, since at least fiscal year 2002 – the line for "other salaries and wages" and decreased to less than $40,000.

Defendant Stephens' statement that "[t]here have been no extra monies spent on employee resources in support of the Resolution, either leading up to or following the Resolution" is clearly untrue. Approximately ***$193,205 was paid to this person over fiscal years 2014 and 2015 – more than 2.5 times the $75,000 requirement***.

Moreover, it is clear from the documents produced thus far that Defendant Stephens' workload was profoundly affected by the Boycott Resolution.  Defendant Stephens' time is quite valuable – or expensive.  He was paid a salary over $255,000 for fiscal year 2016 – not including benefits and payroll taxes.  This included a raise of over $16,000 (7%) from fiscal year 2015, when he was paid a salary of $238,324 (which, in turn, included a raise of over $16,000 from the previous year, fiscal year 2014).

Documents produced by defendants show that he spent a great deal of his time addressing Boycott Resolution-related issues. Not including benefits or payroll taxes, ***Defendant Stephens was paid $1,133,607 over the four years beginning on July 1, 2013, and ending June 30, 2017***. ***If Defendant Stephens spent only 7% of his work hours on the Boycott Resolution, the proportionate share of his pay would satisfy the $75,000 requirement***.

### 4. <u>Contributions and Grants</u>

Defendant Stephens' Declaration further states:

> In the year following the Resolution, contributions and grants increased
> to $70,544.00 and there have been additional contributions since that
> time. Following the Resolution, a number of organizations and
> individuals instituted various public relations-oriented attacks on ASA
> because of the Resolution. A large amount of the contributions since
> the Resolution have been in support of ASA's Resolution. $49,000.00
> is the total amount of the contributions that have been specifically
> designated by donors for ASA's support for the Resolution.

(Stephens Decl. ¶ 9.)  It appears to be true that a small number of donors contributed to the ASA

immediately following the resolution, and that these contributions totaled approximately $49,000

that was specifically designated for "support for the Resolution" in fiscal year 2013.  But this

number is meaningless without context.  The total contributions that year was $70,544 – thus, the

amount of contributions that were not dedicated to "support for the Resolution" and thus were

available for the ASA's general operations was only $21,544 – the lowest in ten years.  Thus, if

there $49,000 in donations that could only be used to support the Boycott Resolution, there was

also a decrease in donations to the ASA's general operations that very year.

Moreover, contributions to the ASA since fiscal year 2013 have decreased significantly.

In the five years preceding the introduction of the resolution (fiscal years 2007 to 2011), the

average contribution was $39,530.  In fiscal year 2011, contributions totaled $36,296.  But after

the passage of the Boycott Resolution, annual contributions declined, reaching a 14-year

minimum last year, in fiscal year 2016, below $30,000.

It is clear from the ASA's financial reports that the $49,000 in donations set aside for

Boycott Resolution-related expenses did not come close to covering those expenses.  It is also

clear that the ASA's general fund has suffered from the decrease in contributions, and that the

small bump in contributions for fiscal year 2013 intended for resolution-related expenses were

not renewed in any of the following years.  Meanwhile, donations to the ASA's general fund never recovered from the negative effect on the ASA's reputation as an academic association.

## II.    INDIVIDUAL DEFENDANTS ARE NOT EXCULPATED FROM LIABILITY FOR MONEY DAMAGES BY § 29-406.31.

The Opinion specifically asks whether the Individual Defendants can be held liable for money damages under § 29-406.31(d) of the D.C. Nonprofit Corporations Act, which exculpates directors (only) from liability for money damages under certain conditions.  The Opinion further questions whether the amount in controversy satisfies the $75,000 requirement under 28 U.S.C. § 1332, if § 29-406.31(d) does apply to the Individual Defendants.  Section 29-406.31 provides:

> (d) Notwithstanding any other provision of this section, a director of a charitable corporation shall not be liable to the corporation or its members for money damages for any action taken, or any failure to take any action, *as a director*, except liability for:
>
> (1) The amount of a financial benefit received by the director to which the director is not entitled;
>
> (2) An intentional infliction of harm;
>
> (3) A violation of § 29-406.33; or
>
> (4) An intentional violation of criminal law.

D.C. Code § 29-406.31(d), emphasis added.

In part, this question arises from Defendants' assertion that the SAC only seeks damages from Individual Defendants on behalf of the ASA.  (Opposition to Plaintiffs' Motion for Leave to File Second Amended Complaint ("Opposition" or "Opp."), Dkt. 66, at 4; *see also* Opinion at 14, 16.)  Defendants' assertion was (and is) incorrect.  Plaintiffs seek all damages that the Court deems appropriate, just and equitable.  This includes injunctive and declaratory relief, as well as money damages, from all Defendants.  Thus, the $75,000 would be still be met – easily, in our view – even if the Individual Defendants were not liable for any money damages at all – which is not at all the case.

But, as explained below, the Individual Defendants' liability for money damages is not exculpated by § 29-406.31(d).  The Individual Defendants are therefore liable for all of the damages they have caused, in far excess of $75,000.

### A.      Defendants Puar and Tadiar Are Not Exculpated by § 29-406.31(d) Because Neither Was a Director of the ASA.

Defendant Puar was a member of the ASA Nominating Committee, not the ASA National Council.  Among other allegations, the SAC alleges that she secretly and intentionally stacked the National Council with members of the USACBI Advisory Committee and Organizing Collective, and ensured that only endorsers of USACBI were nominated for ASA President, and intentionally concealed this agenda from the ASA voters precisely because she feared, accurately, that if the voters understood her candidates' agenda those candidates would lose.  Defendant Puar said nothing about her intent or her interest in USACBI's boycott platform (she is a member of the USACBI Advisory Committee herself) when she ran for her position on the Nominating Committee.  She also intentionally chose to conceal this intent as she nominated the USACBI leaders for the National Council, and ensured that only USACBI supporters were even nominated for ASA President.  (SAC ¶¶ 47-77.)[4]  Since she was not a member of the National Council, she is not exculpated from liability under § 29-406.31(d).

Defendant Tadiar was the head of the committee to plan the ASA's 2013 Annual Meeting, where significant ASA resources were exploited in the interest of USACBI and its supporters (she serves on both the Advisory Committee and the Organizing Collective of USACBI), among other things.  Because was not a member of the National Council during the relevant time period, she is not exculpated from liability under § 29-406.31(d).

---

[4] Defendant Puar was added as a Defendant with the SAC.  No discovery has yet been produced by her.

**B.      Defendant Stephens' Liability for Money Damages Is Not Eliminated By §
29-406.31(d) Because He Is Not a Director and Was Not Acting as a Director.**

The Opinion questions whether Defendant Stephens might be exculpated by § 29-

406.31(d), because as Executive Director of the ASA, he is a deemed a non-voting member of

the ASA National Council.  (Opinion at 17.)

Section 29-406.31 provides:

> (d) Notwithstanding any other provision of this section, a director of a
> charitable corporation shall not be liable to the corporation or its
> members for money damages for any action taken, or any failure to
> take any action, ***as a director***, except liability for:
>
> (1) The amount of a financial benefit received by the director to which
> the director is not entitled;
>
> (2) An intentional infliction of harm;
>
> (3) A violation of § 29-406.33; or
>
> (4) An intentional violation of criminal law.

D.C. Code § 29-406.31(d), emphasis added.

The section explicitly applies only to acts taken by directors, as directors.  John Stephens

is not a director of the ASA, regardless of his position as a non-voting member of the National

Council, and he lacks authority to act as a director.

The ASA Bylaws define the Executive Director as an Officer, rather than a board

member.  The relevant provision states:

> **CONST. ARTICLE IV:  Officers**
>
> Sec. 1. The elected officers shall be the president and the vice
> president. The appointed officers shall be the executive director, the
> editor of the Encyclopedia of American Studies, and the editor of the
> American Quarterly.
>
> . . . .
>
> Sec. 4. The executive director shall be the chief administrative officer
> of the association. It shall be his or her duty, under the direction of the
> president and Council, to oversee the affairs of the association, to have
> responsibility for the continuing operations of the association, to

> supervise the work of its committees and staff, to assist in the
> formulation of policies and projects for submission to the Council, to
> execute instructions of the Executive Committee and of the Council,
> and to perform other such duties as the Executive Committee and the
> Council may direct.

ASA Const. & Bylaws, Const. Art. IV, §§ 1, 4.  This Court has held that Defendant Stephens'

role "is described as the 'chief administrative officer of the association' and [to] 'oversee[s] the

affairs of the association' with 'responsibility for the continuing operations of the association.'"

(Opinion at 17.)

Defendant Stephens's job is to handle the day-to-day affairs of the ASA.  As explained

above, he is the ASA's only full-time employee, and currently the only paid employee but for

part-time assistance from graduate students.  Of the $294,755 the ASA paid in compensation,

salaries and wages in FY 2016, Defendant Stephens accounts for $255,094 (87%). (990 FY 2016

at 10.) He is also the only paid officer of the ASA.  (990 FY 2016 at 7.)

Documents produced in discovery reflect Stephens' role in handling the day-to-day

affairs of the ASA.  And, importantly, with respect to those allegations in the SAC that involve

Defendant Stephens, they all related to this administrative role of the ASA, *e.g.*, implementation

of the voting process, handling of the finances (including invasion of the Trust Fund), responding

to and dealing with members and external correspondence, and the preparation of reports, *inter*

*alia*.

The Court queried whether the designation of the Executive Director as a non-voting

member of the National Council would bring John Stephens "within the ambit" of § 29-

406.31(d), even though he acts as an officer.  (Opinion at 17.)   The answer is no, for two

reasons.

First, status as a non-voting member of the National Council does not render John

Stephens a director of the ASA.  Defendant Stephens is not a director of the ASA because he

does not have the authority of a director and does not perform the tasks of a director.  The ASA

Constitution defines these roles, thereby making clear that Stephens is not a director.

The ASA Constitution describes the authority and responsibilities of the National

Council.  For example, Article V, § 2 provides:

> Sec. 2. The Council shall conduct the business, set fiscal policy, and
> oversee the general interests of the association. The Council shall fix
> the amount of dues and the date upon which any change of dues
> becomes effective. It may appoint such committees as it deems
> necessary. It shall call a meeting of the association at a time and place it
> deems appropriate.  The Council shall hold at least one business
> meeting annually, at a time and place to be determined by the
> Executive Committee, for the election of members to committees, for
> the approval of the budget, for the consideration of reports and
> recommendations from the officers and committees, for the discussion
> of policies and of instructions that should be given to the elected or
> appointed officers, and for the transaction of other such business as
> may come before it.  . . .

Defendant Stephens lacks the power to make, or even to vote on, any of these decisions.  He

lacks authority to set fiscal policy, to fix the amount of dues, to appoint committees, to set

policies, or to instruct the officers (including himself) or to vote on any of these decisions.

Although a person may serve as both as an officer and a director, Defendant Stephens

does not.  The ASA's Form 990 reflects this his role appropriately.  Although the President and

the President-Elect are identified as both "Officer" and "Director," Defendant Stephens is not.

He is identified only as an "Officer."  (*See, e.g.*, ASA 2016 Form 990 at 7.)

Second, even if Defendant Stephens did serve as both an officer and a director, § 29-

406.31(d) only "applies to a director's actions or failures to take action *in his or her capacity as

a director and not in any other capacity, such as officer, employee, or controlling member."*

MODEL NONPROFIT CORP. ACT, cmt. § 2.02, at 2-10 (emphasis added).  Because the allegations

in the SAC involving Defendant Stephens involve actions taken in his capacity as an officer and

an employee, and not do not involve actions that a director would take in the capacity of a director, that a director would take in the capacity of a director, § 29-406.31(d) does not apply.

### C.     **Defendants Marez and Duggan Are Not Exculpated from Liability by § 29-406.31(d).**

As discussed above, § 29-406.31(d) exculpates directors from liability for money damages for actions "taken as directors," only.  Where a person serves as both an officer and a director, § 29-406.31(d) applies only to "actions or failures to take action in his or her capacity as a director and not in any other capacity, such as officer[.]" MODEL NONPROFIT CORP. ACT, cmt. § 2.02, at 2-10.

The Court queries whether Defendants Marez and Duggan, former Presidents of the ASA, are exculpated by § 29-406.31(d), because "even though the President is termed an 'officer' under the ASA's Constitution, the position of President certainly seems to fit within the definition of 'director' given that the President, by the terms of ASA's Constitution, is a member of the National Council. *See* ASA Const. & Bylaws, Const. Art. IV, § 2; Art. V, § 1(a)." (Opinion at 16-17.)

Because § 29-406.31(d) only exculpates directors "for any action taken, or any failure to take any action, ***as a director***," the question is not whether or not they serve as directors, or whether the role of ASA President serves in the same capacity as the President of the Board of Directors.  The question is whether, the allegations against them are for acts that were taken in the capacity of directors.

Thus, even if Defendants Marez and Duggan are both officers and directors, they would not be exculpated by § 29-406.31(d) for actions taken in their capacity as officers, or for any actions taken in any capacity other than director.  Because the SAC alleges numerous claims that involve acts taken by the former ASA Presidents outside of their capacity as directors, the claims

against them are not exculpated.  For example, numerous documents describe the efforts of

Duggan and Marez to conduct "rapid response" to the backlash against the Boycott Resolution.

Other members of the ASA National Council do not engage in these managerial acts – the acts of

President.

The Nonprofit Corporations Act sets forth certain requirements for leadership of

nonprofit corporations that is are instructive here.  For example, § 29-406.40 states, in pertinent

part:

> **OFFICERS**.
>
> (a) The officers of a nonprofit corporation shall be the individuals who
> hold the offices described in its articles of incorporation or bylaws or
> are appointed or elected in accordance with the articles and bylaws or
> as authorized by the board of directors. At a minimum, a nonprofit
> corporation shall have 2 separate officers, ***one responsible for the***
> ***management of the corporation, who may be referred to as the***
> ***"President"*** or by any other term used in its articles of incorporation or
> bylaws and another responsible for the financial affairs of the
> corporation, who may be referred to as the "Treasurer," or by any other
> term used in its articles of incorporation or bylaws.

D.C. Code § 29-406.40(a), emphasis added.  This provision of the Nonprofit Corporations Act

describes the role of President differently than the role of other directors.  The President is

responsible for the ***management*** of the corporation; this involves tasks beyond setting policy

"general oversight" of the ASA.  (ASA Const., Article V, § 2, describing the role of the ASA

National Council.)  Thus, the President is an officer not just because the ASA Constitution

describes the President as "officer," but because the President acts in a different capacity than a

director, or a Chairman of the Board.

With respect to the adoption of the Boycott Resolution, the appropriation of ASA assets

and reputation, the expenditures of ASA funds, and the use of other ASA resources (including

the time and effort of employees), to the detriment of the best interest of the ASA and its

members, Defendants Marez and Duggan are responsible for these decisions, as well as the

decisions to withhold material information from the members before the vote.  These are decisions made in the course of the ***management*** of the ASA – a role unique to the ASA President and President-Elect.  And the documents produced in this litigation reflect these two former ASA Presidents were involved in the day-to-day management of the ASA, at least with respect to the activities related to the Boycott Resolution.

Thus, Defendants Marez and Duggan are not exculpated for their acts, as the allegations involve their acts in their capacity as President – an officer responsible for the management of the ASA – and not acts in their capacity as members of the National Council.

**D.**  **§ 29-406.31(d) Does Not Exculpate Any of the Individual Defendants from Liability for Acts Not Taken in the Capacity of Director.**

As discussed above, § 29-406.31(d) only applies to actions a director takes "***as a director***."  D.C. Code § 29-406.31(d).  Liability for actions "taken in any other capacity, such as officer, employee, or controlling member" is not exculpated. MODEL NONPROFIT CORP. ACT, cmt. § 2.02, at 2-10.  The requirement that the acts be taken "as a director" does not only apply to those who serve as both officers and directors.  It applies to all directors; but only the acts they take in their capacity as director are exculpated.

That limitation is critical in this case, as the many of the actions alleged in the complaint are entirely unrelated to the Individual Defendants' roles as members of the National Council.  Those responsibilities include setting policy and general oversight of the interests of the ASA – responsibilities largely performed at one annual meeting.  ASA Const., Art. V, § 2.  Many of the most serious allegations in the SAC do not involve the National Council meeting, votes by the National Council, or any of the responsibilities set forth in Article V, § 2.  This is particularly true with respect to the breach of fiduciary duty claims.  Those claims largely involve the actions of Individual Defendants, acting outside of the National Council.

Indeed, the ASA's National Council had 20 voting members (and 3 non-voting members) in fiscal year 2013 – the year the Boycott Resolution was adopted.  The SAC names only five of the voting members as Individual Defendants (Duggan, Kauanui, Maira, Marez, and Reddy) and only one of the non-voting members (Stephens).  The reason for this is that the claims do not arise from an action of the National Council as unit.  Rather, the claims arise from the misconduct of these particular individuals leading up to and following the adoption of the Boycott Resolution – misconduct that placed their personal interests over the best interests of the ASA.  The SAC does not allege that the Individual Defendants are liable for their respective votes on issues in front of the National Council, or that liability arises solely for actions taken in their capacity as members of the National Council.  Thus, Defendants' are simply wrong in contending that § 29-406.31(d) exculpates any of the Individual Defendants.  In fact, that provision is irrelevant to most, if not all, of the claims and allegations brought in the SAC.

The Kentucky Supreme Court held the same in *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189 (Ky. 2013), in a case involving a provision which is, in relevant part, nearly identical to the DC provision at issue here.  *Baptist Physicians* involved claims of breach of the fiduciary duty of loyalty against a director who was planning to leave the plaintiff medical practice to join another practice, and who secretly sought to recruit other employees of Baptist Physicians Lexington to go with him.  The Kentucky Supreme Court held that the defendant was not exculpated from liability for money damages by KRS 271B.8-300, a provision of the Kentucky code that exculpates directors from money damages for actions taken

"as a director," because the conduct alleged was not taken "as a director."[5]   The Kentucky

Supreme Court held:

> As it explicitly states, the statute applies to "any action taken as a director" and "any failure to take any action as a director." Preparing for and participating in a competing venture does not constitute the type of internal corporate governance conduct addressed in KRS 271B.8-300 and consequently the statute does not apply. Accordingly, NLC properly pled common law fiduciary duty claims on these alleged facts and this action must be remanded.

*Baptist Physicians Lexington*, 436 S.W.3d at 191-92.  The Court continued:

> The limiting language in KRS 271B.8-300(5) clearly evinces the legislature's intent to accord corporate directors protection in making decisions regarding the corporation and the conduct of its business. But just as clearly, the statute does not purport to address circumstances where a director is acting, not in his capacity as a director, but in his own individual interest with respect to a matter beyond the conduct of the corporation's business, even if that extra-corporate matter may have some impact on the corporation.
>
> . . . . the focus of KRS 271B.8-300 is corporate governance, not any action whatsoever that a person may take with respect to extra-corporate matters during his tenure as a director.

436 S.W.3d at 196-97.  Finally, the Court concluded:

> Contrary to the conclusions of the trial court and the Court of Appeals, KRS 271B.8-300 simply does not speak to all actions an individual takes while serving as a corporate director but only to those which he or she takes or fails to take while acting in a directorial role, *i.e.*, actions or inactions regarding corporate governance and the affairs of the corporation. For claims alleging breach of a director's

---

[5] (5)  In addition to any other limitation on a director's liability for monetary damages contained in any provision of the corporation's articles of incorporation adopted in accordance with subsection (2)(d) of KRS 271B.2-020, any action taken as a director, or any failure to take any action as a director, shall not be the basis for monetary damages or injunctive relief unless:

(a)  The director has breached or failed to perform the duties of the director's office in compliance with this section; and

(b)  In the case of an action for monetary damages, the breach or failure to perform constitutes willful misconduct or wanton or reckless disregard for the best interests of the corporation and its shareholders.

Ky. Rev. Stat. § 271B.8-300 (LexisNexis, Lexis Advance through Chapter 9 of the 2018 legislative session).

> fiduciary duties, especially the duty of loyalty, in the context of
> preparation for and participation in a competing enterprise, the
> common law principles . . . continue to apply.

436 S.W.3d at 198.

Under similar facts and applying a statute with very similar language, the Virginia

Supreme Court held the same:

> We recognized in *Willard v. Moneta Building Supply, Inc.*, 258 Va.
> 140, 151, 515 S.E.2d 277, 284 (1999) that "Code § 13.1.690(A) does
> not abrogate the common law duties of a director." . . . [The section]
> applies only to acts "taken as a director, or any failure to take any
> action," and is confined to the exercise of business judgment on behalf
> of the corporation. When the acts in question do not meet these criteria,
> Code § 13.1-690 does not apply.  . . .
>
> In taking this action, Miller was not exercising business judgment on
> behalf of Las Palmas.  Although implicating a common law duty of
> loyalty, this act does not fall within the scope of Code § 13.1-690.

*Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666, 676 (Va. 2001).

Plaintiffs here do not seek damages for injury arising merely from "unwise decisions or

mistakes of judgment" taken "as a director."  Rather, the SAC brings detailed, specific claims

against the Individual Defendants for intentional acts taken outside of their capacity as directors

– acts that were taken with the knowledge that real, serious injury to the ASA and its members

was likely to result, as opposed to business decisions on behalf of the ASA and intended to

further the association's best interest.  Consequently, the acts alleged in the SAC are not covered

by § 29-406.31(d) and the Individual Defendants are not exculpated from liability for money

damages.

**E.** **§ 29-406.31(d) Does Not Exculpate Any of the Individual Defendants from
Liability for Intentional Infliction of Harm, Including Breach of the
Fiduciary Duty of Loyalty.**

Section § 29-406.31(d) explicitly excludes from exculpation liability for "intentional

infliction of harm."  § 29-406.31(d)(2).  It was the intent of the drafters of this statute that breach

of the fiduciary duty of loyalty would generally be excluded under this subsection.  The SAC bases its claims on the Individual Defendants' intentional infliction of harm on the ASA; the acts at issue are therefore not immunized by §29-406.31(d)(2).

A brief history is informative.  Section 29-406.31, including subsection (d), was adopted from the Model Nonprofit Corporation Act ("Model Nonprofit Act"), § 8.31, which in turn "closely follow[s] the provisions of the Model Business Corporation Act[.]"  MODEL NONPROFIT CORP. ACT, 3d Ed., Introductory Comment to [Chapter 8,] Subchapter C, at 8-37.[6]  When the Model Business Corporation Act ("MBCA") was amended, the drafters rewrote §§ 8.30 and 8.31 to distinguish between "Standards of conduct for directors" (MBCA § 8.30) and "Standards of liability for directors" (MBCA § 8.31).  Model Nonprofit Act §§ 8.30 and 8.31 mirror MBCA §§ 8.30 and 8.31, except for the addition of subsection (d) to Model Nonprofit Act § 8.31.  That subsection, which exculpates directors of charitable organization from liability for money damages under certain circumstances, is very similar to § 2.02 of both the MBCA and the Model Nonprofit Act, which allows for corporate charters to include a provision exculpating directors from liability for money damages under certain circumstances.  *Compare* Model Nonprofit Act § 8.31(d) to MBCA and Model Nonprofit Act § 2.02.

Put more simply, both the MBNA and the Model Nonprofit Act allow a corporation to exculpate a director from liability for money damages under certain circumstances by including language in its charter, but the Model Nonprofit Act also exculpates a director of a charitable corporation under those same circumstances, whether or not the corporation includes the provision in its charter.

---

[6] "[T]his is consistent with the view that the relationship of directors to a nonprofit corporation is more akin to that of directors of business corporations than to that of trustees to their beneficiaries. *Stern v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries*, 381 F. Supp. 1003 (D.D.C. 1974)." *Id.*

The intent behind § 2.02(c) and 8.31(d) is to provide directors reasonable protection from liability for business decisions made in good faith, and for the best interest of the company, but that in retrospect did not benefit the company.  *See* comment to 2.02 at 2-09.  Neither section is intended to exculpate violations of the duty of loyalty or any other undesirable conduct.  Thus, the exception for "intentional infliction of harm."

The Official Comment to § 202 explains the rationale underlying the exception for "intentional infliction of harm":

> [Section 202(c) is intended so] that directors would not be discouraged from fully and freely carrying out their duties, including responsible entrepreneurial risk-taking.  . . . .
>
> [S]ome types of improper conduct are so clearly without any societal benefit that the law should not appear to endorse such conduct, especially in the case of a state-created entity such as a non-profit corporation.  . . . .
>
> [T]he public has an interest in encouraging good corporate governance. While the exceptions [are] few and narrow, they validate important standards of conduct.  . . . .
>
> There may be situations in which a director intentionally causes harm to a non-profit corporation or its members, even though the director does not receive any improper [financial] benefit.  The word intentional . . . is meant to refer to the specific intent to perform, or fail to perform, the acts ***with actual knowledge that the director's action, or failure to act, will cause harm*** . . . .
>
> No public policy should permit [elimination] of the liability of directors for conduct intended to cause harm to the corporation or its members.

2-11 to 2-13.

Importantly, the exception for "intentional infliction of harm" is not limited to situations where the infliction of harm is the purpose of the act.  The exception applies when the director knows or believes that the act will cause harm, even if there is another reason why the director acts.  *C.f.*, *In re Caraco Pharm. Labs Shareholder Litig.*, 2017 Mich. App. LEXIS 929, WL 2562635 (June 13, 2017) (finding that breach of fiduciary duty claims are excepted from

exculpation under exception for "intentional infliction of harm," and comparing the exception under the Model Nonprofit Act with the Delaware exculpation statute, which does not include exception for intentional infliction of harm but does include exception for breach of fiduciary duty of loyalty, *Id*. at *15-19).

Most if not all of the allegations in the SAC involve acts that fall under the exception for "intentional infliction of harm," because the Individual Defendants were clearly aware that adoption of the Boycott Resolution would damage cause the damages claimed – the costs incurred due to the Boycott Resolution, the resignations and decline in revenue, the hostile response from the public and academic leaders – they even predicted that the members of the organization would face difficulty in their employment, and that American Studies departments might lose funding. They discussed these expectations. They acted anyway. This satisfies the exception for intentional infliction of harm.

This is not a case about misjudging about a market or the return on an investment. The Individual Defendants did not decide to adopt the Boycott because they believed it would be in the best interest of the ASA, its coffers, or its members. The ASA was simply a tool to those Individual Defendants on the Organizing Collective and Advisory Committee of USACBI ("the USACBI Defendants") to raise the profile of their platform with adoption of the Boycott Resolution by a respectable academic association. The ASA was a means to end; the best interest of the ASA was not the goal.

## III. THE SAC PROPERLY AND ADEQUATELY ALLEGES CLAIMS WITH A VALUE EXCEEDING $75,000.

As this Court explained when it held that amount in controversy alleged by the FAC was satisfied the $75,000 requirement, "the sum claimed by the plaintiff controls if the claim is

apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co*., 303 U.S. 283, 288

(1938) (footnote omitted).  The Court further held:

> For a court to reject the amount claimed by the plaintiff, "[i]t must
> appear to a legal certainty that the claim is really for less than the
> jurisdictional amount." *Id*. at 289. This means that a court should find
> jurisdiction at this motion-to-dismiss stage of the proceedings even if it
> has serious doubts as to the bases for establishing the amount in
> controversy. *See Compton v. Alpha Kappa Alpha Sorority, Inc*., 64 F.
> Supp. 3d 1, 14 (D.D.C. 2014), aff'd, 639 F. App'x 3 (D.C. Cir. 2016).
> Even a "cursory" allegation of the amount in controversy, if it exceeds
> the jurisdictional requirement, is sufficient to survive a motion to
> dismiss.

(MTD Opinion at 12.)  Applying this standard, the Court held that "Plaintiffs' claims plainly

meet the low standard for establishing a sufficient amount in controversy. . . .It is far from

legally certain that Plaintiffs could not recover over $75,000." *Id.*

The same standard applies today, as we are still in an early phase of the case, and

discovery is incomplete.  Plaintiffs are waiting on thousands of documents that defendants

agreed to provide, but have not yet done so.  Thousands of other documents are at issue in a

discovery motion pending in front of the Court.

Under this same standard, and with the inclusion of all the claims and allegations at issue

when the Court held that the claims and allegations presented in the FAC satisfied the $75,000

requirement, and with the addition of new factual allegations related to expenses, revenues, and

the invasion of the Trust Fund, as well as the eight new claims, the SAC clearly satisfies the

$75,000 requirement.

### A.   Claims for Relief and Damages

Plaintiffs seek injunctive, declaratory and monetary relief, arising from the following

claims against the Individual Defendants and the ASA:

- ***New Claims for Breach of Fiduciary Duties***.  Counts 1 and 2 present claims against the Individual Defendants for breach of fiduciary duties, and seeks, *inter alia*, monetary damages and declaratory relief.

- ***New Claims for Breach of Contract.***  Counts 3, 4, and 5 present claims against the American Studies Association.  These claims arise from the ASA's violation of three separate provisions of the ASA bylaws.  As this Court has held with respect to the continuing claims for breach of contract that were brought in the First Amended Complaint, "[a] nonprofit organization's 'Constitution and Bylaws form a contract between that [organization] and its' members.'"  Plaintiffs seek injunctive and declaratory relief.

- ***New Claims for* Ultra Vires *Acts.***  Counts 3, 4, and 5 present *ultra vires* claims against the Individual Defendants, as well as the claims against the ASA for breach of contract described above.  Although the underlying violations of the ASA bylaws are the same, the claims for *ultra vires* acts are brought against the Individual Defendants, while the claims for breach of contract are brought against the ASA as an entity.  These claims are brought for monetary damages ***and*** for injunctive and declaratory relief (¶¶ 207, 215, 225).

- ***Continuing Claims for Voting Irregularities Brought in the Alternative.***  Aside from the new claims identified above, the SAC brings claims that were also brought in the FAC, including two claims for voting irregularities, in Counts Six through Nine.  Counts Six (Breach of Contract – Voting Process Contrary to Bylaws) and Seven (Breach of the D.C. Nonprofit Corporation Act) are again brought in the alternative.  These claims are brought against the American Studies Association, not the Individual Defendants.  Damages sought include monetary (referencing Count 2), injunctive, and declaratory relief.

- ***Continuing Claim for Breach of Contract by Plaintiff Barton.***  Count Eight is brought solely by Plaintiff Barton against the ASA (only) for refusal to let him vote on the Resolution.  He seeks monetary, declarative and injunctive relief.

- ***Continuing Claim for Waste.***  Count Nine is brought against all Defendants – the ASA and Individual Defendants.  This claim is brought against the ASA and the Individual Defendants.  Plaintiffs seek damages, including ***but not limited to*** "damages from the Individual Defendants on behalf of the American Studies Association."  ¶ 244.  As discussed below, this statement regarding the availability of damages from Individual Defendants does not exclude appropriate damages from the ASA, including declaratory and injunctive relief as well as monetary relief.  Rather, Plaintiffs allege that Defendants' waste of corporate assets "resulted in [all] the damages alleged herein and outlined in prior Counts and previous paragraphs."  *Id.*

**B.**     <u>**Valuation of Injunctive and Declaratory Relief.**</u>

Aside from the value of monetary damages alleged against the Defendants, the value of injunctive and declaratory relief are also included when assessing the amount in controversy. Where a plaintiff asks for declaratory or injunctive relief, a court generally measures the amount in controversy based on the object of the litigation. See *Busby v. Capital One. N.A*., 932 F.Supp.2d 114, 132 (D.D.C. 2013), *citing Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977).  In the District of Columbia, courts "look to either the value of the right the plaintiff seeks to enforce or the cost to the defendants to remedy the alleged denial of that right. *Id*., *citing Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978), *see also Geo Specialty Chems, Inc. v. Husisian*, 951 F.Supp.2d 32, 39-40 (D.D.C. 2013).  In addition, D.C. courts are not obligated to precisely ascertain the value of injunctive relief; "so long as the plaintiff's pleadings amount to more than a 'formal allegation' that the relief is worth more than $75,000, that is sufficient." *Info Strategies, Inc. v. Dumosch*, 13 F.Supp.3d 135, 142 (D.D.C. 2014), citing Smith, 553 F.2d, at 1100-1.

Thus, even if there were no recovery of money damages against the Defendants, the $75,000 requirement would be satisfied by the value of the injunctive and declaratory relief sought in the SAC.

**IV.**     <u>**CONCLUSION**</u>

For all of the foregoing reasons, the actions at issue in this case easily satisfy the amount in controversy requirement.  The Individual Defendants are alleged to have acted for their own purposes, and at the expense of the ASA – and no provision of law immunizes them from such selfish actions.  The Individual Defendants spent hundreds of thousands of ASA dollars pursuing these people's own private goals, advancing their "campaign" with, at best complete and explicit

indifference to whether it "splits the ASA."  Finally, the amount in controversy requirement is satisfied just by injunctive relief that is necessary and appropriate to try to put right the many wrongs inflicted by the Individual Defendants upon the ASA.

Dated: April 5, 2018

Signed: _____*/s/Jennifer Gross*_____
                                              Jennifer Gross

Jerome M. Marcus (admitted *pro hac vice*)
Jonathan Auerbach (admitted *pro hac vice*)
**MARCUS & AUERBACH LLC**
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250
jmarcus@marcusauerbach.com
auerbach@marcusauerbach.com

*Lead Counsel for Plaintiffs*

L. Rachel Lerman (admitted *pro hac vice*)
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3871
rlerman@btlaw.com

Jennifer Gross, DC Bar No. 1003811
Aviva Vogelstein, DC Bar No. 1024231
**THE LOUIS D. BRANDEIS CENTER**
     **FOR HUMAN RIGHTS UNDER LAW**
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006-4623
(202) 559-9296
jenniegross@brandeiscenter.com
avogelst@brandeiscenter.com

Joel Friedlander (admitted *pro hac vice*)
**FRIEDLANDER & GORRIS, P.A**.
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3502
jfriedlander@friedlandergorris.com

Eric D. Roiter (admitted *pro hac vice*)
Lecturer in Law
**BOSTON UNIVERSITY SCHOOL OF LAW**
765 Commonwealth Avenue
Boston, MA  02215
(617) 734-8266
eroiter@bu.edu

*Counsel for Plaintiffs*