## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIMON BRONNER, et al., | |
| Plaintiffs, | |
| and SIMON BRONNER, DERIVATIVELY ON BEHALF OF NOMINAL DEFENDANT, THE AMERICAN STUDIES ASSOCIATION, | Case No: 1:16-cv-00740-RC |
| Derivative Plaintiff, | |
| v. | |
| LISA DUGGAN, et al., | |
| Defendants. | |

## DEFENDANTS' OPPOSITION BRIEF REGARDING
## SUBJECT MATTER JURISDICTION

Defendants, The American Studies Association, Sunaina Maira, Neferti Tadiar, Chandan Reddy, Lisa Duggan and Curtis Marez, by undersigned counsel, submit this response to the Plaintiffs' subject-matter jurisdiction brief. As argued more fully below, Plaintiffs' arguments do not speak to whether the Court has subject-matter jurisdiction.

The Plaintiffs have expended many megabytes of data in memoranda, emails and pleadings alleging damages to the American Studies Association. Yet, they have offered no facts or argument about damages to themselves. That is because there are none that remotely approach the jurisdictional threshold of this Court. And that is the point from which the Plaintiffs, throughout this litigation, have attempted to divert the Court's attention. Plaintiffs' efforts at obfuscation notwithstanding, the fundamental

jurisdictional issue is clear:  the Plaintiffs must show that *each of them* has suffered damages – individually, personally – of at least $75,000 or, alternatively, that the "value" of the injunctive relief they demand – the "non-enforcement" of the Resolution – is greater than $75,000.[1]  The burden is unquestionably upon the Plaintiffs to establish one of these two pivotal alternatives, and they have not done and cannot do so. Jurisdiction accordingly does not reside with this Court.

### A.   Plaintiffs Have Not Met the Jurisdictional Threshold

### 1.   Plaintiffs Have Not Demonstrated Any Individual Damages

Plaintiffs have not demonstrated that they, individually, have been harmed at all. Instead, they claim that monies were withdrawn from the Trust Fund (Plaintiffs' Memo. at 4-5); that membership dues and convention revenue has decreased (*id.* at 7-8); that the time of both Dr. Stephens and another employee have been allegedly devoted to the Resolution work (*id.* at 10-11); and that contributions have decreased (*id.* at 12). [2]

---

[1] The Plaintiffs cannot aggregate their claims to reach the threshold. *Snyder v. Harris*, 394 U.S. 332, 335, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969).

[2]  Each of these items of alleged loss are losses *to the ASA, not to the individual Plaintiffs*. As such, even if the allegations were true (which they are not) they would be irrelevant, because they do not meet the threshold that the Plaintiffs must achieve – proof that they have each suffered damage in the amount of at least $75,000.  Nonetheless, see the accompanying Declaration of John Stephens regarding the allegations regarding the use of trust funds. Regarding the losses of membership and convention revenue, the Plaintiffs' argument that the Resolution is the proximate cause of any such reduction is so speculative as to be unworthy of further discussion. Finally, Plaintiffs try to meet the jurisdictional threshold by positing that the percentage of Dr. Stephens' time devoted to Resolution-related matters is "worth" at least $75,000. This tortured argument is not only – again – a description of losses to the ASA as an entity, but it is without legal or logical, factual support. It erroneously treats Dr. Stephens' role as that of an hourly worker, which, as the Plaintiffs know, he is not.  In short, and as is demonstrated in Defendants' briefs, this Court need not consider these allegations by Plaintiffs.  Nonetheless, should the Court desire any additional information on these claims, Defendants can provide same.

By contrast, there is not a single word, anywhere in the Plaintiffs' submission, as to the losses suffered by the individual Plaintiffs. Indeed, after a brief introduction (*id.* at 3), Plaintiffs are never mentioned again. Nowhere in either the Second Amended Complaint or the Plaintiffs' memorandum is there any mention, even a cursory aside, of any damages suffered by the individual Plaintiffs. And this void is confirmed by Plaintiffs' Initial Disclosures, which recite none. It is not just the case that Plaintiffs have failed to demonstrate that each of their individual damages exceed $75,000; they have not bothered to even try.

### 2. Plaintiffs' Claims for Declaratory or Injunctive Relief Do Not Create Jurisdiction

In determining the value of declaratory or equitable relief, the Court "may look either to the value of the right that plaintiff seeks to enforce or to protect or to the cost to the defendants to remedy the alleged denial." *Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978); *see also Animal Legal Defense Fund v. Hormel Foods Corp.*, 249 F.Supp.3d 53, 59-60 (D.D.C. 2017); *Lurie v. Mid-Atlantic Permanente Med. Grp, P.C.*, 729 F.Supp.2d 304, 335 (D.D.C. 2010). The only injunctive relief specifically alleged in the Second Amended Complaint is for relief "invalidating and vacating the Boycott Resolution and injunctive relief to prohibit its implementation" (*see* Count VI, ¶ 230), a declaration that the Resolution was "*ultra vires,*" and injunctions against enforcing the Resolution or against making any further payments "in violation of … [ASA's] Constitution …" (Prayer for Relief, SAC at p. 82). Plaintiffs have failed to demonstrate any monetary value to the declaratory or injunctive relief, and in fact the remedy for any such relief

would cost nothing.  They thus have failed to demonstrate that this Court has subject matter jurisdiction.  *See Wexler v. United Air Lines*, 496 F.Supp.2d 150, 153-4 (D.D.C. 2007) (a nonexistent evidentiary showing as to the cost of altering a cancellation policy does not show that the Court has jurisdiction); *United States Jaycees v. Superior Court for the District of Columbia*, 491 F. Supp. 579, 581 (D.D.C. 1980) (case dismissed for lack of jurisdiction where plaintiff failed to show that any pecuniary interests in any contracts were affected, nor the costs if injunctive relief were granted).

The declaratory and injunctive relief sought by the Plaintiff would cost the ASA nothing.  Fundamentally, should the Court determine to overturn the Resolution, that would be the ruling of the Court and would require no further action by the Defendants.[3]  The injunctive relief sought by the Plaintiff is an Order enjoining the ASA from "taking any action to support the Israel Boycott purportedly adopted by the American Studies Association's National Council and the American Studies Association," and/or enjoining the ASA from "making any payments or expenditures . . . in support of the Israel boycott."  *See* Prayer for Relief, ¶¶4 and 5. Thus, the Plaintiffs do not seek to require the ASA to take any action, but to refrain from taking any action. The proposed relief would accordingly impose <u>no cost </u>on the ASA.

Moreover, even if the Plaintiffs had proposed injunctive relief that required some affirmative action by the ASA, there would be little, if any, cost involved.  As the

---

[3] In contrast, for example, in a case where the Court ordered a Defendant to fix a crumbling building, there would be costs associated with the remedy Defendants would be required to undergo following the Court's ruling.  The "value" of the injunctive relief in such a case could be the cost of the required repair.

attached Declaration from John Stephens demonstrates, the cost of repealing the Resolution (were such a remedy ordered) would be zero.  Even if the matter were put to a vote of the entire membership, as a sort of "do-over" – which the SAC does not seek – the cost would not be more than approximately $800.  This is clearly far less than the jurisdictional threshold for diversity jurisdiction.

Further, any cost of remedy to the Defendant cannot be taken as a whole, but must be considered as divided among the individual Plaintiffs.    In order to create jurisdiction in this Court for equitable relief, therefore, Plaintiffs would have to show that the cost of repealing the Resolution exceeded $75,000 *per Plaintiff*, or over $300,000 in total.   *See Breathe DC v. Santa Fe Tobacco Co.*, 232 F.Supp.3d 163, 171-2 (D.D.C. 2017) (total cost of injunctive relief must be divided among the beneficiaries of that injunction for purposes of calculating the amount in controversy); *Animal Legal Defense Fund*, *supra* 249 F.Supp.3d at 60.

None of the cases cited by Plaintiffs in their Memorandum (at p. 29) provide any support for their position whatsoever.    To be sure, each case stands for the general proposition cited, but their facts are so dissimilar from the instant case as to be entirely worthless.  In *Busby v. Capital One, N.A.*, 932 F.Supp.2d 114 (D.D.C. 2013), plaintiff sought a rescission of her mortgage, which had an outstanding balance of over $160,000.  As the Court noted, "In cases in which the plaintiff seeks to rescind a loan or prevent foreclosure, the amount in controversy is equal to the amount of the loan."  *Busby*, 932 F.Supp.2d at 132.    In *Smith v. Washington*, 593 F.2d 1097 (D.C. Cir. 1978), plaintiff inmates claimed the deprivation of their constitutional rights because they had been

subjected to "placement in an overcrowded and vermin infested cell …; ineligibility for work detail …; denial of access to the library and law library; restricted visiting rights; inferior medical treatment, and denial of a variety of other privileges available to the general inmate population." *Smith*, 593 F.2d at 1098-99.  Based on prior cases regarding unlawful confinement, the Court of Appeals found that such allegations of constitutional deprivation of liberty demonstrated an amount in controversy greater than $10,000.  Finally, in *Geo Specialty Chems, Inc. v. Husisian*, 951 F.Supp.2d 32 (D.D.C. 2013), the plaintiffs claimed that the defendant (who used to be their lawyer) was now working for their competitors in an unfair trade case. The Court found that the amount in controversy was represented both by the legal fees that defendant would forego if he were required to withdraw (approximately 1,400 hours' worth) as well as the value of the plaintiff's confidential business information.  *Husisian*, 951 F.Supp.2d at 41.  Unlike the instant case, each of those plaintiffs had demonstrated a clear monetary value to their case that exceeded the jurisdictional threshold.

Nor, finally, can Plaintiffs include any attorneys' fees that might be expended in order to get over the jurisdictional threshold.   Attorneys' fees are not included in the amount in controversy, unless specifically provided for by statute or contract.  *Wexler*, *supra* 496 F.Supp.2d at 154; *Walker v. Waller*, 267 F.Supp.2d 31, 33 (D.D.C.2003). No such statute or contract exists here.

In all, it is impossible to state with even the slightest degree of certainty that there is an amount in controversy of $75,000 in this case.   Certainly, no evidence has been presented that any of the Plaintiffs have been damaged in even the slightest way.

Nor have they demonstrated the value of the declaratory or injunctive relief that they seek – neither the value to themselves nor the cost of the remedy to the Defendants. Since Plaintiffs here bear the burden of establishing the amount in controversy, and since they have clearly failed to bear such burden, the case should be dismissed. *Khadr v. United States,* 529 F.3d 1115 (D.C. Cir. 2008).

   **B.     Plaintiffs Have Failed To Show That the Individual Defendants Are Exposed to Liability**

Because Plaintiffs have failed to demonstrate any basis upon which to find that the amount in controversy might exceed $75,000, the question whether the individual defendants might or might not be liable for monetary damages is not an issue that the Court needs to consider; the fact remains that this Court lacks jurisdiction to award any relief.   Nonetheless, even if the Plaintiffs had been able to meet their basic jurisdictional burden, it is clear that the individual Defendants are immune from monetary liability under D.C. law.

   In attempting to show that the individual Defendants could be held liable for monetary damages, Plaintiffs recognize the protections of the Nonprofit Act, but make four assertions in response: (1) Drs. Puar and Tadiar were not directors of ASA, and thus do not fall within the confines of D.C. Code § 29-406.31(d); (2) John Stephens, being the Executive Director, is not a "director" ; (3) Drs. Marez and Duggan, who were serving as Presidents of ASA, were not "directors"; and (4) even so, none of these defendants acted in their capacity as "director." Plaintiffs go to great lengths to avoid the obvious in this regard.    These arguments cannot withstand scrutiny.

1.      <u>Plaintiffs Fail to Account for the Volunteer Statute</u>

It is uncontroverted that none of the Defendants, save for John Stephens, is paid

for their service to ASA.   In addition to being protected by the provisions of D.C. Code

§29-406.31, they also they fall within the purview of D.C. Code § 29-406.90 which

provides, in pertinent part:

> **(a)**      For the purposes of this section, the term "volunteer" means an officer, director, trustee, or other person who performs services for the corporation and who does not receive compensation other than reimbursement of expenses for those services.
>
> **(b)**  Any person who serves as a volunteer of the corporation shall be immune from civil liability except if the injury or damage was a result of:
>
> > **(1)**  The willful misconduct of the volunteer;
> >
> > **(2)** A crime, unless the volunteer had reasonable cause to believe that the act was lawful;
> >
> > **(3)** A transaction that resulted in an improper personal benefit of money, property, or service to the volunteer; or
> >
> > **(4)** An act or omission that is not in good faith and is beyond the scope of authority of the corporation pursuant to this chapter or the corporate charter.

As Defendants have already argued, none of the allegations in the Second

Amended Complaint fall within these exceptions.   Certainly, there is no claim of any

criminal act, nor that any of the individual Defendants realized any monetary, property,

or service benefit from the Resolution.   Moreover, since the Court has already ruled

that adoption of the Resolution was not *ultra vires*, it could not be considered "beyond

the scope of authority of the corporation."   This leaves only the possibility of "willful misconduct."

"Willful misconduct," in the District of Columbia, means wrongful conduct *intended to cause harm.  Copeland v. Baltimore O.R. Co.*, 416 A.2d 1, 3-4 (D.C. 1980); *see also Saba v. Compagnie Nationale*, 78 F.3d 664, 668 (D.C. Cir. 1996). The comments to the Model Nonprofit Corporations Act (Third Ed.), are consistent with the decisional law in this regard. [4]  The comments to Section 2.02 of the  Model Act provide the following guidance on the meaning of "intentional harm" as used in the limitation of liability statute:.

> The use of the word "intentional" rather than the less precise term such as "knowing" is meant to refer to the specific intent to perform, or fail to perform the acts with actual knowledge that the director's action, or failure to act, will cause harm, rather than a general intent to perform the acts which cause the harm.

Model Nonprofit Corporations Act (Third Ed.), official comment 3(H).

There is no allegation, anywhere in the Second Amended Complaint, that the Defendants intended to harm any of the Plaintiffs.  The harm that Plaintiffs allege the Defendants intended -- "to delegitimize the State of Israel in the world community;" (Second Amended Complaint ¶ 6) and to "demand the full 'right of return' …" of claimed Arab descendants, thereby bringing "the end of Israel as a Jewish state …;" (*id.* ¶ 38) – does not constitute "harm" for which any of the Plaintiffs have standing to complain.

---

[4]  The Plaintiffs rely upon the Model Nonprofit Corporations Act in their brief, but they apparently refer to and rely upon an earlier version of the Model Act.

Plaintiffs seek to avoid this result by claiming that "the exception applies when the director knows or believes that the act will cause harm, even if there is another reason why the director acts" (Plaintiffs' Memorandum at 25).    The lone case upon which Plaintiffs rely, however – *In re Caraco Pharm. Labs Shareholder Litig.*, 2017 Mich.App. LEXIS 929 (June 13, 2017) – involved a deliberate scheme to cripple the company's distribution network and thus devalue the company stock, thereby allowing the buyout of the minority shareholders' interests.  The Court specifically found that the complaint adequately alleged that the Defendants had "conspired to inflict harm on minority shareholders by artificially depressing the value of [the company]."    It was that scheme, specifically intended to adversely affect the minority shareholders, that constituted the harm.

There is no such allegation here.  Regardless of Plaintiffs' opinions as to the overall wisdom of the Resolution, there is no allegation that it was put forward with the purpose of crippling ASA.  On the contrary: the Second Amended Complaint is rife with allegations that the Defendants acted in conformance with their overall philosophy, and thus believed that their actions were right and proper, recognizing that it would be controversial.  In their argument on this point, the Plaintiffs erroneously equate adherence to and agreement with Plaintiffs' political views with a duty of loyalty to the ASA (see Plaintiffs' Memorandum, p. 25 – arguing that the non-liability statutes are "intended to exculpate violations of the duty of loyalty or other undesirable conduct"); in other words, they suggest that the Defendants' failure to agree with their views on the merits of the Resolution constitutes a breach of a duty to the ASA.  This a

central and fundamental fallacy of the Plaintiffs' entire case.    That the Plaintiffs strongly disagree with the Resolution does not constitute evidence of intent by Defendants to harm the ASA, under decisional law or the Model Nonprofit Corporations Act.

     2.   <u>Defendants Were Acting as Directors.</u>

As demonstrated in Defendants' opening brief, Plaintiffs have failed to establish that any of the exceptions to the protections of §29-406.31.

Plaintiffs further seek to circumvent the statute by claiming, without any support, that the individual Defendants were not acting "in their capacity as directors." This is farcical.  Each of the actions allegedly taken (by Defendants other than Tadiar and Puar, who were unquestionably not members of the National Council) was done within the context of National Council meetings, within the Defendants' authority as directors.[5]  They could not have acted as private individuals to place the Resolution on the agenda.  In this sense, *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189 (Ky. 2013) is as inapposite as the rest of Plaintiffs' authorities.  Plaintiffs neglect to point out in their lengthy discussion of *Baptist Physicians* that, in that case the defendant physician had diverted patients and appropriated confidential information in order to siphon business away from the corporation and to his new practice.  As such, he was acting not as a director of the plaintiff company, but as a member of the new company.    As the Court noted, "[i]f a director is acting on his own accord in

---

[5] Although the SAC regularly refers to the "Individual Defendants" as members of the National Council, *see* discussion re Defendants Puar and Tadiar on pages 15 – 19 of Defendants' initial jurisdictional memorandum.

anticipation of competing with the corporation which he still serves, that conduct implicates the director's common law fiduciary duties." *Baptist Physicians*, 436 S.W.2d at 196.

*Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666 (2001), the only other decision cited by Plaintiffs in this argument, also presents a dispute arising out of allegations that one shareholder diverted business to a new company – here, a new tobacco company. What the Virginia Supreme Court held was that the act of incorporating the new, competing company was not within the scope of officer responsibility, and the defendant was thus not entitled to the presumption of the business judgment rule.[6]

There is no allegation in the SAC that any of the Defendants were acting outside ASA.   They allegedly brought the philosophy espoused by USACBI into the ASA National Council, but there is no debate that they did so by virtue of their roles as ASA officers and directors.   In their Memorandum, Plaintiffs complain that ASA resources were "exploited in the interests of USACBI" (Plaintiffs' Memorandum at p. 14).   That, however, is not what the Second Amended Complaint asserts.   Rather, the pleading alleges that the Resolution was passed because the Defendants were devotees of the USACBI philosophy. Plaintiffs' argument cannot stand.

---

[6] The *Baptist Physicians* and *Miller* decisions also provide helpful illustrations of what is meant by "intentional infliction of harm" as contemplated by the statute  -- intentionally funneling business away from the corporations. By comparison, they demonstrate the absence of such evidence in the instant case.

3. <u>John Stephens Enjoys Statutory Protection as a Director</u>

The Plaintiffs' claims against John Stephens are barred by the protections against liability afforded directors under the D.C. Nonprofit Corporations Act, because he was a member of the National Council pursuant to the ASA Bylaws.   Plaintiffs take the bold position at page 15 of their brief that John Stephens *is not* a director of the ASA. Plaintiffs' gymnastic effort to avoid the patent language of the ASA Bylaws notwithstanding, John Stephens is a director, as plainly, obviously, and unavoidably set forth in the ASA Bylaws. Article V, Section 1 of the Bylaws specifically indicates that the Executive Director is a member of the National Council.  Section 2 plainly states that the "National Council shall serve as the Board of Directors of the association."

That he is a director is plain under the statute, as well.  D.C. Code §29-401.02 (9)) defines "director" as "an individual designated, elected, or appointed, by that or any other name or title, to act as a member of the board of directors, while the individual is holding that position."  Under the Bylaws, he is "designated . . . or appointed" to act as a member of the National Council.  Moreover, D.C. Code §29-401.02 (1) defines "Board of Directors thus:

> . . . the group of individuals responsible for the management of the activities and affairs of the nonprofit corporation, regardless of the name used to refer to the group.

In their initial jurisdictional brief (Document 88), Plaintiffs cited commentary from the Model Nonprofit Corporation Act in an effort to overcome the protection of

Dr. Stephens as a director.  But they have unfairly cherry-picked that language, and in so doing omitted a material portion of the commentary to Section 2.02 of the Model Act. While unfair, it is understandable, because it weakens their argument.  Following is the full quote from the Model Nonprofit Corporation Act (Third Ed.) commentary; the portion omitted by the Plaintiffs in their original brief is highlighted:

> The phrase "as a director" emphasizes that Section 2.02(c) applies to a director's actions or failure to take action in his or her capacity as a director and not in any other capacity, such as officer, employee or controlling member. **However, it is not intended to exclude coverage of conduct by individuals, even though they are officers, when they are acting in their capacity as directors**.

To claim that Dr. Stephens is not a "director" because he did not have a vote, but only a voice, at the National Council meetings is to betray a fundamental ignorance of the role and function of a director in a non-profit organization. Nor do the Plaintiffs offer any authority for the proposition that one cannot be a non-voting director. Plaintiffs attempt to distinguish their claims against Dr. Stephens as being in his capacity as an officer and/or an employee. But nowhere in the SAC do they attempt to articulate that distinction or its significance for purposes of liability. Instead, the SAC repeatedly groups Dr. Stephens with the other "Individual Defendants," in matters concerning the development and passage of the Resolution. Moreover, they try to eat their cake and have it too in that, on one hand, they rely upon the ASA Bylaws to define Dr. Stephens' role as an "officer," but reject the plain language of the same Bylaws that identifies him as a director. They offer no legal authority for the proposition that they may ignore or contradict an organization's governing documents in identifying

directors.  Plaintiffs then argue that he cannot be protected by the director statute because all allegations against him in the SAC are "related to his administrative role" at the ASA.  Plaintiffs' Jurisdictional Brief (Document 88), p. 16.  Plaintiffs are so focused on avoiding the protections of §29-406.31 for Stephens that they undermine any argument about why he should be held to a duty to the Plaintiffs at all.[7]  If, as they allege, he cannot affect any official act of the ASA, Plaintiffs have surrendered any argument about how or why he should be held liable in the first place.

Under the plain language of the statute, not to mention the organization's own governing documents, John Stephens was a director while he acted within the National Council.[8]  Plaintiffs are accordingly obligated to establish some exception to the statutory presumption that he is not liable to the individual Plaintiffs.  They have not made such a showing.

## CONCLUSION

As discussed more fully above, Plaintiffs have failed to allege or demonstrate any fact that would suggest a monetary amount of damages that they are claiming, much less that each of their claims exceed $ 75,000.   The only damages they claim inure to the ASA, and are legally unavailable to them.  Nor, for that matter, is there any monetary

---

[7] ". . . Stephens lacks the power to make, or even vote on any of these decisions.  He lacks authority to set fiscal policy, to fix the amount of dues, to appoint committees, to set policies or to instruct the offices (including himself) or to vote on any of these decisions." Plaintiffs' Supplemental Brief, p. 17.

[8] Plaintiffs' other argument – that the Presidents could not be "directors" because they were "officers" -- is not only contrary to common sense, but violative of the plain language of §29-401.02 and the Model Act.

value to any of the declaratory or equitable relief they seek.  Finally, Plaintiffs' attempts to exclude the individual Defendants from the protections against liability under the D.C. Nonprofit Corporations Act reveals both the weakness in their argument and their apparent misunderstanding of non-profit organizations.

For these reasons and for the reasons set forth in Defendants' original memorandum, it is a legal certainty that the Plaintiffs cannot demonstrate any viable claim for damages in excess of $75,000.  Accordingly, this Court lacks subject matter jurisdiction over the matter, and this case must be dismissed.


Respectfully submitted,


/s/_____
John J. Hathway, Esq. #412664
Thomas Mugavero, Esq. #431512
Whiteford, Taylor & Preston L.L.P.
1800 M Street, N.W., Suite 450N
Washington, D.C. 20036-5405
(202) 659-6800
jhathway@wtplaw.com
tmugavero@wtplaw.com



/s/_____
Jeff C. Seaman, Esq. #466509
Whiteford, Taylor & Preston L.L.P.
7501 Wisconsin Avenue
Suite 700W
Bethesda, MD 20816
(301) 804-3610
jseaman@wtplaw.com