1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

1

2

3    SIMON BRONNER,                    )
     Derivatively on behalf           )
4    of Nominal Defendant The         )    Civil No. 16-00740
     American Studies                 )
5    Association, et al.,             )
                                       )
6           Plaintiffs,               )    Washington, D.C.
                                       )
7       v.                             )
                                       )    October 3, 2017
8    LISA DUGGAN, et al.,             )
                                       )
9           Defendants.               )
     ─────────────────────────        )

10

11          TRANSCRIPT OF STATUS CONFERENCE
         BEFORE THE HONORABLE RUDOLPH CONTRERAS
             UNITED STATES DISTRICT JUDGE

12

13              APPEARANCES:

14   For the Plaintiffs:      JENNIFER GROSS, ESQ
                              The Louis D. Brandeis Center for
15                               Human Rights Under Law
                              1717 Pennsylvania Ave., NW
16                            Suite 1025
                              Washington, D.C. 20006
17                             -and-
                              JEROME M. MARCUS, ESQ.
18                            Marcus & Auerbach LLC
                              1121 N. Bethlehem Pike
19                            Suite 60-242
                              Spring House, Pennsylvania  19477

20   For the Defendants:      JOHN J. HATHWAY, ESQ.
                              Whiteford, Taylor & Preston L.L.P
21                            1800 M Street, NW
                              Suite 450N
22                            Washington, D.C.  20036
                               -and-
23                            JEFFREY C. SEAMAN
                              Whiteford, Taylor & Preston, LLP
24                            7501 Wisconsin Avenue, NW
                              Suite 700W
25                            Bethesda, MD 20814

1

2    Court Reporter:      PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                          U.S. Courthouse, Room 4700A
3                         333 Constitution Avenue, NW
                          Washington, DC 20001
4                         (202) 354-3243

5

6    Proceedings reported by stenotype shorthand.
     Transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2                          (2:05 p.m.)

3         THE DEPUTY CLERK:  This is Civil Action 16-740, Simon

4   Bronner, et al. versus Lisa Duggan, et al.

5         Counsel, please step forward to the podium and state

6   your appearances for the record.

7         MR. MARCUS:  Jerome Marcus for the plaintiff, and my

8   co-counsel, Jennifer Gross.

9         THE COURT:  Good afternoon.  A more reasonably sized

10  contingency this time.

11        MR. MARCUS:  We listen, Your Honor.

12        MR. HATHWAY:  Good afternoon, Your Honor.  John

13  Hathway and Jeffrey Seaman.

14        MR. SEAMAN:  Good afternoon, Judge.

15        THE COURT:  Good afternoon.

16        All right.  What is the problem?

17        MR. MARCUS:  We are here, Your Honor, because we

18  would like to file a motion to compel and our understanding

19  is that we need to file a motion for leave to do so.  That is

20  our reason for requesting this.

21        THE COURT:  All right.  Tell me about it.  Maybe we

22  can avoid the motion.

23        MR. MARCUS:  Your Honor, there's quite a series of

24  issues.  I don't know if Your Honor wants us to march through

25  them or perhaps Your Honor would like to refer us to a

—4—

1    magistrate.

2           They relate, I think, in general, at the 30,000-foot

3    level, to a series of different problems.  One is just no

4    deadline seems to hold; none.  Deadlines for getting back to

5    us, deadlines for production.  That is issue number one.

6           Issue number two is there are series of responses

7    that are not either yes, no, we have it, we don't have it, we

8    object.  They're ambiguous.  We don't know what to make of

9    them.  We requested clarification and have not received it.

10          Then, there are certain other requests where there

11   are actually objections which the defendants have told us

12   they intend to stick to with respect to which we wish to

13   move.

14          Then, there are other things where they have just not

15   given us things but they haven't formally objected.  And we

16   want, for example, and we have asked for their form 990s, and

17   they have either produced or stated a willingness to produce

18   990s but only with revenues, everything else redacted.  This

19   is a case about how money was spent.  Expenses I think would

20   be relevant.  They won't let us see them.  There are a series

21   of issues like that.  I'm happy to get down into the weeds if

22   Your Honor wishes and go issue by issue.

23          THE COURT:  Let's do that.

24          MR. MARCUS:  Okay.

25          THE COURT:  And with respect to the financial

1    information, is the objection that the protective order isn't

2    in place yet or goes beyond --

3         MR. MARCUS:  No, because we have told the

4    defendants with respect -- "no" is the answer to Your Honor's

5    question.

6         THE COURT:  Okay.

7         MR. MARCUS:  I can explain, if Your Honor wishes.

8         THE COURT:  Let's go in order, then.

9         (The court reporter requested Mr. Marcus to speak

10   slower)

11        MR. MARCUS:  There are two different sets of

12   requests:  One is to individual defendants and one was to the

13   American Studies Association as a defendant.  With respect to

14   the individual defendants, I'm going to start with the things

15   last on my list first because it just troubles me the most.

16   One of the individual defendants is Sunaina Maira.  She was

17   probably one of the most active participants in the acts that

18   are at issue in this case.  We have provided a time period

19   within which we believe material should be produced.  All

20   defendants have produced material for a broader period than

21   Ms. Maira.  Ms. Maira has produced responses for a period

22   totaling about three weeks, cabined very tightly around the

23   actual vote.  We know that there are responsive materials

24   that we have not received from her because she was a party to

25   e-mails that were also received by other defendants, and we

1    have gotten them from them.  Obviously, we have no way of

2    knowing if we received a complete production; I'm sure we

3    have not.  There is no objection as to why her material is

4    not relevant outside that tiny little band.  If there were an

5    objection, (a) it would be untimely, and (b) it would be

6    frivolous.  Therefore, we want that stuff.

7         I don't know if Your Honor wants to go --

8         THE COURT:  I do want to go back and forth on each

9    issue.

10        MR. SEAMAN:  Your Honor, Jeff Seaman for the

11   defendants.

12        Regarding Ms. Maira's documents, what I have

13   explained to counsel -- not to Mr. Marcus directly but his

14   co-counsel, Ms. Gross -- is that we recognize that there are

15   additional documents.  When we originally produced documents,

16   we got the contents of folders that our clients had

17   maintained themselves regarding this issue.  We recognize the

18   objections that counsel made about the production, and what I

19   have explained to counsel is that we have gone back to

20   Ms. Maira and other of the defendants, individual defendants,

21   and collected a large volume of additional e-mails to try to

22   net -- we cast a pretty broad net.  Because of that, it is

23   taking us a while.  What we have done right now is we have

24   collected -- I don't have an exact number for Your

25   Honor -- it's in the tens of thousands of e-mails.  And what

7

1    we have been --

2         THE COURT:  Tens of thousands just for Ms. Maira or

3    total?

4         MR. SEAMAN:  That's right, Your Honor, just for

5    Ms. Maira.

6         We have decided that because of the cost and time

7    that has been involved in reviewing these documents, in my

8    answer -- and my response to this, Your Honor, is going to

9    have to touch on something that is going to have to come up

10   later, and that is about the protective order and the nature

11   of the protective order.  Because of the nature of a lot of

12   these emails and our concerns about security and safety of

13   some of the people who are participants in the e-mail chains,

14   we have had to pay close attention to what is relevant.  That

15   process of review for privilege and for relevance review has

16   required us to initiate technology-assisted review.  So we're

17   in that process right now.  So as I explained to counsel, we

18   think we would be able to have that production of Ms. Maira's

19   e-mails, the remaining portion of it, by October 16th, using

20   that process.

21        THE COURT:  Which is two weeks from today?

22        MR. SEAMAN:  Yes, Your Honor.  I believe it is two

23   weeks from yesterday.

24        THE COURT:  From yesterday, you're correct.

25        All right.  And October 16th is not soon enough for

-8-

1      you?

2           MR. MARCUS:  Well, I confess -- I'm troubled by a

3      couple of things, if I may.  One is there's some details with

4      respect to which I would be grateful if Your Honor would hear

5      Ms. Gross.  Before we get to those, number one, we told them

6      I thought the protective order issues were irrelevant.  I

7      thought the protective order issues were irrelevant because

8      we told the defendants that we will keep things "attorneys'

9      eyes only" until the protective order issue is resolved.  So

10     as far as I am concerned, there should be no basis for

11     withholding things or behaving differently.

12           (The court reporter requested Mr. Marcus to speak

13     slower)

14           MR. MARCUS:  There should be no basis for withholding

15     things or making a different kind of relevance assessment

16     because Your Honor is ultimately going to decide the

17     protective order issue.  It will be what it will be.  We will

18     all be governed by it.  That's that.  That's thing number

19     one.

20           Thing number two, this red herring of harassment and

21     safety is something that we have repeatedly asked for

22     evidence about.  The defendants have spoken about this.  We

23     issued a formal request about it.  We have asked about it on

24     the phone.  We have never, ever received a single so much as

25     a Post-It note evidencing --

9

1          THE COURT:  That was covered in the protective order

2     papers.

3          MR. MARCUS:  That's the protective order issue.

4          The last thing which troubles me -- and then I would

5     be grateful if the Court would hear from Ms. Gross, as

6     well -- is counsel just mentioned technology-assisted review,

7     by which I assume he means using search terms and having

8     electronic searches.  And that's jolly except that we never

9     heard about it before.

10         The right way to do that is to prepare a list of

11     search terms and discuss them with co-counsel, and that has

12     not happened here.  It comes back to the first thing that I

13     said, Your Honor, which is we are just on an endless hunt.

14     This never ends.  So now they'll give us a list of search

15     terms, which they should have done at least when they started

16     producing in their own minds the list of search terms.  They

17     have never raised the issue before.  Now we'll have to

18     discuss it, etc., etc., etc.

19         Your Honor will recall, I know, that when Your Honor

20     set the schedule the last time, I said this is a schedule we

21     can live with if we get timely responses.  This is the kind

22     of conduct which just never seems to end.

23         THE COURT:  I hear you.  My overall observation is

24     that the plaintiffs' side is driven in part by ideology;

25     defense counsel, from my observation, is an insurance defense

1    firm, and they are driven in part by costs.  The civil rules

2    tell me that we have to have proportionality.  So

3    October 16th sounds reasonable to me, but I do want to talk

4    about the search terms.

5           MR. SEAMAN:  Yes, Your Honor.

6           Does the Court want to know what search terms --

7           THE COURT:  No, no.

8           Have you developed search terms?  Have you done

9    searches?  Have you talked to the other side about those at

10   all?

11          MR. SEAMAN:  We have not.  Well, we have developed

12   search terms.  They're quite broad, which is one of the

13   problems.  I want to go back to earlier in the history of the

14   case.  It appears that there was not really a true -- there

15   wasn't a request for search terms, there wasn't a discussion

16   about search terms.  There were requests for documents.  We

17   have developed search terms that are quite broad.  I can

18   share them with the other side.  I'm happy to do that.  I'm

19   sure they will be satisfied.  They're very broad.

20          I would like to address Mr. Marcus' concern about

21   relevance review.  As Your Honor noted, proportionality is

22   now irrelevant.  It's always been.  But the new rules have

23   made it more prominent, and recognizing that we are using

24   technology-assisted review, it is a slightly different

25   process than I think what Mr. Marcus is referring to.  The

1    technology-assisted review that I'm referring to

2    is artificial intelligence.  We review a certain volume of

3    documents.  We feed it to the tool, to this tool.  It then

4    recognizes over the course of the tens of thousands of

5    documents, using that data set that we have given it in the

6    form of several thousands of documents, what is responsive.

7    That is what I'm referring to.  I'm not referring to search

8    terms when I'm talking about technology-assisted review.

9    That is the process we're referring to right now.  And using

10   that process, we can have those documents to the other side

11   by the 16th.

12           I don't know if that addresses everything the Court

13   wanted to hear about.

14           THE COURT:  I think it does for now.

15           I do want you to share the search terms with the

16   other side because better to get those fights over with

17   sooner rather than later.

18           MR. SEAMAN:  Very well.

19           THE COURT:  All right.  Go ahead.

20           MS. GROSS:  If I may briefly speak on that, Your

21   Honor may recall that we had asked numerous times for counsel

22   to meet with us over a discovery plan.  We could not get

23   them.  I have two months' worth of e-mails.  That is part of

24   the discovery plan.  It is also something that I would have

25   liked to have discussed with them with respect to an ESI

1    stipulation.  I could not get them to the table on that,

2    either.  By the time I finally served those discovery

3    requests, I did so without the benefit of what the rules

4    actually expect.  I would have liked to have talked about

5    search terms, but they never gave me the opportunity to do

6    that, and eventually I was running out of time with respect

7    to discovery.

8           With respect to Ms. Maira -- and I understand all of

9    the points that have been made here -- but I just want to

10   clarify that she is probably the most important defendant.

11   And while I understand the balance and proportionality and so

12   forth, I don't think that it is necessarily a coincidence

13   that the defendant whose documents we need the most is

14   somehow the only one that we were not given a real production

15   for.  88 documents we received covering a 10-day span.  For

16   the other defendants, we received, for some, over a thousand,

17   into the thousands.  We received the time frame over a period

18   of years.  And at the time when we did not receive a full

19   production for Ms. Maira, I understood -- and we had a

20   conversation, counsel and I, at a deposition, about the fact

21   that this production was not complete and was it going to be

22   complete by the August 31st deadline -- I understood that

23   they have the documents in house, not that since they have

24   gone back and had to ask for more.  I think that there is a

25   reason why there is a delay in getting these documents, and

1    that is my real concern.

2         THE COURT:  Okay.  So produce her documents based on

3    what you have done already by October 16th, and then within

4    the next two weeks, I want both sides to sit down and discuss

5    the search terms as well as the artificial intelligence tools

6    that are being used.

7         Are they being used for all the defendants or just

8    for this individual?

9         MR. SEAMAN:  Your Honor, they're currently being used

10   just for this individual.  However, I anticipate that there

11   will be some additional for Mr. Marez.  We are going to do

12   the same thing with the additional volume we have collected

13   for Mr. Marez, but we can only do one at a time.

14        THE COURT:  All right.  Discuss it in the context of

15   both defendants or any defendants that this is being used

16   for.  I have never actually seen defense counsel use this

17   type of tool.  I have always seen plaintiffs in much larger

18   cases uses this type of tool, where the document volume is

19   much greater.  But the two sides should talk about that.

20   Everything else in this case has resulted in a fight, so I

21   assume that that will result in a fight, as well, and I will

22   decide it when it comes down the pike.

23        All right.  What's the next issue?

24        MR. MARCUS:  I think perhaps the next issue we should

25   address is the 990s.  Our claim relates to how money was

1    spent.  There's a waste claim in the case.  There are going

2    to be other claims added in shortly.  And we need to see what

3    they did with the money that they raised.  We also have a

4    time period issue.  Mr. Stevens, the executive director, put

5    in an affidavit in which he made representations about the

6    trend of membership dues over a 15-year period.  We asked for

7    information over a 15-year period.  They have not given it to

8    us.  Mr. Stevens actually testified that he has got the 990s,

9    unredacted 990s in a folder.

10           THE COURT:  Refresh my memory.  What are 990s?

11           MR. MARCUS:  990 is the annual statement that a

12   501(c)(3) has to file with the government every year,

13   explaining what it is doing, so that it can show that it is

14   behaving the way a nonprofit is supposed to behave.

15           THE COURT:  When that is filed with the government,

16   is that a public document?

17           MR. MARCUS:  No.  When it is filed with the

18   government, there are parts of it that are public, there are

19   parts of it that can be accessed through a private service

20   called GuideStar.  We have done that, but the revenues and

21   the expenses are typically not available, at least not

22   completely through GuideStar.

23           We have asked for the unredacted document, and the

24   defendants have told us that they're not willing to show

25   anything relating to expenses and they have also limited the

1    time period within which they're prepared to produce these

2    things.

3          THE COURT:  You're asking for all expenses or

4    expenses related to this issue?

5          MR. MARCUS:  Well, we're asking for the 990.  The

6    problem is that I think we may have disagreements about what

7    constitutes an expense related to this issue.

8          I was saddened that we gave Your Honor the sense we

9    are behaving as ideologues.  I'm a commercial litigator, and

10   I don't understand myself to be doing anything differently

11   here than I do anywhere else.  Plaintiffs always have a

12   broader understanding of relevance than defendants do.

13   That's why I'm sitting on this side of the room and they're

14   sitting on that side of the room, but I don't think we're

15   behaving like wild-eyed lunatics.  With respect to the

16   expense issue, I think that's a good illustration.  We know

17   that there were expenses relating to a conference, there were

18   expenses relating to counsel, there were expenses relating to

19   public relation firms.  We don't know what other expenses

20   there were.

21         We're not asking the defendants to show us their

22   checkbook, but we are asking them to take a form which they

23   already have, it is done, it is sitting in a folder,

24   Mr. Stevens testified, on his desk.  All they have to do is

25   drop it in a copy machine and give it to us.

—16—

1           (The court reporter requested Mr. Marcus to speak

2      slower)

3           MR. MARCUS:  If there is a question about the

4      confidentiality of that document, that is appropriately dealt

5      with by some sort of a restriction on the extent to which we

6      can disseminate it.  But to suggest that it is not relevant

7      when we're clearly going to have different concepts of what

8      is relevant, and I think it is appropriate in a situation

9      like that for the plaintiffs to be able to get a broader

10     sense of what the expenses were and then to drill down and

11     say, what's this category, what's that category.  If it turns

12     out that stuff is not, in fact, responsive, that's fine.  But

13     otherwise, we're blocked from actually finding out what

14     really happened here.  That's the problem we're trying to

15     solve.

16          THE COURT:  Okay.  Let me hear from the other side on

17     the 990s.

18          MR. HATHWAY:  Yes, Your Honor.  John Hathway.

19          I did, just want to for the record, take some

20     exception to what Ms. Gross said about the earlier issues in

21     the case.  I will leave it at that, about the

22     meet-and-confer.

23          Also, Your Honor, just for your information, which

24     makes the cost and the burden and the expense and the

25     proportionality perhaps even a little more focused, is that

1    although our firm does insurance defense work, there is no

2    insurance coverage for this claim.  So this is a nonprofit

3    organization, association that is having to foot the bill for

4    defense of this lawsuit.

5         So the financial information I think has to be put

6    into perspective along with the proportionality.  This is

7    related to a claim for waste.  As you know, we have a pending

8    motion on that issue.  But the idea is that there's an

9    allegation that there was waste and there was money spent,

10   for example, after the resolution on media consultants, which

11   there was, in response to a tremendous backlash against the

12   ASA for processing the resolution.  That is all very upfront.

13   It was in Mr. Stevens' declaration that was filed with our

14   initial motion to dismiss.  We have produced all of the

15   documents from the media consultants, the numbers, the

16   contracts, etc., etc.

17        Mr. Marcus indicated that they asked for information

18   going back 15 years and they received none.  That is simply

19   not true.  The 990 -- we have a claim for waste -- if you

20   look at the ad damnum clause to the amended complaint, the

21   plaintiffs individually claim no damages for the waste.  In

22   one of the reply briefs, there is a suggestion on the pending

23   motion that, well, they paid membership dues and they may

24   have a claim for their membership dues arising out of this

25   waste.  They have not put that forth in any actual pleading.

1    But even assuming -- even assuming -- that there was a

2    legitimate claim separate and apart from the legal issues

3    that are part of the motion, you're talking about a couple

4    hundred dollars.  And for this we are spending a month having

5    a number of attorneys go through, pulling all this

6    information.  They want this information going back 15 years.

7    We just don't think that's relevant.  We don't think it is

8    proportionate.  When they said, in one of our

9    meet-and-confers, that the reason they wanted to go back

10   15 years was because of Mr. Stevens' affidavit in which he

11   said that the membership dues, revenues, have averaged X over

12   the last 15 years, fair enough, we've provided them all of

13   that documentation about the membership revenues going back

14   15 years.

15        THE COURT:  What is there in the 990s, if anything,

16   that is particularly sensitive?

17        MR. HATHWAY:  There's salary information.

18        THE COURT:  For individuals or totals?

19        MR. HATHWAY:  For totals and for individuals.  There

20   is the individual executive director's salary information.

21   So there are expenses that are completely unrelated because

22   there really are no expenses.  Just to put this in

23   perspective -- and the plaintiffs know it and they disagree

24   with it -- is that the ASA, after this resolution was passed

25   at the end of 2013, when this backlash came, the ASA said:

1    We are not spending any of ASA's money on this.  If you want

2    to go out, in essence, and have a campaign and ask for

3    campaigns directly related to this, that's fine.  That's what

4    happened.  All the moneys that came in -- this is all set

5    forth in the affidavit -- the moneys that came in were

6    specifically designated for that.  They weren't part of the

7    ASA coffer so to speak.  They weren't part of the ASA

8    coffers.

9         So we have a claim for waste, which is very

10   speculative in our view, for a resolution that took place in

11   2013, and they want all this information going back 15 years.

12   We have given them the membership revenue information going

13   back 15 years.  We have given them the information about

14   convention revenues.  We have given them the information

15   about grants.  We have given them the information about the

16   numbers of members.

17        One of their claims is, well, this caused people to

18   quit or membership went down, which of course if true, if

19   proven, would be a damage to ASA, not to these individual

20   plaintiffs, but we have given that information.  We have

21   agreed to give them the 990s back to 2010, with the

22   information that I have set forth here; the revenues, the

23   grants, all of that information.  But we would like to redact

24   the information that has to do with the salaries.  It has

25   nothing to do with this case.  And so we think that the whole

1    financial is really a fishing expedition trying to glom on to

2    try to find something to support that claim.  And frankly, it

3    is overkill.

4          THE COURT:  Okay.  Are the 990s as easily accessible

5    as the plaintiffs indicate?

6          MR. HATHWAY:  They are, Your Honor.  I have them.

7          THE COURT:  I want you to produce them "attorneys'

8    eyes only."

9          MR. HATHWAY:  For what period of time?  They have

10   asked going back 15 years.

11         THE COURT:  If they're easily accessible, give them

12   15 years given the assertion in the declaration.

13         MR. HATHWAY:  I am only saying that because I think I

14   may only have back to 2010.

15         THE COURT:  You can only produce what you have in

16   your custody and control.

17         MR. MARCUS:  Is it that he only has it or Mr. Stevens

18   only has it?  I believe Mr. Stevens has them all.

19         MR. HATHWAY:  I'm sure he does.  I have made a

20   representation that I --

21         THE COURT:  All right.  Produce the 15 years to the

22   extent that they're in the custody and control of the party.

23         MR. HATHWAY:  Yes, Your Honor.

24         THE COURT:  All right.  What is the next issue?

25         That was for "attorneys' eyes only."

1          MR. MARCUS:  That's fine.

2          The next issue, Your Honor, relates to a series of

3   responses that are just not clear, we can't tell what the

4   defendants are saying.  There is not:  Yes, you can have it;

5   we don't have any; or no, you can't have it and here's an

6   objection.  There are a series of objections that are

7   ambiguous, and we just can't figure out whether they're

8   actually producing, not producing, whether there is material

9   that we think would be relevant.  We just don't understand

10  what is going on.

11         THE COURT:  All right.  Let's go through them.

12         MS. GROSS:  Okay.  We have conferred with opposing

13  counsel over these issues, and we are still unable to get an

14  answer that is clear to us.  There were requests for

15  information having to do with changes in the ASA bylaws, and

16  the response from defendants was that new bylaws are posted

17  on the website and are available to you.  We asked for

18  documents having to do with the reason why the bylaws were

19  changed, specifically because the bylaws were changed in a

20  manner that directly addresses the claims in this action.

21  And so we want to clarify that we don't just want those

22  materials that are on the website, we want the related

23  documents.  I haven't gotten a direct answer about that.  I

24  have asked about that with respect to the ASA entity and the

25  individual defendants.

1           THE COURT:  Okay.  Let's hear from the other side on

2      that one.

3           MR. HATHWAY:  Your Honor --

4           THE COURT:  Do you need a number for the request?

5           MR. HATHWAY:  I found it.  It is number 22, I

6      believe.

7           MS. GROSS:  21 and 22.  One has to do with the

8      bylaws, and the other has to do with other resolutions.

9           MR. HATHWAY:  Yes, Your Honor.  John Hathway.

10          First of all, these were changes that were done in

11     2016, so three years post-resolution.  We have an issue with

12     relevance there.  But nonetheless, we provided those.  We are

13     told that those are available on the website.  As to the

14     documents -- and we did indicate this in our letter -- that

15     as to request number 21, any further documents as to any such

16     resolutions or public statements will be made available.  I

17     mean to the extent we have any documents that relate to

18     putting together public statements -- I'm sorry, that was 21.

19     And 22, having to do with the -- I don't believe we have any

20     such documents.  But to the extent we have any, they would be

21     in any meeting minutes, which we will produce.

22          THE COURT:  This is for the change in the bylaws?

23          MR. HATHWAY:  In 2016, yes, Your Honor.

24          THE COURT:  Every drafting experience I have ever had

25     there's always a bunch of redlines and other documents of

1    that sort, and someone usually has a folder of that sort of

2    thing.

3            Have you looked?

4            MR. HATHWAY:  I believe there has been a search for

5    that, Your Honor.  I believe there has been a search.  I

6    can't tell you as I sit here right now what the answer is.

7            THE COURT:  By the 16th, give a definitive answer to

8    both the Court and the other side on that particular issue

9    about what search was conducted, that and what the results

10   were.

11           MR. HATHWAY:  Your Honor, do you want a report to the

12   Court?

13           THE COURT:  Yes, just a short filing with the Court.

14           Go ahead.

15           MS. GROSS:  Okay.

16           THE COURT:  That was not just for the bylaws.  That

17   was also for public statements?

18           MS. GROSS:  Yes, public statements, other

19   resolutions.

20           THE COURT:  And you have the same answer for --

21           MR. HATHWAY:  Yes.

22           THE COURT:  Give us the same report for both of those

23   in the October 16th filing.

24           MS. GROSS:  Okay.  With respect to the individual

25   defendants' responses, for requests 1, 2, 13, 14, and 15, the

1    answer was:  Defendants do not maintain such documents and

2    understand ASA has produced such info.  If "defendants do not

3    maintain" means that we don't have any, then that's fine.  I

4    mean if they don't have them, they don't have them.  But

5    usually the answer that we got was "none" when there were

6    none.  Obviously, if you were to look at my office, you would

7    see that I have many things that I don't intentionally

8    maintain.  I just want to clarify whether the answer to these

9    is none.  Or if the answer is, we understand ASA has produced

10   such info, in which case they won't, and of course it is the

11   latter, just because ASA has produced some responsive

12   documents does not mean that it is the same ones that the

13   individual defendants would have.

14            THE COURT:  Okay.  Let me hear from the other side.

15            MR. HATHWAY:  Yes, Your Honor.

16            Actually, the responses are slightly different.

17   There's one or two perhaps that says the individual

18   defendants don't maintain this information; for example, the

19   990s.  The individual defendants don't have the 990s, and the

20   ASA has made them available.

21            THE COURT:  Okay.

22            MR. HATHWAY:  The other types of financial

23   information --

24            THE COURT:  Are we talking about financial

25   information?  We're still talking about the changes to the

1    bylaws and --

2           MS. GROSS:  No, we're talking actually about a large

3    number of different -- I listed them.  Requests 1 and 2,

4    which do deal with financial information but not only

5    financial information.  Request number 13, 14, and 15.  13 is

6    about documents pertaining to the number of people who

7    attended the ASA annual meetings for each of those 15 years

8    and for the meeting in 2016.  14 is all documents pertaining

9    to the statement in Stevens' declaration that there has been

10   no financial loss to ASA.  And 15 is documents reflecting the

11   number of paid members of ASA over time, including summaries,

12   documents reflecting the number of members at particular

13   points in time, documents pertaining to the number of new

14   members at different times.

15          So those requests, they are related to the financial

16   issue, for sure, but they are not specific to the 990s.  We

17   did not expect 990s from individual defendants.

18          THE COURT:  Sure.  All right.

19          MR. HATHWAY:  Your Honor, all of this is related to

20   the waste claim; membership dues, amount of this, amount of

21   that, all financial information, financial loss.  The

22   individual defendants don't maintain any of that information.

23   However -- and as they have let me know -- to the extent that

24   ASA's executive director attached some financial information

25   about membership dues and things like that, that would be in

1    what I have produced.  That would be in what I have produced

2    because I have given you that, maybe with the exception of

3    Ms. Maira.  So the answer is this:  It would be duplicative.

4    We believe it has already been produced by the individual

5    defendants, but we don't see the point in going back when

6    we've done this --

7              MR. MARCUS:  When --

8              THE COURT:  Hold on.  He is talking to me.

9              MR. HATHWAY:  -- when we have produced over 5,000

10   documents.  The information has been produced by the ASA.  It

11   is probably in what they have from the individual defendants'

12   production anyway.  But we didn't go back, we didn't see the

13   point of going back and looking at each production on this

14   issue.  It just didn't seem to make sense to us.

15             THE COURT:  But you had the individual defendants

16   search for all the various categories?

17             MR. HATHWAY:  Yes.  Yes.

18             THE COURT:  All right.

19             MS. GROSS:  If I can just briefly respond on that.

20             THE COURT:  Sure.

21             MS. GROSS:  First of all, I have seen e-mails where

22   the president is talking to the executive committee about the

23   dire situation that the ASA is in after the resolution having

24   to do with institutional members dropping out, colleges and

25   universities that had been funding an ASA chapter or the ASA

1    department in those universities where institutional members

2    of ASA, a huge number of them dropped out after this

3    resolution.  I have seen these e-mails because in the parts

4    of the production that we have it's discussed.  Those aren't

5    things that John Stevens has because those are conversations

6    amongst the executive committee.  And as much as he has a

7    great deal of information about the official workings of the

8    ASA, these folks are talking to each other by e-mail all the

9    time without him on them.  So that would be my first point.

10          But my second point is, with respect to this answer

11   of we didn't think that it made sense to go back and look,

12   then make that an objection and say, we think this is

13   duplicative because it is not reasonable that these

14   defendants would have anything that you don't already have.

15   And let us respond to that.  Instead we get this:  Well, they

16   don't maintain it; but if they did maintain it, ASA has

17   already produced it.  It doesn't say everything that these

18   folks have would necessarily be exactly duplicative of what

19   he would receive from ASA, and it doesn't say none.  So we

20   don't know what we don't have.

21          THE COURT:  He just told me that he had the

22   individuals search for all the various categories.  What do

23   you expect me to do?

24          MS. GROSS:  I expect you to ask him to produce them.

25          THE COURT:  He says he has produced them.

1          MS. GROSS:  Well, if that is the answer, if the

2     answer is we've produced these things, then why am I looking

3     at an objection.  I mean if that's the answer, we have them

4     and we have produced them, then I can put a check mark next

5     to that request and we can move on, but we haven't gotten

6     that answer.  If that is the answer we're going to get today,

7     that's nice.

8          MR. HATHWAY:  Your Honor, I would simply read one of

9     our responses, which says, after the objection, for example,

10    on financial losses, number 14, "Any related information in

11    this defendant's possession would be duplicative of that

12    produced by ASA and has been produced."

13         I don't know what else we're supposed to say.

14         MS. GROSS:  Well, he read to you one.  There are a

15    number of these.

16         THE COURT:  I will take him at his representations.

17    What you guys will have to do is make that part of each

18    deposition, ask them what they searched for.  And if they say

19    they didn't search, then I will allow you to reopen the

20    deposition at their expense after they do search.

21         MR. MARCUS:  Okay.

22         MS. GROSS:  Okay.  The next one I hope will be easily

23    resolved.  This has to do with, for the individual

24    defendants, 18, 20 and 33.  And this also is an issue with

25    Defendant ASA.  We received some responses that say, relevant

documents relating to claims or defenses have been or will be produced.  If I take this to mean that relevant documents are going to be produced, then -- all relevant documents -- then I'm satisfied with that.  My concern was that most of the answers don't say relevant documents relating to the claims or defenses.  And so I asked opposing counsel, should I construe this to mean that you are first going to consider amongst yourselves whether or not you think a particular document is relevant to the claims or defenses, and am I not going to know if you have decided a particular document is not such that I never receive it.  If I read this to mean that we're producing the responsive documents, that's fine. I have not been able to get a firm answer on whether that's how I should read this response.

MR. HATHWAY:  I'm sorry, counsel.  Can you just repeat the numbers?  Because I didn't get them.

MS. GROSS:  For some of the individual defendants, 18, 20, and 33.  Also, for ASA, it is 18 and 33.

MR. HATHWAY:  Your Honor, for example, request number 20, "All documents pertaining to Israel or the territories, including, but not limited to, documents reflecting data and information pertaining to the restriction of academic freedom and academic activity in Israel whether or not it was used as support for the resolution."

It seems to us that the plaintiffs in some way are

1   going to want to litigate the whole Middle East conflict,

2   which we'll need to set a year for that trial because no one

3   has been able to solve that.

4   Every document relating to Israel and the

5   territories, regardless of whether it has anything to do with

6   this resolution, we think is just extremely overbroad.  We're

7   talking about college professors who probably have about five

8   or six books that mention Israel, or the territories.  Okay?

9   We have said that we will produce -- to the extent there's

10  e-mails back and forth that discuss Israel, discuss the

11  territories in the resolution, we've produced that.  We've

12  produced that.  But we're not going to go and have these

13  people search for every document in their possession that

14  mentions the word "Israel" or mentions the word "territory."

15  We don't think that's appropriate.  That's number 20, Your

16  Honor.

17  Number 18, any documents referring or related to the

18  resolution at any time prior to, during, or subsequent to the

19  vote on the resolution, including, but not limited to, and

20  then there are about seven categories of documents.

21  Letters, editorials, commentary, and any other

22  statement of opinion or discussion of the resolution

23  submitted to you or published in any form.

24  We have produced all of the documents that have to do

25  with the resolution.  Anything that said "resolution" on it,

1      that has been -- this resolution -- that has been produced,

2      to our knowledge.

3              Number 33, let me look and see what that one is.

4              This is all documents pertaining -- it's an

5      organization called USACBI.  And we have said, any documents

6      that have that term in it, have that organization in it, that

7      were discussed back in any e-mails having to do with the

8      resolution, you've got them.  We've given them to you.  This,

9      as I understand it, is an organization that perhaps some of

10     the individual defendants might have had an association with,

11     and so this is in essence guilt by association.  We think

12     that this is beyond that which is related to the resolution.

13     We think this is going far afield.  Tell us what other

14     organizations you have ever belonged to, you know, Senator

15     McCarthy said.  This is just too much in our view.

16              And when you consider what issues are before the

17     Court at this point, waste, it doesn't have anything to do

18     with waste.

19              And the other remaining counts are:  Did the

20     association -- the association -- violate its own bylaws or

21     the D.C. nonprofit corporation statute in the process by

22     which it enacts this resolution?  That, I just don't see the

23     relevance of it.

24              THE COURT:  I'm a little bit confused now.  Did you

25     say you produced the documents concerning this organization

—32—

1    or you have objected to producing them?

2         MR. HATHWAY:  We have objected to them, but we

3    said -- there are e-mail communications in which this

4    organization is referenced in regards to discussions about

5    the resolution.  Those have been produced.

6         THE COURT:  And what sorts of things have not been

7    produced?

8         MR. HATHWAY:  If someone, for example, was a member

9    of that organization, they, as I understand it, they're

10   asking for every document associated with this individual's

11   association with the organization, whether or not it has

12   anything to do with the resolution, and that has not been

13   searched for, Your Honor.

14        MS. GROSS:  If I may, Your Honor.

15        THE COURT:  You may.

16        MS. GROSS:  To be clear --

17        THE COURT:  First, tell me what the organization is.

18        MS. GROSS:  That's exactly what I was about to do.

19   ACBI stands for Academic and Cultural Boycott of Israel.  So

20   it is the United States Organization for the Academic and

21   Cultural Boycott of Israel.

22        To be clear, I cannot imagine exactly what other

23   information they would have about USACBI that doesn't have to

24   do with the boycott.  However, I want to respond quickly to

25   these few mentions of there's only a waste claim left and so

1    forth.  You know, I have been put in a somewhat difficult

2    position here.  Opposing counsel knows that I have drafted an

3    amended complaint.  They know that that amended complaint

4    adds a number of new claims.

5         Now, I can go ahead and file that amended complaint

6    when I still don't have the bulk of the e-mails from the

7    major defendant, in which case I'm going to have to go back

8    and file another amended complaint, or I can, you know --

9         MR. SEAMAN:  You're going to file a proposed amended

10   complaint?

11        MS. GROSS:  I'm going to file a proposed amended

12   complaint.  But the defendants know this, and defendants have

13   known this for weeks because I went and conferred with them

14   about this amended complaint.  I had really expected -- and I

15   asked four times -- for at least a partial production of

16   whatever they have for Sunaina Maira, just what they had and

17   what they had ready by the end of last week so that Friday I

18   would have had something more.  Not only did I not get a

19   partial production, but they didn't even respond to my

20   e-mails.  So I'm going to file this, go ahead and file this

21   motion to amend the complaint, and I'm going to add a number

22   of new claims.  And defendants have come up here and said a

23   number of times none of this is relevant to anything, but

24   they have withheld information that they knew was relevant to

25   what they know we're going to file.  So there's a circular

—34—

1    problem here.

2         With respect to what was said about we have or we

3    have not produced everything having to do with USACBI, if you

4    have, then that's the answer to give us.  Produced.  If

5    you're objecting because you think it is too broad, then you

6    object and do a partial objection, and let us know if you're

7    withholding any documents, as the rules require, and then we

8    could either come to an agreement about it, okay, you

9    know -- I mean it would not be the first time that a

10   defendant said to me, you know, let me explain to you why

11   you're asking for a lot of things that aren't relevant, and I

12   listen to them, and said, okay, I think we can come to an

13   agreement on this.  But I don't know what their response is.

14   I don't know if they're holding back documents, and I don't

15   know the basis on which they are.  That's what we wanted to

16   talk about.

17        THE COURT:  All right.

18        MR. HATHWAY:  Your Honor, I have to express some

19   confusion on this amended complaint issue.  It is true,

20   because when we had a meet-and-confer, I was advised that

21   there was an amended complaint.  We had a meet-and-confer

22   about we want to file an amended complaint.  We had a

23   meet-and-confer about the discovery issues.  And on a number

24   of occasions I say, well, how can that possibly be relevant?

25   Well, it is relevant to the claims in our amended complaint.

1     There is no amended complaint pending.  There is no motion

2     filed.  I can't see how there can be an argument that I'm

3     supposed to produce things in anticipation of an amended

4     complaint that hasn't been filed which we are going to

5     disagree with.

6          THE COURT:  Let's talk about the documents concerning

7     this organization.  You've said you produced everything

8     pertaining to the resolution.

9          MR. HATHWAY:  That's right.

10          THE COURT:  What types of things have you not

11     produced or have you not had them search at all for anything

12     other than documents for the resolution?

13          MR. HATHWAY:  Documents pertaining to the nomination

14     or election of officers or counsel members or any other

15     academic associations.  The nominations to this other

16     organization --

17          THE COURT:  Nominations --

18          MR. HATHWAY:  Nominations for elections, as I

19     understand the request, for people in this other organization

20     to become officers in this other organization.

21          MS. GROSS:  Well, that is a misunderstanding of the

22     request.

23          THE COURT:  Why don't you come to the podium.

24          MS. GROSS:  For the four years surrounding the

25     resolution, every single person who was chosen by the

1    nominating committee of the ASA to run for president of the

2    ASA was an avid endorser of the USACBI, listed as a member

3    and had a known position on this particular resolution.

4    Prior to the nomination of a founding member of USACBI to the

5    ASA nominating committee, going back to 2008, I believe, not

6    a single person who had any association with USACBI had been

7    nominated for president of the ASA.  So that is the direct

8    relationship that we've noted and that we've asked for

9    discovery on.

10           THE COURT:  Okay.  But other than documents

11   concerning this organization and the resolution, what types

12   of things are you looking for?

13           MS. GROSS:  There was discussion between -- there are

14   members of the national council who -- during this

15   resolution -- who were communicating with USACBI about the

16   resolution as it was going through the executive committee

17   and had not yet even been released to the members of the ASA

18   regarding what did USACBI want to see in the ASA resolution.

19           THE COURT:  You have seen those e-mails already?

20           MS. GROSS:  I have seen a couple, yeah.

21           THE COURT:  Because they produced it?

22           MS. GROSS:  Yes.  For some of the defendants, when I

23   ran a targeted search, I guess you would say, of the

24   documents that I have so far, I did receive -- I did pull up

25   some documents that had the word "USACBI" in it.  If they

—37—

1     want to give me a verification that I have received them all,

2     then we're done.

3            THE COURT:  Those are documents concerning the

4     resolution.  Other than documents concerning this

5     organization and the resolution, what is it you're looking

6     for?

7            MS. GROSS:  I can't imagine a situation where there

8     would be a document having to do with USACBI that ASA would

9     have that doesn't have to do with the resolution because that

10    is all USACBI does, is try to convince organizations and to

11    adopt this resolution.  I don't know of them doing anything

12    else.  So I did, though, specify -- so, for example, he said

13    there was all of these subsections to that request.

14    Documents pertaining to planning for, introducing, drafting,

15    supporting, funding, voting, processes for adoption of the

16    resolution or a similar resolution at another academic

17    association.  Documents pertaining to encouraging,

18    recommending, or recruiting new members to join ASA or any

19    other organization where a boycott of Israel is being

20    considered.  Documents pertaining to appointing members of

21    USACBI to the ASA nominating committee or the nominating

22    committees of other academic associations.  Documents

23    pertaining to the nomination or election of members of USACBI

24    for positions as officers or on the National Council of ASA.

25    And documents pertaining to the nomination or election of

1    officers or council members of any other academic

2    associations underneath the USACBI.  So we're not asking for

3    everything they have having to do with running for office in

4    other organizations, just documents that pertain to USACBI

5    and pertain to placing members of USACBI or endorsers on the

6    leadership of those organizations.

7         THE COURT:  Okay.  First of all, do you know whether

8    there is any responsive documents to any of those things that

9    you haven't produced?  Do you know one way or the other?

10        MR. HATHWAY:  I don't, Your Honor.

11        THE COURT:  Okay.

12        MR. HATHWAY:  I don't.  But I would say that -- and

13   really they want documents regarding any other organization

14   where a boycott of Israel is being considered.  I mean, how

15   far afield are we going to go?  We believe -- the ASA and all

16   the individual defendants are of the firm belief that this

17   whole lawsuit was filed so that other organizations who are

18   considering a similar resolution would not do so.  In fact,

19   it has been cited, this lawsuit has been cited for that

20   purpose; that another organization that has considered it

21   decided not to do it because they saw the judge's opinion

22   that this lawsuit was allowed to go forward.  In our view,

23   they want to know everything about every other organization

24   that might be interested in passing a resolution, and we just

25   don't think that is relevant to the issues in the case, Your

1    Honor.

2              THE COURT:  I think you should search for them and

3    produce them.

4              How much time do you think you need?

5              MR. SEAMAN:  I think we could do that also by the

6    16th, Your Honor.

7              THE COURT:  All right.  Why don't you do that.

8              All right.  What else?

9              MS. GROSS:  I think what is left is relatively

10   straightforward.  There are a number of responses that said,

11   you know, but for this, either we have produced or we will

12   produce or we have produced and will continue to produce, and

13   so we would like some clarification as to when -- we would

14   like a specific deadline -- for those where it says we will

15   produce, or the individual defendant responds, I will

16   produce, when he or she will produce by.

17             THE COURT:  Is there anything that you intend to

18   produce that will take longer than October 16th?

19             MR. SEAMAN:  Your Honor, I probably ought to address

20   that.  I mentioned earlier, Your Honor, we've netted a large

21   volume of documents, additional documents, from Mr. Marez.

22   That will take us longer than the 16th.  I think that will

23   take us an additional 10 days, possibly 14 days to get that

24   volume done.

25             THE COURT:  Other than Mr. Marez, everything else

1    will be produced by the 16th?

2         MR. SEAMAN:  We have also gone back to Mr. Reddy to

3    get some more documents, so there may be some additional

4    documents from Mr. Reddy.

5         THE COURT:  Okay.

6         MR. SEAMAN:  I don't want to over promise you, Your

7    Honor.  I don't think Mr. Reddy -- I don't know quite what

8    volume he has got in addition.  I would say I could have

9    Mr. Reddy's by the end of the month.

10        THE COURT:  Produce everything by the 16th except for

11   Mr. Marez and Mr. Reddy, which you can produce by the 30th.

12        Anything else we need to resolve today?

13        MS. GROSS:  Just a couple more, Your Honor.

14        THE COURT:  Okay.

15        MS. GROSS:  For request number 23 and 30, our

16   instructions had said, you know, to the extent not otherwise

17   specified, that the time frame was 2010 to the present.  And

18   for request number 23 and 30, the responses from all

19   defendants were we will produce documents from 2012 through

20   2015.  Request number 23 is about documents specifically

21   pertaining to any of the plaintiffs, and I think that we have

22   a right to whatever documents they have specifically

23   pertaining to the plaintiffs beyond 2012 through 2015.

24        Request number 30 asks for documents pertaining to

25   nominations of individuals for positions as officers or on

1    the National Council, including, but not limited to, any

2    lists or other documents reflecting all persons nominated by

3    any member and so forth.

4           I will say that I expect we may have received all of

5    those documents because in a subsequent production for

6    Mr. Stevens we received election booklets going back for the

7    full 10 years.  I would just like a clarification that that

8    is what there is and that there isn't more that is being

9    withheld.

10          With respect to request number 29, on a similar note,

11   defendants responded that they would produce documents for

12   the year 2013 only.  This request was documents pertaining to

13   encouraging non-members, including, but not limited to,

14   students to join ASA.  With respect to that request, I would

15   be willing to cut back from the 2010 through the present, but

16   just to the year 2013 is not useful.  What we're looking for

17   is a trend in the period of time right before 2013 and right

18   after 2013.  I'm not uncomfortable making that time period

19   shorter than seven years, but one year isn't sufficient to

20   show a change.

21          THE COURT:  With respect to the first one, which I

22   think you said was 23 about the plaintiffs, all documents

23   concerning the plaintiffs -- is that what you requested?

24          MS. GROSS:  Yes, documents specifically pertaining to

25   plaintiffs.  So, for example, lists of members and so forth,

1    I wouldn't expect for that to be included.  But specific

2    e-mails about -- I know there is a specific amount of e-mails

3    about Plaintiff Bronner because I have seen some of them, and

4    I want to be sure that I have all the e-mails where they talk

5    about Plaintiff Bronner.

6          THE COURT:  But these conversations are concerning

7    the resolution or concerning something else?

8          MS. GROSS:  What I have seen concern resolution, yes.

9          THE COURT:  What other than e-mails concerning the

10   resolution are you looking for?

11         MS. GROSS:  Membership status, right to vote.

12         THE COURT:  For that year or ever?

13         MS. GROSS:  Well, what I would like to show is that

14   at least with respect to Plaintiff Barton, who was the one

15   who was not allowed to vote, I would like to have their

16   information for his entire membership period having to do

17   with when he paid his dues, all the years that he had been a

18   member certainly.

19         THE COURT:  And you said that was Barton?

20         MS. GROSS:  Barton, yes.

21         THE COURT:  All right.  Let me hear from the other

22   side on those.

23         MR. HATHWAY:  Your Honor, we went back to 2012 on the

24   idea that any documents referring or relating to the

25   plaintiffs, you know, perhaps there was some discussion long

1    before 2013 when this issue really started to percolate.  We

2    think that that would be sufficient.  Any information

3    regarding Barton -- and there is one count -- Barton is the

4    last count, and it basically says, I was shut out from

5    voting.  I'm not sure what the relief is there, considering

6    the issues that are in the case, but any information we have

7    about him for the 2012-2015 period we have either produced or

8    will produce.  I believe we have produced what we have.

9         His claim is that I tried to sign up, in essence,

10   when I heard about the resolution, or something to that

11   effect, and I was told that the membership rolls were frozen

12   as of the date that the vote was going to be taken, so I

13   wasn't able to re-up my membership, which had lapsed.  That's

14   his claim.  I don't see going back 10 years on that really

15   even if we have it.  I don't see that that is productive.

16        THE COURT:  Is there a place in which people's dues

17   payments are all in one place, all in one database?

18        MR. HATHWAY:  I don't think so.  I don't think so,

19   Your Honor.

20        THE COURT:  How would that information manifest

21   itself?

22        MR. HATHWAY:  I think the way it works is their

23   membership is done through Johns Hopkins Press, which

24   publishes their encyclopedia and keeps their membership

25   information.  It would simply be a confirmation.  I don't

-44-

1    even know if it is in their database this amount was paid,

2    that amount was paid.  I can double-check on that, Your

3    Honor.

4            THE COURT:  Let's double-check on that one.

5            MR. HATHWAY:  On Barton.

6            THE COURT:  If it is not easily accessible, we can

7    readdress it.

8            And with respect to e-mails concerning the plaintiffs

9    regarding the resolution, that has all been produced?

10           MR. HATHWAY:  Yes, Your Honor, with the exception of

11   what we have said.

12           THE COURT:  Right.  That will be produced.

13           MR. HATHWAY:  Yes.

14           THE COURT:  All right.

15           MS. GROSS:  There are a number of other requests

16   where defendant limited their answer to regarding the

17   resolution.  All documents pertaining to fundraising that we

18   asked for, they have responded that they will produce all

19   documents related to fundraising having to do with the

20   resolution.  Documents pertaining to the nomination of people

21   they said they would produce with respect to the resolution.

22           THE COURT:  Going back to the fundraising --

23           MS. GROSS:  Uh-huh.

24           THE COURT:  -- you want everything about their

25   fundraising ever?

1          MS. GROSS:  Well, first of all, all of it only goes

2     back to 2010.  Except for that 15-year issue having to do

3     with the declaration, I have not asked for anything for 2010.

4     But John Stevens testified in his deposition that the only

5     time that there was a particular fundraising or special

6     fundraising done was for this resolution.  And as long as

7     that is true, then we should have all of the documents if

8     they only give us those related to the resolution.  But

9     that's the answer that I want to get in the responses so that

10    I know.  It is one thing for John Stevens to have said that

11    in a deposition, but I want the attorneys to respond in the

12    responses that they fill out for their clients that there is

13    nothing else except for what we have given you.  And then

14    they only give me things related to the resolution, and I

15    accept that.

16          This also brings me back to a point that counsel made

17    earlier today.  When you all were discussing the issue of

18    expenses and that there was this specific division such that

19    there was a budget for only things related to the resolution

20    and another, well, that didn't happen until late into the

21    spring of 2014.  According to the documents that I have seen,

22    there was a rapid response team that went into immediately

23    effect right then in December of 2013, and there was

24    discussions with media consultants, there were op-eds done.

25    The op-eds were edited with PR people.  There were

1     conversations with attorneys.  There were conversations with

2     attorneys about whether or not this ASA resolution was legal

3     before the vote.  That's an expense.  I'm assuming that those

4     attorneys didn't do it for free.  So to say, well, we have

5     always had this separate budget, is incomplete because that

6     separate budget didn't happen until late into the spring of

7     2014.  So that is something that I just wanted to clarify.

8     That's why we're asking for that information on expenses.

9            THE COURT:  All right.  So with respect to

10    fund-raising, I'm still not exactly clear what it is you want

11    from me.

12           MS. GROSS:  Well, I want for you to instruct them to

13    answer the question in full; and if the answer is that there

14    are no other documents having to do with fundraising for

15    specific issues except for this resolution and they have

16    produced everything having to do with the resolution, then we

17    have our answer.

18           THE COURT:  All right.

19           MR. HATHWAY:  Your Honor, if Mr. Stevens said that

20    was true, then I believe it is true.

21           There was not any fundraising or budget for the

22    resolution.  That is an inaccurate description.  I don't

23    think she was saying it intentionally.  What happened is

24    after the resolution was passed, there was a backlash, and so

25    people thought, well, we need to get the word out and so we

1    need expertise on this.  That's what that was all about.  If

2    there was no other fundraising, then that is the answer, but

3    we preserve our objection.  Any fundraising ever, we still

4    don't think it is relevant, and we responded that any

5    fundraising having to do with the resolution has been

6    produced.  It had been produced earlier.

7         MS. GROSS:  Just quickly, the information that I just

8    related to the Court having to do with the separate budget,

9    that is John Stevens' own words in the deposition.  And also,

10   there are numerous documents that reflect the money that is

11   in this special ASA budget for the resolution as opposed to

12   the general fund for the ASA.  And one issue that makes this

13   particularly pertinent to the waste claim is that while

14   defendants have argued that there's been no new effect on

15   contributions and so forth to the ASA over time, if you take

16   the amount that they say was specially earmarked for

17   resolution-related expenditures and you subtract it from the

18   total contributions to ASA for that year, you see a very

19   small remaining amount for the ASA general fund, which is far

20   smaller than for the previous years.  And so it seems to me

21   difficult to argue that the general purposes of the ASA have

22   not incurred costs from the resolution.

23        THE COURT:  Okay.  We're not here to argue the

24   merits.

25        With respect to fundraising, I'm still a little

—48—

1    unclear as to what you want me to do.

2         MS. GROSS:  We have asked for documents having to do

3    with fundraising.

4         THE COURT:  Any fundraising?

5         MS. GROSS:  Yeah, I mean honestly, I don't see in the

6    documents that I have seen so far a huge vast amount of

7    documents having to do with fundraising.  It seems like the

8    ASA gets most of its revenue from member dues and also from

9    subscriptions to the journal.  So it may sound like

10   everything having to do with fundraising, but in reality I

11   think that is a very small number of documents.  But we did

12   ask for everything having to do with fundraising for that

13   seven-year period, 2010 to the present.  They said they would

14   produce for 2013.  And what I'm saying is that that is

15   insufficient to establish the kinds of changes that we expect

16   to see.

17        THE COURT:  Okay.  Was there any fundraising other

18   than 2013?

19        MR. HATHWAY:  Not that I know of.  Again, if

20   Mr. Stevens, who was the executive director, said the answer

21   is no, I assume he knew what he was talking about.  We didn't

22   say related to 2013; we said any fundraising documents

23   regarding the resolution have been produced.  I will

24   double-check with them just to make sure there is no other

25   fundraising, but again, if there was fundraising -- anyway, I

1    won't reargue the point, Your Honor.

2           THE COURT:  Double-check.  And when you provide me

3    the information on the other issues by October 16th, include

4    information about that.  To the extent you want to argue it's

5    not relevant, you can state that, but I want to know what

6    else is out there before we decide whether it is relevant or

7    not.

8           MS. GROSS:  We have just one more.

9           THE COURT:  Sure.

10          MS. GROSS:  And that's it.

11          We have asked defendants to specify in their

12   responses what documents are responsive to particular

13   questions.  For example, the particular questions that we had

14   asked about, what is the basis for your having alleged that

15   there are threats and harassment against some of the

16   defendants is one of the requests.  They refused to provide

17   information about documents responsive to the requests.

18          They then served our plaintiff with document requests

19   where the very first instruction was exactly that.

20          THE COURT:  And that is what the rule requires.

21          MS. GROSS:  I thought it was what the rule required,

22   too.  I explained that.  We had a meet-and-confer over this

23   issue, and I explained that to them.  And the answer was that

24   no, if you produce documents that are in the form that they

25   are customarily kept.  But my understanding is that has to do

1    with labeling of actual documents, and it really is about

2    hard-copy documents.

3           THE COURT:  Or if you produce an entire file the way

4    it is kept in the ordinary course of business.

5           MS. GROSS:  They asked for the same from us.  I

6    contacted them again.  I said, hey, we have been asking for

7    exactly what your first instruction asked for here.  And

8    their response back was:  Oh, yes, it's a mistake that we

9    asked for this.  It's from another form.  We don't know how

10   that paragraph from another form fell on to this request but

11   we withdraw that.  Rather than what I think the correct

12   response would be, yes, let's both give each other the

13   identification of documents responsive to requests.

14          MR. HATHWAY:  I need to respond to the last comment,

15   because in fact there was a stand-alone sentence that was

16   from another form.  The actual instructions, which I advised

17   counsel abide by the instructions, the very first instruction

18   is exactly in conformance with the federal rule, which is to

19   produce the documents as they're kept in the usual course of

20   business or organize and label them to correspond with the

21   categories of requests.

22          THE COURT:  In which manner did you produce them?

23          MR. HATHWAY:  As they were kept in the ordinary

24   course.  We did not label them that this is responsive to

25   this one, this is responsive to that one.

1          THE COURT:  But presumably you sent over a big batch

2     of documents which presumably was not how ASA kept them in

3     the ordinary course of their business.

4          MR. HATHWAY:  I belive that, in fact, that was, but I

5     will let Mr. Seaman address that, Your Honor.

6          MR. SEAMAN:  Your Honor, when it comes to

7     electronically stored information like e-mail -- and I'm

8     looking at the Sedona Principles, Third Edition, which I

9     think just came out yesterday, which addresses this very

10    issue.  When producing electronic, especially e-mail, the key

11    to whether one has complied with Rule 34(b)(2)(E), the usual

12    course portion of the rule, it depends on the searchability

13    of the e-mail or the electronically stored information.  What

14    it means when you're referring to electronically stored

15    information and you're using the term "usual course," the key

16    issue is whether you have altered that file, the electronic

17    file, specifically metadata.  And the key question is, is it

18    as searchable or as usable when it is provided to the other

19    side as it was when we had it because if you think about

20    e-mail, it's got date, it's got the sender, it's got the

21    recipient.  That's how you keep it.  That's how you keep the

22    e-mail.  It's got a date.  It's got all the pertinent

23    information, and that was provided to the other side.  I'm

24    not sure how else we would provide e-mail.  I don't know how

25    else one would characterize it as stored in the usual course

1    of business unless I provided perhaps our laptop and you

2    could see how it was stored on the laptop.  But that is not

3    necessary.  What is necessary, if the email is the document,

4    and it is, the key is, is it as usable and as searchable.

5    And Ms. Gross pointed this out earlier.  She does term

6    searches, which is what most people do with ESI.  The

7    question is:  Can she do a term search for date, custodian,

8    subject, any word?  She can.  She's got this material at

9    their request in native format.  All the metadata is there.

10   Perhaps there is some other way that I don't know of, but the

11   Sedona conference seems to believe the way you comply with

12   that portion of the rule is by providing it in a format that

13   is as searchable and usable as it was when you had it, and we

14   have done that.

15           MS. GROSS:  Your Honor, if I may.

16           THE COURT:  You may.

17           MS. GROSS:  I haven't read Sedona's new publication

18   from yesterday.

19           THE COURT:  Neither have I.

20           MS. GROSS:  But I will say this:  We don't have any

21   complaints about whether or not the documents were produced

22   in a way that is searchable.  This is not a situation where

23   we said, please produce them exactly as they are kept in the

24   ordinary course of business, and after receiving a production

25   that we are complaining that no, we are not getting them, you

1    didn't produce them the way you kept them in the ordinary

2    course of business.  This is about whether or not they should

3    specify which documents are responsive to which request.

4         With respect to the portion of the rule that talks

5    about labeling and categorizing documents, I have always

6    understood that to have to do with physical production of

7    documents.  If I hand you three folders and I say this folder

8    is for response number 1 or this folder is about membership

9    and this folder is about revenue and so forth, then it is not

10   required for you to provide any more information necessarily

11   about what is responsive to what.  But that is still not the

12   same as whether or not with respect to our particular

13   request -- I mean our requests may or may not be in line with

14   how anything is kept in the ordinary course of business.  So

15   I don't understand the assumption that if it is produced

16   physically, as it would be in the ordinary course of

17   business, that you don't have to answer those questions.  But

18   particularly, I just want to add that I don't see any reason

19   except for that I have a limited number of interrogatories

20   that I can serve, why I couldn't just serve interrogatories

21   asking for what documents did you produce that are responsive

22   to request number 1 in the RFPs that I served you two months

23   ago.  I don't think that the rules intend for me to have to

24   waste my 25 interrogatories asking those questions.

25         THE COURT:  I think we both need to look at the

1      Sedona Principles new edition before we resolve that issue.

2            MR. MARCUS:  I'm on the assumption that we are done

3      with the individual discovery issues.

4            THE COURT:  Okay.

5            MR. MARCUS:  I wanted to raise one, potentially two

6      issues.  One is I don't know whether Your Honor wishes to

7      hear us now on the protective order.

8            THE COURT:  No, I'm on a draft of that protective

9      order.  I intend to issue it in the next couple of days.

10           MR. MARCUS:  My last issue, Your Honor, is that we

11     have now taken 90 minutes of time from an Article III judge,

12     his chambers and his staff, about which I feel very bad, and

13     I wonder whether it would be appropriate to ask Your Honor to

14     appoint a magistrate to whom we could --

15           THE COURT:  My experience has been that that just

16     slows things down.  I want to keep things moving.

17           MR. MARCUS:  Very well.

18           THE COURT:  All right.

19           MR. HATHWAY:  Your Honor, the only thing I would add

20     is, in the review of the protective order, you will note that

21     we submitted one protective order that had the differences

22     side by side in redline.  Obviously, when the Court makes its

23     decision, either side can submit a clean version of what the

24     Court would want, but we have not done that at this point.

25           THE COURT:  Okay.  We will take care of all of that.

1          MR. HATHWAY:  Thank you.

2          THE COURT:  Anything else we need to resolve today?

3          MR. MARCUS:  Nothing, Your Honor.  Thank you.

4          MR. HATHWAY:  Nothing.

5          THE COURT:  Thank you.  You're excused.

6              (Proceedings adjourned at 3:25 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

56

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Patricia A. Kaneshiro-Miller, certify that the

4     foregoing is a correct transcript from the record of

5     proceedings in the above-entitled matter.

6

7

8     /s/ Patricia A. Kaneshiro-Miller        October 6, 2017
      ------------------------------------    ---------------------
9     PATRICIA A. KANESHIRO-MILLER                     DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25