UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SIMON BRONNER, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 16-0740 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 85, 88 |
| | : | | |
| LISA DUGGAN, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

CONFIRMING THE COURT'S SUBJECT MATTER JURISDICTION

### I. INTRODUCTION

This Memorandum Opinion addresses a specific, narrow issue: The impact of District of Columbia ("D.C.") Code § 29-406.31(d), which shields directors of charitable corporations from damages except in specific circumstances, on this Court's subject matter jurisdiction.

While the issue here is narrow, the underlying lawsuit to which this issue relates arose from a much broader dispute over the extent to which an exclusively academic organization should involve itself in political issues. Plaintiffs are current and former members of the American Studies Association ("ASA"), a nonprofit, charitable corporation dedicated to the promotion of the study of American culture. They have sued the ASA and several of its current and former leaders, including Defendants Lisa Duggan, Curtis Marez, Avery Gordon, Neferti Tadiar, Sunaina Maira, Chandan Reddy, Jasbir Puar, J. Kehaulani, Kauanui, Steven Salaita, and John Stephens ("Individual Defendants"), alleging that the Individual Defendants improperly introduced and implemented a resolution calling for the academic boycott of Israel.

During recent briefing regarding whether Plaintiffs could amend their complaint, D.C. Code § 29-406.31(d) emerged as a possible impediment to the Court's subject matter

jurisdiction.  For the reasons stated below, the Court, concludes that § 29-406.31(d) does not defeat its jurisdiction at this stage in the litigation.

## II.  BACKGROUND[1]

### A.  The American Studies Association

The ASA is a nonprofit organization in service of "the promotion of the study of American culture through the encouragement of research, teaching, publication, the strengthening of relations among persons and institutions in this country and abroad devoted to such studies, and the broadening of knowledge among the general public about American culture in all its diversity and complexity."  *See* Const. & Bylaws of the Am. Studies Ass'n ("ASA Const. & Bylaws"), Const., Art. I, § 2, ECF No. 21-3.  The ASA's founding documents provide that the society was "organized exclusively for education and academic purposes."  Pls.' Sec. Am. Compl. ("SAC") ¶ 30, ECF No. 81.

The ASA was incorporated in D.C. as a private, nonprofit corporation, and is therefore governed by D.C. law.  SAC ¶ 17.  Moreover, it has been designated by the Internal Revenue Service as a tax-exempt, charitable organization under the Internal Revenue Code, 26 U.S.C. § 501(c)(3).  *Id.*  Because it is exempt from taxation under § 501(c)(3), it is considered to be a "charitable corporation" under D.C.'s statutory framework governing nonprofit corporations.  D.C. Code § 29-401.02(3), (4).

The ASA is overseen by a "National Council" and a President.  The National Council is charged with "conduct[ing] the business, set[ting] fiscal policy . . . and oversee[ing] the general interests of the [ASA]."  ASA Const. & Bylaws, Const., Art. V, § 2.  It consists of thirteen voting

---

[1] For a more detailed overview of the ASA, the resolution at issue, and this case's procedural history, refer to the most recent Memorandum Opinion in this case, *Bronner v. Duggan*, No. 16-0740, 2018 WL 1178014 (D.D.C. Mar. 6, 2018).

members.  ASA Const. & Bylaws, Const., Art. V, § 1.  The ASA's President presides over the National Council and has a duty to "fulfill the chartered obligations and purposes of the [ASA]." ASA Const. & Bylaws, Const., Art. IV, § 2.

### B.  ASA's Boycott Resolution

In November 2013, at the ASA's annual meeting, ASA leadership introduced a resolution advocating for the boycott of Israeli academic institutions (the "Resolution"), in response to the allegation that Israel restricts academic activity in formerly Jordanian territory currently under Israeli control.  *See* SAC ¶¶ 89, 98.  The Resolution's operative clause states:

> It is resolved that the American Studies Association (ASA) endorses and will honor the call of the Palestinian civil society for a boycott of Israeli academic institutions.  It is also resolved that the ASA supports the protected rights of students and scholars everywhere to engage in research and public speaking about Israel–Palestine and in support of the boycott, divestment, and sanctions (BDS) movement.

Am. Verified Compl. ("FAC") ¶ 31, ECF No. 19.  Plaintiffs allege that the Individual Defendants engaged in improper conduct, in contravention of their duties to the ASA and its members, and in violation of the ASA's bylaws and D.C. law, to ensure that the Resolution was formally endorsed by the ASA.  *See generally* SAC.  They also allege that the Individual Defendants improperly utilized ASA funds to defend the Resolution after its passage.  *Id*.

Additionally, Plaintiffs allege that the Resolution has harmed ASA in multiple ways. First, Plaintiffs claim that, since the Resolution, several members of the ASA have resigned in protest, depriving the ASA of membership dues.  *See* SAC ¶ 174.  Second, Plaintiffs claim that the ASA has experienced reputational harm because of the reaction to the Resolution by the academic community and the general public.  *See* SAC ¶ 154–55, 176.  And third, Plaintiffs claim that the ASA has suffered financial harm because of an alleged decrease in donations and an increase in public-relations and legal spending in response to the public backlash resulting

from the Resolution. *See* SAC ¶ 171, 175, 185. Although the complaint does not specify an amount of damages sought, it does state that "the amount in controversy exceeds $75,000." SAC ¶ 11.

### C. Relevant Procedural History

Plaintiffs filed suit in this Court in April 2016, ECF No. 1, and later amended their complaint in June 2016, ECF No. 19, and in March 2018, ECF No. 81. They challenge various acts relating to the passage of the Resolution and its aftermath, seeking damages, declaratory relief, and injunctive relief for alleged breaches of fiduciary duties, *ultra vires* acts, breaches of contract, violations of the D.C. Nonprofit Corporation Act, and corporate waste. *See generally* SAC. They claim that the Court has subject matter jurisdiction under 28 U.S.C. § 1332, "inasmuch as there exists complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000." SAC ¶ 11.

Soon after the First Amended Complaint's filing, Defendants moved to dismiss it. Among other arguments, Defendants argued that the Court lacked subject matter jurisdiction because Plaintiffs failed to satisfy the amount-in-controversy requirement—$75,000—necessary to maintain a diversity suit under 28 U.S.C. § 1332. *See* Defs.' Mot. Dismiss at 7–11, ECF No. 21. The Court disagreed, holding that because it was not legally impossible for Plaintiffs to receive a judgment of at least $75,000, the amount-in-controversy requirement was satisfied. *Bronner v. Duggan*, 249 F. Supp. 3d 27, 38 (D.D.C. 2017).

In November 2017, Plaintiffs moved for leave to amend their complaint for a second time. *See generally* Pls.' Mot. Leave File Sec. Am. Compl., ECF No. 59. In their opposition to the Plaintiffs' motion for leave to amend, Defendants argued that Plaintiffs did not "attempt to satisfy the requirements under the D.C. Nonprofit Corporations Act to hold the individual

4

defendants liable." Defs.' Opp'n Pls.' Mot. Leave File Sec. Am. Compl. at 5, ECF No. 66. Specifically, they argued that "Plaintiffs' proposed second amended complaint alleges none of [the] exceptions [to D.C. Code § 29-406.31(d)], nor could it." *Id.*

The Court allowed Plaintiffs to amend the complaint, but it also recognized that "[b]ecause Plaintiffs are only seeking money damages from the Individual Defendants, if the D.C. Nonprofit Corporations Act precludes them from doing so, then it would in fact be legally impossible for them to recover $75,000 in this action." *Bronner v. Duggan*, 324 F.R.D. 285, 294 (D.D.C. 2018). "Such a finding would necessarily mean that this Court's subject matter jurisdiction could not be founded on 28 U.S.C. § 1332." *Id.* Discharging its duty to reexamine its subject matter jurisdiction when that jurisdiction comes into doubt, the Court ordered the parties to provide supplemental briefing addressing the impact of D.C. Code § 29-406.31(d) on the Court's jurisdiction. *Id.* at 295. That briefing has concluded, and the issue is ripe for the Court's evaluation.

### III. ANALYSIS

As noted above, Plaintiffs claim that this court has subject matter jurisdiction under 28 U.S.C. § 1332. SAC ¶ 11. That statute provides that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between," among others, "citizens of different states." 28 U.S.C. § 1332(a). The parties do not dispute diversity of citizenship, so the only issue before the Court at this stage of the litigation is whether, in light of D.C. Code § 29-406.31(d), Plaintiffs' claims legally cannot exceed the $75,000 amount-in-controversy required to maintain this action.

5

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Therefore, Congress has the "prerogative to restrict the subject-matter jurisdiction of federal district courts" based on the types of claims brought by particular plaintiffs. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 n.11 (2006). Under this prerogative, Congress authorized federal district courts to hear cases meeting the amount-in-controversy and diversity requirements established by 28 U.S.C. § 1332.

With respect to suits brought under § 1332, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted). For the Court to reject Plaintiffs' claimed damages, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* at 289. This means that the Court should find jurisdiction at this motion-to-dismiss stage of the proceedings even if it has serious doubts as to the bases for establishing the amount-in-controversy. *See Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 14–15 (D.D.C. 2014) (concluding that it was not a "legal certainty" that the plaintiffs could not collect more than $75,000, though their "allegations [left] much to be desired"), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016).

Although the Court already once concluded that it has subject matter jurisdiction over this action, it has a continuing duty to examine its jurisdiction, and it must raise the issue *sua sponte* when it comes into doubt. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."). As explained below, having evaluated the

6

parties' arguments, the Court concludes that Plaintiffs have plausibly alleged that at least a portion of the Individual Defendants' conduct is exempt from D.C. Code § 29-406.31(d)'s damages bar. Therefore, at this stage, it is legally possible that Plaintiffs could recover more than $75,000 if they prevail. The Court is satisfied that its jurisdiction remains intact, for now.

### A. Significance of D.C. Code § 29-406.31(d)

D.C. Code § 29-406.31(d) is significant to the Court's subject matter jurisdiction because that provision could immunize Defendants from the damages sought by Plaintiffs, and therefore make it legally impossible for the Plaintiffs to meet the amount-in-controversy requirement of 28 U.S.C. § 1332. The only damages that Plaintiffs seek in their Second Amended Complaint are "damages from the individual Defendants incurred by [the ASA]." *See* SAC ¶¶ 194, 197, 207, 215, 225; SAC at 82.[2] In the Court's prior Memorandum Opinion, it noted that the Individual Defendants "either currently serve or have previously served on ASA's National Council, which is equivalent to a Board of Directors for purposes of the D.C. Nonprofit Corporations Act." *Bronner*, 2018 WL 1178014, at *7 (citing D.C. Code § 29-401.02 ("'Board' or 'board of directors' means the group of individuals responsible for the management of the activities and affairs of the nonprofit corporation, regardless of the name used to refer to the group.")). And D.C. Code § 29-406.31(d) states:

> Notwithstanding any other provision of this section, a director of a charitable

---

[2] As Plaintiffs have pointed out in prior briefing, the complaint asserts that "Plaintiffs have suffered significant economic and reputational damage." *See* Pls.' Reply Br. Suppl. Pls.' Mot. Leave File Sec. Am. Compl. at 6, ECF No. 67; SAC ¶¶ 206, 214, 224. Plaintiffs also appear to claim that the pecuniary value of the injunctive relief they seek satisfies the amount-in-controversy requirement. Pls.' Br. at 13. However, once the amount-in-controversy is challenged in a diversity action, the party asserting jurisdiction bears the burden of establishing that amount to a higher degree of certainty than mere conclusory assertions can convey. *Rosenboro v. Kim*, 994 F.2d 13, 16–17 (D.C. Cir. 1993). Plaintiffs have made no attempt to explain how they have individually suffered more than $75,000 in damages, or why complying with an injunction would cost the ASA more than that amount.

corporation shall not be liable to the corporation or its members for money damages for any action taken, or any failure to take any action, as a director, except liability for:
(1) The amount of a financial benefit received by the director to which the director is not entitled;
(2) An intentional infliction of harm;
(3) A violation of § 29-406.33; or
(4) An intentional violation of criminal law.

D.C. Code § 29-406.31(d).[3]

Plaintiffs therefore cannot collect damages from the Individual Defendants—the only damages Plaintiffs seek—except in certain circumstances. If those circumstances are not met here, it would be legally impossible for Plaintiffs to recover $75,000 in this action. Such a finding would necessarily mean that this Court lacks subject matter jurisdiction under 28 U.S.C. § 1332. *St. Paul Mercury Indem. Co.*, 303 U.S. at 288; *see Trazell v. Wilmers*, 975 F. Supp. 2d 133, 150–51 (D.D.C. 2013) (dismissing the plaintiffs' claims brought under § 1332 because the D.C. Code limited the plaintiff's recovery to an amount less than $75,000).

### B. Defendants' Alleged Conduct is Exempt from § 29-406.31(d)

In response to the Court's call for supplemental briefing, the parties have asserted a variety of arguments regarding the Court's subject matter jurisdiction, including arguments unrelated to § 29-406.31(d). Those arguments are as follows.

Plaintiffs argue that the Court's subject matter jurisdiction remains intact because (1) two individual Defendants—Jasbir Puar and Neferti Tadiar—were not ASA directors, and therefore their actions do not fall within the scope of § 29-406.31(d); (2) while the remaining individual Defendants may have been ASA directors, their alleged illicit conduct does not fall within the scope of § 29-406.31(d) because they were not acting in their capacities as directors when that

---

[3] As noted above, the ASA is a charitable corporation under the D.C. Nonprofit Corporations Act. *See* D.C. Code § 29-401.02(3), (4).

conduct occurred; (3) Plaintiffs have alleged conduct that constitutes intentional infliction of harm on the ASA, which is exempt from § 29-406.31(d); and (4) Section 29-406.31(d) is an affirmative defense which Defendants have failed to plead, and it therefore cannot deprive the Court of subject matter jurisdiction. *See generally* Pls.' Suppl. Br. Issue Subject Matter Jurisdiction ("Pls.' Br."), ECF No. 88; Pls.' Response Defs.' Suppl. Br. ("Pls.' Response"), ECF No. 90.

In contrast, Defendants argue that the Court lacks subject matter jurisdiction because (1) the non-director Defendants are covered by another D.C. Code exculpatory provision, § 29-406.90(b);[4] (2) Plaintiffs have not sufficiently alleged that Defendants' conduct is exempt from § 29-406.31(d); and (3) Plaintiffs have only claimed damages suffered by the ASA, and the Court has already dismissed Plaintiffs' derivative claims, therefore Plaintiffs cannot legally pursue the damages they seek.[5] *See generally* Defs.' Br. Regarding Subject Matter Jurisdiction ("Defs.' Br."), ECF No. 85.

---

[4] This provision states that "[a]ny person who serves as a volunteer of the corporation shall be immune from civil liability except if the injury or damage was a result of: (1) The willful misconduct of the volunteer; (2) A crime, unless the volunteer had reasonable cause to believe that the act was lawful; (3) A transaction that resulted in an improper personal benefit of money, property, or service to the volunteer; or (4) An act or omission that is not in good faith and is beyond the scope of authority of the corporation pursuant to this chapter or the corporate charter." The parties dispute whether the ASA has sufficient insurance coverage to invoke this provision, as required by § 29-406.90(c), but because the Court rules on other grounds it need not address that dispute here.

[5] Defendants devote a significant portion of their briefs to this argument. *See* Defs.' Br. at 6–11, Defs.' Opp'n Br. Regarding Subject Matter Jurisdiction ("Defs.' Opp'n") at 2–3, ECF No. 89. Defendants overstate the Court's prior holding. While it is true that the Court dismissed Plaintiffs' derivative claims, the Court did not rule that "[a]s a matter of law . . . any damages that were not incurred by the individual Plaintiffs themselves were dismissed." Defs.' Br. at 10; *Bronner*, 249 F. Supp. 3d at 47.

It may be true as a matter of law that Plaintiffs' refashioned complaint cannot seek damages on behalf of the ASA, but that argument should be raised in a well-fashioned motion to dismiss or motion for summary judgment. That is also true for Defendants' argument that D.C. Code § 29-403.04(c) bars Plaintiffs from collecting damages for their *ultra vires* claims. *See*

9

The Court begins its analysis with a simple question: Is the Individual Defendants' alleged conduct covered by § 29-406.31(d)?  The answer, at this stage, is no.  Even assuming that all Individual Defendants were ASA directors potentially protected by § 29-406.31(d) during the period challenged in the complaint, that provision does not prevent Plaintiffs from seeking damages arising from conduct that constituted "[a]n intentional infliction of harm."  D.C. Code § 29-406.31(d)(2).  While the parties dispute whether Plaintiffs have sufficiently pleaded an intentional infliction of harm, they seem to agree on the standard governing that exemption.  Following the parties' guidance, to flesh out the standard the Court will look to the exemption's legislative history and the very few cases that have interpreted similar provisions.  As explained below, the Court concludes that Plaintiffs have sufficiently pleaded that the Individual Defendants' conduct rises to the level of intentional infliction of harm, and therefore that it is exempt from § 29-406.31(d).[6]

Both parties state that D.C. Code Section 29, including § 29-406.31(d), is based on the Model Nonprofit Corporation Act (the "Model Act").[7]  Pls.' Br. at 24–25; Defs.' Br. at 9.  Section 2.02 of the Model Act, which governs the provisions that a nonprofit corporation may include in its articles of incorporation, contains a subsection that is nearly identical to D.C. Code § 29-406.31(d):

---

Defs.' Opp'n Pls.' Mot. Leave File Sec. Am. Compl. at 6, ECF No. 66.  Once those arguments are ripe for consideration, the Court will again reexamine its subject matter jurisdiction.

[6] Because the Court reaches this conclusion, it declines to address the parties' other arguments.

[7] The Model Act is "a single integrated statute covering all nonprofit organizations." Model Act, 3d ed., Foreword at xx (Am. Bar. Ass'n 2009.).  It was drafted by a Committee of nonprofit practitioners from across the United States, incorporating comments from interested parties.  *Id.* at xxi.  It is intended to "follow the Model Business Corporation Act provisions to the extent possible, considering certain differences that distinguish nonprofit corporations from for profit corporations."  *Id.*

> The liability of a director of a nonprofit corporation that is not a charitable corporation may be eliminated or limited by a provision of the articles of incorporation that a director shall not be liable to the corporation or its members for money damages for any action taken, or any failure to take any action, as a director, except liability for:
> (1) the amount of a financial benefit received by the director to which the director is not entitled;
> (2) an intentional infliction of harm;
> (3) a violation of Section 8.33; or
> (4) an intentional violation of criminal law.

Model Act § 2.02(c). This subsection explicitly does not apply to charitable corporations such as the ASA, but its official comment states that the "[i]nclusion of the type of provision authorized by Section 2.02(c) in the articles of incorporation of a charitable corporation is not necessary because the same liability shield is provided for directors of a charitable corporation by Section 8.31(d)." *Id.* cmt. at 2-9. In other words, a director of a charitable corporation is automatically entitled to the protections contained in Section 2.02(c), regardless of whether those protections are included in the corporation's articles of incorporation.

The parties urge the Court to rely on Section 2.02(c)'s Official Comment to guide its interpretation of the "intentional infliction of harm" exemption. See Pls.' Br. at 25; Defs.' Br. at 9; *see also* D.C. Code § 29-107.03 ("In applying and construing the chapters of this title based on uniform or model acts, consideration shall be given to the need to promote uniformity or consistency of the law with respect to its subject matter among states that enact it."). That comment states:

> There may be situations in which a director intentionally causes harm to a nonprofit corporation or its members even though the director does not receive any improper benefit. The use of the word "intentional," rather than a less precise term such as "knowing," is meant to refer to the specific intent to perform, or fail to perform, the acts with actual knowledge that the director's action, or failure to act, will cause harm, rather than a general intent to perform the acts which cause the harm. No public policy should permit the members to eliminate or limit the liability of directors for conduct intended to cause harm to the corporation or its members.

11

Model Act § 2.02(c) cmt. at 2-12–13. Thus, according to the Model Act's Official Comment, a director's conduct rises to the level of intentional infliction of harm if the director (1) intends the conduct; (2) with the knowledge that the conduct will cause harm. *See Adams v. Slonim*, 924 F.2d 256, 260 (D.C. Cir. 1991) (relying on the Official Comment to a D.C. Code provision in support of its interpretation of that provision).

While no courts in this jurisdiction have interpreted § 29-406.31(d)(2), a select few courts in other jurisdictions have interpreted similar provisions. For instance, in *Herbal Care Systems v. Plaza*, the District of Arizona held that the plaintiff corporation's allegations that an executive engaged in self-dealing by diverting the plaintiff's cash flows to another business, and that the executive generally breached his fiduciary duty to the plaintiff, constituted "intentional infliction of harm to the corporation or its shareholders" under Arizona's corporations law. No. 06-2698, 2009 WL 692338, at *4 (D. Ariz. Mar. 17, 2009). Similarly, in *Kamchi v. Weissman*, a New York court held that the plaintiffs' claims against the directors of a Jewish congregation satisfied a provision allowing damages for gross negligence or intent to harm, where the plaintiffs claimed that the defendants refused to allow the congregation's members to vote on the removal of a rabbi, in violation of the organization's bylaws and despite "several petitions and letters delivered to the defendants" requesting the vote. 1 N.Y.S.3d 169, 183–84 (N.Y. App. Div. 2014).[8] Finally, in a case cited by Plaintiffs, the Michigan Court of Appeals held that the plaintiffs' allegations triggered an identical, "intentional infliction of harm," exemption contained in Michigan's corporations law where the plaintiffs claimed that the defendant directors conspired to artificially depress their corporation's value so that it could be cheaply

---

[8] Admittedly, the exemption at issue in *Kamchi* was slightly easier to meet than § 29-406.31(d)(2) because it allows damages for gross negligence, while § 29-406.31(d)(2) only allows damages for conduct constituting an intent to harm.

12

purchased by a different entity; a transaction in which the defendants had an interest. *In re Caraco Pharm. Labs. S'holder Litig.*, No 329933, 2017 WL 2562635, at *6–7 (Mich. Ct. App. June 13, 2017). Read together, these cases suggest that a director's conduct may rise to the level of an intent to harm the director's organization or its members where the conduct is in service of a purpose that is clearly harmful.

Although they agree on the standard to be applied, the parties dispute whether Plaintiffs' Second Amended Complaint meets that standard. Plaintiffs argue that:

> Most if not all of the allegations in the SAC involve acts that fall under the exemption for 'intentional infliction of harm,' because the Individual Defendants were clearly aware that adoption of the Boycott Resolution would damage [sic] cause the damages claimed . . . they even predicted that the members of the organization would face difficulty in their employment, and that [ASA] departments might lose funding. They discussed these expectations. They acted anyway.

Pls.' Br. at 26. On the other hand, Defendants argue that "even after production of nearly 26,000 documents and a corporate deposition of the ASA, the Plaintiffs cannot allege that the Defendants acted with the intent to harm the ASA, let alone themselves individually." Defs.' Br. at 15. In light of the Model Act's Official Comment and the case law, Plaintiffs have plausibly alleged that the Individual Defendants acted with an intent to harm the ASA.

Plaintiffs allege that the Individual Defendants "purposefully and intentionally withheld material information from [ASA] members, including the fact that the Individual Defendants expected that if the [Resolution] was adopted, [the ASA] would be widely attacked throughout the academic world and the press, and that this would harm [the ASA's] reputation, its members' relationships with their universities, and [the ASA's] size, strength, and finances." SAC ¶ 113; *see also* Pls.' Br. at 2 (quoting an email in which an Individual Defendant stated, "I don't care if [the Resolution] 'splits' the organization"). More specifically, for instance, Plaintiffs allege that the Individual Defendants conspired to "pack" key ASA positions and the ASA's National

13

Council with supporters of the Resolution, without disclosing that plan to the ASA's membership. *See* SAC ¶ 54–55, 60, 69. The Individual Defendants also allegedly used ASA resources to attract speakers supporting the Resolution, while consciously declining to provide opposing viewpoints and recognizing the appearance of a conflict of interest that could undermine the ASA's legitimacy with its members. *See* SAC ¶ 91–94. According to Plaintiffs, the Individual Defendants similarly refused to publicize letters and other correspondence opposing the Resolution, including correspondence warning that "the passage of the Resolution would be destructive to the [ASA]." *See* SAC ¶ 104, 109, 114–16. The Individual Defendants then allegedly subverted the ASA's voting procedures to push the Resolution through the ASA's membership approval process with far fewer votes than required by the ASA's bylaws. *See* SAC ¶ 123, 134–37. Finally, knowing that the Resolution would cause significant backlash against the ASA, Defendants allegedly misappropriated ASA funds to hire attorneys and retain a "rapid response" media team to defend against that backlash. *See* SAC ¶ 170–71, 185–89.

Based on these allegations, Plaintiffs claim that Defendants violated their duties to the ASA and its members, violated the ASA's bylaws, and violated D.C. law in furtherance of a Resolution that they knew was likely to harm the organization. Defendants contend that the Complaint shows "that the Defendants acted in conformance with their overall philosophy, and thus believed that their actions were right and proper," Defs.' Opp'n at 10, but that contention does not help if, as alleged, Defendants' "philosophy" was at odds with the ASA's organizational health. Plaintiffs' allegations align with the Model Act's Official Comment that intentional harm occurs when a director intentionally takes action, knowing that the action will harm the organization. Model Act § 2.02(c) cmt. at 2-12–13. And while the directors in *Kamchi* were liable for damages when they subverted the organization's voting procedures for their own

purposes, 1 N.Y.S.3d at 183–84, Defendants here not only allegedly subverted the ASA's voting procedures, but also allegedly improperly diverted its resources and misled its members in service of a harmful purpose.  Accordingly, Plaintiffs have alleged that Defendants' conduct rises to the level of intent to harm the ASA, and therefore that Defendants are not shielded from damages by D.C. Code § 29-406.31(d).

## IV.  CONCLUSION

Because D.C. Code § 29-406.31(d) does not shield Defendants from damages, at this stage, it is legally possible for Plaintiffs to recover $75,000 if they prevail in the action. Accordingly, the Court concludes that § 29-406.31(d) does not defeat its subject matter jurisdiction under 28 U.S.C. § 1332.  *See St. Paul Mercury Indem. Co.*, 303 U.S. at 289.  As of the date of this Memorandum Opinion, the case is no longer stayed, and Defendants are directed to respond to Plaintiffs' Second Amended Complaint within 21 days.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 5, 2018                                                                       RUDOLPH CONTRERAS
                                                                                                         United States District Judge