IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON,<br><br><br>      Plaintiffs,<br><br><br><br>          v.<br><br><br>LISA DUGGAN, CURTIS MAREZ, AVERY GORDON, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, J. KEHAULANI KAUANUI, JASBIR PUAR, STEVEN SALAITA, JOHN STEPHENS and the AMERICAN STUDIES ASSOCIATION,<br><br><br>      Defendants. | Civil Action No.: 16-cv-00740-RC |

**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Defendants Kehaulani Kauanui and Jasbir Puar submit this Motion to Dismiss the Second

Amended Complaint pursuant to Rule 12(b)6).  As more fully set forth in the accompanying

Memorandum in Support of Motion to Dismiss, which is incorporated herein by reference, the

Second Amended Complaint should be dismissed in its entirety.


Dated: August 27, 2018                          Respectfully submitted,


_____

Richard R. Renner , DC Bar #OH0021
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave., NW, Suite 1000
Washington, D.C. 20006
202-466-8696
877-527-0446 (fax)
Rrenner@kcnlaw.com


_____

Mark Allen Kleiman (*pro hac vice*)
Law Office of Mark Allen Kleiman
2907 Stanford Avenue
Venice, CA 90292
310-306-8094
310-306-8491 (fax)
mkleiman@quitam.org


Attorneys for Defendants
Kehaulani Kauanui and Jasbir Puar

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON, | |
| Plaintiffs, | |
| v. | Civil Action No.: 16-cv-00740-RC |
| LISA DUGGAN, CURTIS MAREZ, AVERY GORDON, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, J. KEHAULANI KAUANUI, JASBIR PUAR, STEVEN SALAITA, JOHN STEPHENS and the AMERICAN STUDIES ASSOCIATION, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1   INTRODUCTION AND SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Charging Allegations Against Dr. Puar. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   Charging Allegations Against Dr. Kauanui.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3.  PLAINTIFFS HAVE NOT PLEAD FACTS SUFFICIENT
    TO MAKE FACIALLY PLAUSIBLE CLAIMS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4.  DR. PUAR'S CANDIDACY FOR THE NOMINATING COMMITTEE
    NEVER BREACHED A FIDUCIARY DUTY TO THE ASA. . . . . . . . . . . . . . . . . . . . . . . 6

5.  DR. PUAR'S SERVICE ON THE NOMINATING COMMITTEE
    NEVER BREACHED A FIDUCIARY DUTY TO THE ASA. . . . . . . . . . . . . . . . . . . . . . . 7

6.  DR. KAUANUI'S CANDIDACY FOR THE NATIONAL COUNCIL
    NEVER BREACHED A FIDUCIARY DUTY TO THE ASA. . . . . . . . . . . . . . . . . . . . . . . 7

7.  DR. KAUANUI'S SERVICE ON THE NATIONAL COUNCIL NEVER
    BREACHED A FIDUCIARY DUTY TO THE ASA AND NEVER
    PROXIMATELY CAUSED INJURY TO ANY OF THE PLAINTIFFS. . . . . . . . . . . . . . . 8

    A.  Failing to Ensure That the National Council Represented Diverse Viewpoints. . . . . . . 9

    B.  Placing Personal Interests in the Resolution above the Interests of the
        ASA or its Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.  Joining in the National Council's Unanimous Vote to Refer the Resolution
        To the General Membership for an Open, Democratic Vote. . . . . . . . . . . . . . . . . . . . 11

    D.  Working to Persuade ASA Members to Support the Resolution and
        Serving on a National Council Subcommittee to Rewrite the Resolution
        And Supporting Documents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

i

E.  Forwarding Two Emails Sent by the ASA Director to the Entire
National Council. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8.  THE VOLUNTEER PROTECTION ACT IMMUNIZES DEFENDANTS
FROM SUITS LIKE THIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

A.  The VPA's Salutary Purposes Should be Given Broad Effect. . . . . . . . . . . . . . . . . . . 14

B.  Defendants Are Immune from Suit Under the VPA Because There Are No
Allegations That They Engaged in Intentional and Willful Misconduct
Toward Any *Individual*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C.  Plaintiffs Have Not Alleged Facts Making It Plausible That Either Dr. Puar
or Dr. Kauanui Acted Outside of the Scope of Their Responsibilities. . . . . . . . . . . . . 15

D.  Because Volunteer Immunity Under 42 U.S.C. §14503 is Analogous
to Qualified Immunity Under 42 U.S.C. §1983, it is Appropriate to Resolve
the Immunity Question via a 12(b)(6) Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

9.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

Page

\* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,7,8,13

  *BEG Invs. L.L.C. v. Alberti*, 85 F.Supp.3d 15 (D.D.C. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6

\* *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  *Bronner v. Duggan*, 249 F.Supp.3d 27 (D.D.C. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

\* *Daley v. Alpha Kappa Alpha Sorority*, 26 A.3d 723  (D.C. 2011) . . . . . . . . . . . . . . . . . . . . . 7,11

  *Ford v. Mitchell*, 890 F.Supp.2d 24 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

  *International Action Center v. United States*, 365 F.3d 20 (D.C. Cir. 2004) . . . . . . . . . . . . . . 17

  *McDonald v. Salazar*, 831 F.Supp. 3d 313, (D.D.C. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

  *Millennium Square Residential Ass'n v. 2200 M. Street LLC.*,
    952 F.2d 234 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

  *Probert v. Family Centered Servs. of Alaska*,
    2011 U.S. Dist. LEXIS 161545, at *4-7 (D. Alaska Mar. 11, 2011) . . . . . . . . . . . . . . . . . . . 17

## STATUTES

  42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Volunteer Protection Act
    42 U.S.C. §14501 et. seq... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    42 U.S.C. §14501(a)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

\*   42 U.S.C. §14503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15,16

D.C. Code §29-406.31(d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

## LEARNED TREATISES

\* *12B Fletcher Cyc. Corp*. §5915.10 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.   INTRODUCTION AND SUMMARY OF ARGUMENT

In over two hundred paragraphs of mostly irrelevant political complaints Plaintiffs claim that Dr. Kehaulani Kauanui and Dr. Jasbir Puar, along with others, caused the American Studies Association to breach a contract with them, engage in the *ultra vires* prohibition of their right to vote, spend a "substantial part" of the ASA's money on influencing unspecified legislation, and wastied corporate assets by engaging in advocacy.[1]   Stripped of its rhetoric, the essence of plaintiffs' grievances concerns:  (1) activities Dr. Kauanui engaged in before ever becoming a director or officer of the ASA, when she owed no fiduciary duty to the Association; (2) activities she undertook while an elected member of the ASA's National Council, including a unanimous vote of the Council to give the entire ASA membership the chance to vote on a politically controversial Resolution; and (3) activities Dr. Puar engaged in before ever becoming a volunteer member of an ASA committee.

Dr. Puar and Dr. Kauanui join in the arguments of their codefendants in their motions to dismiss the second amended complaint (except for the personal jurisdiction argument advanced by Dr. Salaita).  They also make the following arguments:

First, Dr. Puar was never a director, officer, or agent of the American Studies Association.  As a mere candidate to become a volunteer member of a committee she did not have a fiduciary relationship with the ASA or its members.  Further, plaintiffs' own allegations make it implausible that she misrepresented her candidacy for the Nominating Committee.

---

[1] This brief addresses only Counts Four, Five and Nine, which are all that remain of Plaintiffs' blunderbuss accusations against these two defendants.

1

Second, nothing Dr. Kauanui did before she became an elected member of the ASA's National Council could have violated a fiduciary duty because she had no such duty until she became a member of the Council in July 2013.

Third, many of the allegations against the ever-growing throng of "individual defendants" fail to set forth what either Dr. Puar or Dr. Kauanui did that violated any hypothetical or actual duty.

Fourth, Plaintiffs' actual claims that Dr. Puar singlehandedly controlled a six-member nominating committee to secretly "stack the deck", are inherently implausible.  Similar claims that Dr. Kauanui voting, along with all other members of the unanimous National Council, to allow the general membership to vote on (and pass) a Resolution "caused" corporate waste or impermissible lobbying are implausible.  This is especially so since the ASA has a long history of public engagement on national and international issues.

Fifth, both Dr. Puar and Dr. Kauanui are entitled to immunity under the Volunteer Protection Act, 42. U.S.C. §14501 et. seq. which shields volunteers such as them from liability unless they intentionally intended to harm the plaintiffs as individuals.

## 2.   <u>STATEMENT OF FACTS</u>

Essentially, Plaintiffs have sued Dr. Puar and Dr. Kauanui because they disagree with their political views.  In fact, plaintiffs lavish attention on Dr. Puar, who has written two highly acclaimed academic books published by Duke University Press, going to great lengths to quote a wildly inaccurate and defamatory *Wall Street Journal* account of a lecture she gave more than two years after the events over which plaintiffs claim to be aggrieved.  (Dkt. No. 81, ¶ 59).  They also accuse both defendants of pro-boycott activities that have nothing at all to do with the ASA,

2

but instead involve an entirely different academic association.  (Dkt. No. 81, ¶¶ 70, 80, 102.)

Plaintiffs' allegations against Dr. Puar and Dr. Kauanui may be summarized as follows:

       A.        **Charging Allegations Against Dr. Puar**

      Dr. Puar was a member of United States Campaign for the Academic and Cultural Boycott

of Israel (USACBI) in November 2017. (Dkt. No. 81, ¶ 42).[2]  Seven years before that she began

serving on the ASA's Nominating Committee, in July 2010. (¶ 25).[3]  When she ran for the

Nominating Committee she "chose not to disclose her true agenda" of supporting an academic

boycott by packing the ASA's leadership (¶ 61).  Dr. Puar controlled the nominating process,

imposing the restriction that only signed supporters of BDS would be nominated for ASA

President and choosing the candidates herself (¶ 5).   Dr. Puar packed elected positions with

supporters, solely to assure that the ASA would adopt the Resolution, thus manipulating the

takeover of the ASA (¶¶ 45, 58, 60).  She encouraged Dr. Sunaina Maira and Dr. Kehaulani

Kauanui to run for seats on the National Council without revealing that they were USACBI

leaders (¶ 68).[4]  Within two years of joining the six-member Nominating Committee Dr. Puar had

---

[2] All paragraph references in the discussion of plaintiffs' charging allegations are to Dkt. No. 81, the Second Amended Complaint.

[3] The Nominating Committee is comprised of six members elected "by the membership-at-large for staggered terms of three (3) years, two (2) members to be elected annually."  (Dkt. No. 14-2, p. 4, ASA Bylaws, Art. VI, §1).

[4] Curiously, the immediately preceding paragraph acknowledges that Kehaulani's campaign statement directly referred to her position on the USACBI Advisory Committee.  (¶ 67) and the paragraph before that acknowledges that Maira's campaign statement said she wanted to "support the mission of the public university and the work of student and faculty activists challenging privatization and debt, as well as about the role and responsibilities of the U.S. university in relation to questions of incarceration, surveillance war, **occupation**, and neoliberalism."  It also states she had "organized a resolution on the war in Iraq and discussions of boycott and divestment opposing the U.S.-backed occupation and violations of human rights and academic freedom in Palestine" (¶ 66), emphasis added.)

arranged it so that six of the ten "continuing voting members" of the National Council had endorsed calls for the boycott (¶ 62). Plaintiffs conclude by alleging that this concealment caused the ASA to engage in *ultra vires* actions, (¶ 72), a claim which was dismissed from the suit. *Bronner v. Duggan*, 249 F.Supp.3d 27, 32 (D.D.C. 2018).[5]

      B.      <u>**Charging Allegations Against Dr. Kauanui**</u>.

Dr. Kauanui was elected to the ASA's National Council in 2013 (¶¶ 24, 90) after acknowledging in her campaign statement that she was on the Advisory Committee of the USACBI. (¶ 67). She decided to run for this office only after Dr. Puar suggested this as a tactic to advance a Resolution (¶ 68). Dr. Kauanui's "vague references" to the committee leading the boycott campaign were intended to conceal her plan from the ASA membership, which elected her (¶ 69). She knew that concealing this mattered long before the election when she wrote her campaign statement, because another candidate who was allegedly more explicit later lost his campaign in the same election which Dr. Kauanui won (¶ 70). This concealment, while she was still a candidate and before she assumed a position on the National Council breached some pre-existing duty of loyalty to ASA members and caused the ASA to engage in *ultra vires* actions, (¶ 72), a claim which was dismissed from the suit. *Bronner v. Duggan*, 249 F.Supp.3d at 32. Dr. Kauanui breached her duties of candor and loyalty to the ASA by "subordinating the Association's obligations and purposes to their own political interests." (¶ 73). Dr. Kauanui placed her personal interest in the Resolution over the interests of the ASA and its members by failing to ensure that all points of view were represented on the National Council and thereby

---

[5] Plaintiffs also extraneously accuse Dr. Puar of involvement in getting a similar resolution passed by the Association for Asian American Studies (¶¶ 70, 80).

breached her "fiduciary duties to the voting membership" (¶ 75).[6]   Along with all other National

Council members, she joined in a unanimous vote to submit the Resolution to the entire ASA

membership, even though she was unhappy about this (¶ 104).  She then worked with colleagues

both within the ASA's National Council and outside of the ASA to support the Resolution (¶

105).  Dr. Kauanui served on a subcommittee of the National Council to revise the text of the

Resolution and accompanying documents (¶ 118).  She also received emails about the

membership and balloting process from the ASA's Executive Director, which she forwarded to

the entire National Council (¶¶ 134-136).

3.   **PLAINTIFFS HAVE NOT PLEAD FACTS SUFFICIENT**

   **TO MAKE FACIALLY PLAUSIBLE CLAIMS**

Although a motion to dismiss requires that the plaintiffs' factual allegations be taken as

true, the complaint "must contain sufficient factual matter … to state a claim to relief that is

plausible on its face." *BEG Invs. L.L.C. v. Alberti*, 85 F.Supp.3d 15, 24-25 (D.D.C. 2015)

(internal quotation marks and citations omitted). A claim is facially plausible only when it

"allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (internal quotation marks omitted). "A

court need not accept a plaintiff's legal conclusions as true, nor must a court presume the veracity

of legal conclusions that are couched as factual allegations."  *Id.*, (quoting *Bell Atl. Corp. v.

Twombly,* 550 U.S. 544, 570, (2007).   Conclusory allegations of law and unwarranted inferences

---

[6] Nothing in the ASA Bylaws establishes the basis for assuming that there *is* a fiduciary duty to the voting membership, or that such a duty includes representation of diverse viewpoints. Plaintiffs' reasons for this conclusion are never articulated.  It is likewise unexplained how the National Council, which neither nominates nor elects its own members or even the members of the Nominating Committee, has any control over this process.

are insufficient to avoid dismissal under this standard. *Id.* at 569.  Where facts are merely *consistent with* possible misconduct a court may reject claims as implausible and thus dismiss a complaint.  *BEG Invs. L.L.C. v. Alberti* at 43-44 (holding that bad faith is notoriously easy to allege and difficult to prove, and that more must be provided before the doors to discovery swing open.)  Applying this standard, we shall show that the plaintiffs simply have not plead facts sufficient to make out plausible claims.

4.    **DR. PUAR'S CANDIDACY FOR THE NOMINATING COMMITTEE NEVER BREACHED A FIDUCIARY DUTY TO THE ASA.**

The threshold requirement for a breach of fiduciary duty claim is the existence of a fiduciary relationship.  *Millennium Square Residential Ass'n v. 2200 M. Street LLC.*, 952 F.2d 234, 248 (D.D.C. 2013).  Although the District of Columbia's caselaw permits a degree of elasticity in defining such a relationship *(See, id.)* no case has held that the duty can arise before one party reposes trust and confidence in the other.  Thus, nothing Dr. Puar did or did not say about her candidacy could itself be the basis for any claimed breach of duty.

Plaintiffs' claims that Dr. Puar harbored a hidden intention to singlehandedly take over the Nominating Committee are fatally flawed.  Plaintiffs admit that Dr. Puar ran for a committee seat in 2010 (¶61), three full years before her first involvement with efforts to get a boycott resolution passed by the Association for Asian American Studies (¶70).  Plaintiffs do not even allege, nor can they, that Dr. Puar was even involved with the USACBI when she sought a position on the ASA's Nominating Committee in 2010.  Plaintiffs are reduced to alleging that in 2010 Dr. Puar did so good a job of concealing her intent to support a Resolution that she hid it even from herself.   "Implausible" is a polite term for this leap of logic.

6

5.    **DR. PUAR'S SERVICE ON THE NOMINATING COMMITTEE**

       **NEVER BREACHED A FIDUCIARY DUTY TO THE ASA.**

The Nominating Committee had six members (fn. 3, *supra*).  From the moment she joined the Committee Dr. Puar allegedly  "obtained control of the nominations process" to "impose this restriction" of "a pledge of allegiance" to the USACBI so that the membership would be asked to vote for her "chosen candidates" (¶5).  These telltale phrases about "control", "restriction", and a "pledge of allegiance" are hallmark examples of conclusions masquerading as factual allegations, the very kind of artful pleading which *Iqbal* teaches us are "not entitled to the presumption of truth".  *Ashcroft v. Iqbal*, 556 U.S. at 679.

One can search all 244 paragraphs of the Second Amended Complaint and not find a word about what Dr. Puar allegedly did to control the five other committee members.  Without more, the bare conclusion that she "obtained control" to "impose this restriction" is undeserving of the presumption of truth.

6.    **DR. KAUANUI'S CANDIDACY FOR THE NATIONAL COUNCIL**

       **NEVER BREACHED A FIDUCIARY DUTY TO THE ASA.**

Again, although Plaintiff's Second Amended Complaint is laden with case citations, none of them stand for the principle that a fiduciary relationship inheres <u>before</u> a candidate is elected to a corporation's board.  The duty arises when one *becomes* an officer.  *(12B Fletcher Cyc. Corp*. §5915.10 [2010] holding that a direct action may be brought against an *officer* of a corporation for violations of a duty arising from contract or otherwise "and owing directly from the officer to the injured shareholder.)  *Daley v. Alpha Kappa Alpha Sorority*, 26 A.3d 723, 729-730 (D.C. 2011).

And even the plaintiffs' claim of concealment is much more problematic, since they admit, as they must, that Dr. Kauanui publicized her leadership of the USACBU right in her campaign statement (¶67).   The idea that this bold declaration amounted to deception is bereft of plausibility.   To conceal their own shortcoming, Plaintiffs tell an even less plausible story about a candidate who did *not* get on the Council, Dr. Alex Lubin.   Dr. Lubin's candidacy statement referenced "a pending Resolution on the academic and cultural boycott of Israel" (¶69).   Dr. Lubin, who ran at the same time as Dr. Maira and Kauanui lost the election.   On this slender fact plaintiffs build a scaffold of unsupported conclusions– that *before* the election Dr. Kauanui "knew" that a commitment to a boycott "was material" to ASA members (¶70) and that she therefore "carefully planned" her subterfuge (¶69).   This inverts the chronology, for how could Dr. Kauanui have "known" this before Dr. Lubin lost the same election that she ran in?  It also makes very generous assumptions about why she won and Dr. Lubin lost.  It could have been because he is a white male, or because Dr. Kauanui had a longer and more prominent history of service to the ASA, or it could have been that Dr. Lubin, who had spent the two previous years overseas, was not in close enough touch with his colleagues.  That Dr. Kauanui's victory is merely *compatible with* hypothetical knowledge that mentioning a Resolution would cost her votes does not make this more plausible than less sinister explanations.  It thus fails the *Iqbal* test.

7.  **DR. KAUANUI'S SERVICE ON THE NATIONAL COUNCIL NEVER BREACHED A FIDUCIARY DUTY TO THE ASA AND NEVER PROXIMATELY CAUSED INJURY TO ANY OF THE PLAINTIFFS.**

Dr. Kauanui served on the National Council from July of 2013 through June of 2016 (¶24) where she was but one of twenty voting members (Dkt. No. 14-2, pp. 3-4, Art. V, §1.)  Once on the Council, Dr. Kauanui is alleged to have done the following things the plaintiffs do not like:

1.   She failed to "ensure that the National Council fairly represented the diversity of the membership – in interests and point of view as well as other characteristics." (¶75);

2.   She placed her personal interests in the Resolution "over the interests of the American Studies Association and its members" *Id.*;

3.   She voted, along with every single other member of the National Council, to submit the Resolution to a vote of the ASA's general membership (¶104);

4.   She worked with colleagues, both within and without the ASA, to support the Resolution (¶105);

5.   She worked on a National Council subcommittee to revise the text of the Resolution and its supporting documents (¶118); and

6.   When she received two emails plaintiffs do not like from the ASA's Executive Director, she forwarded them to the entire Council for consideration  (¶¶ 134-136).

Yet this recitation of alleged calumnies sheds no light on what Dr. Kauanui did that was wrong, or how it proximately caused harm.

A.   **Failing to Ensure That the National Council Represented Diverse Viewpoints**.

First, the responsibility for diversity rests with the six-member Nominating Committee, not the National Council (Dkt. No. 14-2, pp. 4-5, Art. VI, §2.0).  There was nothing that Dr. Kauanui, has a National Council member should have done to intervene in this.  Second, the only definition of diversity in the Bylaws specifies that the Association should "maintain a balance of age, racial, ethnic, regional, and gender participation" (*Id.* at p.17).  The Association did not seek to maintain diversity of interests or viewpoints any more than it sought diversity of height,

weight, or dietary preferences.  Plaintiffs are so unable to show an actual breach of duty or *ultra vires* action that they simply make one up.

      B.      **Placing Personal Interests in the Resolution above the Interests of the ASA or its Members**.

      Plaintiffs forget, and would have this Court forget, that the Association is not a profit-making business, and that not every decision is about maximizing income or minimizing costs. As an academic association profoundly concerned with American culture and values the ASA has had a long history of making decisions very like the Resolution, even where those decisions entered national or international politics and even where they may have cost the Association some money.  In 1998 the ASA supported an NAACP initiative to boycott certain hotel chains[7].  In 2002 the ASA announced it would not site meetings in California or Washington, two states which had passed initiatives outlawing affirmative action.  In 2004 the ASA announced that it would heavily favor unionized hotels for its meetings and would add "labor disputes" as grounds for cancelling hotel contracts.  In 2005 the ASA criticized the Cuban government for imposing travel restrictions on academicians.  In 2006 the ASA passed a resolution calling for an end to the U.S. war in Iraq.[8]  In 2010 the ASA declared that it would no longer hold meetings at Hyatt hotels until all organizing issues with all unions at any Hyatt property had been resolved.  In 2015 the ASA opposed the ban the UAE had imposed on an American researcher.  In 2015 the ASA notified the State of Georgia that it would suspend plans to locate an upcoming annual meeting in

---

[7]  This and the examples which follow are all on the ASA's website at either https://theasa.net/about/advocacy/resolutions-actions/actions or https://theasa.net/node/4899, each last visited on August 27, 2018.

[8]  This resolution, if put into action, would have required Congressional action and efforts to influence legislation as surely as the Resolution.

Atlanta if the state passed a threatened "Religious Freedom Restoration Act" which would have invoked religious grounds to excuse discrimination against the LGBTQ communities and Muslims.  In 2015 the ASA declared its opposition to all state legislation allowing the carrying of concealed weapons on college campuses.  In 2016 the ASA declared it would not site meetings in North Carolina if that state passed the "bathroom ban" legislation which had been proposed targeting transgender students.  In 2016 the ASA declared it would speak out forcefully against attacks on academic freedom in Turkey.  In 2016 the ASA declared its opposition to the Dakota Access Pipeline.

It is thus clear that the Association has had and continues to have a history of outspoken involvement in issues involving freedom and social justice, even where the issues directly implicated legislation and even where the ASA's positions could cost it significant money.  None of these have led to suits accusing the ASA or its officers of placing political interests above the interests of the ASA or its members.

C.     **Joining in the National Council's Unanimous Vote to Refer the Resolution to the General Membership for an Open, Democratic Vote**.

Although plaintiffs complain about this act, they never explain why a vote should not have been taken, or how any individual National Council member's participation in a unanimous vote proximately caused harm to either the plaintiffs or the Association as a whole.

Here the plaintiffs' claim, like the allegation that Dr. Kauanui elevated her personal interests above the Association, is so attenuated as to require a brief review of the law of corporate waste, the claim plaintiffs attach to Count Nine of their jeremiads.  The allegation of "corporate waste" must be plead and proven to a very demanding standard.  (*Daley v. Alpha Kappa Alpha Sorority*, 26 A.3d at729-730 holding that even allegations that the corporation had

11

wasted nearly half a million dollars [$250,000 in a lump sum payment and $48,000 per year for four years] does not meet this demanding standard.)

> Corporate waste claims must articulate an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which a reasonable person might be willing to trade, and must be egregious or irrational. The essence of a waste claim is the diversion of corporate assets for improper and unnecessary purposes, and to meet that standard, the conduct must be exceptionally one-sided. Courts are very deferential to the business judgment of officers and directors of a corporation in decisionmaking, and a claim of waste, even where authorized, will be upheld only where a shareholder can show that the board irrationally squander[ed] corporate assets. If any reasonable person would find that the corporation's decision made sense, the judicial inquiry ends.

> *Id.*, (internal quotation marks and citations omitted.)

There is simply no way that the National Council's steps, in which Dr. Kauanui joined, could have been the proximate cause of cognizable corporate waste under this standard.

> D. **Working to Persuade ASA Members to Support the Resolution and Serving on a National Council Subcommittee to Rewrite the Resolution and Supporting Documents**.

**How is this wrong?** Persuasion and compromise lie at the heart of democratic undertakings, whether in the Congress or in the American Studies Association. There is simply nothing improper about revising a proposal to make it more popular or in trying to persuade colleagues to vote for it. That either of these benign acts are seen as sinister speaks volumes for what is really going on; the plaintiffs do not like the results of the Association's referendum on

the Resolution.  That dislike stains everything they look at to such a degree that even the most

benign acts are viewed (or at least portrayed) as evil.  There is nothing in the law or logic that

supports the allegation that these acts were improper, or that they proximately caused *anything*,

much less harm to the Association or to the plaintiffs.

>    E.    **Forwarding Two Emails Sent by the ASA Director to the Entire**
>
>    **National Council**.

This accusation is Kafkaesque.  We would ask this Court to imagine plaintiffs' reaction

had Dr. Kauanui *not* forwarded these emails to all twenty-plus members of the National Council

and had instead kept them to herself or had shared them with only a few trusted confederates.

Plaintiffs would shout to the heavens that Dr. Kauanui was being secretive to keep this

information from the broader National Council membership and to thus control the vote. As with

so many of plaintiffs' other allegations, this charge is the very type of unwarranted inference that

*Iqbal* abjured – the amplification of something that is merely *compatible* with a theory of liability

when a theory of wrongdoing is no more plausible than a benign theory – that Dr. Kauanui

wanted to ensure that the entire twenty-plus National Council, both voting and nonvoting

members, had complete information.

Plaintiffs have tried to create duties Dr. Kauanui didn't have.  They have drawn a

conclusion of malice where no evidence makes that attribution any more plausible than an

attribution of benign intent.  Out of over a dozen social justice positions the ASA has taken,

plaintiffs have singled out one – and have tried to hang a price tag on that decision because they

disagree with it.  None of this actionable.  All of it cries out for dismissing this complaint.

8.      **THE VOLUNTEER PROTECTION ACT IMMUNIZES DEFENDANTS FROM SUITS LIKE THIS**.

    A.      **The VPA's Salutary Purposes Should be Given Broad Effect**.

Suits against volunteers of nonprofit associations imperil the one of the cornerstones of American society, community-based volunteerism.  Accordingly, Congress enacted the Volunteer Protection Act to clarify and limit the liability of volunteers and keep this important part of society vigorous and flourishing.  42 U.S.C. §14501(a), (b).  The Act provides in general that a volunteer of a nonprofit organization or governmental entity is not liable for harm which he or she caused if the volunteer was acting within the scope of the volunteer's responsibilities at the time of the act or omission, and the harm was caused by mere negligence and not willful or reckless misconduct intended to harm an individual or individuals. 42 U.S.C. §14503.

    B.      **Defendants Are Immune from Suit Under the VPA Because There Are No Allegations That They Engaged in Intentional and Willful Misconduct Toward Any *Individual*.**

To be sure, the Volunteer Protection Act (VPA) does not immunize harm "caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the *individual* harmed by the volunteer . . ..".  42 U.S.C. §14503(a)(3) (emphasis added).  In contrast to D.C. Code §29-406.31(d), however, the plain language of the federal exception renders it inapplicable to alleged misconduct directed against a corporation or organization *itself*.  §14503(a)(3) creates an exception to immunity under the VPA only for conduct directed at an individual; there is no such exception for conduct directed at the volunteer's own corporation or nonprofit entity.

14

The VPA was intended to immunize volunteers from liability for harm they may have committed – unless it was committed "on behalf of the organization or entity" and directed at a third party, rather than the organization or entity itself.  *See* §14503(a); §14503(b) ("Nothing in this section shall be construed to affect any civil action brought by any nonprofit organization . . . against any volunteer of such organization or entity."); §14503(f):

> Punitive damages may not be awarded against a volunteer in an action brought for
>
> harm based on the action of a volunteer acting within the scope of the volunteer's
>
> responsibilities to a nonprofit organization . . . unless the claimant established by
>
> clear and convincing evidence that the harm was proximately caused by an action
>
> of such volunteer which constitutes willful or criminal misconduct, or a conscious,
>
> flagrant indifference to the right or safety *of the individual harmed.*

(Emphasis added).

The plain language of the VPA makes it clear that is intended to immunize all volunteer conduct other than intentional misconduct directed towards individuals or harm to the organization or entity on behalf of which they volunteer.  Therefore, assuming *arguendo* that plaintiffs had adequately alleged that Dr. Kauanui or Dr. Puar had intended to harm the ASA, this intent is still insufficient to bring the alleged action outside the scope of the VPA because there is no allegation that Defendants acted with malice to any individuals, and certainly not to the specific individual plaintiffs who now claim they were harmed.

C.  **Plaintiffs Have Not Alleged Facts Making It Plausible That Either Dr. Puar or Dr. Kauanui Acted Outside of the Scope of Their Responsibilities**.

Plaintiffs' promiscuous use of the phrase "ultra vires" does not imbue their allegations with magical properties.  Dr. Puar had no fiduciary duty while she was running for a seat on the

Nominating Committee and plaintiffs' claim that as a candidate in 2010 she concealed an intention to support a Resolution is belied by the plaintiffs' own chronology (Section 4 of this brief, *supra*.)  Once elected, her only duty under the Bylaws was to see that as a whole, the nominees maintained "a balance of age, racial, ethnic, regional, and gender participation" (Section 5, *supra*.)[9]   There are no facts alleging she acted beyond the scope of her position in any way.

Dr. Kauanui similarly had no duty until she took her position as an elected member of the National Council and in any event, she was entirely forthright about her leadership role in the United States Academic Committee for the Boycott of Israel.  (Section 6, *supra*).  Although the plaintiffs do not like what she did once she was on the Council, there are no facts suggesting that she acted beyond the scope of her position.   We have enumerated six instances before she joined the Council in which the ASA took positions on issues of social justice which might, and in some cases certainly *would*, cost it money, or which required involvement with legislation.  We have identified another six that came up during her term as a National Council member.  There is no basis to suggest that her acts were beyond the scope of her position.  (Section 7, *supra.*)

D.   **Because Volunteer Immunity Under 42 U.S.C. §14503 is Analogous to Qualified Immunity Under 42 U.S.C. §1983, it is Appropriate to Resolve the Immunity Question via a 12(b)(6) Motion**.

Although immunities may be plead as affirmative defenses, a defendant's entitlement to immunity should be resolved at the earliest stage possible so that, as here, the costs and expense

---

[9]  Dr. Puar does not agree that her presence as a mere volunteer on an ASA Committee establishes that she had a fiduciary duty, but she recognizes that this limited question is not amenable to resolution on a motion to dismiss.

of trial are avoided where a defense is dispositive.  *McDonald v. Salazar*, 831 F.Supp. 3d 313,

325-326 (D.D.C. 2011).[10]  *Accord*, *Ford v. Mitchell*, 890 F.Supp.2d 24, 32 (2012).  The Circuit

laid the groundwork for this reasoning in *International Action Center v. United States*, 365 F.3d

20, 25 (D.C. Cir. 2004) in which Judge Roberts applied the immunity analysis to the facts as

plead and held that dismissal based on qualified immunity was appropriate..

   Similarly, the facts as plaintiffs have plead them do not come close to suggesting that

either Dr. Kauanui or Dr. Puar acted outside the scope of their responsibilities or harbored any

intent to harm the plaintiffs as individuals.  The repeated cries of "*ultra vires*" are mere legal

conclusions masquerading as facts.  Where plaintiffs have failed to allege facts demonstrating an

intent to harm them by means of acts beyond the scope of their volunteer responsibilities,

dismissal is appropriate.  *Probert v. Family Centered Servs. of Alaska*, 2011 U.S. Dist. LEXIS

161545, at *4-7 (D. Alaska Mar. 11, 2011)

9.   **CONCLUSION**

   Plaintiffs have tried to conjure duties the defendants to not have and have accused them of

ill intent while bereft of facts making such malice plausible.  "Honi soit qui mal y pense.".  This

case should be dismissed.

---

[10]  We need not claim that volunteers with nonprofit organizations fulfill a function as important
as government officials.  However, where a defendant can show a facial right to immunity, the
social policy of shielding that defendant from personal monetary liability and harassing litigation
argues for the earliest possible resolution of such claims.

Dated:  August 27, 2018                        Respectfully submitted,


_____

Richard R. Renner , DC Bar #OH0021
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave., NW, Suite 1000
Washington, D.C. 20006
202-466-8696
877-527-0446 (fax)
Rrenner@kcnlaw.com


_____

Mark Allen Kleiman (*pro hac vice*)
Law Office of Mark Allen Kleiman
2907 Stanford Avenue
Venice, CA 90292
310-306-8094
310-306-8491 (fax)
mkleiman@quitam.org


Attorneys for Defendants
Kehaulani Kauanui and Jasbir Puar

18