**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON, <br><br> Plaintiffs, <br><br>           v. <br><br> LISA DUGGAN, CURTIS MAREZ, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, J. KEHAULANI KAUANUI, JASBIR PUAR, STEVEN SALAITA, JOHN STEPHENS, and THE AMERICAN STUDIES ASSOCIATION, <br><br> Defendants. | Case No. 16-cv-00740-RC |

**PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT FILED BY DEFENDANTS KAUANUI, PUAR, AND SALAITA**

Plaintiffs Simon Bronner, Michael Rockland, Michael L. Barton, and Charles D. Kupfer (collectively, "Plaintiffs"), by and through their attorneys, hereby submit this brief opposing Motions to Dismiss the Second Amended Complaint (SAC) filed by Defendants Kauanui, Puar, and Salaita.

## I.      THE VOLUNTEER PROTECTION ACT

Defendants Kauanui, Puar, and Salaita assert that the Volunteer Protection Act, § 14503 ("VPA"), immunizes them from liability for the actions alleged in the SAC.  This Court has already held that the District of Columbia analogue, D.C. Code § 29-406.31(d) does not immunize them from liability for money damages, because the SAC alleges liability for

"intentional infliction of harm," an explicit exception in the statute (§ 29-406.31(d)(2)). *Bronner v. Duggan*, 317 F. Supp. 3d 284, 291 (D.D.C. 2018) ("the Immunity Decision") Without question, references to "the defendants" in the Court's decision in the Immunity Decision include the Kauanui, Puar, and Salaita. Although they did not submit the supplemental briefs on this issue ordered by the Court, all three are named as defendants in the SAC, which was filed by order of the Court also on March 5, 2018. Defendants Puar and Salaita were served on April 6, 2018, and April 5, 2018, respectively. Defendant Kauanui was effectively served on May 27, 2018, after intentionally avoiding service of process.[1] The Immunity Decision was issued on July 5, 2018.

This Court held that the SAC alleged that the exception for intentional infliction of harm applied. The Court's rationale includes a detailed discussion of specific allegations that reflect intentional infliction of harm:

> In light of the Model Act's Official Comment and the case law, Plaintiffs have plausibly alleged that the Individual Defendants acted with an intent to harm the ASA.
>
> Plaintiffs allege that the Individual Defendants "purposefully and intentionally withheld material information from [ASA] members, including the fact that the Individual Defendants expected that if the [Resolution] was adopted, [the ASA] would be widely attacked throughout the academic world and the press, and that this would harm [the ASA's] reputation, its members' relationships with their universities, and [the ASA's] size, strength, and finances." SAC ¶ 113[.] . . . More specifically, for instance, Plaintiffs allege that the Individual Defendants conspired to "pack" key ASA positions and the ASA's National Council with supporters of the Resolution, without disclosing that plan to the ASA's membership. *See* SAC ¶¶ 54-55, 60, 69. The

---

[1] Although she knew that Plaintiffs process server was attempting to serve her, she avoided service for weeks, by, *inter alia*, informing her employers' campus security that she would arrange a time to voluntarily accept service, but then refusing to so. Finally, when a Dean of her college contacted her, she informed the Dean that she was unwilling to cooperate. At that point, the process server was allowed to proceed to her office, but she left before he arrived. Ultimately she was served in person at her home. This information came to us verbally from the process server.

Individual Defendants also allegedly used ASA resources to attract speakers supporting the Resolution, while consciously declining to provide opposing viewpoints and recognizing the appearance of a conflict of interest that could undermine the ASA's legitimacy with its members. *See* SAC ¶ 91-94. According to Plaintiffs, the Individual Defendants similarly refused to publicize letters and other correspondence opposing the Resolution, including correspondence warning that "the passage of the Resolution would be destructive to the [ASA]." *See* SAC ¶ 104, 109, 114-16. The Individual Defendants then allegedly subverted the ASA's voting procedures to push the Resolution through the ASA's membership approval process with far fewer votes than required by the ASA's bylaws. *See* SAC ¶ 123, 134-37. Finally, knowing that the Resolution would cause significant backlash against [**21]  the ASA, Defendants allegedly misappropriated ASA funds to hire attorneys and retain a "rapid response" media team to defend against that backlash. *See* SAC ¶ 170-71, 185-89.

Based on these allegations, Plaintiffs claim that Defendants violated their duties to the ASA and its members, violated the ASA's bylaws, and violated D.C. law in furtherance of a Resolution that they knew was likely to harm the organization.  . . . Defendants contend that the Complaint shows "that the Defendants acted in conformance with their overall philosophy, and thus believed that their actions were right and proper," Defs.' Opp'n at 10, but that contention does not help if, as alleged, Defendants' "philosophy" was at odds with the ASA's organizational health. . . . Defendants here not only allegedly subverted the  ASA's voting procedures, but also allegedly improperly diverted its resources and misled its members in service of a harmful purpose. Accordingly, Plaintiffs have alleged that Defendants' conduct rises to the level of intent to harm the ASA, and therefore that Defendants are not shielded from damages by D.C. Code § 29-406.31(d).

*Bronner v. Duggan*, 317 F. Supp. 3d 284, 293-94 (D.D.C. 2018).

Defendants Kauanui, Puar, and Salaita do not dispute that the finding of intentional infliction of harm applies to them, and thus do not (and cannot) argue that they are immunized under D.C. Code § 29-406.31.  Yet they argue that they should still be immunized under the VPA.  The VPA also has an exception for misconduct, and the VPA's exception is **_broader_** than § 29-406.31(d).  ***The VPA's exception applies even to gross negligence and recklessness***:

(a)  Liability protection for volunteers. Except as provided in subsections (b) and (d), no volunteer of a nonprofit organization or

> governmental entity shall be liable for harm caused by an act or
> omission of the volunteer on behalf of the organization or entity if . . .
>
> (3)  the harm was not caused by willful or criminal misconduct, gross
> negligence, reckless misconduct, or a conscious, flagrant indifference
> to the rights or safety of the individual harmed by the volunteer[.]

42 U.S.C.S. § 14503.

Because Kauanui, Puar, and Salaita cannot argue that the SAC does not allege intentional infliction of harm, they cannot possibly argue that the SAC does not allege willful misconduct, much less gross negligence or reckless misconduct, and to their credit, they do not attempt to do so.  Instead, they rely on a particularly creative parsing of the exception.  Creativity aside, the interpretation they urge the Court to adopt is unsupported and unsupportable.

Defendants argue that the exception applies "only for conduct directed at an individual; there is no such exception for conduct directed at the volunteer's own corporation or nonprofit entity."  (Kauanui and Puar Brief at 14.)  Essentially, Defendants' argument is that the language, "to the rights or safety of the individual harmed by the volunteer" modifies not only "flagrant indifference" but also "willful or criminal misconduct" and "gross negligence" and "reckless conduct."

First, Defendants do not cite a single case, or any authority, that supports this interpretation.[2]  There is no indication that any court or any person has ever previously interpreted the statute in this way.

Second, this interpretation is illogical.  Under Defendants' argument, not even criminal misconduct would fall under the exception, unless the criminal acts were "directed at the individual harmed" – and that *individual* cannot be the nonprofit itself.

---

[2] At the August 15 status conference, counsel for Defendants Kauanui and Puar stated that they relied on New York cases that interpret the exception in this way.  The written motion cites no such cases; Plaintiffs' research found none.

Moreover, gross negligence by definition is not "directed" at any individual, the same is true for reckless misconduct. Even if one could imagine a circumstance where gross negligence were directed at an individual, it would then be indistinguishable from willful misconduct and intentional infliction of harm, which do not require an intent to cause the actual injury, but merely an intent to act knowing that the injury to the victim would likely result.  Thus, the inclusion of "gross negligence" and "reckless misconduct" in the statute would be meaningless.

Indeed, if the clause "to the rights or safety of the individual harmed by the volunteer" applies not only to "flagrant indifference" but also to willful misconduct, gross negligence, and reckless misconduct, all three of the terms would be meaningless as well.  All forms of willful misconduct, gross negligence, and reckless misconduct also constitute flagrant indifference.

Third, their creative interpretation does not make grammatical sense.  We would have to read the statute as including types of "misconduct to the rights or safety of the individual" and "gross negligence to the rights and safety of the individual."  Indifference to the rights or safety of an individual makes sense.  Misconduct to the rights and safety of an individual does not.

Regardless, ***even under the defendants' interpretation, the exception would still apply to Kauanui, Puar, and Salaita and the other defendants, because the SAC does allege that their conduct harmed the Plaintiffs*** as well as the ASA:

> Plaintiffs allege that the Individual Defendants "purposefully and intentionally ***withheld material information from [ASA] members***,
>
> Plaintiffs claim that Defendants violated their duties to the ASA ***and its members***, violated the ASA's bylaws, and violated D.C. law in furtherance of a Resolution that they knew was likely to harm the organization. . . .
>
> Defendants here not only allegedly subverted the ASA's voting procedures, but also allegedly improperly diverted its resources and ***misled its members in service of a harmful purpose***.

Immunity Decision at 293-94.  Violations of the duties owed to the members – breach of bylaws, *ultra vires* claims, and breach of fiduciary duties – are injuries to the members.  *See* Plaintiffs' Opposition to the Original Defendants' Motion to Dismiss, filed concurrently and incorporated herein by reference; *see also Daley v. Alpha Kappa Alpha Sorority, Inc*., 26 A.3d 723, 729 (D.C. 2011).  Moreover, as the District of Columbia Court of Appeals also held in *Daley*, dues-paying members of a non-profit have standing to assert, directly, claims that "the organization and its management do not expend those funds in accordance with the requirements of the constitution and by-laws of that organization."  26 A.3d at 729.  In other words, Plaintiffs have a "concrete injury . . . traceable to the defendant's action."  *Id*.

Defendants argue that subsection (e) of the VPA supports their argument.  Subsection e states:

> **(e)**  Limitation on punitive damages based on the actions of volunteers.
>
> **(1)**  General rule. Punitive damages may not be awarded against a volunteer in an action brought for harm based on the action of a volunteer acting within the scope of the volunteer's responsibilities to a nonprofit organization or governmental entity unless the claimant establishes by clear and convincing evidence that the harm was proximately caused by an action of such volunteer which constitutes willful or criminal misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed.

This adds nothing to Defendants' argument.  First, this applies only to punitive damages.  If it were intended to be exactly the same as the exception for all damages, it would serve no purpose.  All this provision does is remove gross negligence and reckless misconduct from the exceptions for purposes of punitive damages.  Regardless, the allegations in the SAC satisfy this exception – the SAC alleges facts that satisfy this exception; Defendants are not be immunized from punitive damages under the VPA.

To the extent that Defendants argue that there is "no allegation of malice to any individuals" – first, this is false.  Second, it is irrelevant.  The VPA never mentions "malice."

To the extent that Defendant Kauanui or Puar argues that she was not acting within the scope of her duties because she was not a fiduciary when she was running for election, her argument fails.  First, the allegations against Defendant Kauanui are not limited to the period of time before she was on the ASA National Council.  Kauanui served on the National Council for three years beginning on June 30, 2013 – well before the adoption of the Boycott Resolution in December 2013.  The breach of fiduciary duties claims against her are not limited to lack of candor when she ran for the position on the National Council.  They also include her lack of candor regarding the vote on the Boycott Resolution, and numerous allegations relating to the expenditure of funds and the processes surrounding the vote that this Court described in the Immunity Decision, excerpted above.  The same is true for Defendant Puar. Third, Counts Three through Nine are not claims for breach of fiduciary duties, thus the timing of when either of these defendants became a fiduciary is irrelevant to them.

To the extent that Defendant Kauanui or Puar otherwise argues that "there is no basis to suggest that her acts were beyond the scope of her position," we are unsure the purpose of this argument.  The exception with respect to punitive damages applies whether or not the acts were in the scope of her position.  See VPA subsection (f).  And, with respect to VPA immunity generally, "scope of the position" is not even mentioned.  Subsection (a) applies to "an act or omission of the volunteer on behalf of the organization or entity."  Clearly, all the Defendants' acts to advance the passage of the ASA's Boycott Resolution were done on behalf of the organization or entity; regardless, it is irrelevant to the exception.

Finally, Defendants argue that this Court should hold that they are immunized from liability at the motion to dismiss stage.  For all the reasons discussed with great detail in Plaintiffs' Response to Defendants' Supplemental Brief, they are wrong.  The Court cannot find that the exceptions do apply to them without engaging in fact-finding.  For that reason, and all of those discussed in *Harris v. United States Dept. of Veterans Affairs*, 126 F.3d 339, 343 (D.C. Cir. 1997) and Plaintiffs' Response to Defendants' Supplemental Brief (Dkt. 90), a finding in favor of the Defendants at the motion dismiss stage is inappropriate.

## II.     THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT SALAITA.

Defendant Salaita argues that this Court lacks personal jurisdiction over him because he does not live in the District of Columbia, and, he claims, the complaint "alleges no contact . . . with the District."  (Salaita Brief at 4.)   It is exactly the same argument that the Individual Defendants named in the First Amended Complaint (FAC) made in 2016, and that this Court rejected.

Defendant Salaita alleges that the SAC intentionally misstated Defendant Salaita's residence as the District of Columbia in order to ascertain jurisdiction. (Salaita Brief at 4, claiming it is a "false allegation that he reside in the District of Columbia; Dr. Salaita lives in Virginia, as Plaintiffs are aware, given that they served him at his home there.")

First, the SAC is quite clear that Plaintiffs were not certain of Defendant Salaita's state of residence.  The paragraph Defendants claim makes a "false allegation" that he lives in the District of Columbia actually says "***Defendant Salaita's residency has changed more than once in recent years. On information and belief, he is currently a resident of the District of Columbia.***"  SAC ¶ 26.  The "information and belief" referred to came from Salaita himself, via

8

a publicized Facebook post.  According to a number of articles published in July of 2017,

Defendant Salaita posted on Facebook a statement that he was leaving academia after losing a

position at the American University in Beirut.  The articles all mentioned he *would* be returning

to the D.C. area.  *See* "Steven Salaita Says He's Leaving Academe," July 25, 2017,

https://www.insidehighered.com/quicktakes/2017/07/25/steven-salaita-says-hes-leaving-

academe; *see also* the referenced Facebook post at

https://m.facebook.com/story.php?storyfbid=10213755322585790&id=1487894562  ("Next

week, I will depart Beirut and return to the D.C. area").

The SAC was drafted and filed with the Motion for Leave to Amend on November 9,

2017, but of course, we did not serve or attempt to serve him or any defendants until the court

granted the motion for leave in March 2018.  It would seem obvious that information that was

uncovered by a process server in March 2018 is not proof of what Plaintiffs knew four months

earlier, and the SAC was filed as the active complaint by the court clerk exactly as it was filed as

an attachment to the Motion to Amend four months earlier.

Second, Plaintiffs did not "allege" that Salaita lived in D.C. to secure personal

jurisdiction, and nothing in the SAC suggests that jurisdiction over Salaita should be based on his

residence.  The actual basis for personal jurisdiction over Defendant Salaita, also set forth at

SAC ¶ 26, was stated as follows:

> Defendant Steven Salaita is a member of the USACBI Organizing
> Collective and a current member of the American Studies Association
> National Council. His term began on July 1, 2015, and will end on June
> 30, 2018. He was a member of the National Council when the
> American Studies Association's bylaws were changed to allow large
> withdrawals from the American Studies Association's Trust and
> Development Fund, and when large withdrawals were taken to cover
> expenses related to the Boycott Resolution.

This Court has personal jurisdiction over Defendant Salaita, for all of the same reasons it has jurisdiction over the other individual defendants - none of whom live in the District or were alleged to live in the District. This Court found jurisdiction over all of them, and explained the basis for this holding in detail. *Bronner v. Duggan*, 249 F. Supp. 3d 27, 40-41 (D.D.C. 2017).

This Court explained the basis reasons as follows:

> This case falls squarely within the holdings in *Family Federation for World Peace* and *Daley* and leads the Court to the conclusion that, taken together, the facts weigh in favor of finding personal jurisdiction. Individual Defendants all voluntarily served as officers of the ASA which is a District of Columbia nonprofit corporation located in the District of Columbia and organized under District of Columbia law. Compl. ¶¶ 15-21. Their respective positions charged them with leading the ASA. *See* ASA Const. & Bylaws, Const., Art. IV (outlining the governing structure of the ASA); Compl. ¶ 28 (noting that Defendant Marez was the president of the ASA). Individual Defendants also voluntarily participated in the 2013 annual meeting in the District of Columbia. Compl. ¶ 30. Each Individual Defendant allegedly took part in the purportedly injurious activities of the ASA in the District of Columbia: Defendants Marez and Gordon co-hosted the discussion of the resolution where dissenting ideas were allegedly suppressed, as in Daley; Defendant Tadiar helped organize the programming of the 2013 convention, which included the allegedly ultra vires act of introducing, debating, and voting on the boycott resolution; Defendants Maira, Duggan, and Reddy were members of the National Council and Executive Committee at the time. See Compl. ¶¶ 16-21. Moreover, Individual Defendants together led the effort to adopt the allegedly inappropriate boycott resolution, and allegedly did so with the intent to alter the nature and purpose of the ASA, a District of Columbia entity, as in *Family Federation for World Peace*. Compl. ¶¶ 2, 30.
>
> As the D.C. Court of Appeals concluded in *Daley*, Individual Defendants' attendance at the meeting in D.C. where they allegedly suppressed ideas and mismanaged the ASA was not "fortuitous." *See* 26 A.3d at 728. Nor was it fortuitous that Individual Defendants assumed leadership positions in the D.C. nonprofit organization. *See Family Federation for World Peace*, 129 A.3d at 243. Taken together, given that the allegedly injurious acts occurred at a meeting in the District of Columbia and Individual Defendants voluntarily assumed leadership roles in the District of Columbia organization they allegedly injured, the Court finds that each Individual Defendant could reasonably anticipate being haled into a District of Columbia court to answer for alleged wrongdoing in connection with their roles in the

> boycott resolution. And, because the Court finds specific jurisdiction over each defendant, the Court need not limit its analysis of Plaintiffs' claims to activity that took place within the District of Columbia. *See Daley*, 26 A.3d at 728 (citing D.C. Code § 13-423).

*Bronner v. Duggan*, 249 F. Supp. 3d 27, 40-41 (D.D.C. 2017).  All of this is true about

Defendant Salaita.  He "voluntarily served as [an] officer[ ] of the ASA which is a District of

Columbia nonprofit corporation located in the District of Columbia and organized under District

of Columbia law."  He "voluntarily participated in the 2013 annual meeting in the District of

Columbia," where he spoke at "the discussion of the resolution where dissenting ideas were

allegedly suppressed," – indeed, he is reported to have said at that meeting, with respect to the

debate, "there is no other side" – and he "led the effort to adopt the allegedly inappropriate

boycott resolution, and allegedly did so with the intent to alter the nature and purpose of the

ASA, a District of Columbia entity."  His own statements affirm that he, with the others, led the

effort.  As quoted in the SAC itself:

> 46. An opinion piece written by Stephen Salaita – a current member of both the American Studies Association National Council and USACBI Leadership – confirms that USACBI was behind the American Studies Association Resolution (and that USACBI lacks its own resources):
>
> > I've worked with USACBI for around five years—***closely during the process to pass the American Studies Association resolution*** . . .. USACBI doesn't accept funding from governments, corporations, or political parties. When we need money, we get it the old-fashioned way: everybody chips. What we lack in material resources is exceeded by the efficiency of unfettered praxis.
> >
> > . . . USACBI does not need the endorsement of university presidents or lawmaking bodies. Nor does it want their endorsement, which would constitute an abdication of what BDS works to accomplish, decolonization of the institutions those bodies exist to enrich and represent.

SAC ¶ 46.  The SAC at n. 4 cites the source of this quote:  Salaita, S., Anti-BDS Activism and

the Appeal to Authority, published March 1, 2014, less than three months after the adoption of

the resolution, available at the Americans United for Palestinian Human Rights website

(http://auphr.org).

Defendant Salaita does not, and cannot, identify any reason why this Court's reasons for finding jurisdiction over every other defendant in this case does not also apply to him.  The Court has personal jurisdiction.

### III.   THE DEMAND REQUIREMENT UNDER § 29-4011.03(2) DOES NOT APPLY BECAUSE THE SAC DOES NOT ALLEGE A SINGLE DERIVATIVE CLAIM.

Defendant Salaita argues:

> **C.  Plaintiffs' Derivative Claims Should Be Dismissed as a Matter of Law.**
>
> Plaintiffs' claims against Dr. Salaita are all brought derivatively on behalf of the ASA for damages incurred by the ASA. *See*, *e.g.*, SAC ¶¶ 194, 197, 244.  Plaintiffs failed to demand a remedy from the ASA National Council ninety days before filing suit, and didn't adequately plead futility, so their derivative claims fail.  D.C. Code § 29-4011.03(2).  Plaintiffs' claims against Dr. Salaita should therefore be dismissed for failure to state a claim against him.

(Salaita Brief at 13.)  This is the entirety of the argument in section II.C. of the brief, except to state that Defendant Salaita purports to join in all motions to dismiss brought by his co-defendants.[3]

***The SAC does not bring a single derivative claim, therefore there is no failure to make a demand.***  Every single claim in the SAC is brought as a direct claim.  Moreover, there is no nominal plaintiff named in the SAC or derivative allegation.

The demand requirement set forth in § 29-4011.03(2) does not apply to direct claims.  There is no need for any additional argument from Plaintiffs.

---

[3] Plaintiffs hereby incorporate by reference their oppositions to the motions to dismiss by any codefendants.

IV.      **THE BUSINESS JUDGMENT RULE IS CLEARLY INAPPLICABLE.**

Salaita Brief at p. 14.

Defendant Salaita asserts that the waste claim and the breach of fiduciary duty claims should be dismissed "pursuant to the business judgment rule."  Salaita Brief at 14.  Other than quoting directly from two cases for the most general statement about the "business judgement rule," this argument consists of one sentence:  "Plaintiffs do not allege that defendants had any financial interest at stake, or that defending the ASA against Plaintiffs' lawsuit was in ***bad faith***, irrational, uninformed, ***or not in the best interest of the ASA***."  (Salaita Brief at 14.)

In fact, Plaintiffs do allege that the ASA spent and exorbitant amount of money because on account of the Resolution – and not just defending against this lawsuit.  Defendant Salaita's Brief makes a number of inflammatory and irrelevant remarks, as well as false assertions, particularly with respect to the First Amendment – an issue this Court ruled on 18 months ago. We assume that opposing counsel have read the Court's decisions in this case.

The following excerpt is an example in the context of legal costs:

> Plaintiffs allege, without irony, that the ASA has incurred "substantial legal costs defending the Resolution." SAC ¶ 183. The absurdity and gall of trying to state a claim for the ASA's expenditure of legal fees to defend against Plaintiffs' own lawsuit would be laughable, if only it were not so damaging to Defendants and to the constitutionally protected right to boycott. Plaintiffs' attempt to bootstrap an injury of their own making must be rejected.

(Salaita Brief at 11.)  Setting aside the fact that the complaint alleges exorbitant expenditures arising from the Resolution that are not "legal costs," but other types of costs, the SAC very specifically alleges legal costs unrelated to this lawsuit.  We know they are unrelated to this lawsuit because they were incurred before this lawsuit was filed, and we know that from Defendants' own documents, produced in discovery, and referenced in the SAC:

> Although Defendants have continuously claimed that the American
> Studies Association did not incur costs related to the Boycott
> Resolution in excess of contributions earmarked for the Boycott
> Resolution, internal documents produced in discovery reveal that
> Defendants incurred legal fees related to ***numerous lawsuits*** by the end
> of 2016, and that the carried the balance on the card, potentially for
> years, until they began withdrawing from the Trust Fund in fiscal year
> 2015.

SAC ¶ 170.  The above-captioned litigation is just one, singular lawsuit; it is not "numerous

lawsuits" under any definition.  The SAC also quotes an email describing "extraordinary

expenses over the past several years," including legal expenses of $40,000 that were charged to

the ASA's American Express account, such that the ASA had substantial debt at the end of 2016.

A 2016 debt for legal fees incurred "over several years" cannot be wholly accountable to this

lawsuit, which was filed in 2016.  Charges associated with the lawsuit could only have been

accrued over 8 months.  Moreover, this case moved very slowly in the first year; no discovery

was conducted, only the motion to dismiss was in front of the court.

That said, the SAC clearly alleges bad faith, and the business judgment rule does not

apply when bad faith is alleged.  *Armenian Assembly of Am., Inc. v. Cafesjian*, 772 F. Supp. 2d

20, 103-04 (D.D.C. 2011) ("the business judgment rule does not apply where the officers or

directors 'lack independence relative to the decision, do not act in good faith, act in a manner

that cannot be attributed to a rational business purpose or reach their decision by a grossly

negligent process that includes the failure to consider all material facts reasonably available").

The SAC could not more clearly allege that the acts of the Defendants were taken not

only with lack of concern for the effect on the ASA, but with the understanding and belief that

the ASA would, indeed, suffer harm.  The SAC quotes correspondence explicitly discussing the

expected damage to the ASA.  This Court's Immunity Decision lays out in detail how the SAC

allegations reflect a lack of good faith:

Plaintiffs claim that Defendants violated their duties to the ASA and its members, violated the ASA's bylaws, and violated D.C. law in furtherance of a Resolution *that they knew was likely to harm the organization*. . . .

Defendants here not only allegedly subverted the ASA's voting procedures, but also allegedly improperly diverted its resources and misled its members *in service of a harmful purpose*. . . .

In light of the Model Act's Official Comment and the case law, *Plaintiffs have plausibly alleged that the Individual Defendants acted with an intent to harm the ASA*.

Plaintiffs allege that the Individual Defendants "purposefully and intentionally withheld material information from [ASA] members, including the fact that the Individual Defendants expected that if the [Resolution] was adopted, [the ASA] would be widely attacked throughout the academic world and the press, and that *this would harm [the ASA's] reputation, its members' relationships with their universities, and [the ASA's] size, strength, and finances*." SAC ¶ 113[.] . . . The Individual Defendants also allegedly used ASA resources to attract speakers supporting the Resolution, while consciously declining to provide opposing viewpoints and *recognizing the appearance of a conflict of interest that could undermine the ASA's legitimacy with its members*. *See* SAC ¶ 91-94. According to Plaintiffs, the Individual Defendants similarly refused to publicize letters and other correspondence opposing the Resolution, including correspondence *warning that "the passage of the Resolution would be destructive to the [ASA]." See* SAC ¶ 104, 109, 114-16. The Individual Defendants then allegedly subverted the ASA's voting procedures to push the Resolution through the ASA's membership approval process with far fewer votes than required by the ASA's bylaws. *See* SAC ¶ 123, 134-37. Finally, *knowing that the Resolution would cause significant backlash* against [**21]  the ASA, Defendants allegedly misappropriated ASA funds to hire attorneys and retain a "rapid response" media team to defend against that backlash. *See* SAC ¶ 170-71, 185-89.

Based on these allegations, Plaintiffs claim that Defendants violated their duties to the ASA and its members, violated the ASA's bylaws, and violated D.C. law in furtherance of a Resolution that they knew *was likely to harm the organization*. . . . Defendants here not only allegedly subverted the  ASA's voting procedures, but also allegedly improperly diverted its resources and misled its members *in service of a harmful purpose*. Accordingly, *Plaintiffs have alleged that Defendants' conduct rises to the level of intent to harm the ASA*, and therefore that Defendants are not shielded from damages by D.C. Code § 29-406.31(d).

*Bronner v. Duggan*, 317 F. Supp. 3d 284, 293-94 (D.D.C. 2018).

## V.     SUBJECT MATTER JURISDICTION (AMOUNT-IN-CONTROVERSY)

The Salaita Brief (pp. 14-15) makes the same arguments regarding the amount-in-

controversy as the Original Defendants.  Plaintiffs' arguments in response are set forth in

Plaintiffs' Opposition to Original Defendants' Motion to Dismiss, filed contemporaneously, and

Plaintiffs' Supplemental Brief on the Issue of Subject Matter Jurisdiction (Dkt. 88), both

incorporated here by reference.

## VI.    DISMISSAL WITH PREJUDICE

Defendant Salaita asks the Court not only to dismiss him from the case, but to order such

dismissal with prejudice.  (Salaita Brief at pp. 15-16.) Plaintiffs disagree.

This is not a frivolous case.  This lawsuit has been pending since April of 2016;  the SAC

was proposed and filed well after the FAC survived a motion to dismiss.  With respect to claims

dismissed from the FAC, there has been no bad faith attempt to revive them in the SAC.  This

Court already held exactly that in its decision on the Motion to Amend.  *Bronner v. Duggan*, 324

F.R.D. 285, 292-93 (D.D.C. 2018).

The addition of Defendant Salaita to this case cannot possibly be seen as unfounded or

frivolous.  He has acknowledged being a leader in the effort to pass the Resolution at the ASA,

he became a member of the ASA National Council, and during his term on the National Council

the bylaws were changed to allow for large withdrawals from the ASA Trust Fund.  During his

term, the withdrawals of from the ASA Trust Fund equaled one-third of the value of the Trust

Fund at the beginning of his term.

Under Rule 15, a court "should freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(1)(2).  Case law in this district also advocates liberal allowance of amendments.  *See* Plaintiffs' Brief for Leave to File the SAC, Dkt. 59.  Defendant Salaita is a newly added defendants; Plaintiffs have had no opportunity to repair defects in the allegations against him, if there are any.  Dismissal with prejudice at this stage would be highly unusual and would conflict with the Rule 15.

## VII.   FAILURE TO STATE A CLAIM – DEFENDANT SPECIFIC

Defendants Kauanui, Puar, and Salaita, respectively, allege that the SAC fails to state claims particular to themselves.  All three set forth their own version of the "facts" alleged in the SAC; those versions are about three pages long – compared to the 68 pages of allegations in the SAC that precede the formal counts – and not at all comprehensive.

From these brief summaries of the facts, Defendants Kauanui, Puar, and Salaita argue that the SAC fails to provide facts to show that they are liable for the claims alleged.

The standard on a motion to dismiss is for the complaint to "contain sufficient allegations factual allegations that, if accepted as true, would state a plausible claim to relief." *Bronner v. Duggan*, 249 F. Supp. 3d at 36.  "Plaintiffs must 'nudge their claims across the line from conceivable to plausible.'"  *Id., quoting Bell Atl. Corp.. v. Twombly*, 550 U.S. 544, 570 (2007).  Plaintiffs need not provide factual evidence of every element of every claim at this stage of a case.

This complaint alleges concerted action among a set of persons, led by the founders and leaders of USACBI, to infiltrate the leadership of an academic association for the purpose of having that association adopt an academic boycott of Israel.  This Court has already held that the SAC plausibly alleges exactly that.  All of the defendants are (or were) leaders in either USACBI

or the ASA.  Notably, ***Kauanui, Puar, and Salaita – all three – served as leaders of both USACBI and the ASA in exactly the time period at issue***.

To the extent that Defendants Kauanui and Puar argue that they were not yet fiduciaries when they ran for their positions as ASA leaders, Plaintiffs disagree with their assertion, but the distinction is meaningless.  Both were in office at the time that the defendants withheld material information about the expected effect of the boycott.  That is a violation of Count II, and thus neither can be dismissed from Count II.  As for the other Counts, the argument that they were not fiduciaries at the time they ran for positions on the National Council and the Nominating Committee are simply not relevant.

As for Defendant Salaita, he was serving on the National Council at the most critical time, for purposes of the ASA's financial health.  The SAC alleges clear liability against him under Counts 1 and 2 for the period of time he was on the National Council.  He is also liable for his participation in all of acts underlying Counts 3-9.  Only Counts 1 and 2 require a fiduciary relationship.

Finally, as this Court has noted, the SAC essentially alleges that the Individual Defendants conspired to ensure the adoption of the Boycott Resolution with the clear understanding that the outcome would not benefit the entity, but instead would damage it.  They were also aware that duties owed to the membership at large were violated by their acts in pursuit of the Resolution.  Defects in the complaint with respect to when Defendant Salaita (or Defendants Kauanui and Puar) were sworn into office are easily resolve by a new amended complaint adding claims for aiding and abetting the violations alleged in the SAC, and for civil conspiracy.  Amending the complaint in this manner is a straight-forward task that Plaintiffs can easily complete.

For all of the reasons detailed above, and for all the reasons detailed in Plaintiffs'
Opposition to the Original Defendants' Motion to Dismiss the SAC, Plaintiffs respectfully
request that this Court deny Defendants Kauanui, Puar, and Salaita's Motions to Dismiss the
SAC.

Dated: October 10, 2018

Signed: _____
                  */s/Jennifer Gross*
                  Jennifer Gross

Jerome M. Marcus (admitted *pro hac vice*)
Jonathan Auerbach (admitted *pro hac vice*)
**MARCUS & AUERBACH LLC**
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250
jmarcus@marcusauerbach.com
auerbach@marcusauerbach.com

*Lead Counsel for Plaintiffs*

L. Rachel Lerman (admitted *pro hac vice*)
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3871
rlerman@btlaw.com

Jennifer Gross, DC Bar No. 1003811
Aviva Vogelstein, DC Bar No. 1024231
**THE LOUIS D. BRANDEIS CENTER
    FOR HUMAN RIGHTS UNDER LAW**
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006-4623
(202) 559-9296
jenniegross@brandeiscenter.com
avogelst@brandeiscenter.com

Joel Friedlander (admitted *pro hac vice*)
**FRIEDLANDER & GORRIS, P.A.**
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3502
jfriedlander@friedlandergorris.com

Eric D. Roiter (admitted *pro hac vice*)
Lecturer in Law
**BOSTON UNIVERSITY SCHOOL OF LAW**
765 Commonwealth Avenue
Boston, MA  02215
(617) 734-8266
eroiter@bu.edu

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on October 10, 2018, I caused to be filed PLAINTIFFS'

OPPOSITION TO MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT FILED

BY DEFENDANTS KAUANUI, PUAR, AND SALAITA with the Clerk of Court using the

CM/ECF system, which will send notice of the filing to all parties registered to receive such

notices.

Dated:  October 10, 2018                     Signed:  _____ /s/*Jennifer Gross* _____
                                                            Jennifer Gross