**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIMON BRONNER, MICHAEL ROCKLAND, CHARLES D. KUPFER, and MICHAEL L. BARTON,<br><br>Plaintiffs,<br><br>v.<br><br>LISA DUGGAN, CURTIS MAREZ, NEFERTI TADIAR, SUNAINA MAIRA, CHANDAN REDDY, J. KEHAULANI KAUANUI, JASBIR PUAR, STEVEN SALAITA, JOHN STEPHENS, and THE AMERICAN STUDIES ASSOCIATION,<br><br>Defendants. | Case No. 16-cv-00740-RC |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Plaintiffs Simon Bronner, Michael Rockland, Michael L. Barton, and Charles D. Kupfer (collectively, "Plaintiffs"), by and through their attorneys, hereby respond to the Motion to Dismiss the Second Amended Complaint ("SAC") filed by Defendants Lisa Duggan, Curtis Marez, Neferti Tadiar, Sunaina Maira, Chandan Reddy, John Stephens, and the American Studies Association ("ASA"), collectively, the Original Defendants.[1]

Defendants' latest attack on the operative Complaint in this case is the fourth time they have approached this Court with the same defective arguments. Indeed, the arguments are even more clearly wrong now than they were the last three times they were offered, because they

---

[1] Although John Stephens is not one of the defendants named in the original lawsuit, he is an employee of the ASA, one of the original defendants. The label "original defendant" is useful for purposes of differentiation.

contradict not only binding law and the pleading's allegations, but this Court's decisions in this very case.

Defendants' attack on the Second Amended Complaint completely ignores:

- Multiple clear holdings issued in binding decisions by the courts of the governing jurisdiction;

- This Court's earlier decisions in this very case;

- Defendants' own previous briefing, in which they made arguments flatly inconsistent with what they are saying now; and

- The testimony of their own witnesses regarding the meaning of by-law provisions, as clarified by the ASA's past practices, which Plaintiffs have sued to enforce.

Instead of reconciling their arguments to these preclusive statements of law and fact, Defendants invoke cases – for example, on the distinction between a direct and a derivative claim – from foreign jurisdictions when the rules in those decisions, and sometimes the decisions themselves, have been explicitly rejected as wrong or irrelevant by the governing authorities. Flailing at the charge that they have improperly spent ASA resources lobbying in support of their political goals, Defendants invoke IRS regulations that, without any uncertainty, do not apply to the ASA or to this case, but instead regulate – and permit lobbying by – an entirely different type of non-profit (a section 501$h$) which the ASA has never been.

More fundamentally, however, Defendants' attacks ignore the central wrongs at issue in this case – a series of abuses that cannot possibly be permissible.  Based on Defendants' own emails and the ASA's financial records and federal filings, the Second Amended Complaint details how, among other things, the Individual Defendants in this case:

- Invaded the ASA's modest endowment, and took the money – to the tune of hundreds of thousands of dollars – to fund their private political crusade, impermissibly lobbying against laws that had no impact on the ASA itself, but with which the individual Defendants disagreed;

- Lied to, and concealed facts from, the ASA's membership about why the individual Defendants were running for ASA office and what they would do if elected;

- Clearly expressed indifference as whether their actions harmed ASA, so long as those actions advanced Defendants' favored political cause;

- Manipulated the ASA's voter rolls to exclude people who would vote against their favored candidates.

At bottom, the discovery already obtained in this case makes clear that the individual Defendants have fraudulently executed a hostile takeover of an academic society. They then took that society's money, its reputation, its office, its paid staff, its mailing list and all of its other resources and deployed them to advance the Defendants' private goal of changing the law in another country, and to change or oppose any laws in the United States that Defendants viewed as impediments to their international campaign.

Common sense is consistent with the law's teaching that these actions, carried out not only without full disclosure but after the explicit decision *not* to disclose Defendants' purpose to the membership whose permission was needed, are a breach of numerous legal and equitable duties.

## I.     PLAINTIFFS HAVE STANDING TO BRING THESE DIRECT CLAIMS.

(Original Defs.' Brief at subsection A.1., pp. 3-4, and subsection A.3., pp. 7-9.)

Plaintiffs have standing to bring the claims alleged in the SAC, each of which is properly alleged as a direct claim.  Defendants argue, however, that all but one of the claims alleged in the SAC should be dismissed because they (wrongly) assert that these are derivative claims, and the Court previously dismissed claims plead as derivative in the FAC.  (Original Defs.' Brief at 3-4, 7-9.)

We have been here before.[2]  Defendants are still wrong.  Cases from the District of Columbia, directly on point, clearly hold that members of nonprofit corporations have standing to bring exactly these types of claims individually.  *Daley v. Alpha Kappa Alpha Sorority, Inc*., 26 A.3d 723, 728-30 (D.C. 2011); *Jackson v. George*, 146 A.3d 405, 415 (D.C. 2016).   In both *Daley* and *Jackson*, the Court rejected defense arguments that the body of law governing claims ***brought by shareholders in for-profit corporations*** should govern whether a member of a non-profit has standing to bring claims against the non-profit or its officers and directors.  There is nothing surprising about these holdings; indeed, the Third Circuit has held the same.  *U.S. Gypsum Co. v. Quigley Co. (In re G-I Holdings, Inc.)*, 755 F.3d 195, 208 (3d Cir. 2014) ("the distinction applies to claims brought by shareholders in a corporation. . . . [plaintiffs] were not shareholders or investors in the Center, which, as a non-profit, non-stock corporation, has no shareholders").  Further discussion of *Daley*, *Jackson*, *U.S. Gypsum*, and the inapplicability of the "direct/derivative inquiry" is presented in section I.A., *infra*.

Defendants also fail to state what rule of law they believe does apply, and why. Defendants only tell us that "traditionally" courts use of any of three different tests to determine whether an action is derivative, followed by two string cites of cases almost entirely from other jurisdictions, and all involving for-profit entities. Defendants cite and quote cases from New York to Alabama and beyond, although the legal principles they cite them for "'depend heavily on state law,' specifically, the state of incorporation," a point made in *Keller v. Estate of McRedmond*, the very first case in Defendants' string cite. *Keller*, 495 S.W.3d 852, 869-70

---

[2] This argument was first raised by Defendants with respect to the waste claim plead in the FAC in Defendants' Motion for Judgment on the Pleadings.  (Dkt. 35.)  Plaintiffs hereby incorporate by reference their Opposition and [Proposed] Surreply to Defendants' Motion for Judgment on the Pleadings (Dkt. 36 & Dkt. 40, Exh. 1).

(Tenn. 2016) (*quoting* 10 A.L.R.6th 293 at § 3 (2006).  Defendants offer no analysis of the

holdings in these cases; no application of law to facts.  The type of entity (for profit or nonprofit,

stock or nonstock, limited liability corporation, partnership), the type of claim (breach of

contract, *ultra vires*, breach of fiduciary duty, waste), the pertinent facts – Defendants ignore

them all.  As explained in section I.B., *infra*, even if the cases cited in Defendants' string cite did

apply in this case, and *Daley* and *Jackson* were never written, Plaintiffs would still have standing

to bring these claims individually.

A.    **D.C.'s Highest Court Has Twice Held that the Inquiry Applied to Distinguish
       Between Direct and Derivative Claims Simply Does Not Apply in Cases
       Involving Non-Profit Entities.**

Plaintiffs have briefed this issue, and particularly the holdings in *Daley* and *Jackson*,

extensively.  (Dkt. 36, Dkt. 40-1.)  Defendants here, as before, fail to even acknowledge the

holdings in *Daley* and *Jackson*, much less attempt to distinguish them.[3]

1.    *Daley v. Alpha Kappa Alpha*

*Daley* involves claims alleging irregularities in fiscal management against Alpha Kappa

Alpha sorority ("AKA"), a non-profit incorporated in the District of Columbia, and against

certain past and present members of AKA's Directorate.  The claims arose from large payments

---

[3] Defendants do briefly mention both cases, while refusing to address the critical holdings of both *Daley* and *Jackson*.  *Daley* is briefly referenced in other sections of the brief.  (Original Defs.' Brief at 10, 16.)

Defendants' brief reference to *Jackson* is in this very section.  Within a long string cite, defendants cite *Jackson* with the following quote:  "In a derivative action, the *shareholder* seeks to assert, on behalf of the corporation, *a claim belonging not to him but to the corporation*."  (Original Defs.' Brief at 7-8, emphasis added.)  No one disagrees with that quote about claims brought by *shareholders*, which is actually a direct quote from *Flocco v. State Farm Mutual Auto. Ins. Co.*, 752 A.2d 147, 151 (D.C. 2000), which indisputably involved a claim that actually was brought derivatively, and on behalf of a for-profit corporation.  However, that quote in *Jackson* is immediately followed by the paragraph quoted above, which holds that the trial court correctly held that the *Jackson* plaintiffs had standing to bring their claims, *directly*, even though the claims "'sp[oke] largely of injuries to the Church and its assets and property.'" 146 A.3d at 415.

made by AKA to the sorority president beginning in 2007, including a lump sum payment of $250,000 and a monthly payment of $4,000.[4]   26 A.3d at 726-27.  The *Daley* plaintiffs, dues-paying members of AKA, brought ten claims against AKA and the individual defendants, including claims for breach of fiduciary duties, breach of contract, *ultra vires*, and corporate waste, *inter alia*.[5]  The *Daley* plaintiffs alleged "that judicial intervention is necessary to restore those funds" and to "enjoin the appellees from taking any further action that would harm AKA[.]"  *Id.*  There is no question – the claims brought by the *Daley* plaintiffs arose from expenditures by the non-profit sorority, and the relief sought was restoration of those funds to AKA and injunction against future such expenditures.

The trial court dismissed the *Daley* plaintiffs' claims on the grounds that they were brought "in the members' own names rather than as a derivative suit."  *Id.* at 729.  The Court of Appeals reversed, criticizing the lower court for adopting "too expansive a view of the requirement of derivative suits."  *Id.*  The Court of Appeals held:

> On its face, it would seem almost self-evident that members of a nonprofit organization whose revenue depends in large part upon the regular recurring annual payment of dues by its members have standing to complain when allegedly the organization and its management do not expend those funds in accordance with the requirements of the constitution and by-laws of that organization. The trial court rejected this argument on the ground that the suit was brought in the members' own names rather than as a derivative suit. *See, e.g., Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008). We think this is too expansive a view of the requirement of derivative suits. To begin with, the total equation of a stockholder in a for-profit corporation complaining of financial losses with a member of a nonprofit corporation in an on-going dues-paying basis aimed at social and charitable purposes and the accompanying emotional connotations is an uneasy fit.

---

[4] No previous president of AKA had received a salary.

[5] One or more of the *Daley* plaintiffs also sought restoration of membership privileges, which they alleged were suspended in retaliation *after* the original lawsuit was filed.

*Id.* at 729.

*Daley* properly recognizes that this is a question of *standing*.  And so the *Daley* court

begins its analysis with the basic principles of standing, set forth in *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992).  From there, the *Daley* court holds that

"it seems almost self-evident that members of a nonprofit organization whose revenue depends

in large part upon the regular recurring annual payment of dues by its members have standing to

complain when allegedly the organization and its management do not expend those funds in

accordance with the requirements of the constitution and by-laws of that organization."  26 A.3d

at 729.  This is not a particularly surprising holding, as there is no reason why cases addressing

the ability of a for-profit corporation's shareholders to bring claims on behalf of the corporation

*should* restrict, or in any way govern, the question of whether a dues-paying member of a non-

profit has standing to bring claims against the organization and/or its officers and directors. The

Third Circuit held exactly the same, for exactly the same reason, in *U.S. Gypsum Co. v. Quigley*

*Co.*:

> We can see no reason why the direct/derivative inquiry should apply in
> this situation. Under the case law, the distinction applies to claims
> brought by shareholders in a corporation. *See* [*Tooley v. Donaldson,*
> *Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)]("We set
> forth in this Opinion the law to be applied henceforth in determining
> whether a stockholder's claim is derivative or direct."). G-I and the
> Former Members were not shareholders or investors in the Center,
> which, as a non-profit, non-stock corporation, has no shareholders. G-I
> has not brought to light any cases bearing any similarity to the situation
> here. Cases applying the distinction elsewhere in corporate and
> partnership law — such as to limited partnerships and LLCs — are
> [also] inapplicable, as the Center's structure and relationship with its
> Members is not similar to those corporate forms.

*U.S. Gypsum Co. v. Quigley Co. (In re G-I Holdings, Inc.)*, 755 F.3d 195, 208 (3d Cir. 2014).

Defendants could not possibly distinguish *Daley* on the facts, and did not try.  The *Daley*

court reversed dismissal of claims for breach of fiduciary duties, breach of contract, *ultra vires*,

and corporate waste claims arising from large expenditures from AKA funds, and breach of

duties, fiduciary and contractual, relating to those expenditures – exactly the types of claims at

issue here.  In reversing the lower court's dismissal of those claims, the *Daley* court rejected

exactly the arguments the ASA Defendants make here:  that claims arising from "corporate

mismanagement," and seeking judicial intervention to enjoin further such action and/or to restore

those funds to the entity, cannot be brought on an individual basis by a dues-paying member of

the non-profit.

> ## 2.    *Jackson v. George*

Five years after *Daley*, the Court of Appeals reaffirmed the *Daley* holding in *Jackson v.*

*George.  Jackson* involved the alleged takeover Jericho Baptist Ministries, Inc. ("Jericho"), a

church in the District of Columbia.  Jericho was founded in 1962 and incorporated as a non-

profit under District of Columbia law in 1962.  In brief, the case alleged that in 2010, certain

trustees of Jericho incorporated a new church under the same name in Maryland, and merged the

two churches, transferring the assets of the original Jericho church to the Maryland church, and

firing the pastor of the D.C. church.  The *Jackson* plaintiffs – longtime *tithe*-paying members of

the church – also alleged that a 2009 resolution that seated four of the trustees and removed two

previous trustees was invalid, thus invalidating any acts by the trustees, including the merger.

The defendants removed the *Jackson* plaintiffs from church membership in 2012; plaintiffs

alleged that the trustee's act to remove them was invalid for the same reason.

The *Jackson* defendants argued on motion to dismiss that the plaintiffs lacked standing,

for the exact same reasons that ASA Defendants claim here.  The trial court denied the motion to

dismiss and the Court of Appeals affirmed.  *Jackson* at 415.  Both Courts quoted *Daley*.  *Id.*

("Judge Nash recognized the court's cautionary words about 'too expansive a view of the

requirement of derivative suits' when allegations are made against a non-profit corporation and

its leaders"). Notably, considering the arguments raised by the ASA Defendants here, the trial court in *Jackson* acknowledged that the claims arose from injury to the Church's property while also denying the motion to dismiss, and the Court of Appeal quoted the trial court on this point: "Judge Nash recognized that the Complaint 'sp[oke] largely of injuries to the Church and its assets and property[.]'" *Id.*

The facts in *Jackson* are in some ways dissimilar to *Daley*, thus they somewhat expand the reach of *Daley*. First, Jericho, like most churches, does not install, suspend, and reactivate membership according to "regular recurring annual payment of dues." *Daley* at 729. Of course, the ASA is a dues-paying nonprofit, like the AKA.[6] Regardless of this fact, the *Jackson* trial court and the Court of Appeals both quoted *Daley* warning against applying "too expansive a view of the requirement of derivative suits" when allegations are made against a non-profit corporation and its leaders" and allowed the claims to proceed individually. *Jackson* at 415.

Second, although "Judge Nash recognized that the Complaint 'sp[oke] largely of injuries to the Church and its assets and property'" (*id.*), Judge Nash held that because the *Jackson* plaintiffs also brought a claim alleging that defendants barred them from attending the church (in 2012), a so-called "direct" injury, by any test – the *Jackson* plaintiffs had standing to bring all of the claims, almost all of which arose in 2009 and 2010, and, "spoke" of injury to Jericho and the church's assets. And again, the Court of Appeals affirmed. Explaining in a footnote that this

---

[6] Thus, this language in *Daley* applies perfectly to the ASA plaintiffs:

> On its face, it would seem almost self-evident that members of a nonprofit organization whose revenue depends in large part upon the regular recurring annual payment of dues by its members have standing to complain when allegedly the organization and its management do not expend those funds in accordance with the requirements of the constitution and by-laws of that organization.

*Id.*

one injury was indisputably a direct claim, even if brought against a for-profit entity, or by a

shareholder, the Court then affirmed the trial court's decision allowing all of the claims raised in

the complaint to proceed:

> We next address appellants' argument that appellees attempted to assert
> entirely derivative claims and that dismissal of the Complaint was
> required because, having failed to satisfy the statutory prerequisites for
> bringing a derivative action, appellees lacked standing to sue. . . .
>
>      . . . .
>
> Here, Judge Nash recognized that the Complaint "sp[oke] largely of
> injuries to the Church and its assets and property," but, citing *Johnson*,
> also observed that "courts have held that 'the same facts can give rise to
> several sets of claims, some of which are personal and some of which
> are derivative.'"

*Id.*  Again, although only one claim alleged an injury that was indisputably direct, the trial court

and the appellate court held that the *Jackson* plaintiffs had standing to pursue all of the claims

alleged in the complaint, including the bulk of the claims (by number, and by value), that

"'spoke to injury to the church and its assets.'"  *Id.*

   The SAC alleges numerous claims that, like the one claim in *Jackson*, indisputably allege

injury for breaches indisputably owed "directly" to the Plaintiffs, not the ASA.  *See* section I.B.,

*infra*.

   In *Jackson*, the claims against a nonprofit church, claims that largely "spoke to injury to

the church and its assets," were allowed to proceed directly.  The Court of Appeals recognized

and supported two separate bases for this holding:  (1) unauthorized use of the *Daley* plaintiffs'

"tithes and offerings," creating a "a 'personal financial stake'" in the defendants'

mismanagement of the Church's assets, and (2) one, single claim alleging an injury

"particularized to them" associated from their removal from the church:

> plaintiffs/appellees sought relief from appellants' conduct in (allegedly)
> barring them from Church . . . ***and from appellants' allegedly
> unauthorized use of appellees' tithes and offerings***. Judge Nash did

not abuse his discretion in concluding that because plaintiffs/appellees
alleged an injury particularized to them ***and a 'personal financial
stake,' they were entitled to proceed on the claims*** they brought on
their own behalves

*Jackson v. George*, 146 A.3d at 415.

### 3.   *Cowin v. Bresler* and *Burman v. Phoenix Worldwide Industries* Are Inapposite and Irrelevant.

As we have stated, Defendants do not acknowledge the holdings in *Daley* and *Jackson*,
much less attempt to distinguish them.  Defendants do, however, cite two cases from D.C.
federal courts.  Both are entirely inapposite.

*Cowin v. Bresler*, 731 F.2d 410 (D.C. Cir. 1984), involves a for-profit entity incorporated
in Delaware.  A minority shareholder brought claims under the Securities Exchange Act of 1934
alleging loss of stock value as well as common law claims.  Applying Delaware law to the state
common law claims, the D.C. Court of Appeals held that the shareholder did not have standing
to bring claims for loss of stock value.[7]

*Cowin* applied the "special injury" test that Defendants refer to in their brief.  The same
"special injury" test was later rejected by the Delaware Supreme Court in *Tooley v. Donaldson,
Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1036-39 (Del. 2004).  *See* Dkt. 36 & 40-1.  Regardless,
Defendants still rely on *Cowin*, a case that does not apply D.C. law, is not good law on this point,
is and always was specific to *shareholders* of a for-profit entity, and also precedes the D.C.
Court of Appeals decision in *Daley* (by 27 years).  Suffice it say, *Cowin* is inapposite.

*Burman v. Phoenix Worldwide Indus.*, 384 F. Supp. 2d 316 (D.D.C. 2005), is also
inapposite.  *Burman* involved claims arising from misrepresentation during the solicitation

---

[7] *Cowin*, 741 F.2d at 414 n. 4  ("Because Bresler & Reiner is incorporated in Delaware, the substantive
law of that state governs our disposition of Cowin's common law claims of corporate mismanagement,
fraud, and self-dealing.)

period for the purchase of stock in a for-profit corporation.  Nothing about *Burman* contravenes the holdings in *Daley* and *Jackson*, as Burman has nothing to say about claims against nonprofit entities.[8]

Like *Cowin* and *Burman*, the remaining cases cited on pages 7-8 of Defendants Brief involve shareholders (or investors) in for-profit entities.[9]  They are also out-of-state cases. Moreover, none of them contravene the holdings in *Daley* and *Jackson*.

**B.      Every Claim Is Properly Brought as a Direct Claim.**

Defendants make the conclusory argument that "every claim except one is derivative in nature," but fail to provide a claim-by-claim analysis.  The relevant law and underlying facts vary across the SAC's ten counts.  Defendants paint them all with a broad brush – and the wrong color paint.

**1.      Breach of contract**

It is a long-standing and clearly established matter of law that the bylaws of an organization "are akin to a contract enforceable by all individual members."  *Welsh v. McNeil*, 162 A.3d 135, 157 (D.C. 2017); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005) ("It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members"); *Daley*, 26 A.3d 723, 731 (D.C. 2011) (*quoting Meshel*); *Willens*, 844 A.2d at 1135.  Defendants never specifically refer to the breach of contract claims asserted in Counts Three, Four and Five or attempt to make any real argument that the contract claims are derivative in nature.  Clearly, they could not possibly do so.

---

[8] *Burman* also precedes *Daley* and *Jackson*.

[9] With the sole exception of *Jackson* itself, which Defendants oddly include in their string cite.

2.    *Ultra vires*

The *ultra vires* claims, also brought in Counts Three, Four, and Five, are also appropriately brought as direct claims.  As this Court held in this very case:

> ***A member of an organization may directly sue that organization*** to enjoin actions that the organization did not have power to execute.  *See* D.C. Code § 29-403.04(b)(1); *see also Daley v. Alpha Kappa Alpha Sorority, Inc*., 26 A.3d 723, 729 (D.C. 2011). Actions taken by the organization that are 'expressly prohibited by state or by-law' or outside the powers conferred upon it by articles of incorporation are ultra vires.

*Bronner v. Duggan*, 249 F. Supp. 3d 27, 47 (D.D.C. 2017), *emphasis added*.  The new claims include *ultra vires* claims arising from violations of explicit bylaws, and they are appropriately brought as direct claims, under this Court's holding and under D.C. Nonprofit Corporations Act § 29-403.04(b), which provides that "The power of a nonprofit corporation to act may be challenged in a proceeding by: (1) A member, director, or member of a designated body against the corporation to enjoin the act; [or] (2) The corporation, directly, derivatively, or through a receiver trustee, or other legal representative."

3.    **Breach of fiduciary duties**

Claims for breach of fiduciary duty are properly brought as direct claims, whether against for-profit and non-profit entities.  *See Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n*, 441 A.2d 956, 962-63 (D.C. 1982) (directors and developers of a housing cooperative must act in good faith on behalf of the cooperative's individual members) (hereinafter, *Wisconsin Avenue*). The plaintiffs in *Wisconsin Avenue* brought direct claims for breach of fiduciary duty and breach of contract.  Citing numerous cases holding that fiduciaries owe a duty not only to the corporation or membership organization, but to the individual stockholders or members as well, the *Wisconsin Avenue* court held:

> Officers and directors of a corporation owe a fiduciary duty to the corporation ***and to its shareholders***, which requires them to act in good faith in managing the affairs of the corporation. *See, e.g., United States v. Byrum*, [408 U.S. 125, 142 (1972)]; *SEC v. Chenery Corp.*, [318 U.S. 80, 85 (1943)]; *McKay v. Wahlenmaier*, [226 F.2d 35, 44 (1955)]; *Johnson v. American General Insurance Co.*, 296 F. Supp. 802, 809 (D.D.C. 1969). . . .
>
> Similarly, promoters of a corporation stand in a fiduciary relation to ***both the corporation and its stockholders***, which requires them to act with the utmost good faith and to ***disclose fully all material facts to both the corporation and its stockholders***. *McCandless, Receiver v. Furlaud*, [296 U.S. 140, 156-57 (1935)]; *Dickerman v. Northern Trust Co.*, [176 U.S. 181, 203-04 (1900)]; *Post v. United States*, [407 F.2d 319, 328 (1968), *cert. denied*, 393 U.S. 1092 (1969)]; *Bailes v. Colonial Press, Inc.*, 444 F.2d 1241, 1244 (5th Cir. 1971); *Earle R. Hanson & Associates v. Farmers Cooperative Creamery Co.*, 403 F.2d 65, 70 (8th Cir. 1968). The fiduciary concept is not limited to stock corporations but applies to membership organizations as well. *Post v. United States, supra*, [407 F.2d at 329].
>
> Like promoters or directors of a corporation, developers of a housing cooperative ***occupy a fiduciary position with respect to the individual members*** of the cooperative.

*Wisconsin Avenue*, 441 A.2d at 962-63, emphasis added. *Wisconsin Avenue* follows the United States Supreme Court's decision in *United States v. Byrum*, a case involving breach of fiduciary by a majority shareholder. After holding that a fiduciary owes duties to both the corporation and to its stockholders, the Supreme Court held that minority shareholders could bring direct claims for breach of fiduciary duties against the majority shareholder:

> Byrum was similarly inhibited by a fiduciary duty from abusing his position as majority shareholder for personal or family advantage to the detriment of the corporation ***or other stockholders***. There were a substantial number of minority stockholders in these corporations who were unrelated to Byrum. Had Byrum and the directors violated their duties, the minority shareholders would have had a cause of action under Ohio law.

*United States v. Byrum*, 408 U.S. 125, 142, 92 S. Ct. 2382, 2393 (1972), emphasis added. The result is the same under District of Columbia law. *See Wisconsin Avenue, supra*; *see also*

*Willens v. 2720 Wis. Ave. Coop. Ass'n*, 844 A.2d 1126, 1136 (D.C. 2004) ("directors of the

Cooperative owed the duties of a fiduciary to the corporation ***and to its members***," emphasis

added) and *Daley*, 26 A.3d at 729 ("the right of faithful representation" is "a direct claim").

    4.    <u>Corporate waste</u>

    As discussed above, the Court of Appeal held in *Daley v. Alpha Kappa Alpha* that dues-

paying members of nonprofits, such as Plaintiffs here, have standing to pursue direct claims

arising from financial mismanagement of the sorority.  *See* section I.A.1, *supra*.  Under *Daley*,

Defendants' argument that Plaintiffs' claims must be dismissed as derivative clearly fails.  *Daley*

is determinative of the issue, directly on point, and binding under District of Columbia law.

    One of the claims in *Daley* was a claim for corporate waste, and the only time that

Defendants have acknowledged this holding in *Daley* was in their reply brief on their motion for

judgment on the pleadings, seeking dismissal of the waste claim.  (Dkt. 37.) Defendants were

simply unable to distinguish *Daley*.  They argued in their Reply on the Motion for Judgment on

the Pleadings that *Daley* (and *Jackson*) "rested, ultimately, on a finding that the plaintiffs had

been directly and individually injured."  (Dkt. 37 at 3.)  This is clearly untrue.  *Daley* clearly held

that a dues-paying member of a nonprofit has standing to bring a claim addressing

mismanagement of their payments against the Constitution and bylaws of the entity, and

explained its rationale for doing so in clear and strong terms.  In no way does this holding rely

solely on the *Daley* plaintiffs' additional direct claim for suspension of their membership, which

was brought after the original complaint.  Nothing in *Daley* suggests that the court would have

ruled differently if the plaintiffs had not added a claim alleging that they were wrongly

suspended from the sorority.

    Defendants are still unable to distinguish *Daley*.  They no longer try.  In this Motion to

Dismiss the SAC, Defendants argue again that the waste claim must be dismissed.  (Original

Defs.' Brief at 22.)  But rather than challenge the application of *Daley* (and *Jackson*), they now

rely on *Cowin v. Bresler*.  (*Id.*)  For all the reasons stated in section I.A.3., *supra*, and in

plaintiffs' briefing on the motion for judgment on the pleadings, *Cowin* is inapposite.  That said,

reliance on *Cowin* with respect to the waste claim is particularly nonsensical.  *Cowin* did not

involve a waste claim (or a nonprofit, or an entity incorporated in the district).

      *Daley* is clearly on point, determinative, and binding, as is *Jackson*.  Plaintiffs have

discussed both cases in detail in numerous briefs over the past year; but except for the one reply

brief a year ago, Defendants fail to even acknowledge them.  Plaintiffs incorporate these briefs

by reference.  (Dkt. 36 & 40-1.)

## II.    PLAINTIFFS PROPERLY STATE CLAIMS FOR *ULTRA VIRES* ACTS, BREACH OF FIDUCIARY DUTY THROUGH MISREPRESENTATIONS AND OMISSIONS RELATING TO AN ELECTION, AND WASTE.

      Defendants also argue that the following claims (only) should be dismissed for failure to

state a claim: the *ultra vires* claims brought against the Individual Defendants in Counts Three,

Four and Five, the breach of fiduciary duty claim brought in Count One, and the waste claim

brought in Count Nine.

      Defendants do ***not*** argue that the Counts Two, Six, Seven, or Eight fail to state a claim,

and do not move to dismiss those claims (except to the extent that Defendants incorrectly argue

that Plaintiffs' claims cannot be brought directly, an argument refuted in Section I, *supra*.)

Defendants also do not argue that the breach of contract claims brought against Defendant ASA

in Counts Three, Four, and Five fail to state a claim, and do not move to dismiss those claims

with respect to Defendant ASA.

### A.    Plaintiffs Properly Allege *Ultra Vires* Claims.

      (Original Defs.' Brief at Section B, pp. 14-20.)

Defendants argue that the three new *ultra vires* claims brought in Counts Three, Four, and Five should be dismissed, simply because the Court previously dismissed an earlier and different *ultra vires* claim (without prejudice).  (Original Defs.' Brief at 14-15, "The Court has already ruled that the Resolution is not *ultra vires* and Plaintiffs should not be allowed to retest that ruling.")  Not surprisingly, Defendants state no authority in support of this argument.  There is, of course, no rule prohibiting amending a complaint to include a claim that is the same *type* of claim as another that was previously dismissed without prejudice.  Such a rule would turn Rule 15 on its ear.  *See* Fed. R. Civ. Proc. 15(a)(2) ("The court should freely give leave when justice so requires").

Indeed, a Plaintiff can even amend a complaint to include a claim that is not only the same *type* of claim, but is also based on the *same factual allegations* as one previously dismissed without prejudice, if, for example, the Plaintiff includes additional factual information that resolves the Court's concerns about the presentation of the claim in the earlier complaint.  This happens frequently.[10]

---

[10] Defendants' argument, including terminology such as "[t]his Court has previously ruled that the Resolution was not *ultra vires*" (Original Defs.' Brief at 14), "[t]he Court has already ruled that the Resolution was not *ultra vires* and Plaintiffs should not be allowed to retest that ruling" (*id*. at 14-15), and "Plaintiffs' claim that the Resolution was *ultra vires* was dismissed" (*id.* at 15) seem to suggest issue preclusion.  But there was no judicial determination that would invoke the *law of the case* doctrine.  The fact that the Court dismissed the previous *ultra vires* claim without prejudice (as well as the fact that the issue was not raised to the Court of Appeal) rules out any *law of the case* argument.  Nor do *collateral estoppel* or *res judicata* apply, as both only preclude relitigation of issues in a different action after a final judgment.  (*Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 78, 326 (D.C. Cir. 1997) ("a final, valid judgment on the merits precludes any further litigation between the same parties on the same cause of action"); *Hegna v. Islamic Revolutionary Guard Corps*, 908 F. Supp. 2d 116, 126 (D.D.C. 2012) (*res judicata* protects the finality of judicial judgments in previous cases); *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. 1992) (for collateral estoppel to apply, "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case"); *Restatement (Second) of Judgments* § 27 (1982) ("when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties").)

17

Defendants do not specifically argue that any of the three new *ultra vires* claims is exactly the same as the previously-dismissed claim, nor can they.[11]  The new *ultra vires* claims in Counts Three, Four, and Five do not allege that the Resolution itself is *ultra vires*.  Instead, the new *ultra vires* claims allege that ***particular actions taken by Defendants violate specific provisions of the ASA bylaws***.  (*See* Section II.A.2, directly below.)

As this Court has already held,

> [T]he new claims that Plaintiffs assert do not appear to be the same as those that this Court has already rejected nor do they appear outlandish on their face.
>
> * * * *
>
> Moreover, to the extent that Plaintiffs are asserting *ultra vires* claims, it is apparent from the Complaint that Plaintiffs have made efforts to cure defects that the Court identified in its prior opinion.

*Bronner v. Duggan*, 324 F.R.D. 285, 293 & at n.2 (D.D.C. 2018).  Defendants do not reference this holding, which is directly on point.[12]  Instead, they simply ignore the March of 2018 decision.

There is simply no question about it:  these new *ultra vires* claims are not foreclosed by the dismissal of a previous *ultra vires* claim without prejudice.

Defendants also argue that the *ultra vires* claims brought in Counts Three, Four, and Five should be dismissed because they do not properly allege *ultra vires* claims.  Defendants refer to this Court's 2017 decision dismissing the previous *ultra vires* claim, where the Court held, "[a]ctions taken by the organization that are 'expressly prohibited by statute or by-law' or

---

[11] Although Plaintiffs did not replead the same *ultra vires* claim that was dismissed in 2017, such a claim would not necessarily be precluded, as the claim was not dismissed with prejudice.

[12] In fact, Defendants never once cite to the Court's (March of 2018) decision allowing Plaintiffs to amend and file the SAC, although they previously made nearly all (if not all) of the arguments brought in the Original Defs.' Brief in their Opposition to Plaintiffs' the Motion to Amend.

outside the powers conferred upon it by its articles of incorporation are *ultra vires*."  *Bronner v. Duggan*, 249 F.Supp.3d 27, 47 (D.D.C. 2017) ("Opinion on Motion to Dismiss the FAC" or "March 2017 opinion").[13]

In drafting the SAC, Plaintiffs were careful to only allege *ultra vires* claims that conformed to the Court's 2017 decision.  The SAC thus cites to and quotes from the particular "statute or by-law" at issue in each of the *ultra vires* claims (*see, e.g.*, SAC ¶¶ 48, 124, 142-43), and also presents specific allegations of fact, largely taken from Defendants' own documents, that show how Defendants violated the identified "statutes and by-laws" (*see, e.g.*, SAC ¶¶ 52-77, 123-37, 145-61).[14]  As the Court held in the March 2018 Opinion, "it is apparent from the Complaint that Plaintiffs have made efforts to cure defects that the Court identified in its prior opinion."  *Bronner v. Duggan*, 324 F.R.D. at 293 n.2.

We respond to Defendants' further arguments, specific to each of the three *ultra vires* claims, in the three subsections directly below.

      1.      <u>Count Three:  Packing the National Council with Supporters of the Resolution in Violation of the ASA Constitution, Article VI, § 2.</u>

Apparently, Defendants do not dispute that Count Three alleges violation of an ASA bylaw, because Defendants argue, explicitly, that Plaintiffs' claims ignore language "contained within the very bylaw upon which they rely."  (Original Defs.' Mot. Dismiss at 16.)  As

---

[13] Defendants also cite to and quote from *Welsh v. McNeil*, 162 A.3d 135, 150 n. 43 (D.C. 2017), for the same proposition, but the cited and quoted language is double *dicta*.  *Welsh* does not involve an *ultra vires* claim.  Moreover, the language Defendants quote is actually a direct quote from another case, *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 7 (D.D.C. 1997), *aff'd* 159 F.3d 636 (D.C. Cir. 1998), although this is not indicated in Defendants' citation.  The quoted language is also *dicta* in *Columbia Hospital* – there was no *ultra vires* claim in that case, either. 15 F. Supp. 2d at 7 ("Plaintiffs correctly note that they are not disputing the legitimacy of the January pledge agreement because it was *ultra vires*").

[14] Much of this information was unavailable to Plaintiffs just one month before; thus, these claims clearly do not merely repeat the *ultra vires* claim in the FAC.

discussed below, however, ***the bylaw quoted by Defendants is not the same provision*** invoked

by, cited to, and quoted in Count Three.

Count Three alleges that Defendants' actions to pack the National Council with USACBI

founders and endorsers – including ensuring that every single candidate for President nominated

by the Nominating Committee was an active supporter of an academic boycott of Israel and had

publicly endorsed USACBI – violated the ASA Constitution, article VI (Elections), § 2, attached

hereto as Exhibit A.[15]   Count Three correctly cites to, and quotes from, article VI, § 2:

> 199.  Pursuant to the American Studies Association Constitution, "The
> Nominating Committee shall nominate candidates for the office of
> [President Elect], member of the Council, and members of the
> Nominating Committee.  It shall present two nominees for each elected
> position.  Nominees shall be representative of the diversity of the
> association's membership."  (American Studies Association Const., art.
> VI, § 2.)

(SAC ¶ 199.)   ***Defendants would have the Court believe that article VI of the ASA***

***Constitution includes a definition of "the diversity of the association's membership." It does***

***not.***  Defendants go so far as to actually quote an unrelated bylaw (without citation), suggesting

that the quoted provision is from the ASA Constitution, article VI (Elections), § 2.  (Original

Defs.' Brief at 16.)  It is not.

The provision quoted in Defendants' brief is not in article VI or any other article of the

ASA Constitution.  It is an excerpt from the ASA Bylaws, which until March 2016 was a

separate document from the ASA Constitution. *See* Exhibit A, ASA Bylaws, art. VII

(Conventions), § 4, for the quoted language in context.

---

[15] This citation is to the ASA Constitution as it was at the time of the events alleged in the complaint.  The
ASA has since revised the Constitution and bylaws at least twice.

Moreover, the bylaw quoted by Defendants is specific to the planning of conventions and includes no information extraneous to that purpose. The quoted excerpt pertains to recommendations made by the chairs of the convention's Program Committee for other members of the Program Committee.  Exhibit A, ASA Bylaws, art. VII (Conventions), § 4.  It does not mention, and does not pertain to, the ASA nominating committee or elections to the National Council or the presidency.  If Defendants had included the entire sentence they quoted from, it would have been apparent to every reader that the quoted provision is unrelated and irrelevant to Count Three.  *See id.*

Contrary to Defendants' arguments, Defendants John Stephens testified explicitly that the nominating committee's mandate under the ASA Constitution, art. VI, § 2, was ***not*** limited to ensuring diversity only with respect to "age, racial, ethnic, regional, and gender" variation – the qualities mentioned in ASA Bylaw art. VII, § 4.  (Excerpt from Stevens Dep. Trans., attached hereto as Exh. B.)  Stephens testified that the ASA had implemented corrective action to ensure that at least one adjunct professor was on the National Council, in order to satisfy the diversity mandate.  Adjunct, contingent and  non-tenured status in employment is clearly not included in "age, racial, ethnic, region, and gender" – the factors that Defendants excerpt from an unrelated bylaw.  And, as Defendant Stephens, long-time executive director of the ASA, testified explicitly, although adjunct and contingent (non-tenured) status in employment is also not covered by the employment discrimination laws, reparations were made to ensure diversity with respect to adjunct and contingent employment status:

> 21 Q. Okay. So you would agree with me that
> 22 contingency in your employment or being an adjunct
> 23 professor is not a category that is watched and
> 24 enforced by the EEOC?
> 25 A. Right.

1 Q. It's not religion, race, nationality, gender;
2 right?
3 A. Right.
4 Q. And yet it is an issue with respect to
5 diversity among the membership at ASA that there was a
6 change made to ensure that that type of diversity was
7 reflected?
8 A. Yes. And the reason is that somewhere in the
9 area of 50 to 60 percent of our membership is in that
10 category, and there's no one who actually wears
11 that -- was wearing that suit or outfit that was --
12 that had a voice on the board.

(Exh. B at 218:21-219:12.)

Defendants argue for dismissal because contract provisions – in this case, the ASA's Constitution – should be "interpreted according to its plain language."  (Original Defs.' Brief at 16.)  We would correct Defendants' statement to point out that where this rule applies, ***the provision should be interpreted according to its own plain language – not the language of another, inapplicable provision***.  Moreover, as this Court previously held, in interpreting *ultra vires* claims, "'a long-standing pattern of practice of corporate behavior may give rise to a by-law.'"  *Bronner* I, 249 F. Supp. 3d at 48, *quoting Family Fed.'n for World Peace*, 129 A.3d 234, 251 (D.C. 2015).  We cannot imagine a better interpreter of the ASA Constitution, art. VI, § 2, than the executive director, testifying here against the ASA's interest.

2.  <u>Count Four:  Freezing the Membership Roles to Prevent Dissenters from Voting Against the Resolution in Violation of the ASA Constitution, Article 2, § 2.</u>

Count Four clearly and specifically alleges violation of the ASA Constitution, art. 2, § 2, which section provides that a member who is dropped from the rolls of the ASA membership for failure to timely pay his or her annual dues "may be reinstated at any time" merely by paying his or her annual dues. (Exh B, 150:3-23, 151:18-23, 154:14-155:4, 155:16-156:1.)

Defendants apparently believe that "may be reinstated at any time" means that reinstatement can occur at the time that best suits the political goals of the Individual Defendants. That interpretation clearly contradicts the deposition testimony of Defendant John Stephens, the plain reading of the ASA Constitution, the long-standing pattern and practice of the ASA, and, quite frankly, the experience of every person who has ever paid dues to renew their membership in any non-profit organization.

Defendant Stephen's testimony is quoted in the SAC.  After confirming that no members could have known there would be a vote on the academic boycott of Israel until November 25, and that the membership rolls were intentionally frozen on the morning of November 25, such that no members in arrears would be able to pay their dues to renew their membership in time to vote on the academic boycott of Israel, Defendant Stephens confirmed that the decision to freeze the membership rolls (to prevent long-time ASA members in arrears from voting on the academic boycott) was a first and only occurrence.  His correspondence with other defendants at the time clearly reveals that this aberration in the ASA's long-standing policy had one purpose: to prevent members who might disagree with the Individual Defendants from voting.

Defendant Stephens testified, against his interest, as executive director of the ASA, as follows:

> Q. Is there any place in the bylaws that accounts for suspending the provision in the bylaws that says that membership is reactivated upon payment of dues in arrears?
> THE WITNESS: Not that I'm aware of.
> Q. Okay. Has this ever happened at any time that you recall?
> A. No.
> . . .
> Q. And so the experience of members in the American Studies Association who, if they're procrastinators like me, who always do things at the very last minute, the experience of those people is that they can wait until a day before an election, pay their dues, and vote?
> A. Yes.

. . .
Q. So up to the day that they were already banned from voting, they had no previous awareness that if they didn't pay their dues on time, this vote would happen and they would already be banned from taking part?
A. Well, no one would have known that because no one knew there was going to be a support vote until November 25.
Q. But on November 25 when that group got together and said, "We're going to do a support vote," they could have said, "So let's give folks five days to get their money in arrears to pay up their debt so that they can take part"?
A. Yes.
Q. But they didn't do that?
A. No.
. . .
Q. That heads up that you weren't going to be able to vote came after it was too late for people to pay their arrears and be able to vote?
A. They froze the membership roster on November 25.
Q. With no warning?
A. That was the board decided to freeze that --
Q. I hear you.
A. -- and they told me to instruct Johns Hopkins to hold all orders for membership until the vote was over.

(Exh. B at 150:3-23, 151:18-23, 154:14-155:4, 155:16-156:1.)

If Defendant Stephens' testimony is not enough, discovery produced by Defendants in this case reveals that the ASA routinely sends emails to members in arrears reminding them before every other election that if they quickly pay their dues, they will be able to vote in the election.

The SAC also quotes from correspondence between Defendant Stephens and Defendant Kauanui, then shared with other Individual Defendants serving on the ASA National Council, that quite obviously reflect the Defendants' intention to limit voting by persons they believed were more likely to oppose the resolution. Thus, these facts also go toward Plaintiffs' claims for breach of fiduciary duties.

For purposes of Defendants' Motion to Dismiss, the only issue is whether Plaintiffs have identified a bylaw that was violated by Defendants, recognizing that "'a long-standing pattern of

practice of corporate behavior may give rise to a by-law.'"  *Bronner I*, 249 F. Supp. 3d at 48,

*quoting Family Fed.'n for World Peace*, 129 A.3d 234, 251 (D.C. 2015).  Plaintiffs have clearly

done so.

> **3.      Count Five:  A Substantial Amount of the ASA's Activities Spent Attempting to Influence Legislation in Violation of the ASA's Statement of Election and the Tax Law Regulating Tax-Exempt Entities.**

Defendants argue that the *ultra vires* claim alleged in Count V has already been

adjudicated by this Court.  (Original Defs.' Brief at 19.)  Not true – not by a long shot.

Defendants further argue that although the ASA spends an extensive, and certainly substantial,

amount of time and resources spent on activities challenging legislation at the state level, that

these activities do not violate the ASA's commitment under its Statement of Election, because

(they claim) these activities fall under exceptions specified in the tax code.

First, this claim in the SAC alleges that the ASA spent and spends a substantial amount

of time attempting to influence legislation.  This is not the same as question that the Court

addressed when dismissing the *ultra vires* claim presented in the FAC.  The Court held that the

"boycott resolution itself was not an attempt to influence legislation" and that Plaintiffs had not

"pointed to any existing, proposed, or pending legislation that the ASA may have been targeting

with the resolution."  *Bronner I*, 249 F. Supp. 3d at 49.

Claim Five does not allege an *ultra vires* claim based on the boycott ***itself***.  Claim Five

alleges a violation of an express bylaw – that "No substantial part of the activities of the

corporation shall be the carrying on of propaganda, or otherwise attempting, to influence

legislation . . ."  (Statement of Election, ¶ 3, § 4, attached hereto as Exh. C.; SAC ¶ 142.)  ***At

issue is the extent to which the ASA's activities are focused on influencing legislation***.

Documents produced in discovery reflect an inordinate amount of ASA time and resources

dedicated to influencing the federal, state, and local legislatures, assemblies, and councils here in

the United States – as well as in Israel.  This claim turns on the whether a "substantial part" of

the ASA's activities go to influencing legislation, not whether any particular act alone, or even

the resolution, itself, constitutes an *ultra vires* act.

> As this Court noted when granting Plaintiffs' Motion to File the SAC,

> > To the extent that Plaintiffs are asserting *ultra vires* claims, it is
> > apparent from the Complaint that Plaintiffs have made efforts to cure
> > defects that the Court identified in its prior opinion.

*Bronner II*, 324 F.R.D. 285, 293 n.2 (D.D.C. 2018).  Indeed, Plaintiffs did take care to ensure

that the *ultra vires* claims in the SAC did not repeat the defects identified by the Court.  This

claim clearly identifies the bylaw at issue (Exh. C, Statement of Election, ¶ 3, § 4) and how it is

violated (a substantial part of the ASA's activities spent on attempts to influence legislation).

The SAC also specifies legislation that the ASA sought to influence, responding to the Court's

concern that the FAC to do.  (*See, e.g.*, SAC at pp. 52-57.)

Second, Defendants' argument that the substantial time and resource expenditures spent

on influencing legislation are permissible, despite the clear language in the Statement of

Election, because they fall under an exception in the Tax Code (***not*** the Statement of Election).

However, ***that section of the tax code does not does not apply to the ASA.  Defendants'***

***reliance on 42 U.S.C. § 14503 is entirely misplaced, as that section of the tax code applies only***

***to entities that have taken the election to report under section 501(h).  The ASA's Form 990s***

***show that the ASA has not taken the section 501(h) election.  This is critical because those***

***entities that take the 501(h) election pay some taxes.***

Even if section 14503 did apply (and it does not), the SAC identifies numerous examples

of legislation that the ASA expended substantial resources to influence that are not "aimed

*directly at the ASA*"  (Original Defs.' Brief at 20), much less "might affect the existence of the

organization, its powers and duties, tax-exempt status, or the deduction of contributions to the organization" – the actual standard set in the statute. Thus, even if the exceptions set out in the Tax Code § 501(h) did apply, and even if they somehow also constitute exceptions to the ASA's own promise in the Statement of Election, Count Five still survives, because the SAC alleges that a substantial part of the ASA's activities are and were directed at influencing legislation that is not covered by the exceptions set forth in Tax Code § 501(h)(2).  And, finally, the resolution of this question is one of fact, and not appropriately determined on a motion to dismiss.

*However, again, Defendants misrepresented the applicable law.  Section 501(h) does not and has not applied to the ASA.*

**B.**    **Count One Brings Claims for Breach of Fiduciary Duty – Not Fraud – and Reliance Is Not an Element.**

(Original Defs.' Brief at section C, pp. 21-22.)

Defendants' sole argument for dismissal of Count One is that Plaintiffs fail to allege that they relied on Defendants' numerous omissions and misrepresentations of information clearly material to the ASA membership's decisions regarding how to vote on critical issues, including the election of National Council members and the vote on whether to adopt the boycott.

*Reliance is not an element of this breach of fiduciary duty claim.*  *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1997) ("action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action do not include the elements of reliance, causation and actual quantifiable money damages" (*Id.* at 12).  Whether or not any of the Plaintiffs relied on the Defendants' many material omissions and misrepresentations in deciding how they would vote is of no consequence, whatsoever, to this Motion to Dismiss.

Defendants actually recite what they claim to be five required elements of Count One, and they include reliance.  (Original Defs.' Brief at 21.)  *The "elements" set out in Defendants'*

**brief are not the elements of the claim brought in Count I or any other breach of fiduciary claim, but rather the elements of common law fraud**.  Indeed, the two authorities that Defendants rely on – *D.C. Jury Instruction 20.01* and *Shiff v. American Ass'n of Retired Persons*, 697 A.2d 1193 (D.C. 1997) – both clearly set forth those same five elements as the elements of common law fraud.  Indeed, ***the actual title of Jury Instruction 20.01 is* Fraudulent Misrepresentation—Elements of The Claim**.   Similarly, *Shiff v. American Ass'n of Retired Persons* presents the same set of elements under the clearly bolded heading, "Common Law Fraud."[16]  Nothing in *Schiff* suggests that the case involves breach of fiduciary duty.  The defendants in *Schiff* were not fiduciaries of the Plaintiffs and were not alleged to be.  Fiduciary duties are not even mentioned in *Schiff.*

It is difficult to understand how Defendants could have confused the breach of fiduciary duty claim with common law fraud.  Count One is clearly labeled as breach of fiduciary duty:

**COUNT ONE**

**Breach of Fiduciary Duties Against the Individual Defendants by All Plaintiffs**

**(Material Misrepresentations and Omissions in Connection with Elections to Office and Seeking Member Approval of Boycott Resolution and Amendment of the Bylaws)**

(SAC at p. 69.)  Below this heading, the SAC clearly describes a breach of fiduciary duty claim.  (*See* SAC ¶ 193, "the Individual Defendants owe all the duties of a fiduciary to the American Studies Association and all of its members," and ¶ 194 "the Individual Defendants breached their fiduciary duties of loyalty, care, candor and good faith by making or causing to be made material misrepresentations and omissions to members, when seeking election to the National Council

_____

[16] Defendants did not provide a pinpoint cite for specific pages in *Schiff*, but the case addresses three claims:  unlawful trade practices in violation of the D.C. Consumer Protection and Procedures Act, common law fraud, and unjust enrichment. 697 A.2d at 1194.  The elements recited in Original Defs.' Brief are set forth at 697 A.2d at 1197-98 under the heading "Common Law Fraud."

and approval of the Boycott Resolution[.]")  There is no mention of "fraud" or "fraudulent" in Count One.  (SAC ¶¶ 191-93.)

Whether Defendants are unable to distinguish between breach of fiduciary duty and common law fraud or knowingly misrepresented the applicable law is impossible to know. However, this much is certain:  Defendants made this same argument nearly a year ago in their brief opposing Plaintiffs' Motion for Leave to File a Second Amended Complaint (Dkt. 66 at 7).[17]  In that brief, Defendants cited *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C. 1992) for the proposition that "Plaintiffs' reliance on the representation is a necessary element."  (Opp. Mot. File SAC at 7.)

Although Defendants' argument at that time was only two sentences long – and clearly erroneous – Plaintiffs responded with a full-page argument.  (Plfs.' Reply Mot. to Amend, Dkt. 67 at 15-16.)  Citing *Malone*, Plaintiff's reply brief showed that a breach of fiduciary duty claim arising from material misrepresentations or omissions relating to a vote by stockholders (or, in the case of a nonprofit, dues-paying members) does not require reliance.  Plaintiffs further showed that Defendants' reliance on *Hercules & Co. v. Shama Restaurant Corp.* was misplaced, because *Hercules*, like *Shiff*, involved a claim for fraud.  Indeed, *Hercules* explicitly rejects the rule for which Defendants invoked it.  *Hercules* at 923 ("one cannot close his eyes and blindly rely upon the assurances of another *absent some fiduciary relationship*"), emphasis added.

Having been caught once before misstating the elements of the claim at issue in Count One, it is striking that Defendants would do so again.  This time, they substituted out one fraud

---

[17] In two sentences, Defendants argued:  "Plaintiffs do not even allege that they relied on any alleged misrepresentation. Said another way, there are no allegations in the proposed Second Amended Complaint that the Plaintiffs themselves changed their vote because of any representation by any party. *See Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C. 1992) (Plaintiffs' reliance on the representation is a necessary element)."

case for another fraud case, and went so far as to cite the Jury Instructions for fraudulent

misrepresentation, while oddly never using the word "fraud" or any derivative of the word.

We cannot know whether Defendants intentionally sought to mislead the Court or

whether this argument was presented in good faith, but the we know this:  Count One presents a

breach of fiduciary claim, and reliance is not an element of that claim.


## III.       THIS COURT CONTINUES TO HAVE FEDERAL DIVERSITY JURISDICTION.

(Original Defs.' Brief at subsection A.2., pp. 4-7, and subsection A.4., pp. 10-14.)

In *Bronner I*, this Court held that the claims and allegations in the FAC satisfied the

amount-in-controversy requirement:

> ***Plaintiffs' claims plainly meet the low standard for establishing a***
> ***sufficient amount in controversy***. The complaint asserts that over
> $75,000 is in controversy in the case, albeit in a cursory fashion. See
> Compl. ¶ 9. ***It is far from legally certain that Plaintiffs could not***
> ***recover over $75,000.*** The complaint seeks monetary, injunctive, and
> declarative relief for waste, breach of contract, breach of fiduciary
> duties, ultra vires acts, and violation of the D.C. Nonprofit Corporation
> Act. See Compl. at 25-31. It specifically alleges that the ASA will lose
> membership dues from many former members for years to come.
> Compl. ¶ 60. The complaint also specifically states that the boycott
> resolution has "resulted in the improper expenditure of ASA funds
> related to membership dealings, public relations, legal matters, and . . .
> employee time and effort," and that Individual Defendants are
> "consciously attempting to appropriate the assets and reputation of the
> ASA to achieve purposes . . . at odds with[] [the] purposes and mission
> . . . [of] the ASA." Compl. ¶¶ 80, 84.

249 F. Supp. 3d at 38, *emphasis added*.

The SAC also seeks monetary, injunctive, and declarative relief.  The only difference is

that the SAC includes additional allegations showing that the amount-in-controversy is

substantially higher than even Plaintiffs imagined when the FAC was filed in April of 2017.

Documents produced in discovery revealed that the Defendants were not paying the expenses arising from the backlash after the adoption of the academic boycott contemporaneously, instead carrying tens of thousands of dollars on an American Express card and letting other expenses accrue; because the ASA employed a cash-basis method of accounting, the impact of the resolution on the ASA's financial health was not apparent in the Form 990 filed for fiscal year 2013, the year of the Boycott Resolution.  (JS 940.)  But by fiscal year 2016, the ASA's reported expenses had increased 33% over fiscal year 2012.[18]  (Calculated from ASA Form 990s for fiscal years 2012 and 2016; see Dkt. 88 and exhibits attached thereto.)  Revenues fell 7% over the same period.  (Calculated from ASA Form 990s for fiscal years 2012 and 2016. *Id*.)  Indeed, the reported revenue for fiscal year 2016 – the most recent form filed by the ASA – was the lowest the ASA had reported since fiscal year 2009, the heart of the financial crisis. *Id*.

To cover the shortfall, Defendants changed the ASA bylaws to allow them to invade the ASA's Trust and Development Fund.  The first withdrawal was in fiscal year 2015, in an amount over $112,000, according to correspondence produced by Defendants in discovery.  The ASA's Form 990 for that year shows that ASA revenue for sale of securities of $156,024, and that the securities were sold at a loss of $16,240.  After the (Proposed) SAC was filed, we learned from ASA's Form 990 for fiscal year 2016 that the association had sold securities of $268,085 that year, at a loss of $19,319.  *Id.*  ***The sale of securities in fiscal years 2015 and 2016 – is***

---

[18] Fiscal year 2012 ended on June 30, 2013 – less than six months before the adoption of the Resolution.

*equivalent to 33% of the value of ASA's investments at the end of fiscal year 2014*

*($1,281,986).*[19]

The financial information directly above is one example of allegations in the SAC that were not included in the SAC, and they speak particularly to the valuation of the injunctive and declaratory relief sought.

A.     **Contrary to Defendants' Position, This Court Has Already Held that the Direct Claims Alleged in the FAC Satisfy the Amount-in-Controversy Requirement.**

Every allegation in the FAC relating to the amount-in-controversy requirement is also alleged in the SAC.  There is no logical argument that could possibly explain how the Court could find that the FAC satisfied the amount-in controversy requirement in *Bronner I*, but that the SAC does not.

The Court questioned defense counsel on this very point.  At the status conference on August 15, 2018, counsel for the Original Defendants stated that they did not believe they should be required to (continue to) respond to discovery until the Court ruled on their (at that time, unfiled) Motion to Dismiss the SAC.  This exchange followed:

> 10     THE COURT:  What is [the basis of your motion]?
> 11     MR. SEAMAN:  Well, there were several.  One is --
> 12 the primary -- a primary one is that the Court doesn't have
> 13 subject matter jurisdiction.  There is a -- this is the
> 14 second amended complaint that doesn't allege $75,000 of
> 15 damage to the individual plaintiffs.  And in our view,
> 16 that's what has to happen, and that hasn't happened.  That's
> 17 a nutshell version of the argument.
> 18     THE COURT:  **Didn't I address that in my first**
> 19 **opinion?**

---

[19] For further discussion of the decline of the ASA's financial health, see Plaintiffs' Supplemental Brief on the Issue of Subject Matter Jurisdiction ("Plaintiffs Supplemental Brief"), Dkt. 88, at pp. 4-13. Plaintiffs' Supplemental Brief, all pages, and Plaintiffs' Response to Defendants' Supplemental Brief, Dkt. 90, are incorporated herein by reference.

20        MR. SEAMAN:  I don't think so, Your Honor.  The
21    first motion to dismiss was oriented towards the ASA.  The
22    motions to dismiss for lack of subject matter jurisdiction
23    had to do with the ASA as the, quote-unquote, victim of the
24    alleged acts of the defense.  **At that point, the Court had**
25    **not determined that this was not properly a derivative**
1     **action.  So we did not address the absence of allegations of**
2     **$75,000 worth of damage to each individual plaintiff** . . .

(Aug. 15, 2018 Hearing Trans. 16:10-17:6, attached hereto as Exh. D, emphasis added.)

Defense counsel misstated the posture of the case in *Bronner I.*  First, the FAC alleged

direct claims for corporate waste and *ultra vires* acts.[20]  Defendants were aware of this at the

time:  entire sections of their briefs specifically addressed the direct claims.  (Motion to Dismiss

the FAC at 28, "VIII. The "Direct Claims" Asserted in Counts II and III Must be Dismissed as

Against the Individual Defendants"; Defendants' Reply on Motion to Dismiss the FAC, Dkt. 25,

at 22, "F.  The Direct Claims in Counts II and III Must Be Dismissed.")  And Defendants did

address damages to the individual plaintiffs at the time, albeit briefly.  (Dkt. 21 at 11, "there are

no factual allegations of any specific financial amounts alleged to . . . [be] owed to the

Plaintiffs"; *see also* Dkt. 25 at 16.)

Second, the Court dismissed the derivative claims *in the very same decision* that it held

that the FAC satisfied the amount-in-controversy requirement: *Bronner I.*  It is simply

disingenuous for Defendants to assert that the Court did not hold that the direct claims brought in

the FAC satisfy the amount-in-controversy requirement.  The Court was right:  it "did address

that in [the] first opinion."

---

[20] Both claims were brought both directly and derivatively against all defendants.  The *ultra vires* claim
was dismissed for failure to state a claim, but not because it was only brought derivatively.

**B.      Defendants' Argument that Jurisdiction Requires Claims for Individual Damages Is Simply Wrong.**

(Original Defs.' Brief at subsection A.2., pp. 4-7.)

Section A.2. of Defendants' Brief argues that the Court lacks jurisdiction because "[the only damages Plaintiffs seek are those incurred by the Association (as would be appropriate in a derivative claim).  This is fatal from a jurisdictional perspective." (Original Defs.' Brief at 4.) This argument is a red-herring.[21]  The assertion that jurisdiction only exists where there are claims for individual damages is unsupported and unsupportable.  Not surprisingly, Defendants do not cite a single case in support of this proposition.

There are numerous combinations of claims and remedies that do not seek individual damages.  (*Id*.)  By their very nature, claims for injunctive and declaratory relief do not seek individual damages.  The Court does not lose jurisdiction over such claims.

Defendants' reference to damages "incurred by the association (as would be appropriate in a derivative claim)" further confuses their argument.  The question of ***whether a claim that alleges damage to a corporation can be brought directly is a question of standing, not a question of jurisdiction***.  The law clearly provides standing for plaintiffs to bring claims for damages "incurred by" a corporation in certain circumstances.  It cannot be that the court has no jurisdiction over such claims if the plaintiff seeks injunctive relief only.

Consider § 29-403.04 of the D.C. Nonprofit Corporations Act, which provides for *ultra vires* claims.  Subsection (b)(1) allows for a member to bring a direct *ultra vires* claim to enjoin the act, but does not provide for damages.  Under Defendants' theory, there would be no jurisdiction over such a claim.

---

[21] It is also factually incorrect.  Plaintiffs did indeed allege individual damages.

Consider also *Daley v. Alpha Kappa Alpha*.  The plaintiffs in *Daley* sought to restore to AKA large sums of money paid by the sorority to its president.[22]  As discussed above, the Court of Appeals held that the *Daley* plaintiffs had standing to pursue their claims directly.  Among other things, the Court of Appeals held that the plaintiffs "had a 'direct, personal interest' in the cause of action, even if 'the corporation's rights are also implicated.'"  *Daley*, 26 A.3d at 729, *quoting Franchise Tax Board of Cal. v. Alcan Aluminum, Ltd.*, 493 U.S. 331, 336 (1990).  The *Daley* plaintiffs did not seek individual damages.  Of course, the Court had jurisdiction over the case.

There is clearly no legal basis for this jurisdictional argument.  It may be that Defendants have confused the standing issue with jurisdiction.  Or, it may be that Defendants are really arguing that the SAC does not satisfy the amount-in-controversy requirement, although they do address that argument separately, in section A.4.  Because Defendants provide no legal argument, it is difficult to respond section A.2.

However, to the extent that Defendants may have intended to argue that the SAC does not satisfy the amount-in-controversy requirement because the requirement is only met by claims for individual damages, defendants are wrong.  We address this argument subsection on the amount-in-controversy, below.

---

[22] According to the Court of Appeals decision, the *Daley* plaintiffs did not seek individual damages – only restoration of the funds to the sorority.  Although the *Daley* plaintiffs also brought a direct claim for suspension of membership, which they claimed was an act of retaliation after they brought the lawsuit, the Court clearly did not require the addition of the direct claim to find that the plaintiffs had standing to bring the claims arising from the payments from AKA to the president, nor did they seek monetary damages relating to the suspension – just reinstatement.

C.      **The SAC Alleges Damages Sufficient to Satisfy the Jurisdictional Amount.**

(Original Defs.' Brief at subsection A.4., pp. 10-14.)

Defendants appear to argue that only individual damages contribute to the amount-in-controversy calculus.  This is, of course, untrue.

In *Jackson*, the Court allowed claims for damages to the Jericho D.C. church to proceed directly and in *Daley*, the damages to the church were not "individual damages."  Yet the Court ruled in both cases that the plaintiffs had standing to bring them.  It cannot be that standing exists where there is no amount-in-controversy.

In this circuit, the value of an injunction can be measured either by the value to the plaintiff or the cost to implement the injunction borne by the defendant.  When the value is measured by the cost to the defendant, the amount-in-controversy is not zero.

As this Court explained when it held that amount in controversy alleged by the FAC was satisfied the $75,000 requirement, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted).  The Court further held:

> For a court to reject the amount claimed by the plaintiff, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* at 289. This means that a court should find jurisdiction at this motion-to-dismiss stage of the proceedings even if it has serious doubts as to the bases for establishing the amount in controversy. *See Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 14 (D.D.C. 2014), aff'd, 639 F. App'x 3 (D.C. Cir. 2016). Even a "cursory" allegation of the amount in controversy, if it exceeds the jurisdictional requirement, is sufficient to survive a motion to dismiss.

(MTD Opinion at 12.)  Applying this standard, the Court held that "Plaintiffs' claims plainly meet the low standard for establishing a sufficient amount in controversy. . . .It is far from legally certain that Plaintiffs could not recover over $75,000." *Id.*

The same standard applies today, as we are still in an early phase of the case, and discovery is incomplete.  Plaintiffs are waiting on thousands of documents that defendants agreed to provide, but have not yet done so.  Thousands of other documents are at issue in a discovery motion pending in front of the Court.

Under this same standard, and with the inclusion of all the claims and allegations at issue when the Court held that the claims and allegations presented in the FAC satisfied the $75,000 requirement, and with the addition of new factual allegations related to expenses, revenues, and the invasion of the Trust Fund, as well as the eight new claims, the SAC clearly satisfies the $75,000 requirement.

### 1.   Claims for Relief and Damages

Plaintiffs seek injunctive, declaratory and monetary relief, arising from the following claims against the Individual Defendants and the ASA:

- *New Claims for Breach of Fiduciary Duties*.  Counts 1 and 2 present claims against the Individual Defendants for breach of fiduciary duties, and seeks, *inter alia*, monetary damages and declaratory relief.

- *New Claims for Breach of Contract.*  Counts 3, 4, and 5 present claims against the American Studies Association.  These claims arise from the ASA's violation of three separate provisions of the ASA bylaws.  As this Court has held with respect to the continuing claims for breach of contract that were brought in the First Amended Complaint, "[a] nonprofit organization's 'Constitution and Bylaws form a contract between that [organization] and its' members.'"  Plaintiffs seek injunctive and declaratory relief.

- *New Claims for* **Ultra Vires** *Acts.*  Counts 3, 4, and 5 present *ultra vires* claims against the Individual Defendants, as well as the claims against the ASA for breach of contract described above.  Although the underlying violations of the ASA bylaws are the same, the claims for *ultra vires* acts are brought against the Individual Defendants, while the claims for breach of contract are brought against the ASA as an entity.  These claims are brought for monetary damages ***and*** for injunctive and declaratory relief (¶¶ 207, 215, 225).

- *Continuing Claims for Voting Irregularities Brought in the Alternative.*  Aside from the new claims identified above, the SAC brings claims that

were also brought in the FAC, including two claims for voting irregularities, in Counts Six through Nine.  Counts Six (Breach of Contract – Voting Process Contrary to Bylaws) and Seven (Breach of the D.C. Nonprofit Corporation Act) are again brought in the alternative.  These claims are brought against the American Studies Association, not the Individual Defendants.  Damages sought include monetary (referencing Count 2), injunctive, and declaratory relief.

- ***Continuing Claim for Breach of Contract by Plaintiff Barton.***  Count Eight is brought solely by Plaintiff Barton against the ASA (only) for refusal to let him vote on the Resolution.  He seeks monetary, declarative and injunctive relief.

- ***Continuing Claim for Waste.***  Count Nine is brought against all Defendants – the ASA and Individual Defendants.  This claim is brought against the ASA and the Individual Defendants.  Plaintiffs seek damages, including ***but not limited to*** "damages from the Individual Defendants on behalf of the American Studies Association."  ¶ 244.  As discussed below, this statement regarding the availability of damages from Individual Defendants does not exclude appropriate damages from the ASA, including declaratory and injunctive relief as well as monetary relief.  Rather, Plaintiffs allege that Defendants' waste of corporate assets "resulted in [all] the damages alleged herein and outlined in prior Counts and previous paragraphs."  *Id.*

### 2.   <u>Valuation of Injunctive and Declaratory Relief.</u>

Aside from the value of monetary damages alleged against the Defendants, the value of injunctive and declaratory relief are also included when assessing the amount in controversy. Where a plaintiff asks for declaratory or injunctive relief, a court generally measures the amount in controversy based on the object of the litigation. See *Busby v. Capital One. N.A.*, 932 F.Supp.2d 114, 132 (D.D.C. 2013), *citing Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977).  In the District of Columbia, courts "look to either the value of the right the plaintiff seeks to enforce or the cost to the defendants to remedy the alleged denial of that right. *Id.*, *citing Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978), *see also Geo Specialty Chems, Inc. v. Husisian*, 951 F.Supp.2d 32, 39-40 (D.D.C. 2013).  In addition, D.C. courts are not obligated to precisely ascertain the value of injunctive relief; "so long as the plaintiff's pleadings amount to more than a 'formal allegation' that the relief is worth more than $75,000,

that is sufficient." *Info Strategies, Inc. v. Dumosch*, 13 F.Supp.3d 135, 142 (D.D.C. 2014), citing Smith, 553 F.2d, at 1100-1.

Thus, even if there were no recovery of money damages against the Defendants, the $75,000 requirement would be satisfied by the value of the injunctive and declaratory relief sought in the SAC.

For all the reasons detailed above, and set forth in the briefs incorporated herein, Plaintiffs respectfully request that this Court deny this Motion to Dismiss.

Dated: October 10, 2018

Signed: _____ */s/Jennifer Gross*
                            Jennifer Gross

Jerome M. Marcus (admitted *pro hac vice*)
Jonathan Auerbach (admitted *pro hac vice*)
**MARCUS & AUERBACH LLC**
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250
jmarcus@marcusauerbach.com
auerbach@marcusauerbach.com

*Lead Counsel for Plaintiffs*

L. Rachel Lerman (admitted *pro hac vice*)
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
(310) 284-3871
rlerman@btlaw.com

Jennifer Gross, DC Bar No. 1003811
Aviva Vogelstein, DC Bar No. 1024231
**THE LOUIS D. BRANDEIS CENTER**
   **FOR HUMAN RIGHTS UNDER LAW**
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006-4623
(202) 559-9296
jenniegross@brandeiscenter.com
avogelst@brandeiscenter.com

Joel Friedlander (admitted *pro hac vice*)
**FRIEDLANDER & GORRIS, P.A**.
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3502
jfriedlander@friedlandergorris.com

Eric D. Roiter (admitted *pro hac vice*)
Lecturer in Law
**BOSTON UNIVERSITY SCHOOL OF LAW**
765 Commonwealth Avenue
Boston, MA  02215
(617) 734-8266
eroiter@bu.edu

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on October, 2018, I caused to be filed PLAINTIFFS' OPPOSITION

TO DEFENDANTS' MOTIONS TO DISMISS with the Clerk of Court using the CM/ECF

system, which will send notice of the filing to all parties registered to receive such notices.

Dated:  October 10, 2018                    Signed:   _____ /s/*Jennifer Gross* _____
                                                                             Jennifer Gross