1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3

4     SIMON BRONNER, MICHAEL ROCKLAN,      )

5     CHARLES D. KUPFER, and MICHAEL L.  ) Civil Action No.

6     BARTON,                            ) 16-cv-00740-RC

7             Plaintiffs,                )

8          v.                            )

9     LISA DUGGAN, CURTIS MAREZ,         )

10    AVERY GORDON, NEFERTI TADIAR,      )

11    SUNAINA MAIRA, CHANDAN REDDY,      )

12    and THE AMERICAN STUDIES           )

13    ASSOCIATION,                       )

14             Defendants.               )

15    ----------------------------------)

16                    - - -

17             Wednesday, August 23, 2017

18                    - - -

19        30(b)(6) Deposition of The American Studies

20    Association, by and through its designee, JOHN

21    STEPHENS, PH.D., taken at the offices of Veritext

22    Legal Solutions, 1250 I Street Northwest, Washington,

23    D.C., beginning at 10:11 a.m., before Nancy J. Martin,

24    a Registered Merit Reporter, Certified Shorthand

25    Reporter.

1     and November 25, 2013?

2          A.  Yes.

3          Q.  Was -- is there any record of a deadline for

4     eligibility to vote prior to November 24, 25, 2013?

5               MR. SEAMAN:  Objection.  Scope.

6               THE WITNESS:  I didn't know, and no one knew,

7     actually, there would be a vote until November 25.

8     That is, the council had not decided to put it out for

9     a vote until November 25.  There had been no

10    discussion at the previous meetings about putting it

11    out for a vote.  That discussion took place at the

12    Sunday meeting.

13    BY MS. GROSS:

14         Q.  Is there any place in the bylaws that

15    accounts for suspending the provision in the bylaws

16    that says that membership is reactivated upon payment

17    of dues in arrears?

18              MR. SEAMAN:  Same objection.

19              THE WITNESS:  Not that I'm aware of.

20    BY MS. GROSS:

21         Q.  Okay.  Has this ever happened at any time

22    that you recall?

23         A.  No.

24         Q.  This is the only time that this kind of

25    action was taken?

1          A.  Well, we have had times when we've proposed

2     amendments to the constitution or the bylaws of the

3     association, and those have been placed on the end of

4     an election ballot where we elect officers, counselors

5     nominate committee members.

6          Q.  And with respect to that election, people can

7     pay dues in arrears the day of the election and vote;

8     correct?

9               MR. SEAMAN:  Scope.

10              THE WITNESS:  The people have -- the ballot

11    is issued, more or less, on January 15.  And the

12    closing date is March 1, and people can renew up to

13    March 1.  And assuming that their order is processed

14    by the back offices of the credit card processor and

15    the Johns Hopkins Press, then that person would be

16    eligible to vote on that day.

17    BY MS. GROSS:

18         Q.  And so the experience of members in the ASA

19    who, if they're procrastinators like me, who always do

20    things at the very last minute, the experience of

21    those people is that they can wait until a day before

22    an election, pay their dues, and vote?

23         A.  Yes.

24         Q.  And there was nothing warning anybody prior

25    to this election that "If you haven't already paid

1    your dues in arrears as of November 25, we're telling

2    you right now on November 25 you're not going to be

3    able to vote"?

4         A.   The way in which they --

5              MR. SEAMAN:  Can I have a standing objection

6    to this line?  This is a new line.

7              MS. GROSS:  I thought we had a standing

8    objection for the whole -- if it's about being outside

9    the issues, which I don't think I am -- you think I

10   am.  But I thought that we had a standing objection

11   with respect to being outside the 30(b)(6) issues.  If

12   not --

13             MR. SEAMAN:  Well, why don't you go back to

14   inside the scope of the notice.  So I'm just -- as you

15   change lines of questioning, I'm asking for standing

16   objections just to be fair.

17             MS. GROSS:  That's fine.  I'm going to ask

18   you to not make them speaking objections so that we

19   don't sit here all day.

20             MR. SEAMAN:  That's not a speaking objection.

21   I'm just objecting to the scope.  That's not a

22   speaking objection.

23             MS. GROSS:  So you can say, "object to

24   scope," and that takes three syllables.

25             MR. SEAMAN:  I'm trying to save time,

Page 153

1    actually, believe it or not, because I'm trying to

2    preserve a line of questioning that I consider to be

3    outside the scope.

4         MS. GROSS:  You're trying to save time by my

5    not asking the questions.  That doesn't save time on

6    my end.

7         MR. SEAMAN:  I'm not telling him not to

8    answer.  I'm trying to preserve the record.  That's

9    all.

10        MS. GROSS:  Okay.

11        Q.  I'm going to go back and ask you that

12   question again.

13        A.  It was a long question.  It seemed to be

14   several questions, like a compound question.

15        Q.  Oh, listen to your lawyerly terminology.

16        A.  Is that lawyerly?

17        Q.  Compound question.  If we were in trial, he

18   could have made that objection.

19        A.  I don't know.  That sounds like city council

20   meetings.

21        Q.  Okay.  I last asked you, and so the

22   experience of members in the ASA who, if like me,

23   procrastinate and do things like pay their bills at

24   the very last minute, their experience is that they

25   can pay their arrears the day before a vote and

1    they'll be able to vote?

2         A.   This is true, and it's true that all votes

3    previously were taking place during the winter.

4         Q.   But there had never been a situation before

5    where somebody would find out, before they had the

6    opportunity to pay their arrears, that they had

7    already missed the deadline to vote in an election?

8         A.   The only thing -- or the one thing that

9    would -- where this was stated or signaled was on the

10   election ballot itself, which said --

11        Q.   Which nobody got before November 25 because

12   there was no decision there was going to be a vote.

13        A.   Right.

14        Q.   So up to the day that they were already

15   banned from voting, they had no previous awareness

16   that if they didn't pay their dues on time, this vote

17   would happen and they would already be banned from

18   taking part?

19        A.   Well, no one would have known that because no

20   one knew there was going to be a support vote until

21   November 25.

22        Q.   But on November 25 when that group got

23   together and said, "We're going to do a support vote,"

24   they could have said, "So let's give folks five days

25   to get their money in arrears to pay up their debt so

1    that they can take part"?

2        A.   Yes.

3        Q.   But they didn't do that?

4        A.   No.

5        Q.   Okay.

6        A.   The ballot stated "Active members of the

7    association" --

8        Q.   But nobody got the ballot before it was too

9    late --

10       A.   No.  I'm just saying that's -- you're asking

11   me what the indication or the heads up might have

12   been, and that was the indication or the heads up.

13       Q.   Okay.  So to clarify, that heads up came

14   after it was too late to fix it?

15       A.   Could you rephrase that.

16       Q.   That heads up that you weren't going to be

17   able to vote came after it was too late for people to

18   pay their arrears and be able to vote?

19       A.   They froze the membership roster on

20   November 25.

21       Q.   With no warning?

22       A.   That was the board decided to freeze that --

23       Q.   I hear you.

24       A.   -- and they told me to instruct Johns Hopkins

25   to hold all orders for membership until the vote was

1    over.

2         Q.   And do you have records of that

3    communication?

4         A.   Either -- I don't have -- wait, yes.   But

5    it's not an E-mail record.   The instructions I sent

6    over to the associate director of the press asking him

7    to have his tech guy set up the ballot.   Along with

8    that I sent instructions to the board to freeze the

9    membership roster as of November 25.

10        Q.   Okay.

11        A.   So that meant that anybody who tried to

12   vote -- somebody could have gone in and placed an

13   order, and there were people that, on both sides of

14   the issue, that attempted to do so.   But their order

15   wasn't officially -- or wasn't supposed to be

16   officially recorded until December 15, or whichever

17   the final date of the vote was, the due date of a

18   ballot was.

19             MS. GROSS:   Okay.   So -- okay.   I lost my

20   real-time.   I'm not sure what happened.

21             MR. SEAMAN:   Would this be a good time to

22   take a break?

23             MS. GROSS:   Sure.

24             (A recess was taken from 2:19 p.m.

25              to 2:23 p.m.)

1          And he said that "We had a CSR, customer

2     service representative, that was not at the meeting

3     where we discussed these issues of who was eligible

4     and who wasn't."

5          And I said, "Okay.  So how should we handle

6     this?  What should we do?  I don't think that vote

7     should be counted."

8          And he said, "I agree with you."  And since

9     all votes are date stamped, we were able to identify

10    the voter and cancel the vote.

11        Q.  Okay.  Were you able to confirm that there

12    was only one other person?

13        A.  According to Johns Hopkins Press and its

14    spokesperson.

15        Q.  Okay.  Is there documentation of the

16    nominating committee's nominating process?

17        A.  There is documentation of the rules and

18    procedures that the nominating committee is expected

19    to follow.  There is a schedule of work that I issue

20    to the committee each year, and criteria that they're

21    given is primarily drawn from the bylaws.  I give them

22    deadlines, and they're instructed to select candidates

23    from active members of the association, and there are

24    guidelines there that this final slate, not

25    necessarily a final outcome, should reflect a

1    diversity of the association's membership and

2    diversity including standard affirmative action

3    definition, but also geographic -- the large research

4    institutions, small colleges, now even by employment

5    status.  So we have a position for adjunct and

6    contingent faculty on the committee.  So they get

7    these instructions that they're supposed to do, and

8    they're supposed to nominate the best, qualified

9    people for the particular positions.

10        Q.  How do they -- I mean you've got 4,000,

11   estimate, people and, you know, they need to pick two

12   people to run against each other for president.  Is

13   there any documentation of how that decision is made?

14        A.  They will get a membership roster.  They will

15   then install the members of the association that are

16   current members.  They're instructed to select

17   candidates from that list because those are the

18   members.  They're also advised that if they wish to

19   nominate someone who has been a member and has

20   forgotten that they are a member, as long as they

21   renew their membership and are eligible to serve, then

22   they might be considered.  So they get that.

23            They are advised to look -- if they want to

24   find out what service and offices people have held,

25   they can go to our website and look in the front

Page 201

1    section of our annual meeting programs going back to

2    1996, and it will list all the board and committee,

3    council members, et cetera, going back to that time.

4          The deliberations are held separate from the

5    staff.  They don't include me.  They don't include the

6    elected officers currently.  And they don't include

7    any other board members.  So it's an independent

8    nominating committee that works apart from the

9    appointed and elected officers and board members of

10   the association.

11          That doesn't mean that they don't talk or ask

12   questions or communicate, but they're not prohibited

13   from communicating; that is, the nominating committee

14   is not prohibited from communicating with the current

15   officers.  In fact, sometimes they're encouraged to

16   find out what the issues are that the association is

17   facing so that they can advise potential candidates

18   who have questions about what they're inheriting, what

19   that would be.

20   Q.  Is there --

21   A.  In other words, are you willing to run for

22   office --

23   Q.  When this is going on?

24   A.  "What do I have to do?  What is going on?  I

25   hear about this.  How much work is this?  What are the

1   things that the association is doing," and so forth.

2       Q.  If I was to tell you that from the year 2011

3   'til the present time every person slated to run for

4   president was a vocal if not heavily invested

5   supporter of BDS or USACBI, would that surprise you?

6       A.  Yes, because I can think of at least two

7   people who were very skeptical of this and --

8       Q.  Who ran for president within the past five

9   years?

10      A.  Oh, in the past five years?  Since 2013?  Is

11  that right with --

12      Q.  Remember, I don't have the most recent year.

13  So that's why --

14      A.  Are you starting with Curtis Marez?  Because

15  presidents before -- Matthew Jacobson was our

16  president in 2012 --

17      Q.  Yeah.  Yeah.  I'm starting with Curtis

18  Marez --

19      A.  Okay.

20      Q.  -- and the person he ran against.  Both

21  people slated for president that year.

22      A.  Okay.

23      Q.  Same with the next year, Lisa Duggan and the

24  person she ran against.  That was Avery; right?

25      A.  Okay.  I get those two.

1        Q.   And then the year after that as well.

2        A.   David Whitaker and David Eng.

3        Q.   Yes.

4             REPORTER MARTIN:  David what?

5             THE WITNESS:  Eng, E-n-g.  Okay.

6     BY MS. GROSS:

7        Q.   And then the year -- the one right now is

8     where I saw the trend end.

9        A.   Okay.

10       Q.   Otherwise, that's what I saw.  That doesn't

11    surprise you?

12       A.   I don't think either candidate this past

13    year --

14       Q.   I didn't notice anything this past year

15    there, to be perfectly honest.

16       A.   Well, it takes time to work things through.

17       Q.   So --

18       A.   A different nominating committee.

19       Q.   And how did the nominating committee members

20    become members of the nominating committee?

21       A.   Nominating committee nominates candidates for

22    president, for counsel and for nominating committee.

23       Q.   Right.  So there's a self-perpetuating issue

24    there, isn't there?

25       A.   Potentially, yes.

```
 1          MR. SEAMAN:  Objection.  Form.
 2     BY MS. GROSS:
 3          Q.  Okay.  Were any Jewish people nominated for
 4     president in those same years --
 5          A.  I don't know everyone's religion.
 6          Q.  Are you aware of anyone who you know is
 7     Jewish or that you would suspect to be Jewish?
 8          A.  Again, I don't know who -- I believe that
 9     there are Jewish members of the current board.
10          Q.  Of the board, yes, but of the people -- well,
11     I don't know.  But I'm speaking of the people
12     nominated to run for president.  What about executive
13     officers; right?  So that executive council, tell me
14     how that works.  You've got the president, the past
15     president, and the president elect?
16          A.  Right.
17          Q.  And then you've got some number of members
18     from the council who are appointed to be on the
19     executive board; is that right?
20          A.  From the council.
21          Q.  Right.  So some people are sort of elevated
22     from the council to also be on the executive board?
23          A.  Typically, on the basis of their willingness
24     to do the work.
25          Q.  Okay.  So that's -- who picks them?
```

1      A.  Well, the president will nominate -- what we

2   did -- what we've done in the past several years, past

3   two or three years is we've put out a call to the

4   current members of the council, and we've asked them

5   to self-nominate.  And then the president gets to

6   pick -- or the president elect gets to pick a person

7   who's in the cohort of which he or she was elected

8   president.

9      Q.  Say that again.

10      A.  So, in other words, if I'm elected president

11   in 2017 and there are five council members who are

12   elected in 2017, I get to pick one of the people who

13   is willing to do the work or volunteer to do the work.

14          The person who is the next president gets the

15   same privilege.  So of those five people nominated

16   that year -- and these are the regular members, not

17   the student or -- you know, we have two student

18   members or the international member.  They are the

19   at-large members.  So that's how it works internally.

20      Q.  I'm going to read to you the members of the

21   executive committee for the year 2013 through 2014.

22      A.  Okay.

23      Q.  Curtis Marez, I guess he was the current

24   president.  Lisa Duggan, president elect; Matthew Frye

25   Jacobson, former president; Karen Young, Chandan

1    Reddy, Nikali Palestine.

2          A.   Okay.

3          Q.   Are you aware of any of those people being

4    opposed or uncertain about the resolution?

5          A.   Yes.

6          Q.   Who?

7          A.   Nikali actually said to the executive

8    committee that they needed to proceed with the utmost

9    caution, that they were temporary custodians of the

10   association, and that they need to understand that

11   future incarnations of their body, the executive

12   committee or the council, may very well wish to act

13   differently, and they needed to respect their role,

14   which was a temporary one.

15         Q.   Okay.  So he's written publicly about

16   Palestine and Israel?

17         A.   Yes.

18         Q.   And you're aware of his view --

19         A.   Yes.

20         Q.   -- on the political issue?

21         A.   He said that the board meeting --

22              MR. SEAMAN:  I'm just going to interject.

23   Again, my continuing objection to this line.

24              THE WITNESS:  He said that the board needed

25   to put its responsibilities to the association first.

1    Whatever their judgment at the end would be, that that

2    should be their first order of business.  And he was

3    supported on that by two members, along with Matthew

4    Jacobson, at the May 2013 executive committee meeting.

5    He was supported by Priscilla Wold.

6    BY MS. GROSS:

7         Q.  Who was not a member of the May 2013 -- oh,

8    you're going to the previous year now.

9         A.  Yes.  Yes.

10        Q.  Oh.  Okay.

11        A.   And what I'm referring to is as the

12   resolution was first being presented.  Okay.  That was

13   presented, or the prospect of a resolution was being

14   discussed.  So Priscilla Wold agreed with Matthew

15   Jacobson and with Nikeel Singh that the board needed

16   to behave going forward as a board.

17        Q.  So that year, 2012 to 2013, which ends in

18   June of 2013 --

19        A.  Would have had two Jewish members of the

20   executive committee, two Jewish presidents.

21        Q.  -- and the fiscal year when the vote actually

22   took place, Matthew Frye Jacobson, he's still on it

23   because he's past president and you can't get rid of

24   him.

25        A.  Yes.

1        Q.   Everybody else --

2        A.   Was not.

3        Q.   -- and had open and known views about the

4    Palestinian question?

5        A.   I didn't know it at the time.  I do so now.

6        Q.   You do so now.  Not just because I'm saying

7    it, but you understand that now?

8        A.   Well, as I referred earlier in the -- I went

9    to that website, the US- --

10        Q.   USACBI?

11        A.   And I noticed a number of names I recognized.

12        Q.   Okay.

13        A.   But I didn't know this before.

14        Q.   And then if you were to look at the entire

15    council for that year, 2013 to 2014, I'm going to

16    leave out the international person and --

17        A.   The students.

18        Q.   -- the students.

19             Do the students vote?

20        A.   Yes.

21        Q.   Okay.  And their vote counts the same as a

22    nonstudent?

23        A.   Yes.

24        Q.   So we have Jennifer DeVere Brody, Ann

25    Sevetkavic.  I'm not sure if I'm pronouncing these

1    right.  Lisa Duggan, a defendant, Avery Gordon, a

2    defendant.  Matthew Frye Jacobson.  A. Patrick

3    Johnson.  Is that a student or --

4         A.  No.  He's a faculty member.

5         Q.  Okay.  We have Ms. Kehaulani Kauanui.

6         A.  Uh-huh.

7         Q.  And she's a founding member of USACBI; right?

8         A.  Okay.

9         Q.  Marisol LeBron.  She's a student.  Karen

10   Young.  Sunaina Maira, Martin Manlansin.  Is that a

11   student?

12        A.  No.  He's faculty.

13        Q.  Does he have public views that you're aware

14   of?

15        A.  No.

16        Q.  Curtis Marez.  Roya Rastegard, that's a

17   student.  Curtis, defendant.  Sunaina is a defendant.

18   Chandan Reddy, defendant.

19             REPORTER MARTIN:  Slow down, please.

20             MS. GROSS:  Sorry.

21        Q.  Chandan Reddy, C-h-a-n-d-a-n.  Juana Maria

22   Rodriguez?

23        A.  Right.

24        Q.  Maria Josefina Saldana-Portillo --

25             REPORTER MARTIN:  Maria what?

1          MS. GROSS:   Josefina Saldana-Portillo.

2     Q.   And Nikali Palestine.

3          So excluding the students and excluding the

4     international members, more than half of the members

5     of the National Council were not just people who

6     internally had a preference for the resolution but

7     were outspoken, hard-working advocates for USACBI and

8     for the boycott of Israel; correct?

9     A.   If -- I mean I recognize that now.  I didn't

10    know what people's views or affiliation, whatever.

11    Q.   Do you think that when people were voting to

12    make these members of the National Council, did they

13    know?

14    A.   I think you're asking did they state this in

15    the candidate statements?

16    Q.   Or -- well, I have the candidate statements.

17    So I know what they say there, but is there discussion

18    about this outside of the candidate statements because

19    the candidate statements don't say, "I am a founding

20    member of USACBI"?

21    A.   Okay.

22    Q.   None of them do.

23         So my question is how do people know that

24    both of the candidates that are up for president are

25    vocal advocates for this issue?

1      A.  Well, I wouldn't know that people were

2   founding members of USACBI unless they announced it.

3      Q.  Okay.  Or generally about they're strong

4   advocates for this position, which did you have some

5   sense of that running the administrative office?

6      A.  To be honest, I didn't know what BDS was

7   until May of 2013.

8      Q.  I think you're the only member of ASA who

9   feels that way.

10          MR. SEAMAN:  Object to the form.

11          THE WITNESS:  Well, I mean if you look at how

12   many people didn't vote and how many people did vote,

13   there's --

14   BY MS. GROSS:

15      Q.  Okay.  Do you think that there was a higher

16   turnout for the vote among people who wanted the

17   resolution as opposed to people who had no idea what

18   was going on or didn't want it?

19      A.  I'm sure.

20          MR. SEAMAN:  Object to form.

21   BY MS. GROSS:

22      Q.  Was your answer, "I'm sure"?

23      A.  I'm sorry?

24      Q.  Was your answer, "I'm sure"?

25      A.  I mean I would imagine that the people who

1    wanted to pass the resolution would have made every

2    effort to vote in favor of the resolution.  I mean

3    it's almost a truism.

4         Q.  And if you're an American studies professor

5    in Ohio who, you know, goes to the conference once

6    every five years if there's a particular paper you're

7    interested in, you may have no idea; is that right?

8              MR. SEAMAN:  Objection to form.

9              THE WITNESS:  I don't know how to answer

10   that.

11   BY MS. GROSS:

12        Q.  Okay.  Okay.  Did you find any documents in

13   your search related to USACBI?

14        A.  No.

15        Q.  No references to the term?

16        A.  No.

17        Q.  Okay.  Did you find materials pertaining to

18   the nomination of Yasbir Puar to the nominating

19   committee?

20        A.  No.

21        Q.  You didn't find a statement or anything?

22        A.  Only the candidate statement that I received

23   from her during the year she stood for election.

24        Q.  Okay.  Did you turn that over to counsel?

25        A.  That is in -- that is in the election

1    booklets that I have.

2         Q.  Okay.

3         A.  I think I turned it over.  I'm not --

4         Q.  Okay.

5         A.  No.  No.  What I did was I turned over the

6    URLs to those election booklets --

7         Q.  Okay.

8         A.  -- which are on a site that I verified as

9    still operating at the Johns Hopkins Press.

10        Q.  Okay.

11        A.  So the syntax will take you to the candidate

12   statements from the election of 2016, election of

13   Robert Warrior back to, I think the election of either

14   Kevin Gaines or Ruth Wilson Gilmore.

15        Q.  Okay.

16        A.  That was the 2009 and 2010, or 2008, 2009

17   elections.

18             MS. GROSS:  I dare say that I just need to

19   look over my notes to make sure I didn't miss

20   anything.  Actually, hold on.  I do need -- the rest

21   of this, I do have some left, but it's very quick, and

22   then you're going to be going home, which I'm sure

23   that you will appreciate.

24             THE WITNESS:  My dog will appreciate it.

25             MS. GROSS:  I will appreciate it.

1              (Pause in proceedings.)

2       BY MS. GROSS:

3           Q.  What kind of software is used for budgeting

4       and finances?

5           A.  Excel.

6           Q.  Okay.  No fancy, homemade --

7           A.  No.

8           Q.  -- or, you know --

9           A.  My budgets are typically based on precedent

10      and the end of the year financial statement, with

11      adjustments that -- for special projects, such as the

12      website build or the purchase of the encyclopedia --

13          Q.  Okay.

14          A.  -- where we're, in a sense, applying to

15      ourselves for a grant.

16          Q.  I hope you get it.  Is there any sort of

17      remote access to a network for people working --

18      including interns unpaid as well as only you paid

19      working at ASA?

20          A.  When we had a task force to produce the white

21      papers, the task force worked through Google docs, but

22      these were set up on a project-by-project or a

23      one-time basis.

24          Q.  Okay.  Was there one for resolution-related

25      issues?

1          A.   I don't believe so.

2          Q.   Would you check?

3          A.   No.   I don't have -- if there was one, it was

4     not one I had access to --

5          Q.   Okay.

6          A.   -- or knew existed because I think a lot of

7     that took place on Facebook or over E-mail, which I've

8     lost.

9          Q.   Who has an ASA E-mail address aside from you?

10          A.   No one.

11          Q.   All right.

12          A.   We had generic addresses to research, to

13     publications, to annual meetings, to newsletters, and

14     I have allowed my graduate assistants for the first

15     time to -- the way you can configure that is that even

16     though the newsletter address will say research at the

17     ASA.net, it will be the person's name and not the --

18     it will be the person's name, but the E-mail address

19     will still be research.   The way you can --

20          Q.   I think I know what you mean.

21          A.   It's when you set it up, you can assign a

22     user or a name to that particular E-address.   And two

23     people can share an E-mail address while working on --

24     staff, graduate students on the same project.   So

25     right now I have two people working on a conference.

1      So they can share an E-mail address.

2              MS. GROSS:  Okay.  That's clever.  If we can

3      take a short break so I can just look at my notes and

4      make sure I asked everything I meant to ask, but I

5      think that I'm largely finished.  So that's nice.

6              (A recess was taken from 3:43 p.m.

7              to 3:54 p.m.)

8              MS. GROSS:  Okay.  I just have one area I'd

9      like to go back to briefly, and then I'll be ready to

10     close.

11             Do you want to question and rehabilitate at

12     all?

13             MR. SEAMAN:  I think I'll have just one.

14             MS. GROSS:  Okay.

15        Q.   So, Mr. Stephens, a little while ago I had

16     asked you about the nominating committee and how they

17     go about making selections.  You noted that there is a

18     provision in the bylaws that requires that the

19     nominating committee reflect the diversity of the

20     membership.

21        A.   That the slate --

22        Q.   The slate.  Excuse me.  And that's --

23        A.   Not the results.

24        Q.   Let me say that question again so that in the

25     transcript we have an excerpt of it being properly

1      asked.

2              You mentioned previously that there's a

3      provision in the bylaws that requires that the slate

4      of candidates for office set out by the nominating

5      committee reflect the diversity of the membership.

6          A.   That's correct.

7          Q.   In your time at the ASA, do you have a

8      recollection of that bylaw being enforced?

9          A.   Yes.

10         Q.   Can you tell me about that.

11         A.   Very often the slates do reflect the

12     diversity of the association along the criteria that

13     are expressed.  However, the results of the election

14     are often -- more often skewed toward the research

15     institutions and people who have a record of

16     publication or have a public persona that's well known

17     to the voters.

18             So unless, as we did this past year, we pair

19     adjunct contingent faculty, we would not succeed in

20     getting an adjunct contingent faculty person elected

21     to the board in an at-large election.

22         Q.   Okay.  So that, I understand.  You set aside,

23     or the ASA sets aside a position that would only be

24     filled by an adjunct or a contingent?

25         A.   In that particular --

1          Q.   In that particular -- okay.

2          A.   And when the elections are for the at-large

3     seats, there's considerable bias towards people who

4     are well known, who are well published, or who in some

5     way are popular or who are, as I said, at a research

6     institution where a graduate school may exist.

7          Q.   Can you name a research institution or two so

8     I have a better --

9          A.   UCLA is a research -- one institution.

10    Notre Dame is a research one, NYU, Harvard.

11         Q.   So when was this incident when there was an

12    issue, a question of whether or not the slate was

13    diverse?

14         A.   It wasn't so much an incident.  It was after

15    the election when the results come in and people say,

16    "Well, you had this slate, but you wound it up with

17    the same outcome.  You're basically -- you don't have

18    people who are -- whose primary purpose is teaching,"

19    or "You don't have people who are of a particular

20    age."  It used to be people of a particular

21    demographic.  Diversity was a very strong issue.  In

22    the '80's it had to do with gender, or in particular

23    it was sex.

24         Q.   So, first of all, what year was it, or

25    approximately, when the positions set aside for an

1    adjunct or contingency --

2         A.   This year was the first year, after receiving

3    several years of complaints, that that voice wasn't

4    recognized.   That's kind of a blow-back from 2008

5    because contingency is the No. 1 issue in the academy

6    right now.

7         Q.   What is "contingency"?

8              People who hold part-time jobs at three or

9    four institutions without benefits and get paid on a

10   per-course basis and don't have a regular salary.

11             REPORTER MARTIN:   And don't have a regular

12   salary?

13             THE WITNESS:   And don't have a regular

14   salary.

15             You're paid by the course.   So you can wind

16   up teaching a full course load, say four or five

17   courses for $28,000 a year.   70 percent of the

18   positions in universities now are contingent or

19   nontenurable.

20   BY MS. GROSS:

21        Q.   Okay.   So you would agree with me that

22   contingency in your employment or being an adjunct

23   professor is not a category that is watched and

24   enforced by the EEOC?

25        A.   Right.

1          Q.   It's not religion, race, nationality, gender;

2     right?

3          A.   Right.

4          Q.   And yet it is an issue with respect to

5     diversity among the membership at ASA that there was a

6     change made to ensure that that type of diversity was

7     reflected?

8          A.   Yes.   And the reason is that somewhere in the

9     area of 50 to 60 percent of our membership is in that

10    category, and there's no one who actually wears

11    that -- was wearing that suit or outfit that was --

12    that had a voice on the board.

13         Q.   50 or 60 percent of --

14         A.   Are either graduate students or contingent or

15    part time or nontenurable -- you know, nontenurable

16    faculty; that is, they hold lines that they will

17    never -- that will never result in tenure.

18         Q.   How long has that been such a large

19    proportion?

20         A.   It began in a huge way in 2008 with the

21    recession, and it's been reported on extensively, even

22    in the mainstream press like the New York Times or The

23    Post as the No. 1 phenomenon within the economics of

24    higher education.   So if you send your child to Yale,

25    the odds are very, very good that you won't meet a