# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SIMON BRONNER, et al.,

     Plaintiffs,

                                       Case No: 1:16-cv-00740-RC

v.

LISA DUGGAN, et al.,

     Defendants.

---

## REPLY OF DEFENDANTS AMERICAN STUDIES ASSOCIATION, LISA DUGGAN, SUNAINA MAIRA, CURTIS MAREZ, NEFERTI TADIAR, CHANDAN REDDY AND JOHN STEPHENS TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

The question to be answered is straightforward - have the Plaintiffs overcome the strong presumption against federal jurisdiction by demonstrating that they have suffered, individually, $ 75,000 in damages or that the injunctive relief sought (invalidation of the Resolution) would cost the ASA $ 75,000?  Once the smoke in Plaintiffs' brief has cleared, it is manifest that they have not borne their burden.

The central issue before the Court on the Defendants' Motions to Dismiss is jurisdiction, yet the Plaintiffs' argument in opposition is constructed upon decisions that concern standing in Superior Court - primarily *Daley v. Alpha Kappa Sorority, Inc.*, 26 A.3d 723 (D.C. 2011) and *Jackson v. George*, 146 A.3d 405 (2016). Neither case has anything to do with federal subject matter jurisdiction.

1

Their reliance on these decisions misses the point by conflating standing with subject matter jurisdiction, or by arguing that one is equivalent to the other.   This is pivotal because -- as the Court noted in its Opinion of July 6, 2018 -- the Plaintiffs have still made no effort to identify any damages they have suffered and which might meet the jurisdictional threshold of this Court. Plaintiffs sidestep that important issue and instead seek to maintain this action on the basis that the alleged damages *to the entity* are of sufficient amount to establish jurisdiction.   But *Daley* and *Jackson* do not stand for or support such a position. Plaintiffs' jurisdictional argument –- and thus this federal action -- accordingly collapses.

Separate and apart from that collapse, they have not adequately explained why most of their claims would nonetheless fail on substantive legal grounds. The new claims set forth in the SAC are all subject to dismissal, independent of the jurisdictional argument.   Count One (Breach of Fiduciary Duty / Material Misrepresentations) falls because, as the Plaintiffs concede, they did not rely upon the alleged representations of the Defendants. The acts alleged in Counts Three, Four and Five were not *ultra vires*, and thus those Counts should be dismissed. Count Nine (Waste) fails for reasons previously set forth in the pending Motion for Partial Judgment on the Pleadings [Document 35] – a claim for corporate waste can only be maintained derivatively, unless the individual plaintiff can show an injury to himself distinct from that to the corporation; Plaintiffs are unable to do so.

### A.   Plaintiffs Cannot Show that this Court Has Subject-Matter Jurisdiction

#### 1.   The Key Issue is the Quantum of Damages, Not Standing

It is clear from the additional allegations in the SAC that all of the damages that Plaintiffs are seeking belong to the Association, not to the Plaintiffs individually.   Such claims, therefore, are derivative in nature, and barred here as a matter of law.    Still, Plaintiffs maintain, with obstinacy, that "whether a claim that alleges damage to a corporation can be brought directly is a question of standing, not a question of jurisdiction."   (Opposition at 34).   This is incorrect.   Where a case is in federal court on diversity grounds, it is not enough merely to have standing to bring a claim: the plaintiff must also demonstrate sufficient damages to meet the jurisdictional threshold. The Plaintiffs have erroneously suggested that their standing to bring claims in this case is coextensive with an ability to recover damages allegedly suffered by the American Studies Association.    The issue is, in fact, jurisdictional because if Plaintiffs cannot rely upon damages to the corporate entity to meet the federal jurisdictional threshold, they cannot meet the necessary threshold.

Plaintiffs' reliance on *Daley* and *Jackson*, which address the question of standing in the Superior Court on the basis of individualized damages suffered by the plaintiffs, is misplaced in this argument about subject matter jurisdiction in federal court.   They interpret those cases too broadly, and they gloss over significant and substantial differences between those two cases and the one before this Court.   In *Daley*, the Court of Appeals permitted individual sorority members' claims to continue against the sorority and its directors, noting that the "individual rights of the plaintiffs were

affected by the alleged failure to follow the dictates of the constitution and the by-laws and they thus had a 'direct personal interest' in the cause of action."  (*supra* 26 A.3d at 729, *citing Tooley v. Donaldson, Lufkin & Jenrette*, 845 A.2d 1031, 1036 (Del. 2004)). As to *Jackson*, the rationale was the same, and the *Jackson* court cited *Daley* in that regard. Neither *Daley* nor *Jackson* addressed the particular question before this Court: whether the plaintiffs could claim, as the basis of federal subject matter jurisdiction, injuries other than those to the individual plaintiffs.  Defendants respectfully submit that there is a wide gap between the issue of "standing" to survive a motion to dismiss for lack of injury in Superior Court and the issue of quantum of damages that an individual plaintiff may claim for federal jurisdictional purposes.  Plaintiffs have not addressed that issue, understandably.  But a careful reading of those cases, including a review of the decisions relied upon by the *Daley* and *Jackson* courts, reveals that the Plaintiffs cannot rely upon *Daley* and *Jackson* as a bridge to federal subject matter jurisdiction.

As noted above, the *Daley* Court cited with approval *Tooley*, *supra*.  In *Tooley*, the court made clear the distinction between a claim personal to the individual plaintiff and that belonging to the entity.

> "We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)? . . . a court should look to the nature of the wrong and to whom the relief should go."

*Tooley*, 845 A.2d 1031, 1033, 1039 (Del. 2003).  Relying on this formulation, the *Daley* Court found that where the individuals claimed that their dues payments had been

misspent, and their personal memberships had been terminated in retaliation, they had sufficient individual injuries to create standing to sue.  *See also Family Federation for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 244 (D.C. 2015) (An "important exception" lies "where an individual seeking enforcement … has a special interest distinguishable from the public at large.") (internal quotations omitted).

Each of the cases relied on by the *Daley* Court, moreover, involved an individual injury.  *See Blodgett v. University Club*, 930 A.2d 210 (D.C. 2007) (member expelled from private club); *Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop Ass'n*, 441 A.2d 956 (D.C. 1982) (cooperative association damaged by the developer's breach of fiduciary duty); *Willens v. 2720 Wisconsin Ave. Coop Association*, 844 A.2d 1126 (D.C. 2004) (individual member had standing to sue when the indebtedness of his neighbors on a special assessment was cancelled, but his was not).  In *Waller v. Waller*, 49 A.2d 449 (Md. 1946), also cited in *Daley*, the Maryland Court of Appeals explained the rationale behind the derivative action and the requirement that the claims be first presented to the entity's leadership.  The *Waller* court allowed, however, that a stockholder could maintain an action for "violations of duty arising from contract or otherwise owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation."  *Waller*, 49 A.2d at 453.  To demonstrate this principle, the *Waller* court cited a Pennsylvania case in which it had been held that "a stockholder could bring suit against the officers of the corporation for defrauding him of his patents, royalties, and other property, because the gravamen of his complaint was

not the damage to the corporation or its stockholders in general but to himself personally." *Id.*

Although the court in *Jackson v. George*, 146 A.3d 405 (D.C. 2016) offered less analysis of the issue, it is clear that it based its decision regarding the plaintiffs' ability to proceed on the ruling in *Daley.* In that regard it is important that the *Jackson* plaintiffs claimed that the defendants had breached their fiduciary duties as officers of a church; plaintiffs claimed that their individual tithes and offerings had been misused, and that they had been individually barred from church property and facilities and from attending church services.   These were injuries "particularized to [plaintiffs]" and thus did not require a demand on the corporation.   *Jackson,* 146 A.2d at 415.

In both of these cases, the plaintiffs had alleged specific individual damages that they had suffered because of the alleged breaches by the non-profit corporation, and were determined for that reason to have standing to maintain an action in the Superior Court of the District of Columbia.   In its Memorandum Opinion [Document 80], this Court, referencing *Daley* and *Jackson*, wrote that "[t]he claims that Plaintiffs seek to assert sound in breaches of fiduciary duty, breaches of contract, and *ultra vires* actions, which the D.C. Court of Appeals has suggested may be asserted directly by shareholders and members of non-profit organizations under certain circumstances." Defendants respectfully suggest that the existence of individualized damages constituted the "certain circumstances" under which such claims could be made.

By contrast, in the instant case, Plaintiffs have alleged no individual damages, no special interest which they hold apart from and independent of the corporation.   On the

contrary: as described in full in the Motion (at 5 – 6), with the exception of Count Eight of the SAC (which seeks unstated damages incurred by Mr. Barton for exclusion of his vote on the Resolution), all of the Plaintiffs' claims for relief seek either injunctive relief or "damages ... incurred by the Association."   Plaintiffs cannot even claim that the dues that they pay into the Association's coffers has been misspent: Plaintiffs Bronner and Rockland are "honorary lifetime members" (SAC, ¶¶ 14, 15) and therefore presumably do not pay yearly dues.  Plaintiff Kupfer allowed his membership in ASA to lapse after 2014, so he does not pay any dues after that point, either (Id., ¶ 17).   The Plaintiffs here simply do not fit into the *Daley/Jackson* framework.

Finally, Plaintiffs cite to *In re G-I Holdings, Inc.*, 755 F.3d 195 (3rd Cir. 2014) for authority that the concept of a "derivative action" does not apply to non-profit corporations.  Their reliance is misplaced, because that was not a derivative action case. In *G-I Holdings*, a group of asbestos producers created a "Center for Claims Resolution" to coordinate and administer any and all payouts for asbestos-related litigation.  When one of those Members (G-I) failed to pay its share of settlements and expenses, individual Members were left to cover some of the shortfall.   They then sought reimbursement of these payments.  The Court of Appeals stated that

> "The Former Members and G-I are in contractual privity with one another but *not* with the Center via the Producer Agreement.   It seems illogical to inquire whether one contract signatory's breach of contract claim against another signatory is derivative of a non-signatory's claim.  While the Center was granted rights under the Producer Agreement, this does not make the Former Members' claims derivative. Once the Former Members were required to make additional

> payments to cover the shortfall … [they] suffered damages
> and had a straightforward breach of contract claim."
> 755 F.3d at 207.

The cause of action in *G-I Holdings* was a breach of contract action between individual members, not a claim on behalf of, or against, the member organization.  This case has no bearing here.

It is therefore not accurate to claim that there is no distinction between derivative or direct claims against a non-profit corporation.  Rather, the *Daley* and *Jackson* courts recognized that members of a non-profit organization may suffer individual injuries other than the typical monetary losses which could befall the shareholders of a for-profit corporation, and would thus have standing to maintain an action (*G-I*, by contrast, relies on the fact that individual members were bringing a breach of contract action against another member, and not derivative claims on behalf of the corporation).  Indeed, the D.C. Code specifically envisions derivative claims on behalf of a non-profit corporation.  *See* D.C. Code § 29-411.01 *et seq*.[1]  Plaintiffs' strained interpretation would render the laws governing derivative claims meaningless.   Were members of a non-profit organization able in all circumstances to claim damages suffered by the organization as a *direct* claim, there would be no need for these provisions in the Code.

Another fundamental weakness of Plaintiffs' reliance on *Daley* and *Jackson* is that their arguments entirely overlook the critical issue of choice of forum.  It is true that in neither *Daley* nor *Jackson* was there any discussion of the value of the plaintiffs'

---

[1]   "For the purposes of this subchapter, the term 'derivative proceeding' means a civil action in the right of a domestic nonprofit corporation or, to the extent provided in § 29-411.08, in the right of a foreign nonprofit corporation."

individual claims.   Those cases, however, were brought in the Superior Court for the District of Columbia, then appealed to the Court of Appeals for the District of Columbia.   But neither of these courts has a jurisdictional threshold amount greater than $500; thus, it was irrelevant what the value of the injunctive or declaratory relief sought might have been.   Too, neither opinion parses which of the damages claimed by the plaintiffs might be derivative rather than direct; once it was determined that the plaintiffs had standing, their claims could continue, to one degree or another.   Had Plaintiffs here timely brought the action in Superior Court, their individual claims for relief, no matter how insignificant in monetary value, might have been allowed to continue.   In this Court, however, they must demonstrate individual damages above the jurisdictional threshold.

### 2.   Plaintiffs' Other Jurisdictional Arguments Are Unavailing

In addition to their erroneous argument on standing, Plaintiffs make two other attacks on the argument that this Court lacks subject-matter jurisdiction.   The first is to suggest that, because the Court previously ruled that the Plaintiffs had met the amount-in-controversy requirement, it should not revisit that issue. *See* Opposition at pp. 30-33. On the contrary: not only is the issue of subject matter jurisdiction always before the Court, but this precise question was left open.  In its July 6, 2018 Memorandum Opinion [Document 94], the Court noted that, despite their claims of "significant economic and reputational damage," Plaintiffs had made "no attempt to explain how they have individually suffered more than $75,000 in damages, or why complying with an

injunction would cost the ASA more than that amount." Memorandum Opinion, p. 7

n.2.   The Court continued:

> It may be true as a matter of law that Plaintiffs' refashioned
> complaint cannot seek damages on behalf of the ASA, but
> that argument should be raised in a well-fashioned motion
> to dismiss or for summary judgment.

Memorandum Opinion [Document 94], p. 9 n. 5.   The Defendants accordingly have

submitted the pending Motion.

Plaintiffs' second attack asserts that they seek equitable relief, and that "claims

for injunctive and declaratory relief do not seek individual damages." (Opposition at

34).   This, in general, is a true statement, but it misses the point.   As the Court has

already noted, equitable remedies such as injunctive or declaratory relief are alternative

remedies for which a pecuniary interest over $ 75,000 must be demonstrated.   *See, e.g.*,

*Animal Legal Defense Fund v. Hormel Food Corp.*, 249 F. Supp.3d 53 (D.D.C. 2017).   In other

words, in order to meet the jurisdictional threshold, Plaintiffs must demonstrate that the

equitable relief they seek has a comparable worth greater than $ 75,000.     In each of the

cases cited by Plaintiffs here (Opposition at pp. 38 – 9), the prospective costs of the

equitable relief was clearly greater than the jurisdictional threshold.   *See Busby v. Capital*

*One N.A.*, 932 F.Supp.2d 114 (D.D.C. 2013) (plaintiff sought cancellation of a mortgage

debt greater than $ 130,000); *Geo Specialty Chems, Inc. v. Husisian*, 951 F.Supp.2d 32

(D.D.C. 2013) (plaintiff sought to enjoin both the disclosure of its trade secrets affecting

global tariffs on glycine and the continued representation by plaintiff's former counsel

of plaintiff's competitors); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977)

(plaintiff challenged a North Carolina statute that affected all the apple growers in Washington State); *Smith v. Washington*, 593 F.2d 1097 (D.C. Cir. 1978) (prisoner contentions that they had been routinely subjected to overcrowded and vermin-infested cells, as well as a deprivation of library and other privileges, because of their homosexuality showed an amount in controversy above the jurisdictional threshold); *Info Strategies, Inc. v. Dumosch*, 13 F.Supp.3d 135 (D.D.C. 2014) (plaintiff sought to protect a series of contractual rights, including non-compete provisions, which affected millions of dollars of plaintiff's income).

By contrast, the equitable relief requested in the SAC consists of an order declaring that the vote on the Resolution was *ultra vires*; declaring that the Defendants breached fiduciary duties owed to the ASA and its members; enjoining "any action that does not strictly follow the statement of purpose set forth in the [ASA] Constitution; enjoining any action to enforce the Resolution; and enjoining the ASA from "making any payments or expenditures in violation of the [ASA] Constitution, including support of the Israel Boycott."   As Defendants have already demonstrated, a court order reversing the vote on the Resolution would have zero cost.  And even if a new vote were to be held—which the Plaintiffs have not requested—there would be very little cost to the Association.   The prospective costs of that injunctive relief is, at best, *de minimis*; it cannot help Plaintiffs reach the threshold for subject-matter jurisdiction.

3.      The Plaintiffs Utterly Fail to Establish the Jurisdictional Minimum.

Plaintiffs have the obligation to set forth sufficient facts to support any finding that subject matter jurisdiction exists, and that their damages exceed $ 75,000. Where a

defendant has challenged a plaintiff's allegations concerning the jurisdictional amount – even an allegation that is sufficient from a pleading standpoint —"a factual issue emerges and the burden of establishing jurisdictional amount is thrust upon the claimant." *Gomez v. Wilson*, 477 F.2d 411, 420 (D.C. Cir. 1973); *see also Watkins v. Pepco Energy*, 2005 U.S. Dist. Lexis 16930, *6 (D.D.C. 2005) (dismissing for lack of jurisdiction); *Khadr v. United States*, 381 529 F.3d 1112 (2008) (affirming dismissal on motion for failure to establish subject matter jurisdiction).

The authority relied upon by Plaintiffs does allow for a claim by an individual member against a non-profit organization, but says nothing about the amount of damages that might be claimed.   Thus, Plaintiffs could have decided to bring suit in the Superior Court for the District of Columbia: *Daley* and *Jackson* suggest so.   Plaintiffs, needless to say, did not file their complaint in that forum, but chose instead this federal tribunal, where the law requires that they set forth sufficient facts to bring their damages above the jurisdictional threshold. Indeed, this requirement was highlighted by the Court when it noted that Plaintiffs had made "no attempt to explain how they have individually suffered more than $75,000 in damages, or why complying with an injunction would cost the ASA more than that amount."   July 6, 2018 Memorandum Opinion [Document 94], p. 7 n.2.   The sole attempt by Plaintiffs to address the individual damages in their entire 40-page brief comes in a one sentence footnote, with no support provided whatsoever:   "Plaintiffs did indeed allege individual damages." Fn 21, at 34.   As is clear by reading the SAC, they did not.

Thus, finally, we are brought to the $ 75,000 question: is there anything in the SAC that would indicate that Plaintiffs would be able to legally recover more than the Court's jurisdictional threshold were this case allowed to continue?   As Defendants have already argued – and as Plaintiffs have failed to counter, notwithstanding their impassioned rhetoric – the answer to this question must be in the negative.   Plaintiffs cannot claim that *their* dues were misspent, since the majority of them don't pay dues (and, even if they did, the annual dues are only $155 per Plaintiff).   Plaintiffs cannot demonstrate that the equitable relief they seek has any monetary value, for it would cost either nothing or next to nothing to nullify the Resolution or to schedule a new vote.   Plaintiffs have not even *alleged* that they have suffered any economic, reputational, or emotional damages.   The entirety of the damages that they seek was allegedly incurred by the Association, and any award at trial would inure to the benefit of the Association, not to the individual Plaintiffs.   That, in the end, is the definition of a derivative claim, which has already been foreclosed.   As argued in the Motion, and discussed above, Plaintiffs cannot legally recover any damages in excess of $ 75,000. Accordingly, this case must be dismissed for lack of subject matter jurisdiction.   28 U.S.C. §1332(b).

**B.      The Claims for Waste, Breach of Fiduciary Duty, And *Ultra Vires* Must Fail As a Matter of Law**

The lack of subject matter jurisdiction dooms the Second Amended Complaint. Nonetheless, there are independent substantive reasons why the claims for waste,

breach of fiduciary duty and the allegedly "*ultra vires*" acts (Counts Three, Four and Five of the SAC) fail.

### 1.     The Actions Alleged Were Not *Ultra Vires*

The Opposition repeats Plaintiffs' mantra that "a member of an organization may directly sue that organization to enjoin actions that the organization did not have the power to execute."  Opposition at 13.  But the pivotal issue here is whether the subject actions directly contradicted a statute or a bylaw of the organization. Whether the organization had acted differently in the past, or whether Plaintiffs believe it should have acted differently in this instance is entirely irrelevant: if there is no express provision prohibiting the action, it cannot be *ultra vires*.  *See, e.g., Daley*, 26 A.3d at 730.

### a.     *Count Three / "Lack of Diversity"*

Plaintiffs seek to avoid dismissal of Count Three in two ways: first, by diverting the Court's attention from the plain definition of "diversity" set out in the ASA's governing documents; second, by referring to deposition testimony of Director John Stephens, in which he explained that the ASA has sought to ensure that adjunct and non-tenured academics are adequately represented within the ASA.

For a corporate action to be *ultra vires*, it must be expressly prohibited by either statute or by-law.  It matters little whether the organization had acted differently in the past, or whether Plaintiffs believe it should have acted differently in this instance: if there is no express provision prohibiting the action, it cannot be *ultra vires*.  *See, e.g., Welsh v. McNeil*, 162 A.3d 135, 150 n. 43 (D.C. 2017).

Plaintiffs are unable to prop up Count Three, which is based on the imagined requirement that the Nominating Committee must balance the Council's views on global political issues in order to promote "diversity."  As Defendants have argued, that "diversity" is later referred to in the Bylaws of the ASA as "a balance of age, racial, ethnic, regional, and gender participation."  Rather than confront the obvious point – that a candidate's position on Israeli/Palestinian relations is not the type of "diversity" addressed in the ASA governing documents -- the Opposition harps on the fact that the Nominating Council is described in Article VI, § 2 of the ASA Constitution, while the Motion to Dismiss (at 16) quotes from the Bylaws, Article VII, § 4.  Though these are different provisions of the entity's governing documents, they nonetheless must be read as a whole, and must follow what a reasonable person would think the words mean. *See BSA 77 P ST. LLC v. Hawkins*, 983 A.2d 988, 993 (D.C. 2009).  The governing documents provide, in Bylaw Article VII, §4, a definition of "diversity."

Plaintiffs' reliance on Dr. Stephens's testimony is equally unavailing.  Given the different types of academics that make up the ASA membership – from graduate students to senior, tenured professors – it is logical that ASA has endeavored to ensure that the leadership of the ASA includes non-tenured teachers as well as tenured researchers.  It is grossly illogical, however, to assume that this translates to a discrete issue in geopolitics.

No reasonable person could read the phrase "diversity of the association's membership" as Plaintiffs now claim.  This proscription was intended to capture the numerous differences in the membership – differences in gender, age, national origin,

religious belief, sexual orientation, professional development and academic philosophy. It is hardly reasonable to assert that the term expressly refers to a single issue in international relations.

In the end, there is no express prohibition in any of ASA's governing documents that requires the Nominating Committee to take into account pro-Israel or pro-Palestinian viewpoints in order to maintain diversity – any more than the Committee would have to consider the candidates' views on the abortion debate or international trade.   Where there is no express provision, the action cannot be *ultra vires*.   Count Three should be dismissed.

> b.    *Count Four / "Freezing" Voter Roll*

Plaintiffs' argument in support of Count Four, distilled, is that as to a person who has allowed his membership in the ASA lapse, ASA has some obligation to provide notice of an upcoming vote on an ASA matter.  Plaintiffs offer no citation to any governing document or statute to support this position.

It should also be noted that the voting rolls were "frozen" on November 25, 2013 (SAC, ¶ 123).   The vote on the Resolution was held "during a ten-day period in December 2013" (*id.*, ¶ 139), but Mr. Barton did not pay his dues and bring himself back into good standing until "December 2013" (*id.*, ¶ 131).   Given that he didn't pay his dues until the month after the rolls were closed, it is difficult to see how he, personally,

could have been targeted (*c.f.* ¶ 132), or how the Board's actions violated any specific provision of the governing documents.[2]

Plaintiffs attempt to build an argument from Dr. Stephens' testimony about the decision to limit voting to current members of the ASA, but Dr. Stephens' testimony does not constitute an "express prohibition by a statute or bylaw" of the alleged acts. *Daley*, 26 A.3d at 730.[3]

Because Count Four does not identify an *ultra vires* act, it should be dismissed.

     c.    *Count Five / "Efforts to Influence Legislation"*

The Plaintiffs claim at County Five that efforts by the ASA to lobby against anti-boycott laws were *ultra vires*.[4]   Again, the alleged actions are not barred by the Constitution or bylaws.[5]

---

[2]    This same reasoning compels dismissal of Professor Barton's individual claim for "breach of contract" based on the closure of the voting rolls (Count Eight).

[3]    Plaintiffs apparently don't consider that, by "freezing" the voting pool as of the date of the announcement of the vote, would-be pro-Resolution voters were also prevented from joining simply to vote *in favor* of the Resolution.

[4]    In this regard, the Defendants do not concede that the actions of members of the National Council constituted official action of the ASA. The arguments made herein are based upon the standards set forth in Rule 12, and thus the Plaintiff's allegation of official action by ASA is assumed *arguendo*.

[5]    In fact, the Bylaws of the ASA as they existed at the time of the Resolution included the following provisions:

    Sec. 1. The Executive Committee is empowered to speak for the association on public issues where these directly affect our work as scholars and teachers. Such issues include, but are not restricted to, academic freedom; freedom of access to information; appointments to and policies of granting and funding agencies.

As for whether the alleged actions of the ASA regarding legislation affect its status under the Tax Code, this is not the proper forum for determination of that issue. *See* 26 U.S.C. § 7428.   But even if the Court were to address the matter directly, the "self-defense" exception to the prohibition against legislative activity defeats Plaintiffs' claims to the contrary.

Plaintiffs correctly note in their Opposition that the ASA did not elect to report under 26 U.S.C. §501(h). But the basic, common-sense concept that a non-profit entity should be permitted to defend itself is also articulated elsewhere in the Tax Code.  I.R.C. §4945, which concerns the taxability of payments to private foundations, defines as taxable expenditures those made to "carry on propaganda, or otherwise to attempt, to influence legislation." 26 U.S.C. §4945(d).   Echoing the language of 26 U.S.C. §501(h), §4945 exempts from the definition of taxable expenditures any that are made

> "in connection with an appearance before, or communication to, any legislative body with respect to a possible decision of such body which might affect the existence of the private foundation, its powers and duties, its tax-exempt status, or the deduction of contributions to such foundation.

26 U.S.C. § 4945 (e)(2).[6]

The IRS has indicated that it considers § 4945(e)(2) applicable to § 501(c)(3) organizations. *See* IRS General Counsel Memorandum 34289 (**Exhibit A** hereto). General Counsel, addressing the question of whether appearance before a legislative body at the invitation of the body constituted "carrying on propaganda or otherwise attempting to influence legislation" concluded, *inter alia*, as follows:

---

[6]        See SAC, ¶¶ 153, - 158.

Although the above-cited statutory provision is found in Code section 4945(e) and not in section 501(c)(3), we believe a similar exception exists with respect to this latter code section, both as an inherent exception to the statutory prohibition regarding "attempts" to influence legislation and by virtue of its relationship to section 4945(e) . . .

. . . we believe it apparent that this exception in section 4945(e) for appearances regarding matters which might affect the very existence of the organization was not regarded by either Congress or the Treasury Department as a substantive change in the types of legislative activities authorized by the statute but as a specific codification, by way of definition, of the existing law under section 501(c)(3).

*See also Description of Present-Law Rules Relating to Political and Other Activities of Organizations Described in Section 501(c)(3) and Proposals Regarding Churches*, Joint Committee on Taxation, May 14, 2002, p. 9 fn. 35 (noting that "the IRS has stated that the section 4945 definitions and exceptions apply to section 501(c)(3)," and citing GCM 34289).

For the preceding reasons Count Five must be dismissed for failure to state a cause of action for *ultra vires* acts.

> d.    *Without Reliance, the Breach of Fiduciary Duty Based on Fraud (Count I) Must Be Dismissed.*

Count One claims breach of fiduciary for "material misrepresentations and omissions in connection with elections to office" – again, stripped of the *ad hominem* attacks, Plaintiffs argue that the failure to disclose that the 2012 and 2013 candidates for National Council were members of USACBI misled the voting members, and thus constituted a breach of fiduciary duty.   Their sole argument is that such a claim does not require any showing of reliance on the alleged misrepresentation.   As with their other arguments, this assertion misses the point.

It is elementary that a director has the fiduciary duty to avoid misrepresentations of material fact.  To that extent, at least, Plaintiff's reliance on *Malone v. Bincat*, 722 A.2d 5 (Del. 1998) is sound.  Otherwise, *Malone* is inapposite.  In that case, the minority shareholders claimed that that the company directors had made false statements in SEC filings and to its shareholders.  The essence of the *Malone* plaintiff's claim was that the statements greatly overvalued the shares, and thus that he would have sold his shares had he known of the true value.  The *Malone* Court reasonably presumed that where the issue is the value of one's investment, it is almost a given that any statement regarding the company's worth is a material representation.    Thus did the Court note, in *dicta*, that "[a]n action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the elements of reliance, causation and actual quantifiable monetary damages." *Malone*, 722 A.2d at 12.

By contrast, this is not a shareholder action, and Plaintiffs here are not claiming loss of value of their shares.  The only misrepresentation alleged in Count I is the political leanings of the candidates put forward for election to the National Council.  In order for an omission of this information to be material, it must be data upon which the Plaintiffs would reasonably rely.  Without a showing of reliance, Plaintiffs cannot show either that they were misled, or that the information about the geopolitical leanings of the various candidates could be at all material.

Contrary to Plaintiffs' position, there is a long line of cases holding that reliance is a necessary element in breach of fiduciary claims that involve misrepresentation.  The Third Circuit has long held that, to establish a breach of fiduciary duty under ERISA,

plaintiffs "must demonstrate that" they "detrimentally relied on the misrepresentation or inadequate disclosure." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009); *see also*, *e.g.*, *Shook v. Avaya Inc.*, 625 F.3d 69, 73 (3d Cir. 2010) ("In order to prevail on a breach of fiduciary duty claim under ERISA, a plaintiff must establish that … the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure."). Similarly, the Second, Sixth and Eleventh Circuits have required a showing of detrimental reliance for a plaintiff to prevail on an ERISA fiduciary-breach claim. *See*, *e.g.*, *Deschamps v. Bridgestone Ams., Inc. Salaried Emps. Ret. Plan*, 840 F.3d 267, 276-77 (6th Cir. 2016) (explaining, in ERISA action, that "[t]o establish a breach of [fiduciary] duty, [plaintiff] must show that … [he] detrimentally relied on the misrepresentations"); *Ballone v Eastman Kodak Co.*, 109 F.3d 117, 125 (2nd Cir 1997); *Hammond v. Reynolds Metals Co.*, 219 Fed.Appx. 910, 916-17 (11th Cir. 2007) (citing *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1074 (11th Cir. 2004).

Similarly, in the law of trusts, "constructive fraud"—which is a claim for "breach" of an "equitable duty" that stems from a "fiduciary … relationship"—requires that the person under the fiduciary obligation "induce justifiable reliance by the other to his detriment." *Dawson v. Withycombe*, 163 P.3d 1034, 1057-58 (Ariz. Ct. App. 2007); *see also McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 896 (Ind. Ct. App. 2007) ("[d]etrimental reliance is … an element of … constructive fraud"); 10 Stuart M. Speiser et al., *American Law of Torts* § 32:81 ("Once a fiduciary relationship is established, to state a claim for breach of fiduciary duty, the plaintiff must prove that a material misrepresentation was made, on which the plaintiff detrimentally and reasonably relied").

Moreover, equitable claims for misrepresentation, which are similar to fiduciary-breach claims, also require a showing of "reliance by [the plaintiff] to his detriment." *Jewish Ctr. of Sussex Cty. v. Whale*, 432 A.2d 521, 524 (N.J. 1981). And in the common law of torts, reliance is an essential element of a claim for misrepresentation, which is a close analogue to the fiduciary-breach claim alleged by plaintiffs in this case. *See*, *e.g.*, Restatement (Second) of Torts § 525 ("One who fraudulently makes a misrepresentation … for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."). Where fraud is alleged there must be a showing of reliance.

Finally, Plaintiffs concede in their Opposition – as they had to -- that they did not rely on the alleged misrepresentations set forth in the SAC. They thus concede that none of them changed their position because of the alleged misrepresentations. In other words, they concede that none of them were harmed by the alleged conduct. Plaintiffs nonetheless submit that the Court should adjudicate a claim for which they concede no harm resulted. Claims don't exist in a vacuum; the Court does not issue advisory opinions.

As discussed above (*see* (a), *supra*), nothing in the ASA governing documents suggests that geopolitical opinions should be criteria – material or not – for nominating Council candidates. Moreover, there is no allegation in the SAC to suggest that anyone in the voting membership cared about the candidates' positions on the Israeli/Palestinian conflict. There is certainly no allegation that the Plaintiffs would

have relied on such information in casting their own votes for the National Council, or that they cared, one way or the other, about such opinions until this lawsuit was filed. Without some factual allegation of reliance, Plaintiffs cannot demonstrate that they were misled by any statement, or omission of any statement, by the Nominating Committee, and thus cannot show a breach of fiduciary duty.

e. *Count Nine / "Waste"*

Plaintiffs claim that *Cowin* is inapposite, and that *Daley* stands for the proposition that the individuals may bring a claim for waste on behalf of the entity. Plaintiffs argue in their Opposition that "[n]othing in *Daley* suggests that the court would have ruled differently if the plaintiffs had not added a claim alleging that they were wrongly suspended from the sorority." Opposition, p. 15. This is striking, given the language of *Daley* and the decisions upon which it was based (see discussion, Section A.1, above). Plaintiffs again miss the distinction between standing in Superior Court and subject-matter jurisdiction in this Court. But to the Plaintiffs' oft-repeated argument that *Daley* and *Jackson* permit an individual member to bring a waste claim on behalf of an entity after having failed to comply with the derivative action requirements, Defendants offer the following from *Jackson*, which undercuts Plaintiffs' assertion:

> In this case, plaintiffs/appellees sought relief from appellants' conduct in (allegedly) barring them (but not all others) from church property and facilities and from attending church services and from appellants' allegedly unauthorized use of appellees' tithes and offerings. Judge Nash did not abuse his discretion in concluding that *because plaintiffs/appellees alleged an injury particularized to them and a "personal financial stake," they were entitled to proceed on the claims they brought on their own behalves, by which they sought relief from "a special injury ... not suffered equally by all" who affiliated with the church.*

*Jackson*, 146 A.3d at 415 (emphasis added).  *See also* fn. 6 of *Jackson*, in which the Court of Appeals explains that the trial judge had relied upon the "special exception" to the derivative action requirement, in which plaintiffs "allege a 'special injury' to themselves, apart from that suffered by the corporation [such as losses resulting from a company wrongfully withholding dividends]."

Plainly, the plaintiffs in *Daley* and *Jackson* were permitted to proceed on the basis of their individual injuries.

<b><u>CONCLUSION</u></b>

For the reasons set forth in the Motion to Dismiss [Document 106], and as to the waste claim, the Motion for Partial Judgment on the Pleadings [Document 35], the Second Amended Complaint should be dismissed.

Respectfully submitted,


/s/
John J. Hathway, Esq. #412664
Thomas Mugavero, Esq. #431512
Whiteford, Taylor & Preston L.L.P.
1800 M Street, N.W., Suite 450N
Washington, D.C. 20036-5405
(202) 659-6800
jhathway@wtplaw.com
tmugavero@wtplaw.com

/s/_____
Jeff C. Seaman, Esq. #466509
Whiteford, Taylor & Preston L.L.P.
7501 Wisconsin Avenue
Suite 700W
Bethesda, MD 20816
(301) 804-3610
jseaman@wtplaw.com

*Counsel for the American Studies
Association, Lisa Duggan, Sunaina Maira,
Curtis Marez, Chandan Reddy, John
Stephens and Neferti Tadiar*